## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | |
|---|---|
| COUNTY OF MONMOUTH; DIANE SCAVELLO, Individually and on behalf of all others similarly situated<br><br>v.<br><br>RITE AID CORPORATION; RITE AID HDQTRS. CORP.,<br><br>*Appellants* | No. 23-1655 |

## APPELLANTS' NOTICE OF PERMANENT INJUNCTION AND DISCHARGE

**PLEASE TAKE NOTICE** that, on October 15, 2023, Rite Aid Corporation and certain of its affiliates and subsidiaries (collectively, the "Reorganized Debtors" and, prior to August 30, 2024, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") commencing cases which were jointly administered under the lead case *In re Rite Aid Corp.*, Case No. 23-18993 (MBK) (collectively, the "Chapter 11 Cases"). Pursuant to 11 U.S.C. § 362, the above-captioned action was automatically stayed during the pendency of the Chapter 11 Cases.

**PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court confirmed the Debtors' Plan of Reorganization on June 28, 2024, and issued the *Order Approving the Disclosure Statement and Confirming the Second Amended Joint*

*Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (With Further Modifications)* [Docket No. 4532] (the "<u>Confirmation Order</u>") on August 16, 2024.  Copies of the Confirmation Order and the Debtors' Plan of Reorganization are attached hereto as **Exhibit A**. [1]  The Debtors' Plan of Reorganization went into effect on August 30, 2024 (the "<u>Effective Date</u>").  A copy of the notice of effective date is attached hereto as **Exhibit B**.

 **PLEASE TAKE FURTHER NOTICE** that pursuant to the Confirmation Order, any claim, interest, or cause of action against the Debtors or their property that arose before the Effective Date and is not otherwise addressed pursuant to the Confirmation Order, Plan, or related papers has been discharged and the pursuit of any such claim, interest, or cause of action, whether known or unknown, has been permanently enjoined.   Confirmation Order ¶ 179; *see also id.* ¶¶ 200-01 (implementing channeling injunction).  Accordingly, as of August 30, 2024, the automatic stay that applied to the above-captioned case during the pendency of the Chapter 11 Cases was replaced by a discharge injunction in accordance with 11 U.S.C. § 524(a)(2), permanently enjoining the pursuit of the claims asserted against the Reorganized Debtors in the above-captioned case outside of the process established by the Bankruptcy Court.  No order has been entered in the Chapter 11

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or Confirmation Order.

Cases granting relief from the discharge injunction with respect to the above-captioned case.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Article XIII of the Plan, "on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, except as otherwise set forth in th[e] Plan, over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code." Plan Art. XIII; *see also* Confirmation Order ¶ 275 (incorporating Article XIII of the Plan). As set forth in Article XIII of the Plan, the Bankruptcy Court expressly retains "jurisdiction to: . . . adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code," *i.e.*, the provision of the Bankruptcy Code that provides for the discharge of debts pursuant to the confirmation of a plan. *See* Plan Art. XIII(7); 11 U.S.C. § 1141(d).

**PLEASE TAKE FURTHER NOTICE** that except as otherwise provided in the Plan, any party that did not opt in to the releases contained in Article X.D of the Plan (or, other than Allowed General Unsecured Claims, any party who was deemed to reject the Plan) and that seeks to assert a claim against a Released Party must first obtain a final order from the Bankruptcy Court, after notice and a hearing, (i) determining that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan and (ii) specifically authorizing such party to bring such claim against any Released Party. *See* Plan Art. X.D; Confirmation Order ¶ 22. Except as otherwise provided in the Plan or the Confirmation Order, the

Bankruptcy Court retains sole and exclusive jurisdiction to determine whether a claim constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action. *See* Confirmation Order ¶ 22.

**PLEASE TAKE FURTHER NOTICE** that pleadings filed in the Chapter 11 Cases may be obtained free of charge by visiting the website of the Reorganized Debtors' noticing and claims agent, Kroll Restructuring Administration, at https://restructuring.ra.kroll.com/RiteAid/.   You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov/ (PACER login and password required) in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that, consistent with the bankruptcy discharge and injunction, the Reorganized Debtors respectively request that the Court administratively terminate the above-captioned case.

Dated: September 23, 2024                    Respectfully submitted,

                                             **Morgan, Lewis & Bockius LLP**

                                             */s/ Stephanie Schuster*
                                             Stephanie Schuster
                                              DC Bar No. 1011924
                                             1111 Pennsylvania Avenue, NW
                                             Washington, DC 20004

T: 202.739.3000
stephanie.schuster@morganlewis.com

Franco A. Corrado
  PA Bar No. 91436
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
T: 215.963.5843
franco.corrado@morganlewis.com

Joseph Bias
  CA Bar No. 257127
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071
T: 213.612.2500
joseph.bias@morganlewis.com

*Attorneys for Appellants Rite Aid*
*Corporation and Rite Aid Hdqtrs Corp.*

## **CERTIFICATE OF COMPLIANCE**

1.      This document contains 810 words, excluding the items exempted by

Federal Rule of Appellate Procedure 32(f).

2.      The document complies with the typeface and type style requirements

of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was

prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft

365 MSO in Times New Roman 14-point font.

Dated:  September 23, 2024                               */s/ Stephanie Schuster*_____

## **CERTIFICATE OF SERVICE**

I hereby certify that counsel for all parties are registered as Filing Users of the Court's CM/ECF system and that a copy of this Appellants' Notice of Permanent Injunction and Discharge will be served electronically on this date by operation of the Court's CM/ECF system.

Dated:  September 23, 2024                    */s/ Stephanie Schuster*

# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**Order Filed on August 16, 2024
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

| | |
|---|---|
| In Re:<br><br>Rite Aid Corporation | Case No.: 23-18993<br><br>Chapter: 11<br><br>Judge: Michael B. Kaplan |

ORDER
APPROVING THE DISCLOSURE
STATEMENT AND CONFIRMING THE
SECOND AMENDED JOINT CHAPTER 11 PLAN
OF REORGANIZATION OF RITE AID CORPORATION
AND ITS DEBTOR AFFILIATES (WITH FURTHER MODIFICATIONS)

The relief set forth on the following page is **ORDERED**.

**DATED: August 16, 2024**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Caption in Compliance with D.N.J. LBR 9004-1(b)

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel for Debtors and Debtors in Possession*

(Page | 3)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

The above-captioned debtors (collectively, the "Debtors") having:

a.  commenced, on October 15, 2023 (the "Petition Date"), these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b.  continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

c.  filed on October 16, 2023, the *Declaration of Jeffrey S. Stein in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 20] (the "First Day Declaration"), detailing the facts and circumstances leading up to these Chapter 11 Cases;

d.  filed, on October 16, 2023, (i) the *Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 42] (as amended, supplemented, or otherwise modified from time to time, the "Plan"), (ii) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 43] (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"),[2] and (iii) the *Debtors' Motion for Order Approving Certain Dates and Protocols* [Docket No. 14];

e.  served, on or before November 3, 2023, a notice of commencement (the "Notice of Commencement") on all known parties in interest, which informed recipients that the Debtors commenced their Chapter 11 Cases on October 15, 2023;

f.  obtained, on November 20, 2023, the entry of the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 703] (the "Bar Date Order");

g.  obtained, on December 20, 2023, the entry of the *Order (I) Approving Entry into the MedImpact Seller Financing Documents and (II) Granting Related Relief* [Docket No. 1139] (the "Seller Financing Order");

---

2   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan. The rules of interpretation set forth in Article I.B of the Plan apply to this Confirmation Order.

(Page | 4)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

h.     obtained, on January 17, 2024, the entry of the *Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Elixir APA, (III) Approving Assumption and Assignment of Certain Executory Contracts, and (IV) Granting Related Relief* [Docket No. 1510] (the "Elixir Sale Order");

i.     filed, on January 31, 2024, the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 1971];

j.     filed, on February 16, 2024, the *Debtors' Amended Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 1976] (the "Amended Disclosure Statement Motion");

k.     filed, on February 19, 2024, (i) the *Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 1992] and (ii) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 1993];

l.     filed, on March 28, 2024, (i) the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 2466] and (ii) the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 2467];

m.     obtained, on March 28, 2024, the entry of the *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 2482] (the "Conditional Disclosure Statement Order"), conditionally approving the Disclosure Statement and approving the Confirmation timeline, the solicitation procedures (the "Solicitation Procedures"), the notices of (i) the combined hearing (the "Combined Hearing" and, such notice, the "Combined Hearing Notice") to be held to consider the adequacy of the Disclosure Statement and confirmation of the Plan ("Confirmation") and (ii) the non-voting status (the "Notice of Non-Voting Status"), the cover letter, and other

(Page | 5)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

related forms and ballots (the foregoing materials, collectively, the "Solicitation Packages");

n. filed, on April 2, 2024, (i) the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 2511] and (ii) the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 2512], reflecting modifications to the Plan and Disclosure Statement filed at Docket Nos. 2466 and 2467, respectively, and representing solicitation of versions of the Plan and Disclosure Statement;

o. caused the Solicitation Packages, the Combined Hearing Notice, and the deadline for objecting to approval of the Disclosure Statement and Confirmation, to be distributed on or before April 2, 2024 (or as otherwise detailed in the Affidavit of Solicitation), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"), as evidenced by, among other things, the *Affidavit of Service of Solicitation Materials* [Docket No. 2939] (together with all exhibits thereto, the "Affidavit of Solicitation");

p. published the Combined Hearing Notice on April 4, 2024 in *The New York Times*, and on April 5, 2024 in the *Financial Times (International Edition)*, as evidenced by the *Affidavit of Publication – The Financial Times* [Docket No. 2823] and the *Proof of Publication – The New York Times* [Docket No. 2822] (the "Publication Affidavits" and, together with the Affidavit of Solicitation, the "Affidavits");

q. filed, on April 8, 2024, the *Notice of Filing Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 2675] (the "Initial Plan Supplement");

r. filed, on April 8, 2024, the *Notice of the Occurrence of the Sale Transaction Restructuring Notice Deadline and Debtors' Decision to Pursue Plan Restructuring* [Docket No. 2680];

s. filed, on April 9, 2024, the *Notice of Filing of Amended Plan Supplement* [Docket No. 2681] (the "Amended Plan Supplement");

(Page | 6)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

t.     filed, on April 10, 2024, the *Notice of Filing of Second Amended Plan Supplement* [Docket No. 2697] (the "Second Amended Plan Supplement");[3]

u.     filed, on April 10, 2024, the *Notice and Non-Tort Third-Party Release Opt-Out Form* in the Second Amended Plan Supplement and the *Notice of Third-Party Release and Opportunity to Opt Out* in the Second Amended Plan Supplement;[4]

v.     filed, on April 18, 2024, the *Notice of Adjournment of the Combined Hearing*;

w.     filed, on May 13, 2024, the *Notice of Filing of Third Amended Plan Supplement* [Docket No. 3420];

x.     filed, on June 5, 2024, the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (As Modified)* [Docket No. 3711];

y.     published, on June 6, 2024, the *Notice of Adjourned Hearing to Consider Confirmation of the Chapter 11 Plan and Final Approval of the Disclosure Statement Filed by the Debtors and Related Voting and Objection Deadlines* in *The New York Times* [Docket No. 3735] and the *Financial Times* [Docket No. 3736];

z.     obtained, on June 14, 2024, entry of the *Order Extending the Voting Deadline and the Deadline to File the Voting Report* [Docket No. 3777] (the "Second Scheduling Order");

aa.    filed, on June 14, 2024, the *Notice of Filing of Fourth Amended Plan Supplement* [Docket No. 3790];

bb.    filed, on June 19, 2024, the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (As Further Modified)* [Docket No. 3833];

cc.    filed, on June 20, 2024, the *Stipulation Regarding the Second Amended Joint Chapter 11 Plan of Reorganization of Debtor Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 3850];

---

[3]    For purposes of the Plan and this Confirmation Order, the Plan Supplement is included in the definition of "Plan."

[4]    The Debtors will file an amended *Notice of Third-Party Release and Opportunity to Opt In*, with an opportunity for parties to object to the Opt-In Form prior to the Opt-In Form being issued, and, following either the resolution of any objections or the expiration of the objection period, the Opt-In Form will be deemed approved.

(Page | 7)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

dd.     filed, on June 20, 2024, the *Debtors' Memorandum of law in Support of (I) Approval of the Adequacy of the Debtors' Disclosure Statement and (II) Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtors Affiliates (As Further Modified)* [Docket No. 3861] (the "Confirmation Brief");

ee.     filed, on June 20, 2024, the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of Rite Aid Corporation, in Support of Confirmation* [Docket No. 3862] (the "Stein Declaration"), which was admitted into evidence at the Combined Hearing;

ff.     filed, on June 20, 2024, the *Declaration of Carrie W. Teffner, in Support of Confirmation* [Docket No. 3863] (the "Teffner Declaration"), which was admitted into evidence at the Combined Hearing;

gg.     filed, on June 20, 2024, the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* [Docket No. 3864]  (the "Voting Report"), which accounts for Ballots received up to the Voting Deadline;

hh.     filed, on June 22, 2024, the *Notice of Filing of Fifth Amended Plan Supplement* [Docket No. 3891];

ii.     filed, on July 12, 2024, the *Notice of Filing of Sixth Amended Plan Supplement* [Docket No. 4218];

jj.     filed, on July 31, 2024, the *Notice of Filing of Seventh Amended Plan Supplement* [Docket No. 4454];

kk.     filed, on August 15, 2024, the *Notice of Filing of Eighth Amended Plan Supplement* [Docket No. [●]] and

ll.     filed, on August 15, 2024, the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (With Further Modifications)* [Docket No. [●]].

(Page | 8)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No.: | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

## THE BANKRUPTCY COURT HAVING:

a.   set June 18, 2024, at 5:00 p.m. (prevailing Eastern Time),[5] as the deadline for voting on the Plan (the "Voting Deadline") and for Filing objections to the adequacy of the Disclosure Statement and/or Confirmation (the "Objection Deadline");

b.   set June 27, 2024, at 10:00 a.m. (prevailing Eastern Time),[6] as the date and time for the Combined Hearing, pursuant to sections 1125, 1126, 1128, and 1129 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, as set forth in the Conditional Disclosure Statement Order;

c.   reviewed the Plan, the Disclosure Statement, the Amended Disclosure Statement Motion, the Plan Supplement, the Confirmation Brief, the Voting Report, the Declarations, the Combined Hearing Notice, the Affidavits, and all Filed pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and Confirmation, including all objections, statements, and reservations of rights;

d.   considered the Restructuring Transactions incorporated and described in the Plan;

e.   held the Combined Hearing;

f.   heard the statements and arguments made by counsel in respect of approval of the Disclosure Statement and Confirmation;

g.   considered all oral representations, testimony, documents, filings, and other evidence regarding approval of the Disclosure Statement and Confirmation;

h.   overruled (i) any and all objections to the Plan, to Confirmation, and to approval of the Disclosure Statement, except as otherwise stated herein or indicated on the record, and (ii) all statements, joinders, and reservations of rights not consensually resolved, agreed to, adjourned, or withdrawn unless otherwise indicated; and

---

[5]   The Bankruptcy Court originally set April 15, 2024, at 4:00 p.m. (prevailing Eastern Time) as the Voting Deadline. The Bankruptcy Court modified the Voting Deadline in the *Confirmation Scheduling Order* [Docket No. 3684] (the "Scheduling Order") to June 14, 2024. The Bankruptcy Court further modified the Voting Deadline in the Second Scheduling Order to June 18, 2024 at 5:00 p.m. (prevailing Eastern Time). The Bankruptcy Court further modified the Voting Deadline in the *Order Extending the Voting Deadline and the Deadline to File the Voting Report* [Docket No. 3777] to June 18, 2024 at 5:00 p.m. (prevailing Eastern Time).

[6]   The Bankruptcy Court originally set April 22, 2024, at 10:00 a.m. (prevailing Eastern Time) as the Voting Deadline. The Bankruptcy Court rescheduled the Combined hearing in the Scheduling Order to June 27, 2024.

(Page | 9)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

     i.     taken judicial notice of all pleadings and other documents Filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Bankruptcy Court that the Combined Hearing Notice and the opportunity for any party in interest to object to approval of the Disclosure Statement and Confirmation having been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents Filed in support of approval of the Disclosure Statement and Confirmation and other evidence presented at the Combined Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court makes and issues the following findings of fact and conclusions of law, and orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:**

**A.    Findings and Conclusions.**

1.    The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. All findings of fact and conclusions of law announced by the Bankruptcy Court at the Combined Hearing in relation to approval of the Disclosure Statement and Confirmation, including any rulings made on the record at the Combined Hearing, are hereby incorporated into this Confirmation Order. To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

**B.      Jurisdiction, Venue, and Core Proceeding.**

2.      This Bankruptcy Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court under Title 11* of the United State District court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). Consideration of whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  This Bankruptcy Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**C.      Eligibility for Relief.**

3.      The Debtors were and are Entities eligible for relief under section 109 of the Bankruptcy Code.

**D.      Commencement and Joint Administration of these Chapter 11 Cases.**

4.      On the Petition Date, each of the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.   In accordance with the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 122], these Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015.   Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   On November 2, 2023, the U.S. Trustee appointed an official committee of unsecured creditors [Docket No. 431] (the "UCC") and an

(Page | 11)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

official committee of tort claimants [Docket No. 432] (the "TCC" and, together with the UCC, the "Committees") in these Chapter 11 Cases.  On March 15, 2024, the Bankruptcy Court appointed a fee examiner [Docket No. 2375].

### E.    The Bar Dates.

5.    On November 20, 2023, the Bankruptcy Court entered the Bar Date Order setting (a) January 12, 2024, as the last day for filing Proofs of Claim (including Proofs of Claim for Claims arising under section 503(b) of the Bankruptcy Code against the Debtors that arose (or was deemed to have arisen) before the Petition Date) and (b) April 12, 2024 as the last day for filing Proofs of Claim of Governmental Units (as defined in the Bar Date Order).[7]

### F.    Modifications to the Plan.

6.    Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan described or set forth in this Confirmation Order (the "Modifications") constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest under the Plan.  The Modifications made to the Plan between solicitation and Confirmation comply in all respects with section 1127 of the Bankruptcy Code.  Specifically, Modifications with respect to any settlements resulting from negotiations,

---

[7]    As to the United States, the Court has entered the *Consent Order (I) Further Extending Rule 4007(c) Deadline for United States to File a Complaint to Determine Dischargeability of Certain Debts Pursuant to 11 U.S.C. § 1141(d)(6), and (II) Extending the Governmental Bar Date for Certain Claims of the United States* [Docket No. 2897] (the "DOJ Extension Order"), which, among other things, extends the Governmental Bar Date for the United States to file Proofs of Claim on account of any DOJ Claims until fourteen (14) days following the Effective Date.  Notwithstanding the confirmation of the Plan, anything to the contrary in this Confirmation Order, or any other Document, or the occurrence of the Effective Date, the DOJ Extension Order shall remain fully effective and enforceable in accordance with its terms.

(Page | 12)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

including the Committee Settlement (and the Settlement of Opioid Claims and the UCC / TCC Allocation Agreement included therein) incorporated into the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (As Further Modified)* [Docket No. 3833] and set forth in this Confirmation Order do not materially and adversely affect the treatment of any Claims against, or interest in, the Debtors. The Debtors' key constituents that are affected by, or whose clients representing parties are affected by, the Modifications (including the Committees, the DIP Agents, the Junior DIP Noteholders, the Ad Hoc Secured Noteholder Group, the DOJ, McKesson, and the Ad Hoc Group of States) negotiated the Modifications and support, or otherwise have not objected to, the Modifications.

7. Notice of the Modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, the Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims in the Voting Class (as defined herein) be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan is properly before this Bankruptcy Court and all votes cast with respect to the Plan prior to the Modifications shall be binding and shall apply with respect to the Plan.

**G.     Plan Supplement.**

8. The Plan Supplement (including as subsequently amended, supplemented, or otherwise modified from time to time in accordance with the Plan) complies with the Bankruptcy Code and the terms of the Plan and this Confirmation Order under the facts and circumstances of

(Page | 13)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

these Chapter 11 Cases, including those adduced at the Combined Hearing, and the Debtors

provided sufficient notice of the Filing of the Plan Supplement under the facts and circumstances

of these Chapter 11 Cases, including those adduced at that Combined Hearing, in accordance with

the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the

Local Rules, and this Confirmation Order, and all other applicable rules, laws, and requirements,

and no other or further notice is required with respect to the Plan Supplement or any of the

documents contained therein or relating thereto.  All documents included in the Plan Supplement

are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the

Plan and this Confirmation Order (including the consent rights reflected therein), and only

consistent therewith, and in accordance with section 1127(b) of the Bankruptcy Code, the Debtors

reserve the right to alter, amend, update, or modify the Plan Supplement before the Effective Date.

The Filing and notice of the documents included in the Plan Supplement were adequate and proper

and in compliance with this Bankruptcy Court's orders, including this Confirmation Order.  For

the avoidance of doubt, any Plan Supplement documents filed after entry of this Confirmation

Order shall not be inconsistent with the Plan or this Confirmation Order.  All parties' rights are

reserved solely with respect to whether any such subsequent filings are inconsistent with the Plan

or this Confirmation Order, *provided, however*, that (i) such challenges must be brought no later

than seven days following the filing of any such Plan Supplement Documents, (ii) any challenging

party consents to, and will seek, expedited consideration of any such challenge, which the Debtors

will not oppose, and (iii) any such challenge must be decided by this Court prior to the Effective

(Page | 14)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Date, *provided* that the Effective Date will not occur sooner than the deadline for challenges set forth in clause (i).

### H.     Disclosure Statement.

9.     The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein.  The filing of the Disclosure Statement with the clerk of the Bankruptcy Court satisfied Bankruptcy Rule 3016(b).

### I.     Burden of Proof—Confirmation of the Plan.

10.     The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard. Each witness who testified and/or submitted a declaration on behalf of the Debtors in connection with Confirmation was credible, reliable, and qualified to testify and/or submit such Declaration as to the topics addressed in his or her testimony.

### J.     Notice.

11.     As evidenced by the Affidavits and the Voting Report, the Debtors provided due, adequate, and sufficient notice of the commencement of these Chapter 11 Cases, the Disclosure Statement, the Plan, the Combined Hearing, together with all deadlines for voting to accept or

(Page | 15)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

reject the Plan as well as objecting to the Disclosure Statement and the Plan in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002, 3017, and 2018, the Local Rules, and the procedures set forth in the Conditional Disclosure Statement Order. Further, the Combined Hearing Notice was published in *The New York Times* and the *Financial Times (International Edition)* on April 5, 2024 in compliance with Bankruptcy Rule 2002(i), as evidenced by the Publication Affidavit, and the Combined Hearing Notice was properly served on parties in interest on April 2, 2024, as evidenced by the Affidavit of Service.

12.     The Solicitation Packages and the Combined Hearing Notice were transmitted and served in compliance with this Bankruptcy Court's orders, and such transmission and service were timely, adequate, and sufficient under the facts and circumstances of these Chapter 11 Cases in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Conditional Disclosure Statement Order. No other or further notice is or shall be required.

**K.    Voting Report.**

13.     Prior to the Combined Hearing, the Debtors Filed the Voting Report. As described in the Voting Report, the solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases, and complied with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable rules, laws, and regulations.

(Page | 16)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

**L.  Solicitation.**

14.  The period during which Holders of Claims in the Voting Class were required to submit acceptances or rejections to the Plan was reasonable, appropriate, and sufficient for such Holders to make an informed decision to accept or reject the Plan.

**M.  Ballots.**

15.  The Class of Claims entitled to vote under the Plan to accept or reject the Plan (the "Voting Class") is set forth below:

| Class | Designation |
|---|---|
| 5 | Senior Secured Notes Claims |

16.  The form of Ballots attached to the Conditional Disclosure Statement Order as Exhibit 3A and Exhibit 3B that the Debtors used to solicit votes to accept or reject the Plan from Holders of Claims in the Voting Class adequately addressed the particular needs of these Chapter 11 Cases and were appropriate for Holders in the Voting Class to vote to accept or reject the Plan.

**N.  Voting.**

17.  As evidenced by the Voting Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Conditional Disclosure Statement Order, and any applicable nonbankruptcy law, rule, or regulation.  The Solicitation Packages were transmitted and served, including to all Holders of Claims in the Voting Class, in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the Conditional Disclosure Statement Order, and any

(Page | 17)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

applicable nonbankruptcy law. Transmission and service of the Solicitation Packages were timely, adequate, and sufficient under the facts and circumstances of these Chapter 11 Cases. No further notice of the documents included in the Solicitation Packages was required. The Solicitation Packages were distributed to Holders in the Voting Class that held a Claim in such class as of February 20, 2024 (the "Voting Record Date").

18.    The establishment and notice of the Voting Record Date were reasonable and sufficient, and, as evidenced by the Voting Report, the Voting Class has voted to accept the Plan.

19.    As set forth in the Plan and Disclosure Statement, Holders of Claims in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 3 (ABL Facility Claims), and Class 4 (FILO Term Loan Facility Claims) (collectively, the "Unimpaired Classes") are Unimpaired and conclusively presumed to have accepted the Plan. Holders of Claims and Interests in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) (the "Deemed Accepting/Rejecting Classes") are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or are Impaired and deemed to reject the Plan (to the extent cancelled), and, in either event, are not entitled to vote to accept or reject the Plan. Holders of Claims and Interests in Class 6 (General Unsecured Claims), Class 9 (Existing Equity Interests in Rite Aid), and Class 10 (Section 510(b) Claims) (the "Deemed Rejecting Classes" and, together with the Unimpaired Classes and the Deemed Accepting/Rejecting Classes, the "Non-Voting Classes") are Impaired and deemed to reject the Plan.

**O.    Releases, Exculpation, and Injunction.**

(Page | 18)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

20.     The Plan and all modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and the Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, with specific and conspicuous language, all acts to be enjoined and identify the Entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

**P.     Service of Opt-In Form.**

21.     Following Confirmation, the Debtors will provide all Holders of Claims and Interests in Class 6 with the Opt-In Form enabling such Holders to opt in to the Third-Party Release.  For the avoidance of doubt, any party that does not elect on the applicable Opt-In Form to opt in to the Third-Party Release prior to the applicable deadline to submit an Opt-In Form, whether under an original or extended deadline, shall be neither a Released Party nor a Releasing Party under the Plan.

**Q.     Gatekeeper Provision.**

22.     Article X.D of the Plan contains a provision that, except as otherwise provided in the Plan, requires Entities that (a) did not opt in to the releases contained in Article X.D of the Plan or (b) other than Allowed General Unsecured Claims, were deemed to reject the Plan, before they may assert a claim or Cause of Action against a Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases in Article X.C of the Plan, to first obtain a Final Order of the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan and

(Page | 19)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

(b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party (the "Gatekeeper Provision"). Except as otherwise provided in the Plan or this Confirmation Order, the Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

23. Notwithstanding anything to the contrary in the Plan or in this Confirmation Order, and for the avoidance of doubt, the Debtors shall not be released from liability for any Tort Claims; *provided, however*, that any recovery for any such Tort Claim against the Debtors (or their Affiliates), including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors or the Wind Down Debtors, and no Person, Entity, or other party shall execute, garnish, or otherwise attempt to collect any recovery on account of a Tort Claim from any assets other than the Litigation Trust Assets and the GUC Equity Pool, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.

24. For the avoidance of doubt and notwithstanding anything to the contrary herein, in the Plan Supplement, this Confirmation Order or otherwise, any recovery on behalf of claims or Causes of Action (if any) contributed to the Litigation Trust or a GUC Sub-Trust against any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with the Plan (including those not included in the definition of Debtor Related Parties) shall be expressly limited to proceeds of the applicable Insurance Policies, and no Person, Entity,

(Page | 20)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

or otherwise shall attempt to collect on assets of any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with the provisions of the Plan (including those not included in the definition of Debtor Related Parties), except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability, and all such directors and officers shall have the full protections of any existing D&O Liability Insurance Policies.

**R. The Plan Settlements.**

25. The settlements reached in the Mediation, including, but not limited to, the McKesson Settlement, the DOJ Settlements (solely to the extent approved pursuant to the Plan and not pursuant to separate Bankruptcy Court order, as further detailed and defined in paragraph 28 herein), the settlement with the Ad Hoc Group of States (the "States' Settlement"), and the Committee Settlement, including the UCC / TCC Allocation Agreement and the Settlement of Opioid Claims (collectively, the "Plan Settlements"), are integrated in nature. Each of the Plan Settlements satisfies the standards for approval under sections 1123(b)(3)(a) and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019, and to the maximum extent permitted by the Bankruptcy Code, solely to the extent approval is sought pursuant to the Plan.

26. **The McKesson Settlement.** The McKesson Settlement constitutes a good-faith compromise and settlement of all claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved between the Debtors and their Affiliates, on the one hand, and McKesson, on the other hand, including with respect to the McKesson 503(b)(9) Settlement, the McKesson Prepetition Contract, and the McKesson New Contract. The McKesson

(Page | 21)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

27.     Upon the granting of Liens in accordance with the McKesson Settlement Documents and this Confirmation Order, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the McKesson Settlement Documents, as applicable.  The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the McKesson Settlement Documents, as applicable, have been or will have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value, as an inducement to McKesson to extend credit thereunder, shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purpose whatsoever under the Bankruptcy Code or any applicable non-bankruptcy law.  No party shall be permitted to challenge the validity, enforceability, allowability, priority, secured status, or amount of any Lien granted under the McKesson Settlement Documents, as applicable.  To the extent applicable, the Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents, necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required).

(Page | 22)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

28. **The DOJ Settlements.** The Debtors seek approval of the DOJ Settlements pursuant to the Plan. The DOJ Elixir Settlement and the DOJ White Settlement (together, the "DOJ Settlements") constitute good-faith compromises and settlements of the Claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved by the DOJ Settlements between the Debtors and their Affiliates, on the one hand, and the United States Department of Justice, on behalf of the United States, on the other hand, and this Bankruptcy Court finds that each DOJ Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. The DOJ Settlements shall be approved pursuant to this Confirmation Order.

29. **The States Settlement.** The States' Settlement constitutes a good-faith compromise and settlement of all Claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved between the Debtors and their Affiliates, on the one hand, and the Settling States (as defined in the Controlled Substance Injunction), on the other hand. Pursuant to the States Settlement, the Debtors and the Settling States agree to the terms of the Controlled Substance Injunction attached to the Plan as Exhibit A. The States' Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

30. **The Committee Settlement.** The Committee Settlement, other than the Settlement of Opioid Claims, which is addressed in paragraph 31 of this Order, constitutes a good-faith compromise and settlement of all claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved therein between the Debtors and their Affiliates, the

| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

DIP Agents, the Junior DIP Noteholders, the Ad Hoc Secured Noteholder Group, and the Committees. The Committee Settlement is the result of arm's-length negotiations among numerous parties and on several key issues, including, but not limited to, the Assigned Claims and Assigned Insurance Rights and the releases in the Plan. The Committee Settlement is fair, equitable, reasonable, an essential element of the Plan, as are the Litigation Trust, any GUC Sub-Trusts, the GUC Equity Trust, and the Committee Settlement Documents, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. The entry of this Confirmation Order constitutes the Bankruptcy Court's finding that the applicable terms of the Committee Settlement incorporated in the Plan and the Plan Supplement, including the UCC / TCC Allocation Agreement, are (i) in the best interests of Holders of General Unsecured Claims, including Tort Claims, and in the best interests of the Debtors and their Estates, (ii) on account of value provided to the Estates, including through resolution of the Committees' potential objections, and (iii) given and made with adequate and appropriate notice. The Committee Settlement Documents, and the mechanisms, criteria and procedures therein for operating the GUC Equity Trust, Litigation Trust and any GUC Sub-Trusts and resolving General Unsecured Claims and allocating value to and among General Unsecured Claims, including Tort Claims, are fair and reasonable with respect to holders of General Unsecured Claims in light of the benefits to be provided. All documents and agreements necessary to implement the applicable terms of the Committee Settlement, including, but not limited to, the Committee Settlement Documents, and any supplemental documentation contemplated thereby, are essential elements of the Committee Settlement and the Plan, and have been negotiated in good faith, at arm's length, and without

| Debtors: | RITE AID CORPORATION, *et al*. |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

collusion or fraud, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, their Estates, and holders of General Unsecured Claims and shall, upon completion of documentation and execution, be valid, binding, and enforceable and not be in conflict with any federal, state, foreign, or local law. The provisions of the Committee Settlement Documents (including the provisions therein setting forth the allocation and distribution of consideration) are premised on the consideration provided under the applicable terms of the Committee Settlement and the Plan, were negotiated in good faith and at arm's length, and are fair and reasonable.

31. **Settlement of Opioid Claims.** The Settlement of Opioid Claims, which is a part of the Committee Settlement, constitutes a good-faith compromise and settlement of the Opioid Claims between the Debtors and the TCC, that as of the Petition Date and with the Bankruptcy Court's approval of the settlement in the Plan, the Debtors have stipulated with the TCC that the Debtors were legally obligated to pay Opioid Claimants an amount equal to at least $2.352 billion on a nominal basis. For the avoidance of doubt, nothing in this Confirmation Order constitutes a finding with respect to the Debtors' liability for Opioid Claims, including, without limitation, as to the actual value of the Debtors' liability for Opioid Claims, or that the methodology used to reach the Settlement of Opioid Claims is the correct way to assess the Debtors' liability for Opioid Claims; rather, the Court is (i) approving the Settlement of Opioid Claims under Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code, (ii) acknowledging the fact of the Stipulation, that the Stipulation has been agreed to by the Debtors and the TCC, and that the words of the Stipulation speak for themselves, and (iii) finding that the Settlement of Opioid Claims establishes a debt owed

(Page | 25)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

by the Debtors. In approving the Settlement of Opioid Claims, the Court is not making any rulings regarding the allocation of Opioid Claims, the merits of Opioid Claims, or the actual value of the Opioid Claims, individually or in the aggregate. The Settlement of Opioid Claims is not an admission of liability by the Debtors regarding any individual claim, nor an admission that any value should be ascribed to any Opioid Claim. The Settlement of Opioid Claims is the result of good faith, arm's-length negotiations among several parties and on several key issues, including, but not limited to, the Opioid Claims, the Assigned Insurance Rights, and the releases in the Plan. The Settlement of Opioid Claims is fair, equitable, reasonable, an essential element of the Plan, and in the best interests of the Debtors, the Estates, and Holders of Opioid Claims. The entry of this Confirmation Order constitutes the Bankruptcy Court's finding that the applicable terms of the Settlement of Opioid Claims incorporated in the Plan and the Plan Supplement, are (i) in the best interest of Holders of Opioid Claims, and in the best interests of the Debtors and their Estates, (ii) on account of value provided to the Estates, including through resolution of potential objections by the TCC and/or the Holders of Opioid Claims; *provided* that nothing in this Confirmation Order constitutes a finding as to the actual value of the Debtors' liability for Opioid Claims, and (iii) given and made with adequate and appropriate notice. The terms of the Settlement of Opioid Claims are fair and reasonable with respect to the Holders of Opioid Claims in light of the benefits to be provided. The provisions of the Settlement of Opioid Claims (including the *Stipulation Regarding the Plan* [Docket No. 3850]) are essential elements of the Settlement of Opioid Claims and the Plan, are premised on the consideration provided under the applicable terms of the Settlement of Opioid Claims and the Plan, and were negotiated in good faith and at arm's length,

(Page | 26)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

and without collusion or fraud, and are fair and reasonable settlements under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. With respect to the Settlement of Opioid Claims, Article IV.F of the Plan and Paragraphs 148 through 152 of this Confirmation Order are incorporated herein. For the avoidance of doubt, nothing in Article IV.B. of the Plan or this Paragraph 31 is intended to alter or enlarge the rights and obligations of any insurer under any Insurance Policy.

32. Pursuant to the Bankruptcy Code, including Bankruptcy Code section 1123, the Debtors have authority to propose and negotiate a resolution of Opioid Claims and, with approval of the Bankruptcy Court, enter into a resolution of Opioid Claims through the Plan. The Settlement of Opioid Claims embodied in the Plan, is fair, equitable and reasonable and was entered into in good faith based on arm's-length negotiations. For the avoidance of doubt, nothing in this Confirmation Order constitutes a finding regarding the Debtors' liability for Opioid Claims, including, without limitation, the actual value of the Debtors' liability for Opioid Claims or that the methodology used to reach the Settlement of Opioid Claims is the correct way to assess the Debtors' liability for Opioid Claims, the allocation of Opioid Claims, the merits of Opioid Claims, or the actual value of Opioid Claims, individually or in the aggregate.

**S.    New Common Stock.**

33. The issuance and distribution of the New Common Stock are essential elements of the Plan and the Debtors' ability to emerge from chapter 11 and is approved in all respects.

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

### T.     Exit Facilities, Exit 1.5 Lien Notes, and Takeback Facility.

34.     The Exit Facilities, the Exit Facilities Documents, the Exit 1.5 Lien Notes, the Exit 1.5 Lien Notes Documents, the Takeback Notes, and the Takeback Notes Documents are each an essential element of the Plan, necessary for Confirmation and Consummation, and critical to the overall success and feasibility of the Plan.   Entry into the Exit Facilities, the Exit Facilities Documents, the Exit 1.5 Lien Notes, the Exit 1.5 Lien Notes Documents, the Takeback Notes, and the Takeback Notes Documents are in the best interests of the Debtors and their Estates.   The Debtors have exercised reasonable business judgment in determining to enter into the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents and have or will have provided sufficient and adequate notice of the material terms of the Exit Facilities, the Exit 1.5 Lien Notes, and the Takeback Notes, which material terms were or will be Filed as part of the Plan (including through the Plan Supplement) and related pleadings prior to the Effective Date.   The terms and conditions are fair and reasonable and were negotiated in good faith and at arm's length, and any credit extended and loans made pursuant to the Exit Facilities, the Exit 1.5 Lien Notes, or the Takeback Notes, as applicable, if and as applicable, shall be deemed to have been extended, assumed and assigned, issued, or made, as applicable, in good faith.   All fees due and payable under the Exit Facilities, the Exit 1.5 Lien Notes, and the Takeback Facility are hereby approved and the Debtors or the Reorganized Debtors, as applicable, are authorized and directed to pay such fees in accordance with the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, as applicable.   The agreements, documents, securities, and instruments entered into in connection with the Exit Facilities, the Exit

(Page | 28)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

1.5 Lien Notes, and the Takeback Facility constitute legal, valid, and binding obligations of the Debtors and the Reorganized Debtors and shall be enforceable in accordance with their respective terms. The Debtors are authorized without further approval of this Bankruptcy Court or any other party to execute and deliver the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, and execute, deliver, file, record, and issue all agreements, guarantees, instruments, mortgages, control agreements, certificates, and other documents related or identical thereto and perform their obligations thereunder and all transactions contemplated thereby, including the payment or reimbursement of any fees, expenses, losses, damages, or indemnities and the creation or perfection of all Liens in connection therewith, in each case, without further notice to this Bankruptcy Court or further act or action under applicable non-bankruptcy law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

35.     Upon the granting of Liens in accordance with the Exit Facilities, the Exit 1.5 Lien Notes, the Takeback Notes, and this Confirmation Order, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facilities, the Exit 1.5 Lien Notes, and the Takeback Notes Documents, as applicable. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facilities, the Exit 1.5 Lien Notes, and the Takeback Notes, as applicable, have been or will have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value, as an inducement to the applicable lenders to extend credit thereunder, shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purpose whatsoever under the Bankruptcy Code or any applicable non-bankruptcy law. No party shall be permitted to challenge the validity, enforceability, allowability, priority, secured status, or amount of any Lien granted under the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, as applicable. To the extent applicable, the Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents, necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required).

U.    **AHG Notes.**

36.    The entry into the AHG New-Money Commitment Agreement and the issuance of the AHG Notes is a necessary and integral component of these Restructuring Transactions. As set forth in the SCD Trust Documentation, on the Effective Date, (i) New Rite Aid and its Affiliates shall transfer, or cause to be transferred, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances (other than as provided for by the AHG Notes Documentation) to the SCD Trust (A) an amount of in Cash which shall be used as initial funding for the SCD Trust to pay the reasonable fees and expenses of the SCD Trust and the SCD Trustee and (B) the SCD Trust Assets, and (ii) the SCD Trustee shall execute the SCD Trust Documentation and take all

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

steps necessary to establish the SCD Trust in accordance with the Plan and the SCD Trust Documentation.

37.     On the Effective Date, the SCD Trust shall issue the AHG Notes, on the terms set forth in the AHG New-Money Commitment Agreement, the AHG Notes Documentation, the SCD Trust Documentation, the Plan, and this Confirmation Order.  On the Effective Date, and without the need for any further corporate action or other action by Holders of Claims or Interests, the AHG Notes Documents, including any documents required in connection with the creation or perfection of Liens in connection therewith, shall constitute legal, valid, binding, and authorized indebtedness and obligations of the SCD Trust, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be enjoined or subject to discharge, impairment, release, or avoidance under the Plan, this Confirmation Order, or on account of the Confirmation or Consummation of the Plan.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the AHG New-Money Commitment Agreement, the AHG Notes Documentation, the SCD Trust Documentation, and the Plan (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the AHG New-Money Commitment Agreement, the AHG Notes Documentation, the SCD Trust Documentation, the Plan, and this Confirmation Order, (c) shall be deemed automatically attached and perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the AHG New-Money Commitment Agreement, the AHG Notes Documentation, the SCD Trust Documentation, and the Plan, and (d) shall not be subject to avoidance, recharacterization or

(Page | 31)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The AHG Notes shall not be secured by real or leased property of the Reorganized Debtors. The Reorganized Debtors and the persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. No party shall be permitted to challenge the validity, enforceability, allowability, priority, secured status, or amount of any Lien granted under the AHG Notes Documentation or the SCD Trust Documentation, as applicable.

38.     The terms and conditions under the AHG New-Money Commitment Agreement are fair, reasonable, customary, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are based on good, sufficient, and sound business purposes and justifications, and are supported by reasonably equivalent value and consideration. The Debtors, the AHG New-Money Initial Commitment Parties, and their respective professional

(Page | 32)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

advisors negotiated the AHG New-Money Commitment Agreement in good faith and at arm's length.

### V.    GUC Equity Trust.

39.    As set forth in <u>Article IV</u> of the Plan, on the Effective Date, New Rite Aid shall transfer, or cause to be transferred, to the GUC Equity Trust all the GUC Equity Trust Assets, and the GUC Equity Trustee shall execute the GUC Equity Trust Agreement and take all steps necessary to establish the GUC Equity Trust in accordance with the Plan and the GUC Equity Trust Agreement.

### W.    Litigation Trust.

40.    As set forth in <u>Article IV</u> of the Plan, on the Effective Date, New Rite Aid shall transfer, or cause to be transferred, to the Litigation Trust all the Litigation Trust Assets, and the Litigation Trustees shall execute the Litigation Trust Agreement and take all steps necessary to establish the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement, including as set forth in the Litigation Trust Cooperation Agreement.

### X.    Executory Contracts and Unexpired Leases; Schedule of Assumed Executory Contracts and Unexpired Leases; Notices of Assumption

41.    On April 8, 2024, the Debtors Filed and served the Schedule of Assumed Executory Contracts and Unexpired Leases as part of the Initial Plan Supplement.  On April 9, 2024, the Debtors Filed and served the Schedule of Assumed Executory Contracts and Unexpired Leases as part of the Amended Plan Supplement.  On May 13, 2024, the Debtors filed a further amended Schedule of Assumed Executory Contracts and Unexpired Leases in the Third Amended Plan Supplement.  On August 15, 2024, the Debtors filed a further amended Schedule of Assumed

(Page | 33)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Executory Contracts and Unexpired Leases in the Eighth Amended Plan Supplement.  Unless otherwise agreed in writing by the parties to the applicable Unexpired Lease or Executory Contract, a counterparty to an Unexpired Lease or Executory Contract may file an objection or supplemental objection to a proposed assumption or related Cure Cost, which must be Filed, served, and actually received by counsel to the Debtors no later than 10 days after the service of notice of the Schedule of Assumed Executory Contracts and Unexpired Leases in the Eighth Amended Plan Supplement on affected counterparties (the "Subsequent Objection Deadline").

42.    In accordance with Article V of the Plan, unless otherwise provided in this Confirmation Order, all Executory Contracts and Unexpired Leases included in the Schedule of Assumed Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date.  Any Unexpired Lease or Executory Contract for which an objection remains outstanding or the Subsequent Objection Deadline remains pending or has not yet elapsed as of the Confirmation Date will be deemed assumed or assumed and assigned, as applicable, as of the Effective Date upon the earlier of (a) the expiration of the Subsequent Objection Deadline without a timely objection having been filed, (b) agreement between the Debtors and the applicable counterparty that such objection is resolved, or (c) entry of an order  by the Bankruptcy Court resolving such objection.

**Y.    Compliance with Bankruptcy Code Requirements—Section 1129(a)(1).**

43.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.  In addition, the Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

(Page | 34)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

(i)      *Proper Classification—Sections 1122 and 1123.*

44.      The Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code. <u>Article III</u> of the Plan provides for the separate classification of Claims and Interests into ten Classes. Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests. The classifications reflect no improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests. Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

(ii)      *Specified Unimpaired Classes—Section 1123(a)(2).*

45.      The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code. <u>Article III</u> of the Plan specifies that Claims, as applicable, in the following Classes are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code:

| Class | Claims and Interests |
|:---:|---|
| 1 | Other Secured Claims |
| 2 | Other Priority Claims |
| 3 | ABL Facility Claims |
| 4 | FILO Term Loan Facility Claims |

46.      For the avoidance of doubt, Holders of Intercompany Claims and Intercompany Interests are Unimpaired and conclusively presumed to have accepted the Plan, or are Impaired and deemed to reject the Plan, and, in either event, are not entitled to vote to accept or reject the Plan. Additionally, <u>Article II</u> of the Plan specifies that Allowed Administrative Claims (including the AHG New-Money Commitment Premium and the AHG Notes Ticking Fee (together the "<u>AHG</u>

(Page | 35)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Commitment Agreement Obligations")) in accordance with the AHG New-Money Commitment Letter, Professional Fee Claims, Priority Tax Claims, DIP Claims, and Junior DIP Claims will be paid in full in accordance with the terms of the Plan, although these Claims are not classified under the Plan as contemplated by section 1123(a)(1) of the Bankruptcy Code. For the avoidance of doubt, any McKesson Claim that is an Allowed Administrative Claim shall be treated in accordance with the terms of the McKesson Settlement.

47.     Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

    (iii)    *Specified Treatment of Impaired Classes—Section 1123(a)(3).*

48.     The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes (the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes:

| Class | Claims and Interests |
|---|---|
| 5 | Senior Secured Notes Claims |
| 6 | General Unsecured Claims |
| 9 | Existing Equity Interests in Rite Aid |
| 10 | Section 510(b) Claims |

49.     For the avoidance of doubt, Holders of Intercompany Claims and Intercompany Interests are Unimpaired and conclusively presumed to have accepted the Plan, or are Impaired and deemed to reject the Plan, and, in either event, are not entitled to vote to accept or reject the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

      (iv)     *No Discrimination—Section 1123(a)(4).*

50.     The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest and complies with section 1123(a)(4) of the Bankruptcy Code.

      (v)     *Adequate Means for Plan Implementation—Section 1123(a)(5).*

51.     The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The provisions in <u>Article IV</u> of the Plan and elsewhere in the Plan, and in the exhibits and attachments to the Plan and the Disclosure Statement, provide, in detail, adequate and proper means for the Plan's implementation, including regarding: (a) the general settlement of Claims and Interests; (b) the Settlement of Opioid Claims; (c) authorization for the Debtors, the Reorganized Debtors, and/or the Wind-Down Debtors to take all actions necessary to effectuate the Plan, including those actions necessary to effect the Restructuring Transactions, including, without limitation, any restructuring transaction steps set forth in the Restructuring Transactions Memorandum, as the same may be modified or amended from time to time prior to the Effective Date; (c) the execution of Definitive Documents, including in accordance with the Committee Settlement; (d) the adoption of the New Corporate Governance Documents; (e) the funding and sources of consideration for the Plan distributions; (f) the reservation of equity for future distribution in accordance with the terms and conditions of the Management Incentive Plan; (g) the authorization and approval of the Exit Facilities, the Exit 1.5 Lien Notes, and the Takeback Notes, the issuance of New Common Stock, the formation of the Litigation Trust, any GUC Sub-Trusts,

(Page | 37)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

and the GUC Equity Trust and entry into any agreements related to the same as set forth in the Plan or the Plan Supplement; (i) cancellation of existing securities and agreements; (j) the authorization and approval of corporate actions under the Plan; (k) the creation of the Professional Fee Escrow Account; (l) the adoption, authorization, and entry of the GUC Equity Trust Agreement and all actions contemplated thereby; (m) the adoption, authorization, and entry of the Litigation Trust Agreement and all actions contemplated thereby; and (n) the effectuation and implementation of documents and further transactions. The Bankruptcy Court authorizes the transfer and vesting of the Litigation Trust Assets, notwithstanding any terms of the Insurance Policies or provisions of non-bankruptcy law.

(vi)    *Voting Power of Equity Securities—Section 1123(a)(6).*

52.    The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. In accordance with <u>Article IV.K</u> of the Plan, the New Corporate Governance Documents will prohibit the issuance of non-voting Interests to the extent required by section 1123(a)(6) of the Bankruptcy Code.

(vii)    *Directors and Officers—Section 1123(a)(7).*

53.    The manner of selection of any officer, director, or trustee (or any successor of any officer, director, or trustee) of New Rite Aid will be determined in accordance with the Plan and the New Corporate Governance Documents, as applicable. Under the Plan Restructuring, on or prior to the Effective Date, the New Rite Aid board shall be appointed. The Junior DIP Noteholders shall select the New Rite Aid board members.

(Page | 38)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

54.    Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

(viii)    *Impairment / Unimpairment of Classes—Section 1123(b)(1).*

55.    The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.  Article III of the Plan Impairs or leaves Unimpaired each Class of Claims and Interests.

(ix)    *Assumption and Rejection—Section 1123(b)(2).*

56.    The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.  Article V of the Plan provides that each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (1) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) have been previously assumed or rejected by the Debtors pursuant to the Assumption/Rejection Procedures Order or any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (4) are to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, through a Sale Order in connection with any sale transaction, including in any sale transaction that is pending on the Confirmation Date; (5) are a contract, release, or other agreement or document entered into in connection with the Plan; or (6) are an Insurance Policy.  The Debtors' decisions

(Page | 39)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

to assume or reject certain Executory Contracts and Unexpired Leases as provided in <u>Article V</u> of the Plan and in the Plan Supplement are reasonable exercises of the Debtors' business judgment. To the extent a proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease has been approved by the Bankruptcy Court or the counterparty otherwise agrees, the Debtors shall have demonstrated adequate assurance of future performance of the assumed Executory Contracts and Unexpired Leases within the meaning of section 365(b)(1) of the Bankruptcy Code, but all rights are reserved with respect to adequate assurance of future performance of Executory Contracts and Unexpired Leases.

57.  Notwithstanding anything to the contrary in this Confirmation Order, the Debtors shall and are authorized to assume all employee and retiree benefits programs in accordance with <u>Article V.G</u> of the Plan; *provided* that with respect to all existing employment agreements of the Debtors' executives, such agreements shall be (i) assumed on the Effective Date, (ii) replaced with new employment agreements on terms mutually acceptable to the Debtors and the Required Junior DIP Noteholders; *provided* that the Debtors and the Required Junior DIP Noteholders shall, promptly following the filing of the Plan, commence negotiations in good faith regarding the terms of any such new employment agreements, if any, (iii) rejected, in each case of clause (i), (ii) and (iii), with the consent of the Required Junior DIP Noteholders, or (iv) deemed rejected solely to the extent the Debtors and the Required Junior DIP Noteholders disagree on the assumption (or terms thereof) or rejection of an existing employment agreement and such dispute is not resolved among the Debtors and Required Junior DIP Noteholders within a reasonable period of time (not to exceed five (5) Business Days from the date upon which such dispute arose); *provided, further*

(Page | 40)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

that the Debtors shall seek Bankruptcy Court approval of the employment agreement between the

Debtors and the Chief Executive Officer (the "CEO Agreement") on terms consistent with the

agreement in principal reached among the Debtors, the DIP Agents, and the Ad Hoc Secured

Noteholder Group via separate motion, after notice and a hearing, and nothing in this Confirmation

Order shall authorize the Debtors to assume the CEO Agreement.

58.     Notwithstanding anything to the contrary herein, entry of this Confirmation Order

shall not prejudice any assumption, assumption and assignment, rejection, or Cure Cost disputes

that are pending as of such entry or are subject to the Subsequent Objection Deadline.  The

applicable parties' rights with respect to such disputes are fully reserved, and any disputes shall be

addressed and, if applicable, heard pursuant to the procedures set forth in the Plan, including

Article V.C thereof.

(x)     *Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3).*

a.     **Settlement.**

59.     The Bankruptcy Court has jurisdiction under section 1334 of title 28 of the United

States Code to approve the injunctions, releases, and exculpation set forth in Article X of the Plan,

including, but not limited to, jurisdiction to release claims against the Released Parties.  Sections

105(a) and 1123(b)(3) and (6) of the Bankruptcy Code and the Bankruptcy Court's inherent

equitable power permits issuance of the injunction and approval of the releases and exculpations

set forth in Article X of the Plan.  With respect to the Third-Party Release (defined below), as has

been established based upon the record in the Chapter 11 Cases and the evidence presented at the

Combined Hearing, the Bankruptcy Court has subject matter jurisdiction to approve the Third-

| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Party Release because (i) confirmation of a plan of reorganization is a core proceeding and the Third- Party Release is integral to confirmation of the Plan and the failure to approve these injunctions, exculpations, and releases would render the Debtors unable to confirm and implement the Plan, and (ii) the Released Claims that are the subject of the Third-Party Release could have a conceivable effect on the Debtors' Estates. Released Claims have factual and legal issues in common with actual or potential claims or causes of action against the Debtors and actual or potential claims or causes of action of the Estates against third parties, including the Released Parties. The litigation of the Released Claims would have conceivable effects on the res of the Estates. Litigation of such claims could deplete the value of certain insurance policies, could lead to the assertion of indemnification and contribution claims against the Estates, and could prejudice the Estates or the Litigation Trust (and, therefore, reduce the value available for distribution to the GUC Sub-Trusts) in future litigation of such claims or causes of action. Litigation over a disputed indemnification or contribution claim is itself an effect upon the Estates. Moreover, the Bankruptcy Court has the authority, consistent with Article III of the United States Constitution, to enter a final order confirming the Plan, including such provisions.

60. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, to the maximum extent permitted by the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including the McKesson Settlement, the Committee

(Page | 42)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Settlement (including the Settlement of Opioid Claims), and, subject to satisfying all conditions and contingencies thereto (including approval by authorizing officials within the DOJ, acceptable documentation, and approval by the Bankruptcy Court), the Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved by the DOJ White Settlement and the DOJ Elixir Settlement.  The entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

b.    **Debtor Release.**

61.    <u>Article X.C</u> of the Plan describes certain releases granted by the Debtors (the "<u>Debtor Release</u>").  The Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Release.  Such release is a necessary and integral element of the Plan, and is fair, reasonable, and in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  The Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good-faith settlement and compromise of the claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors or their respective Estates

(Page | 43)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

or, if applicable, the Reorganized Debtors or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

62.     The Debtor Release appropriately offers protection to parties that participated in the Debtors' restructuring process.  The Released Parties, individually and collectively, made significant concessions and contributions, or had significant contributions made on their behalf, to the Chapter 11 Cases, including negotiating and entering into the plan settlements, providing funding for the Chapter 11 Cases, and otherwise actively supporting the Debtors' reorganization. The Debtor Release for each Debtor Related Party is appropriate because the Debtor Related Parties share an identity of interest with the Debtors, supported the Plan and these Chapter 11 Cases, actively participated in meetings and negotiations leading up to and during these Chapter 11 Cases, and have provided other valuable consideration to the Debtors to facilitate the Debtors' reorganization.

63.     The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases, given that it was negotiated in connection with the Committee Settlement and expressly excludes (a) all Assigned Claims and all Assigned Insurance Rights against Excluded Parties and (b) any claims or Causes of Action arising out of, or relating to, any act or omission of a Released Party that is deemed by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.  The Debtor Release is appropriate in light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Release to the Plan.  The Debtor Release is approved.

(Page | 44)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

c.    **Third-Party Release.**

64.    Article X.D of the Plan describes certain releases granted by the Releasing Parties (the "Third-Party Release").  The Third-Party Release is an integral part of the Plan.  Like the Debtor Release, the Third-Party Release appropriately offers protection to parties that participated in the Debtors' restructuring process.  The Third-Party Release was an integral component of the Plan, the Committee Settlement, the DIP ABL Facility, the DIP FILO Term Loan Facility, the DIP Term Loan Facility, and the Junior DIP Facility (collectively, the "DIP Facilities"), the Sale Process, the Plan, and the restructuring transactions generally, thereby preventing significant and time-consuming litigation regarding the parties' respective rights and interests.  The Third-Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring  process by, among other things, supporting the Plan.

65.    The Third-Party Release is consensual as to all Releasing Parties, and such Releasing Parties were provided notice of the chapter 11 proceedings, the Plan, the deadline to object to Confirmation of the Plan, received the releases through the Plan and the Disclosure Statement, and, following the Combined Hearing, will receive the applicable Opt-In Form which will properly inform all Holders of Claims that the Holders of Claims against the Debtors that check the "Opt In" box on the Opt-In Form (electronically or in paper form) and submit such Opt-In Form (electronically or in paper form) in advance of the opt-in deadline will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all claims and Causes of Action against the Debtors and the Released Parties.  Additionally, the release provisions of the Plan were conspicuous in the Plan and the Disclosure

(Page | 45)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Statement.  Further, members of Class 6 (including holders of Unsecured Notes) will each receive a pre-addressed prepaid return envelope to facilitate the submission of any opt-in election, and, to the extent a solicitation directive was submitted on behalf of members of the Non-Voting Classes, opt-in elections may be submitted in accordance thereof.  For the avoidance of doubt, the United States of America (including all departments, agencies, and instrumentalities thereof, the "United States") is not a "Releasing Party" (as defined in the Plan) and is not subject to the Third-Party Release.

66.    The Third-Party Release provides finality for the Debtors, the Reorganized Debtors, the Wind-Down Debtors, and the Released Parties regarding the parties' respective obligations under the Plan.  The Combined Hearing Notice sent to Holders of Claims and Interests and published on April 4, 2024 in *The New York Times* and the *Financial Times (International Edition*) and on April 5, 2024, and the Ballots sent to all Holders of Claims entitled to vote on the Plan, in each case, unambiguously stated that the Plan contains the Third-Party Release.  Such release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests.  Also, the Third-Party Release is:   (i) consensual; (ii) given in exchange for the good and valuable consideration provided by the Released Parties; (iii) a good-faith settlement and compromise of such claims and Causes of Action; (iv) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; (vii) a sound exercise of the Debtors' business judgment; and (viii) a bar to any of the Releasing Parties or the Debtors or their respective Estates or, if applicable,

(Page | 46)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

the Reorganized Debtors or the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property in accordance with the Plan. The Third-Party Release is approved.

### d. **Exculpation.**

67. The exculpation, described in Article X.E of the Plan (the "Exculpation"), is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, and except as otherwise specifically provided in the Plan, each Exculpated Party has participated in these Chapter 11 Cases in good faith and is released and exculpated from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or this Confirmation Order in lieu of such legal opinion), except for claims or Causes of Action in each

(Page | 47)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

case arising out of or related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Nothing in the Plan or this Confirmation Order shall operate as a release of, and the Debtors shall not release, claims or Causes of Action against any Excluded Parties or any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. The Exculpation is approved.

### e.     **Injunction.**

68.     The injunctions set forth in <u>Article X</u> of the Plan, including the Channeling Injunction and the Insurer Injunction, are (i) necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Release, the Third-Party Release, and the Exculpation, and the compromises and settlements implemented under the Plan, (ii) essential to the Plan, and (iii) narrowly tailored to achieve this purpose.

### f.     **Provisions Regarding Excluded Parties.**

69.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Excluded Parties shall be neither a Released Party nor a Releasing Party. None of the Excluded Parties shall be Exculpated Parties.

### g.     **Preservation of Causes of Action.**

(Page | 48)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

70.      In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VII and Article X of the Plan, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action other than the Assigned Claims and the Assigned Insurance Rights, whether arising before or after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) that constitute Elixir Acquired Assets or Retail Acquired Assets, (b) exculpated or released (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article X of the Plan, or (c) waived in accordance with Article IV.R of the Plan which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Reorganized Debtors or the Wind Down Debtors, as applicable, as of the Effective Date.   The provisions regarding the preservation of Causes of Action in the Plan, including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

## h.      **Discharge; Lien Release.**

71.      The discharge provisions and the release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article X.A of the Plan (the "Discharge") and Article X.B of the Plan (the "Release of Liens") is necessary to implement the Plan.   The provisions of the Discharge and Release of Liens are

(Page | 49)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

72.     Except as expressly provided in this Confirmation Order or the Plan, the Discharge and release of the Debtors through the Plan will not operate to relieve any other entity, including insurance companies, of their obligation to pay the Debtors' tort-related liabilities, without regard to (i) whether the Debtors would be able to pay such liabilities in the first instance outside of bankruptcy, and (ii) whether the Debtors or a post-bankruptcy trust can or do pay those liabilities in full, in both instances notwithstanding any terms of the Insurance Policies or provisions of non-bankruptcy law.

(xi)     *Additional Plan Provisions—Section 1123(b)(6).*

73.     The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

(xii)     *Cure of Defaults —Section 1123(d).*

74.     The Plan complies with section 1123(d) of the Bankruptcy Code.  Article V.C of the Plan provides for the satisfaction of Cure Costs associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan  on the Effective Date or as soon as reasonably practicable thereafter, or on such terms as

(Page | 50)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that, if a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved. Any Cure Cost shall be deemed fully satisfied, released, and discharged upon payment of the Cure Cost.

75.     Except as otherwise set forth in any applicable Sale Order, if there is any dispute regarding any Cure Costs, the ability of the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure Costs shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  Any such disputes shall be scheduled for hearing upon request of the affected counterparty or the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, at the earliest convenience of the Bankruptcy Court; *provided* that no hearing will be scheduled on less than 10 days' notice to the affected counterparty, and the Debtors, the Reorganized Debtors, or the Wind Down Debtors, as applicable, and that no such hearing shall be scheduled less than 30 days after entry of this Confirmation Order unless agreed to between the Debtors, the Reorganized Debtors, or the Wind Down Debtors, as applicable, and the affected counterparty.  The Debtors, the Reorganized Debtors, and the Wind Down Debtors, as applicable, may reconcile and settle in

(Page | 51)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

the ordinary course of the Debtors' business any dispute regarding any Cure Cost or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

76.    To the extent a proposed assumption and assignment of an Executory Contract or Unexpired Lease has been approved by the Bankruptcy Court or the counterparty otherwise agrees, the Debtors shall be deemed to have provided sufficient notice to the counterparties to the Assumed Executory Contracts and Unexpired Leases in accordance with any Assumption Procedures and the Debtors shall provide notice to counterparties to Unexpired Leases of the Subsequent Objection Deadline with respect to assumption or assumption and assignment of Unexpired Leases, as applicable.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

**Z.    Debtor Compliance with the Bankruptcy Code—Section 1129(a)(2).**

77.    The Debtors have complied with the applicable provisions of the Bankruptcy Code and, thus, satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

      a.    is an eligible debtor under section 109 of the Bankruptcy Code, and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code; and

      b.    complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, the Local Rules, any applicable nonbankruptcy law, rule and regulation, the Conditional Disclosure Statement Order, and all other applicable law, in transmitting the Solicitation Packages, and related documents and notices, and in soliciting and tabulating the votes on the Plan, except as otherwise provided or permitted by orders of the Bankruptcy Court.

(Page | 52)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

### AA. Plan Proposed in Good Faith—Section 1129(a)(3).

78. The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors and their agents have proposed the Plan in good faith and not by any means forbidden by law. In so determining, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan, the Mediation, the process leading to Confirmation, including the support of Holders of Claims in the Voting Class for the Plan, and the transactions to be implemented pursuant thereto. These Chapter 11 Cases were Filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to implement the Restructuring Transactions.

79. The Plan is the product of good-faith, arm's-length negotiations by and among the Debtors, the DIP Agents, the Junior DIP Noteholders, the Ad Hoc Secured Noteholder Group, and the Committees, among others. The Plan itself and the process leading to its formulation provides independent evidence of the Debtors' and such other parties' good faith, serves the public interest, and assures fair treatment of Holders of Claims and Interests. Consistent with the overriding purpose of chapter 11, the Debtors filed the Chapter 11 Cases with the belief that the Debtors were in need of reorganization, and the Plan was negotiated and proposed with the intention of accomplishing a successful reorganization and maximizing stakeholder value and for no ulterior purpose. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

### BB. Payment for Services or Costs and Expenses—Section 1129(a)(4).

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

80.     Any payment made or to be made by the Debtors for services or for costs and expenses in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, shall be subject to the approval of the Bankruptcy Court for reasonableness, in compliance with, section 1129(a)(4) of the Bankruptcy Code.

**CC.     Directors, Officers, and Insiders—Section 1129(a)(5).**

81.     The identities, or process of appointment, of the Reorganized Debtors' directors and officers proposed to serve after the Effective Date will be selected by the Required Junior DIP Noteholders and be disclosed in the Plan Supplement on or prior to the Effective Date.

82.     Accordingly, the Debtors have satisfied the requirements of Section 1129(a)(5) of the Bankruptcy Code.

**DD.     No Rate Changes—Section 1129(a)(6).**

83.     Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and therefore will not require governmental regulatory approval.

**EE.     Best Interest of Creditors—Section 1129(a)(7).**

84.     The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached to the Disclosure Statement, as supplemented by Liebman Report and the Updated Liebman Report (as defined in the Confirmation Brief), and the other evidence related thereto in support of the Plan that was proffered or adduced at, prior to, or in affidavits filed in connection with the Combined Hearing:  (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize

(Page | 54)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code. As a result, the Debtors have demonstrated that the Plan is in the best interests of creditors, and the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

### FF.    Acceptance by Certain Classes—Section 1129(a)(8).

85.    The Plan satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code. Classes 1, 2, 3, and 4 constitute Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code. The Voting Class, Class 5, has voted to accept the Plan. Holders of Claims and Interests in Class 6 are Impaired and deemed to reject the Plan and are not entitled to vote to accept or reject the Plan. Holders of Claims and Interests in Classes 7 and 8 are Unimpaired and conclusively presumed to have accepted the Plan (to the extent Reinstated) or are Impaired and deemed to reject the Plan (to the extent cancelled), and, in either event, are not entitled to vote to accept or reject the Plan. Holders of Claims and Interests in Classes 9 and 10 receive no recovery on account of their Claims or Interests pursuant to the Plan and are deemed to have rejected the Plan. Although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect

(Page | 55)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

to the Deemed Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.

**GG. Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9).**

86. The treatment of Allowed Administrative Claims, Professional Fee Claims, and Priority Tax Claims under Article II of the Plan, and of Other Priority Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**HH. Acceptance by At Least One Impaired Class—Section 1129(a)(10).**

87. The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, the Voting Class, which is impaired, voted to accept the Plan by the requisite numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

**II. Feasibility—Section 1129(a)(11).**

88. The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The evidence in support of the Plan that was proffered or adduced at, prior to, or in affidavits filed in connection with the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) have not been controverted by other evidence; and (c) establish that the Plan is feasible and that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan.

**JJ. Payment of Fees—Section 1129(a)(12).**

(Page | 56)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

89. The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article II.B of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).

**KK.   Retiree Benefits—Section 1129(a)(13).**

90. The Debtors shall continue to pay any retiree benefits (as defined in section 1114 of the Bankruptcy Code) in accordance with section 1129(a)(13) of the Bankruptcy Code.

**LL.   Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16).**

91. Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases. The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

**MM.   "Cram Down" Requirements—Section 1129(b).**

92. The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met. *Second*, the Plan is fair and equitable with respect to the Deemed Rejecting Classes. The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of a Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to such Class is receiving more than payment in full on account of its Claim or Interest. Specifically, to the extent Class 7 (Intercompany Claims) or Class 8 (Intercompany Interests) are

(Page | 57)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Reinstated, such treatment is provided for administrative convenience and efficiency, and not on account of such Claims or Interests, and will not alter the treatment provided for any other Holder of any Claim or Interest. Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Deemed Rejecting Classes. *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because similarly situated Claim and Interest Holders will receive substantially similar treatment on account of their Claims or Interests, as applicable, in such Class. The evidence supporting the Plan proffered or adduced by the Debtors at, or prior to, or in Declarations filed in connection with, the Combined Hearing regarding the Debtors' classification and treatment of Claims and Interests (x) is reasonable, persuasive, credible, and accurate, (y) utilizes reasonable and appropriate methodologies and assumptions, and (z) has not been controverted by other evidence. Therefore, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

### NN.    Only One Plan—Section 1129(c).

93.    The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan Filed in each of these Chapter 11 Cases.

### OO.    Principal Purpose of the Plan—Section 1129(d).

94.    No Governmental Unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. As evidenced by its terms, the principal purpose of the Plan is not such avoidance. Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

(Page | 58)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

### PP.    Good Faith Solicitation—Section 1125(e).

95.    The Debtors and their agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e), and in a manner consistent with the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation provisions set forth in <u>Article X.E</u> of the Plan.  The Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys have participated in good faith and in compliance with the Bankruptcy Code in the issuance of the New Common Stock, the Exit Facilities, the Exit 1.5 Lien Notes, the Takeback Notes, the AHG Notes, the formation of the Litigation Trust, and solicitation of acceptances of the Plan, as applicable, and are entitled to the protections afforded by 1125(e) of the Bankruptcy Code.

### QQ.    Satisfaction of Confirmation Requirements.

96.    Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

### RR.    Implementation.

97.    All documents necessary to implement the Plan and all other relevant and necessary documents (including, but not limited to, the GUC Equity Trust Agreement, the Committee Settlement Documents, the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, the Takeback Notes Documents, the AHG Notes Documentation, the Litigation Trust Agreement, and

(Page | 59)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

the New Corporate Governance Documents) are essential elements of the Plan and have been negotiated in good faith and at arm's length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and shall not be in conflict with any federal or state law.

### SS. Disclosure of Facts.

98.    The Debtors have disclosed all material facts regarding the Plan, including with respect to the consummation of the Restructuring Transactions, including with respect to the execution of the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, the Takeback Notes Documents, the New Corporate Governance Documents, the AHG Notes Documentation, the SCD Trust Documentation, the GUC Equity Trust Agreement, and the Litigation Trust Agreement, and the Plan Settlements prior to the Combined Hearing.

### TT. Good Faith.

99.    The Debtors and their respective directors, officers, management, counsel, advisors, and other agents have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders. The Plan accomplishes this goal. Accordingly, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, and their respective officers, directors, and advisors have been, are, and will continue to act in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed by this Confirmation Order and the Plan to effectuate the Restructuring Transactions.

(Page | 60)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

### UU. Essential Element of the Plan.

100.    The Exit Facilities, the Exit 1.5 Lien Notes, the Takeback Notes, the AHG New-Money Commitment Agreement, the Litigation Trust Agreement, the AHG Notes, the New Corporate Governance Documents, the Committee Settlement Documents, and all other documents and transactions contemplated by the Plan are essential elements of the Plan, are necessary for Confirmation and Consummation, and are critical to the overall success and feasibility of the Plan.  The execution, performance, and incurrence of all obligations by the Reorganized Debtors, and/or any successors, assigns, or transferees of the applicable Debtors or Reorganized Debtors, including in connection with the Restructuring Transactions and the creation and perfection of Liens in connection therewith, are necessary and appropriate for Confirmation and the operations of the Reorganized Debtors.  The Debtors have exercised sound business judgment in deciding to pursue, enter into, and consummate, as applicable, the Exit Facilities, the Exit 1.5 Lien Notes, the Takeback Notes, the AHG New-Money Commitment Agreement, the Litigation Trust Agreement, the AHG Notes, the New Corporate Governance Documents, the Committee Settlement Documents, and all other documents and transactions contemplated by the Plan and have provided sufficient and adequate notice of the material terms thereof to all parties in interest in these Chapter 11 Cases.  The execution, delivery, or performance by the Debtors or the Reorganized Debtors, as applicable, of any of the Exit Facilities, the Exit 1.5 Lien Notes, the Takeback Notes, the AHG New-Money Commitment Agreement, the Litigation Trust Agreement, the AHG Notes, the New Corporate Governance Documents, the Committee Settlement Documents, and any other document and transaction contemplated by the Plan and any agreements

(Page | 61)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

related thereto and compliance by the Debtors or the Reorganized Debtors, as applicable, with the

terms thereof is authorized by, and will not conflict with, the terms of the Plan or this Confirmation

Order.

## VV.    Additional Findings Regarding the Chapter 11 Cases and the Plan.

101.    **Non-Precedential Effect for Holders of Tort Claims.**    The Plan, the Plan

Supplement, and this Confirmation Order constitute a good faith, full and final comprehensive

compromise and settlement of the Claims of Opioid Claimants based on the unique circumstances

of these Chapter 11 Cases (such as the unique facts and circumstances relating to the Debtors as

compared to other defendants in tort litigation and the need for an accelerated resolution without

litigation) such that (a) none of the of the foregoing documents, nor any materials used in

furtherance of Confirmation (including, but not limited to, the Disclosure Statement, and any notes

related to, and drafts of, such documents and materials), may be offered into evidence, deemed an

admission, used as precedent, or used by any party or Person in any context whatsoever beyond

the purposes of the Plan, in any other litigation or proceeding except as necessary, and as

admissible in such context, to enforce their terms and/or to evidence the terms of the Plan before

the Bankruptcy Court or any other court of competent jurisdiction and (b) any obligation of any

party, in furtherance of such compromise and settlement, to not exercise rights that might

otherwise be applicable to such party shall be understood to be an obligation solely in connection

with this specific compromise and settlement and to be inapplicable in the absence of such

compromise and settlement.  The Plan, the Plan Supplement, and this Confirmation Order will be

binding as to the matters and issues described therein, but will not be binding with respect to similar

(Page | 62)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

matters or issues that might arise in any other litigation or proceeding involving opioid claims or other tort claims in which none of the Debtors, the Reorganized Debtors, or the Litigation Trust is a party; *provided* that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Supplement, or this Confirmation Order. Any claimant's support of, or position or action taken in connection with the Plan, the Plan Supplement, and this Confirmation Order may differ from their position or testimony in any other litigation or proceeding except in connection with these Chapter 11 Cases. Further, the treatment of tort claims as set forth in the Plan is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other Chapter 11 Cases relating to tort claims, nor shall it be used as precedent by any Entity or party in any other chapter 11 case related to tort claims. This provision does not and shall not be construed to impair, diminish, or compromise (A) any of the rights and protections of the Debtors, the Reorganized Debtors (and any Affiliates), the Debtor Related Parties, the DIP Secured Parties, the Junior DIP Secured Parties, the Prepetition Secured Parties, the Senior Secured Noteholders, the Senior Secured Notes Trustees, or their respective Related Parties or (B) any of the release, discharge, and exculpation provisions in the Plan.

**WW. Objections.**

102.   All objections, responses, reservations, statements, and comments in opposition to the Plan or the Disclosure Statement, other than those resolved, adjourned, subject to the Subsequent Objection Deadline and adjudication, or withdrawn with prejudice prior to, or on the record at, the Combined Hearing are overruled on the merits in all respects. All withdrawn objections, if any, are deemed withdrawn with prejudice. All objections to Confirmation not filed

(Page | 63)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

and served prior to the Objection Deadline set forth in the Combined Hearing Notice, if any, are deemed waived and shall not be considered by the Bankruptcy Court.

103.    All parties have had a full and fair opportunity to litigate all issues raised or that might have been raised in the objections to Confirmation of the Plan and approval of the Disclosure Statement, and the objections have been fully and fairly litigated, including by agreed upon language or reservations of rights as set forth in the Plan.

104.    Notwithstanding entry of this Confirmation Order, all parties' rights with respect to rejection, assumption, assumption and assignment, and/or cure regarding Executory Contracts or Unexpired Leases which are subject to the Subsequent Objection Deadline or for which disputes remain outstanding are hereby reserved and will be heard at the next omnibus hearing, or as otherwise scheduled by the Debtors subject to the Bankruptcy Court's availability and consistent with the terms of the Plan and this Confirmation Order.

## **ORDER**

**IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

105.    **Final Approval of the Disclosure Statement.**    The Disclosure Statement is approved on a final basis pursuant to section 1125 of the Bankruptcy Code.

106.    **Solicitation Procedures.**    To the extent applicable, the solicitation of votes on the Plan complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other provisions of the Bankruptcy Code, and all other applicable rules, laws, regulations, and was appropriate and satisfactory and is approved in all respects.

(Page | 64)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

107. **Notice of Combined Hearing.** The Combined Hearing Notice was appropriate and satisfactory and is approved in all respects.

108. **Confirmation of the Plan.** The Plan (including the Plan Supplement, as both have been modified by the parties, including any modifications set forth herein) is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, including the Plan Supplement, are incorporated by reference into and are an integral part of this Confirmation Order.

109. **Objections Overruled.** Except as set forth in paragraph 151 hereof and for any Unexpired Leases or Executory Contracts for which the Subsequent Objection Deadline is pending, all objections and all reservations of rights pertaining to approval of the Disclosure Statement and Confirmation of the Plan that have not been withdrawn, waived, or consensually resolved are overruled on the merits unless otherwise indicated in this Confirmation Order.

110. **Plan Modifications.** The Modifications address concerns raised by parties in interest and implement additional compromises of objections to the Plan. The Modifications do not materially adversely affect the treatment of any Claim against or Interest in any of the Debtors under the Plan. Moreover, the Debtors' key constituents, including the Committees, the Junior DIP Noteholders, the Ad Hoc Secured Noteholder Group, the DIP Agents, and the Exit Facilities Agent, support, or otherwise have not objected to, the Modifications. Pursuant to Bankruptcy Rule 3019, these Modifications do not require additional disclosure under 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast

(Page | 65)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

acceptances or rejections of the Plan. Accordingly, the Modifications are hereby approved pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019. After giving effect to the Modifications, the Plan continues to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code.

111. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan.

112. **No Action Required.** Under section 1142(b) of the Bankruptcy Code and any other comparable provisions under applicable law, no action of the respective directors, managers, members, or equity holders of any of the Debtors is required to authorize any of the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the Restructuring Transactions, and any contract, assignment, certificate, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including each Definitive Document, and the appointment and election of the New Rite Aid board and the officers, directors, and/or managers of each of the Reorganized Debtors.

113. **Binding Effect.** Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors (if applicable), the Wind-Down Debtors (if applicable), and any and all Holders of Claims or Interests (regardless of whether their Claims or Interests have, or are deemed

(Page | 66)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors, except with respect to any Executory Contract or Unexpired Lease included on the Schedule of Assumed Executory Contracts and Unexpired Leases that is subject to an unresolved dispute, adjourned objection, or the Subsequent Objection Deadline on the Confirmation Date.

114.    Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders entered in these Chapter 11 Cases and all documents and agreements executed by the Debtors as authorized and directed thereunder as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors or the Reorganized Debtors or Wind-Down Debtors, as applicable, and their respective successors and assigns.

115.    **General Settlement of Claims and Interests.**    In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all claims, Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019, including, for the avoidance of doubt, the McKesson Settlement, the DOJ White Settlement (subject to satisfying all conditions and contingencies thereto (including approval by authorizing officials within the DOJ, acceptable documentation, and approval by the Bankruptcy Court)), the DOJ Elixir Settlement (subject to

(Page | 67)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

satisfying all conditions and contingencies thereto (including approval by authorizing officials within the DOJ, acceptable documentation, and approval by the Bankruptcy Court)), and the Committee Settlement (including the Settlement of Opioid Claims). Subject to Articles III.B.6.b, VI, and XIV of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final, shall be in full satisfaction of such Claims, and shall be free and clear of the Liens of any Entity other than, solely with respect to distributions to Holders of Allowed Claims in Class 6, including Tort Claims, (i) the claims and Liens of counsel representing them in connection with such Claims, and (ii) the Liens of any federal Entity. While the Settlement of Opioid Claims may be used to pursue the Assigned Insurance Rights, no party shall be permitted to argue in any coverage action concerning Opioid Claims that the Court's findings and conclusions concerning whether the Settlement of Opioid Claims is fair, equitable, and reasonable are in any way relevant to whether the Settlement of Opioid Claims should be found fair, equitable, or reasonable in any coverage action concerning Opioid Claims and no such findings concerning whether the Settlement of Opioid Claims is fair, equitable, and reasonable shall be offered as evidence in any such coverage action. All rights and defenses with respect to insurance coverage sought pursuant to the Assigned Insurance Rights, including with respect to the Settlement of Opioid Claims, shall be subject to the applicable terms, conditions, exclusions, and other provisions of the applicable Insurance Policies and applicable law.

116. **Committee Settlement.** The entry of this Confirmation Order constitutes the Bankruptcy Court's approval of the applicable terms of the Committee Settlement, other than the Settlement of Opioid Claims, for which this Bankruptcy Court's conclusions are addressed in

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

paragraph 117 of this Confirmation Order, all transactions contemplated therein and thereby, and all the terms and conditions thereof, as incorporated in the Plan and the Plan Supplement. The entry of this Confirmation Order constitutes the Bankruptcy Court's approval of the UCC / TCC Allocation Agreement as (i) premised on the consideration provided under the Committee Settlement, (ii) negotiated in good faith and at arm's length, (iii) fair and reasonable, and (iv) made with adequate and appropriate notice. The Committee Settlement Documents, and the mechanisms, criteria and procedures therein for operating the GUC Equity Trust, Litigation Trust, and any GUC Sub-Trusts, and for resolving General Unsecured Claims and allocating value to and among General Unsecured Claims, including Tort Claims, are approved. The Debtors and the Reorganized Debtors, as applicable, are authorized and directed to make the distributions contemplated by the Plan in connection with the Committee Settlement, including the Committees' Initial Cash Consideration and the Committees' Post-Emergence Cash Consideration. The GUC Equity Trustee, the Litigation Trustee and any GUC Sub-Trust Trustee(s) are authorized and shall be entitled to take the actions set forth in, and in each case in accordance with, the Plan, the applicable terms of the Committee Settlement, and the applicable Committee Settlement Documents, including by making distributions in compliance with the Committee Settlement Documents to intermediate trusts for purposes of enabling distributions to claimants, whether such trusts are now existing or hereafter created, and such intermediate trusts are authorized to accept such distributions. In furtherance of the administration of such GUC Sub-Trusts and of Tort Claims and the making of corresponding distributions to Holders of such Claims, the Debtors (prior to the Effective Date) and the Reorganized Debtors (after the Effective Date) are

(Page | 69)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

(a) authorized and directed to cooperate with such GUC Sub-Trusts and their trustees by providing (or causing the Debtors' claims and noticing agent to provide) to such trustees, on or before the Effective Date, the register of Tort Claims to be channeled to such trust, and access to the proof of claim documents related to such Tort Claims, at no cost to such trusts, and (b) are authorized to otherwise reasonably cooperate with such GUC Sub-Trusts and their trustees in accordance with the Plan and the Litigation Trust Cooperation Agreement.  In furtherance of the making of distributions to Holders of General Unsecured Claims that are not Tort Claims, the Debtors (prior to the Effective Date) and the Reorganized Debtors (after the Effective Date) are authorized and directed to cooperate with such GUC Sub-Trusts and their trustees by providing (or causing the Debtors' claims and noticing agent to provide) to such trustees, on or before the Effective Date, the register of General Unsecured Claims that are not Tort Claims, and access to the proof of claim documents related to such General Unsecured Claims, at no cost to such trusts, and (b) are authorized to otherwise reasonably cooperate with such GUC Sub-Trusts and their trustees in accordance with the Plan and the Litigation Trust Cooperation Agreement.  For the avoidance of doubt and subject to Article XIV.P of the Plan, (x) the payments or distributions under the Plan to Holders of General Unsecured Claims, including Tort Claims, shall be in full satisfaction of such Claims, and shall be free and clear of, and shall not be subject to the claims or Liens, other than the claims and Liens of counsel representing them in connection with such Claims, of any other non-federal entity, and (y) to the extent any Tort Claim is channeled, in whole or in part, to any Tort Sub-Trust (as defined in Litigation trust Documents) in accordance with the Plan and the Litigation Trust Documents, the sole recourse of Holders of such channeled Tort Claims with

(Page | 70)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

respect thereto shall be to the applicable Tort Sub-Trust, and not against any other trust formed or operating in connection with the Plan (an "Other Trust"), regardless of whether such Other Trust retains any partial interest in such Tort Claim.  Notwithstanding any state law to the contrary, the GUC Equity Trustee, the Litigation Trustee and any GUC Sub-Trustee(s) and any statutory trustee thereof shall not be required to give any bond or similar security relating to the operation of the GUC Equity Trust, the Litigation Trust, and any GUC Sub-Trust, or the administration of the assets thereof.

117.    **Settlement of Opioid Claims.**  The entry of this Confirmation Order constitutes the Bankruptcy Court's approval of the applicable terms of the Settlement of Opioid Claims, all transactions contemplated therein and thereby, and all the terms and conditions thereof, as incorporated in the Plan and the Plan Supplement as a settlement under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.  The entry of this Confirmation Order constitutes the Bankruptcy Court's approval of the Settlement of Opioid Claims as a good faith, reasonable compromise and settlement between the Debtors and the TCC negotiated at arm's length on adequate and appropriate notice, that, as of the Petition Date and with the Bankruptcy Court's approval of the settlement in the Plan, the Debtors have stipulated with the TCC that the Debtors were legally obligated to pay Opioid Claimants an amount equal to at least $2.352 billion on a nominal basis.  For the avoidance of doubt, nothing in this Confirmation Order constitutes a finding (i) as to the actual value of the Debtors' liability for Opioid Claims, (ii) that the methodology used to reach the Settlement of Opioid Claims is the correct way to assess the Debtors' liability for Opioid Claims, or (iii) regarding the allocation of Opioid Claims, the merits of Opioid Claims, or

(Page | 71)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

the actual value of Opioid Claims, individually or in the aggregate. For purposes of enabling the Litigation Trust and the GUC Sub-Trust(s) to pursue the Assigned Insurance Rights, the Bankruptcy Court expressly authorizes (i) Opioid Claimants to use and disclose such records and information as the Litigation Trust and the GUC Sub-Trust(s) reasonably and in good faith request for such purposes, and (ii) the Litigation Trust and the GUC Sub-Trust(s) to use and disclosure such records and information so received to insurance carriers, as the Litigation Trust and GUC Sub-Trust(s) reasonably and in good faith deem necessary for such purposes. The Litigation Trust, the GUC Sub-Trust(s) and any insurance carriers that receive records or information under this paragraph shall (i) take such steps as may be required under applicable law to protect and share such records and information, including implementing reasonable security safeguards and (ii) only use such records and information for purposes of pursuing the Assigned Insurance Rights.

118.   **Full and Final Satisfaction of Claims.**   Unless otherwise provided in the Plan or this Confirmation Order, the distributions and deliveries to be made on account of Allowed Claims under the Plan shall, in the aggregate, be in complete and final satisfaction, settlement and discharge of, and exchange for, such Allowed Claims. Except as otherwise provided in the Plan or this Confirmation Order, the distributions and deliveries to be made on account of Claims under the Plan shall additionally be in consideration of the release and discharge of any and all Causes of Action released pursuant to Article X of the Plan related to or arising from such Claims.

119.   **Establishment and Purpose of the Trusts.**   Each of the GUC Equity Trust, the Litigation Trust and any GUC Sub-Trusts shall be established or designated as a trust under applicable state law for the purposes described in the Plan and the applicable Definitive

(Page | 72)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Documents, and shall be funded as and to the extent provided for in the Plan. Each of the GUC Equity Trust, the Litigation Trust and any GUC Sub-Trusts is being established to resolve or satisfy Claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to Claims asserting liability arising out of a tort, breach of contract or violation of law.

120.     **Beneficiaries.** Beneficiaries of the GUC Equity Trust, the Litigation Trust and any GUC Sub-Trusts shall have only such rights and interests in and with respect to the applicable trust assets as set forth in the Plan and the applicable Definitive Documents. Each of the GUC Equity Trustee, the Litigation Trustee and the GUC Sub-Trustee(s) shall be entitled to take the actions set forth in, and in each case in accordance with, the Plan and the applicable Definitive Documents. The GUC Equity Trust, the Litigation Trust and any GUC Sub-Trusts shall be subject to the continuing jurisdiction of the Bankruptcy Court as and to the extent set forth in the Plan.

121.     **Vesting of Assets.** Except as otherwise provided in the Plan, this Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, on the Effective Date, all property in each Estate (including the Unassigned Insurance Policies), all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan (other than the GUC Equity Pool, the Committees' Initial Cash Consideration, the Committees' Post-Emergence Cash Consideration, and the other Litigation Trust Assets), shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, including Article X of the

(Page | 73)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects. For the avoidance of doubt, Holders of General Unsecured Claims shall be entitled to the Committees' Initial Cash Consideration, the Committees' Post Emergence Cash Consideration, the GUC Equity and Litigation Trust Assets as set forth in the Committee Settlement.

122. **Corporate Action.** Upon the Effective Date, all actions contemplated under the Plan and the Definitive Documents, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including, as applicable: (1) selection of the Plan Administrator; (2) implementation of the Restructuring Transactions; (3) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors, before, on, or after the Effective Date involving the corporate structure of the Debtors, the Reorganized Debtors, or the Wind Down Debtors, as applicable, and any corporate action required by the Debtors, the Reorganized Debtors, or the Wind Down Debtors, as applicable, in connection with the Plan or corporate structure of the Debtors, the Reorganized Debtors, or the Wind Down Debtors, as applicable, shall be deemed to have occurred and shall be in effect on the Effective

| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, except for any filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution with applicable governmental authorities required pursuant to applicable state or provincial law.  Before, on, or after the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors, the Reorganized Debtors, or the Wind Down Debtors, as applicable, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Article IV.L of the Plan shall be effective notwithstanding any requirements under non bankruptcy law.

123.    **Restructuring Transactions**.  On the Effective Date (or before or following the Effective Date, as specified in the Restructuring Transactions Memorandum), the Debtors or the Reorganized Debtors (as applicable) shall take all actions set forth in the Restructuring Transactions Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the Plan Restructuring described in Article IV of the Plan, subject in all respects to the terms set forth therein, including, as applicable:  (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that

(Page | 75)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (iv) the execution, delivery, and Filing of the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, the AHG Notes Documentation, and the Takeback Notes Documents; (v) the issuance of New Common Stock and any other securities necessary to implement the Restructuring Transactions, all of which shall be authorized and approved in all respects; (vi) the execution and delivery of the Definitive Documents, (vii) the execution of the Litigation Trust Agreement; and (viii) all other actions that the Debtors determine (with the consent of the Required Junior DIP Noteholders) to be necessary or appropriate in connection with the Consummation of the Plan Restructuring.

124. **Cancellation of Existing Securities and Agreements**. On the Effective Date, except as otherwise specifically provided for in the Plan or one or more Purchase Agreements: (1) the obligations under the DIP Documents, the Junior DIP Documents, the Prepetition Credit Agreement, the 2025 Secured Notes Indenture, the 2026 Secured Notes Indenture, the 2027 Unsecured Notes Indenture, the 2028 Unsecured Notes Indenture, and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

ownership interest in the Debtors or giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled, except as set forth in the Plan, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

125.    On or after the Effective Date, each Holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture(s) or credit agreement that governs the rights of such Holder of such Claim upon such Holder's (or its nominee's or designee's) receipt of the distributions to which it is entitled pursuant to the Plan.  Such surrendered certificate or instrument shall be deemed cancelled as set forth in, and subject to the exceptions set forth in, Article IV.K of the Plan.  If the record Holder of a Notes Claim or Junior DIP Notes Claim is DTC or its nominee, the applicable Trustee or Junior DIP Trustee, or another securities depository or custodian thereof, and Holders of Notes Claims or Junior DIP Notes Claims are represented by a global security held by or on behalf of DTC, the applicable Trustee or Junior DIP Trustee, or such

(Page | 77)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

other securities depository or custodian, then each such Holder of such Notes Claims or Junior DIP Claims shall be deemed to have surrendered such Holder's note, debenture, or other evidence of indebtedness upon surrender of such global security by DTC, the applicable Trustee or Junior DIP Trustee, or such other securities depository or custodian thereof.

126.     Notwithstanding the foregoing, (a) no Executory Contract or Unexpired Lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, (b) the DIP Documents, the Junior DIP Documents, the Prepetition Credit Agreement, the Senior Secured Notes Indentures, and the Unsecured Notes Indentures shall continue in effect solely for the purpose of (i) allowing Holders of the DIP Claims, the Junior DIP Claims, ABL Facility Claims, Holders of FILO Term Loan Facility Claims, the Junior DIP Trustee, and the Trustees, to receive the distributions provided for under the Plan, (ii) allowing the Junior DIP Trustee, the Prepetition Agent and the Trustees to receive or direct distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in <u>Article VI.A </u>of the Plan, (iii) preserving all rights, including rights of enforcement, of the DIP Agents, the Junior DIP Trustee, the Prepetition Agent and the Trustees to indemnification or contribution pursuant and subject to the terms of the DIP Documents, the Junior DIP Documents, the Prepetition Credit Agreement and the Indentures, as applicable, in respect of any claim or Cause of Action asserted against the DIP Agents, the Junior DIP Trustee, the Prepetition Agent and the Trustees, as applicable, (iv) permitting each of the Junior DIP Trustee, the Prepetition Agent, and the Trustees to appear in the Chapter 11 Cases or in any proceeding in

(Page | 78)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

the Bankruptcy Court, and (v) preserving any rights of the DIP Agents, the Prepetition Agent, the Junior DIP Trustee, and the Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture, Prepetition Credit Agreement, or DIP Credit Agreements or Junior DIP Notes Indenture, including any rights to priority of payment and/or to exercise charging Liens.

127.    The Prepetition Agent and Senior Secured Notes Trustee shall be considered Released Parties and shall be fully released and have no further obligation or liability except as provided for in the Plan and this Confirmation Order, and after the performance by the Prepetition Agent and Senior Secured Notes Trustees and each of their respective representatives and professionals of any obligations and duties required under or related to the Plan or, this Confirmation Order, the Prepetition Agent and Senior Secured Notes Trustees shall be relieved of and released from any obligations and duties arising thereunder.

128.    Except as provided in the Plan, on the Effective Date, each DIP Agent and Junior DIP Trustee and their respective agents, successors, and assigns shall be automatically and fully released of all of their duties and obligations associated with the applicable DIP Documents and Junior DIP Documents.  The commitments and obligations, if any, of the DIP Lenders and Junior DIP Noteholders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents or Junior DIP Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

(Page | 79)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

129.    On and after the Effective Date, the duties and responsibilities of the Junior DIP Trustee and the Trustees under the applicable indenture shall be discharged and released, except (i) to the extent required to effectuate the Plan including, but not limited to, making distributions under the Plan to the Holders of Allowed Junior DIP Claims or Allowed Notes Claims under the applicable indenture, and (ii) with respect to any rights of the Junior DIP Trustee or the Trustees to payment of reasonable and documented fees, expenses, and indemnification obligations (to be documented in accordance with the terms of the applicable indenture) as against any money or property distributable to Holders of Claims pursuant and subject to the terms of the applicable Indenture, including any rights to priority of payment and/or to exercise charging liens.  Based on the record before this Court, as Released Parties, the Junior DIP Trustee and the Trustees have diligently and in good faith discharged their duties and obligations pursuant to the Junior DIP Documents and the Indentures, as applicable, and conducted themselves with respect to all matters in any way related to the Junior DIP Notes and the Notes, as applicable, with the same degree of care and skill that a prudent person would exercise or use under the circumstances in the conduct of their own affairs.  Accordingly, the Junior DIP Trustee and the Trustees have, to date, discharged their duties fully in accordance with the Junior DIP Documents and the Indentures, as applicable. After the performance by the Junior DIP Trustee and the Trustees and, in each case, their respective representatives and professionals of any obligations and duties required under or related to the Plan or this Confirmation Order, the Junior DIP Trustee and the Trustees, as Released Parties, shall be deemed to be forever relieved of and released from any obligations and duties arising thereunder.

(Page | 80)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

130.    **Distributions.**  The procedures governing distributions contained in <u>Article VI</u> of the Plan shall be, and hereby are, approved in their entirety.

131.    **AHG New-Money Commitment Obligations.**    The AHG Commitment Agreement Obligations, which were previously approved in the Final Financing Order, shall be treated as allowed administrative expenses of each of the Debtors and their estates pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall be non-refundable, and shall not be subject to any avoidance, disgorgement, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or entity, except as set forth in, and subject to the terms of, the AHG New-Money Commitment Agreement.  The AHG Commitment Agreement Obligations shall not be discharged, modified, or otherwise affected by, dismissal of these Chapter 11 Cases, or conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

132.    **Exit Facilities, Exit 1.5 Lien Notes, and Takeback Notes.**  The Debtors and Reorganized Debtors, as applicable, are hereby authorized without further notice to or action, order or approval of the Bankruptcy Court to enter into, perform under, and consummate the transactions contemplated by the Exit Facilities, the Exit 1.5 Lien Notes, and the Takeback Notes and shall execute and deliver on the Effective Date, as applicable, all agreements, documents, instruments, financing statements, mortgages, security documents, and certificates relating to the Exit Facilities, the Exit 1.5 Lien Notes, and the Takeback Notes, in each case that are contemplated by the Exit

(Page | 81)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Facilities, the Exit 1.5 Lien Notes, and the Takeback Notes to be executed and/or delivered, as applicable, on the Effective Date.

133.    On the Effective Date, New Rite Aid shall enter into the Exit Facilities, the Exit 1.5 Lien Notes, and the Takeback Notes on the terms set forth in the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, respectively.  To the extent not already approved, Confirmation shall be deemed approval of the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein, and, with respect to the Exit Facilities, the immediate and indefeasible repayment in full in Cash of all of the DIP Claims from the proceeds of the Exit Facilities, and authorization of New Rite Aid to enter into and execute (a) the Exit Facilities Credit Agreement, and such other Exit Facilities Documents as may be required to effectuate the Exit Facilities, (b) the Exit 1.5 Lien Notes Indenture and such other Exit 1.5 Lien Notes Documents as may be required to issue the Takeback Notes, and (c) Takeback Notes Indenture and such other Takeback Notes Documents as may be required to issue the Takeback Notes.

134.    On the Effective Date or such date as otherwise approved by the Sale Order, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected,

(Page | 82)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, as applicable; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, as applicable; and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  No party shall be permitted to challenge the validity, enforceability, allowability, priority, secured status, or amount of any Lien granted under the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, as applicable.

135.    To the extent not already approved, New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(Page | 83)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

136.  **AHG Notes.**  The Debtors and Reorganized Debtors, as applicable, are hereby authorized without further notice to or action, order or approval of the Bankruptcy Court to enter into, perform under, and consummate the transactions contemplated by the AHG Notes and shall execute and deliver on the Effective Date, as applicable, all agreements, documents, instruments, financing statements, mortgages, security documents, and certificates relating to the AHG Notes, in each case that are contemplated by the AHG Notes to be executed and/or delivered, as applicable, on the Effective Date, subject to the terms of the AHG New-Money Commitment Agreement.

137.  On or prior to the Effective Date, subject to the terms and conditions of the AHG New-Money Commitment Agreement, the New Money DIP Notes Term Sheet, and the Plan, the Debtors shall create the SCD Trust and enter into the SCD Trust Documentation and the AHG Notes Documentation.  Subject to the terms and conditions of the AHG New-Money Commitment Agreement, the New Money DIP Notes Term Sheet, and the Plan, on the Effective Date, all of the Liens and security interests to be granted in accordance with the AHG Notes Documentation, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the AHG Notes Documentation; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the AHG Notes Documentation and this Confirmation Order; and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers,

(Page | 84)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  No party shall be permitted to challenge the validity, enforceability, allowability, priority, secured status, or amount of any Lien granted under the AHG Notes Documentation or the SCD Trust Documentation, as applicable.

138.  **McKesson Settlement Documents.**  To the extent not already approved, the Debtors and Reorganized Debtors, as applicable, are hereby authorized without further notice to or action, order or approval of the Bankruptcy Court to enter into, perform under, and consummate the transactions contemplated by the McKesson Settlement and shall execute and deliver on the Effective Date, as applicable, all agreements, documents, instruments, financing statements, mortgages, security documents, and certificates relating to the McKesson Settlement, in each case that are contemplated by the McKesson Settlement to be executed and/or delivered, as applicable, on the Effective Date.

139.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the McKesson Settlement Documents, to the extent applicable:  (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the McKesson Settlement Documents, as applicable; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the McKesson Settlement Documents, as applicable; and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers,

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  No party shall be permitted to challenge the validity, enforceability, allowability, priority, secured status, or amount of any Lien granted under the McKesson Settlement Documents, as applicable.

140.    To the extent not already approved, New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

141.    **Preservation of Causes of Action.**  In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VI and Article X of the Plan, and the terms of the Committee Settlement, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action other than the Assigned Claims and the Assigned Insurance Rights, whether arising before or after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) that constitute Elixir Acquired Assets or

(Page | 86)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Retail Acquired Assets, (b) exculpated or released (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article X, or (c) waived in accordance with Article IV.R, which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Reorganized Debtors or the Wind-Down Debtors, as applicable, as of the Effective Date.

142.    The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, may pursue such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights), as appropriate, in accordance with the best interests of the Reorganized Debtors and the Wind-Down Debtors, as applicable; *provided* that, for the avoidance of doubt, the Litigation Trust is not obligated to facilitate (directly or indirectly) the Debtors', Reorganized Debtors', or Wind-Down Debtors' pursuit of any such claims or Causes of Action that are not Assigned Claims or Assigned Insurance Rights.  The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may exclusively enforce any and all such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights).  The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights) and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

143.    No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Purchaser in accordance with the Purchase Agreement(s) or otherwise expressly provided in the Plan, including Article IV and Article X of the Plan.  Unless any such Causes of Action against an Entity are expressly waived (including pursuant to Article IV.R of the Plan), relinquished, exculpated, released, compromised, assigned, or transferred to a Purchaser in accordance with a Purchase Agreement, or settled in the Plan or a Final Order, the Reorganized Debtors and the Wind-Down Debtors expressly reserve all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

144.    Notwithstanding anything to the contrary in the Plan, in the Plan Supplement or in this Confirmation Order, the Debtors shall preserve and transfer and/or assign to the Litigation Trust, the Assigned Claims and the Assigned Insurance Rights and the right to commence, prosecute, or settle all Assigned Claims and Assigned Insurance Rights belonging to such Debtors or their Estates, subject to the occurrence of the Effective Date and the other terms and conditions set forth in the Plan; *provided* that, subject to the terms and conditions of the Plan, (a) the Litigation Trust or GUC Sub-Trust(s) shall be the successor-in-interest to the Debtors' rights, title, and interest in any Assigned Claims and Assigned Insurance Rights, (b) the Litigation Trust or GUC

(Page | 88)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Sub-Trust(s) as may be applicable, shall have exclusive standing to pursue the Assigned Claims and Assigned Insurance Rights, and (c) the Litigation Trustee or GUC Sub-Trust Trustee(s), pursuant to the Committee Settlement Documents, shall (i) retain and may exclusively enforce any and all Assigned Claims and Assigned Insurance Rights, and (ii) have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment all such Assigned Claims and Assigned Insurance Rights and to decline to do any of the foregoing in its discretion and without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  In pursuing any Assigned Claim or Assigned Insurance Right, the Litigation Trust or GUC Sub-Trust(s) shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which an Assigned Claim or Assigned Insurance Right may be bought under section 546 of the Bankruptcy Code.  The Litigation Trust or GUC Sub-Trust(s) shall be entitled to recover on any Assigned Claims or Assigned Insurance Rights as a result of the Settlement of Opioid Claims described in Article IV.B of the Plan and/or any settlement or judgment with respect to the other Assigned Claims and no consent shall be necessary for the Litigation Trust or GUC Sub-Trust(s) to transfer such proceeds of any such Assigned Claims or Assigned Insurance Rights once received from an insurer or other third-party.  For the avoidance of doubt, the Litigation Trust or applicable GUC Sub-Trust shall be solely responsible for effectuating all distributions on account of the Litigation Trust Assets for General Unsecured Claims.

| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

145.    **Preservation of Setoff Rights**.  Notwithstanding anything in <u>Article X</u> of the Plan to the contrary or in a Sale Order, any right of setoff or recoupment is preserved against the Debtors, the Purchasers in the event of a Sale Transaction Restructuring or an Other Asset Sale, and any of their affiliates and successors to the extent such right(s) exist under applicable law and subject to the Debtors', Purchasers', and any of their Affiliates' and successors', as applicable, right to contest any such right(s) of setoff or recoupment; *provided*, *however*, that notwithstanding the foregoing or anything in the Plan to the contrary, the right of any Entity or Holder of a Claim or Interest to assert setoff or recoupment as a defense or affirmative defense to claims brought against them is expressly preserved to the extent permitted by applicable law and shall not be impaired, enjoined, precluded, restricted, or otherwise limited by the Plan or this Confirmation Order.

146.    Notwithstanding anything to the contrary in the Plan, nothing in the Plan or this Confirmation Order shall modify the rights, if any, of any counterparty to any Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy law or non-bankruptcy law, including, but not limited to, the (i) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease(s) with the Debtors, under the Plan, (ii) assertion of rights or setoff or recoupment, if any, in connection with the claim reconciliation process, or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.

(Page | 90)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

147. **Subordination.** The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

148. **Insurance Neutrality.** Nothing in the Plan, the Plan Supplement, the Confirmation Order (including any provision of the Confirmation Order), or any other judgment, order, finding of fact, conclusion of law, determination or statement (written or verbal, on or off the record) made by the Bankruptcy Court, the District Court, or entered by any other court exercising jurisdiction over these Chapter 11 Cases, including in any judgment, order, writ or opinion entered on appeal from any of the foregoing, shall in any action against any insurer:

    i.      in any way impair, alter, supplement, change, expand, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Insurance Policies, or the rights or obligations of any insurers, third-party administrators, the Debtors, the Litigation Trust, any GUC Sub-Trust, or any holder of the Assigned Insurance Rights arising out of, under, or relating to the Insurance Policies and/or applicable law;

(Page | 91)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

ii. constitute an adjudication, judgment, trial, determination on the merits, finding, or conclusion of law establishing:

 a. or liquidating the liability (in the aggregate or otherwise) of any insurer with respect to any claim for insurance coverage;

 b. that the conduct of the Debtors and Committees in connection with the negotiation, development, settlement and/or implementation of the Plan, Plan Supplement or any related documents or agreements was, is, or will be consistent with the terms and conditions of any Insurance Policy or applicable non-bankruptcy law; and

 c. that any insurer was invited to participate in or participated in, consulted on, negotiated, and/or consented to the Plan, Plan Supplement, the Litigation Trust Agreement and other plan documents;

iii. have any res judicata, collateral estoppel or other preclusive effect with respect to any matter set forth in Article IV.F of the Plan, or shall otherwise prejudice, diminish, impair, or affect (under principles of waiver, estoppel, or otherwise) any defense, claim or right any insurer may have under any Insurance Policy or applicable non-bankruptcy law with respect thereto, subject to applicable law;

iv. be construed to constitute a finding, conclusion, or determination regarding any insurer's coverage obligations under any Insurance Policy; or

v. impair any insurer's legal, equitable, or contractual rights under any Insurance Policy or with respect to insurance claims, or the Debtors', the Litigation Trust's,

(Page | 92)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

any GUC Sub-Trust's, or any policyholder's legal, equitable, or contractual rights under any Insurance Policy or applicable law. The parties shall retain, and be permitted to assert, in any action against any insurer, all claims and/or defenses, including any coverage defenses related to the Claims, the insurance claims, and/or any Insurance Policy, notwithstanding any provision of the Plan, Plan Supplement, the Litigation Trust Agreement, the other Plan documents, the Confirmation Order, any findings of fact and/or conclusions of law with respect to the confirmation of the Plan, or any final order or opinion entered on appeal from the Confirmation Order, except as otherwise provided under applicable law.

149. On and after entry of the Confirmation Order, no party shall assert anything to the contrary of Article IV.F of the Plan in any action against an insurer. Each insurer shall be entitled to enforce Article IV.F of the Plan.

150. In the event of any dispute concerning any insurance coverage issue, such dispute shall be resolved pursuant to the terms and conditions of the Insurance Policies and/or applicable law, with all rights respect thereto preserved, and notwithstanding any terms of the Plan, Plan Supplement, or any findings in the Confirmation Order, all pre-petition rulings, findings, opinions, or any other orders of a court of competent jurisdiction with respect to insurance coverage under the Insurance Policies shall continue to apply to the insurers under any Insurance Policy and any assignee of the Assigned Insurance Rights, subject to applicable law.

151. Furthermore, nothing in the Plan, the Plan Supplement, or this Confirmation Order shall relieve or discharge any insurer of the Debtors from their obligations under the Insurance

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Policies; *provided* that nothing therein determines whether or not any insurer is obligated to pay any amount for any Tort Claim.  Nothing in the Plan, the Plan Supplement, or this Confirmation Order shall operate to require any insurer or third-party administrator to pay under any Insurance Policies the liability of any Person or Entity that was not insured thereunder before the Effective Date for any liability that arose before the Effective Date, and, notwithstanding anything in the Plan, the Plan Supplement, this Confirmation Order, or any other order of the Bankruptcy Court relating to the Plan, all rights and defenses with respect to insurance coverage sought pursuant to the Assigned Insurance Rights shall be subject to the applicable terms, conditions, exclusions, and other provisions of the applicable Insurance Policies and applicable law.

152.    Nothing in the Plan, the Plan Supplement, the Confirmation Order, or in any other ruling by the Bankruptcy Court shall prohibit the Insurers under any Insurance Policy from contesting the reasonableness of the Settlement of Opioid Claims in connection with any post-emergence dispute or litigation regarding insurance coverage.

153.    **Release of Liens.**  Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates that have not been previously released shall be fully released, settled, and compromised, and the holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the Debtors' Estates shall be authorized to take such

(Page | 94)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

actions as may be reasonably requested by the Debtors to evidence such releases, at the sole expense of the Debtors or the Wind-Down Debtors, as applicable. Notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims and the Junior DIP Claims shall not be released and such Liens shall remain in full force and effect until the DIP Claims and the Junior DIP Claims are indefeasibly paid in full in Cash or otherwise treated in a manner consistent with Article II.E of the Plan, respectively.

154. **Issuance of New Common Stock.** On or prior to the Effective Date, New Rite Aid shall take steps to provide that the New Common Stock is issued and/or transferred in accordance with the terms of the Plan, this Confirmation Order, the New Corporate Governance Documents, and applicable law (including applicable securities law).

155. **New Corporate Governance Documents.** The terms of the New Corporate Governance Documents are approved in all respects. The New Corporate Governance Documents will prohibit the issuance of non-voting equity Securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the New Corporate Governance Documents may be amended or restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

156. **Assumption and Rejection of Executory Contracts and Unexpired Leases.** The provisions governing treatment of Executory Contracts and Unexpired Leases set forth in Article V of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption, assumption and assignment, Cure Costs, or rejection, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.

(Page | 95)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

For the avoidance of doubt, on the Effective Date, except as otherwise provided in the Plan or this Confirmation Order, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Eighth Amended Plan Supplement; (2) have been previously assumed or rejected by the Debtors pursuant to the Assumption/Rejection Procedures Order or any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (4) are to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, through a Sale Order in connection with any sale transaction, including in a Sale Transaction Restructuring that is pending on the Confirmation Date; (5) are a contract, release, or other agreement or document entered into in connection with the Plan; or (6) are an Insurance Policy and any agreements, documents, or instruments relating thereto.

157.    Except as otherwise provided in this Confirmation Order, entry of this Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically

(Page | 96)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

set forth in the Plan or in this Confirmation Order or any Purchase Agreement to be approved pursuant to the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Notwithstanding anything in the Plan to the contrary, with respect to any Unexpired Lease that is not assumed on the Effective Date pursuant to Article V.A of the Plan, the effective date of rejection of such Unexpired Leases shall be the later of: (A) the Effective Date, except (1) in connection with a Court-Ordered Cure Cost pursuant to Article V.C of the Plan or (2) if agreed by the applicable counterparty, and (B) the date upon which the Debtors actually relinquish possession and control of the premises by (1) notifying the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returning the keys, key codes, or security codes, if any, to the landlord or (2) notifying the landlord in writing (e-mail being sufficient) of the Debtors' surrender of the premises and that the keys, key codes, or security codes, if any, are not available, but that the landlord may rekey the premises, as applicable; *provided* that on the date the Debtors surrender the premises as set forth in subsection (B) above, all property remaining in the premises will be deemed abandoned free and clear of any interests, Liens, Claims, and encumbrances and landlords may dispose of such property without further notice or court order, unless otherwise agreed by the applicable lessor or pursuant to an order of the Bankruptcy Court. If the effective date of any rejection of an Unexpired Lease is after the Confirmation Date pursuant to the terms in the Plan and in this Confirmation Order, the Reorganized Debtors shall provide notice of such rejection to the applicable landlord no later than the applicable deadlines set forth in section 365(d)(4) of the Bankruptcy Code, to the extent modified by the Extension Order, setting forth the deadline for Filing any Claims arising

(Page | 97)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

from such rejection, which notice shall also be served upon the GUC Equity Trustee and Litigation Trustee.

158. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan, or on such terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that, if a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved. Any Cure Cost shall be deemed fully satisfied, released, and discharged upon payment of the Cure Cost. Any disputed Cure Costs shall be determined in accordance with the procedures set forth in Article V.C of the Plan.

159. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in, and be fully enforceable by the applicable Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption, subject to Article V.A of the Plan. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Debtors may amend or otherwise modify the Schedule of Assumed Executory Contracts and Unexpired Leases prior to entry of the Confirmation Order to designate an Executory Contract or Unexpired Lease previously included on the Schedule of Assumed Executory Contracts and Unexpired Leases as assumed, assumed and assigned, or

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

rejected, as applicable, subject to the applicable deadlines set forth in 365(d)(4) of the Bankruptcy Code, to the extent modified by the Extension Order; *provided* that, notwithstanding the foregoing, the Debtors may amend or modify the Schedule of Assumed Executory Contracts and Unexpired Leases with respect to any existing employment agreements of the Debtors' executives prior to the Effective Date. Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable.

160. The Debtors' determinations regarding the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Debtors, their Estates, and other parties in interest in these Chapter 11 Cases. Except as otherwise provided in this Confirmation Order, this Confirmation Order shall constitute a Final Order, subject to paragraph 161 hereof, approving the assumptions and assumptions and assignments of the Executory Contracts and Unexpired Leases set forth in the Plan and the Schedule of Assumed Executory Contracts and Unexpired Leases and the rejection of the Executory Contracts and Unexpired Leases deemed rejected upon entry of the Confirmation Order pursuant to section 365(a) and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order with respect to all existing employment agreements of the Debtors' executives, such agreements shall be  (i) assumed on the Effective Date, (ii) replaced with new employment agreements on terms mutually acceptable to the Debtors and the Required Junior DIP Noteholders;

(Page | 99)
Debtors:          RITE AID CORPORATION, *et al.*
Case No.          23-18993 (MBK)
Caption of Order: Order Approving the Disclosure Statement For, and Confirming the Second
                  Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation
                  and Its Debtor Affiliates

*provided* that the Debtors and the Required Junior DIP Noteholders shall, promptly following the filing of the Plan, commence negotiations in good faith regarding the terms of any such new employment agreements, if any, (iii) rejected, in each case of clause (i), (ii) and (iii), with the consent of the Required Junior DIP Noteholders, or (iv) deemed rejected solely to the extent the Debtors and the Required Junior DIP Noteholders disagree on the assumption (or terms thereof) or rejection of an existing employment agreement and such dispute is not resolved among the Debtors and Required Junior DIP Noteholders within a reasonable period of time (not to exceed five (5) Business Days from the date upon which such dispute arose).

161. **Additional Provisions Regarding Unexpired Leases.** With respect to cure disputes, the Debtors will address the cure objections at a later hearing date, to the extent not resolved by ordinary-course reconciliation. The Debtors will also address all assumption and adequate assurance objections at a later, separate hearing date. Accordingly, notwithstanding anything to the contrary in the Plan or this Confirmation Order, a landlord's objection challenging assumption, including any adequate assurance-related issues (including evidence), is expressly reserved until a later proceeding is scheduled on lease assumptions. No landlord needs to object to or challenge the assumption or assumption and assignment of their leases as part of Confirmation, including any challenge to the Debtors' feasibility evidence and cure amounts at Confirmation, to preserve their rights for that later hearing. While the Debtors may rely on similar feasibility evidence in connection with lease assumption issues, the Debtors will not argue issue preclusion as it relates to feasibility-related evidence or findings that may be relevant to lease assumption issues.

(Page | 100)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

162.    Notwithstanding anything in the Plan, Plan Supplement, or this Confirmation Order, nothing herein shall impair, waive, or limit the rights and remedies of landlords under the Debtors' Unexpired Leases that are assumed pursuant to the Plan with respect to contractually-required insurance coverage.

163.    The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall schedule a status conference forty-five days after the Confirmation Date, or as soon as reasonably practicable thereafter, subject to the availability of the Bankruptcy Court, regarding Cure Costs reconciliation or any other unresolved assumption objections related to Unexpired Leases that are proposed to be assumed under the Plan.  At such status conference, any affected landlord may request a further status conference, a briefing schedule, or a hearing on their assumption objection.

164.    **Indemnification.**  Except as otherwise provided in the Plan, all Indemnification Provisions currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of each of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of the Debtors than the Indemnification Provisions in place prior to the Effective Date.  For the avoidance of doubt, however, any Indemnification Provisions for any

(Page | 101)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Excluded Party shall not be Reinstated. The Reorganized Debtors instead shall provide indemnification to any Excluded Party who is a past or present director or officer of the Debtors for acts, omissions, or events that took place prior to the Effective Date, however such indemnification shall be expressly excess of and net of any insurance coverage available to such Excluded Party, including, but not limited to, being expressly excess of any insurance coverage available under D&O Liability Insurance Policies (the "Excluded Party Indemnification"). With the exception of it applying expressly excess of and net of any insurance coverage, the Excluded Party Indemnification shall be on terms no less favorable to such Excluded Party than the Indemnification Provisions in place prior to the Effective Date.

165. **Insurance Policies.** Notwithstanding anything to the contrary in the Plan, the Plan Supplement or this Confirmation Order:

i.  Nothing in the Plan, the Plan Supplement or this Confirmation Order shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies. After the Effective Date, all directors, officers, managers, authorized agents or employees of the Debtors (or their Affiliates) who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Liability Insurance Policies for the full term of such policies, including but not limited to any extension of coverage after the end of such policy period if any extended reporting period has been purchased, in accordance with the terms thereof.

ii. The Debtors shall maintain tail coverage for any current D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less

| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the current D&O Liability Insurance Policies. In addition to such tail coverage, the D&O Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

iii. To the extent the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan, unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed such Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims under such Insurance Policies, and (ii) such Insurance Policies and any agreements, documents, or instruments relating thereto, shall vest in the Reorganized Debtors or the Wind-Down Debtors, as applicable.

iv. The Litigation Trust or GUC Sub-Trust(s) shall be responsible for monitoring and preserving the ability to maintain claims that are Assigned Claims or Assigned Insurance Rights against the Insurance Policies (except for (a) the Debtors' Unassigned Insurance Policies and (b) the Unassigned Insurance Rights), including the D&O Liability Insurance Policies. To the extent the Debtors are not the first named insured under any Insurance Policy and notwithstanding Confirmation of the Plan or the occurrence of the Effective Date (i) nothing herein shall constitute a rejection of such Insurance Policy, (ii) such Insurance Policy shall remain in full force and effect, and (iii) any and all rights of the Debtors under such Insurance

| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Policy shall remain in full force and effect. For the avoidance of doubt, the dissolution of the Debtors or the Reorganized Debtors shall have no impact upon the rights of the Litigation Trust or GUC Sub-Trust(s) to assert the Assigned Insurance Rights or Assigned Claims.

v.        After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, and the Litigation Trust, the GUC Sub-Trust(s), and any successor or assign of the Litigation Trust or the GUC Sub-Trust(s) shall not terminate the coverage under any D&O Liability Insurance Policies (including the "tail policy") in effect prior to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy in accordance with and subject in all respects to the terms and conditions of any applicable D&O Liability Insurance Policy, which shall not be altered, for the full term of such D&O Liability Insurance Policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

166.    For the avoidance of doubt, nothing herein shall in any way impair the Litigation Trust's or GUC Sub-Trust's ability on and after the Effective Date to assert on behalf of the Debtors or Reorganized Debtors, as applicable, any Assigned Claims or any Assigned Insurance Rights, on account of such Assigned Claims or such Assigned Insurance Rights, which shall not be altered except as otherwise provided herein. Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement the Insurance Policies, with the reasonable

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

consent and cooperation of the Litigation Trust or GUC Sub-Trust(s) and as the Debtors and the Litigation Trust or GUC Sub-Trust(s) deem necessary (except with respect to the Unassigned Insurance Policies, for which no consent is required).

167.    **Employee and Retiree Benefits.**  Except as otherwise provided in <u>Article V.G</u>, all compensation and benefits programs and employment agreements shall be assumed by the Reorganized Debtors, and the Reorganized Debtors shall continue the compensation and benefits programs according to existing terms and practices.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, with respect to all existing employment agreements of the Debtors' executives, such agreements shall be (i) assumed on the Effective Date, (ii) replaced with new employment agreements on terms mutually acceptable to the Debtors and the Required Junior DIP Noteholders, *provided* that the Debtors and the Required Junior DIP Noteholders shall, promptly following the filing of the Plan, commence negotiations in good faith regarding the terms of any such new employment agreements, if any, (iii) rejected, in each case of clause (i), (ii), and (iii), with the consent of the Required Junior DIP Noteholders, or (iv) deemed rejected solely to the extent the Debtors and the Required Junior DIP Noteholders disagree on the assumption (or terms thereof) or rejection of an existing employment agreement and such dispute is not resolved among the Debtors and Required Junior DIP Noteholders within a reasonable period of time (not to exceed five (5) Business Days from the date upon which such dispute arose).

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

168.    **Collective Bargaining Agreements.**  For the avoidance of doubt, the collective bargaining agreements ("CBAs") between labor unions and various Debtors may only be rejected pursuant to and in accordance with the procedures and standards set forth in section 1113 of the Bankruptcy Code; provided that the Debtors shall assume the Pension Plan as well as all CBAs and union contracts.

169.    The cure amounts, if any, related to the assumption of the CBAs shall be satisfied in full by payment by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course, of all the Debtors' or the Reorganized Debtors' obligations under the assumed CBA(s), as applicable, arising under the CBAs to the extent such obligations are valid and payable.  As a result, if the CBAs are assumed, no Proof of Claim, request for administrative expense, or cure claim need be Filed with respect to such cure amounts, provided, however, that the Debtors' and the Reorganized Debtors' rights, defenses, claims, and counterclaims with respect to any such obligations are expressly preserved.

170.    **Pension Plans.**  On the Effective Date, the Reorganized Debtors shall, in the ordinary course of their business and in accordance with applicable non-bankruptcy law, (i) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083; (ii) pay all required premiums, if any, owed to PBGC under 29 U.S.C. §§ 1306 and 1307, for the Pension Plan under ERISA or the Internal Revenue Code ("IRC"); and (iii) administer the Pension Plan in accordance with the applicable provisions of ERISA and the IRC, and the Reorganized Debtors reserve their rights thereunder.  Further, PBGC and the Debtors agree that all Proofs of Claim Filed by PBGC are deemed withdrawn on the Effective Date.

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

171.    Nothing in the Disclosure Statement, the Plan, this Confirmation Order, or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plan for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plan, subject to any and all applicable rights and defenses of such parties, which are expressly preserved.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document Filed in the Chapter 11 Cases.  For the avoidance of doubt, the Reorganized Debtors shall not be released from any liability or obligation under ERISA, the IRC, and any other applicable law relating to the Pension Plan.

172.    **Authorization to Consummate.**  The Debtors are authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in <u>Article XI</u> of the Plan.

173.    **Professional Fee Claims.**  All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders, *provided* that, the allowance and payment of such Professional Fee Claims shall be consistent with the applicable Acceptable Professional Fee Budget (as defined in the Final Financing Order and as agreed to by the relevant Professionals); *provided, further, that,*

Debtors:              RITE AID CORPORATION, *et al.*
Case No.              23-18993 (MBK)
Caption of Order:     Order Approving the Disclosure Statement For, and Confirming the Second
                      Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation
                      and Its Debtor Affiliates

for the avoidance of doubt, the Acceptable Professional Fee Budget may not be amended to be

inconsistent with the terms of any prior orders of this Bankruptcy Court without the consent of any

party affected by such amendment. The Reorganized Debtors or the Wind-Down Debtors (or the

authorized signatories to the Professional Fee Escrow Account, after consultation with the Plan

Administrator), as applicable, shall pay the amount of the Allowed Professional Fee Claims owing

to the Professionals in Cash, subject to the Acceptable Professional Fee Budget and provisions set

forth below in paragraphs 174 and 175 of the Confirmation Order, to such Professionals from

funds held in the Professional Fee Escrow Account when such Professional Fee Claims are

Allowed by entry of an order of the Bankruptcy Court.

174.    As soon as is reasonably practicable after the Confirmation Date and no later than

the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with

Cash equal to the Professional Fee Escrow Amount in accordance with the Acceptable Professional

Fee Budget. The Professional Fee Escrow Account shall be maintained in trust solely for the

Professionals and for no other Entities until all Professional Fee Claims Allowed by the

Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more

Final Orders of the Bankruptcy Court and in accordance with the Acceptable Professional Fee

Budget. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account or

Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee

Escrow Account shall not be considered property of the Estates, the Debtors, or the Wind Down

Debtors.

(Page | 108)

| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

175.    The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors, the DIP Agents, the Junior DIP Noteholders, and/or the Committees before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided* that such estimate shall not (a) be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates or (b) exceed the amounts applicable to such Professional in accordance with the Acceptable Professional Fee Budget.  The Debtors shall promptly forward such estimates to the DIP Agents and the Required Junior DIP Noteholders.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional, with such estimate provided to the DIP Agents, the Required Junior DIP Noteholders, and the Committees.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account in consultation with the Junior DIP Noteholders.  For the avoidance of doubt, to the extent that the hourly and monthly fees (but not success fees) and expenses of the Committees and the Committees' Professionals incurred on or after April 1, 2024 are less than $9.5 million, the Committees' Initial Cash Consideration shall be increased by an amount equal to the difference between (a) $9.5 million and (b) the fees and expenses actually incurred by the Committees and the Committees' Professionals during the aforementioned period. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Order, the payment obligations of the Debtors or Reorganized Debtors, as applicable, with respect to all Professional Fee Claims shall be consistent with and not exceed the amounts set forth in the Acceptable Professional Fee Budget as agreed to by the applicable Professionals regardless of the Allowed amount of the Professional Fee Claims of such Professionals; *provided* that, for the avoidance of doubt, the Acceptable Professional Fee Budget may not be amended to be inconsistent with the terms of any prior orders of this Bankruptcy Court without the consent of any party affected by such amendment.

176. **Post-Effective Date Fees and Expenses.**  Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors or the Wind-Down Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Purchaser(s) shall not be liable or otherwise responsible for the payment of any Professional Fee Claims.

177. After the Effective Date, to the extent the Trustees provide services or incur expenses, including professional fees, related to the Plan or the applicable indenture, including with respect to the effectuation of any distributions under the Plan or any action the Debtors request

(Page | 110)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

to be taken in furtherance of the Plan, the reasonable and documented fees and expenses of the

Trustees, including professional fees, shall be paid in the ordinary course by the Debtors or the

Debtors' successor-in-interest.  Notwithstanding this section, the Trustees shall have the right to

exercise their respective charging liens under the applicable Indentures against distributions on

account of the respective Notes Claims for the payment of the Trustees' fees and expenses, to the

extent not otherwise paid.

178. **Release, Exculpation, Discharge, Release of Liens, and Injunction Provisions.**

The following release, exculpation, Discharge, Release of Liens, and injunction provisions set

forth in <u>Article X</u> of the Plan are approved and authorized in their entirety, and such provisions are

effective and binding on all parties and Entities to the extent provided therein.

a. **Settlement, Compromise and Release of Claims and Interests.**

179. **The assets of the Debtors, the Reorganized Debtors, and the Wind Down**

**Debtors, as applicable, are being and shall be used for the satisfaction of expense obligations**

**and/or the payment of Claims only in the manner set forth in the Plan and shall not be**

**available for any other purpose.  Except as otherwise specifically provided in the Plan, this**

**Confirmation Order, or in any contract, instrument, or other agreement or document**

**created pursuant to the Plan, pursuant to and to the fullest extent permitted by section**

**1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided**

**in the Plan shall be in complete satisfaction, discharge, compromise, and release, effective as**

**of the Effective Date, of Claims, including General Unsecured Claims (including any**

**Intercompany Claims resolved or compromised after the Effective Date by the Reorganized**

(Page | 111)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Debtors or the Wind-Down Debtors, as applicable), Interests, controversies, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date (including any Causes of Action or Claims based on theories or allegations of successor liability), any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests

(Page | 112)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

**based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Reorganized Debtors, the Wind Down Debtors, or the Chapter 11 Cases, that occurred prior to the Effective Date, other than as expressly provided in the Plan or this Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan. This Confirmation Order shall be a judicial determination of the settlement, discharge, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.**

180. **Notwithstanding anything herein to the contrary, and for the avoidance of doubt, the Debtors, and/or the Wind-Down Debtors, as applicable, shall not be released from liability for any Tort Claims; *provided*, *however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.**

b. **Release of Liens.**

181. **On the Effective Date, concurrently with the Consummation of the Restructuring Transaction and except as otherwise set forth in the Purchase Agreement, as applicable, the Retail Acquired Assets shall be transferred to and vest in New Rite Aid free**

(Page | 113)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of this Confirmation Order, the Plan, and the Purchase Agreement(s), each as applicable. Without limiting the foregoing, except as otherwise provided in the Purchase Agreement(s), the Plan, the Plan Supplement, the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, the Takeback Notes Documents, the AHG Notes Documentation, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III thereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases.  The presentation or filing of this Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. Notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims and the Junior DIP Claims shall not be released and such Liens shall remain in full force and effect until the DIP Claims and the Junior DIP Claims are indefeasibly paid in full in Cash or otherwise treated in a manner consistent with **Article II.E** of the Plan, respectively.

c.      **Releases by the Debtors.**

182.    **Except as otherwise provided in the Plan or this Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates and, if applicable, the Wind-Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, or through, for, or because of, the foregoing Entities, from any and all claims and Causes of Action, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, and the Wind-Down Debtors (if applicable), whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or**

(Page | 115)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, and the Wind-Down Debtors (if applicable), or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Restructuring Transactions, their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the pursuit of the Restructuring Transaction, the Committee Settlement, the

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Committee Settlement Documents, the UCC / TCC Recovery Allocation Agreement, the AHG New-Money Commitment Agreement, the Junior DIP Facility, the MedImpact Term Loan Sales Process, the administration and implementation of the Plan equitization (if applicable) or the Wind-Down (if applicable), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, in all cases upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  For the avoidance of doubt, nothing contained in the Plan, including <u>Article X.C</u>, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights or Tort Claims Insurance Proceeds and no Assigned Claims against any Excluded Parties shall be released; provided, further, that nothing in the Plan or this Confirmation Order shall operate as a release of, and the Debtors shall not release, any Assigned Claim against any Excluded Parties or any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

183.    Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in <u>Article X.C</u> by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in <u>Article X.C</u> of the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the

(Page | 117)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

**Restructuring Transactions and implementing the Plan; (ii) a good-faith settlement and compromise of the claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors or their respective Estates or, if applicable, the Reorganized Debtors or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**184.    Notwithstanding anything to the contrary in the Plan or in this Confirmation Order, consistent with the terms of the McKesson Settlement Documents, with the exception of (i) the Debtors' and Reorganized Debtors' obligations to McKesson under the Plan, (ii) McKesson and the Debtors' and Reorganized Debtors' ongoing business relationships, including under the Interim Agreement (as defined in the McKesson New Contract) and the McKesson New Contract, and (iii) McKesson's right to assert its Co-Defendant Defensive Rights as set forth in __Article VI.K__ of the Plan and in this Confirmation Order, the Debtors and the Reorganized Debtors (and each of the Debtors' and the Reorganized Debtors' Related Parties), on the one hand, and McKesson and McKesson's Related Parties, on the other hand, shall exchange full and complete mutual releases, as set forth in the McKesson Settlement Documents, the Plan and Confirmation Order.  For the avoidance of doubt, (a) McKesson is not an Excluded Party, (b) Assigned Claims shall not include any claims or Causes of Action against McKesson, *provided*, that, for the avoidance of doubt, Assigned**

(Page | 118)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Claims shall include the Debtors' rights to pursue all product warranties and indemnities from all manufacturers and vendors of McKesson with respect to products purchased by McKesson and resold to Rite Aid ("**Pass Through Rights**"), including any Pass Through Rights as provided in any agreement between Rite Aid and McKesson, and (c) Assigned Insurance Rights shall not include insurance rights under any Insurance Policy issued to McKesson under which any Debtor is designated as an additional insured party.

### d.    Third-Party Release.

185.    Except as otherwise expressly set forth in the Plan or this Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns,

managers, accountants, attorneys, representatives, consultants, agents, and any other

Persons claiming under or through them, including any derivative claims asserted or

assertable on behalf of any of the Debtors, would have been legally entitled to assert in its

own right (whether individually or collectively) or on behalf of the Holder of any Claim or

Interest or other Person, based on or relating to, or in any manner arising from, in whole or

in part, the Debtors (including the management, ownership, or operation thereof) or the

Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the

purchase or sale of any security of the Debtors, the subject matter of, or the transactions or

events giving rise to, any Claim or Interest that is treated in the Plan, the business or

contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-

court restructuring efforts, intercompany transactions between or among a Debtor and

another Debtor, the formulation, preparation, dissemination, negotiation, filing, or

consummation of the Definitive Documents, or any contract, instrument, release, or other

agreement or document created or entered into in connection with the Definitive Documents,

the pursuit of Consummation of the Plan, the Mediation (including the negotiations with

respect thereto), the pursuit of the Restructuring Transaction, the Committee Settlement,

the Committee Settlement Documents, the UCC / TCC Recovery Allocation Agreement, the

AHG New-Money Commitment Agreement, the Junior DIP Facility, the MedImpact Term

Loan Sales Process, the restructuring of any Claim or Interest before or during the Chapter

11 Cases, the administration and implementation of the Plan Restructuring (if applicable)

(Page | 120)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

and the Wind-Down (if applicable), in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided* that, notwithstanding anything in the Plan, the Plan Supplement or this Confirmation Order to the contrary, the Debtors and/or the Wind-Down Debtors, as applicable, shall not be released from liability for any Tort Claims; *provided, however*, that any recovery for any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets, and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.  For the avoidance of doubt, nothing contained in the Plan, including Article X.D thereof, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights, or Tort Claims Insurance Proceeds and no Assigned Claims against any Excluded Parties shall be released; *provided, further*, that nothing in the Plan or this Confirmation Order shall operate as a release of, and the Debtors shall not release, Assigned Claims against any Excluded Parties or any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

(Page | 121)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

186. **Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article X.D of the Plan, which include by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article X.D of the Plan is: (i) consensual; (ii) given in exchange for the good and valuable consideration provided by the Released Parties; (iii) a good-faith settlement and compromise of such claims and Causes of Action; (iv) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; (vii) a sound exercise of the Debtors' business judgment; and (viii) a bar to any of the Releasing Parties or the Debtors or their respective Estates or, if applicable, the Reorganized Debtors or the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

187. **Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt in to the releases contained in Article X.D of the Plan in accordance with the Plan and exercises such opt in may not assert any Claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Reorganized Debtors. From and after the Effective Date, any Entity that did not opt in to (or otherwise did not participate in) the releases contained in Article X.D in accordance with the Plan may not assert any Claim or other Cause of Action against any Released Party for which it is asserted or implied that such**

(Page | 122)

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

**Claim or Cause of Action is not subject to the releases contained in <u>Article X.C</u> of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such Claim or Cause of Action is not subject to the releases contained in <u>Article X.C</u> of the Plan and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Released Party.  For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator.   The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in <u>Article XI</u> of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.  Notwithstanding anything herein to the contrary, and for the avoidance of doubt, the Debtors shall not be released from liability for any Tort Claims; *provided, however*, that any recovery for any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors or the Wind-Down Debtors, and no Person, Entity, or other party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets and the GUC Equity Pool, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.  For the avoidance of doubt, and notwithstanding the foregoing, no Holder of a General Unsecured Claim, including a**

(Page | 123)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Tort Claim, that does not opt in to the Third-Party Release shall be a Releasing Party or shall otherwise be deemed to grant the Third-Party Release.

188.    **For the avoidance of doubt and notwithstanding anything to the contrary herein, in the Plan Supplement, this Confirmation Order or otherwise, any recovery on behalf of claims or Causes of Action (if any) contributed to the Litigation Trust or a GUC Sub-Trust against any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with the Plan (including those not included in the definition of Debtor Related Parties) shall be expressly limited to proceeds of the applicable Insurance Policies, and no Person, Entity, or otherwise shall attempt to collect on assets of any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with the provisions of the Plan (including those not included in the definition of Debtor Related Parties), except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability, and all such directors and officers shall have the full protections of any existing D&O Liability Insurance Policies.**

e.    **Exculpation.**

189.    **Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any**

(Page | 124)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

**Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or this Confirmation Order in lieu of such legal opinion), except for claims or Causes of Action in each case arising out of or related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided, however*, that no Person or Entity that is not an Exculpated Party shall be entitled to rely on the exculpation provided for in <u>Article X.E</u> of the Plan, including by asserting <u>Article X.E</u> as a defense or the basis for a claim or Cause of Action in its own name (whether directly or derivatively, and, whether or not in the capacity as a subrogee, assignee, or successor to an Exculpated Party, except to the extent that such relation renders such Person or Entity an Exculpated Party in its own right). For the avoidance of doubt, nothing contained in the Plan, including <u>Article X.E</u>, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance**

| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

**Rights, or Tort Claims Insurance Proceeds and no Excluded Party shall be exculpated for any Assigned Claims; *provided, further*, that nothing in the Plan or this Confirmation Order shall operate as a release of, and the Debtors shall not release, Claims or Causes of Action against any Excluded Parties or any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.**

**190.    For the avoidance of doubt, the Committees, each of their members, and the advisors to the Committees' and their members shall be Exculpated Parties and shall be exculpated for any Claims or Causes of Action associated with the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or this Confirmation Order in lieu of such legal opinion), the**

(Page | 126)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Committee Settlement (including the Settlement of Opioid Claims), the UCC / TCC Recovery

Allocation Agreement, or any of the Committee Settlement Documents.

191.     The Exculpated Parties have, and upon Consummation of the Plan shall be

deemed to have, participated in good faith and in compliance with the applicable laws with

regard to the solicitation of votes and distribution of consideration pursuant to the Plan and,

therefore, are not, and on account of such distributions shall not be, liable at any time for

the violation of any applicable law, rule, or regulation governing the solicitation of

acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

192.     The exculpation will be in addition to, and not a limitation of, all other releases,

indemnities, exculpations, and any other applicable law or rules protecting such Exculpated

Parties from liability; *provided, however*, that notwithstanding anything herein to the

contrary, nothing in the Plan shall affect, limit, or release in any way any performance

obligations of any party or Entity under the Plan or any document, instrument, or agreement

(including those set forth in the Plan Supplement) executed to implement the Plan (including

any Purchase Agreement and any documents in connection therewith).

193.     Solely with respect to the exculpation provisions, notwithstanding anything to

the contrary in the Plan, the 1125(e) Covered Parties shall not incur liability for any Claim

or Cause of Action related to any act or omission in connection with, relating to, or arising

out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good

faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the

participation, in good faith and in compliance with the applicable provisions of the

(Page | 127)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, or the negotiations thereof. No Entity or Person may commence or pursue a Claim or Cause of Action against any of the 1125(e) Covered Parties that is subject to the terms of this paragraph, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim or Cause of Action for actual fraud, gross negligence, or willful misconduct against any such 1125(e) Covered Party and such party is not exculpated pursuant to this provision; and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such 1125(e) Covered Party. The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. The Exculpation shall not apply with respect to the United States, as set forth within the Plan.

### f. Injunction.

194. **Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except with respect to Co-Defendant Defensive Rights set forth in Article VI.K of the Plan, as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or this Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article X.C of the Plan, released pursuant to the Debtor Release, the Third Party Release, or another provision of the Plan (including the release of Liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking**

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

**any of the following actions against, as applicable, the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust, the Litigation Trust, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan. For the avoidance of doubt, nothing contained in the Plan, including <u>Article X.F</u>, shall release, compromise, impair, or**

(Page | 129)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

in any way affect any Assigned Claims or Co-Defendant Defensive Rights set forth in <u>Article VI.K</u> of the Plan. <u>Article X.F</u> of the Plan and these paragraphs 194–198 of this Confirmation Order shall not apply to Tort Claims, which shall be subject to <u>Article X.G</u> of the Plan.

195.     Except as otherwise provided in the Plan or this Confirmation Order, no Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust (with respect to General Unsecured Claims), the Litigation Trust (with respect to General Unsecured Claims), the Exculpated Parties, or the Released Parties, as applicable, that relates to or arises out of a Claim or Cause of Action subject to <u>Article X.C</u>, <u>Article X.D</u>, or <u>Article X.E</u> thereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor (or their Affiliates), Reorganized Debtor (or their Affiliates), Wind-Down Debtor (or their Affiliates), GUC Equity Trust, Litigation Trust, Exculpated Party, or Released Party.

196.     Except as otherwise provided in the Plan or this Confirmation Order, upon entry of this Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Plan or this Confirmation

(Page | 130)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in **Article X.F** of the Plan.

197.    For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as provided for in **Article VI.K** of the Plan or otherwise specifically provided in the Plan, a Sale Order, or this Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors (or their Affiliates), the Estates, the Purchaser, or, if applicable, the Reorganized Debtors (or their Affiliates) or the Wind Down Debtors (or their Affiliates), except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Reorganized Debtors or the Wind-Down Debtors, as applicable, or otherwise contemplated under the Sale Order.  Such injunction will not enjoin Persons, Entities, or Holders of Claims that do not consent to or otherwise are not subject to the Third Party Release from pursuing any direct (but not derivative) claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Purchaser, the Reorganized Debtors (if applicable), or the Wind Down Debtors (if applicable).

(Page | 131)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

198.     **Solely with respect to Unassigned Insurance Policies, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit (i) claimants with valid workers' compensation claims or direct action claims against insurance companies under applicable non-bankruptcy law to proceed with their claims, (ii) insurance companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) worker's compensation claims, (B) claims where the claimant asserts a direct action claim against an insurance company under applicable non-bankruptcy law, or an order as been entered by this Bankruptcy Court granting a claimant relief from the stay or the injunction set forth in the Plan to proceed with its claims, and (C) all costs in relation to each of the foregoing, and (iii) the Chubb Companies (as defined below) to draw on or against, use and/or apply all of the collateral and security provided by or on behalf of the Debtors (and the Reorganized Debtors or the Wind-Down Debtors, as applicable, at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, or the Wind-Down Debtors, as applicable) in accordance with and pursuant to the Chubb Insurance Program (as defined below).**

199.     **Approval and Authorization of the Release Opt-In.**  The Debtors are authorized to solicit, receive, and tabulate the election of Holders of Claims via the Notice and Third-Party Release Opt-In Form (the "Opt-In Form"), which shall be substantially in the form attached hereto as **Exhibit D**.  Kroll is authorized to assist the Debtors in:  (a) distributing the Opt-In Form;

| Debtors: | RITE AID CORPORATION, *et al*. |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

(b) receiving, tabulating, and reporting on the results of Opt-In Form; (c) responding to inquiries from Holders of Claims relating to the Opt-In Form; and (d) if necessary, contacting Holders of Claims regarding the release opt-ins. Kroll is also authorized to accept the Opt-In Form via electronic online transmission through an online balloting portal on the Debtors' case website. The encrypted data and audit trail created by such electronic submission shall become part of the record of any Opt-In Form submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective. Kroll is authorized to serve the Opt-In Form on Holders of Tort Claims in accordance with any completed and returned solicitation directive.

200. **Channeling Injunction.** The Bankruptcy Court hereby approves Article X.G of the Plan, which provides:

201. TERMS. Pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons or Entities that have held or asserted or that hold or assert any Tort Claim shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of, on or with respect to any Tort Claim from or against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), including:

> a. commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Tort Claims, against, or affecting any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), or any property or interests in property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

(Page | 133)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

b.   enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) or against the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

c.   creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) or the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

d.   asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), or against the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims; and

e.   taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Definitive Documents, with respect to any Tort Claims.

RESERVATIONS.  Notwithstanding anything to the contrary in <u>Article X.G</u> of the Plan or this Confirmation Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

a.   the rights of Holders of Tort Claims to the treatment afforded them under the Plan and the Definitive Documents, including the rights of Holders of Tort Claims to assert such Tort Claims in accordance with the Plan and the Litigation Trust Documents;

b.   the rights of Persons to assert any claim, debt, litigation, or liability for payment of expenses against the Litigation Trust and/or any GUC Sub-Trust as provided in the Litigation Trust Documents;

c.   the rights of the Litigation Trust and/or GUC Sub-Trust to pursue, litigate, collect on and enforce Assigned Insurance Rights and the Assigned Claims in accordance with the terms of the Plan;

(Page | 134)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

d.    the Litigation Trust and/or any GUC Sub-Trust from enforcing its rights, on behalf of itself, against the Debtors or the Reorganized Debtors in accordance with the terms of the Plan; or

e.    the Litigation Trustee(s) and/or any GUC Sub-Trust Trustee(s) from assigning and/or transferring the Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust and/or any GUC Sub-Trust, as further described in the Litigation Trust Documents, to the extent permitted by the terms and conditions of the applicable Insurance Policy(ies) and applicable law, *provided*, *however*, that any such assignee or transferee shall remain subject to the terms and conditions of the Plan and the Confirmation.

MODIFICATIONS.    There can be no modification, dissolution or termination of this Channeling Injunction, which shall be a permanent injunction.

NON-LIMITATION OF CHANNELING INJUNCTION.    Except as expressly set forth in paragraph (2) of Article X.G of the Plan, nothing in the Plan or the Litigation Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of this Channeling Injunction issued in connection with the Plan.

BANKRUPTCY RULE 3016 COMPLIANCE.    The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

202.    **Insurer Injunction.**    The Bankruptcy Court hereby approves Article X.H of the

Plan, which provides:  TERMS.  In accordance with section 105(a) of the Bankruptcy Code, upon

the occurrence of the Effective Date, all Persons that have held or asserted or that hold or assert

any claim based on, arising under or attributable to an Insurance Policy (excluding (a) the

Unassigned Insurance Policies and (b) the Unassigned Insurance Rights) shall be, and hereby are,

permanently stayed, restrained and enjoined from taking any action for the purpose of directly or

indirectly collecting, recovering or receiving payment or recovery on account of any such claim

(Page | 135)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

based on, arising under or attributable to such Insurance Policy from or against any insurer,

including:

a.  commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy;

b.  enforcing, attaching, levying, collecting, or otherwise recovering, by any manner or means, any judgment, award, decree, or other order against any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy;

c.  creating, perfecting or enforcing in any manner any Lien of any kind against any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy;

d.  asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy; and

e.  taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any claim based on, arising under or attributable to an Insurance Policy.

RESERVATIONS.  The provisions of this Insurer Injunction shall not preclude the Litigation Trust and any GUC Sub-Trusts from pursuing any claim based on, arising under or attributable to an Insurance Policy excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights, or any other claim that may exist under any such Insurance Policy against any insurer, or enjoin the rights of the Litigation Trust and any GUC Sub-Trusts to prosecute any action based on or arising from the Insurance Policies or the rights of the Litigation Trust and any GUC Sub-Trusts to assert any claim, debt, obligation, Cause of Action or liability for payment against an insurer based on or arising from the Insurance Policies.  The provisions of this Insurer Injunction are not issued for the benefit of any insurer, and no such insurer is a third-party beneficiary of this Insurer Injunction.  This Insurer Injunction shall not (a) enjoin, impair or affect (i) any claims between or among insurers; or (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors or (b) prohibit any current and former

| Debtors: | RITE AID CORPORATION, *et al.* |
|----------|-------------------------------|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

directors, officers, employees, and authorized agents of the Debtors from seeking insurance coverage in their capacities as such under the D&O Liability Insurance Policies.

Notwithstanding anything to the contrary in Article X.H of the Plan, the Litigation Trustee and any GUC Sub-Trustee shall have the right to assign and/or transfer Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust and any GUC Sub-Trusts, as further described in the Litigation Trust Documents and any GUC Sub-Trust Documents, as applicable and to the extent permitted by the terms and conditions of the applicable Insurance Policy(ies) and applicable law; *provided*, *however*, that any assignee or transferee shall remain bound by the provisions in the Plan (including, for the avoidance of doubt, Article X.D of the Plan).

The provisions of this Insurer Injunction shall be subject in all respects to Article VI.K of the Plan.

Notwithstanding anything to the contrary in the Plan (including this Insurer Injunction), the Plan Supplement, this Confirmation Order, or otherwise, no Person, Entity, or party, including the Litigation Trust and the Litigation Trustee and any GUC Sub-Trusts and GUC Sub-Trustees (including any successors, beneficiaries, transferees, and assigns), shall oppose any effort by any current or former director, officer, or employee of the Debtors or Reorganized Debtors or any its subsidiaries and Affiliates to seek defense cost coverage under the Insurance Policies (including under the D&O Liability Insurance Policies and including with respect to Assigned Claims). With respect to the Debtors' D&O liability policies that provide coverage for the directors' and officers' non-indemnifiable loss and do not provide direct coverage for the Debtors' losses (the "Side-A Only D&O Insurance Policies"), the automatic stay imposed under section 362(a) of the Bankruptcy Code does not apply, or, to the extent it does apply, the automatic stay is lifted and modified solely to the extent necessary to permit and authorize the insurers that issued the Side-A Only D&O Insurance Policies (the "Side A Only Insurers") to evaluate coverage and to advance defense costs under and in accordance with the terms of the Side-A Only D&O Insurance Policies. Any advancement made under the Side-A Only D&O Insurance Policies shall not be considered property of the Debtors' estates. The automatic stay imposed under section 362(a) of the Bankruptcy Code shall not subject any of the Side-A Only Insurers to liability for paying defense costs.

MODIFICATIONS. To the extent the Litigation Trustee and any GUC Sub-Trustee makes a good faith determination that some or all of the proceeds of the Assigned Claims, including the Tort Claim Insurance Proceeds, (excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights) are substantially unrecoverable by the Litigation Trust and any GUC Sub-Trusts, the Litigation Trust and any GUC Sub-Trusts, with the consent of the Debtors and Reorganized Debtors, as applicable, shall have the

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

authority at any time, upon written notice to any affected insurer, to terminate, reduce or limit the scope of this Insurer Injunction with respect to any insurer, *provided* that any termination, reduction, or limitation of this Insurer Injunction (i) shall apply in the same manner to all beneficiaries of the Litigation Trust and any GUC Sub-Trusts and (ii) shall comply with any procedures set forth in the Litigation Trust Documents.

203.    **Controlled Substance Injunction.**  Except as otherwise provided for in the Plan or this Confirmation Order, the Bankruptcy Court hereby approves the terms of the Controlled Substance Injunction, a copy of which is attached to the Plan as <u>Exhibit A</u> and as set forth in <u>Article X.I</u> of the Plan.

204.    **Co-Defendants.**  Notwithstanding anything to the contrary in the Plan as it currently exists or as it may be further amended, the Plan Supplement (or the Plan Supplement as further amended), or this Confirmation Order or any other order entered in connection with the Plan or the Chapter 11 Cases, nothing contained in the Plan or any of the foregoing documents or orders (including, without limitation, the classification, treatment, allowance, disallowance, release, bar, injunction, Controlled Substance Injunction, or any other provision of the Plan with respect to, impacting, affecting, modifying, limiting, subordinating, or impairing, in any respect, a Co-Defendant Claim), nothing will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim or of any Co-Defendant as such rights exist or might in the future exist under applicable non bankruptcy law.  Nothing in the Plan, any of the Definitive Documents or in this Confirmation Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim or of any Co Defendant from asserting in any proceeding any and all Co Defendant Defensive Rights that it has or may have under applicable law.  Nothing in the Plan,

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

any of the Definitive Documents, or this Confirmation Order shall be deemed to waive any Co

Defendant Defensive Rights, and further, except as provided above, nothing in the Chapter 11

Cases, the Plan, any of the Definitive Documents or this Confirmation Order may be used as

evidence of any determination regarding any Co Defendant Defensive Rights, and, under no

circumstances shall any Entity be permitted to assert issue preclusion or claim preclusion, waiver,

estoppel, or consent in response to the assertion of any Co-Defendant Defensive Rights.

Article VI.K shall be included in this Confirmation Order.  For the avoidance of doubt, any

assignment of claims or Causes of Action of the Debtors or their Estates, including any Assigned

Claims or Assigned Insurance Rights, pursuant to the Plan shall be subject to the Co-Defendant

Defensive Rights.  The Co-Defendant Defensive Rights (i) may be used to offset, set off, recoup,

allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise to defend

against any Cause of Action or Claim brought by any Entity against the Holder of any Co

Defendant Claim or any Co-Defendant based in whole or in part on Opioid-Related Activities; and

(ii) shall in no case be used to seek any affirmative monetary recovery from any Protected Party

or any asset of any Protected Party (including from any applicable Insurance Policy of a Protected

Party) on account of any Claim or Cause of Action released pursuant to Article X of the Plan or

on account of any Claim against the Debtors.

205.    **Compliance with Tax Requirements.**  In connection with the Plan, to the extent

applicable, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall

comply with all tax withholding and reporting requirements imposed on them by any

Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding

(Page | 139)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

206. **Section 1146 Exemption.** To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to New Rite Aid, from a Debtor to the Wind-Down Debtor, or from the Wind-Down Debtor to the Liquidating Trust or to any other Person) of property under the Plan (including pursuant to the Purchase Agreement(s), if applicable, or a Plan Restructuring) or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Wind Down Debtors, including in accordance with any Purchase Agreement, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, including any real property mortgage securing the Exit Facilities, the Exit 1.5 Lien Notes, or the Takeback Notes, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, or (5) the making, delivery, or recording of any deed or other instrument of transfer

(Page | 140)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale,

assignments, or other instrument of transfer executed in connection with any transaction arising

out of, contemplated by, or in any way related to the Plan (including any Restructuring

Transaction), shall not be subject to any document recording tax, stamp tax, conveyance fee,

intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax,

Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other

similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate

state or local governmental officials or agents shall forgo the collection of any such tax or

governmental assessment and accept for filing and recordation any of the foregoing instruments

or other documents without the payment of any such tax, recordation fee, or governmental

assessment. All filing or recording officers (or any other Person with authority over any of the

foregoing), wherever located and by whomever appointed, shall comply with the requirements of

section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental

assessment, and shall accept for filing and recordation any of the foregoing instruments or other

documents without the payment of any such tax or governmental assessment.

207.    **De Minimis Settlements.** Pursuant to section 363(b) of the Bankruptcy Code and

Rule 9019 of the Federal Rules of Bankruptcy Procedure, the Debtors are authorized on and before

the Effective Date to enter into and perform under settlement agreements pursuant to which the

total consideration to be paid by the Debtors to the applicable counterparty is equal to or less

than $15,000 (each a "De Minimis Settlement Agreement"), as calculated within the Debtors'

reasonable discretion with the prior written consent of the Required Junior DIP Noteholders;

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

*provided* that the Required Junior DIP Noteholders shall be deemed to consent if they do not respond within three (3) Business Days. The Debtors shall provide notice of any De Minimis Settlement Agreements to the Committees. The Debtors shall be authorized to enter into any such De Minimis Settlement Agreement without the need for further Bankruptcy Court approval or order. The Plan shall be deemed modified to provide for the entry into and performance under any De Minimis Settlement Agreement, and the Plan, as so modified, and the Combined Hearing shall be deemed sufficient motion, notice, and hearing for purposes of Rule 9019 of the Federal Rules of Bankruptcy Procedure. For the avoidance of doubt, the *Settlement Order* for Inspection Number 1610523 before the State of California Occupational Safety and Health Appeals Board is a De Minimis Settlement Agreement.

208. **Provisions Regarding Pension Benefit Guaranty Corporation.** On the Effective Date, the Reorganized Debtors shall, in the ordinary course of their business and in accordance with applicable non-bankruptcy law, (i) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083; (ii) pay all required premiums, if any, owed to PBGC under 29 U.S.C. §§ 1306 and 1307, for the Pension Plan under ERISA or the Internal Revenue Code ("IRC"); and (iii) administer the Pension Plan in accordance with the applicable provisions of ERISA and the IRC, and the Reorganized Debtors reserve their rights thereunder. Further, PBGC and the Debtors agree that all proofs of claim filed by PBGC are deemed withdrawn on the Effective Date.

209. Nothing in the Disclosure Statement, the Plan, this Confirmation Order, or any other document filed in the Chapter 11 Cases shall be construed to discharge, release, limit, or

(Page | 142)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

relieve any individual from any claim by the PBGC or the Pension Plan for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plan, subject to any and all applicable rights and defenses of such parties, which are expressly preserved. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document filed in the Chapter 11 Cases. For the avoidance of doubt, the Reorganized Debtors shall not be released from any liability or obligation under ERISA, the IRC, and any other applicable law relating to the Pension Plan.

210. **Collective Bargaining Agreements**. For the avoidance of doubt, the collective bargaining agreements ("CBAs") between labor unions and various Debtors may only be rejected pursuant to and in accordance with the procedures and standards set forth in section 1113 of the Bankruptcy Code; *provided* that the Debtors shall assume the Pension Plan according to Article V.I of the Plan as well as all CBAs and union contracts according to Article V.H of the Plan.

211. The cure amounts, if any, related to the assumption of the CBAs shall be satisfied in full by payment by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course, of all the Debtors' or the Reorganized Debtors' obligations under the assumed CBA(s), as applicable, arising under the CBAs to the extent such obligations are valid and payable. As a result, if the CBAs are assumed, no Proof of Claim, request for administrative expense, or cure claim need be Filed with respect to such cure amounts, *provided*, *however*, that the Debtors' and the Reorganized Debtors' rights, defenses, claims, and counterclaims with respect to any such obligations are expressly preserved.

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

212. **Lease Termination Agreement**. Article V.M of the Plan shall apply to the Lease Termination Agreement.[8]  Nothing in the (i) Plan including, without limitation, the Settlement, Release, Injunction, and Related Provisions of Article X thereof, or (ii) this Confirmation Order shall constitute a discharge or release of or enjoin the assertion of Tenant's Indemnification Obligation, as defined in the Lease Termination Agreement, against Tenant (or any other of the Reorganized Debtors if or to the extent Tenant is merged out of existence or otherwise liquidated or dissolved after the Effective Date) subject to the terms of the Lease Termination Agreement. Moreover, Landlord shall not be required to file any requests for allowance of an Administrative Claim under the Plan to preserve Tenant's Indemnification Obligation, as defined in the Lease Termination Agreement.  In the event the Debtors sell substantially all of their assets or equity through an Other Asset Sale or pursuant to 11 U.S.C. §363, Tenant's Indemnification Obligation, as defined in the Lease Termination Agreement, shall be assumed by the purchaser or recipient of substantially all of the Debtors' assets or equity.  The Debtors and Landlord agree that the terms of this paragraph 212 shall be incorporated into this Confirmation Order.  Landlord's rights and remedies are hereby preserved in the event of any material Plan modification that materially impacts Landlord's rights under the Lease Termination Agreement.

213. **Provisions Regarding the United States.**  Reference is made to Article XIV.P of the Plan (the "Special Provisions Regarding the United States"), which is incorporated by reference with the same force and effective as if reproduced in full in the text of this Confirmation

---

[8]    Capitalized terms used but not otherwise defined in this paragraph 212 have the meanings given to them in the *Stipulation and Consent Order Pursuant to Sections 105, 363 and 365 Approving the Lease Termination Agreement with University Place Associates, LLC* [Docket No. 3144] (the "Consent Order").

(Page | 144)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Order.  Notwithstanding any other provision of this Confirmation Order to the contrary, (a) to the extent of any conflict between any provision in this Confirmation Order and the Special Provisions for the United States, the Special Provisions for the United States shall control and (b) to the extent of any conflict between the Special Provisions for the United States or this Confirmation Order, on the one hand, and the DOJ Settlements, on the other hand, the DOJ Settlements shall control.

214.    Except as otherwise provided in the Special Provisions Regarding the United States as set forth in <u>Article XIV</u> of the Plan, the Committee Settlement Documents shall control in the event of any inconsistency regarding the treatment of General Unsecured Claims.

215.    Without limiting the foregoing, but subject to paragraph 270 of this Confirmation Order, nothing in the Plan or this Confirmation Order shall release, discharge, enjoin, limit, preclude, or otherwise prejudice any DOJ Claim, or the United States from asserting, litigating, enforcing, or collecting upon any DOJ Claim or judgment arising therefrom, in each case, solely to the extent permitted by and in accordance with the DOJ White Settlement and the DOJ Elixir Settlement.[9]  For the avoidance of doubt, the United States shall not be a Releasing Party.

216.    **Provisions Regarding Commonwealth of Massachusetts**.  The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the Commonwealth of Massachusetts on account of, or relating to, the Massachusetts OAG Agreement, and this Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such Claims.

---

[9]    Notwithstanding the confirmation of the Plan, anything to the contrary in this Confirmation Order or any other Definitive Document, or the occurrence of the Effective Date, the DOJ Extension Order shall remain fully effective and enforceable in accordance with its terms.

| Debtors: | RITE AID CORPORATION, *et al*. |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

217.    **Provisions Regarding the State of California**.  Each of the California AG Proofs of Claim is an Allowed General Unsecured Claim.  The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the California AG, or any mediate or immediate transferee of the California AG, on account of, or relating to, the California AG Agreement, and this Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such Claims.

218.    **Provisions Regarding the Internal Revenue Service.**  Nothing in the Plan or Plan Supplements shall excuse the Debtors or the Reorganized Debtors, as applicable, from paying any Allowed Priority Tax Claims held by the United States of America, on behalf of its agency, the Internal Revenue Service, in full, as and to the extent such Allowed Priority Tax Claims become due or payable consistent with 11 U.S.C. § 1129(a)(9)(C).  The IRS is not required to file a motion or application for payment of administrative expense claims pursuant to 11 U.S.C. § 503(b)(1)(D).

219.    **Provisions Regarding the California Department of Tax and Fee Administration**.  Nothing in the Plan shall excuse the Debtors or the Reorganized Debtors, as applicable, from paying any Allowed Priority Tax Claims held by the California Department of Tax and Fee Administration in full in the ordinary course of business, as and to the extent such Allowed Priority Tax Claims become due and payable.

220.    **Provisions Regarding the Arizona Department of Revenue.**  If the Reorganized Debtors fail to make a payment on the Arizona Department of Revenue ("ADOR")'s Allowed Priority Tax Claim pursuant to the terms of the Plan, and such outstanding payment remains uncured for ten days after the Reorganized Debtors' receipt of written notice thereof, such

(Page | 146)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

nonpayment shall be considered an "Event of Default." The Debtors shall receive notice of and have the opportunity to cure two Events of Default. In the event of a third Event of Default, the ADOR may (a) enforce the entire amount of the Allowed Priority Tax Claim and (b) exercise rights and remedies under applicable non-bankruptcy law, subject to any defenses available to the Debtors or the Reorganized Debtors.

221. **Provisions Regarding the Pennsylvania DOR.** Notwithstanding any provision to the contrary in the Plan, the Plan Supplement, and the Confirmation Order ("Documents"), as to any tax claim held by the Commonwealth of Pennsylvania, Department of Revenue ("Pennsylvania DOR") nothing in the Documents shall:

    a.    require the Pennsylvania DOR, as provided in 11 U.S.C. § 503(b)(1)(D), to file an administrative claim in order to receive payment for any liability described in 11 U.S.C. §§ 503(b)(1)(B) and 503(b)(1)(C);

    b.    affect any setoff and recoupment rights of the Pennsylvania DOR under applicable law or the Debtors' defenses thereto and such rights are expressly preserved and shall not be altered or impaired;

    c.    affect the ability of the Pennsylvania DOR to pursue any non-Debtors to the extent allowed by nonbankruptcy law for any liabilities that may be related to any state tax liabilities owed to the Pennsylvania DOR by the Debtors and the Reorganized Debtors;

(Page | 147)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

    d.    affect the imposition of the Pennsylvania realty transfer tax against any all transfers not made under prior to the confirmation of the Plan as provided for under 11 U.S.C. § 1146(a) and applicable case law;

    e.    confer exclusive jurisdiction to the Bankruptcy Court, except to the extent set forth in 28 U.S.C. § 1334(b), or divest any court of its jurisdiction to adjudicate the validity of any claim of the Pennsylvania DOR; and

    f.    allow the Debtors, the Reorganized Debtors, or the Wind-Down Debtors to estimate, for whatever reason, any of the Department's allowed claims beyond what is provided and allowed for in section 502(c) of the Bankruptcy Code.

222.    Allowed Administrative Claims, regardless of amount, of the Pennsylvania DOR shall be paid in accordance with section 1129(a)(9)(A) of the Bankruptcy Code in full in cash on the later of (i) the Effective Date or as soon as practicable after the Effective Date, or (ii) the date on which such Allowed Administrative Claim becomes payable under applicable law, and shall accrue interest (if any) (pursuant to section 511 of the Bankruptcy Code at the rate set forth under applicable law) and penalties (if any) in accordance with the Bankruptcy Code and nonbankruptcy law until paid in full.

223.    Allowed Priority Tax Claims, regardless of amount, of the Pennsylvania DOR will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code with interest to the extent required under applicable law.  To the extent such Allowed Priority Tax Claims (including any penalties, interest, or additions to tax entitled to priority under the Bankruptcy Code) are not paid

(Page | 148)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

in full in cash on the Effective Date, then such Allowed Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate set forth in section 511 of the Bankruptcy Code and nonbankruptcy law until paid in full.  Nothing in the Plan or Plan Supplements shall excuse the Debtors or the Reorganized Debtors, as applicable, from paying any Allowed Priority Tax Claims held by the Pennsylvania Department of Revenue in full, as and to the extent such Allowed Priority Tax Claims become due or payable consistent with 11 U.S.C. § 1129(a)(9)(C).

224.    Nothing contained in the Documents shall be deemed to bind the Pennsylvania DOR to any characterization of any transaction for tax purposes or to determine the tax liability or withholding or collection obligations of any person or entity, including, but not limited to the Debtors or any of the Debtors' estates, nor shall the Documents be deemed to have determined the Pennsylvania state tax treatment of any item, distribution, or entity, including the Pennsylvania state tax consequences of the Plan nor shall anything in the Documents be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to Pennsylvania state tax liability and Pennsylvania state tax treatment except as provided under sections 505 or 1146 of the Bankruptcy Code.

225.    Nothing in the Documents shall relieve the Debtors, the Reorganized Debtors, or the Wind-Down Debtors and their non-Debtor affiliates from any obligation to file postpetition Pennsylvania tax returns that are required under applicable law.

226.    **Provisions Regarding the Settling States.**  Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, the States that are part of the Ad Hoc Group of States (the "<u>Settling States</u>") have agreed, on behalf of the Settling States and any and

(Page | 149)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

all other Entities who may purport to assert any Opioid Claim or Cause of Action on behalf of one or more Settling States derivatively, including pursuant to agreement or applicable non-bankruptcy law (such Settling States and such other Entities, collectively, the "Settling States Releasors"), to voluntarily release any Opioid Claims and Causes of Action the Settling State Releasors may have against the Debtors on the terms and conditions set forth in the Controlled Substance Injunction (the "Settling States Terms") and in consideration for the Settlement of Opioid Claims.

227.    Further, and notwithstanding anything to the contrary contained in the Plan or Confirmation Order, the Plan provides a discharge for the Debtors of all Claims and Causes of Action to the fullest extent permitted under Section 1141 of the Bankruptcy Code; *provided, however*, for the avoidance of doubt that the Debtors shall not be released from liability for any Tort Claims; *provided, further, however*, that any recovery for any such Tort Claim against the Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.

228.    Nothing in the Plan or the Confirmation Order shall be deemed or construed as a conclusion or finding that any Opioid Claim or Cause of Action held by a Governmental Unit against the Debtors that is not dischargeable under Section 1141 of the Bankruptcy Code has been involuntarily discharged.

(Page | 150)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

229.    To the extent that any Governmental Unit that is not a Settling State Releasor seeks to bring a claim or Cause of Action after the Effective Date that it believes was not discharged or is not dischargeable, in each case pursuant to Section 1141 of the Bankruptcy Code (or otherwise), such Governmental Unit's (including the States that are part of the Ad Hoc Group of States) rights are reserved to argue that such claims and Causes of Action were not discharged and/or are not dischargeable, in each case pursuant to the Plan and the Confirmation Order; *provided, however,* that the Settling States shall remain subject to, and bound by, the Settling States Terms as they apply to each respective Settling State.   The Debtors and the Reorganized Debtors rights are reserved to argue that such Claims and Causes of Action were discharged pursuant to the Plan and the Confirmation Order.

230.    For the avoidance of doubt, notwithstanding anything to the contrary in the Plan or in the Confirmation Order, the State of Maryland shall not be a Releasing Party and shall not be required to opt out, and shall not be subject to, the third party releases in the Plan.

231.    Notwithstanding anything to the contrary in the Settling States Terms, in the Plan, or in the Confirmation Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, (i) each of the Settling States, (ii) any and all other Entities who may purport to assert any Opioid Claim or cause of action on behalf of one or more Settling States derivatively, including pursuant to agreement or applicable non-bankruptcy law, and (iii) to the maximum extent of the power of each Settling State's Attorney General, any and all other Entities who may be bound by such Attorney General to this release (such Settling States and such other Entities referred to in the preceding clauses (i) through (iii), collectively, the "<u>Settling States</u>

(Page | 151)

| Debtors: | RITE AID CORPORATION, *et al*. |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Releasors") voluntarily, conclusively, absolutely, unconditionally, irrevocably, and forever release

Rite Aid and each of its subsidiaries and affiliates (the "Company"), from any and all Opioid

Claims and causes of action that such Settling State Releasor would have been legally entitled to

assert in its own right on the Settling States Terms and in consideration for the Settlement of Opioid

Claims.

232.    **Provisions Regarding GSK Consumer Healthcare Services Inc.**  Nothing in the

Definitive Documents (including but not limited to any documents or orders relating to exit

financing or sale transaction), or any documents related thereto (including any provision therein

that purports to be preemptory or supervening, grants an injunction, discharge, or release), shall

prime, discharge, impair, modify, or subordinate the rights of GSK Consumer Healthcare Services

Inc. or its past, present, or future affiliates (collectively, "GSK") with respect to any valid, and

perfected security interest, collateral, lien, setoff rights, recoupment rights, or claims of GSK

arising under that certain trade agreement dated as of December 6, 2023 between Rite Aid Hdqtrs.

Corp. and GSK (as amended, supplemented, or otherwise modified from time to time).  Any

Allowed Other Secured Claim of GSK shall be Reinstated.

233.    GSK is deemed to have opted out of the Third-Party Release contained in

Article X.D of the Plan without any need for GSK to submit an Opt-Out Form or otherwise object

to the Plan.

234.    **Provisions Regarding Sureties.**  Certain sureties (collectively, the "Sureties" and

each, individually, a "Surety") – including, without limitation, International Fidelity Insurance

Company, Berkley Insurance Company, The Hanover Insurance Company, Mitchell Insurance,

(Page | 152)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

and RLI Insurance Company – issued surety bonds on behalf of the Debtors, and certain of their affiliates (collectively, the "Existing Surety Bonds" and each, individually, an "Existing Surety Bond"). Certain of the Debtors and their affiliates (all such Debtor and non-Debtor Affiliates, collectively, the "Indemnitors") executed certain indemnity agreements and/or related agreements with one or more of the Sureties (collectively, the "Existing Indemnity Agreements" and, each, an "Existing Indemnity Agreement").

235. Notwithstanding any other provisions of the Plan, the Plan Supplement, or this Confirmation Order, on the Effective Date, all rights and obligations of the Debtors and Indemnitors related to (i) the Existing Surety Bonds that have not been replaced and released; (ii) any Existing Indemnity Agreements; (iii) any Surety collateral, if any, that secures the Debtors' obligations in connection with the Surety Bonds (the "Surety Collateral"); (iv) any Surety agreements governing Surety Collateral; and/or (v) ordinary course premium payments to the Surety for the Existing Surety Bonds (items (i), (ii), (iii), (iv), and (v) collectively, the "Surety Bond Program" and the Debtors' and Indemnitors' obligations arising therefrom, the "Surety Bond Obligations") shall be reaffirmed and ratified by the applicable Reorganized Debtors and Indemnitors, shall continue in full force and effect, and shall not be affected, modified, discharged, enjoined, impaired or released by the Plan, the Plan Supplement, or this Confirmation Order in any way. For the avoidance of doubt, nothing in the Plan or this Confirmation Order, including, without limitation, any exculpation, release, injunction, exclusions and discharge provision of the Plan contained in Article X of the Plan, shall bar, alter, limit, impair, release, modify or enjoin any Surety Bond Obligations. Without the requirement of any action by the Sureties, the Sureties are

| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

deemed to have opted out of all release, exculpation and injunction provisions of the Plan that apply or could be interpreted to apply to the Sureties, their rights, or their claims. For the avoidance of doubt, the Sureties are not Releasing Parties under the Plan. On and after the Effective Date, each Surety Bond Program and all Surety Bond Obligations related thereto shall be treated by the Reorganized Debtors, the Indemnitors and the Surety in the ordinary course of business as if the Chapter 11 Cases had not been commenced. For the avoidance of any doubt, with a reservation of rights of all parties, and only to the extent applicable and/or necessary to effectuate the treatment of the Surety Bond Program as set forth herein, any agreements related to the Surety Bond Program are assumed by the Debtors and the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date. Nothing in the Plan or this paragraph shall affect in any way any Surety's rights against any non-Debtor, or any non-Debtor's rights against any Surety, including under any Surety Bond Program or with regard to any Surety Bond Obligations.

236. **Provisions Regarding Chubb Companies.** Notwithstanding anything to the contrary in the Definitive Documents, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

    a.    on the Effective Date the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall assume all insurance policies issued at any time by ACE American Insurance Company, Indemnity Insurance Company of North America, ACE Fire Underwriters Insurance Company, Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, ACE Property & Casualty Insurance

(Page | 154)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Company, Federal Insurance Company, Great Northern Insurance Company, Executive Risk Indemnity Inc., Pacific Indemnity Company, and/or each of their U.S.-based affiliates and predecessors (collectively, and solely in their capacities as insurers or third party administrators, as applicable, the "Chubb Companies") and any agreements, documents or instruments relating thereto (collectively, the "Chubb Insurance Program")[10] in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code, unaltered; *provided*, that for the avoidance of doubt, all automobile liability, property liability, environmental liability, cargo liability (including marine cargo), fire liability (including excess), export package/worldnet, package, inland marine, special risk excess/capacity excess occurrence, managed care services primary errors & omissions, and workers' compensation policies issued as part of the Chubb Insurance Program, at any time, shall be Unassigned Insurance Policies ("Unassigned Chubb Insurance Policies"); *provided, however*, that nothing herein shall impact or affect in any way the Assigned Insurance Rights under those insurance policies and agreements issued or entered into at any time under the Chubb Insurance Program that are not Unassigned Chubb Insurance Policies; *provided*, that Chubb will not assert that the assumption provided in this paragraph alters the terms of or the coverage provided by the Chubb Insurance Program or that the Reorganized Debtors or the Wind-Down Debtors shall have obligations greater than those that applied to the Debtors with respect to the Chubb Insurance Program;

b.  on and after the Effective Date the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall become and remain liable in full for all of their and the Debtors' respective: (i) obligations to the Chubb Companies under those insurance policies and agreements issued or entered into at any time under the Chubb Insurance Program that are Unassigned Chubb Insurance

---

[10] The Chubb Insurance Program shall include certain historical legacy Insurance Policies issued prior to 2019 by Federal Insurance Company; Pacific Indemnity Company; ACE American Insurance Company; Illinois Union Insurance Company; Century Indemnity Company, successor to CIGNA Specialty Insurance Company formerly known as California Union Insurance Company, and successor to CCI Insurance Company as successor to Insurance Company of North America; Westchester Fire Insurance Company for policies issued by International Insurance Company; and Oakwood Insurance Company, successor in interest to Central National Insurance Co. of Omaha, and Motor Vehicle Casualty Co., with respect only to policies issued through Cravens, Dargan & Company (Pacific Coast), and such entities shall be considered "Chubb Companies" to the extent of such Insurance Policies.

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Policies, and (ii) in accordance with applicable law, financial obligations to the Chubb Companies under the remainder of the Chubb Insurance Program, regardless (in the case of both (i) and (ii)) of whether such obligations arise or become due before, on, or after the Effective Date, without the need or requirement for the Chubb Companies to file or serve any objection to a proposed Cure Cost or a request, application, claim, Proof of Claim or motion for payment or allowance of any Administrative Claim, and the Chubb Companies shall not be subject to any bar date or similar deadline governing Cure Costs, Proofs of Claim, or Administrative Claims;

c.      for the avoidance of doubt nothing shall in any way impair, alter, supplement, change, expand, decrease, or modify (i) any valid setoff or recoupment rights under the Chubb Insurance Program (subject to the terms thereto and/or applicable non-bankruptcy law as to the Unassigned Chubb Insurance Policies and/or applicable law as to the other insurance policies in the Chubb Insurance Program) against the Reorganized Debtors and/or Wind-Down Debtors, or (ii) the Chubb Companies' interest in (including any security interests in and liens on) any and all letters of credit, cash, trusts, accounts, credits and other collateral and security provided or held by the Chubb Companies in relation to the Chubb Insurance Program;

d.      with regard to any Unassigned Chubb Insurance Policy, as of the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article X of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (i) the Chubb Companies to draw on or against, use and/or apply all of the collateral and security provided by or on behalf of the Debtors (and the Reorganized Debtors, or the Wind-Down Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, or the Wind-Down Debtors, as applicable) in accordance with and pursuant to the Chubb Insurance Program; and (ii) the Chubb Companies to cancel any policies issued under the Chubb Insurance Program, and take other actions relating to the Chubb Insurance Program (including effectuating a setoff or recoupment), pursuant to the terms and conditions of the applicable insurance policy and/or applicable non-bankruptcy law;

e.      the Chubb Companies shall not be Releasing Parties under the terms of the Plan; and

f.      with regard to any Claim asserted under or on account of any Unassigned Chubb Insurance Policy sentences two and four of paragraph three of

(Page | 156)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Article X.D of the Plan and paragraph two of Article X.F of the Plan, and any corresponding provisions of the Confirmation Order, shall not apply to the Chubb Companies or the Chubb Companies' right or ability to administer, handle, defend, settle and/or pay Claims under the Chubb Insurance Program.

237.     **Provisions Regarding the DMP Settlement Parties.**  Solely with respect to those distributors, manufacturers, pharmacies or other dispensers, and marketers who are party to national opioid settlements (and/or opioid settlements the terms of which substantially conform to national opioid settlements) (collectively, and including all of their respective past and present direct or indirect parents, subsidiaries, divisions, affiliates, joint ventures, predecessors, successors, and assigns, the "DMP Settlement Parties") with state attorneys general, states, municipal entities, subdivisions (including cities, counties, or other political subdivisions and special or other districts), governmental agencies, and tribes (collectively, the "Governmental Entities Settlement Parties") related to litigation concerning the marketing, sale, distribution, or dispensing of opioid products, on the Effective Date, the Estates shall release any indemnification, contribution or other claims against the DMP Settlement Parties for amounts paid to Governmental Entities Settlement Parties on account of Claims for opioid liabilities.  All other claims and Causes of Action against the DMP Settlement Parties (but excluding claims or Causes of Action, if any, against McKesson) shall be preserved as Assigned Claims and shall be transferred to and vested in the Litigation Trust (and/or any GUC Sub-Trusts, as applicable) in accordance with the Plan.

238.     For the avoidance of doubt, claims or Causes of Action, if any, against McKesson are not Assigned Claims and have been released **in accordance with the terms of** the McKesson Settlement.  Notwithstanding anything to the contrary herein, Assigned Claims shall not include

(Page | 157)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

any claims or Causes of Action against McKesson, which, for the avoidance of doubt, is not an Excluded Party; *provided*, that, for the avoidance of doubt, Assigned Claims shall include the Debtors' Pass Through Rights, including any Pass Through Rights as provided in any agreement between Rite Aid and McKesson.

239. **Provisions Regarding Double H. Plastics, Inc.** Nothing in the Plan or this Order shall excuse the Debtors or the Reorganized Debtors, as applicable, from paying any Allowed Administrative Claim(s) held by Double H Plastics, Inc., in full, as and to the extent such Allowed Administrative Claim(s) are due and payable.

240. **Provisions Regarding Colgate-Palmolive Company and Tom's of Maine, Inc.** Nothing in the Plan shall affect any valid setoff or recoupment rights of Colgate-Palmolive Company and Tom's of Maine, Inc., or any defenses to such rights available to the Debtors or the Reorganized Debtors.

241. **Provisions Regarding Helen of Troy L.P. and KAZ USA, Inc.** Notwithstanding anything in the Plan, this Confirmation Order, the Plan Supplement, or any related documents (collectively, the "Plan Documents") to the contrary: (i) nothing in the Plan Documents shall impair, release, discharge, enjoin, or otherwise adversely affect any valid setoff or recoupment rights of Helen of Troy L.P. ("HOT") or KAZ USA, Inc. ("KAZ" and collectively, such rights, the "HOT and KAZ Setoff and Recoupment Rights"); (ii) neither HOT nor KAZ shall be required to file any motion either before or after the Effective Date in order to preserve, assert and avail themselves of any of the HOT and KAZ Setoff and Recoupment Rights and any language in the Plan Documents to the contrary shall not apply to the HOT and KAZ Setoff and Recoupment

157

| Debtors: | RITE AID CORPORATION, *et al.* |
| --- | --- |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Rights; (iii) HOT and KAZ shall be permitted to assert any of the HOT and KAZ Setoff and

Recoupment Rights defensively in response to any claim that may be asserted against them by any

of the Debtors, Wind Down Debtors, Reorganized Debtors or their successors or assigns; and

(iv) except as set forth in this paragraph, the Debtors, Wind Down Debtors, Reorganized Debtors

and their successors and assigns shall retain any defenses available to them with respect to the

HOT and KAZ Setoff and Recoupment Rights.

242. **Provisions Regarding Waters & Kraus LLP.** Notwithstanding anything to the

contrary herein or in the Plan, nothing contained in the Plan, the Plan Supplement, any related

document, form of document, agreement, schedule, addendum, or exhibit, this Confirmation Order

or any order of the Bankruptcy Court entered in these Chapter 11 Cases (including, absent the

consent of WKPS (as defined herein), any language purporting to override this provision), and

nothing set forth by WKPS in any Proof of Claim Filed in these Chapter 11 Cases or in any

document filed in the Adversary Proceeding (as defined herein) shall or shall be deemed, and the

effectiveness of the Plan shall not and shall not be deemed, (i) to discharge, waive, limit, release,

enjoin, prejudice, foreclose or preclude the rights of claims of Waters & Kraus, LLP (n/k/a Waters,

Kraus, Paul & Siegel) ("WKPS"), including as asserted in connection with the currently pending

adversary proceeding captioned Waters & Kraus, LLP v. Rite Aid Corporation, et al., Adv. Case

No. 24-01062 (the "Adversary Proceeding"); or (ii) to impede WKPS's rights or the questions,

including of nondischargeability, presently before this Bankruptcy Court in the Adversary

Proceeding, including without limitation with respect to the foregoing (i) and (ii), as against the

Debtors or the Reorganized Debtors (as applicable) and/or in connection with any potential

(Page | 159)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

consensual resolution of the Adversary Proceeding, and regardless of when or before which tribunal such matters are determined. All rights of WKPS and the Debtors or the Reorganized Debtors (as applicable) with respect to the foregoing are expressly reserved and preserved, and, for the avoidance of doubt, shall include WKPS's ability to seek all amounts asserted as nondischargeable and as due and owing to WKPS, whether or not previously asserted or set forth in any such Proof of Claim or any document filed in the Adversary Proceeding, (and, absent agreement among WKPS and the Debtors (or the Reorganized Debtors, as applicable) and/or further order of this Bankruptcy Court, WKPS shall not be required to amend, modify, or supplement its Proofs of Claim nor to amend the complaint filed in the Adversary Proceeding prior to the entry of this Order and/or the occurrence of the Effective Date in connection therewith), and the Debtors' or the Reorganized Debtors' (as applicable) right to contest any amounts sought by WKPS, asserted as non-dischargeable or as due and owing to WKPS.

243. **Provisions Regarding 32-14 31st Food LLC ("31st Food").** 31st Food shall not be a Released Party or a Releasing Party under the Plan. 31st Food's objections to confirmation of the Plan have been resolved in accordance with an agreement between 31st Food and the Debtors.

244. **Provisions Regarding Cardinal Health.** For the avoidance of doubt, upon the assumption of the Pharmaceuticals Purchasing Agreement dated as of April 5, 2021 (together with amendments and supplements thereto) between Cardinal Health and debtor Rite Aid Hdqtrs. Corp. and its affiliates, all indemnity amounts currently owed, or which may become owed in the future thereunder, shall become the responsibility of the applicable Reorganized Debtor party, or party otherwise bound thereto; *provided, however*, that all parties' rights, defenses, claims, and

(Page | 160)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

counterclaims with respect to any such amounts are expressly preserved, in accordance with the terms of such Agreement; *provided, further* that to the extent there is any conflict between this paragraph and the Plan, the Plan Supplement, and this Confirmation Order, this paragraph shall control with respect to the Pharmaceuticals Purchasing Agreement.

245.    **Provision Regarding FlavorX, Inc.**  For the avoidance of doubt, the Debtors agree that the All-In-One Master Lease, Supply and License Agreement for Pure Water Dispensing, Medication Reconstituting and Flavoring (the "FLAVORx Agreement"), entered into by and between FLAVORx, Inc. ("FLAVORx") and Rite Aid Hdqtrs. Corp., shall be deemed rejected by the applicable Debtor(s) as of the Effective Date.  For the avoidance of doubt, the Debtors and the Reorganized Debtors shall assert no title to or interest in: (i) any and all equipment subject to the FLAVORx Agreement, including the Digital Dispenser (FLAVORx Auto) & Reverse Osmosis Filtration systems identified in Exhibit A to the FLAVORx Agreement (the "FLAVORx Equipment"); and (ii) FLAVORx's "Reconstitution System," "Formulary System," certain other "Proprietary Information" and "Formulary System SD Card" as those terms are defined in the FLAVORx Agreement (collectively, and together with the FLAVORx Equipment, the "FLAVORx Assets"); provided that, for the avoidance of doubt, nothing in this paragraph 245 shall be deemed an admission as to the amount, basis for, nature, validity, priority, or enforceability of any Claims (if any) arising from such rejection.  The Debtor shall return, or cause to be returned, the FLAVORx Assets to FLAVORx within sixty (60) days of the Effective Date, or at such other time as agreed to by the Parties in writing; provided that, unless otherwise agreed by the parties in writing: (i) nothing in the foregoing proviso shall implicate an unscheduled visit as described in

(Page | 161)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

<u>Exhibit D</u> of the FLAVORx Agreement; and (ii) such return of the FLAVORx Assets shall not be subject to any fees or costs related to an unscheduled visit.

246. **Provisions Regarding the California Department of Healthcare Services.** Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, the Debtors hereby assume any and all Medi-Cal Provider Agreements entered into between the Debtors and the California Department of Healthcare Services related to all of the Debtors' currently operating pharmacies in the State of California effective upon entry of this Confirmation Order, and the Debtors shall be deemed to have satisfied the requirements of section 365 of the Bankruptcy Code in connection therewith. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, the Debtors and the Reorganized Debtors intend to continue participating on a go-forward basis in the Medi-Cal Program for each currently operating pharmacy in the State of California on the terms set forth in the Medi-Cal Provider Agreements.

247. **Provisions Regarding GA Communications, Inc.** The Objection of PureRed to the Debtors' Proposed Cure Amount filed by GA Communications, Inc. and its subsidiaries, collectively doing business as PureRED ("<u>PureRED</u>") on April 23, 2024 at Docket No. 3036 shall be resolved as of the Effective Date by the assumption of that certain Master Services Agreement (as amended, "<u>PureRed MSA</u>") between PureRed and Debtor Rite Aid Hdqtrs. Corp., as amended by that certain Second Amendment to Master Services Agreement and Release of Claims dated as of June 27, 2024 and effective as of the Plan's Effective Date. For the avoidance of doubt,

(Page | 162)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

notwithstanding any provision of the Plan or this Order, unless and until the Effective Date of the Plan, Proof of Claim 6855 filed by PureRed in the Debtors' chapter 11 cases shall remain of record.

248. **Provisions Regarding Certain UFCW Pension Plans.** Notwithstanding Article VI.B of the Plan, nothing in the Plan shall operate to relieve any of the Debtors from joint and several liability, if any, arising out of Claims for "complete withdrawal" (as defined in 29 U.S.C. § 1383(a)) or "partial withdrawal" (as defined in 29 U.S.C. § 1385(a)) liability pursuant to 29 U.S.C. § 1381(a) of the United Food and Commercial Workers Union Local 880 – Mercantile Employers Joint Pension Fund and/or the United Food and Commercial Workers Union – Employer Pension Fund to the extent any such Claims arise prior to the Effective Date.

249. **Provisions Regarding Western Union.** The Debtors shall assume that certain Western Union North America Agency Agreement (together, with all amendments, exhibits, schedules, attachments, statements of work, and other documents related thereto, the "Agency Agreement") between certain of the Debtor parties and Western Union Financial Services, Inc. ("Western Union") under the Plan pursuant to section 365 of the Bankruptcy Code effective as of entry of the Confirmation Order (the "Assumption Date").

250. For the avoidance of doubt, upon the Assumption Date, the Debtors and Western Union shall be obligated under the Agency Agreement to perform in accordance with the terms thereof, except as otherwise may be mutually agreed to in writing between the Debtors and Western Union. For avoidance of doubt, assumption shall not cut off or reduce any rights, claims, or remedies that any of the parties may have under the Agency Agreement (whether arising pre- or post-assumption).

(Page | 163)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

251. In lieu of a Cure payable on the Effective Date, any obligations under the Agency Agreement as of the Assumption Date shall continue to be reconciled and, where appropriate, setoff and/or paid, in the ordinary course pursuant to the terms of the Agency Agreement; *provided* that any defenses, claims, counterclaims, affirmative defenses, and other rights and remedies that exist under the Agency Agreement and applicable law in favor of Western Union, the Debtors and Reorganized Debtors are preserved and unimpaired; *provided, further*, that the parties to the Agency Agreement shall not use the assumption of the Agency Agreement as a reason to alter, reduce, modify or eliminate any of any such parties' rights, claims, defenses, damages, and remedies that may exist under the Agency Agreement and applicable law.

252. **Provisions Regarding Travelers.** The Debtors acknowledge that they are parties to certain claims service agreements (the "Travelers Contracts") by which Constitution State Services and/or its predecessor and related entities administer certain self-insured obligations of the Debtors (collectively, the "Self-Insured Claims"). For the avoidance of doubt, the assumption of the Travelers Contracts pursuant to this provision shall include assumptions of the Self-Insured Claims and all agreements related to the servicing and administration of such Self-Insured Claims; *provided, however*, that nothing in this paragraph shall enlarge the Debtors' obligations with respect to the Self-Insured Claims as provided for under the terms of the Travelers Contracts and all agreements related to the servicing and administration of such Self-Insured Claims; *provided, further*, that assumption of any self-insured retention, deductible and servicing and administration obligations in this paragraph does not apply to any insurance policies other than the Travelers Contracts or any claims other than the Self-Insured Claims.

(Page | 164)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

253.    **Provisions Regarding Non-Releasing Parties**.  For the avoidance of doubt, the following parties shall not be Released Parties or Releasing Parties under the Plan:  the objecting landlords [Docket No. 2759]; 31ˢᵗ Food; Foothill Partners, LLC, and any other party who objected to the Debtor Release or the Third-Party Release in the Plan.

254.    **Protected Health Information and Individually Identifiable Health Information**.  For purposes of this Order, "PHI" shall have the same definition as "protected health information" set forth in 45 C.F.R. § 160.103 and includes, but is not limited to, names, addresses, prescription numbers, health plan numbers, and dates related to an individual, other than year, such as the date of dispensing.  Subject to the requirements below, the disclosure by the Debtors or the Reorganized Debtors (for purposes of this paragraph 254, collectively, the "Debtors") of PHI and other individually identifiable health information created, received, or maintained by the Debtors (collectively "IIHI") to the Litigation Trust and/or any GUC Sub-Trusts (collectively, "Recipients") in response to requests made in good faith by the Recipients related to the Litigation, as detailed below, is hereby ordered by the Bankruptcy Court through and upon approval of this Plan and, as such, the IIHI disclosure, including PHI, is required by law and, therefore,  is permitted to be disclosed under HIPAA pursuant to 45 C.F.R. § 164.512(e)(1)(i). Furthermore, none of the Debtors or the Reorganized Debtors shall be liable for violating any confidentiality or privacy protections as a result of transferring books and records to the Recipients, including but not limited to IIHI.  As a precondition of any request or receipt of IIHI by the Recipients, the Recipients agree as follows:

a.    Recipients shall request only such IIHI from the Debtors as reasonably necessary to pursue the Assigned Claims (the "Litigation"), which shall

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

include the following categories of IIHI associated with specific prescriptions for pharmaceutical Products: (i) patient and/or prescriber notes, (ii) diagnosis codes, and (iii) patient profiles. If there is disagreement between the Parties with respect to whether requested IIHI is "reasonably necessary," the Parties shall meet and confer to reach a resolution. Any remaining disputes regarding whether IIHI is "reasonably necessary" shall be resolved by the Bankruptcy Court.

b.      Documents containing IIHI shall be designated in accordance with the Protective Order entered pursuant to Section 3.2 of the Cooperation Agreement. The designated documents and the information contained therein relating to IIHI shall be used, shown and disclosed only as provided in this Order, and Recipients must maintain the privacy and security of all such IIHI in accordance with applicable law and appropriate administrative, technical and physical safeguards.

c.      IIHI may be disclosed only to and used by (i) counsel for the Recipients who are actively engaged in the conduct of the Litigation, and the partners, associates, secretaries, paralegals, experts, consultants, and vendors of such counsel for the Recipients to the extent necessary for the Litigation, (ii) counsel for any defendants in the Litigation and who are actively engaged in the conduct of the Litigation and the partners, associates, secretaries, paralegals, experts, consultants, and vendors of such counsel to the extent necessary for the Litigation, (iii) in-house counsel and only those personnel of any defendants in the Litigation that reasonably need to review the IIHI in connection with the Litigation, and (iv) a court, mediator, or arbitration tribunal and the personnel of any of the foregoing to the extent necessary for the Litigation. IIHI may only be disclosed to the individuals listed in (i)-(iii) above who have agreed in writing to comply with the protections, restrictions, and requirements set forth in paragraph 254; all applicable privacy laws such as those protecting information relating to mental health, HIV, and/or substance use; the Protective Order entered pursuant to Section 3.2 of the Cooperation Agreement (which shall include the terms required for a qualified Protective Order in accordance with 45 C.F.R. § 164.512(e)(i)(v)); and the provisions of 45 C.F.R. § 164.509 concerning attestations for PHI relating to reproductive health to the extent applicable. IIHI may not be disclosed to any other person without the prior written consent of the Debtors, except pursuant to a court order or as otherwise required by law. Consent may be made via email.

(Page | 166)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al*. |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

d.    Recipients are prohibited from using or disclosing the IIHI for any purpose other than the Litigation and must either return to the Debtors or securely destroy the IIHI, including all copies made, at the end of the Litigation.

e.    Recipients must ensure that they do not file any IIHI in the public record. Recipients must comply with all privacy and data security laws and rules applicable to the Debtors and Reorganized Debtors (including all relevant court rules) when filing materials in the public record. Without limiting the foregoing, prior to filing materials in the public record, Recipients shall first remove all direct identifiers, including those listed in 45 C.F.R. § 164.514(e)(2)(i)-(xvi). Recipients shall seek leave to file material containing any subset of IIHI, including aggregated or redacted data ("Derived Data"), under seal with the Bankruptcy Court unless otherwise directed by the Bankruptcy Court or the Debtors agree otherwise in writing. The filing Recipient shall only file the minimum amount of Derived Data the Recipient has in good faith determined to be necessary for the Litigation. It is ordered that the Recipients are to make good faith efforts to comply with this Confirmation Order and specifically to protect IIHI. If the Bankruptcy Court will not permit the filing of any Derived Data under seal, counsel for the Debtors and Recipients shall confer in good faith to reach an agreement that allows use of the Derived Data while maintaining the protections within the spirit of this Order to the fullest extent possible (such as, for example, by further redaction of portions of the Derived Data at issue). Notwithstanding anything to the contrary, nothing in this Order is intended to preclude, limit, or place conditions on the disclosure of data as necessary for the sole purpose of the Litigation that has been de-identified in accordance with the standards and implementation specifications set forth in 45 C.F.R. § 164.514(a)-(c). For the avoidance of doubt, this Bankruptcy Court expressly authorizes the use and disclosure of IIHI as described in, and subject to, this section.

f.    No Recipient shall, without prior leave of the Bankruptcy Court, use IIHI or Derived Data in order to contact any patient or former patient of the Debtors.

g.    Immediately upon discovery of a use or disclosure of IIHI or Derived Data not permitted by this Order, the Recipients shall immediately report such use or disclosures to the Reorganized Debtors' Chief Privacy Officer at privacyoffice@riteaid.com. In the event that the Recipients, including any agent of a Recipient (which shall include any counsel, including any partners, associates, secretaries, and paralegals, experts consultants, and vendors of such counsel), improperly or inadvertently uses or discloses IIHI

(Page | 167)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

or Derived Data in a manner not permitted by this Confirmation Order, the Recipients shall provide any legally required notices to individuals, applicable government entities, and other applicable third parties as required under applicable laws and at Recipients' expense. Recipients must provide the Debtors with a reasonable opportunity to review and approve the wording of such notices, and such approval shall not be unreasonably conditioned, withheld, or delayed. Recipients shall indemnify and hold harmless the Debtors with respect to any such use or disclosure and any related reporting, as well as any third party claims or government enforcement actions brought against the Debtors relating to any use or disclosure of IIHI or Derived Data by Recipients, solely to the extent caused by any act, omission, or negligence of Recipients and their agents (which shall include any counsel, including any partners, associates, secretaries, and paralegals, experts consultants, and vendors of such counsel).

255. **Documents, Mortgages, and Instruments.** Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, and this Confirmation Order.

256. **Continued Effect of Stays and Injunction.** Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court that is in existence upon entry of this Confirmation Order shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

257. **Nonseverability of Plan Provisions Upon Confirmation.** Notwithstanding any holding, alteration, or interpretation of any term or provision of the Plan by this Bankruptcy Court, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. This

(Page | 168)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Purchasers' consent; and (3) nonseverable and mutually dependent.

258. **Modifications and Amendments.** Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the DIP Agents, the Required Junior DIP Noteholders, and the Committees (solely in respect of any modification that materially and adversely impacts the rights or entitlements of the constituencies of the Committees under the Committee Settlement) reserve the right to modify the Plan, whether such modification is material or immaterial, seek Confirmation consistent with the Bankruptcy Code (*provided* that any modification or amendment shall be consistent with the Committee Settlement) and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any amendments must not be inconsistent with the Committee Settlement and the Debtors may not amend or modify any

| Debtors: | RITE AID CORPORATION, *et al.* |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

provisions of the Plan that directly relate to the Committee Settlement or the consent rights of the Committees without the consent of the Committees (which may be granted or denied by the Committees in their sole discretion). Any amendments to the UCC / TCC Recovery Allocation Agreement shall require consent of the Committees in their sole discretion.

259.    **Applicable Nonbankruptcy law.**  The provisions of this Confirmation Order, the Plan and Plan Supplement, or any amendments or modifications thereto made in accordance with the terms set forth herein, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law, except that for the avoidance of doubt, paragraphs 148 through 152 and 236 of this Confirmation Order and Article IV.F of the Plan shall be governed by the terms therein.

260.    **Waiver of Filings.**  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to File any list, schedule, or statement with the Bankruptcy Court or the office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement not Filed as of the Confirmation Date.

261.    **Governmental Approvals Not Required.**   This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state, federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

262.    **Exemption from Registration Requirements.**  To the extent that section 1145 of the Bankruptcy Code is inapplicable, the offering, issuance, exchange, or distribution of any

(Page | 170)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

securities pursuant to the Plan, including the New Common Stock issued pursuant to the Management Incentive Plan, is or shall be conducted in a manner that is exempt from the registration requirements of section 5 of the Securities Act and applicable state and local securities laws, pursuant to section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder (including Regulation D), Regulation S under the Securities Act and/or another available exemption from registration under Section 5 of the Securities Act.  To the extent such securities are issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder or Regulation S under the Securities Act, each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.  In that regard, each recipient shall be required to make customary representations to the Debtors including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

263. **Exemption from Securities Act Registration.**  The interests in the Litigation Trust or the GUC Equity Trust Interests (or any GUC Sub-Trusts) is not expected to be deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, or the provision of section 1145 of the Bankruptcy Code is expected to apply to such interests (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) or the issuance of such interests is expected to be exempt from the registration under Section 5 of the Securities Act pursuant to Section 4(a)(2)

| Debtors: | RITE AID CORPORATION, *et al*. |
|---|---|
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

264.    DTC and any participants and intermediaries shall be required to accept and conclusively rely upon the Plan and this Confirmation Order in lieu of a legal opinion regarding whether the 1145 Securities, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

265.    Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

266.    **Payment of Statutory Fees.** All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date (or funded by the Reorganized Debtors and disbursed by the Disbursing Agent on behalf of each of the Reorganized Debtors).  After the Effective Date, any Debtor entity making disbursements on behalf of any Debtor or any Reorganized Debtor, or making disbursements on account of an obligation of any Debtor or any Reorganized Debtor (each a "Disbursing Entity"), shall be jointly and severally liable to pay Quarterly Fees when due and payable.  The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11- MOR.  After the Effective Date, the Reorganized Debtors, and any Disbursing Entities shall file with the Bankruptcy Court separate

(Page | 172)

| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Reorganized Debtors, and Disbursing Entities shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The Litigation Trust Assets (including the Committees' Initial Cash Consideration) disbursed to the Litigation Trust and any Sub-Trust(s) upon the Effective Date will be included in the calculation of the statutory fees payable to the U.S. Trustee by the Debtors and the Reorganized Debtors for the quarter in which the Effective Date occurs, and neither the Debtors, the Reorganized Debtors, nor the Litigation Trust or any Sub-Trust(s) will be responsible for any statutory fees based on the Litigation Trust's (or any Sub-Trusts') subsequent distribution. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

267. **Notices of Confirmation and Effective Date.** The Reorganized Debtors or the Wind-Down Debtors, as applicable, shall serve notice of entry of this Confirmation Order and the occurrence of the Effective Date, substantially in the form attached hereto as **Exhibit C** (the "Confirmation Order and Effective Date Notice"), in accordance with Bankruptcy Rules 2002 and 3020(c) on all Holders of Claims and Interests and the Core Service List (as defined in the *Case Management Procedures* [Docket No. 149]) within ten (10) Business Days after the Effective Date. Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason, unless the

(Page | 173)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. The Combined Hearing Notice and this Confirmation Order and Effective Date Notice are adequate under the particular circumstances of these Chapter 11 Cases and no other or further notice is necessary.

268. **Failure of Consummation.** If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

269. **Substantial Consummation.** "Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

270. **References to and Omissions of Plan Provisions.** References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

271. **Headings.** Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

(Page | 174)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

272. **Effect of Conflict.** This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order. If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control. Notwithstanding the foregoing, nothing contained in the Plan or this Confirmation Order constitutes or shall be construed as any modification or amendment of any Sale Order, including the Elixir Sale Order. For the avoidance of doubt, any Plan Supplement documents filed after entry of this Confirmation Order shall not be inconsistent with the Plan or this Confirmation Order. All parties' rights are reserved solely with respect to whether such subsequent filings are inconsistent with the Plan or this Confirmation Order; *provided*, *however* that (i) such challenges must be brought no later than seven days following the filing of any such Plan Supplement Documents, (ii) any challenging party consents to, and will seek, expedited consideration of any such challenge, which the Debtors will not oppose, and (iii) any such challenge must be decided by this Court prior to the Effective Date, *provided* that the Effective Date will not occur sooner than the deadline for challenges set forth in clause (i).

273. **Expiration of Challenge Period**. The Challenge Period (as defined in the Financing Orders) is deemed expired with respect to the Committees, and the stipulations, admissions, findings, and release contained in the Financing Orders shall be binding on the Debtors' estates and all parties in interest as of July 3, 2024.

274. **Final Order.** This Confirmation Order is a Final Order upon the satisfaction of the conditions precedent to becoming a Final Order as set forth in the definition of Final Order in the

(Page | 175)

| | |
|---|---|
| Debtors: | RITE AID CORPORATION, *et al.* |
| Case No. | 23-18993 (MBK) |
| Caption of Order: | Order Approving the Disclosure Statement For, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates |

Plan and as set forth in this Confirmation Order. The period in which an appeal of the Confirmation Order must be Filed shall commence upon the entry hereof.

275. **Retention of Jurisdiction.** Notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, except as otherwise provided in the Plan, this Confirmation Order, or by applicable federal law, the Bankruptcy Court shall retain jurisdiction as set forth in <u>Article XIII</u> of the Plan.

## Exhibit A

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## SECOND AMENDED JOINT CHAPTER 11
## PLAN OF REORGANIZATION OF RITE AID CORPORATION
## AND ITS DEBTOR AFFILIATES (WITH FURTHER MODIFICATIONS)

NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:    (201) 489-3000
Email:    msirota@coleschotz.com
         wusatine@coleschotz.com
         fyudkin@coleschotz.com
         svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    esassower@kirkland.com
         joshua.sussberg@kirkland.com
         aparna.yenamandra@kirkland.com
         ross.fiedler@kirkland.com
         zach.manning@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' Claims and Noticing Agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these Chapter 11 Cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
     GOVERNING LAW .................................................................................................1
  A.   Defined Terms. ........................................................................................................1
  B.   Rules of Interpretation. ..........................................................................................36
  C.   Computation of Time. ............................................................................................36
  D.   Governing Law. .....................................................................................................37
  E.   Reference to Monetary Figures. .............................................................................37
  F.   Controlling Document. ...........................................................................................37
  G.   Nonconsolidated Plan. ...........................................................................................37
  H.   Purchase Agreement Consent Rights and Controlling Documents ...........................37
  I.   Reference to the Debtors and the Reorganized Debtors. ..........................................38

ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE   CLAIMS, PRIORITY TAX
     CLAIMS, AND DIP CLAIMS ...............................................................................38
  A.   Administrative Claims. ..........................................................................................38
  B.   Payment of Fees and Expenses under Financing Orders. .........................................39
  C.   Professional Fee Claims. ........................................................................................39
  D.   Priority Tax Claims. ..............................................................................................40
  E.   DIP Claims. ...........................................................................................................41
  F.   AHG New-Money Commitment Agreement Claims. ...............................................42

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................42
  A.   Classification of Claims and Interests. ...................................................................42
  B.   Treatment of Claims and Interests. .........................................................................43
  C.   Special Provision Governing Unimpaired Claims. ..................................................48
  D.   Elimination of Vacant Classes. ..............................................................................48
  E.   Voting Classes, Presumed Acceptance by Non-Voting Classes. ..............................48
  F.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .....48
  G.   Controversy Concerning Impairment. .....................................................................48
  H.   Subordinated Claims. .............................................................................................48

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN .............................................................49
  A.   General Settlement of Claims and Interests. ...........................................................49
  B.   Settlement of Opioid Claims ..................................................................................49
  C.   Equitization Transaction. .......................................................................................50
  D.   Sale Transaction Restructuring. ..............................................................................52
  E.   Committee Settlement. ...........................................................................................54
  F.   Insurance Neutrality. .............................................................................................64
  G.   Sources of Consideration for Plan Distributions. ....................................................66
  H.   Plan Administrator and the Wind-Down Debtors. ...................................................69
  I.   Liquidating Trust. ..................................................................................................71
  J.   Release of Liens. ...................................................................................................72
  K.   Cancellation of Existing Securities and Agreements. ..............................................72
  L.   Corporate Action. ..................................................................................................74
  M.   New Corporate Governance Documents. .................................................................74
  N.   Management Incentive Plan. ...................................................................................74
  O.   Effectuating Documents; Further Transactions. ......................................................74
  P.   Section 1146 Exemption. .......................................................................................75
  Q.   Exemption from Securities Act Registration. ..........................................................75
  R.   Preservation of Causes of Action. ..........................................................................76
  S.   Private Company. ...................................................................................................77
  T.   Additional Sale Transactions. .................................................................................78

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................. 78
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................... 78
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases...................................... 80
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.......................... 80
    D.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases........... 82
    E.    Insurance Policies. ............................................................................................................ 82
    F.    Indemnification Provisions. ................................................................................................. 83
    G.    Employee and Retiree Benefits. ........................................................................................... 83
    H.    Collective Bargaining Agreements ....................................................................................... 84
    I.    Pension Plans. ..................................................................................................................... 84
    J.    Modifications, Amendments, Supplements, Restatements, or Other Agreements........................ 84
    K.    Reservation of Rights. ......................................................................................................... 84
    L.    Nonoccurrence of Effective Date. ........................................................................................ 85
    M.    Contracts and Leases Entered Into After the Petition Date. ................................................. 85
    N.    Sale Order Assignment Procedures........................................................................................ 85

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ........................................................... 85
    A.    Timing and Calculation of Amounts to Be Distributed. ....................................................... 85
    B.    Distributions on Account of Obligations of Multiple Debtors. ............................................... 86
    C.    Distributions Generally. ....................................................................................................... 86
    D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........................... 87
    E.    Manner of Payment. ............................................................................................................ 88
    F.    Compliance with Tax Requirements. .................................................................................... 88
    G.    Allocations. ......................................................................................................................... 89
    H.    Foreign Currency Exchange Rate. ....................................................................................... 89
    I.    Setoffs and Recoupment. ..................................................................................................... 89
    J.    Claims Paid or Payable by Third Parties. ............................................................................ 89
    K.    Co-Defendant Defensive Rights ......................................................................................... 90

ARTICLE VII THE PLAN ADMINISTRATOR ................................................................................ 91
    A.    The Plan Administrator. ....................................................................................................... 91
    B.    Wind-Down. ........................................................................................................................ 92
    C.    Exculpation, Indemnification, Insurance & Liability Limitation. ........................................ 93
    D.    Tax Returns. ........................................................................................................................ 93

ARTICLE VIII RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR .......................................... 93
    A.    Establishment of Reserve Accounts. .................................................................................... 93
    B.    Undeliverable Distribution Reserve. ..................................................................................... 93
    C.    Wind-Down Reserve. .......................................................................................................... 94
    D.    Administrative / Priority Claims Reserve. ............................................................................ 94

ARTICLE IX PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
          DISPUTED CLAIMS ........................................................................................................... 95
    A.    Disputed Claims Process. ..................................................................................................... 95
    B.    Allowance of Claims............................................................................................................ 95
    C.    Estimation of Claims. .......................................................................................................... 95
    D.    Adjustment to Claims or Interests without Objection. ......................................................... 96
    E.    Time to File Objections to Claims. ....................................................................................... 96
    F.    Disallowance of Claims or Interests. .................................................................................... 96
    G.    No Distributions Pending Allowance. ................................................................................... 97
    H.    Distributions After Allowance. ............................................................................................ 97
    I.    Tax Treatment of Reserves for Disputed Claims. ................................................................. 97
    J.    No Interest............................................................................................................................ 98
    K.    Amendments to Claims. ....................................................................................................... 98

ARTICLE X SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..................................98
   A.    Settlement, Compromise, and Release of Claims and Interests. ....................................98
   B.    Release of Liens. .........................................................................................................99
   C.    Debtor Release. ...........................................................................................................99
   D.    Third-Party Release ...................................................................................................100
   E.    Exculpation. ..............................................................................................................102
   F.    Injunction. .................................................................................................................104
   G.    Channeling Injunction. ..............................................................................................105
   H.    Insurer Injunction. ....................................................................................................106
   I.    Controlled Substance Injunction ...............................................................................108
   J.    Preservation of Setoff Rights. ...................................................................................108
   K.    Protections Against Discriminatory Treatment. .........................................................108
   L.    Document Retention. .................................................................................................109
   M.    Reimbursement or Contribution. ...............................................................................109
   N.    Term of Injunctions or Stays. ....................................................................................109
   O.    Subordination Rights. ...............................................................................................109

ARTICLE XI CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ...................................110
   A.    Conditions Precedent to the Effective Date. ..............................................................110
   B.    Waiver of Conditions. ...............................................................................................112
   C.    Effect of Failure of Conditions. ................................................................................112
   D.    Substantial Consummation. .......................................................................................113

ARTICLE XII MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...........................113
   A.    Modification and Amendments. .................................................................................113
   B.    Effect of Confirmation on Modifications. ..................................................................113
   C.    Revocation or Withdrawal of Plan. ...........................................................................113

ARTICLE XIII RETENTION OF JURISDICTION ...........................................................................114

ARTICLE XIV MISCELLANEOUS PROVISIONS .............................................................................116
   A.    Immediate Binding Effect. .........................................................................................116
   B.    Additional Documents. ..............................................................................................116
   C.    Payment of Statutory Fees. .......................................................................................116
   D.    Statutory Committees and Cessation of Fee and Expense Payment. ...........................116
   E.    Rights of Purchasers under a Sale Order. .................................................................117
   F.    Reservation of Rights. ...............................................................................................117
   G.    Successors and Assigns. ............................................................................................117
   H.    Notices. .....................................................................................................................117
   I.    Entire Agreement. .....................................................................................................119
   J.    Exhibits. ....................................................................................................................119
   K.    Nonseverability of Plan Provisions. ..........................................................................119
   L.    Votes Solicited in Good Faith. ...................................................................................119
   M.    Closing of Chapter 11 Cases. ...................................................................................119
   N.    Waiver or Estoppel. ..................................................................................................120
   O.    Conflicts. ...................................................................................................................120
   P.    Special Provisions Regarding the United States. .......................................................120

# INTRODUCTION

Rite Aid Corporation ("<u>Rite Aid</u>") and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 Cases (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") propose this joint plan of reorganization (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>") for the resolution of the outstanding Claims against, and Interests in, the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in <u>Article I.A</u> of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in <u>Article III</u> of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*1125(e) Covered Parties*" means, each of, and, in each case, in its capacity as such, (a) the Exculpated Parties, (b) the directors and officers of any of the Debtors or their affiliates, (c) the Reorganized Debtors, and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' Related Parties, in each case solely in their capacity as such.

2.    "*1145 Securities*" means, collectively, (a) the New Common Stock (excluding New Common Stock issued pursuant to the Management Incentive Plan), (b) the Takeback Notes, (c) the Exit 1.5 Lien Notes.

3.    "*2025 Secured Notes*" means the 7.500% secured notes due July 1, 2025, issued by Rite Aid pursuant to the 2025 Secured Notes Indenture.

4.    "*2025 Secured Notes Indenture*" means that certain indenture, dated as of February 5, 2020, among Rite Aid, as issuer, the subsidiary guarantors party thereto, and the 2025 Secured Notes Trustee, and any related documents, as amended, supplemented, or otherwise modified from time to time.

5.    "*2025 Secured Notes Trustee*" means The Bank of New York Mellon Trust Company, N.A., and any successor thereto, as trustee and notes collateral agent for the 2025 Secured Notes under the 2025 Secured Notes Indenture.

6.    "*2026 Secured Notes*" means the 8.000% secured notes due November 15, 2026, issued by Rite Aid pursuant to the 2026 Secured Notes Indenture.

7.    "*2026 Secured Notes Indenture*" means that certain indenture, dated as of July 27, 2020, among Rite Aid, as issuer, the subsidiary guarantors party thereto, and the 2026 Secured Notes Trustee, and any related documents, as amended, supplemented, or otherwise modified from time to time.

8.        "*2026 Secured Notes Trustee*" means The Bank of New York Mellon Trust Company, N.A., and any successor thereto, as trustee and notes collateral agent for the 2026 Secured Notes under the 2026 Secured Notes Indenture.

9.        "*2027 Unsecured Notes*" means the 7.700% unsecured notes due February 15, 2027, issued by Rite Aid pursuant to the 2027 Unsecured Notes Indenture.

10.      "*2027 Unsecured Notes Indenture*" means that certain indenture, dated as of August 1, 1993, by and between Rite Aid, as issuer, and Morgan Guaranty Trust Company of New York, as trustee, as supplemented by that certain supplemental indenture, dated as of February 3, 2000, by and between Rite Aid, as issuer, and U.S. Bank Trust National Association, as trustee, as may be amended, supplemented, or otherwise modified from time to time.

11.      "*2027 Unsecured Notes Trustee*" means U.S. Bank Trust National Association, and any successor thereto, as trustee for the 2027 Unsecured Notes under the 2027 Unsecured Notes Indenture.

12.      "*2028 Unsecured Notes*" means the 6.875% unsecured notes due December 15, 2028, issued by Rite Aid pursuant to the 2028 Unsecured Notes Indenture.

13.      "*2028 Unsecured Notes Indenture*" means that certain indenture, dated as of December 21, 1998, by and between Rite Aid, as issuer, and Harris Trust and Savings Bank, as trustee, as supplemented by that certain supplemental indenture, dated as of February 3, 2000, by and between Rite Aid, as issuer, and Harris Trust and Savings Bank, as trustee (as may be amended, supplemented, or otherwise modified from time to time).

14.      "*2028 Unsecured Notes Trustee*" means Harris Trust and Savings Bank, and any successor thereto, as trustee for the 2028 Unsecured Notes under the 2028 Unsecured Notes Indenture.

15.      "*ABL Availability*" shall have the meaning ascribed to it in the Exit ABL Facility.

16.      "*ABL Facility*" means the senior secured asset-based revolving credit facility provided for under the Prepetition Credit Agreement.

17.      "*ABL Facility Claim*" means, to the extent not converted into a DIP ABL Claim, any Claim derived from, based upon, or arising under the ABL Facility.

18.      "*ABL Lenders*" means the lenders from time to time under the ABL Facility.

19.      "*Acquired Assets*" means, collectively, the Elixir Acquired Assets and the Retail Acquired Assets.

20.      "*Ad Hoc Secured Noteholder Group*" means an ad hoc group of Holders of Senior Secured Notes Claims represented by the Ad Hoc Secured Noteholder Group Professionals.

21.      "*Ad Hoc Secured Noteholder Group Professionals*" means, collectively, (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as primary counsel, (b) Evercore Group L.L.C., as investment banker, (c) FTI Consulting, Inc. as financial advisor, (d) Fox Rothschild LLP, as New Jersey counsel, (e) Littler Mendelson P.C., as special labor counsel, (f) Flaherty & O'Hara, P.C., as special regulatory counsel, (g) Reed Smith LLP, as special regulatory counsel, and (h) any other professionals retained by the Ad Hoc Secured Noteholder Group in connection with the Chapter 11 Cases subject to the consent of the Debtors and in accordance with the Financing Orders.

22.      "*Administrative / Priority Claims Reserve*" means a segregated account established by the Wind-Down Debtors established in accordance with Article VIII.D.

23.      "*Administrative / Priority Claims Reserve Amount*" means in the event of a Sale Transaction Restructuring, the amount of Cash necessary to satisfy all Allowed Administrative Claims, Allowed Priority Claims, Allowed Secured Tax Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims to the extent any such Claims are not Assumed Liabilities under the applicable Sale Transaction

Documentation or any other Purchase Agreement, which aggregate amount shall be funded into the Administrative / Priority Claims Reserve and shall be acceptable to the Required Junior DIP Noteholders and the Debtors.  For the avoidance of doubt, the Administrative / Priority Claims Reserve Amount shall include any amounts necessary to fund costs associated with any claims or obligations arising under the WARN Act and its state law equivalents.

24.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) the Disinterested Director Fee Claims; and (e) the AHG Notes Ticking Fee and the AHG New-Money Commitment Premium (subject to the terms of the Final Financing Order); *provided*, *however*, that in the event of a Sale Transaction Restructuring or an Other Asset Sale, any Administrative Claim that is an Assumed Liability shall be satisfied pursuant to the applicable Purchase Agreement in accordance with <u>Article V.A</u> of this Plan.

25.    "*Administrative Claim Bar Date*" means the deadline for filing requests for payment of Administrative Claims, which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be the later of (i) 30 days after the Effective Date or (ii) in the event an Executory Contract is rejected following the Effective Date, solely as to Administrative Claims related to such rejected Executory Contract, 30 days after notice to the counterparty to such rejected Executory Contract; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

26.    "*Administrative Claim Objection Bar Date*" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the first Business Day that is 180 days following the Effective Date; *provided* that the Administrative Claims Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

27.    "*Affiliate*" means, with respect to any person, or any other person, which directly or indirectly controls, or is under common control with, or is controlled by, such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such Person were a debtor in a case under the Bankruptcy Code.

28.    "*Agents*" means, collectively, the Prepetition Agent, the DIP Agents, the Junior DIP Trustee, the Exit Facilities Agent, and each of the Takeback Notes Trustees, including, in each case, any successors thereto.

29.    "*AHG New Money*" means Cash in the amount of $57,000,000.

30.    "*AHG New-Money Commitment Agreement*" means that certain Commitment Agreement, dated as of June 19, 2024, by and among the Debtors and the AHG New-Money Initial Commitment Parties (and, as may later become signatories thereto, the AHG New-Money Commitment Parties), as may be amended, supplemented, amended and restated, or otherwise modified from time to time.  For the avoidance of doubt, entry of the Final Financing Order shall constitute Bankruptcy Court approval of, among other things, the Debtors' entry into and performance under the AHG New-Money Commitment Agreement, and approving, as Allowed Administrative Claims, the AHG Notes Ticking Fee and the AHG New-Money Commitment Premium, in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement, the New Money DIP Notes Term Sheet, and the Plan.

31.    "*AHG New-Money Commitment Parties*" means those holders of Senior Secured Notes that are signatories to the AHG New-Money Commitment Agreement as "Commitment Parties" thereunder, together with their designees, successors, and permitted assigns, and that provide each of the commitments set forth therein, including the obligation to fund the AHG New Money on or prior to the Effective Date and to purchase AHG Notes in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement and the Plan.

32.    "*AHG New-Money Commitment Premium*" means a commitment premium equal to 15% of the AHG New Money, payable in kind to the applicable AHG New-Money Initial Commitment Parties in additional AHG Notes issued on the Effective Date in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement and the Confirmation Order.

33.    "*AHG New-Money Commitment Premium Claim*" means any Claim arising under or relating to the AHG New-Money Commitment Premium under the AHG New-Money Commitment Agreement.

34.    "*AHG New-Money Initial Commitment Parties*" means certain members of the Ad Hoc Secured Noteholder Group that are signatories to the AHG New-Money Commitment Agreement as "Initial Commitment Parties" thereunder, together with their designees, successors, and permitted assigns, in accordance with the terms and conditions of the AHG New-Money Commitment Agreement.

35.    "*AHG Notes*" means the new senior secured notes issued by the SCD Trust pursuant to the AHG New-Money Commitment Agreement and the Plan, and secured by all of the SCD Trust's assets, including, for the avoidance of doubt, the SCD Claim.  For the avoidance of doubt, no entity other than the SCD Trust, including any Affiliate or subsidiary of Rite Aid (including any Debtor), shall be an obligor on the AHG Notes, and the AHG Notes shall not be secured by any assets of the Debtors (or their Affiliates) or the Reorganized Debtors (or their Affiliates), other than the assets of the SCD Trust.  The principal amount of AHG Notes issued shall be equal to the AHG New Money plus the accrued amount of the AHG New-Money Commitment Premium plus the AHG Notes Ticking Fee (then accrued), which (a) shall be issued, or caused to be issued, by the SCD Trust to the applicable AHG New-Money Initial Commitment Parties and AHG New-Money Commitment Parties in accordance with the AHG Notes Documentation on or prior to the Effective Date and (b) bear interest at a rate of 12%, per annum, paid-in-kind on a monthly basis, subject to the terms and conditions of the AHG New-Money Commitment Agreement.

36.    "*AHG Notes Documentation*" means the AHG Notes Purchase Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee statements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents, each of which shall be consistent in all respects with the terms and conditions of the AHG New-Money Commitment Agreement.

37.    "*AHG Notes Purchase Agreement*" means the purchase agreement with respect to the AHG Notes.

38.    "*AHG Notes Ticking Fee*" means, subject to the terms and conditions of the AHG New-Money Commitment Agreement, an amount of AHG Notes equal to the following formula:  (Days between the Effective Date and the later of (x) entry of the Final Financing Order and (y) execution of the AHG New-Money Commitment Agreement) divided by 365 times AHG New Money times 10%.  The AHG Notes Ticking Fee shall be an Allowed Administrative Claim under section 503(b) of the Bankruptcy Code and shall be paid (a) in AHG Notes issued on or as soon as reasonably practicable following the Effective Date or (b) if the AHG New-Money Commitment Agreement is terminated, in Cash to the applicable AHG New-Money Commitment Parties, if so entitled, all in accordance with the terms and conditions of the AHG New-Money Commitment Agreement.  For the avoidance of doubt, the AHG Notes Ticking Fee shall not begin to accrue unless and until execution and delivery of the AHG New-Money Commitment Agreement by each of the AHG New-Money Initial Commitment Parties.

39.    "*AHG Notes Ticking Fee Claim*" means any Claim arising under or relating to the AHG Notes Ticking Fee under the AHG New-Money Commitment Agreement.

40.    "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed by the Claims Bar Date or the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed) in accordance with the terms of the Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim

described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be Filed), is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt:  (x) a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed after the Claims Bar Date or the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or agreement in writing by the Debtors and the Holder of such late-Filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "Allow" and "Allowing" shall have correlative meanings.

41.    "*Alternative Sale Transaction*" means a Sale Transaction Restructuring with one or more third parties for some, all, or substantially all of the Retail Acquired Assets pursuant to Article IV.D of the Plan, which Sale Transaction Restructuring is not a Credit Bid Transaction.

42.    "*Assigned Claims*" means, collectively, all of the Debtors' claims and Causes of Action, including all of the Debtors' claims and Causes of Action against the Excluded Parties, except:  (a) preference actions waived or settled during the Chapter 11 Cases (provided that the Debtors will not waive or settle any preference claims against the Excluded Parties without the consent of the Committees), or as otherwise agreed by the Committees; (b) claims or Causes of Action against third parties, with respect to which the Reorganized Debtors have an ongoing trade or commercial relationship and with respect to which the Reorganized Debtors assume indemnification obligations under the Plan or otherwise through the Chapter 11 Cases (other than indemnification claims against potential joint tortfeasors and Co-Defendants); (c) claims or Causes of Action (including Avoidance Actions) against contractual counterparties, vendors, or other go-forward commercial counterparties with the Reorganized Debtors (other than indemnification claims against potential joint tortfeasors and Co-Defendants); (d) claims or Causes of Action (including Avoidance Actions) against the DIP Secured Parties, the Junior DIP Secured Parties, the Prepetition Secured Parties, the Senior Secured Noteholders, and in each case their respective Agents, Trustees, and other Related Parties; (e) any and all claims or Causes of Action against any Debtor Related Party; and (f) any and all claims or Causes of Action against MedImpact or any of its affiliates or subsidiaries arising postpetition in connection with the enforcement of the Elixir Sale Order (including the Elixir Purchase Agreement) and the acquisition by MedImpact of the Elixir Acquired Assets.  Notwithstanding the foregoing, the Assigned Claims shall include all of the Debtors' claims and Causes of Action against or relating to McKinsey & Co., Inc. and its Related Parties and shall include all of the Debtors' claims and Causes of Action against or relating to MedImpact arising prior to the Petition Date, if any (other than in connection with negotiating and documenting the Elixir Purchase Agreement).  For the avoidance of doubt, any Assigned Claims against any officer or director of Rite Aid Corporation or any of Rite Aid's directors or officers who are not Debtor Related Parties shall have recovery expressly limited to the proceeds of any Insurance Policy, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability and all such individuals shall have the full protections of any D&O Liability Insurance Policies.  Notwithstanding anything to the contrary herein, all of the Debtors' claims and Causes of Action against the Excluded Parties, and all Scheduled Claims, shall be Assigned Claims.  Notwithstanding anything to the contrary herein, Assigned Claims shall not include any claims or Causes of Action against McKesson, which, for the avoidance of doubt, is not an Excluded Party; *provided*, that, for the avoidance of doubt, Assigned Claims shall include the Debtors' Pass Through Rights, including any Pass Through Rights as provided in any agreement between Rite Aid and McKesson.

43.    "*Assigned Insurance Rights*" means, collectively, any and all rights, titles, privileges, interests, claims, demands or entitlements, as well as obligations, of the Debtors and/or any Holder of Tort Claims to any and all proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity arising under, or

attributable to, any and all Insurance Policies, now existing or hereafter arising, accrued, or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including those arising under or attributable to any and all commercial general liability policies, punitive damages policies, products liability policies, life sciences policies, D&O Liability Insurance Policies, and any of the Debtors' rights under any third parties' policies, but in all cases excluding the Unassigned Insurance Rights. For the avoidance of doubt, this definition is not intended to alter the Debtors' (including the Debtors' assignees') or any insurers' rights under any Insurance Policy or applicable law.

44.    "*Assignment Procedures*" means any assignment procedures attached to a Sale Order.

45.    "*Assumed Contracts*" means collectively, all Executory Contracts and Unexpired Leases that were assumed by the Debtors pursuant to the Schedule of Assumed Executory Contracts and Unexpired Leases.

46.    "*Assumed Liabilities*" means, in a transaction that is a Sale Transaction Restructuring or an Other Asset Sale, the liabilities assumed by the Purchaser in the Sale Transaction Restructuring or the Other Asset Sale(s) pursuant to the terms of the applicable Purchase Agreement(s).

47.    "*Assumption/Rejection Procedures Order*" means the *Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 702].

48.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, Causes of Action, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including claims, Causes of Action, actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

49.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

50.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 156, the United States District Court for the District of New Jersey.

51.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

52.    "*Bar Date Order*" mean the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 703].

53.    "*Bidding Procedures*" means the bidding procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.

54.    "*Bidding Procedures Order*" means the *Amended Order (I) Approving the Auction and Bidding Procedures, (II) Approving Bidding Procedures and Bid Protections, (III) Scheduling Certain Dates and Deadlines with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving the Elixir Stalking Horse APA, (VI) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VII) Authorizing the Assumption and Assignment of Assumed Contracts, (VIII) Authorizing the Sale of Assets, and (IX) Granting Related Relief* [Docket No. 1413].

55.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

56.     "*California AG Agreement*" means that certain settlement agreement entered among the State of California, acting through the California Department of Justice, Office of the Attorney General, Division of Medi-Cal Fraud and Elder Abuse ("California AG"), Rite Aid Corporation, Rite Aid Hdqtrs. Corp., Thrifty Payless, Inc., and Loyd F. Schmuckley Jr. on October 13, 2023. *See* Docket No. 411 at 7–31.

57.     "*California AG Proofs of Claim*" means those unsecured Proofs of Claim, each for $58,000,000.00, filed by the California AG in connection with the California AG Agreement on January 12, 2024 (Claim Nos. 7119, 7199, and 7220).

58.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

59.     "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

60.     "*Casualty Insurance Policies*" means any Insurance Policies held or maintained by any of the Debtors covering losses with respect to casualty, damage, destruction, or other similar loss with respect to real property or personal property or improvements of the Debtors or the Reorganized Debtors; *provided* that Casualty Insurance Policies shall not include the Debtors' commercial general liability policies.

61.     "*Cause of Action*" or "*Causes of Action*" means any claim, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, including Indemnification Rights, guaranty, interest, damage, remedy, cause of action, proceeding, agreement, cross claim, counterclaim, contribution, suit, class action, third-party claim, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, direct or indirect, choate or inchoate, Disputed or undisputed, liquidated or unliquidated, Secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, in tort, at law, in equity, or otherwise. Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

62.     "*Channeling Injunction*" means the channeling injunction set forth in Article X.G of the Plan.

63.     "*Chapter 11 Cases*" means the procedurally consolidated cases Filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

64.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

65.     "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC, the claims and noticing agent retained by the Debtors in the Chapter 11 Cases by order of the Bankruptcy Court [Docket No. 143].

66.     "*Claims Bar Date*" means the date established pursuant to the Bar Date Order, by which Proofs of Claim must be Filed with respect to Claims, other than Administrative Claims, including Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the Holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

67.    "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims.

68.    "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

69.    "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

70.    "*CM/ECF*" means the Bankruptcy Court's case management and electronic case filing system.

71.    "*CMS*" means Centers for Medicare & Medicaid Services, an agency within the U.S. Department of Health and Human Services.

72.    "*CMS Receivable*" means any 2023 plan year Medicare Part D final reconciliation payment that is or may become owing to EIC by CMS, together with any related obligations of CMS owing to EIC for such plan year.

73.    "*Co-Defendant*" means (i) any Holder of a Co-Defendant Claim, whether or not such Co-Defendant Claim has been asserted as of the Effective Date, and (ii) any co-defendant in a Pending Opioid Action commenced as of the Effective Date, in each case, other than the Debtors and their current and former officers, directors, authorized agents and employees, and any applicable insurers under the Debtors' Insurance Policies.  For the avoidance of doubt, Co-Defendant includes the parties listed on **Exhibit B** hereto.

74.    "*Co-Defendant Claims*" means any and all Claims, other than Claims held by an insurer, solely in such insurer's capacity with respect to an Insurance Policy, that (i) either (A) are or could be asserted against any Debtor or Reorganized Debtor, including without limitation any and all Claims that would otherwise be a Cure Cost or (B) seek to recover from any property of any Debtor or its Estate, any Reorganized Debtor, or any Insurance Policy, and (ii) either (A) are for or based upon or arise from contribution, indemnification, reimbursement, setoff or recoupment or any other similar claim or Cause of Action (other than indemnification obligations expressly assumed pursuant to the Plan or an order of the Bankruptcy Court) or (B) are for or based upon or arise from any alleged right, claim, or interest, of any Co-Defendant, under any Insurance Policy, provided that such right is derivative, as opposed to direct, in nature, and (iii) seek to recover, directly or indirectly, any costs, losses, damages, fees, expenses or any other amounts whatsoever, actually or potentially imposed upon the Holder of such Claims, in each case based upon, arising from, or attributable to any actual or potential litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter based on, arising under, or attributable to, in whole or in part, Opioid-Related Activities, any Opioid Claim or any Opioid Demand (including any such Claims or demands asserted by any manufacturer, distributor, pharmacy, pharmacy-benefit manager, group purchasing organization or physician or other contract counterparty or business partner of any Debtor, but excluding any Claims in respect of any D&O Liability Insurance Policy or Indemnification Provisions expressly assumed pursuant to Article V of the Plan).  For the avoidance of doubt, a Co-Defendant Claim shall not include any Co-Defendant Surviving Pre-Effective Date Claim and the McKesson Claim and shall not include any Claims of Co-Defendants against insurers under any applicable Insurance Policies in which Co-Defendants hold an interest that are not derivative in nature and are not otherwise released.  Notwithstanding anything to the contrary in the Plan (other than the immediately proceeding sentence), any Claim that satisfies the definition of a Co-Defendant Claim shall be a Co-Defendant Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.  For the avoidance of doubt, Co-Defendant Claim includes a Claim that is held by an insurance company in its capacity as subrogee of a Holder of a Co-Defendant Claim.

75.    "*Co-Defendant Defensive Rights*" means any and all direct, or indirect, rights, remedies, protections, immunities, objections, defenses, assertions, Claims, Causes of Action, and, in each case, of any kind, character, or nature, whether legal, equitable, or contractual, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, including, without limitation, all rights, remedies, defenses, assertions, and Claims against liability, rights to setoff, offset, recoupment, counter-claims, cross-claims, rights to allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses,

or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case, solely to reduce the liability, judgment, obligation or fault of the applicable Co-Defendant to any Entity that asserts any Cause of Action or claim against the Co-Defendant based in whole or in part on Opioid-Related Activities. Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise to defend against any Cause of Action or Claim brought by any Entity against the Holder of any Co-Defendant Claim or Co-Defendant based in whole or in part on Opioid-Related Activities; and (ii) shall in no case be used to seek any affirmative monetary recovery from any Protected Party or any asset of any Protected Party (including from applicable Insurance Policy of a Protected Party) on account of any Claim or Cause of Action released pursuant to Article X or on account of any Claim against the Debtors. For the avoidance of doubt, Co-Defendant Defensive Rights also includes all rights of a Co-Defendant, based on the conduct or alleged conduct of any Debtor or Reorganized Debtor, to judgment setoff, allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses, or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case, solely to reduce the liability, judgment, obligation or fault, even where the Co-Defendant does not have a Claim against a Debtor or Reorganized Debtor. For the avoidance of doubt, Co-Defendant Defensive Rights may apply to offset or otherwise reduce Claims or Causes of Action asserted by the Litigation Trust and/or any GUC Sub-Trust as provided under contract and/or applicable law, but shall in no case be used to seek an affirmative recovery from the Litigation Trust or any GUC Sub-Trust or any asset of the Litigation Trust or any GUC Sub-Trust.

76.     "*Co-Defendant Related Action*" means any Pending Opioid Action and any previous, pending, or future litigation or dispute that alleges substantially similar facts or Causes of Action as those alleged in the Pending Opioid Actions and that concerns conduct occurring before the Effective Date.

77.     "*Co-Defendant Surviving Pre-Effective Date Claim*" means any Cause of Action held by a Co-Defendant against any of the Debtors that (i) arose in the ordinary course of business, (ii) is not related to a Co-Defendant Related Action, and (iii) concerns conduct occurring before the Effective Date.

78.     "*Combined Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, pursuant to sections 1128 and 1129 of the Bankruptcy Code, and approval of the Disclosure Statement on a final basis, as such hearing may be continued from time to time.

79.     "*Committee Settlement*" means the comprehensive settlement between the Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Agents, as set forth in Article IV.E of the Plan.

80.     "*Committee Settlement Documents*" means (i) the Litigation Trust Documents, (ii) the Litigation Trust Cooperation Agreement, (iii) the UCC / TCC Recovery Allocation Agreement, (iv) the GUC Sub-Trust Documents, (v) the GUC Equity Trust Documents, and (vi) any other documents necessary to implement the Committee Settlement and reasonably acceptable to the Debtors and the Required Junior DIP Noteholders (to the extent such other documents impact the Litigation Trust Class B Interests). Each of the Committee Settlement Documents shall be subject to the consent rights set forth in this Plan.

81.     "*Committees*" means, collectively, the UCC and the TCC.

82.     "*Committees Elixir Rx Distribution*" has the meaning set forth in Article IV.E.1(a).

83.     "*Committees Initial Cash Consideration*" means $20 million in Cash, in the aggregate, for the benefit of Holders of General Unsecured Claims, to be allocated in amounts agreed between the UCC and the TCC pursuant to the UCC / TCC Recovery Allocation Agreement, subject to adjustment to the extent that the hourly and monthly fees (but not success fees, as provided for in the respective engagement letters of the Committee Professionals) and expenses of the Committees and the Committees' Professionals incurred on or after April 1, 2024 are less than $9.5 million, in which case the Committees' Initial Cash Consideration shall be increased by an amount equal to the difference between (a) $9.5 million and (b) the fees and expenses actually incurred by the Committees and the Committees' Professionals during the aforementioned period.

84.    "*Committees Post-Emergence Cash Consideration*" means up to $27.5 million in Cash, in the aggregate, for the benefit of Holders of General Unsecured Claims, payable pursuant to Article III.B.6 of the Plan in accordance with the terms of the Committee Settlement, consisting of:  (a) up to $2.5 million from the proceeds of the sale of unoccupied real estate of the Debtors that is not part of the Reorganized Debtors, to be paid by the first anniversary of the Effective Date simultaneously with the distribution of $2.5 million to Holders of Senior Secured Notes Claims; (b) the Committees Elixir Rx Distribution as set forth in Article IV.E.1(a) of the Plan; and (c) $20 million in Cash, payable semi-annually in the amount of $5 million per year for four years, commencing on the first anniversary of the Effective Date and at each six-month anniversary thereof (the "Required Payment Dates," and each such payment on a Required Payment Date, a "Specified Committee Payment"), subject to the limitations set forth in either Article IV.E.1(b)(i) or Article IV.E.1(b)(ii) of the Plan, at the Committees' election.

85.    "*Committees Professionals*" means any and all professionals retained or engaged by the Committees by order of the Bankruptcy Court in connection with the Chapter 11 Cases and the administration thereof.

86.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

87.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

88.    "*Confirmation Order*" means the order entered by the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code; *provided* that, if the Restructuring Transaction is a Sale Transaction Restructuring, the Sale Order shall govern the consummation of such Sale Transaction Restructuring.

89.    "*Consummation*" means the occurrence of the Effective Date.

90.    "*Controlled Substance Injunction*" means the operating injunction, as set forth in that certain Rite Aid Controlled Substance Compliance Program & Anti Diversion Injunctive Terms, by and among Rite Aid Corporation and the Settling States, attached as **Exhibit A** to this Plan.

91.    "*Controlled Substance Injunction Order*" means an order enforcing the terms of the Controlled Substance Injunction, which, for the avoidance of doubt, may be the Confirmation Order.

92.    "*Credit Bid*" means a bid by Holders of Senior Secured Notes Claims, in a manner consistent with the Bidding Procedures and Bidding Procedures Order, the Confirmation Order, the Final Financing Order, a Sale Order, and section 363(k) of the Bankruptcy Code.

93.    "*Credit Bid Transaction*" means a Sale Transaction Restructuring whereby the Debtors sell some, all, or substantially all of their assets to the Holders of Senior Secured Notes Claims pursuant to a Purchase Agreement on account of a Credit Bid, which Credit Bid is selected by the Debtors as the highest or otherwise best bid for some, all, or substantially all of the Debtors' assets except for the Elixir Acquired Assets (subject to any Alternative Sale Transaction consummated pursuant to the Bidding Procedures and Bidding Procedures Order), as approved by the Bankruptcy Court pursuant to the Sale Order, pursuant to Article IV.D of the Plan.

94.    "*Creditor Distribution*" has the meaning set forth in Article IV.E.1(a).

95.    "*Cure Cost*" means all amounts, including an amount of $0.00, required to cure any monetary defaults and other non-monetary defaults to the extent required by section 365 of the Bankruptcy Code, under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors or assumed and assigned by the Debtors pursuant to a Sale Order or the Confirmation Order pursuant to sections 365 and/or 1123 of the Bankruptcy Code.

96.    "*Cyber Insurance Policies*" means any Insurance Policies held or maintained by any of the Debtors covering losses and/or costs with respect to cybersecurity or privacy events.

97.    "*D&O Liability Insurance Policies*" means all directors and officers/liability Insurance Policies (including any "tail policy") issued or providing coverage at any time to any of the Debtors, any of their predecessors, and/or any of their current or former subsidiaries for current or former directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

98.    "*Debtor Related Party*" means: (a) any Person who serves as an officer of Rite Aid or any of its subsidiaries as of the Petition Date, in their capacities as such; (b) any Person who serves as an employee, officer, or director who currently works for Rite Aid or any of its subsidiaries and Affiliates in any capacity and who will serve New Rite Aid or any of its subsidiaries or Affiliates in any capacity (*provided*, that (i) in the case of an employee such individual remains employed by New Rite Aid immediately following the Petition Date for a period of at least 60 days and performing services commensurate with the position such Person held prior to the Effective Date; *provided, however*, that to the extent such Person resigns due to extenuating personal circumstances or is terminated due to working for a store which is closed by the Reorganized Debtors or such Person's employment is otherwise terminated by the Reorganized Debtors without cause during the 60-day period, such a Person shall nonetheless be considered a Debtor Related Party) and (ii) in the case of an officer or director, such individual remains employed by New Rite Aid immediately following the Effective Date for a period of at least 90 days and performing services commensurate with the position such Person held prior to the Effective Date; *provided*, *however*, that to the extent such Person resigns due to extenuating personal circumstances, such a Person shall nonetheless be considered a Debtor Related Party; (c) each of the Chief Executive Officer of Rite Aid or any of its Affiliates or subsidiaries (in place as of the Petition Date), the Chief Transformation Officer of Rite Aid or any of its Affiliates or subsidiaries (in place as of the Petition Date), and each of the Disinterested Directors, in all capacities in which they served Rite Aid or any of its Affiliates and subsidiaries; and (d)(i) the Retained Professionals, including with respect to any services provided to the Debtors prior to the Petition Date by any professional that is a Retained Professional and (ii) any firm or professional retained under the *Order Granting Debtors' Motion for Entry of an Order Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business* [Docket No. 1138], solely in their capacities as such and solely for conduct after the Petition Date.

99.    "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in <u>Article X.C</u> of the Plan.

100.    "*Debtors*" means, collectively, each of the following:  Rite Aid Corporation; 1515 West State Street, Boise, Idaho, LLC; 1740 Associates, L.L.C.; 4042 Warrensville Center Road – Warrensville Ohio, Inc.; 5277 Associates, Inc.; 5600 Superior Properties, Inc.; Apex Drug Stores, Inc.; Broadview and Wallings-Broadview Heights Ohio, Inc.; Eckerd Corporation; EDC Drug Stores, Inc.; Ex Benefits, LLC; Ex Design, LLC; Ex Design Holdings, LLC; Ex Holdco, LLC; Ex Initiatives, LLC; Ex Options, LLC; Ex Pharmacy, LLC; Ex PR, Inc.; Ex Procurement, LLC; Ex Rxclusives, LLC; Ex Savings, LLC; Ex Software, LLC; EX Solutions of MO, LLC; Ex Solutions of NV, LLC; Ex Solutions of OH, LLC; Ex Tech, LLC; First Florida Insurers of Tampa, LLC; GDF, Inc.; Genovese Drug Stores, Inc.; Gettysburg and Hoover-Dayton, Ohio, LLC; Harco, Inc.; Health Dialog Services Corporation; Hunter Lane, LLC; JCG (PJC) USA, LLC; JCG Holdings (USA), Inc.; Juniper Rx, LLC; K & B Alabama Corporation; K & B Louisiana Corporation; K & B Mississippi Corporation; K & B Services, Incorporated; K & B Tennessee Corporation; K&B Texas Corporation; K & B, Incorporated; Lakehurst and Broadway Corporation; Maxi Drug North, Inc.; Maxi Drug South, L.P.; Maxi Drug, Inc.; Maxi Green Inc.; Munson & Andrews, LLC; Name Rite, L.L.C.; P.J.C. Distribution, Inc.; P.J.C. Realty Co., Inc.; PDS-1 Michigan, Inc.; Perry Drug Stores, Inc.; PJC Lease Holdings, Inc.; PJC Manchester Realty LLC; PJC of Massachusetts, Inc.; PJC of Rhode Island, Inc.; PJC of Vermont Inc.; PJC Peterborough Realty LLC; PJC Realty MA, Inc.; PJC Revere Realty LLC; PJC Special Realty Holdings, Inc.; RCMH LLC; RDS Detroit, Inc.; READ's Inc.; RediClinic Associates, Inc.; RediClinic of PA, LLC; RediClinic LLC; Rite Aid Drug Palace, Inc.; Rite Aid Hdqtrs. Corp.; Rite Aid Hdqtrs. Funding, Inc.; Rite Aid Lease Management Company; Rite Aid of Connecticut, Inc.; Rite Aid of Delaware, Inc.; Rite Aid of Georgia, Inc.; Rite Aid of Indiana, Inc.; Rite Aid of Kentucky, Inc.; Rite Aid of Maine, Inc.; Rite Aid of Maryland, Inc.; Rite Aid of Michigan, Inc.; Rite Aid of New Hampshire, Inc.; Rite Aid of New Jersey, Inc.; Rite Aid of New York, Inc.; Rite Aid of North Carolina, Inc.; Rite Aid of Ohio, Inc.; Rite Aid of Pennsylvania, LLC; Rite Aid of South Carolina, Inc.; Rite Aid of Tennessee, Inc.; Rite Aid of Vermont, Inc.; Rite Aid of Virginia, Inc.; Rite Aid of Washington, D.C. Inc.;  Rite Aid of West Virginia, Inc.;  Rite Aid Online Store, Inc.;  Rite Aid Payroll

Management, Inc.; Rite Aid Realty Corp.; Rite Aid Rome Distribution Center, Inc.; Rite Aid Specialty Pharmacy, LLC; Rite Aid Transport, Inc.; Rite Investments Corp.; Rite Investments Corp., LLC; Rx Choice, Inc.; The Bartell Drug Company; The Jean Coutu Group (PJC) USA, Inc.; The Lane Drug Company; Thrift Drug, Inc.; Thrifty Corporation; Thrifty PayLess, Inc.; Richfield Road – Flint, Michigan, LLC; LMW – 90B Avenue Lake Oswego, Inc.; ILG – 90 B Avenue Lake Oswego, LLC; Drug Palace, Inc.; Grand River & Fenkell, LLC; Rx USA, Inc.; RediClinic of Dallas-Fort Worth, LLC; RediClinic of DC, LLC; RediClinic of MD, LLC; RediClinic of VA, LLC; RediClinic US, LLC; and RediClinic of DE, LLC.  For the avoidance of doubt, the term "Debtors" does not include EIC.

101.    "*Definitive Documents*" means, collectively, and in each case in form and substance acceptable to the Debtors, the Required Junior DIP Noteholders, the DIP Agents, and the Exit Facilities Agent, (a) the Plan and any Plan Supplement, (b) the Disclosure Statement and the Solicitation Materials, (c) the Confirmation Order, (d) any Sale Order, (e) the Disclosure Statement Order, (f) the Final Financing Order, (g) Exit Facilities Documents, (h) the Sale Transaction Documentation, (i) the New Corporate Governance Documents, (j) the Exit 1.5 Lien Notes Documents, (k) the Takeback Notes Documents, (l) the GUC Equity Trust Documents, (m) the MIP Documents, (n) any and all filings with or requests for regulatory or other approvals from any governmental Entity or unit, other than ordinary course filings and requests, necessary or desirable to implement the Restructuring Transactions, (o) the Bidding Procedures and the Bidding Procedures Order, (p) the Registration Rights Agreement, if any, (q) the McKesson Settlement Documents, including the McKesson 503(b)(9) Settlement, (r) the AHG Notes Documentation, AHG New-Money Commitment Agreement, and the SCD Trust Documentation, (s) the DOJ Settlement Documents, (t) the Committee Settlement Documents, (u) such other agreements and documentation contemplated in, or necessary or advisable to, consummate and implement the Restructuring Transactions, and (v) any amendments or modifications to each of the Definitive Documents in clauses (a) through (t); *provided*, *however*, that the DIP Agents and the Exit Facilities Agent shall not have consent rights over the Definitive Documents set forth in clauses (i), (l), (m), (p), or (t), or any amendments or modifications thereto; *provided*, *further*, that the Required Junior DIP Noteholders (1) shall not have consent rights over the Definitive Documents in clause (t) except (i) for the Litigation Trust Documents, (ii) the GUC Sub-Trust Documents, *provided* that the Required Junior DIP Noteholders shall not have consent rights over any Exempt GUC Sub-Trust Documents except to the extent such documents materially and adversely impact the Litigation Trust Class B Interests, and (iii) any other Committee Settlement Document, in each case solely to the extent such document materially and adversely impacts the Litigation Trust Class B Interests and (2) acknowledge that the form and substance of the Exit Facilities Credit Agreement attached to the Exit Facilities Commitment Letter is acceptable to the Required Junior DIP Noteholders. Each Definitive Document except the UCC / TCC Recovery Allocation Agreement shall be in form and substance acceptable to the Debtors, including, for the avoidance of doubt, the Litigation Trust Cooperation Agreement, except for the GUC Equity Trust Documents and the other Committee Settlement Documents, which shall be in form and substance reasonably acceptable to the Debtors.  The McKesson Settlement Documents, including the McKesson 503(b)(9) Settlement, shall be in form and substance acceptable to McKesson and the Debtors, each in their sole discretion and, in each case, otherwise consistent with the Plan and the Confirmation Order.  The Definitive Documents shall not be inconsistent with the terms and conditions of the Committee Settlement and shall not, as determined reasonably, adversely impact the Committees or the Committee Settlement.  The UCC/TCC Recovery Allocation Agreement shall be acceptable to the Committees in their sole discretion, and the Definitive Documents set forth in clauses (l) and (t) shall be acceptable to the Committees; *provided* that, with respect to any Definitive Documents not subject to the foregoing clause, any provisions in such documents that materially and adversely impact the rights or entitlements of the constituencies of the Committees or could reasonably be expected to adversely affect the amount or timing of recovery under the Committee Settlement shall be reasonably acceptable to the Committees.

102.    "*Designee*" shall have the meaning set forth in the Purchase Agreement(s) in the event of a Sale Transaction Restructuring or Other Asset Sale(s).

103.    "*DIP ABL Claim*" means any Claim arising under or relating to the DIP ABL Facility under the DIP ABL Credit Agreement or the Financing Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP ABL Credit Agreement.

104.    "*DIP ABL Credit Agreement*" means the debtor-in-possession financing credit agreement by and among the Debtors, the applicable DIP Agent, and the DIP ABL Lenders, as approved by the Financing Orders, setting forth the terms and conditions of the DIP ABL Facility and the DIP FILO Facility.

105.    "*DIP ABL Facility*" means the new superpriority secured revolving asset-based loan made in accordance with the DIP ABL Credit Agreement and the Financing Orders in the principal amount of $2.85 billion.

106.    "*DIP ABL Lenders*" means, collectively, the lenders from time to time under the DIP ABL Facility.

107.    "*DIP Agents*" means Bank of America, N.A., in its capacities as administrative, collateral agent, and senior collateral agent, as applicable, under the DIP Credit Agreements, together with its respective successors, assigns, or any replacement agent(s) appointed pursuant to the terms of the DIP Credit Agreements.

108.    "*DIP Claims*" means, collectively, the DIP ABL Claims, the DIP FILO Claims, and the DIP Term Loan Claims.

109.    "*DIP Credit Agreements*" means, collectively, the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement.

110.    "*DIP Documents*" means, collectively, the DIP Credit Agreements and any other agreements, documents, and instruments delivered or entered into therewith, including, without limitation, any guarantee amendments, pledge and collateral agreements, intercreditor agreements, and other security documents.

111.    "*DIP FILO Claim*" means any Claim arising under or relating to the DIP FILO Facility under the DIP ABL Credit Agreement or the Financing Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP ABL Credit Agreement.

112.    "*DIP FILO Facility*" means the new superpriority secured first-in, last-out term loan made in accordance with the DIP ABL Credit Agreement and the Financing Orders in the initial principal amount of $400 million.

113.    "*DIP FILO Lenders*" means, collectively, the lenders from time to time under the DIP FILO Facility.

114.    "*DIP Lenders*" means the lenders from time to time under the DIP Credit Agreements.

115.    "*DIP Secured Parties*" means, collectively, the DIP Agents, the DIP Lenders, the other "Senior Secured Parties" (as defined in the DIP ABL Credit Agreement), and the other "Secured Parties" (as defined in the DIP Term Loan Credit Agreement).

116.    "*DIP Term Loan Claim*" means any Claim arising under or relating to the DIP Term Loan Facility under the DIP Term Loan Credit Agreement or the Financing Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Term Loan Credit Agreement.

117.    "*DIP Term Loan Credit Agreement*" means the debtor-in-possession financing credit agreement by and among the Debtors, the applicable DIP Agent, and the DIP Term Loan Lenders, as approved by the Financing Orders, setting forth the terms and conditions of the DIP Term Loan Facility.

118.    "*DIP Term Loan Facility*" means the new secured term loan made in accordance with the DIP Term Loan Credit Agreement in the principal amount of $200 million.

119.    "*DIP Term Loan Lenders*" means, collectively, the lenders from time to time under the DIP Term Loan Facility.

120.    "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is scheduled as zero or as contingent, Disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

121.    "*Disbursing Agent*" means, as applicable, the Debtors, the Reorganized Debtors, the Wind-Down Debtors (as applicable), the GUC Equity Trustee (solely with respect to GUC Equity Trust Interests distributed to General Unsecured Claims subject to the allocation set forth in the UCC / TCC Recovery Allocation Agreement), the Litigation Trustee (solely with respect to General Unsecured Claims and Senior Secured Notes Claims), the Senior Secured Notes Trustees (solely with respect to Senior Secured Notes Claims), or any Entity or Entities selected by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors to make or facilitate distributions contemplated under the Plan.

122.    "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time.

123.    "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

124.    "*Disinterested Director Fee Claims*" means all unpaid fees and expenses as of the Effective Date due to the Disinterested Directors of each of the Debtors pursuant to their respective director agreements with the applicable Debtor Entity.  On the Effective Date, the Disinterested Director Fee Claims shall be deemed Allowed Administrative Claims against the Debtors.

125.    "*Disinterested Directors*" means, in the aggregate, the six disinterested directors of each of the Debtors, in all capacities in which they served Rite Aid or any of its subsidiaries.

126.    "*Disputed*" means, with respect to any Claim or Interest (or portion thereof), any Claim or Interest (or portion thereof) that is not yet Allowed.

127.    "*Distributable Proceeds*" means in the event of a Sale Transaction Restructuring, all Cash of the Debtors or the Wind-Down Debtors, as applicable, on or after the Effective Date, after giving effect to the funding of the Professional Fee Escrow Account, the Wind-Down Reserve, and the Administrative / Priority Claims Reserve, including, as determined by the Debtors or the Wind-Down Debtors, in consultation with the Required Junior DIP Noteholders and the Committees, any Cash returned to the Debtors or the Wind-Down Debtors, as applicable, after the irrevocable payment in full of all Allowed Professional Fee Claims, Allowed Administrative / Priority Claims, and all costs and expenses obligated to be paid from the Wind-Down Reserve.

128.    "*Distribution Date*" means a date on which the Disbursing Agent makes distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date.

129.    "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Effective Date or such other date as designated in a Final Order of the Bankruptcy Court; *provided* that the Distribution Record Date shall not apply to any securities of the Debtors deposited with DTC, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC.

130.    "*DOJ*" means the United States Department of Justice.

131.    "*DOJ Claims*" means, collectively, the DOJ Elixir Claims and the DOJ White Claims.

132.    "*DOJ Elixir Claims*" means the United States' claims and Causes of Action against the Debtors and their non-Debtor Affiliates, including EIC, arising from the "Covered Conduct" (as such term is used in the DOJ Settlement Document for the DOJ Elixir Settlement), including any Claim or Cause of Action of the United States in the action captioned *United States ex rel. Rzeszutko v. Rite Aid Corp.*, Index No. 5:21-cv-00574-JRA (N.D. Ohio).

133.    "*DOJ Elixir Settlement*" means that certain settlement[2] between EIC and certain of the Debtors, on the one hand, and the DOJ, on the other hand, with respect to the DOJ Elixir Claims.  For the avoidance of doubt, any unsecured, nonpriority Claims granted to the United States pursuant to the terms of the DOJ Elixir Settlement shall be Allowed in the in amounts specified therein and shall not be subject to subordination, reconsideration, or disallowance.

134.    "*DOJ White Claims*" means the United States' Claims and Causes of Action against the Debtors and their non-Debtor Affiliates arising from the "Covered Conduct" (as such term is defined in the DOJ Settlement Document for the DOJ White Settlement), including the Claims and Causes of Action of the United States as set forth in the complaint filed on March 13, 2023 by the DOJ against certain of the Debtors and their non-Debtor Affiliates in the United States District Court for the Northern District of Ohio (Eastern Division) under the caption *United States ex. Rel. White v. Rite Aid Corp.*, Index No. 1:21-CV-1239 (N.D. Ohio).

135.    "*DOJ White Settlement*" means the settlement[3] between certain of the Debtors, on the one hand, and the DOJ, on the other hand, with respect to DOJ White Claims.  For the avoidance of doubt, any unsecured, nonpriority Claims granted to the United States pursuant to the terms of the DOJ White Settlement shall be Allowed in the in amounts specified therein and shall not be subject to subordination, reconsideration, or disallowance

136.    "*DOJ Settlement Documents*" means any and all definitive documents memorializing the terms of the DOJ Settlements.

137.    "*DOJ Settlements*" means, collectively, the DOJ Elixir Settlement and the DOJ White Settlement.

138.    "*DTC*" means the Depository Trust Company.

139.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XI.A of the Plan have been satisfied or waived in accordance with Article XI.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter; *provided* that the Litigation Trust Assets or the rights thereto, as applicable, shall be transferred to the Litigation Trust and/or the GUC Equity Trust, as applicable, on the Effective Date.

---

[2]    Certain of the Debtors and the DOJ have reached a settlement in principle, subject to the completion of definitive documentation, to resolve the allegations in the government's complaint.  The settlement remains conditioned on final DOJ approval, as well as additional conditions, including the completion of definitive documentation.  The DOJ White Claims remain preserved pending all necessary approvals, *see* Docket No. 2897, and the Debtors shall consult with the Committees, the Junior DIP Noteholders, and the DIP Agents regarding the definitive documentation of the DOJ Elixir Settlement.

[3]    Certain of the Debtors and the DOJ have reached a settlement in principle, subject to the completion of definitive documentation, to resolve the allegations in the government's complaint.  The settlement remains conditioned on final DOJ approval, as well as additional conditions, including the completion of definitive documentation.  The DOJ White Claims remain preserved pending all necessary approvals, *see* Docket No. 2897, and the Debtors shall consult with the Committees, the Junior DIP Noteholders, and the DIP Agents regarding the definitive documentation of the DOJ White Settlement.

140.    "*EIC*" means Elixir Insurance Company, a non-Debtor subsidiary of Rite Aid.

141.    "*Elixir Acquired Assets*" means the assets of the PBM Business acquired pursuant to the Elixir Purchase Agreement and the Elixir Sale Order, which, for the avoidance of doubt, does not include any assets of, or the equity interests in, EIC.

142.    "*Elixir Escrow*" means the escrow arrangement established by Debtor Ex Options, LLC and administered by a third-party escrow agent acceptable to the Required AHG New-Money Commitment Parties and the Debtors, the DIP Agents, and the Exit Facilities Agent, pursuant to the Elixir Escrow Agreement, which shall, upon receipt, hold all proceeds of the Elixir Rx Intercompany Claim and other distributable value at EIC to be distributed pursuant to the Plan, which shall be consistent with, and subject to the terms and conditions of, the AHG New-Money Commitment Agreement and the Plan.

143.    "*Elixir Escrow Agreement*" means that certain escrow agreement or similar arrangement entered into on or before the Effective Date by and among Debtor Ex Options, LLC, the Exit Facilities Agent, and the SCD Trust on terms acceptable to the Required AHG New-Money Commitment Parties, the DIP Agents, the Exit Facilities Agent, and the Debtors, which shall be consistent with, and subject to the terms and conditions of, the AHG New-Money Commitment Agreement and the Plan.  For the avoidance of doubt, entry of the Confirmation Order shall constitute Bankruptcy Court approval of, among other things, the Debtors' entry into the Elixir Escrow Agreement.

144.    "*Elixir Purchase Agreement*" means that certain Purchase Agreement, dated October 15, 2023 by and among MedImpact and Hunter Lane, LLC, as may be amended, supplemented, or otherwise modified from time to time.

145.    "*Elixir Rx Distributions*" has the meaning set forth in Article IV.E.1(a).

146.    "*Elixir Rx Distributions Schedule*" has the meaning set forth in Article IV.E.1(a).

147.    "*Elixir Rx Intercompany Claim*" means that certain Intercompany Claim payable by EIC to Debtor Ex Options, LLC.

148.    "*Elixir Rx Recovery*" has the meaning set forth in Article IV.E.1(a).

149.    "*Elixir Sale Order*" means the *Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform their Obligations Under the Elixir APA, (III) Approving Assumption and Assignment of Certain Executory Contracts, and (IV) Granting Related Relief* [Docket No. 1510], as may be amended.

150.    "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

151.    "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code.

152.    "*ERISA*" means the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301-1461, and the regulations promogulated thereunder.

153.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case.

154.    "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a et seq, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

1.    "*Excluded Parties*" means (a) any potential joint tortfeasor with the Debtors, Co-Defendant to the Debtors, or named party in connection with any Tort Claims related to any of the Debtors' Products; (b) any of the Debtors' current or former third party agents, partners, representatives, professionals or consultants named in

connection with any Tort Claims related to any of the Debtors' Products (excluding any Debtor Related Party); (c) any distributor, manufacturer, supplier, or other party engaged in the distribution, manufacture, supply, or dispensing/sale of the Debtors' Products named in connection with any Tort Claims related to any of the Debtors' Products; (d) any of the Debtors' current and former directors and officers other than any Debtor Related Party; (e)(i) the seller counterparties and subsequent transferees for (A) the Envision acquisition completed in February 2015 and (B) the Bartell acquisition completed in December 2020, (ii) such seller counterparties' Related Parties and subsequent transferees, solely in their capacities as Related Parties, and (iii) the attorneys, financial advisors, investment bankers, agents, representatives, consultants, underwriters, and other professionals, in each case, to the Debtors in connection with such acquisition or the related financings thereof, except to the extent that any such parties are Debtor Related Parties; (f) the consultants who provided shareholder proxy advisory services in connection with the failed merger with Albertsons Companies, Inc., solely in their capacity as such; (g) Walgreens Boots Alliance, Inc. and Walgreen Co., together with any of their Related Parties; (h) McKinsey and Company, together with any of its Related Parties; (i) CVS Health Corp., together with any of its Related Parties; (j) Optum Rx, Inc., together with any of its Related Parties;  (k) Express Scripts, Inc., together with any of its Related Parties; (l) parties against which the Debtors asserted the Scheduled Claims; (m) the insurers that issued the Insurance Policies; (n) MedImpact and its affiliates and subsidiaries, together with any of their Related Parties; and (o) certain additional parties to be identified by the Committees, with the consent of the Debtors, prior to the Voting Deadline; *provided*, that none of the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates), the Wind-Down Debtors, the DIP Secured Parties, the Junior DIP Secured Parties, the Prepetition Secured Parties, the Senior Secured Noteholders, the Senior Secured Notes Trustees, McKesson, or any of their Related Parties, in their capacities as such, shall be an Excluded Party.  For the avoidance of doubt, no Debtor Related Party shall be an Excluded Party.

2.      "*Exculpated Parties*" means, collectively, and in each case solely in its capacity as such:  (a) each of the Debtors; (b)  each of the Reorganized Debtors; (c) the Committees and each of their respective members; (d) with respect to each of the foregoing Entities in clauses (a) through (c), each such Entity's current and former control persons (including any officers), directors, members of any committees of any Entity's board of directors or managers, equity Holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, none of the Excluded Parties shall be Exculpated Parties.

3.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

4.      "*Exempt GUC Sub-Trust Documents*" means the GUC Sub-Trust Documents entered into by any Tort Sub-Trust, as defined in the Litigation Trust Document entitled *Sub-Trust B Agreement* (which agreement, for the avoidance of doubt, along with the Litigation Trust Document entitled *Sub-Trust A Agreement*, shall not be Exempt GUC Sub-Trust Documents).

5.      "*Existing Equity Interests*" means, collectively, the shares (or any Class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into or exercisable for the shares (or any Class thereof), common stock, preferred stock, limited liability company interests, or other equity, ownership, or profit interests of any Debtors (in each case, whether or not arising under or in connection with any employment agreement).

6.      "*Exit 1.5 Lien Notes*" means the new 1.5 lien notes in the aggregate principal amount equal to the amount of outstanding New Money DIP Notes Claims as of the Effective Date, to be issued by New Rite Aid to Holders of Allowed New Money DIP Notes Claims pursuant to the Plan and the Exit 1.5 Lien Notes Documents.

7.      "*Exit 1.5 Lien Notes Documents*" means, collectively, the Exit 1.5 Lien Notes Indenture and all other agreements, documents, and instruments delivered or entered into in connection with the Exit Facilities,

including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

8.    "*Exit 1.5 Lien Noteholders*" means, collectively, the parties holding the Exit 1.5 Lien Notes from time to time under the Exit 1.5 Lien Notes Indenture.

9.    "*Exit 1.5 Lien Notes Indenture*" means that certain notes indenture evidencing the Exit 1.5 Lien Notes, a form of which shall be included in the Plan Supplement, and which shall be in form and substance acceptable to the Debtors, the DIP Agents, the Exit Facilities Agent, and the Required Junior DIP Noteholders.

10.    "*Exit 1.5 Lien Notes Trustee*" means the trustee under the Exit 1.5 Lien Notes Indenture, together with such trustee's respective successors, assigns, or any replacement trustee(s) appointed pursuant to the terms of the Exit 1.5 Lien Notes Indenture.

11.    "*Exit ABL Facility*" means the new money asset-based loan facility to be provided pursuant to the Exit Facilities Credit Agreement, which shall be in form and substance acceptable to the Debtors, the DIP Agents, the Exit Facilities Agent, and (a) in the event of a Plan Restructuring or Credit Bid Transaction, the Required Junior DIP Noteholders, or (b) in the event of an Alternative Sale Transaction(s), the Purchaser(s) (it being acknowledged that the form and substance of the Exit ABL Facility set forth in the Exit Facilities Credit Agreement attached to the Exit Facilities Commitment Letter is acceptable to the Debtors and the Required Junior DIP Noteholders (or the Purchaser(s), as the case may be)).

12.    "*Exit ABL Facility Loans*" means the loans incurred under the Exit ABL Facility

13.    "*Exit Facilities*" means, collectively, the Exit ABL Facility and the Exit FILO Term Loan Facility, each provided for under the Exit Facilities Credit Agreement.

14.    "*Exit Facilities Agent*" means the administrative agent under the Exit Facilities Credit Agreement, together with such agent's successors, assigns, or any replacement agent(s) appointed pursuant to the terms of the Exit Facilities Credit Agreement.

15.    "*Exit Facilities Credit Agreement*" means that certain credit agreement evidencing the Exit Facilities, a form of which shall be included in the Plan Supplement, and which shall be in form and substance acceptable to the Debtors, the DIP Agents, the Exit Facilities Agent, and (a) in the event of a Plan Restructuring or Credit Bid Transaction, the Required Junior DIP Noteholders, or (b) in the event of an Alternative Sale Transaction(s), the Purchaser(s) (it being acknowledged that the form and substance of the Exit Facilities Credit Agreement attached to the Exit Facilities Commitment Letter is acceptable to the Required Junior DIP Noteholders).

16.    "*Exit Facilities Commitment Letter*" means that certain commitment letter, dated as of June 19, 2024, among the Debtors, the Exit Lenders, and the Exit Facilities Agent, which attaches the form of the Exit Facilities Credit Agreement.

17.    "*Exit Facilities Documents*" means, collectively, the Exit Facilities Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection with the Exit Facilities, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.  In the event of a Plan Restructuring or a Credit Bid Transaction, the Exit Facilities Documents shall be in form and substance acceptable to the Required Junior DIP Noteholders (it being acknowledged that the form and substance of the Exit Facilities Credit Agreement attached to the Exit Facilities Commitment Letter is acceptable to the Required Junior DIP Noteholders).

18.    "*Exit FILO Term Loan Facility*" means the new money first-in, last-out term loan facility to be provided pursuant to the Exit Facilities Credit Agreement, which shall be in form and substance acceptable to the Debtors, the DIP Agents, the Exit Facilities Agent, and (a) in the event of a Plan Restructuring or Credit Bid Transaction, the Required Junior DIP Noteholders, or (b) in the event of an Alternative Sale Transaction(s), the Purchaser(s) (it being acknowledged that the Exit FILO Term Loan Facility set forth in the Exit Facilities Credit

Agreement attached to the Exit Facilities Commitment Letter is acceptable to the Debtors and the Required Junior DIP Noteholders (or the Purchaser(s), as the case may be)).

19.     "*Exit FILO Term Loan Facility Loans*" means the loans incurred under the Exit FILO Term Loan Facility.

20.     "*Exit Lenders*" means, collectively, the lenders from time to time under the Exit Facilities.

21.     "*Extension Order*" means (a) the *Order Pursuant to Section 365(d)(4) of the Bankruptcy Code (I) Extending the Debtors' Time to Assume or Reject Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* [Docket No. 1132] and (b) any further order(s) of the Bankruptcy Court extending the time within which the Debtors may assume or reject Unexpired Leases.

22.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

23.     "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized Designee in the Chapter 11 Cases.

24.     "*FILO Lenders*" means, collectively, the lenders from time to time under the FILO Term Loan Facility.

25.     "*FILO Term Loan Facility*" means that certain first-in, last-out term loan facility provided under the Prepetition Credit Agreement.

26.     "*FILO Term Loan Facility Claims*" means any Claim against a Debtor arising under, derived from, related to, or based on the FILO Term Loan Facility.

27.     "*Final Financing Order*" means the *Third Amended Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 3836] (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms).

28.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or Filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be Filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

29.     "*Financing Orders*" means, collectively, the Interim Financing Order and the Final Financing Order.

30.     "*First Out Takeback Notes*" means new first out junior secured notes in the aggregate principal amount of $225 million to be issued by New Rite Aid to Holders of Allowed Roll-Up DIP Notes Claims pursuant to the Plan and the Takeback Notes Documents.

31.     "*General Unsecured Claim*" means any Claim, other than a Secured Claim, that is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim, a Disinterested Director Fee

Claim, an AHG New-Money Commitment Premium Claim, and an AHG Notes Ticking Fee Claim), (b) an Other Secured Claim, (c) an Other Priority Claim, (d) a DIP Claim, (e) a Junior DIP Claim, (f) a Prepetition Credit Agreement Claim, (g) a Senior Secured Notes Claim, including any Senior Secured Notes Deficiency Claim, (h) an Intercompany Claim, or (i) a Section 510 Claim.

32.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

33.    "*GUC Distribution*" has the meaning set forth in Article IV.E.1(a).

34.    "*GUC Equity Pool*" means the greater of (i) 10% minus one share and (ii) 9.99% of the New Common Stock, subject to (a) reasonable and customary minority protections, (b) certain agreed-upon anti-dilution protections, and (c) dilution on account of the New Common Stock issued pursuant to the Management Incentive Plan, which shall be issued to, and held by, the GUC Equity Trust for the benefit of Holders of Allowed General Unsecured Claims; *provided* that neither the Committees nor Holders of General Unsecured Claims shall have management, governance, or board appointment rights on account of their interests in the GUC Equity Pool. The GUC Equity Pool shall be contributed to either the GUC Equity Trust, a GUC Sub-Trust, or some other trust or consented to investment entity in consideration of tax efficiencies and regulatory compliance, which shall be mutually agreed by the Debtors, the Required Junior DIP Noteholders, and the Committees (which consent shall not be unreasonably withheld).

35.    "*GUC Equity Trust*" means one or more trusts and/or sub-trusts (including as a sub-trust of a single trust that also includes the Litigation Trust as a sub-trust) established prior to, on, or after the Effective Date pursuant to, and in accordance with, Article IV.E.2 of the Plan to hold the GUC Equity Trust Assets for the benefit of Holders of Allowed General Unsecured Claims pursuant to the applicable GUC Equity Trust Agreement. For the avoidance of doubt, the GUC Equity Trust and the Litigation Trust may be sub-trusts within a single trust, as mutually agreed between the Debtors, the Required Junior DIP Noteholders, and the Committees.

36.    "*GUC Equity Trust Agreement*" means each of the trust agreements establishing and delineating the terms and conditions for the creation and operation of the applicable GUC Equity Trust to be entered into on or before the Effective Date between the Debtors and the GUC Equity Trustee.

37.    "*GUC Equity Trust Assets*" means the GUC Equity Pool. For the avoidance of doubt, the GUC Equity Trust Assets shall not include any asset(s) other than the GUC Equity Pool.

38.    "*GUC Equity Trust Documents*" means the GUC Equity Trust Agreements and all other agreements, documents, and instruments delivered or entered into in connection with the establishment and formation of the GUC Equity Trust; *provided, however*, that under the GUC Equity Trust Documents, the number of holders of any securities, including New Common Stock, shall not exceed such amounts as would prohibit or preclude the Reorganized Debtors from being a private company not subject to reporting obligations under Section 13(a) or 15(d) of the Exchange Act upon emergence or thereafter.

39.    "*GUC Equity Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes imposed on or payable by the GUC Equity Trust) incurred by the GUC Equity Trust, any professionals retained by the GUC Equity Trust, and any additional amount determined necessary by the GUC Equity Trustee to adequately reserve for the operating expenses of the GUC Equity Trust.

40.    "*GUC Equity Trust Interests*" means the beneficial interest in the GUC Equity Trust Assets, granted to each beneficiary of the applicable GUC Equity Trust, which shall entitle such Holder of Allowed General Unsecured Claims to a Pro Rata share of the GUC Equity Trust Assets, subject to, and on, the terms and conditions as set forth in this Plan, the applicable GUC Equity Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and any documents related thereto. GUC Equity Trust Interests will be non-voting.

41.     "*GUC Equity Trustee*" means, in its capacity as such, the Person selected by the Committees, in consultation with the Debtors and the Ad Hoc Secured Noteholder Group, to serve as the trustee of each of the GUC Equity Trust, and any successor thereto, in accordance with the GUC Equity Trust Agreements.

42.     "*GUC Sub-Trust*" means one or more trusts, if any, to be established or designated on the Effective Date pursuant to, and in accordance with, the UCC / TCC Recovery Allocation Agreement, to hold and/or distribute assets for the benefit a subset of Holders of Allowed General Unsecured Claims pursuant to the applicable GUC Sub-Trust Documents.

43.     "*GUC Sub-Trust Documents*" means the trust agreements, together with any associated trust distribution procedures, governing any GUC Sub-Trust, which GUC Sub-Trust Documents shall be in form and substance reasonably acceptable to the Committees.

44.     "*GUC Sub-Trust Trustee*" means, in its capacity as such, the Person selected by the TCC and/or the UCC, as applicable, to serve as the trustee of a GUC Sub-Trust, and any successor thereto, in accordance with the GUC Sub-Trust Documents.

45.     "*Holder*" means any holder of an Allowed Claim or Interest.

46.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

47.     "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, indemnification agreements, employment contracts, or trust agreements, for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, other Professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

48.     "*Indemnification Right*" means the Debtors' indemnification rights against any manufacturer, distributor, supplier, or other party, with respect to any of the Debtors' Products, including by way of contract, statute, common law, or otherwise.

49.     "*Indentures*" means, collectively, the Senior Secured Notes Indentures and the Unsecured Notes Indentures.

50.     "*Insurance Policies*" means, collectively, insurance policies, including commercial general liability policies, punitive damages policies, products liability policies, life sciences policies, D&O Liability Insurance Policies, and any of the Debtors' rights under any third parties' insurance policies.

51.     "*Insurer Injunction*" means the insurer injunction set forth in <u>Article X.H</u> of the Plan.

52.     "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor.

53.     "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor or non-Debtor subsidiary or Affiliate.

54.     "*Interest*" means any Equity Security in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

55.     "*Interim Financing Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing*

*Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 120].

56.      "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

57.      "*Junior DIP Claim*" means any Claim arising under or relating to the Junior DIP Notes under the Junior DIP Notes Indenture or the Final Financing Order, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the Junior DIP Notes Indenture.

58.      "*Junior DIP Documents*" means, collectively, the Junior DIP Notes Indenture and any other agreements, documents, and instruments delivered or entered into therewith, including, without limitation, any guarantee amendments, pledge and collateral agreements, intercreditor agreements, and other security documents.

59.      "*Junior DIP Facility*" means the debtor-in-possession financing notes facility provided for under the Junior DIP Notes Indenture.

60.      "*Junior DIP Noteholders*" means, collectively, the parties holding the Junior DIP Notes from time to time under the Junior DIP Notes Indentures.

61.      "*Junior DIP Noteholders Equity Distribution*" means 17.309% of the New Common Stock, subject to dilution on account of the New Common Stock issued pursuant to the Management Incentive Plan.

62.      "*Junior DIP Notes*" means the New Money DIP Notes and the Roll-Up DIP Notes.

63.      "*Junior DIP Notes Indenture*" means the debtor-in-possession financing notes indenture by and among the Debtors, the applicable Junior DIP Trustee, and the Junior DIP Noteholders, as approved by the Final Financing Order, setting forth the terms and conditions of the Junior DIP Notes.

64.      "*Junior DIP Roll-Up*" means the roll-up of $225,000,000 of Senior Secured Notes held by the Junior DIP Noteholders into Roll-Up DIP Notes in accordance with the Junior DIP Documents and Final Financing Order.

65.      "*Junior DIP Secured Parties*" means, collectively, the Junior DIP Trustee and the Junior DIP Noteholders.

66.      "*Junior DIP Trustee*" means U.S. Bank Trust Company, National Association, its capacity as trustee and notes collateral agent under the Junior DIP Notes Indenture, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the Junior DIP Notes Indenture.

67.      "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

68.      "*Liquidating Trust*" means, in the event the Restructuring Transaction is not a Plan Restructuring, the trust, if any, formed under the Liquidating Trust Agreement, which shall hold the Liquidating Trust Assets.

69.      "*Liquidating Trust Agreement*" means the trust or similar agreement (if any) providing for the Liquidating Trust, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof that, among other things, establishes the Liquidating Trust and governs the powers, duties, and responsibilities of the Plan Administrator, Filed as part of the Plan Supplement (if applicable).

70.      "*Liquidating Trust Assets*" means in the event the Restructuring Transaction is not a Plan Restructuring, the Remnant Assets transferred from the Wind-Down Debtors to the Liquidating Trust in accordance with <u>Article IV.E.3</u> herein.

71.     "*Liquidity Event*" has the meaning set forth in the Exit Facilities Credit Agreement (in the form filed in the Plan Supplement).

72.     "*Litigation Trust*" means the one or more trusts and/or sub-trusts (including as a sub-trust of a single trust that also includes the GUC Equity Trust as a sub-trust) formed under the Litigation Trust Agreement(s), which trust(s) shall hold the Litigation Trust Assets.

73.     "*Litigation Trust Agreement*" means the trust or similar agreement (if any) providing for the Litigation Trust, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof.

74.     "*Litigation Trust Assets*" means (i) the Committees' Initial Cash Consideration, (ii) the Committees' Post-Emergence Cash Consideration, (iii) the Assigned Claims, (iv) the proceeds of the Assigned Claims, (v) the Assigned Insurance Rights, and (vi) the Tort Claim Insurance Proceeds.

75.     "*Litigation Trust Class A Interests*" means the class A beneficial interests in the Litigation Trust as provided for in the Litigation Trust Agreement, which interests shall only be available to Holders of General Unsecured Claims, subject to the terms of the UCC / TCC Recovery Allocation Agreement.  For the avoidance of doubt, Litigation Trust Class A Interests shall include, in addition to other Litigation Trust Assets other than Litigation Trust Class B Interests, (a) 85% of the first $100 million of Proceeds of Assigned Claims; (b) 75% of any amounts above $100 million and less than $200 million of Proceeds of Assigned Claims; and (c) 65% of any amounts above $200 million of Proceeds of Assigned Claims.

76.     "*Litigation Trust Class B Interests*" means the class B beneficial interests in the Litigation Trust as provided for in the Litigation Trust Agreement, which interests shall only be available to Holders of New Money DIP Notes Claims.  For the avoidance of doubt, Litigation Trust Class B Interests shall only include (a) 15% of the first $100 million of Proceeds of Assigned Claims; (b) 25% of any amounts above $100 million and less than $200 million of Proceeds of Assigned Claims; and (c) 35% of any amounts above $200 million of Proceeds of Assigned Claims.

77.     "*Litigation Trust Cooperation Agreement*" means an agreement between the Reorganized Debtors and the Litigation Trust, to be operative as of and after the Effective Date, (a) transferring to the Litigation Trust, *inter alia*, certain documents, information, and privileges relevant for the pursuit and administration by the Litigation Trust of the Assigned Claims and Assigned Insurance Rights; and (b) providing for reasonable terms for cooperation between the Reorganized Debtors and the Litigation Trust regarding the same.

78.     "*Litigation Trust Documents*" means the Litigation Trust Agreement and all other agreements, documents, procedures, and instruments delivered or entered into in connection with the establishment, formation, and implementation of the Litigation Trust, including the Litigation Trust Cooperation Agreement.

79.     "*Litigation Trust Interests*" means all beneficial interests in the Litigation Trust, as provided for in the Litigation Trust Agreement.

80.     "*Litigation Trustee*" means the trustee for the Litigation Trust to be selected by the Committees, in consultation with the Debtors and the Required Junior DIP Noteholders, which Person (and any successor Litigation Trustee) shall be a "U.S. Person" as determined for U.S. federal income tax purposes.

81.     "*Management Incentive Plan*" means, in the event of a Plan Restructuring, the post-Effective Date management equity incentive plan of New Rite Aid, to be determined and allocated by the New Rite Aid Board.

82.     "*Massachusetts OAG Agreement*" means that certain settlement agreement between Debtor Maxi Drug, Inc. and the Massachusetts Office of the Attorney General establishing the terms of an Assurance of Discontinuance under Massachusetts law, as filed in the Suffolk County Superior Court on or about October 10, 2023.

83. "*McKesson*" means, collectively, the McKesson Corporation and certain corporate Affiliates, as creditors and contract counterparties in the Chapter 11 Cases.

84. "*McKesson 503(b)(9) Settlement*" means that certain settlement, by and between the Debtors and McKesson, setting forth the treatment of all Claims held by McKesson against any Debtor under section 503(b)(9) of the Bankruptcy Code, on the terms and conditions set forth in the Plan Supplement.

85. "*McKesson Claim*" means all Claims of McKesson arising under the McKesson Prepetition Contract or otherwise, including any Claims under section 503(b)(9) of the Bankruptcy Code.

86. "*McKesson New Contract*" means that certain supply agreement, effective as of the Effective Date, pursuant to which McKesson will supply certain of the Reorganized Debtors with, among other things, pharmaceutical Products.

87. "*McKesson Prepetition Contract*" means that certain supply agreement, originally entered into and dated as of December 22, 2003, pursuant to which McKesson supplied certain of the Debtors with, among other things, pharmaceutical Products, prior to the Petition Date, as the same was previously amended, supplemented, or otherwise modified from time to time.

88. "*McKesson Settlement*" means that certain compromise and settlement, by and among the Debtors and McKesson, with respect to, among other things, the treatment of the McKesson Claim and the terms of the go-forward McKesson New Contract.

89. "*McKesson Settlement Documents*" means, collectively, the McKesson New Contract, the McKesson Settlement Term Sheet, the McKesson 503(b)(9) Settlement, and any and all other documents memorializing or implementing the McKesson Settlement.

90. "*McKesson Settlement Term Sheet*" means that certain term sheet setting forth certain terms and conditions of the McKesson Settlement.

91. "*Mediation*" means the mediation between the Debtors and certain key parties in interest in the Chapter 11 Cases authorized by the Bankruptcy Court pursuant to the Mediation Order.

92. "*Mediation Order*" means the *Stipulation and Agreed Order (I) Appointing Hon. Shelley C. Chapman (Ret.) as Mediator to Mediate the Mediation Topics, (II) Referring Such Matters to Mediation, (III) Directing the Mediation Parties to Participate in the Mediation, and (IV) Granting Related Relief* [Docket No. 1771], as may be amended, supplemented, or otherwise modified from time to time.

93. "*Mediator*" has the meaning ascribed to it in the Mediation Order.

94. "*MedImpact*" means MedImpact Healthcare Systems, Inc., as Purchaser under the Elixir Sale Order.

95. "*MedImpact Term Loan*" means that certain seller financing term loan facility provided under the MedImpact Term Loan Credit Agreement as the "2023 Term Loans" (as defined therein).

96. "*MedImpact Term Loan Credit Agreement*" means that certain second amended and restated credit agreement, dated as of November 8, 2023, by and among MI OpCo Holdings, Inc., as borrower, MI OpOco H2, LLC, as guarantor, the other subsidiary guarantors from time to time party thereto, the lenders and letter of L/C issuers from time to time party thereto, and Bank of America, N.A., as administrative agent, swing-line lender, and L/C issuer, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

97. "*MedImpact Term Loan Distribution*" means the portion of the MedImpact Term Loan (or the proceeds thereof) that shall be distributed to Holders of Allowed New Money DIP Notes Claims after payment of (a) the Backstop Commitment Premium (as defined in the New Money DIP Notes Term Sheet) and (b) any amounts

allocable to the DIP Lenders, which MedImpact Term Loan (or the proceeds thereof) shall be distributed at the election of each Holder of an Allowed New Money DIP Notes Claim in accordance with paragraph (f) of the "Plan Amendments" section of the New Money DIP Notes Term Sheet.

98.     "*MedImpact Term Loan Sale*" means the sale of the MedImpact Term Loan pursuant to the MedImpact Term Loan Sales Process.

99.     "*MedImpact Term Loan Sales Process*" means the competitive marketing and bidding process conducted by the Debtors in accordance with the Final Financing Order, as applicable, for the sale of all, substantially all, or a portion of the MedImpact Term Loan.

100.     "*MIP Documents*" means, collectively, the documents governing the Management Incentive Plan, as such documents may be amended, supplemented, or otherwise modified from time to time in accordance with their terms.

101.     "*New Common Stock*" means, in the event of a Plan Restructuring, the common stock, limited liability company membership units, or functional equivalent thereof of New Rite Aid having the terms set forth in the New Corporate Governance Documents to be issued on the Effective Date subject to the terms and conditions set forth in this Plan and the New Shareholders Agreement.

102.     "*New Corporate Governance Documents*" means, in the event of a Plan Restructuring, the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of New Rite Aid, including any certificates of designation and the New Shareholders Agreement, each of which shall be included in the Plan Supplement and be in form and substance acceptable to the Debtors and the Required Junior DIP Noteholders.

103.     "*New Money DIP Notes*" means new junior secured notes issued in accordance with the Junior DIP Documents and the Final Financing Order in the principal amount of $76.5 million.

104.     "*New Money DIP Notes Claim*" means any Claim arising under or relating to the New Money DIP Notes under the Junior DIP Notes Indenture or the Final Financing Order, including any and all fees, interest paid in kind, and accrued but unpaid interest and fees arising under the Junior DIP Notes Indenture.

105.     "*New Money DIP Notes Term Sheet*" means that certain *Term Sheet for $75,000,000 New Money Junior DIP Facility and $57,000,000 Exit Financing Facility* approved by the Bankruptcy Court in connection with the Bankruptcy Court's entry of the Final Financing Order and authorization of the Debtors' entry into and performance under the AHG New-Money Commitment Agreement.

106.     "*New Rite Aid*" means, in each case, after taking into account any Alternative Sale Transaction or Other Asset Sale consummated pursuant to the Bidding Procedures and Bidding Procedures Order, either (a) Rite Aid, as reorganized pursuant to and under the Plan, or any successor or assign thereto, by merger, amalgamation, consolidation or otherwise, or any Affiliate thereto, on or after the Effective Date, or (b) a new Entity that may be formed to, among other things, directly or indirectly to acquire the assets and/or Interests of the Debtors in the Chapter 11 Cases, and issue the New Common Stock to be distributed pursuant to the Plan.

107.     "*New Rite Aid Board*" means the board of directors of New Rite Aid, as selected by the Required Junior DIP Noteholders.

108.     "*New Shareholders Agreement*" means, in the event of the Plan Restructuring, the agreement with respect to the New Common Stock, which shall include customary minority shareholder protections and shall be otherwise acceptable to the Debtors and the Required Junior DIP Noteholders.

109.     "*Notes*" means, collectively, the Senior Secured Notes and the Unsecured Notes.

110.    "*Notes Claims*" means, collectively, the Senior Secured Notes Claims and Unsecured Notes Claims.

111.    "*Opioid Claim*" means a Claim or Cause of Action (other than Claims or Causes of Action arising from violations of any opioid-related injunction entered by the Bankruptcy Court in connection with the Chapter 11 Cases), whether existing now or arising in the future, based in whole or in part on any conduct or circumstance occurring or existing on or before the Effective Date and arising out of, relating to, or in connection with any opioid product or substance, and any and all Opioid Demands related thereto, including, for the avoidance of doubt, claims for indemnification, contribution, or reimbursement on account of payments or losses in any way arising out of, relating to, or in connection with any such conduct or circumstances and Co-Defendant Claims.  For the avoidance of doubt, Opioid Claims do not include (i) any liability solely to the extent premised on allegations regarding conduct undertaken by the Reorganized Debtors after the Effective Date or (ii) any claims arising under section 502(h) of the Bankruptcy Code.

112.    "*Opioid Claimant*" means a claimant alleging a Claim or Cause of Action (other than Claims or Causes of Action arising from violations of any opioid-related injunction entered by the Bankruptcy Court in connection with the Chapter 11 Cases), whether existing now or arising in the future, based in whole or in part on any conduct or circumstance occurring or existing on or before the Effective Date and arising out of, relating to, or in connection with any opioid product or substance, and any and all Opioid Demands related thereto, but not including, claims for indemnification, contribution, or reimbursement on account of payments or losses in any way arising out of, relating to, or in connection with any such conduct or circumstances and Co-Defendant Claims. For the avoidance of doubt, Opioid Claimants do not include claimants alleging (i) any liability solely to the extent premised on allegations regarding conduct undertaken by the Reorganized Debtors after the Effective Date or (ii) any claims arising under section 502(h) of the Bankruptcy Code.

113.    "*Opioid Demand*" means any present or future demand for payment against a Debtor that (a) was not a Claim during the Chapter 11 Cases prior to the Effective Date; (b) is based in whole or in part on any conduct or circumstance occurring or existing on or before the Effective Date; or (c) arises out of, relating to, or in connection with the same or similar conduct or events that gave rise to the Opioid Claims addressed by the Plan.  For the avoidance of doubt, Opioid Demands do not include (i) any liability solely to the extent premised on allegations regarding conduct undertaken by the Reorganized Debtors after the Effective Date or (ii) any claims arising under section 502(h) of the Bankruptcy Code.

114.    "*Opioid-Related Activities*" means the development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution, dispensing, or sale of opioid Products or the use or receipt of any proceeds therefrom, or the use of opioids, including opioids that are not Products, or any other activities that form the basis of an Opioid Claim.

115.    "*Opt-In Forms*" means the *Notice and Non-Tort Third-Party Release Opt-In Form* that shall be filed with the Plan Supplement and the *Notice of Third Party-Release and Opportunity to Opt In* that shall be filed with the Plan Supplement.

116.    "*Other Asset Sale*" means, in the event the Plan Restructuring occurs and the Debtors agree to sell certain of the Debtors' assets, one or more sale(s) of some of the Debtors' assets pursuant to the Bidding Procedures, consummated through one or more Sale Order(s).  For the avoidance of doubt, the sale transaction consummated pursuant to the Elixir Sale Order shall not be considered an "Other Asset Sale."

117.    "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases; *provided* that any Other Priority Claim that (i) is an Assumed Liability under a Purchase Agreement shall be satisfied solely under the applicable Purchase Agreement and shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors and (ii) solely in the event of a Sale Transaction Restructuring, is not an Assumed Liability under a Purchase Agreement shall be satisfied solely from the Administrative / Priority Claims Reserve.

118.     "*Other Secured Claim*" means any Secured Claim, other than (a) an ABL Facility Claim, (b) a FILO Term Loan Facility Claim, (c) a DIP ABL Claim, (d) a DIP FILO Claim, (e) a DIP Term Loan Claim, or (f) a Senior Secured Notes Claim; *provided* that any Other Secured Claim that (i) is an Assumed Liability under a Purchase Agreement shall be satisfied solely under the applicable Purchase Agreement and shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors and (ii) solely in the event of a Sale Transaction Restructuring, is not an Assumed Liability under a Purchase Agreement shall be satisfied solely from the Administrative / Priority Claims Reserve.

119.     "*Pass Through Rights*" means the Debtors' rights to pursue all product warranties and indemnities from all manufacturers and vendors of McKesson with respect to products purchased by McKesson and resold to Rite Aid.

120.     "*PBGC*" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and agency of the United States created by ERISA.

121.     "*PBM Business*" means the pharmacy benefit manager business conducted by certain Debtor subsidiaries, which, for the avoidance of doubt, includes Hunter Lane, LLC and each of its direct and indirect subsidiaries, other than non-Debtor EIC.

122.     "*Pending Opioid Actions*" means the judicial, administrative or other actions or proceedings to bring or assert Opioid Claims or Opioid Demands, that were commenced before the Petition Date against any of the Debtors, including, for the avoidance of doubt, any such actions or proceedings in respect of any Co-Defendants.

123.     "*Pension Plan*" means the Debtors' pension plan.

124.     "*Permitted Transfer*" means a transfer of all or a portion of the assets of the Wind-Down Debtors to the Liquidating Trust in accordance with Article IV.I herein.

125.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code and shall include, without limitation, the Litigation Trust and the Litigation Trustee.

126.     "*Petition Date*" means October 15, 2023, the date on which the Debtors commenced the Chapter 11 Cases.

127.     "*Plan*" has the meaning set forth in the Introduction.

128.     "*Plan Administrator*" means, in the event the Restructuring Transaction is not a Plan Restructuring, the person or persons, if any, identified in the Plan Supplement (as determined by the Debtors) to be appointed on the Effective Date and who will serve as the trustee and administrator for the Wind-Down Debtors as set forth in Article IV.H of the Plan.  In the event of a Credit Bid Transaction, the Plan Administrator shall be reasonably acceptable to the Required Junior DIP Noteholders.

129.     "*Plan Restructuring*" means the transactions and reorganization contemplated by, and pursuant to, this Plan in accordance with Article IV.B of this Plan.

130.     "*Plan Supplement*" means, subject to the consent rights set forth in Article I.A.101, where applicable, the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), drafts of which shall be Filed by the Debtors no later than the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable:  (a) the New Corporate Governance Documents; (b) the MIP Documents; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) the Restructuring Transactions Memorandum; (e) the Exit Facilities Documents; (f) the Exit 1.5 Lien Notes Documents; (g) the Takeback Notes Documents; (h) a document listing the members of the New Rite Aid Board; (i) the GUC Equity Trust Agreements; (which shall not be inconsistent with the Committee Settlement); (j) the Litigation Trust

Agreement (which shall not be inconsistent with the Committee Settlement); (k) the identity of the Plan Administrator (if any) and the terms of compensation of the Plan Administrator; (l) the Liquidating Trust Agreement (if any); (m) the McKesson 503(b)(9) Settlement; (n) the AHG New-Money Commitment Agreement; (o) the AHG Notes Documentation and the SCD Trust Documentation; (p) the UCC / TCC Recovery Allocation Agreement (which shall not be inconsistent with the Committee Settlement and which shall be acceptable to the Committees in their sole discretion); (q) any GUC Sub-Trust Documents and any other documents reasonably necessary to implement the Committee Settlement, including all Committee Settlement Documents; (r) the Litigation Trust Cooperation Agreement; (s) the Opt-In Forms, which documents shall not be inconsistent with the Committee Settlement, and which shall be reasonably acceptable to the Committees and the Required Junior DIP Noteholders; (t) the DOJ Settlement Documents (to the extent completed prior to the Combined Hearing); and (u) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement shall be in form and substance acceptable to the Debtors, the Required Junior DIP Noteholders, the DIP Agents, and the Exit Facilities Agents except as set forth in Article I.A.101; *provided* that the DIP Agents and the Exit Facilities Agent shall not have consent rights over the documents or exhibits set forth in clauses (c), (h), (i), (j), (p), (q), or (r) or any amendments or modifications thereto; *provided, further*, that the Required Junior DIP Noteholders shall not have consent rights over the Committee Settlement Documents except (i) for the Litigation Trust Documents or (ii)  the GUC Sub-Trust Documents; *provided*, that the Required Junior DIP Noteholders shall not have consent rights over any Exempt GUC Sub-Trust Documents except to the extent such other documents materially and adversely impact the Litigation Trust Class B Interests, and (iii) any other Committee Settlement Documents other than the UCC / TCC Recovery Allocation Agreement, in each case solely to the extent such document materially and adversely impacts the Litigation Trust Class B Interests; *provided, further*, that the documents set forth in clauses (n) and (o) shall be subject to the consent rights set forth in the AHG New-Money Commitment Agreement.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, any Purchase Agreement(s), any Sale Order, and the Financing Orders, subject to the consent rights set forth herein and in Article I.A.101.  For the avoidance of doubt, the finalization and execution of the UCC / TCC Recovery Allocation Agreement and any GUC Sub-Trust Documents shall not be a condition to Confirmation or Consummation of the Plan.  With respect to any Plan Supplement documents not subject to the Committees' consent rights (set forth herein and in Article I.A.101), any provisions in such documents that materially and adversely impact the rights or entitlements of the constituencies of the Committees under the Committee Settlement, or could reasonably be expected to adversely affect the amount or timing of recovery under the Committee Settlement shall be reasonably acceptable to the Committees.[4]

131.    "*Prepetition Agent*" means Bank of America, N.A., in its capacity as administrative and collateral agent under the Prepetition Credit Agreement.

132.    "*Prepetition Credit Agreement*" means that certain credit agreement, dated as of December 20, 2018, by and between Rite Aid, as borrower, the Prepetition Agent, as administrative agent and collateral agent, and the lenders parties thereto, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

133.    "*Prepetition Credit Agreement Claim*" any Claim derived from, based upon, or arising under the Prepetition Credit Agreement and the other "Senior Loan Documents" (as defined therein).

134.    "*Prepetition Credit Agreement Lenders*" means the lenders from time to time under the Prepetition Credit Agreement.

135.    "*Prepetition Credit Facilities*" means, together, the ABL Facility and the FILO Term Loan Facility.

---

[4]    Consent rights with respect to Definitive Documents remain subject to ongoing negotiation among the parties.

136.    "*Prepetition Secured Parties*" means, collectively, the Prepetition Agent, the Prepetition Credit Agreement Lenders, and the other "Senior Secured Parties" as defined in the Prepetition Credit Agreement.

137.    "*Priority Claims*" means, collectively, the Priority Tax Claims and Other Priority Claims.

138.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

139.    "*Private Placement Securities*" means, collectively, (a) the New Common Stock issued pursuant to the Management Incentive Plan and (b) the AHG Notes.

140.    "*Pro Forma Closing Liquidity*" has the meaning set forth in the Exit Facilities Credit Agreement (in the form filed in the Plan Supplement).

141.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

142.    "*Proceeds of Assigned Claims*" means the Cash proceeds obtained through the pursuit of Assigned Insurance Rights for any Assigned Claims and any amounts received from any third parties in connection with any Assigned Claims; *provided, however,* that "Proceeds of Assigned Claims" shall not include Tort Claim Insurance Proceeds.  For the avoidance of doubt, any Cash proceeds recoverable by the Debtors or the Reorganized Debtors obtained through the pursuit of Assigned Insurance Rights for (a) any prepetition settlement or defense expenses in connection with Tort Claims; (b) the DOJ Elixir Claims and the DOJ Elixir Settlement; and/or (c) the DOJ White Claims and DOJ White Settlement are "Proceeds of Assigned Claims."

143.    "*Products*" means any and all products developed, designed, manufactured, marketed, dispensed, or sold by the Debtors.

144.    "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

145.    "*Professional Fee Claim*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date that the Bankruptcy Court has not denied by Final Order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

146.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account to be funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

147.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors or to either of the Committees prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in <u>Article II</u> of the Plan.

148.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable bar date.

149.    "*Property Insurance Policies*" means any Insurance Policies held or maintained by any of the Debtors covering losses with respect to real or personal property or improvements or losses from business interruption of the Debtors.

150.    "*Protected Party*" means (a) the Debtors, (b) the Reorganized Debtors, (c) the Wind-Down Debtors, (d) any Purchaser in connection with any Credit Bid Transaction, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Persons' (i) predecessors, successors, permitted assigns, subsidiaries, and controlled Affiliates, respective heirs, executors, Estates, and nominees, in each case solely in their capacity as such, and (ii) respective current and former officers and directors, managers, principals, members, partners, employees, agents, advisors (including financial advisors), attorneys (including attorneys retained by any director in his or her capacity as a director or manager of a Person), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as a director or manager of a Person), consultants, experts and other professionals (including any professional advisor retained by any director in his or her capacity as a director or manager of a Person) or other representatives of the Persons described in clauses (a) through (d).

151.    "*Purchase Agreement*" means one or more agreements entered into by some or all of the Debtors, on the one hand, and one or more parties (which may include the Senior Secured Noteholders in connection with a Credit Bid Transaction), on the other hand, in connection with the sale of some, all, or a portion of the Debtors' assets and/or equity, including in connection with an Alternative Sale Transaction, any Sale Transaction Restructuring, or an Other Asset Sale, together with all exhibits, appendices, supplements, documents, and agreements ancillary thereto, in each case as amended, modified, or supplemented from time to time.

152.    "*Purchasers*" means the purchasers under any Purchase Agreement(s).

153.    "*Registration Rights Agreement*" means a registration statement or registration rights agreement (or equivalent governing documents of any of the foregoing), if any, pursuant to which New Common Stock is issued, which may be entered into in the discretion of the Debtors and the Required Junior DIP Noteholders.

154.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

155.    "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.  For the avoidance of doubt, no Excluded Party shall be a Related Party.

156.    "*Released Party*" means, collectively, in each case in its capacity as such:  (a) the Debtors (including any Debtor Related Party); (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Releasing Parties (except to the extent that any Excluded Party would otherwise constitute a Releasing Party); (e) the Senior Secured Noteholders (including the Ad Hoc Secured Noteholder Group and each of its members); (f) the Agents; (g) the Trustees; (h) the DIP Secured Parties; (i) the Junior DIP Secured Parties; (j) the Prepetition Secured Parties; (k) each of the lenders under the Exit Facilities; (l) the Committees and each member of the Committees; (m) the Litigation Trustee, the GUC Equity Trustee, and the GUC Sub-Trust Trustee (if any); (n) AHG New-Money Commitment Parties; (o) the SCD Trustee; (p) each current and former Affiliate of each Entity in clauses (a), (b), and (c); (q) each Debtor Related Party of each Entity in clauses (a), (b), and (c); (r) each current and former Affiliate of each Entity in clauses (d) through (p) and the following clause (s); and (s) each Related Party of each Entity in clauses (d) through (p) and this clause (s); *provided* that, in each case, any Holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."  For the avoidance of doubt, no Excluded Party shall be a Released Party.  For the avoidance of doubt, notwithstanding anything herein to the contrary, Holders of Tort Claims shall not

be deemed to release the Debtors, provided, however, that any recovery for any such Tort Claim against the Debtors (and their Affiliates), the Reorganized Debtors (and their Affiliates), and/or the Wind-Down Debtors, as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets, as applicable, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.  For the avoidance of doubt, any Debtor Related Party shall be a Released Party.

157.    "*Releasing Party*" means, collectively, in each case solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Agents; (e) the Trustees; (f) the Prepetition Secured Parties; (g) the DIP Secured Parties; (h) the Junior DIP Secured Parties; (i) Senior Secured Noteholders (including the Ad Hoc Secured Noteholder Group and each of its members); (j) each of the lenders under the Exit Facilities; (k) the Committees and each member of the Committees; (l) the Litigation Trustee and the GUC Equity Trustee; (m) the AHG New-Money Commitment Parties; (n) the SCD Trustee; (o) all Holders of Claims that vote to accept the Plan and who affirmatively opt in to the releases provided for in the Plan; (p) all Holders of Claims that are deemed to accept the Plan and who affirmatively opt in to the releases provided by the Plan; (q) all Holders of Claims who abstain from voting on the Plan and who affirmatively opt in to the releases provided by the Plan; (r) all Holders of Claims who vote to reject the Plan and who affirmatively opt in to the releases provided by the Plan; (s) all Holders of General Unsecured Claims who are deemed to reject the Plan and who affirmatively opt in to the releases provided for in the Plan;[5] (t) each current and former Affiliate of each Entity in clauses (a) through (s); and (u) each Related Party of each Entity in clauses (a) through clause (s).  For the avoidance of doubt and notwithstanding anything to the contrary herein, Holders of Tort Claims shall not be deemed to release the Debtors, provided, however, that any recovery for any such Tort Claim against the Debtors (and their Affiliates), the Reorganized Debtors (and their Affiliates), and/or the Wind-Down Debtors, as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets, as applicable, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.  Notwithstanding anything to the contrary herein, the following shall not be a Releasing Party:  (x) any of the Debtors' current and former directors and officers that are not a Debtor Related Party; and (y) the United States.

158.    "*Remnant Assets*" means, in the event of any Sale Transaction Restructuring, any of the assets of the Debtors that are not Retail Acquired Assets or Elixir Acquired Assets.

159.    "*Reorganized Debtors*" means New Rite Aid and any Affiliates thereto that are Debtors, on or after the Effective Date.

160.    "*Required Junior DIP Noteholders*" means, as of the relevant date, Junior DIP Noteholders holding at least 50 percent of the aggregate outstanding principal amount of the Junior DIP Claims.

161.    "*Restructuring Transaction*" means the Plan Restructuring or the Sale Transaction Restructuring as such transactions are described in Article IV of the Plan.

162.    "*Restructuring Transactions Memorandum*" means, with respect to a Plan Restructuring, a document to be included in the Plan Supplement that will set forth a summary of the transaction steps to complete the Restructuring Transactions.

---

[5]    Solicitation of elections with respect to Holder releases will occur after Confirmation of the Plan, through service of the Opt-In Forms.  Holders will be required to submit their applicable Opt-In Form by the applicable deadline set forth in such Opt-In Form.  The Debtors shall consult with the Committees and the Junior DIP Noteholders regarding such solicitation process and the solicitation process shall not be inconsistent with the Committee Settlement and reasonably acceptable to the Committees as it relates to the solicitation process for general unsecured creditors.

163.   "*Retail Acquired Assets*" means the assets, other than the Elixir Acquired Assets, acquired in a Sale Transaction Restructuring or Other Asset Sale.

164.   "*Retained Professionals*" means each of Kroll Restructuring Administration LLC, Cole Schotz P.C., Guggenheim Securities, LLC, Deloitte, Alvarez & Marsal North America, LLC, A&G Realty Partners, Pricewaterhouse Coopers LLP, Wilson Sonsini Goodrich & Rosati, Milbank LLP, Katten Muchin Rosenman LLP, Kirkland & Ellis LLP, and Kobre & Kim LLP, each in any capacity.

165.   "*Rite Aid Retail Assets*" shall have the meaning given to it in the Bidding Procedures

166.   "*Roll-Up DIP Notes*" means the new junior secured notes issued in accordance with the Junior DIP Documents and the Final Financing Order in the principal amount of $225 million, which were utilized to repay and refinance outstanding Senior Secured Notes.

167.   "*Roll-Up DIP Notes Claim*" means any Claim arising under or relating to the Roll-Up DIP Notes under the Junior DIP Notes Indenture or the Final Financing Order, including any and all fees, interest paid in kind, and accrued but unpaid interest and fees arising under the Junior DIP Notes Indenture.

168.   "*Rules*" means Rule 501(a)(1), (2), (3) and (7) of the Securities Act.

169.   "*Sale Order*" means one or more Bankruptcy Court orders approving the Debtors' entry into one or more definitive Purchase Agreement(s) in connection with the Sale Transaction Restructuring, or the Other Asset Sale(s).

170.   "*Sale Transaction Documentation*" means the definitive documentation for the Sale Transaction Restructuring and/or any Other Asset Sale(s).

171.   "*Sale Transaction Restructuring*" means one or more sale(s) of some, all, or substantially all of the Debtors' assets pursuant to the Bidding Procedures, consummated through one or more Sale Orders, including a Credit Bid Transaction and an Alternative Sale Transaction, that results, in the aggregate, in the disposition of all or substantially all of the Debtors' assets through one or more sale transactions.  For the avoidance of doubt, the sale transaction consummated pursuant to the Elixir Sale Order shall not be considered a "Sale Transaction Restructuring."

172.   "*SCD Claim*" means the SCD Trust's rights under the Plan to the applicable portion of the proceeds of the Elixir Rx Intercompany Claim and other distributable value at EIC (including the CMS Receivable) to be distributed to the SCD Trust pursuant to the Elixir Rx Distributions Schedule and in accordance with the Elixir Rx Distributions Schedule, the Elixir Escrow, the AHG New-Money Commitment Agreement, and the Plan.

173.   "*SCD Trust*" means a newly formed entity or entities formed pursuant to the Plan on or prior to the Effective Date, to be controlled by the SCD Trustee, the organizational documents of which shall be in form and substance acceptable to the Debtors, the DIP Agents, the Required Junior DIP Noteholders, and the Exit Facilities Agent and in accordance with the SCD Trust Documentation, the AHG New-Money Commitment Agreement, and the Plan

174.   "*SCD Trust Assets*" means the SCD Claim as set forth in, and subject to the terms and conditions of, the AHG New-Money Commitment Agreement and the Plan.

175.   "*SCD Trust Documentation*" means the definitive documentation for the creation of the SCD Trust and the appointment of the SCD Trustee, including all agreements, documents, and instruments delivered or entered into in connection with the SCD Trust, including the Elixir Escrow Agreement, which shall be consistent with, and subject to the terms and conditions of, the AHG New-Money Commitment Agreement, New Money DIP Notes Term Sheet, and the Plan

176.    "*SCD Trustee*" means the trustee or similar designee for the SCD Trust, selected in accordance with the AHG New-Money Commitment Agreement, and any of its successors and assigns, in its capacity as such.

177.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means that certain schedule Filed with the Plan Supplement of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan and in accordance with the respective Purchase Agreement (if applicable), as such schedule may be amended, modified, or supplemented from time to time by the Debtors in accordance with Article V of the Plan, which, including any modifications thereto, shall be acceptable to the Purchasers.

178.    "*Scheduled Claims*" means claims and Causes of Action asserted by the Debtors in prepetition actions set forth in part 11, question 74 of Debtor Rite Aid Corporation's *Schedules of Assets and Liabilities* [Docket No. 859].

179.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

180.    "*Second Out Takeback Notes*" means new second out junior secured notes in the aggregate principal amount of $125 million to be issued by New Rite Aid to Holders of Allowed Senior Secured Notes Claims pursuant to the Plan and the Takeback Notes Documents.

181.    "*Section 510(b) Claim*" means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

182.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.

183.    "*Secured Claim*" means a Claim secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

184.    "*Secured Tax Claim*" means any Secured Claim that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties; *provided* that any Secured Tax Claim that (a) is an Assumed Liability under a Purchase Agreement shall not be satisfied from the Administrative / Priority Claims Reserve and shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors and shall not be considered a Secured Tax Claim and (b) solely in the event of a Sale Transaction Restructuring, is not an Assumed Liability under a Purchase Agreement shall be satisfied solely from the Administrative / Priority Claims Reserve.

185.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

186.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

187.    "*Seller Financing Order*" means the *Order (I) Approving Entry into the MedImpact Seller Financing Documents and (II) Granting Related Relief* [Docket No. 1139].

188.    "*Senior Secured Noteholders*" means, collectively, the parties holding the Senior Secured Notes from time to time under the Senior Secured Notes Indentures.

189.    "*Senior Secured Noteholders Equity Distribution*" means 72.691% of the New Common Stock, subject to dilution on account of the New Common Stock issued pursuant to the Management Incentive Plan.

190.    "*Senior Secured Noteholders Real Estate Proceeds Recovery*" means up to $2.5 million from the proceeds of the sale of unoccupied real estate of the Debtors that is not part of the Reorganized Debtors, distributed on the first anniversary of the Effective Date.

191.    "*Senior Secured Notes*" means, collectively, the 2025 Secured Notes and the 2026 Secured Notes.

192.    "*Senior Secured Notes Adequate Protection Claim*" means any Claim arising under or related to any adequate protection provided to the Senior Secured Noteholders.

193.    "*Senior Secured Notes Claim*" means any Claim against a Debtor, the Estates, or property of a Debtor arising under, related to, or in connection with the Senior Secured Notes.

194.    "*Senior Secured Notes Deficiency Claim*" means any Senior Secured Notes Claim that is not a Secured Claim.  For the avoidance of doubt, the only recovery that any Senior Secured Notes Claim shall receive on account of their Senior Secured Notes Deficiency Claim shall be the Litigation Trust Class B Interests.

195.    "*Senior Secured Notes Indentures*" means, collectively, the 2025 Secured Notes Indenture and the 2026 Secured Notes Indenture.

196.    "*Senior Secured Notes Trustees*" means The Bank of New York Mellon Trust Company, N.A., in its respective capacity as trustee and notes collateral agent under the 2025 Secured Notes Indenture and the 2026 Secured Notes Indenture, together with its successors and assigns.

197.    "*Solicitation Materials*" means all solicitation materials in respect of the Plan.

198.    "*Takeback Indenture*" means one or more definitive agreements governing the First Out Takeback Notes and the Second Out Takeback Notes, forms of which shall be included in the Plan Supplement, and which shall be in form and substance acceptable to the Debtors, the DIP Agents, the Exit Facilities Agent, and the Required Junior DIP Noteholders.

199.    "*Takeback Notes*" means the First Out Takeback Notes and the Second Out Takeback Notes.

200.    "*Takeback Notes Documents*" means, if applicable, the Takeback Indentures and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee statements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

201.    "*Takeback Notes Trustee*" means the trustee, or each of the trustees, as applicable, under the Takeback Indenture, together with each applicable trustee's respective successors, assigns, or any replacement trustee(s) appointed pursuant to the terms of the Takeback Indenture.

202.    "*TCC*" means the official committee of tort claimants appointed in the Chapter 11 Cases [Docket No. 432].

203.    "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in <u>Article X.D</u> of the Plan.

204.    "*Tort Claim*" means a Claim made on or before the Effective Date (other than Claims or Causes of Action arising from violations of the automatic stay or any injunction entered by the Bankruptcy Court in connection

with the Chapter 11 Cases) based in whole or in part on any alleged tortious act or omission by any Debtor and/or arising out of, relating to, or in connection with any Product, but not including, for the avoidance of doubt, claims for indemnification, contribution, or reimbursement on account of payments or losses in any way arising out of, relating to, or in connection with any such conduct or circumstances and Co-Defendant Claims.  For the avoidance of doubt, Tort Claims do not include (i) any liability solely to the extent premised on allegations regarding conduct undertaken by the Reorganized Debtors after the Effective Date or (ii) any Claims arising under section 502(h) of the Bankruptcy Code.

205.    "*Tort Claim Insurance Proceeds*" means the Cash proceeds obtained through the pursuit of Assigned Insurance Rights for Tort Claims, except any Cash proceeds recoverable by the Debtors or the Reorganized Debtors obtained through the pursuit of Assigned Insurance Rights for (a) any prepetition settlement or defense expenses in connection with Tort Claims; (b) the DOJ Elixir Claims and the DOJ Elixir Settlement; and/or (c) the DOJ White Claims and DOJ White Settlement.  For the avoidance of doubt, the Cash proceeds obtained through the pursuit of Assigned Insurance Rights in connection with the "Settlement of Opioid Claims" set forth in Article IV.B (and as defined therein) shall constitute Tort Claim Insurance Proceeds.

206.    "*Trustees*" means, collectively, the Senior Secured Notes Trustees and any other indenture trustee, collateral agent, or trustee or similar Entity under the 2025 Secured Notes Indenture, the 2026 Secured Notes Indenture, the 2027 Unsecured Notes Indenture, or the 2028 Unsecured Notes Indenture, including any successors thereto.

207.    "*UCC*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases [Docket No. 431].

208.    "*UCC / TCC Recovery Allocation Agreement*" means that certain agreement, including as amended, between the UCC and the TCC which shall govern the allocation of the consideration provided under the Committee Settlement, filed in the *Notice of Filing of Fifth Amended Plan Supplement* [Docket No. 3891].

209.    "*U.S. Trustee*" means the United States Trustee for the District of New Jersey.

210.    "*U.S. Trustee Fees*" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

211.    "*Unassigned Insurance Policies*" means, each of, (a) the Property Insurance Policies, (b) the Casualty Insurance Policies, (c) the Cyber Insurance Policies, (d) any Insurance Policy reasonably necessary to operate the Reorganized Debtors' business (or any proceeds recovered in connection with the operation of the Reorganized Debtors' business), (e) any Insurance Policy issued to McKesson under which any Debtor is designated as an additional insured party, and (f) any Insurance Policy purchased to maintain the insurance covenant in any Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, the Takeback Notes Documents, or documents necessary to effectuate any security interests agreed to be granted to McKesson in connection with the McKesson Settlement. For the avoidance of doubt, no Unassigned Insurance Policy or any insurance rights in an Unassigned Insurance Policy are being assigned to the Trust or to any other constituency.  Furthermore, for the avoidance of doubt, nothing herein shall affect or impair the Assigned Claims or Assigned Insurance Rights or vice versa, except that (i) Assigned Insurance Rights and Assigned Claims shall not include McKesson Insurance Policies and (ii) any recoveries on McKesson Insurance Policies shall not be used to provide distributions under the Plan.

212.    "*Unassigned Insurance Rights*" means, collectively, any and all rights, titles, privileges, interests, claims, demands or entitlements of the Debtors to any and all proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity arising under, or attributable to, any and all Unassigned Insurance Policies, now existing or hereafter arising, accrued, or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent.

213.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

214.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

215.    "*Unsecured Noteholders*" means the Holders of Unsecured Notes.

216.    "*Unsecured Notes*" means, collectively, the 2027 Unsecured Notes and the 2028 Unsecured Notes.

217.    "*Unsecured Notes Claims*" means any Claim against a Debtor, the Estates, or property of a Debtor, arising under, related to, or in connection with the Unsecured Notes.

218.    "*Unsecured Notes Indentures*" means, collectively, the 2027 Unsecured Notes Indenture and the 2028 Unsecured Notes Indenture.

219.    "*Unsecured Notes Trustees*" means, collectively, U.S. Bank Trust National Association, in its capacity as trustee under the 2027 Unsecured Notes Indenture, and Harris Trust and Savings Bank, in its capacity as trustee under the 2028 Unsecured Notes Indenture, together with their successors and assigns.

220.    "*Voting Deadline*" means 4:00 p.m., prevailing Eastern Time, on the date that is seven days before the Combined Hearing, which date may be extended by the Debtors.

221.    "*WARN Act*" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the rules and regulations promulgated thereunder.

222.    "*Waterfall Recovery*" means, in the event of a Sale Transaction Restructuring, and subject to the terms set forth in the Final Financing Order, as applicable, including as it relates to treatment of the MedImpact Term Loan, the priority by which Distributable Proceeds shall be allocated and paid to the Holders of Claims or Interests, as applicable, until paid in full, in each case, on a Pro Rata basis, except as otherwise agreed to by such Holders of Claims or Interests, as follows, subject to the terms of the Final Financing Order, including paragraph 17 thereof:  (a) Allowed DIP ABL Claims; (b) Allowed DIP FILO Claims; (c) Allowed DIP Term Loan Claims; (d) Allowed  New Money DIP Notes Claims; (e) Allowed Roll-Up DIP Notes Claims; (f) Allowed Other Secured Claims; (g) Allowed Other Priority Claims; (h) Allowed ABL Facility Claims; (i) Allowed FILO Term Loan Facility Claims; (j) Allowed Senior Secured Notes Claims; and (k) Allowed Administrative Claims and Allowed Priority Tax Claims; *provided* that the aggregate amount of Distributable Proceeds allocated to Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims shall not exceed the Administrative / Priority Claims Reserve Amount.

223.    "*Wind-Down*" means, in the event of a Sale Transaction Restructuring pursuant to Article IV.D of the Plan, the wind-down, dissolution, and liquidation of the Debtors' Estates after the Effective Date.

224.    "*Wind-Down Budget*" means a budget for the activities and expenses to be incurred in connection with a Wind-Down, in amount to be mutually agreed by the Debtors and the Required Junior DIP Noteholders, which shall include amounts necessary to fund the Professional Fee Escrow Account, the Administrative / Priority Claims Reserve, and the Wind-Down Reserve in accordance with the Purchase Agreement(s), as applicable, the Plan, and the Confirmation Order.

225.    "*Wind-Down Debtors*" means, for any Sale Transaction Restructuring pursuant to Article IV.D of the Plan, the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

226.    "*Wind-Down Reserve*" means a segregated account established by the Wind-Down Debtors established in accordance with Article VIII.C and funded in accordance with the Wind-Down Budget.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (9) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any effectuating provisions may be interpreted by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (15) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (16) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors or the Wind-Down Debtors shall mean the Debtors and the Reorganized Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control);

*provided* that corporate or limited liability company governance matters relating to the Debtors not incorporated in Delaware shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

      E.       *Reference to Monetary Figures.*

      All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

      F.       *Controlling Document.*

      In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  Except as otherwise provided in the Special Provisions Regarding the United States set forth in <u>Article XIV</u> of the Plan, (a) in the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control and (b) the Committee Settlement Documents shall control in the event of any inconsistency regarding the treatment of General Unsecured Claims between the Plan and the Plan Supplement, but for the avoidance of doubt, the Plan shall control in the event of any inconsistency between such documents regarding the Assigned Insurance Rights.  For the avoidance of doubt, any Plan Supplement documents filed after the date the Bankruptcy Court issues a ruling confirming the Plan (including a bench ruling) shall otherwise be consistent with such ruling, and all parties' rights are reserved to argue that any such subsequent Plan Supplement documents filed are inconsistent with such ruling or are otherwise inconsistent with the Plan and/or the Confirmation Order.  In the event of any inconsistency between the Plan or Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

      G.       *Nonconsolidated Plan.*

      Although for purposes of administrative convenience and efficiency the Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for substantive consolidation of any of the Debtors.

      H.       *Purchase Agreement Consent Rights and Controlling Documents*

      In the event of a MedImpact Term Loan Sale, Sale Transaction Restructuring, or an Other Asset Sale, any and all consent rights of the Purchasers set forth in the Purchase Agreement(s) with respect to the form and substance of this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, any Definitive Documents and any other documents related to the MedImpact Term Loan Sale, Sale Transaction Restructuring, or the Other Asset Sale, as applicable, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in <u>Article I.A</u> of the Plan) and be fully enforceable as if stated in full herein until such time as the Purchase Agreement(s) is terminated in accordance with its terms.  Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the Purchase Agreement(s) shall not impair such rights and obligations. For the avoidance of doubt, any Purchase Agreement(s) shall not result in any material and adverse impact (as reasonably determined) on the economic terms of the Committee Settlement and to the extent that any Purchase Agreement(s) could reasonably be expected to affect the Committee Settlement or the rights or entitlements of the constituencies of either of the Committees, such terms of any Purchase Agreement(s) shall be reasonably acceptable to the Committees.  The Debtors agree to consult with the advisors to the Committees and keep such advisors reasonably informed as to the status of any such Purchase Agreement(s).

      I.       *Reference to the Debtors and the Reorganized Debtors.*

      Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors and the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE
## CLAIMS, PRIORITY TAX CLAIMS, AND DIP CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> hereof.

A.    *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter), without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that, in the event of a Sale Transaction Restructuring or an Other Asset Sale, any Allowed Administrative Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser and shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors; *provided*, *further*, that, in the event of a Sale Transaction Restructuring, any Allowed Administrative Claim that is not an Assumed Liability under any Purchase Agreement shall instead be satisfied solely from the Administrative / Priority Claims Reserve. For the avoidance of doubt, any McKesson Claim that is an Administrative Claim shall be treated in accordance with the terms of the McKesson Settlement.

Except for Professional Fee Claims, DIP Claims, Junior DIP Claims, Disinterested Director Fee Claims, AHG Notes Ticking Fee Claims, and AHG New-Money Commitment Premium Claims, and unless previously Filed, subject to the terms of any Sale Orders, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors or the Wind-Down Debtors, as applicable, no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the Reorganized Debtors or the Wind-Down Debtors and the requesting party on or before the Administrative Claim Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims, DIP Claims, Junior DIP Claims, Disinterested Director Fee Claims, AHG Notes Ticking Fee Claims, and AHG New-Money Commitment Premium Claims, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Debtors, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors, the Wind-Down Debtors, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

B.      *Payment of Fees and Expenses under Financing Orders.*

On the Effective Date, the Debtors shall pay all accrued and unpaid fees, expenses, disbursements, contribution or indemnification obligations, including without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by each of the DIP Agents, the DIP Lenders, the Junior DIP Noteholders, the Junior DIP Trustee, the Prepetition Agent, the Ad Hoc Secured Noteholder Group, and the Trustees, whether incurred prior to or after the Petition Date, in each case to the extent payable or reimbursable under or pursuant to the Financing Orders, the DIP Credit Agreements, the Junior DIP Notes Indenture, the Prepetition Credit Agreement, or the Indentures, as applicable. Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims. Nothing herein shall require the DIP Agents, the DIP Lenders, the Junior DIP Noteholders, the Junior DIP Trustee, the Prepetition Agent, the Ad Hoc Secured Noteholder Group, the Trustees, or their respective Professionals, to File applications, a Proof of Claim, or otherwise seek approval of the Court as a condition to the payment of such Allowed Administrative Claims. For the avoidance of doubt, nothing herein shall be deemed to impair, discharge, or negatively impact or affect the rights of the DIP Agents, the Junior DIP Trustee, the Prepetition Agent, the Ad Hoc Secured Noteholder Group, or the Trustees to exercise any charging Liens pursuant to the terms of the DIP Credit Agreements, the Junior DIP Notes Indenture, the Indentures, or the Prepetition Credit Agreement, as applicable, subject to any applicable intercreditor agreements.

C.      *Professional Fee Claims.*

1.      Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors or the Wind-Down Debtors (or the authorized signatories to the Professional Fee Escrow Account, after consultation with the Plan Administrator), as applicable, shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

2.      Professional Fee Escrow Account.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind-Down Reserve. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.        <u>Professional Fee Amount</u>.

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors, the DIP Agents, the Junior DIP Noteholders, and/or the Committees before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided* that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. The Debtors shall forward such estimates to the DIP Agents and the Ad Hoc Secured Noteholder Group. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional, with such estimate provided to the DIP Agents, the Ad Hoc Secured Noteholder Group, and the Committees. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account in consultation with the Junior DIP Noteholders. For the avoidance of doubt, to the extent that the hourly and monthly fees (but not success fees) and expenses of the Committees and the Committees' Professionals incurred on or after April 1, 2024 are less than $9.5 million, the Committees' Initial Cash Consideration shall be increased by an amount equal to the difference between (a) $9.5 million and (b) the fees and expenses actually incurred by the Committees and the Committees' Professionals during the aforementioned period.

4.        <u>Post-Effective Date Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors or the Wind-Down Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Purchaser(s) shall not be liable or otherwise responsible for the payment of any Professional Fee Claims.

After the Effective Date, to the extent the Trustees provide services or incur expenses, including professional fees, related to the Plan or the applicable indenture, including with respect to the effectuation of any distributions under the Plan or any action the Debtors request to be taken in furtherance of the Plan, the reasonable and documented fees and expenses of the Trustees, including professional fees, shall be paid in the ordinary course by the Debtors or the Debtors' successor-in-interest. Notwithstanding this section, the Trustees shall have the right to exercise their respective charging liens under the applicable Indentures against distributions on account of the respective Notes Claims for the payment of the Trustees' fees and expenses, to the extent not otherwise paid.

D.        *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that (a) any Allowed Priority Tax Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser, shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, (b) in the event of a Sale Transaction Restructuring pursuant to <u>Article IV.D</u>, any Allowed Priority Tax Claim that (i) is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser, shall not be an obligation of the Debtors or the Wind-Down Debtor, and shall not be satisfied from the Administrative / Priority Claims Reserve and (ii) is not an Assumed Liability under a Purchase Agreement shall be satisfied solely from the Administrative / Priority Claims Reserve, and (c) the aggregate amount of Cash distributed to Holders of Allowed Priority Tax Claims shall be acceptable to the Required Junior DIP Noteholders.

E.    *DIP Claims.*

As of the Effective Date, the DIP Claims and Junior DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreements and the Junior DIP Notes Indenture, respectively, including principal, interest, fees, costs, other charges, and expenses. Upon the satisfaction of the Allowed DIP Claims and Allowed Junior DIP Claims in accordance with the terms of this Plan, the Final Financing Order, the DIP Documents, the Junior DIP Documents, and the Purchase Agreement, all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Pursuant to the DIP Credit Agreement and the Junior DIP Notes Indenture, all distributions pursuant to this <u>Article II.E</u> shall be made to the applicable DIP Agent or the Junior DIP Trustee, as applicable, for distributions to the applicable DIP Lenders and Junior DIP Noteholders in accordance with the DIP Credit Agreements, DIP Documents, Junior DIP Notes Indenture, and Junior DIP Documents unless otherwise agreed upon in writing by such DIP Agent, Junior DIP Trustee, and the Debtors, as applicable. The DIP Agents and the Junior DIP Trustee shall hold or direct distributions for the benefit of the applicable Holders of DIP Claims and Holders of Junior DIP Claims. Each DIP Agent shall retain all rights as DIP Agent under the DIP Documents in connection with the delivery of the distributions to the DIP Lenders, and the Junior DIP Trustee shall retain all rights as Junior DIP Trustee in connection with the delivery of the distributions to the Junior DIP Noteholders. The DIP Agents and the Junior DIP Trustee shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Agents or Junior DIP Trustee.

1.    <u>DIP ABL Claims</u>

Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP ABL Claim, each Holder of an Allowed DIP ABL Claim shall receive: (a) in the event of a Plan Restructuring, at the option of the applicable Holder of an Allowed DIP ABL Claim, (i) its Pro Rata share of the Exit ABL Facility and/or (ii) payment in full in Cash on the Effective Date; or (b) in the event of a Sale Transaction Restructuring, either, at each of the DIP ABL Lenders' discretion, (i) payment in full in Cash on the Effective Date and/or (ii) its Pro Rata share of the Exit ABL Facility.

2.    <u>DIP FILO Claims</u>

Except to the extent that a Holder of an Allowed DIP FILO Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP FILO Claim, each Holder of an Allowed DIP FILO Claim shall receive: (a) in the event of a Plan Restructuring, at the option of the applicable Holder of an Allowed DIP FILO Claim, (i) its Pro Rata share of the Exit FILO Term Loan Facility and/or (ii) payment in full in Cash on the Effective Date; or (b) in the event of a Sale Transaction Restructuring, either, at each of the DIP FILO Lenders' discretion, (i) payment in full in Cash on the Effective Date and/or (ii) its Pro Rata share of the Exit FILO Term Loan Facility.

3.    <u>DIP Term Loan Claims</u>

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP Term Loan Claim, each Holder of an Allowed DIP Term Loan Claim shall receive payment in full in Cash on the Effective Date.

4.    <u>New Money DIP Notes Claims</u>

Except to the extent that a Holder of an Allowed New Money DIP Notes Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed New Money DIP Notes Claim, and consistent with the terms of the Final Financing Order and the Junior DIP

Documents, each Holder of an Allowed New Money DIP Notes Claim shall receive its Pro Rata share of the (i) Exit 1.5 Lien Notes, (ii) the Litigation Trust Class B Interests, (iii) the Elixir Rx Recovery, and (iv) the MedImpact Term Loan Distribution; *provided* that any Junior DIP Noteholder that fails to timely fund its ratable share of the AHG New Money under the terms of the subscription procedures approved by the Final Financing Order and the AHG New-Money Commitment Agreement shall not be entitled to any distributions under clauses (ii) through (iv) of this <u>Article II.E.4</u>.

5.    <u>Roll-Up DIP Notes Claims</u>

Except to the extent that a Holder of an Allowed Roll-Up DIP Notes Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed Roll-Up DIP Notes Claim, and consistent with the terms of the Final Financing Order and the Junior DIP Documents, each Holder of an Allowed Roll-Up DIP Notes Claim shall receive its Pro Rata share of (i) the First Out Takeback Notes, (ii) the Junior DIP Noteholders Equity Distribution, and (iii) 17.309% of the Senior Secured Noteholders Real Estate Proceeds Recovery.

F.    *AHG New-Money Commitment Agreement Claims.*

As of the date on which the Final Financing Order was entered, in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement, the AHG Notes Ticking Fee Claims and the AHG New-Money Commitment Premium Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the AHG New-Money Commitment Agreement, and shall be Allowed Administrative Claims under section 503(b) of the Bankruptcy Code.

1.    <u>AHG Notes Ticking Fee Claims</u>

Except to the extent that a Holder of an Allowed AHG Notes Ticking Fee Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each such Claim, each Holder thereof shall receive (i) if the AHG New-Money Commitment Agreement is not terminated and the Effective Date occurs, AHG Notes issued on or prior to the Effective Date or (ii) if the AHG New-Money Commitment Agreement is terminated, payment in full in Cash, if so entitled, in each case, in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement and the Final Financing Order.

2.    <u>AHG New-Money Commitment Premium Claims</u>

Except to the extent that a Holder of an Allowed AHG New-Money Commitment Premium Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each such Claim, (i) if the AHG New-Money Commitment Agreement is not terminated and the Effective Date occurs, each Holder of an Allowed AHG New-Money Commitment Premium Claim shall receive its Pro Rata share of AHG Notes issued on or prior to the Effective Date in an aggregate principal amount equal to the AHG New-Money Commitment Premium or (ii) if the AHG New-Money Commitment Agreement is terminated or upon the occurrence of an Alternate Sale Event (as defined in the New Money DIP Notes Term Sheet), the amount of the AHG New-Money Commitment Premium shall constitute an obligation under the Junior DIP Facility senior in priority to the Roll-Up DIP Notes, and each Holder of an Allowed AHG New-Money Commitment Premium Claim shall receive its Pro Rata share of New Money DIP Notes issued by the Debtors in an aggregate principal amount equal to the AHG New-Money Commitment Premium as necessary to effectuate such obligations, if so entitled, in each case, in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement and the Final Financing Order.

# ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | FILO Term Loan Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Equity Interests in Rite Aid | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests.*

Subject to Article IV hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.     Class 1 – Other Secured Claims

    (a)     *Classification*:  Class 1 consists of all Other Secured Claims.

    (b)     *Treatment*:  Each Holder of an Allowed Other Secured Claim, unless such Holder agrees to less favorable treatment, shall receive, at the option of the Debtors, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

        (i)     payment in full in Cash;

        (ii)     the collateral securing its Other Secured Claim;

        (iii)     Reinstatement of its Other Secured Claim; or

        (iv)     such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code;

    (c)     *Voting*: Class 1 is Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.     Class 2 – Other Priority Claims

    (a)     *Classification*:  Class 2 consists of all Other Priority Claims.

    (b)     *Treatment*:  Each Holder of an Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, shall receive, at the option of the applicable Debtor or Wind-Down Debtor, as applicable, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

        (i)     payment in full in Cash; or

        (ii)     such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code;

    (c)     *Voting*:  Class 2 is Unimpaired.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 – ABL Facility Claims

    (a)     *Classification:*  Class 3 consists of all ABL Facility Claims.

    (b)     *Treatment*:  To the extent any Allowed ABL Facility Claim remains outstanding on the Effective Date, and except to the extent that a Holder of an Allowed ABL Facility Claim and the Debtor against which such Allowed ABL Facility Claim is asserted agree to less favorable treatment, each Holder of an Allowed ABL Facility Claim shall receive, at the option of the applicable Holder of an Allowed

ABL Facility Claim, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

    (i)    payment in full in Cash; or

    (ii)    its Pro Rata share of the Exit ABL Facility Loans issued under the Exit ABL Facility.

(c)    *Voting:*  Class 3 is Unimpaired.  Holders of ABL Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of ABL Facility Claims are not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – FILO Term Loan Facility Claims</u>

(a)    *Classification:*  Class 4 consists of all FILO Term Loan Facility Claims against any Debtor.

(b)    *Treatment*:  To the extent any Allowed FILO Term Loan Facility Claims remain outstanding, and except to the extent that a Holder of an Allowed FILO Term Loan Facility Claim and the Debtor against which such Holder asserts a Claim agree to less favorable treatment for such Holder, each Holder of an Allowed FILO Term Loan Facility Claim shall receive, at the option of the applicable Holder of an Allowed FILO Term Loan Facility Claim, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

    (i)    payment in full in Cash; or

    (ii)    its Pro Rata share of Exit FILO Term Loan Facility Loans issued under the Exit FILO Term Loan Facility.

(c)    *Voting:*  Class 4 is Unimpaired.  Holders of FILO Term Loan Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of FILO Term Loan Facility Claims are not entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – Senior Secured Notes Claims</u>

(a)    *Classification:*  Class 5 consists of all Senior Secured Notes Claims against any Debtor.

(b)    *Allowance*:  The Senior Secured Notes Claims shall be deemed Allowed in the aggregate principal amount of $1,169,920,000, plus interest, fees, and other expenses and amounts provided for in the 2025 Secured Notes Indenture and the 2026 Secured Notes Indenture, incurred through the Effective Date, solely to the extent Allowed by the Bankruptcy Code.

(c)    *Treatment:*  Except to the extent that a Holder of an Allowed Senior Secured Notes Claim and a Debtor against which such Allowed Senior Secured Notes Claim is asserted agree to less favorable treatment, on the Effective Date, each Holder of a Senior Secured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim:

(i)       in the event of a Plan Restructuring, its Pro Rata share of (A) the Senior Secured Noteholders Equity Distribution, (B) the Second Out Takeback Notes, and (C) 72.691% of the Senior Secured Noteholders Real Estate Proceeds Recovery; or

(ii)     in the event of a Sale Transaction Restructuring, its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery.

(d)    *Voting:* Class 5 is Impaired under the Plan. Therefore, Holders of Senior Secured Notes Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 6 – General Unsecured Claims</u>

(a)    *Classification:* Class 6 consists of all General Unsecured Claims.

(b)    *Treatment:* As a settlement of all open disputes with the Debtors, the Holders of DIP Claims, and the Holders of Senior Secured Notes Claims, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, a portion of the Litigation Trust Assets and the GUC Equity Trust Interests, as set forth in the UCC / TCC Recovery Allocation Agreement and in accordance with the Litigation Trust Documents, the GUC Equity Trust Documents, and any GUC Sub-Trust Documents, including:

(i)       the Committees Initial Cash Consideration;

(ii)     the Committees Post-Emergence Cash Consideration;

(iii)    100% of the GUC Equity Trust Interests;

(iv)    the Tort Claim Insurance Proceeds; and

(v)     Litigation Trust Class A Interests.

       For the avoidance of doubt and subject to <u>Article XIV.P</u> of the Plan, the payments or distributions under this Plan to Holders of General Unsecured Claims, including Tort Claims, shall be in full satisfaction of such Claims, and shall be free and clear of, and shall not be subject to the claims or Liens, other than the claims and Liens of counsel representing them in connection with such Claims, of any other non-federal Entity.

(c)    *Channeling*: As of the Effective Date, in accordance with the Plan and the Litigation Trust Documents, any and all liability of the Debtors and/or the Reorganized Debtors for any and all Tort Claims shall automatically, and without further act, deed or court order, be channeled exclusively to, and all of the Debtors' and Reorganized Debtors' liability for such claims shall be assumed by, the Litigation Trust or any applicable GUC Sub-Trust. Each Tort Claim shall be asserted exclusively against the Litigation Trust or GUC Sub-Trust and resolved solely in accordance with the terms, provisions and procedures of the Litigation Trust Documents or GUC Sub-Trust Documents. The sole recourse of any Person, Entity, or other party on account of any Tort Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder Filed a Proof of Claim in the Chapter 11 Cases, shall be to the Litigation Trust or GUC Sub-Trust as and to the extent provided in the Litigation Trust Documents and GUC Sub-Trust Documents.

Notwithstanding anything to the contrary herein, Holders of Tort Claims are enjoined from asserting against any Debtor (or their Affiliates) or any Reorganized Debtor (or their Affiliates) any Tort Claim and may not proceed in any manner against any Debtor (or their Affiliates) or Reorganized Debtor (or their Affiliates) on account of any Tort Claim in any other forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum, and are required to pursue Tort Claims exclusively against the Litigation Trust or GUC Sub-Trust, solely as and to the extent provided in the Litigation Trust Documents and GUC Sub-Trust Documents.

(d)    *Voting:*  Class 6 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are conclusively deemed to have rejected the Plan. Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

7.    Class 7 – Intercompany Claims

(a)    *Classification*:  Class 7 consists of all Intercompany Claims.

(b)    *Treatment*:  Each Intercompany Claim shall be, at the option of the Debtors, and, in the event of a Plan Restructuring or a Credit Bid Transaction, with the consent of the Required Junior DIP Noteholders, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as is reasonably determined by the Debtors.

(c)    *Voting*:  Holders of Claims in Class 7 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.    Class 8 – Intercompany Interests

(a)    *Classification*:  Class 8 consists of all Intercompany Interests.

(b)    *Treatment*:  Each Intercompany Interest shall be, at the option of the Debtors, and, in the event of a Plan Restructuring or a Credit Bid Transaction, with the consent of the Required Junior DIP Noteholders, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interest, or such other treatment as is reasonably determined by the Debtors.

(c)    *Voting*:  Holders of Interests in Class 8 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

9.    Class 9 – Existing Equity Interests in Rite Aid

(a)    *Classification*:  Class 9 consists of all Existing Equity Interests in Rite Aid.

(b)    *Treatment*:  All Existing Equity Interests in Rite Aid will be cancelled and extinguished, and Holders of Existing Equity Interests in Rite Aid shall receive no recovery on account of such Interests.

        (c)     *Voting*: Class 9 is Impaired. Holders of Existing Equity Interests in Rite Aid are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests in Rite Aid are not entitled to vote to accept or reject the Plan.

10.    <u>Class 10 – Section 510(b)</u>

        (a)     *Classification:* Class 10 consists of all Section 510(b) Claims.

        (b)     *Treatment:* Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to Holders of such Claims.

        (c)     *Voting:* Class 10 is Impaired. Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan. Therefore, Holders (if any) of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired; *provided* that the Reinstatement or other treatment of such Claims shall not be inconsistent with the Purchase Agreement. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to <u>Article III.B</u> of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with <u>Article XII</u> of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules, *provided, however*, that the treatment of Holders of General Unsecured Claims shall only be modified with the consent of the Committees, except any modifications that are consistent with the Committee Settlement and otherwise reasonably acceptable to the Committees.

G.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.      *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtors reserve the right to reclassify any Allowed Claim (other than the Allowed Senior Secured Notes Claim and Senior Secured Notes Deficiency Claims) or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  For the avoidance of doubt, neither the Debtors nor the Wind-Down Debtors may reclassify any Senior Secured Notes Deficiency Claim as a General Unsecured Claim entitled to a recovery in Class 6.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, to the maximum extent permitted by the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including the McKesson Settlement, the Committee Settlement (including the Settlement of Opioid Claims), and, subject to satisfying all conditions and contingencies thereto (including approval by authorizing officials within the DOJ, acceptable documentation, and approval by the Bankruptcy Court), the DOJ White Settlement and the DOJ Elixir Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to <u>Articles III.B.6(b)</u>, <u>VI</u>, and <u>XIV</u> hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final, shall be in full satisfaction of such Claims, and shall be free and clear of the Liens of any Entity other than, solely with respect to distributions of Holders of Allowed General Unsecured Claims, including Tort Claims, (i) the claims and Liens of counsel representing them in connection with such Claims, and (ii) the Liens of any federal Entity.  While the Settlement of Opioid Claims may be used to pursue the Assigned Insurance Rights, no party shall be permitted to argue in any coverage action concerning Opioid Claims that the Court's findings and conclusions concerning whether the Settlement of Opioid Claims is fair, equitable, and reasonable are in any way relevant to whether the Settlement of Opioid Claims should be found fair, equitable, or reasonable in any coverage action concerning Opioid Claims and no such findings concerning whether the Settlement of Opioid Claims is fair, equitable, and reasonable shall be offered as evidence in any such coverage action.  All rights and defenses with respect to insurance coverage sought pursuant to the Assigned Insurance Rights, including with respect to the Settlement of Opioid Claims, shall be subject to the applicable terms, conditions, exclusions, and other provisions of the applicable Insurance Policies and applicable law.

B.      *Settlement of Opioid Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan shall constitute and be deemed a good-faith, reasonable compromise and settlement between the Debtors and the TCC, that as of the

Petition Date and with the Bankruptcy Court's approval of the settlement in the Plan, the Debtors have stipulated with the TCC that the Debtors were legally obligated to pay Opioid Claimants an amount equal to at least $2.352 billion on a nominal basis (the "Settlement of Opioid Claims"). The Settlement of Opioid Claims is not an admission of liability by the Debtors regarding any individual claim, nor an admission that any value should be ascribed to any Opioid Claim. For the avoidance of doubt, with respect to the Settlement of Opioid Claims, Article IV.F is incorporated herein.

Neither the Debtors nor the TCC is asking the Court to make, nor has the Court made, a finding with respect to the Debtors' liability for Opioid Claims, including, without limitation, the actual value of the Debtors' liability for Opioid Claims, or that the methodology reflected in the Stipulation is the correct way to assess the Debtors' liability for Opioid Claims; rather, the Court is (i) approving the Settlement of Opioid Claims under Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code, (ii) acknowledging the fact of the Stipulation, that the Stipulation has been agreed to by the Debtors and the TCC, and that the words of the Stipulation speak for themselves, and (iii) finding that the Settlement of Opioid Claims establishes a debt owed by the Debtors. In approving the Settlement of Opioid Claims, the Court is not making any rulings regarding the allocation of Opioid Claims, the merits of Opioid Claims, or the actual value of the Opioid Claims, individually or in the aggregate.

In exchange for the settlement of their Claims, Holders of Tort Claims shall receive such treatment as set forth in this Plan, but subject to the allocation of recoveries on account of such treatment as set forth in the UCC / TCC Recovery Allocation Agreement. The Litigation Trustee shall retain the right to pursue the settlement value of the Tort Claims of Opioid Claimants from Insurance Policies (other than the Unassigned Insurance Policies) pursuant to the Assigned Insurance Rights subject to the terms and conditions of the Plan. The Litigation Trustee's recovery of any amounts pursuant to the Assigned Insurance Rights shall be subject to the applicable terms, conditions, and other provisions of the applicable Insurance Policies and applicable law. For the avoidance of doubt, nothing herein is intended to alter or enlarge the rights and obligations of any insurer under any Insurance Policy. This paragraph does not and shall not be construed to impair, diminish, or compromise (i) any of the rights and protections of the Debtors, the Reorganized Debtors (and any Affiliates), the Wind-Down Debtors, the Debtor Related Parties, the DIP Secured Parties, the Junior DIP Secured Parties, the Prepetition Secured Parties, the Senior Secured Noteholders, the Senior Secured Notes Trustees, or their respective Related Parties or (ii) any of the release, discharge, and exculpation provisions in this Plan.

1.      <u>Non-Precedential Effect for Holders of Tort Claims</u>

This Plan, the Plan Supplement, and the Confirmation Order constitute a good faith, full and final comprehensive compromise and settlement of the Claims of Opioid Claimants based on the unique circumstances of these Chapter 11 Cases (such as the unique facts and circumstances relating to the Debtors as compared to other defendants in tort litigation and the need for an accelerated resolution without litigation) such that (i) none of the of the foregoing documents, nor any materials used in furtherance of Confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed and admission, used as precedent, or used by any party or Person in any context whatsoever beyond the purposes of this Plan, in any other litigation or proceeding except as necessary, and as admissible in such context, to enforce their terms and to evidence the terms of the Plan before the Bankruptcy Court or any other court of competent jurisdiction and (ii) any obligation of any party, in furtherance of such compromise and settlement, to not exercise rights that might otherwise be applicable to such party shall be understood to be an obligation solely in connection with this specific compromise and settlement and to be inapplicable in the absence of such compromise and settlement.  This Plan, the Plan Supplement, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding involving opioid claims or other tort claims in which none of the Debtors, the Reorganized Debtors, or the Litigation Trust is a party; provided that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Supplement, or the Confirmation Order.  Any claimant's support of, or position or action taken in connection with this Plan, the Plan Supplement, and the Confirmation Order may differ from their position or testimony in any other litigation or proceeding except in connection with these Chapter 11 Cases. Further, the treatment of tort claims as set forth in this Plan is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other Chapter 11 Cases relating to tort claims, nor shall it be used as precedent by any Entity or party in any other chapter 11 case related to tort claims.  This provision does not and shall not be construed to impair, diminish, or compromise (A) any of the rights and protections of the Debtors, the Reorganized Debtors (and any Affiliates), the Wind-Down Debtors, the Debtor Related Parties, the DIP Secured Parties, the Junior DIP Secured Parties, the Prepetition Secured Parties, the Senior Secured Noteholders, the Senior Secured Notes Trustees, or their respective Related Parties or (B) any of the release, discharge, and exculpation provisions in this Plan.

C.    *Equitization Transaction.*[6]

If the Plan Restructuring occurs, the following provisions shall govern in lieu of <u>Article IV.D</u>.

On the Effective Date (or before the Effective Date, as specified in the Restructuring Transactions Memorandum), the Debtors or the Reorganized Debtors (as applicable) shall take all actions set forth in the Restructuring Transactions Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the Plan Restructuring described herein, subject in all respects to the terms set forth herein, including, as applicable:  (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (iv) the execution, delivery, and Filing of the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, and the Takeback Notes Documents, (v) the issuance of New Common Stock and any other securities necessary to implement the Restructuring Transactions, all of which shall be authorized and approved in all respects; (vi) the execution and delivery of the Definitive Documents, (vii) the execution and delivery of the Takeback Notes Documents, if applicable, and (viii) all other actions that the Debtors determine (with the consent of the Required Junior DIP Noteholders) to be necessary or appropriate in connection with the Consummation of the Plan Restructuring.

The Confirmation Order shall, and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, approved by, or necessary to effectuate the Plan, including the Restructuring Transactions, including, for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy law.

1.    <u>Reorganized Debtors.</u>

On the Effective Date, in accordance with the terms of the New Corporate Governance Documents, the New Rite Aid Board shall be appointed, and New Rite Aid shall adopt the New Corporate Governance Documents; *provided* that each Disinterested Director of the Debtors shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and discretion in accordance with the terms of the Plan.  Each Disinterested Director shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to New Rite Aid, the Reorganized Debtors, or any other Entity without such director's prior written consent.  Each Disinterested Director of the Debtors retains the right to review, approve, and make decisions, as well as to file papers and be heard before the Bankruptcy Court, on all matters under such director's continuing authority.

2.    <u>Corporate Existence.</u>

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist on and after the Effective Date as a separate legal Entity with all the powers available to such Entity pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Corporate Governance Documents, in each case consistent with the

---

[6]    The Debtors will pursue the Plan Restructuring.

Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

    3.    <u>New Rite Aid Board.</u>

Under the Plan Restructuring, on or prior to the Effective Date, the New Rite Aid board shall be appointed. The Required Junior DIP Noteholders shall select the New Rite Aid board members.

    4.    <u>Vesting of Assets.</u>

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, on the Effective Date, all property in each Estate (including the Unassigned Insurance Policies), all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan (other than the GUC Equity Pool, the Committees' Initial Cash Consideration, the Committees' Post-Emergence Cash Consideration, and the other Litigation Trust Assets), shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, including <u>Article X</u> hereof, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects. For the avoidance of doubt, Holders of General Unsecured Claims shall be entitled to the Committees' Initial Cash Consideration, the Committees' Post-Emergence Cash Consideration, and the GUC Equity and Litigation Trust Assets as set forth in the Committee Settlement.

Notwithstanding anything contained herein to the contrary and for the avoidance of doubt, any DIP ABL Lender's and/or any DIP FILO Lender's potential entry into the Exit Facilities and the Exit Facilities Documents shall be fully subject to the express written consent of the relevant DIP ABL Lenders and the DIP FILO Lenders, and nothing contained herein shall imply that any of the DIP ABL Lenders or the DIP FILO Lenders have consented at this time to provide any loans or financial accommodations pursuant to the Exit Facilities and the Exit Facilities Documents.

    5.    <u>Other Asset Sales.</u>

In the event the Plan Restructuring occurs and it incorporates one or more Other Asset Sale(s), the Reorganized Debtors will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Reorganized Debtors shall have the power and authority to take any action necessary to wind-down and dissolve any applicable Debtor's Estate(s). As soon as practicable after the Effective Date, the Reorganized Debtors shall: (1) cause such Debtors to comply with, and abide by, the terms of the Plan, Confirmation Order, the Purchase Agreement(s), the Sale Order, the Committee Settlement, and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of such Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Reorganized Debtors may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Reorganized Debtors without need for any action or approval by the shareholders or board of directors or managers of any Debtor. From and after the Effective Date, except with respect to the Reorganized Debtors as set forth herein, such Debtors (a) for all purposes shall be deemed to have

withdrawn their business operations from any state in which such Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (b) shall be deemed to have canceled pursuant to this Plan all Interests, and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. For the avoidance of doubt, notwithstanding such Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims. For the avoidance of doubt, in the event one or more Other Asset Sales and the Effective Date occurs, the Committee Settlement shall remain in full force and effect, including such adjustments as are necessary to provide Holders of General Unsecured Claims with the economic equivalent of the Committee Settlement.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Reorganized Debtors.

D.    *Sale Transaction Restructuring.*

If the Sale Transaction Restructuring occurs, the following provisions shall govern in lieu of Article IV.B.

On the Effective Date (or before the Effective Date, as specified in the Restructuring Transactions Memorandum), the Debtors or the Wind-Down Debtors (as applicable) shall take all actions set forth in the Restructuring Transactions Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the Sale Transaction Restructuring as described herein, subject in all respects to the terms set forth herein, including, as applicable: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (iv) the execution, delivery, and Filing of the Exit Facilities Documents, (v) the execution and delivery of the Definitive Documents, and (vi) all other actions that the Debtors and the Purchasers determine to be necessary or appropriate in connection with the Consummation of the Sale Transaction Restructuring, including, among other things, making filings or recordings that may be required by applicable law in connection with the Plan and authorizing and directing the Senior Secured Notes Trustees to effectuate the Credit Bid in accordance with the Sale Order, as applicable, and providing that any assignees of the Credit Bid, if applicable, are bound by the terms and provisions of the direction to the Senior Secured Notes Trustees. For the avoidance of doubt, in the event of a Sale Transaction Restructuring, the Committee Settlement shall be incorporated into any Sale Transaction Restructuring and shall remain in full force and effect, including such adjustments as are necessary to provide Holders of General Unsecured Claims with the economic equivalent of the Committee Settlement.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

1.    Formation of New Rite Aid.

In the event of a Credit Bid Transaction, on or prior to the Effective Date, New Rite Aid and certain direct or indirect subsidiaries (as applicable) shall be formed for the purpose of acquiring all of the Acquired Assets and assuming all of the Assumed Liabilities.

2.     <u>Wind-Down Debtors.</u>

In the event of a Sale Transaction Restructuring, on and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) resolving Disputed Claims, (b) making distributions on account of Allowed Claims as provided hereunder, (c) establishing and funding the Administrative / Priority Claims Reserve and the Wind-Down Reserve, (d) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (e) filing appropriate tax returns, (f) complying with its continuing obligations under the Purchase Agreement(s), if any, (g) liquidating all assets of the Wind-Down Debtors, and (h) otherwise administering the Plan.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind-Down Debtors to File motions or substitutions of parties or counsel in each such matter.

3.     <u>Vesting of Assets.</u>

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, in the event of a Sale Transaction Restructuring, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, including the Remnant Assets of the Debtors, shall vest in each respective Wind-Down Debtor for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, the Wind-Down Debtors may, at the direction of the Plan Administrator, and subject to the Purchase Agreement(s), the Sale Order, and the Confirmation Order, use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.     *Committee Settlement.*

The Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Agents agreed to the terms of the Committee Settlement to be implemented through the Plan and to be approved by the Bankruptcy Court as a good faith compromise and settlement of Claims and controversies among the Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Agents.  The compromises and settlements included in the Committee Settlement are each (a) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (b) necessary and integral to this Plan and the success of these Chapter 11 Cases. The description of the Committee Settlement contained herein is qualified in its entirety by the applicable definitive documents pertaining thereto, which definitive documents shall, unless otherwise specified herein, be Filed with the Plan Supplement.

Notwithstanding anything to the contrary in this Plan, the Plan Supplement, the Confirmation Order, or otherwise, the finalization and execution of the UCC / TCC Recovery Allocation Agreement and any GUC Sub-Trust Documents shall not be a condition to Confirmation or Consummation of the Plan.  To the extent the UCC / TCC Recovery Allocation Agreement is finalized prior to Confirmation of the Plan, it shall be approved by the Court in a manner in form and substance satisfactory to the Committees.

1.     <u>Consideration.</u>

Holders of General Unsecured Claims shall receive the GUC Equity Trust Interests and Litigation Trust Class A Interests, as set forth in <u>Article III</u> of the Plan, subject to the terms of the UCC / TCC Recovery Allocation Agreement.

The Committees Post-Emergence Cash Consideration shall be subject to the following limitations:

(a)  Committees Post-Emergence Cash Consideration on account of the CMS Receivable and the proceeds of other distributable value at EIC shall in all respects remain subject to the following schedule (the "Elixir Rx Distributions Schedule"), which provides that proceeds therefrom shall be allocated: (i) *first*, to the SCD Trust in an amount sufficient to repay $57 million in Cash of the AHG Notes; (ii) *second*, to the Exit Facilities Agent, in an amount sufficient to repay the Exit FILO Term Loan Facility in the amount of $60 million (which amount shall be applied to fund an immediate prepayment under the Exit FILO Term Loan Facility); (iii) *third*, to the SCD Trust in an amount up to $14 million to pay fees, interest, and other amounts in respect of the AHG Notes in excess of the principal amount of $57 million of the AHG Notes repaid pursuant to subsection (a)(i) herein; (iv) *fourth*, to the Exit Facilities Agent, to be applied to repayment of the Exit ABL Facility, in an amount equal to the greater of (A) the amount by which Pro Forma Closing Liquidity is less than $500 million (such amount, the "Pro Forma Closing Liquidity Shortfall Amount") and (B) to the extent ABL Availability at the time of the distribution herein is less than $585 million, the lesser of (x) $57 million and (y) the amount necessary to cause ABL Availability to equal $585 million; (v) *fifth*, to the extent the aggregate amount of proceeds of the Elixir Rx Intercompany Claim distributed to (x) the SCD Trust to repay in Cash the AHG Notes pursuant to subsection (a)(i) and (a)(iii) herein and (y) the Holders of Allowed New Money DIP Notes Claims in accordance with the Junior DIP Documents pursuant to subsection (a)(vi) herein (excluding, for the avoidance of doubt, any amounts held in the Elixir Escrow unless and until such amounts are distributed to Holders of Allowed New Money DIP Notes Claims) exceeds $280 million (such aggregate amount, the "Creditor Elixir Rx Distribution"), an amount to the Litigation Trust equal to the lesser of (x) 50% of the amount by which the Creditor Elixir Rx Distribution exceeds $280 million and (y) $5 million (such amount, the "Committees Elixir Rx Distribution"); and (vi) *sixth*, all remaining amounts on account of the CMS Receivable and the proceeds of other distributable value at EIC shall be held in the Elixir Escrow, with (x) 40.0% of each dollar received released immediately from the Elixir Escrow to fund distributions to the Holders of Allowed New Money DIP Notes Claims in accordance with the Junior DIP Documents pursuant to and in accordance with the Plan and (y) 60.0% of each dollar received remaining in the Elixir Escrow until the occurrence of a Liquidity Event (and the corresponding required repayments of the Exit Facilities), whereupon such amounts shall be released immediately from the Elixir Escrow to fund distributions to the Holders of Allowed New Money DIP Notes Claims pursuant to and in accordance with the Plan; *provided*, *however*, that, following application of the proceeds of the CMS Receivable and the proceeds of other distributable value at EIC pursuant to the Elixir Rx Distributions Schedule (including subsection (a)(vi)), to the extent a Liquidity Event has not yet occurred, the first $10 million held in escrow pursuant to clause (y) of subsection (a)(vi) shall be released immediately from the Elixir Escrow to fund distributions to the Holders of Allowed New Money DIP Notes Claims pursuant to and in accordance with the Plan (the "Elixir Rx Recovery").  Upon receipt by EIC of any distributable Cash or Cash equivalents, including the proceeds of the CMS Receivable, the Reorganized Debtors shall cause all Cash and Cash equivalents held by EIC (including proceeds of the CMS Receivable) to be transferred to the Elixir Escrow, including in satisfaction of the Elixir Rx Intercompany Claim, for further distribution pursuant to the Elixir Rx Distributions Schedule.   The distributions of the proceeds of the CMS Receivable and the proceeds of other distributable value at EIC in satisfaction of, and pursuant to, the Elixir Rx Distributions Schedule are referred to herein, collectively, as the "Elixir Rx Distributions". For the avoidance of doubt, in accordance with the definition of Pro Forma Closing Liquidity and constituent

defined terms set forth in the Exit Facilities Credit Agreement, Pro Forma Closing Liquidity for purposes of subsection (a)(iv) of the Elixir Rx Distributions Schedule shall be calculated giving effect to the payment of all exit financing fees payable to the Exit Lenders, but not giving effect to any additional Discretionary Reserves (as defined in the Exit Facilities Credit Agreement)). The Debtors may, with the consent of the DIP Agents and the Junior DIP Noteholders, enter into one or more alternative transactions or structuring arrangements with respect to the transactions, arrangements, and distributions described in this paragraph, which alternative transactions, arrangements, and distributions shall in no way change any of the terms of the Committee Settlement or in any way modify, amend, or otherwise impact in any way, the timing of payments, amount of consideration, or value of consideration received under the Committee Settlement. The Elixir Rx Distributions Schedule shall not be modified without the consent of the Debtors, the DIP Agents, and the Required Junior DIP Noteholders; provided, however, that the allocation of proceeds set forth in the Elixir Rx Distributions Schedule shall not be modified in a manner inconsistent with the Committee Settlement and adverse to the Committees without the consent of the Committees. Pursuant to the Exit Facilities Documents, this Plan, and related settlement agreements, certain settlement payments are intended to be funded solely from proceeds of the CMS Receivable. To the extent the Reorganized Debtors request, and the requisite Exit Lenders and Exit 1.5 Lien Noteholders otherwise permit and consent, all or any portion of any such settlement payment to be funded by loans under the Exit Facilities due to any delay in receipt of payment to EIC of the CMS Receivable (or otherwise), then the Exit Lenders shall be entitled to repayment of loans under the Exit Facilities in an amount equal to the amount of loans used to fund such settlement payment, which repayment of loans shall be funded with proceeds of the CMS Receivable, as and when received, in reimbursement of funding such settlement payment; provided, however, that the foregoing shall in no way change any of the terms of the Committee Settlement or in any way modify, amend, or otherwise impact in any way, the timing of payments, amount of consideration, or value of consideration received under the Committee Settlement.

(b)     The Committees Post-Emergence Cash Consideration payment of $20 million shall be subject to the Payment Conditions (as defined in the Exit Facilities Credit Agreement); provided, however, that, at the Committees' election, either:

(i)     (1) there must be capacity under the Payment Conditions to pay Holders of Senior Secured Notes Claims on account of each corresponding dollar paid to the Committees; or (2) if, on or prior to the date on which such Specified Committee Payments are due, the Senior Secured Noteholders shall have received dividends or distributions (other than as a result of (A) the immediately preceding Article IV.E.1(b)(i)(1) (in an amount not to exceed the amount of the Specified Committee Payment) or (B) the Elixir Rx Distributions (collectively (A) and (B), the "Excluded Distributions")), then, the Specified Committee Payments (in an aggregate amount up to the amount of dividends and distributions made to Holders of Senior Secured Notes Claims during the immediately preceding 12-month period (other than Excluded Distributions)) shall be exempted from the requirements to satisfy Payment Conditions. In no event shall the Specified Committee Payments exceed (x) $5 million in any 12-month period and (y) $20 million in the aggregate; or

(ii)    (1) there must be capacity under the Payment Conditions to pay Holders of Senior Secured Notes Claims on account of each corresponding dollar paid to the Committees; or (2) if the Holders of Senior Secured Notes Claims shall take dividends or distributions (other than as a result of (A) the immediately preceding Article IV.E.1(b)(ii)(1) (in an amount not to exceed the amount of the Specified Committee Payment) or (B) the Elixir Rx Distributions (collectively, (A) and (B), the "Alternative Excluded Distributions")), there must be capacity under the Payment Conditions for a corresponding dollar to go to satisfy the Specified Committee Payments that are payable in the immediately succeeding 12-month period, and upon such dividends or distributions to the Holders of Senior Secured Notes Claims (other than Alternative Excluded Distributions), New Rite Aid shall cause a corresponding amount (up to the Specified Committee Payments that are payable in the immediately succeeding 12-month period and not previously escrowed) to be segregated and escrowed for the benefit of the Committees and paid to the Committees to satisfy the Specified Committee Payments on the applicable Required Payment Dates.

To the extent the Payment Condition applies and cannot be satisfied at the time a payment is due to the Committees or to the Holders of Senior Secured Notes Claims, such obligation shall remain outstanding (without accruing interest) until the Payment Condition can be satisfied to permit the payments as described above. Payment to the Committees as set forth herein are subject to a prepayment discount if paid early at the election of the Holders of Senior Secured Notes Claims.

Notwithstanding the foregoing, nothing in this Article IV.E.1 shall prejudice the United States' rights or the Reorganized Debtors' rights to enforce the terms of the DOJ Settlements in accordance with their respective terms; *provided* that nothing in the DOJ Settlements shall relieve any Person, Entity, or other party in interest from the obligations set forth in this Article IV.E.1.

2.    GUC Equity Trust.

On or prior to the Effective Date, the Debtors shall take all necessary steps to establish the GUC Equity Trust as one or more standalone trusts and/or sub-trusts in accordance with the Plan, *provided, however*, that the GUC Equity Trust shall not be permitted to take any actions which would prevent or impair the ability of the Reorganized Debtors from being a private company not subject to reporting obligations under Section 13(a) or 15(d) of the Exchange Act upon emergence or thereafter. The GUC Equity Trust shall be established for the primary purpose of liquidating the GUC Equity Trust's assets and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the GUC Equity Trust. Upon the transfer of the GUC Equity Trust Assets to the GUC Equity Trust, the Debtors and the Reorganized Debtors, will have no reversionary or further interest in or with respect to the assets of the GUC Equity Trust. To the extent beneficial interests in the GUC Equity Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. Prior to any transfer of the GUC Equity Trust Assets to the GUC Equity Trust, the Debtors and the Reorganized Debtors, as applicable, may designate trustee(s) for the GUC Equity Trust for the purposes of administering the GUC Equity Trust. The reasonable costs and expenses of the trustee(s) shall be paid from the GUC Equity Trust.

If, as of the Effective Date, the UCC / TCC Recovery Allocation Agreement is not in full force and effect, the GUC Equity Trustee shall hold the GUC Equity Trust Assets for the benefit of the Holders of the GUC Equity Trust Interests as later determined in accordance with the terms of the UCC / TCC Recovery Allocation Agreement.

The GUC Equity Trust Interests shall be distributed in accordance with the UCC / TCC Recovery Allocation Agreement.

<div align="center">(a)        GUC Equity Trust Treatment.</div>

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the GUC Equity Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any GUC Equity Trust will take a position on the GUC Equity Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of the GUC Equity Trust Assets to the GUC Equity Trust will be deemed to occur as (a) a first-step transfer of the GUC Equity Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the GUC Equity Trust.

No request for a ruling from the IRS will be sought on the classification of the GUC Equity Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Equity Trust. If the IRS were to successfully challenge the classification of the GUC Equity Trust as a grantor trust, the federal income tax consequences to the GUC Equity Trust and the GUC Equity Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the GUC Equity Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year. The GUC Equity Trust beneficiaries shall be treated for all purposes of the IRC as the grantors and deemed owners of the GUC Equity Trust.

As soon as possible after the transfer of the GUC Equity Trust Assets to the GUC Equity Trust, the trustee(s) of the GUC Equity Trust shall make a good faith valuation of the GUC Equity Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the GUC Equity Trust, and the Holders of Claims receiving interests in the GUC Equity Trust shall take consistent positions with respect to the valuation of the GUC Equity Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the GUC Equity Trust among the GUC Equity Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the GUC Equity Trust had sold all of the GUC Equity Trust Assets at their tax book value and distributed the proceeds to the GUC Equity Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the GUC Equity Trust. The tax book value of the GUC Equity Trust Assets shall equal their fair market value on the date of the transfer of the GUC Equity Trust Assets to the GUC Equity Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The GUC Equity Trust shall in no event be dissolved later than five (5) years from the creation of such GUC Equity Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the GUC Equity Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the GUC Equity Trust Assets.

The GUC Equity Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the GUC Equity Trust Assets (e.g., income, gain, loss, deduction and credit). Each GUC Equity Trust beneficiary holding a beneficial interest in the GUC Equity Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the GUC Equity Trust will pertain to GUC Equity Trust beneficiaries who receive their interests in the GUC Equity Trust in connection with the Plan.

(b)     Disputed Ownership Fund Treatment.

With respect to any of the assets of the GUC Equity Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the GUC Equity Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

3.      Litigation Trust.

On the Effective Date, the Debtors shall take all necessary steps to establish the Litigation Trust as one or more standalone trust and/or sub-trusts in accordance with the Plan and the Litigation Trust Documents, including as set forth in the Litigation Trust Cooperation Agreement.  Notwithstanding anything to the contrary herein, the Debtors and the Reorganized Debtors, as applicable, shall transfer the Litigation Trust Assets to the Litigation Trust, which, except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations, and such treatment is assumed with respect to the following discussion. For the avoidance of doubt, in the event of any transfer of the Litigation Trust Assets to the Litigation Trust, the provisions set forth herein shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Causes of Action transferred to the Litigation Trust.  The Litigation Trust shall be established for the purposes of liquidating the Litigation Trust's assets, reconciling claims asserted against the Debtors and the Reorganized Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust and the purposes described in the Plan.  Upon the transfer of the Debtors' or the Reorganized Debtors' assets to the Litigation Trust, the Debtors and the Reorganized Debtors will have no reversionary or further interest in or with respect to the Litigation Trust Assets.  To the extent beneficial interests in the Litigation Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests; *provided* that, for the avoidance of doubt, to the extent the GUC Equity Trust is established as a sub-trust under the Litigation Trust, such GUC Sub-Trust shall be governed by the GUC Equity Trust provisions set forth in Article IV.E.2 of the Plan.  Prior to any transfer of the Litigation Trust Assets to the Litigation Trust, the Committees may designate trustee(s) for the Litigation Trust for the purposes of administering the Litigation Trust, as more fully described in the Litigation Trust Documents.  The reasonable costs and expenses of the trustee(s) shall be paid from the Litigation Trust.

(a)     Transfer of Assigned Claims and Assigned Insurance Rights

In furtherance of the transfer of the Litigation Trust Assets to the Litigation Trust and in accordance with the Litigation Trust Agreements, on the Effective Date, the Debtors shall be deemed to have irrevocably vested in, transferred, granted and assigned to the Litigation Trust, and the Litigation Trust shall receive and accept, any and all of the Assigned Claims and the Assigned Insurance Rights. The foregoing transfer shall be (i) free and clear of any and all actual or alleged Liens or encumbrances of any nature whatsoever (other than, as applicable, the Tort Claims and the Assigned Claims), (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Debtors, the Litigation Trust, the Bankruptcy Court, or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the applicable Insurance Policies, and subject to Article IV.F. The transfer of the Assigned Insurance Rights contemplated in this Section is not an assignment of any Insurance Policy itself. The Confirmation Order shall contain findings with respect to the preservation of Assigned Claims and Assigned Insurance Rights consistent with the Committee Settlement and the Plan.  Notwithstanding the foregoing, the Litigation Trustee and/or GUC Sub-Trust Trustee shall have the power to assign and/or transfer Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims, subject to reasonable restrictions so as not to interfere

with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents, to the extent permitted by the terms and conditions of the applicable Insurance Policy(ies) and applicable law.

(b)        Vesting of the Litigation Trust Assets in the Litigation Trust

The corpus of the Litigation Trust shall consist of the Litigation Trust Assets. On the Effective Date, pursuant to the Plan and in accordance with the Litigation Trust Documents, the Litigation Trust Assets shall be irrevocably transferred to and vest in the Litigation Trust free and clear of any and all actual or alleged Claims, Interests, Liens, other encumbrances and liabilities of any kind (other than, as applicable, the Tort Claims and the Assigned Claims). The Litigation Trust shall have no liability for, and the Litigation Trust Assets shall vest in the Litigation Trust free and clear of, any and all actual or alleged pre-petition and post-petition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the Litigation Trust Documents. From and after the Effective Date, all proceeds of the Litigation Trust Assets, including without limitation, the Proceeds of Assigned Claims and the Tort Claim Insurance Proceeds, shall be paid to the Litigation Trust to be applied in accordance with the Plan, including the treatment of claims set forth in Article III, the Litigation Trust Documents and, as applicable, the UCC / TCC Recovery Allocation Agreement. Notwithstanding the foregoing, the Litigation Trustee and/or GUC Sub-Trust Trustee shall have the power to assign and/or transfer Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims, subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents.

(c)        Assumption of Liability for Tort Claims

As of the Effective Date, any and all liability of the Debtors (or their Affiliates) and the Reorganized Debtors (or their Affiliates) for any and all Tort Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Litigation Trust solely for the purpose of effectuating the purpose of the Litigation Trust. Distributions, in accordance with the Litigation Trust Documents from the Litigation Trust, any GUC Sub-Trust and the GUC Equity Trust, shall be the sole source of recovery, if any, in respect of such Tort Claims, and the Holder of such Tort Claims shall have no other or further recourse to the Debtors (and their Affiliates), their Estates, the Reorganized Debtors (and their Affiliates), or the Wind-Down Debtors. In furtherance of the foregoing, the Litigation Trust, subject to and only to the extent provided in the Litigation Trust Documents, shall have all defenses, cross-claims, offsets, and recoupments regarding the Tort Claims that the Debtors, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the Litigation Trust Documents and the Plan. For the avoidance of doubt, nothing in this Section shall limit or affect the transfer of the Assigned Insurance Rights or the Assigned Claims.

(d)        Institution and Maintenance of Legal and Other Proceedings

On the Effective Date (and subject to the establishment of the Litigation Trust and/or any GUC Sub-Trust), (a) the Litigation Trust and/or any GUC Sub-Trust shall be empowered, and have the sole authority, to initiate, prosecute, defend, and resolve (as applicable) all legal actions and other proceedings related to any asset, liability, or responsibility of the Litigation Trust, including the Assigned Claims, the Tort Claims, and Assigned Insurance Rights that are transferred to the Litigation Trust by operation of this Plan, subject to the terms and conditions of the Plan; (b) the Litigation Trust and/or any GUC Sub-Trust shall be empowered, and have the sole authority, to initiate, prosecute, defend, and resolve (as applicable) the Assigned Claims, the Tort Claims, and the Assigned Insurance Rights in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the Litigation Trustee(s) and/or any GUC Sub-Trust Trustee, subject to the terms and conditions of the Plan; and (c) subject to applicable law and contractual rights, the Litigation Trust and/or any GUC Sub-Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Litigation Trust and/or any GUC Sub-Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(e)    Administration of Tort Claims

On the Effective Date (and subject to the establishment of the Litigation Trust and/or any GUC Sub-Trust):  (a) all Tort Claims will be administered, processed, and resolved pursuant to the provisions outlined in the Litigation Trust Documents; (b) the Litigation Trustee or GUC Sub-Trust Trustee, as applicable, shall determine the eligibility, amount and allowance of Tort Claims in accordance with the applicable Litigation Trust Documents; (c) the determination by the Litigation Trustee or GUC Sub-Trust Trustee, as applicable, of the eligibility, amount and allowance of each Tort Claim shall be final and binding on the Holders of Tort Claims, except as set forth in this Plan and in the Litigation Trust Documents; and (d) the Litigation Trust, any GUC Sub-Trust and the GUC Equity Trust shall be the sole source of recovery for Holders of Tort Claims.  Holders of Disallowed Tort Claims shall have no recourse to the Litigation Trust, any GUC Sub-Trust or the GUC Equity Trust, the Debtors (or their Affiliates or their Estates), the Reorganized Debtors (or their Affiliates), the Wind-Down Debtors, the DIP Secured Parties, the Junior DIP Secured Parties, the Prepetition Secured Parties, the Senior Secured Noteholders, and in each case their respective Agents, Trustees, and other Related Parties in respect of such Disallowed Tort Claims.

(f)    Litigation Trust Distributions

The Litigation Trust and/or any GUC Sub-Trust shall make distributions in accordance with the Plan, the Confirmation Order, the Litigation Trust Documents, and, as applicable, the UCC / TCC Recovery Allocation Agreement, including, for the avoidance of doubt, by making distributions in compliance with the Committee Settlement Documents and the Plan and Confirmation Order to intermediate trusts for purposes of enabling distributions to creditors, whether such trusts are now existing or hereafter created.

(g)    Litigation Trust Treatment.

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, the Debtors expect to treat the Litigation Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Internal Revenue Code, and the trustee of any Litigation Trust will take a position on the Litigation Trust's tax return accordingly.  Such treatment is assumed with respect to the following discussion.  For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Litigation Trust.  As a result, the transfer of the Litigation Trust Assets to the Litigation Trust is expected to be a taxable transaction, and the Debtors are accordingly expected to recognize gain or loss equal to the difference between the tax basis and fair value of the Litigation Trust Assets.  The Litigation Trust beneficiaries shall be treated for all purposes of the IRC as the grantors and deemed owners of the Litigation Trust.

No request for a ruling from the IRS will be sought on the classification of the Litigation Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust.  If the IRS were to successfully challenge the classification of the Litigation Trust as a grantor trust, the federal income tax consequences to the Litigation Trust and the Litigation Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the Litigation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the trustee(s) of the Litigation Trust shall make a good faith valuation of the Litigation Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the trustee(s) of the Litigation Trust, and the Holders of Claims receiving interests in the Litigation Trust shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the Litigation Trust among the Litigation Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the Litigation Trust had sold all of the Litigation Trust Assets at their tax book value and distributed the proceeds to the Litigation Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. The tax book value of the Litigation Trust Assets shall equal their fair market value on the date of the transfer of the Litigation Trust Assets to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Litigation Trust shall in no event be dissolved later than five (5) years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Litigation Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

The Litigation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Litigation Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each Litigation Trust beneficiary holding a beneficial interest in the Litigation Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Litigation Trust will pertain to Litigation Trust beneficiaries who receive their interests in the Litigation Trust in connection with the Plan.

(h)    Disputed Ownership Fund, Qualified Settlement Fund, or Widely Held Fixed Investment Trust Treatment.

To the extent the Debtors and the Committees determine in their reasonable discretion to treat all or any portion of the Litigation Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations, any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return may be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The treatment of a "widely held fixed investment trust" would be as described above with respect to the GUC Equity Trust.

4.    GUC Sub-Trusts.

To the extent provided for in the UCC / TCC Recovery Allocation Agreement and the GUC Sub-Trust Documents (if finalized and executed on or before the Effective Date), the GUC Sub-Trusts shall be established on the Effective Date subject to such documentation as may be required, to hold and distribute, as applicable, such consideration as may be allocated to any subset of Holders of General Unsecured Claims.

5.    SCD Trust.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement and the Plan, no earlier than the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall transfer the SCD Trust Assets to the SCD Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations. The SCD Trust shall be established for the primary purpose of liquidating the SCD Trust's assets and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the SCD Trust. Upon the transfer of the SCD Trust Assets to the SCD Trust, the Debtors and the Reorganized Debtors, will have no reversionary or further interest in or with respect to the assets of the SCD Trust. To the extent

beneficial interests in the SCD Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. Prior to any transfer of the SCD Trust Assets to the SCD Trust, the Debtors and the Reorganized Debtors, as applicable, may designate trustee(s) for the SCD Trust for the purposes of administering the SCD Trust in accordance with the terms and conditions of the AHG New-Money Commitment Agreement. The reasonable costs and expenses of the trustee(s) shall be paid from the SCD Trust.

        (a)        SCD Trust Treatment.

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the SCD Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any SCD Trust will take a position on the SCD Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of the SCD Trust Assets to the SCD Trust will be deemed to occur as (a) a first-step transfer of the SCD Trust Assets by Rite Aid directly to the Holders of the applicable Claims in exchange for the AHG New Money Plus the settlement of such Holders' Claims in respect of the AHG Notes Ticking Fee and the AHG New-Money Commitment Premium, and (b) a second-step transfer by such Holders to the SCD Trust in exchange for the AHG Notes in the principal amount of the AHG New Money plus the AHG Notes Ticking Fee plus the AHG New-Money Commitment Premium. As a result, the transfer of the SCD Trust Assets to the SCD Trust is expected to be a taxable transaction, and the Debtors are accordingly expected to recognize gain or loss equal to the difference between the tax basis and fair value of the SCD Trust Assets. The SCD Trust beneficiaries shall be treated for all purposes of the IRC as the grantors and deemed owners of the SCD Trust.

No request for a ruling from the IRS will be sought on the classification of the SCD Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the SCD Trust. If the IRS were to successfully challenge the classification of the SCD Trust as a grantor trust, the federal income tax consequences to the SCD Trust and the SCD Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the SCD Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the SCD Trust Assets to the SCD Trust, the trustee(s) of the SCD Trust shall make a good faith valuation of the SCD Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the SCD Trust, and the Holders of Claims receiving interests in the SCD Trust shall take consistent positions with respect to the valuation of the SCD Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the SCD Trust among the SCD Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the SCD Trust had sold all of the SCD Trust Assets at their tax book value and distributed the proceeds to the SCD Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the SCD Trust. The tax book value of the SCD Trust Assets shall equal their fair market value on the date of the transfer of the SCD Trust Assets to the SCD Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The SCD Trust shall in no event be dissolved later than five (5) years from the creation of such SCD Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the SCD Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the SCD Trust Assets.

The SCD Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the SCD Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each SCD Trust beneficiary holding a beneficial interest in the SCD Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the SCD Trust will pertain to SCD Trust beneficiaries who receive their interests in the SCD Trust in connection with the Plan.

(b)        Disputed Ownership Fund Treatment.

With respect to any of the assets of the SCD Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the SCD Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

6.        Cooperation.

The Debtors and Reorganized Debtors, as applicable, shall provide reasonable cooperation necessary to maximize the value of the Assigned Claims, prosecute the Assigned Insurance Rights, and reconcile and administer Tort Claims, including, without limitation, (i) providing the Litigation Trust[7] and its Professionals with full access to the Debtors' books, records, and other documents that are relevant to the Assigned Claims and Assigned Insurance Rights (including privileged documents and materials containing PHI[8] or individually identifiable health information insofar as such documents and materials are relevant to the Assigned Claims and Assigned Insurance Rights assigned, transferred, or otherwise vested to or in the Litigation Trust), (ii) providing the Litigation Trust and its Professionals with reasonable access to employees and agents of the Debtors and Reorganized Debtors, as applicable, for fact finding, consultation, interviews, and as witnesses (including as needed to authenticate documents where appropriate) that are relevant to the Assigned Claims, Assigned Insurance Rights, and Tort Claims, (iii) providing the Litigation Trust and its Professionals with reasonable access to systems and Debtor and Reorganized Debtor personnel as relevant for administration of the Litigation Trust, (iv) funding insurance archival efforts, including costs to retain Marsh to undertake archival efforts and costs incurred by personnel of the Debtors, the Reorganized Debtors, and/or the Wind-Down Debtors, as applicable, and agreeing that Professionals of the Debtors, the Reorganized Debtors, and/or the Wind-Down Debtors will reasonably cooperate with and assist Marsh in the insurance archival efforts, (v) taking commercially reasonable measures to retain documents relevant to the Assigned Claims and Assigned Insurance Rights, consistent with the "Document Retention" provision in this Plan and the Litigation Trust Cooperation Agreement and applicable law, and (vi) providing reasonable assistance to maximize the value of the Assigned Claims and prosecute Assigned Insurance Rights, as reasonably determined by the Committees, the Litigation Trust, or any of their respective Professionals. With respect to sub-parts (i), (ii), (iii), (iv), and (vi) of the foregoing sentence, objections and contentions regarding relevance, undue burden, and privilege are preserved, provided, however, that the obligation to cooperate to maximize the value of the Assigned Claims and prosecute Assigned Insurance Rights shall be paramount. Any attorney client privilege, work-product protections, or

---

[7]    References to the Litigation Trust in this provision include any GUC Sub-Trusts that are established as set forth herein.

[8]    "PHI" or "protected health information" is individually identifiable health information that is protected under the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act of 2009 (together with their implementing regulations, "HIPAA"), including, for example, customer pharmacy records and claims information.

other privilege or immunity held by any of the Debtors, including any predecessors, committee or sub-committees, or other designated Entities or Persons, to the extent that it is related to the Assigned Claims and Assigned Insurance Rights, shall be extended to and shared with the Litigation Trust under the terms of the Litigation Trust Cooperation Agreement (and for the avoidance of doubt, will not be extended to or shared with the Committees, their members, or their professionals). The transfer of any privileged books and records provided to the Litigation Trust under the terms of the Litigation Trust Cooperation Agreement shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records. Further, none of the Debtors or the Reorganized Debtors shall be liable for violating any confidentiality or privacy protections as a result of transferring the books and records to the Litigation Trust in accordance with the Litigation Trust Cooperation Agreement. The Litigation Trust shall promptly reimburse the Reorganized Debtors for all reasonable and documented costs and expenses, including costs associated with allocating time of employees on projects requiring allocation of employee time (*provided, however*, that the identification of such projects, and estimation and identification of costs associated with them, shall be agreed among the parties without cost to the Litigation Trust) and professionals (including professional fees at the applicable rates charged by such professionals) of the Reorganized Debtors paid in connection with any such obligations incurred post emergence, but excluding any costs incurred in connection with the insurance archival efforts described in subpart (iv) above. Notwithstanding anything to the contrary in the Plan, Plan Supplement or Confirmation Order, or any ruling of the Bankruptcy Court, Reorganized Debtors shall not receive any proceeds or recoveries from the Assigned Insurance Rights. With respect to the time of the Reorganized Debtors' employees on projects requiring an allocation of employee time, the Litigation Trust agrees that it shall use reasonable efforts to minimize the use of such employee time in connection with advancing the goal and purpose of the Litigation Trust, and the Litigation Trust and the Reorganized Debtors shall agree on a mutually acceptable and reasonable process by which the Litigation Trust and the Reorganized Debtors will use employee time (both in terms of number of employees and the quantum of expected time) before any employee time is incurred. For the avoidance of doubt, after the Confirmation Date and prior to the Effective Date, the Debtors shall reasonably cooperate with the foregoing paragraph 6 in its entirety (except the transfer of privileged information), except that such cooperation shall be afforded to the Committees and their Professionals in advance of the formation and retention of Professionals by the Litigation Trust, as is consistent with, and reasonably necessary to, comply with and satisfy closing conditions. The Litigation Trust Cooperation Agreement shall provide that the Litigation Trust cannot waive the Debtors' privilege without the express written consent of the Debtors, the Wind-Down Debtors, the Reorganized Debtors, and/or any joint privilege holder, as applicable, or an order from the Bankruptcy Court.

   7. <u>Additional Terms.</u>

  The Debtors shall assume the Pension Plan as well as all CBAs and union contracts.

   F. *Insurance Neutrality.*

  Nothing in the Plan, the Plan Supplement, the Confirmation Order (including any provision of the Confirmation Order), or any other judgment, order, finding of fact, conclusion of law, determination or statement (written or verbal, on or off the record) made by the Bankruptcy Court, the District Court, or entered by any other court exercising jurisdiction over these Chapter 11 Cases, including in any judgment, order, writ or opinion entered on appeal from any of the foregoing, shall in any action against any insurer:

   1. in any way impair, alter, supplement, change, expand, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Insurance Policies, or the rights or obligations of any insurers, third-party administrators, the Debtors, the Litigation Trust, any GUC Sub-Trust, or any holder of the Assigned Insurance Rights arising out of, under, or relating to the Insurance Policies and/or applicable law.

   2. constitute an adjudication, judgment, trial, determination on the merits, finding, or conclusion of law establishing:

     (a) or liquidating the liability (in the aggregate or otherwise) of any insurer with respect to any claim for insurance coverage;

(b)    that the conduct of the Debtors and Committees in connection with the negotiation, development, settlement and/or implementation of the Plan, Plan Supplement or any related documents or agreements was, is, or will be consistent with the terms and conditions of any Insurance Policy or applicable non-bankruptcy law; and

(c)    that any insurer was invited to participate in or participated in, consulted on, negotiated, and/or consented to the Plan, Plan Supplement, the Litigation Trust Agreement and other plan documents.

3.    have any res judicata, collateral estoppel or other preclusive effect with respect to any matter set forth in this Article IV.F, or shall otherwise prejudice, diminish, impair, or affect (under principles of waiver, estoppel, or otherwise) any defense, claim or right any insurer may have under any Insurance Policy or applicable non-bankruptcy law with respect thereto, subject to applicable law;

4.    be construed to constitute a finding, conclusion, or determination regarding any insurer's coverage obligations under any Insurance Policy; or

5.    impair any insurer's legal, equitable, or contractual rights under any Insurance Policy or with respect to insurance claims, or the Debtors', the Litigation Trust's, any GUC Sub-Trust's, or any policyholder's legal, equitable, or contractual rights under any Insurance Policy or applicable law. The parties shall retain, and be permitted to assert, in any action against any insurer, all claims and/or defenses, including any coverage defenses related to the Claims, the insurance claims, and/or any Insurance Policy, notwithstanding any provision of the Plan, Plan Supplement, the Litigation Trust Agreement, the other plan documents, the Confirmation Order, any findings of fact and/or conclusions of law with respect to the confirmation of the Plan, or any final order or opinion entered on appeal from the Confirmation Order, except as otherwise provided under applicable law.

On and after entry of the Confirmation Order, no party shall assert anything to the contrary of this Article IV.F in any action against an insurer.  Each insurer shall be entitled to enforce this Article IV.F.

In the event of any dispute concerning any insurance coverage issue, such dispute shall be resolved pursuant to the terms and conditions of the Insurance Policies and/or applicable law, with all rights respect thereto preserved, and notwithstanding any terms of the Plan, Plan Supplement, or any findings in the Confirmation Order, all pre-petition rulings, findings, opinions, or any other orders of a court of competent jurisdiction with respect to insurance coverage under the Insurance Policies shall continue to apply to the insurers under any Insurance Policy and any assignee of the Assigned Insurance Rights, subject to applicable law.

Furthermore, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall relieve or discharge any insurer of the Debtors from their obligations under the Insurance Policies; provided that nothing herein determines whether or not any insurer is obligated to pay any amount for any Tort Claim. Nothing in the Plan, the Plan Supplement, or the Confirmation Order shall operate to require any insurer or third-party administrator to pay under any Insurance Policies the liability of any Person or Entity that was not insured thereunder before the Effective Date for any liability that arose before the Effective Date, and, notwithstanding anything in the Plan, the Plan Supplement, the Confirmation Order, or any other order of the Court relating to the Plan, all rights and defenses with respect to insurance coverage sought pursuant to the Assigned Insurance Rights shall be subject to the applicable terms, conditions, exclusions, and other provisions of the applicable Insurance Policies and applicable law.

Nothing in the Plan, the Plan Supplement, the Confirmation Order, or in any other ruling by the Bankruptcy Court shall prohibit the Insurers under any Insurance Policy from contesting the reasonableness of the Settlement of Opioid Claims in connection with any post-emergence dispute or litigation regarding insurance coverage.

G.    *Sources of Consideration for Plan Distributions.*

All amounts necessary for the Debtors and, if applicable, the Wind-Down Debtors, to make payments or distributions pursuant hereto shall be (in each case subject to the terms of the Purchase Agreement(s) and the Sale Order, as applicable) obtained from the proceeds of the issuance of New Common Stock, Exit Facilities, Exit 1.5 Lien Notes, Takeback Notes, the Elixir Rx Distribution, the AHG Notes, Cash of the Debtors, and any additional Cash consideration provided under one or more Purchase Agreements, in accordance with the terms thereof. Unless otherwise agreed, distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities under a Purchase Agreement shall be the sole responsibility of the applicable Purchaser.

Notwithstanding anything to the contrary herein, other than the effectiveness of the Exit Facilities Documents and the occurrence of the Effective Date, there shall not be conditions precedent (implied or otherwise) to the effectiveness of the Exit 1.5 Lien Notes Documents, the Takeback Notes Documents, or the AHG Notes Documentation, and the Exit 1.5 Lien Notes Documents, the Takeback Notes Documents, and the AHG Notes Documentation shall be in a form such that they do not impair the effectiveness of the Exit 1.5 Lien Notes Documents, the Takeback Notes Documents, or the AHG Notes Documentation concurrently with the effectiveness of the Exit Facilities Documents and the Plan.

1.    The New Common Stock.

In the event of a Plan Restructuring, on the Effective Date, New Rite Aid is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Transactions Memorandum, issue the New Common Stock for distribution to the Holders of Allowed Senior Secured Notes Claims, the Junior DIP Noteholders, and the GUC Equity Trust in accordance with the terms of this Plan and the New Corporate Governance Documents (including the New Shareholders Agreement) without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Common Stock shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Common Stock issued pursuant to the Plan, as contemplated by the Plan Restructuring, shall be duly authorized and validly issued and shall be full paid and non-assessable.

2.    Exit Facilities.

On the Effective Date, New Rite Aid shall enter into the Exit Facilities on the terms set forth in the Exit Facilities Documents. To the extent not already approved, Confirmation shall be deemed approval of the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of New Rite Aid to enter into and execute the Exit Facilities Credit Agreement, and such other Exit Facilities Documents as may be required to effectuate the Exit Facilities.

On the Effective Date or such date as otherwise approved by the Sale Order, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facilities Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. For the avoidance of doubt, Liens and security interests under the Exit Facilities shall be subject to the same limitations regarding leased property as is set forth in paragraphs 7(e)(3) and 19(e) of the Final Financing Order.

To the extent not already approved, New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable

state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

       3.       <u>Exit 1.5 Lien Notes.</u>

On the Effective Date, New Rite Aid shall issue the Exit 1.5 Lien Notes on the terms set forth in the Exit 1.5 Lien Notes Documents. To the extent not already approved, Confirmation shall be deemed approval of the Exit 1.5 Lien Notes Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of New Rite Aid to enter into and execute the Exit 1.5 Lien Notes Indenture, and other such Exit 1.5 Lien Notes Documents as may be required to effectuate the Exit 1.5 Lien Notes.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit 1.5 Lien Notes Documents, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit 1.5 Lien Notes Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit 1.5 Lien Notes Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. For the avoidance of doubt, Liens and security interests under the Exit 1.5 Lien Notes Documents shall be subject to the same limitations regarding leased property as is set forth in paragraphs 7(e)(3) and 19(e) of the Final Financing Order.

To the extent New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

       4.       <u>MedImpact Term Loan Sales Process.</u>

Following the Confirmation Date, the Debtors shall continue the MedImpact Term Loan Sales Process. The MedImpact Term Loan shall be marketed by the Debtors pursuant to a syndication process in accordance with the Final Financing Order. Distributions relating to the sale of the MedImpact Term Loan shall be applied pursuant to <u>Section (II)(A)</u> of <u>Exhibit E</u> to the Final Financing Order, unless otherwise agreed as among the Debtors, the DIP Agents, and the Required Junior DIP Noteholders. For the avoidance of doubt, the amount of any (i) interest and amortization payments made under the MedImpact Term Loan Credit Agreement and (ii) net working capital adjustments or other amounts owed to or received by the Debtors, the DIP Agents, or the DIP Lenders from MedImpact or pursuant to the Elixir Purchase Agreement shall be included in the distribution of proceeds of Elixir-Related Prepayment Events (as defined in the DIP Credit Agreement) to the DIP Lenders and the Junior DIP Noteholders in accordance with the terms of the Final Financing Order.

       5.       <u>The SCD Trust and the AHG Notes.</u>

On or prior to the Effective Date, subject to the terms and conditions of the AHG New-Money Commitment Agreement, the Debtors shall create the SCD Trust and enter into the SCD Trust Documentation and the AHG Notes Documentation. On or prior to the Effective Date, subject to the terms and conditions of the AHG New-Money

Commitment Agreement and the Confirmation Order, the SCD Trust shall, and to the maximum extent permitted by applicable law, (a) (i) hold all right, title, and interest to the SCD Claim, which the Debtors shall transfer from Debtor Ex Options, LLC to the SCD Trust, (b) issue, or cause to be issued, the AHG Notes to the applicable AHG New-Money Commitment Parties in accordance with the AHG Notes Documentation, and (c) be vested with all requisite authority to distribute the proceeds of the SCD Claim as contemplated by the Plan and the terms and conditions of the AHG New-Money Commitment Agreement.  To the extent not already approved, Confirmation shall be deemed approval of the AHG Notes Documentation and the SCD Trust Documentation, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the SCD Trust in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the SCD Trust to enter into and execute the SCD Trust Documentation, the AHG Notes Purchase Agreement, and such other AHG Notes Documentation as may be required to issue the AHG Notes, consistent with the terms of the Plan, the Confirmation Order, the AHG New-Money Commitment Agreement, and the New Money DIP Notes Term Sheet.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement and the Plan, distributions on account of the SCD Claim shall be allocated as set forth in the Elixir Rx Distributions Schedule.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement and the Confirmation Order, on the Effective Date, all of the Liens and security interests to be granted in accordance with the AHG Notes Documentation, to the extent applicable:  (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the AHG Notes Documentation; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the AHG Notes Documentation; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The AHG Notes shall not be secured by real or leased property of the Reorganize Debtors.

To the extent not already approved, the SCD Trust and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties, all in accordance with the terms of the AHG New-Money Commitment Agreement and the Confirmation Order.

The Cash proceeds of the AHG Notes shall be used to pay down the loans outstanding under the DIP ABL Facility, thereby reducing the DIP ABL Claims on a dollar-for-dollar basis.

6.    Takeback Notes.

On the Effective Date, in the event of a Plan Restructuring, New Rite Aid shall enter into the Takeback Notes on the terms set forth in the Takeback Notes Documents.  To the extent not already approved, Confirmation shall be deemed approval of the Takeback Notes Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of New Rite Aid to enter into and execute the Takeback Indenture, and other such Takeback Notes Documents as may be required to effectuate the Takeback Notes.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Takeback Notes Documents, to the extent applicable:  (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Takeback Notes Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted

under the respective Takeback Notes Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  For the avoidance of doubt, Liens and security interests under the Takeback Notes Documents shall be subject to the same limitations regarding leased property as is set forth in paragraphs 7(e)(3) and 19(e) of the Final Financing Order.

To the extent New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

7.     <u>Cash on Hand.</u>

Except as otherwise provided herein, the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims solely in accordance with the terms of the Plan, including any Cure Costs in connection with a Plan Restructuring.

8.     <u>Creation of the Administrative / Priority Claims Reserve and the Wind-Down Reserve.</u>

On or before the Effective Date, in the event of a Sale Transaction Restructuring, each of the Administrative / Priority Claims Reserve and Wind-Down Reserve shall be funded in accordance with the Purchase Agreement, the Sale Order, and section 1129 of the Bankruptcy Code, as applicable, and subject to the applicable consent rights of the Required Junior DIP Noteholders.

9.     <u>Payment of Cure Costs.</u>

In the event of a Sale Transaction Restructuring or an Other Asset Sale, the Debtors or Purchaser shall pay all Cure Costs, if any, pursuant to sections 365 or 1123 of the Bankruptcy Code and in accordance with the Purchase Agreement(s) and Sale Order(s).

H.     *Plan Administrator and the Wind-Down Debtors.*

This <u>Article IV.H</u> shall apply to a Sale Transaction Restructuring.

1.     <u>Plan Administrator.</u>

As set forth below, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order.  On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in <u>Article VII</u> hereof.  The Plan Administrator shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets without any additional notice to or approval from the Bankruptcy Court.

    2.      Board of the Debtors.

As of the Effective Date, in the event of a Sale Transaction Restructuring: (a) the existing board of directors or managers, as applicable, of each of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity Holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor; *provided* that each Disinterested Director of the Debtors shall retain respective authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan; (b) each Disinterested Director shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors, or the Wind-Down Debtors, or any other Entity without such director's prior written consent; (c) each Disinterested Director of the Debtors retains the right to review, approve, and make decisions as well as to file papers and be heard before the Bankruptcy Court on all matters under such director's continuing authority; and (d) subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Wind-Down Debtors with respect to its affairs. Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution, cancellation, or equivalent document for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of any of the Debtors under the applicable laws of each applicable Debtor's state of formation; (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors or any of their Affiliates.

    3.      Tax Returns.

After the Effective Date and subject to the Purchase Agreement(s), the Plan Administrator shall complete and file all final or otherwise required federal, state, provincial, and local tax returns for each of the Debtors and the Wind-Down Debtors.

    4.      Dissolution of the Wind-Down Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction. Notwithstanding the foregoing, the Plan Administrator shall retain the authority to take all necessary actions to dissolve the Debtors in, and withdraw the Debtors from, applicable states and provinces to the extent required by applicable law.

    I.      *Liquidating Trust.*

This Article IV.I shall apply to a Sale Transaction Restructuring.

Notwithstanding anything to the contrary herein, the Plan Administrator, on behalf of the Wind-Down Debtors, may, subject to the consent of the Required Junior DIP Noteholders, may transfer all or any portion of the Remnant Assets to the Liquidating Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations. For the avoidance of doubt, in the event of a Permitted Transfer, the provisions set forth in Article IV.R herein shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Causes of Action transferred to the Liquidating Trust. The Liquidating Trust shall be established for the primary purpose of liquidating the Liquidating Trust's assets, reconciling claims asserted against the Debtors and the Wind-Down Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust. Upon the transfer of the Debtors' or the Wind-Down Debtors' assets to the Liquidating Trust, the Debtors and the Wind-Down Debtors will have no reversionary or further interest in or with respect to the assets of the Liquidating Trust. To the extent beneficial interests in the Liquidating Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. Prior to any Permitted Transfer, the Plan Administrator may designate trustee(s) for the Liquidating Trust for the purposes of administering the Liquidating Trust. The reasonable costs and expenses of the trustee(s) shall be paid from the Liquidating Trust.

1.    Liquidating Trust Treatment.

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the Liquidating Trust had sold all of the Liquidating Trust Assets at their tax book value and distributed the proceeds to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter

ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

2.     Disputed Ownership Fund Treatment.

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

*J.*     *Release of Liens.*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates that have not been previously released shall be fully released, settled, and compromised, and the Holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the Debtors' Estates shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases, at the sole expense of the Debtors or the Wind-Down Debtors, as applicable. Notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims and the Junior DIP Claims shall not be released and such Liens shall remain in full force and effect until the DIP Claims and Junior DIP Claims are paid in full in Cash or otherwise treated in a manner consistent with Article II.E of the Plan, respectively.

*K.*     *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise specifically provided for in the Plan or one or more Purchase Agreements: (1) the obligations under the DIP Documents, the Junior DIP Documents, the Prepetition Credit Agreement, the 2025 Secured Notes Indenture, the 2026 Secured Notes Indenture, the 2027 Unsecured Notes Indenture, the 2028 Unsecured Notes Indenture, and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled, except as set forth herein, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing

indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

On or after the Effective Date, each Holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture(s) or credit agreement that governs the rights of such Holder of such Claim upon such Holder's (or its nominee's or designee's) receipt of the distributions to which it is entitled pursuant to the Plan. Such surrendered certificate or instrument shall be deemed cancelled as set forth in, and subject to the exceptions set forth in, this Article IV.K. If the record Holder of a Notes Claim or Junior DIP Notes Claim is DTC or its nominee, the applicable Trustee or Junior DIP Trustee, or another securities depository or custodian thereof, and Holders of Notes Claims or Junior DIP Notes Claims are represented by a global security held by or on behalf of DTC, the applicable Trustee or Junior DIP Trustee, or such other securities depository or custodian, then each such Holder of such Notes Claims shall be deemed to have surrendered such Holder's note, debenture, or other evidence of indebtedness upon surrender of such global security by DTC, the applicable Trustee or Junior DIP Trustee, or such other securities depository or custodian thereof.

Notwithstanding the foregoing, (a) no Executory Contract or Unexpired Lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, (b) the Prepetition Credit Agreement, the Senior Secured Notes Indentures, and the Unsecured Notes Indentures shall continue in effect solely for the purpose of (i) allowing Holders of the ABL Facility Claims, FILO Term Loan Facility Claims, the Trustees, to receive the distributions provided for under the Plan, (ii) allowing the Prepetition Agent, the Trustees to receive or direct distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan, (iii) preserving all rights, including rights of enforcement, of the Prepetition Agent, the Trustees to indemnification or contribution pursuant and subject to the terms of the Prepetition Credit Agreement, the Indentures, in respect of any claim or Cause of Action asserted against the Prepetition Agent, the Trustees, as applicable, (iv) permitting each of the Prepetition Agent, the Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, and (v) preserving any rights of the DIP Agents, the Junior DIP Trustee, the Prepetition Agents, the Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture, Prepetition Credit Agreement, DIP Credit Agreements, or Junior DIP Notes Indenture, including any rights to priority of payment and/or to exercise charging Liens.

The Prepetition Agent shall be released and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Prepetition Agent and their respective representatives and Professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Prepetition Agent shall be relieved of and released from any obligations and duties arising thereunder.

Except as provided in this Plan, on the Effective Date, each DIP Agent and its respective agents, successors, and assigns, and the Junior DIP Trustee and its agents, successors, and assigns, shall be automatically and fully released of all of their duties and obligations associated with the applicable DIP Documents or Junior DIP Documents. The commitments and obligations, if any, of the DIP Lenders or the Junior DIP Noteholders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents or the Junior DIP Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

On and after the Effective Date, the duties and responsibilities of the Trustees under the applicable indenture shall be discharged and released, except (i) to the extent required to effectuate the Plan including, but not limited to, making distributions under the Plan to the Holders of Allowed Notes Claims under the applicable indenture, and (ii) with respect to any rights of the Trustees to payment of reasonable and documented fees, expenses, and indemnification obligations (to be documented in accordance with the terms of the applicable indenture) as against any money or property distributable to Holders of Claims pursuant and subject to the terms of the applicable Indenture, including any rights to priority of payment and/or to exercise charging liens. After the performance by the Trustees and their respective representatives and professionals of any obligations and duties

required under or related to the Plan or the Confirmation Order, the Trustees shall be deemed to be forever relieved of and released from any obligations and duties arising thereunder.

L.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including, as applicable: (1) selection of the Plan Administrator; (2) implementation of the Restructuring Transactions; (3) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors, before, on, or after the Effective Date involving the corporate structure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, in connection with the Plan or corporate structure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security Holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors, except for any filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution with applicable governmental authorities required pursuant to applicable state or provincial law. Before, on, or after the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.L shall be effective notwithstanding any requirements under non-bankruptcy law.

M.      *New Corporate Governance Documents.*

In the event of a Plan Restructuring or Credit Bid Transaction, on the Effective Date, New Rite Aid shall enter into and deliver the New Corporate Governance Documents to each holder of New Common Stock, and the New Corporate Governance Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each party shall be bound thereby, in each case, and as applicable, without the need for execution by any party thereto other than New Rite Aid. Any Entity's acceptance of New Common Stock, including any New Common Stock issuable upon exercise of any warrants issued pursuant to the Plan or otherwise, shall be deemed as its agreement to the New Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms, and each such Entity will be bound thereby in all respects.

The New Corporate Governance Documents will prohibit the issuance of non-voting Equity Securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the New Corporate Governance Documents may be amended or restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

N.      *Management Incentive Plan.*

On the Effective Date, the New Rite Aid Board shall adopt and implement the Management Incentive Plan as determined by the New Rite Aid Board and in accordance with the MIP Documents.

O.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Committee Settlement, the MedImpact Term Loan Sale, Sale Transaction Restructuring, the Other Asset Sale(s), and the instruments issued pursuant to the Plan in the name

of and on behalf of the Reorganized Debtors or the Wind-Down Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may issue, execute, deliver, file, or record, such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate implement, and further evidence the terms and conditions of the Committee Settlement, including, but not limited to, the Litigation Trust Agreement, the GUC Equity Trust Documents, the GUC Sub-Trust Documents, the Litigation Trust Cooperation Agreement, and the other Committee Settlement Documents.

P.     *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to New Rite Aid, from a Debtor to the Wind-Down Debtor, or from the Wind-Down Debtor to the Liquidating Trust or to any other Person) of property under the Plan (including pursuant to the Purchase Agreement(s), if applicable, or a Plan Restructuring) or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Wind-Down Debtors, including in accordance with any Purchase Agreement, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any Restructuring Transaction), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Q.     *Exemption from Securities Act Registration.*

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of securities under the Plan. The issuance of the 1145 Securities under the Plan is expected to be exempt from the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code. Thus, the 1145 Securities to be issued under the Plan (a) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) would be freely tradable and transferable by any initial recipient thereof that (i) is not an "Affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "Affiliate" within 90 days of such transfer, and (iii) is not an Entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. Should the Debtors elect on or after the Effective Date to reflect any ownership of the 1145 Securities to be issued under the Plan through the facilities of DTC, the Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the 1145 Securities to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding any policies, practices, or procedures of DTC, DTC shall

cooperate with and take all actions reasonably requested by a Disbursing Agent or an indenture trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distribution be characterized as repayments of principal or interest. No Disbursing Agent or indenture trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC. The rights of holders of New Common Stock, including the right to transfer such interests, will also be subject to any restrictions in the New Corporate Governance Documents, to the extent applicable.

To the extent that section 1145 of the Bankruptcy Code is inapplicable, the offering, issuance, exchange, or distribution of any securities pursuant to the Plan, including the Private Placement Securities, is or shall be conducted in a manner that is exempt from the registration requirements of section 5 of the Securities Act and applicable state and local securities laws, pursuant to section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder (including Regulation D), Regulation S under the Securities Act and/or another available exemption from registration under Section 5 of the Securities Act. To the extent such securities are issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder or Regulation S under the Securities Act, each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each recipient shall be required to make customary representations to the Debtors including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

The interests in the Liquidating Trust, the Litigation Trust, any GUC Sub-Trust, or the GUC Equity Trust Interests are not expected to be deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, or the provision of section 1145 of the Bankruptcy Code is expected to apply to such interests (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) or the issuance of such interests is expected to be exempt from the registration under Section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the 1145 Securities, Private Placement Securities, or interests in the Liquidating Trust, the Litigation Trust, any GUC Sub-Trust, or the GUC Equity Trust Interests under applicable securities laws.

R.     *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to <u>Article VII</u> and <u>Article X</u> hereof, and the terms of the Committee Settlement, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action other than the Assigned Claims and the Assigned Insurance Rights, whether arising before or after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) that constitute Elixir Acquired Assets or Retail Acquired Assets, (b) exculpated or released (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in <u>Article X</u>, or (c) waived in accordance with <u>Article IV.R</u> which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Reorganized Debtors or the Wind-Down Debtors, as applicable, as of the Effective Date.

The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the Commonwealth of Massachusetts on account of, or relating to, the Massachusetts OAG Agreement, and the Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such claims. Additionally, each of the California AG Proofs of Claim is an Allowed General Unsecured Claim. The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the California AG, or any mediate or immediate transferee of the California AG, on account of, or relating to, the California AG Agreement, and the Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such claims.

The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, may pursue such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights), as appropriate, in accordance with the best interests of the Reorganized Debtors and the Wind-Down Debtors, as applicable; *provided* that, for the avoidance of doubt, the Litigation Trust is not obligated to facilitate (directly or indirectly) the Debtors', Reorganized Debtors', or Wind-Down Debtors' pursuit of any such claims or Causes of Action that are not Assigned Claims or Assigned Insurance Rights. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may exclusively enforce any and all such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights). The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights) and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Purchaser in accordance with the Purchase Agreement(s) or otherwise expressly provided in the Plan, including this Article IV and Article X of the Plan. Unless any such Causes of Action against an Entity are expressly waived (including pursuant to this Article IV.R of the Plan), relinquished, exculpated, released, compromised, assigned, or transferred to a Purchaser in accordance with a Purchase Agreement, or settled in the Plan or a Final Order, the Reorganized Debtors and the Wind-Down Debtors expressly reserve all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Notwithstanding anything to the contrary in this Plan, in the Plan Supplement or in the Confirmation Order, the Debtors shall preserve and transfer and/or assign to the Litigation Trust, the Assigned Claims and the Assigned Insurance Rights and the right to commence, prosecute, or settle all Assigned Claims and Assigned Insurance Rights belonging to such Debtors or their Estates, subject to the occurrence of the Effective Date and the other terms and conditions set forth in this Plan; *provided*, that, subject to the terms and conditions of the Plan, (a) the Litigation Trust or GUC Sub-Trust(s) shall be the successor-in-interest to the Debtors' rights, title, and interest in any Assigned Claims and Assigned Insurance Rights, (b) the Litigation Trust or GUC Sub-Trust(s) as may be applicable, shall have exclusive standing to pursue the Assigned Claims and Assigned Insurance Rights, and (c) the Litigation Trustee or GUC Sub-Trust Trustee(s), pursuant to the Committee Settlement Documents, shall (i) retain and may exclusively enforce any and all Assigned Claims and Assigned Insurance Rights, and (ii) have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment all such Assigned Claims and Assigned Insurance Rights and to decline to do any of the foregoing in its discretion and without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. In pursuing any Assigned Claim or Assigned Insurance Right, the Litigation Trust or GUC Sub-Trust(s) shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which an Assigned Claim or Assigned Insurance Right may be bought under section 546 of the Bankruptcy Code. The Litigation Trust or GUC Sub-Trust(s) shall be entitled to recover on any Assigned Claims or Assigned Insurance Rights as a result of the Settlement of Opioid Claims described in Article IV.B of this Plan and/or any settlement or judgment with respect to the other Assigned Claims and no consent shall be necessary for the Litigation Trust or GUC Sub-Trust(s) to transfer such the proceeds of any such Assigned Claims or Assigned Insurance Rights once received from an insurer or other third-party. For the avoidance of doubt, the Litigation Trust or applicable GUC Sub-Trust shall be solely responsible for effectuating all distributions on account of the Litigation Trust Assets for General Unsecured Claims.

S.      *Private Company.*

In the event of a Plan Restructuring, the Reorganized Debtors shall not have any class of Equity Securities listed on a national securities exchange and shall make commercially reasonable efforts to take the steps necessary to be a private company without Securities Act or Exchange Act reporting obligations upon emergence or as soon as

reasonably practicable thereafter in accordance with and to the extent permitted by the Securities Act and the Exchange Act.

T.       *Additional Sale Transactions.*

Pursuant to the Bidding Procedures and Bidding Procedures Order, interested parties may submit a bid for some, all, or any portion of the Debtors' assets. If, in the Debtors' business judgment, and subject to the Bidding Procedures and the terms of the Bidding Procedures Order, the Debtors determine that one or more bids for all or a portion of the Debtors' assets offers higher or otherwise better terms to the Debtors' Estates, then the Debtors may conduct (a) in the event of a Plan Restructuring, Other Asset Sale(s) for those assets or (b) in the event of a Sale Transaction Restructuring, Alternative Sale Transaction(s) for those assets, with the consent of the Required Junior DIP Noteholders in the event of a Plan Restructuring or a Credit Bid Transaction. Such Other Asset Sale(s) or Alternative Sale Transaction(s), as applicable, would be consummated pursuant to section 363 of the Bankruptcy Code either pursuant to the Plan or separate Purchase Agreement(s) to be approved pursuant to separate Sale Order(s), and the treatment of proceeds from such Other Asset Sale(s) or Alternative Sale Transaction(s) shall be distributed pursuant to the Plan or separate Court order and in a manner consistent with the Final Financing Order. For the avoidance of doubt, pursuit of any Other Asset Sales shall not impact the Committee Settlement.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.       *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) have been previously assumed or rejected by the Debtors pursuant to the Assumption/Rejection Procedures Order or any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (4) are to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, through a Sale Order in connection with any sale transaction, including in a Sale Transaction Restructuring that is pending on the Confirmation Date; (5) are a contract, release, or other agreement or document entered into in connection with the Plan; or (6) are an Insurance Policy.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing of a motion or identification in the Plan Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code, as clarified by the Extension Order. To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement or similar schedule in connection with a Sale Order, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein or in the Confirmation Order or any Purchase Agreement to be approved pursuant to the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Notwithstanding anything herein to the contrary, with respect to any Unexpired Lease that is not

assumed on the Effective Date pursuant to this Article V.A, the effective date of rejection of such Unexpired Leases shall be the later of: (A) the Effective Date, except (1) in connection with a Court-Ordered Cure Cost pursuant to Article V.C or (2) if agreed by the applicable counterparty, and (B) the date upon which the Debtors notify the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable; *provided* that on the date the Debtors surrender the premises as set forth in subsection (B) above, all property remaining in the premises will be deemed abandoned free and clear of any interests, Liens, Claims, and encumbrances and landlords may dispose of such property without further notice or court order, unless otherwise agreed by the applicable lessor or pursuant to an order of the Bankruptcy Court. If the effective date of any rejection of an Unexpired Lease is after the Confirmation Date pursuant to the terms herein, the Reorganized Debtors shall provide notice of such rejection to the applicable landlord no later than the applicable deadlines set forth in section 365(d)(4), as clarified by the Extension Order, setting forth the deadline for Filing any Claims arising from such rejection, which notice shall also be served upon the GUC Equity Trustee and Litigation Trustee.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the rights of counterparties to Unexpired Leases of nonresidential real property to object to the continued possession of such leased property, including the ability to conduct GOB sales on the properties, or failure to comply with any other lease terms or obligations, including payment of rents and charges and insurance obligations, in each case related to such Unexpired Lease following entry of the Confirmation Order are expressly preserved, and the rights of such counterparties to request such objection be heard on shortened notice are preserved.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in, and be fully enforceable by the applicable Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties thereto, subject to this Article V.A. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the Debtors may amend or otherwise modify the Schedule of Assumed Executory Contracts and Unexpired Leases prior to the Effective Date to designate an Executory Contract previously included on the Schedule of Assumed Executory Contracts and Unexpired Leases for assumption and assignment. Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable.

Subject to any Sale Order, to the maximum extent permitted by law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (A) result in a violation, breach, or default under such Executory Contract or Unexpired Lease, (B) increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors under such Executory Contract or Unexpired Lease, or (C) result in the creation or imposition of a Lien upon any property or asset of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors pursuant to the applicable Executory Contract or Unexpired Lease, and to the extent any provision in any such Executory Contract or Unexpired Lease restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the transactions contemplated by the Plan, the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, and any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption thereof (subject to the other provisions of this Article V.A) shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, after the Confirmation Date, an Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases as of the Confirmation Date may not be rejected by the applicable Debtor(s), other than as provided for in the Plan, unless the applicable lessor has (x) consented to such rejection, (y) objected to the assumption of such Unexpired Lease and such objection remains outstanding, or (z) consented to an extension of the time period in which the applicable Debtor(s) must assume or reject such Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code (as extended with the applicable lessor's consent, the "Deferred Deadline"), in which case for purposes of clause (z) the applicable Debtor(s) shall have until the Deferred Deadline to assume or reject such Unexpired Lease, subject to the applicable lessor's right to object to such assumption or rejection. For any Unexpired Lease assumed pursuant to this paragraph, all Cure Costs

shall be paid on the Effective Date or as soon as reasonably practicable thereafter, unless subject to a dispute with respect to Cure Cost, such dispute shall be addressed in accordance with Article V.C.

Any guaranty of an Unexpired Lease that is assumed pursuant to this Plan, the Confirmation Order, or any other order of the Bankruptcy Court shall be reaffirmed by the applicable Reorganized Debtor and remain in full force and effect as of the Effective Date, unless otherwise agreed in writing by the Debtors and the applicable counterparty

Notwithstanding anything to the contrary in the Plan, in the event of a Sale Transaction Restructuring under Article IV.D of the Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement (i) the Schedule of Assumed Executory Contracts and Unexpired Leases and (ii) any schedule of Executory Contracts and Unexpired Leases that is attached to any Purchase Agreement(s), with the consent of the Purchaser, at any time up to the earlier of (x) 90 days following the closing date of a Sale Transaction Restructuring, and (y) solely with respect to Unexpired Leases of nonresidential real property, the deadline set forth in section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the consent of the applicable landlord counterparty, consistent with the Purchase Agreement, as applicable.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time shall be barred from asserting such Claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions on account of such Claims in these Chapter 11 Cases. The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims not timely filed;** *provided* **that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed**. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article IX of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to (i) use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, or any third party, and (ii) shall be authorized to assert a Claim for any and all damages arising from the abandonment of such property by filing a Claim in accordance with this Article V.B.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan on such terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that, if a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved. Any Cure Cost shall be deemed fully satisfied, released, and discharged upon payment of the Cure Cost.

Unless otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Cost must be Filed, served, and actually received by counsel to the Debtors no later than 14 days after the

service of notice of assumption on affected counterparties. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment and any untimely request for an additional or different Cure Cost shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by the applicable Reorganized Debtors or the Wind-Down Debtors, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

Any payment of Cure Costs by the Debtors or a Purchaser, as applicable, in connection with Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to a Sale Transaction Restructuring or an Other Asset Sale shall be satisfied in full by the Debtors or the Purchaser(s), as applicable, in accordance with the terms in the Purchase Agreement(s) and the Sale Order(s), as applicable (including the Assignment Procedures), including in the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Debtors, the Purchaser, or any assignee to provide "adequate assurance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption.

Except as otherwise set forth in any applicable Sale Order, if there is any dispute regarding any Cure Costs, the ability of the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure Costs shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Any such disputes shall be scheduled for hearing upon request of the affected counterparty or the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, at the earliest convenience of the Court; *provided* that no hearing will be scheduled on less than 10 days' notice to the affected counterparty, and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and that no such hearing shall be scheduled less than 30 days after the Effective Date unless agreed to between the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the affected counterparty. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, may reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely Filed objection) regarding any Cure Cost or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases (such greater amount, the "Court-Ordered Cure Cost"), the Debtors shall have the right to (a) satisfy the Court-Ordered Cure Cost as soon as reasonably practicable thereafter and assume such Executory Contract or Unexpired Lease in accordance with the terms herein or, (b) in the event the Court-Ordered Cure Cost is materially higher than the Allowed Cure Cost listed in the Schedule of Assumed Executory Contracts and Unexpired Leases, within 14 days of such determination, remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected on the later of (i) the date of entry of the Court-Ordered Cure Cost and, (ii) solely with respect to Unexpired Leases, the date upon which the Debtors notify the landlord in writing (email being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable, and in the case of rejection of an Unexpired Lease pursuant to the preceding clause (ii), the Debtors shall, pursuant to section 365(d)(4) of the Bankruptcy Code, immediately surrender the related premises to the lessor unless otherwise agreed with the applicable lessor or ordered by the Court, subject to the applicable counterparty's right to object to such rejection; *provided* that, after the deadline to assume an Executory Contract or Unexpired Lease set forth in section 365(d) of the Bankruptcy Code, as clarified by the Extension Order, an Executory Contract or Unexpired Lease may only be removed from the Schedule of Assumed Executory Contracts and Unexpired Leases if (1) the applicable counterparty consents to such rejection, (2) the applicable counterparty objected to the assumption or cure of such Executory Contract or Unexpired Lease and such objection remains outstanding, or (3) the court orders a Court-Ordered Cure Cost. Notwithstanding anything to the contrary herein, the Reorganized Debtors, the Wind-Down Debtors, and the applicable counterparty shall be entitled to the full benefits

of the Executory Contract or Unexpired Lease (including without limitation, any license thereunder) pending the resolution of any Cure Cost dispute.

The assumption of any Executory Contract or Unexpired Lease in connection with any Sale Transaction Restructuring, Plan Restructuring, or Other Asset Sale and the cure of defaults associated therewith in accordance with section 365(b) of the Bankruptcy Code, including the payment of any Cure Costs as adjudicated or agreed upon by the Debtors and the applicable Purchaser, shall result in the full release and satisfaction of any Cure Cost, Claims, or defaults, whether monetary or nonmonetary, including those arising from or triggered by the filing of these Chapter 11 Cases and provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, in each case at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption or (2) the effective date of such assumption without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court;** *provided, however,* **that nothing herein shall affect the allowance of Claims or any Cure Cost agreed to by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, in any written agreement amending or modifying any Executory Contract or Unexpired Lease prior to its assumption**. Notwithstanding anything in this Plan, the Purchase Agreement(s), the Sale Order(s), the Plan Supplement, or otherwise to the contrary, any non-Debtor party to any such Executory Contract or Unexpired Lease shall be entitled to receive, and nothing herein shall release or result in the satisfaction of such party's right to receive, payment in full of all Cure Costs and all amounts that have accrued or otherwise arisen as of the Effective Date (but are not in default as of the Effective Date) with respect to any Executory Contract or Unexpired Lease.

       D.       *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

       E.       *Insurance Policies.*

Notwithstanding anything to the contrary in the Plan, the Plan Supplement or the Confirmation Order:

Nothing in the Plan, the Plan Supplement or the Confirmation Order shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies. After the Effective Date, all directors, officers, managers, authorized agents or employees of the Debtors (or their Affiliates) who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Liability Insurance Policies for the full term of such policies, including but not limited to any extension of coverage after the end of such policy period if any extended reporting period has been purchased, in accordance with the terms thereof.

The Debtors shall maintain tail coverage for any current D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the current D&O Liability Insurance Policies. In addition to such tail coverage, the D&O Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

To the extent the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan, unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed such Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims under such Insurance Policies, and (ii) such Insurance Policies

and any agreements, documents, or instruments relating thereto, shall vest in the Reorganized Debtors or the Wind-Down Debtors, as applicable.

The Litigation Trust or GUC Sub-Trust(s) shall be responsible for monitoring and preserving the ability to maintain claims that are Assigned Claims or Assigned Insurance Rights against the Insurance Policies (except for (a) the Debtors' Unassigned Insurance Policies and (b) the Unassigned Insurance Rights), including the D&O Liability Insurance Policies. To the extent the Debtors are not the first named insured under any Insurance Policy and notwithstanding Confirmation of the Plan or the occurrence of the Effective Date (i) nothing herein shall constitute a rejection of such Insurance Policy, (ii) such Insurance Policy shall remain in full force and effect, and (iii) any and all rights of the Debtors under such Insurance Policy shall remain in full force and effect. For the avoidance of doubt, the dissolution of the Debtors or the Reorganized Debtors shall have no impact upon the rights of the Litigation Trust or GUC Sub-Trust(s) to assert the Assigned Insurance Rights or Assigned Claims.

After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, and the Litigation Trust, the GUC Sub-Trust(s), and any successor or assign of the Litigation Trust or the GUC Sub-Trust(s) shall not terminate the coverage under any D&O Liability Insurance Policies (including the "tail policy") in effect prior to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy in accordance with and subject in all respects to the terms and conditions of any applicable D&O Liability Insurance Policy, which shall not be altered, for the full term of such D&O Liability Insurance Policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

For the avoidance of doubt, nothing herein shall in any way impair the Litigation Trust's or GUC Sub-Trust's ability on and after the Effective Date to assert on behalf of the Debtors or Reorganized Debtors, as applicable, any Assigned Claims or any Assigned Insurance Rights, on account of such Assigned Claims or such Assigned Insurance Rights, which shall not be altered except as otherwise provided herein. Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement the Insurance Policies, with the reasonable consent and cooperation of the Litigation Trust or GUC Sub-Trust(s) and as the Debtors and the Litigation Trust or GUC Sub-Trust(s) deem necessary (except with respect to the Unassigned Insurance Policies, for which no consent is required).

F.      *Indemnification Provisions.*

Except as otherwise provided herein, all Indemnification Provisions currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of each of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of the Debtors than the Indemnification Provisions in place prior to the Effective Date. For the avoidance of doubt, however, any Indemnification Provisions for any Excluded Party shall not be Reinstated. The Reorganized Debtors instead shall provide indemnification to any Excluded Party who is a past or present director or officer of the Debtors for acts, omission, or events that took place prior to the Effective Date, however such indemnification shall be expressly excess of and net of any insurance coverage available to such Excluded Party, including but not limited being expressly excess of any insurance coverage available under D&O Liability Insurance Policies (the "Excluded Party Indemnification"). With the exception of it applying expressly excess of and net of any insurance coverage, the Excluded Party Indemnification shall be on terms no less favorable to such Excluded Party than the Indemnification Provisions in place prior to the Effective Date.

G.      *Employee and Retiree Benefits.*

Except as otherwise provided in this Article V.G, all compensation and benefits programs shall be assumed by the Reorganized Debtors, and the Reorganized Debtors shall continue the compensation and benefits programs according to existing terms and practices. For the avoidance of doubt, pursuant to section 1129(a)(13) of the

Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. Notwithstanding anything to the contrary herein or in the Plan Supplement, with respect to all existing employment agreements of the Debtors' executives, such agreements shall be (i) assumed on the Effective Date, (ii) replaced with new employment agreements on terms mutually acceptable to the Debtors and the Required Junior DIP Noteholders; *provided* that the Debtors and the Required Junior DIP Noteholders shall, promptly following the filing of this Plan, commence negotiations in good faith regarding the terms of any such new employment agreements, if any, or (iii) rejected, in each case of clause (i), (ii), and (iii), with the consent of the Required Junior DIP Noteholders, or (iv) deemed rejected solely to the extent the Debtors and the Required Junior DIP Noteholders disagree on the assumption (or terms thereof) or rejection of an existing employment agreement and such dispute is not resolved among the Debtors and Required Junior DIP Noteholders within a reasonable period of time (not to exceed five (5) Business Days from the date upon which such dispute arose).

H.    *Collective Bargaining Agreements*

For the avoidance of doubt, the collective bargaining agreements ("CBAs") between labor unions and various Debtors may only be rejected pursuant to and in accordance with the procedures and standards set forth in section 1113 of the Bankruptcy Code; *provided* that the Debtors shall assume the Pension Plan as well as all CBAs and union contracts.

The cure amounts, if any, related to the assumption of the CBAs shall be satisfied in full by payment by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course, of all the Debtors' or the Reorganized Debtors' obligations under the assumed CBA(s), as applicable, arising under the CBAs to the extent such obligations are valid and payable. As a result, if the CBAs are assumed, no Proof of Claim, request for administrative expense, or cure claim need be Filed with respect to such cure amounts, provided, however, that the Debtors' and the Reorganized Debtors' rights, defenses, claims, and counterclaims with respect to any such obligations are expressly preserved.

I.    *Pension Plans.*

On the Effective Date, the Reorganized Debtors shall, in the ordinary course of their business and in accordance with applicable non-bankruptcy law, (i) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083; (ii) pay all required premiums, if any, owed to PBGC under 29 U.S.C. §§ 1306 and 1307, for the Pension Plan under ERISA or the Internal Revenue Code ("IRC"); and (iii) administer the Pension Plan in accordance with the applicable provisions of ERISA and the IRC, and the Reorganized Debtors reserve their rights thereunder. Further, PBGC and the Debtors agree that all Proofs of Claim Filed by PBGC are deemed withdrawn on the Effective Date.

Nothing in the Disclosure Statement, the Plan, the Confirmation Order, or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plan for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plan, subject to any and all applicable rights and defenses of such parties, which are expressly preserved. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document Filed in the Chapter 11 Cases. For the avoidance of doubt, the Reorganized Debtors shall not be released from any liability or obligation under ERISA, the IRC, and any other applicable law relating to the Pension Plan.

J.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, a Sale Order, or the Purchase Agreement(s), each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including easements, reciprocal easement agreements, construction operating and reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests,

unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

K.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan or a Sale Order. Following the expiration of the Designation Rights Period, as applicable, the Debtors may not subsequently reject any Unexpired Lease previously designated as assumed or assumed and assigned and may not assume or assume and assign an Unexpired Lease previously designated as rejected on the Schedule of Assumed Executory Contracts and Unexpired Leases absent the consent of the applicable lessor or order of the Bankruptcy Court. A final and timely designation with respect to all Unexpired Leases of nonresidential real property will be made in accordance with <u>Article V.A</u> of this Plan.

L.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4)(B)(ii) of the Bankruptcy Code.

M.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor (but excluding any contracts or leases assigned to a Purchaser in accordance with a Purchase Agreement and approved by the applicable Sale Order), will be performed by the applicable Debtor or, after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases but excluding any Executory Contracts or Unexpired Leases that have been rejected as of the date of entry of the Confirmation Order) will survive and remain unaffected by entry of the Confirmation Order.

N.      *Sale Order Assignment Procedures.*

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of a Sale Order or the Assignment Procedures attached thereto, in the event of a Sale Transaction Restructuring or an Other Asset Sale.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter, (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter) each Holder

of an Allowed Claim or Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article IX hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI; *provided, however*, and notwithstanding anything to the contrary in the Plan, including in this Article VI, the Plan Supplement, or the Confirmation Order, that the GUC Equity Pool shall be contributed to the GUC Equity Trust and the GUC Equity Trust Interests shall be distributed in accordance with the GUC Equity Trust Agreement, subject to the terms of the UCC / TCC Recovery Allocation Agreement.

B.      *Distributions on Account of Obligations of Multiple Debtors.*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan, *provided* that Claims held by a single Entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor.  Any such Claims shall be released pursuant to Article X of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

C.      *Distributions Generally.*

Except as otherwise provided herein, distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors, or the Wind-Down Debtors, as applicable; *provided, however*, that the costs and expenses associated with the Litigation Trust, any GUC Sub-Trust, and the GUC Equity Trust shall be the responsibility of the applicable trust, as and to the extent agreed in the Committee Settlement.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, the GUC Equity Trust Documents, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

Notwithstanding any provision of the Plan to the contrary, distributions to Holders of DIP Claims shall be made to or at the direction of the applicable DIP Agent and distributions to Holders of ABL Facility Claims and FILO Term Loan Facility Claims shall be made to or at the direction of the Prepetition Agent, as applicable, each of which shall act as Disbursing Agent for distributions to the respective Holders of ABL Facility Claims and FILO Term Loan Facility Claims, as applicable, in each case, at the sole expense of the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable.  The Prepetition Agent shall arrange to deliver such distributions to or on behalf of such Holders of ABL Facility Claims and FILO Term Loan Facility Claims.  Notwithstanding any

provision of the Plan to the contrary, distributions to Holders of Junior DIP Claims shall be made to or at the direction of the Junior DIP Trustee, which shall act as Disbursing Agent for distributions to the Holders of Junior DIP Claims at the sole expense of the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable. The Trustees may establish their own record dates for distribution in accordance with the Plan and each applicable indenture, and shall, to the extent possible, transfer or direct the transfer of such distributions through the facilities of DTC, as set forth in the following paragraph. The Trustees shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall use commercially reasonable efforts to (i) seek the cooperation of DTC with respect to effectuating distributions and the cancellation of the Notes as of the Effective Date, and (ii) seek the cooperation of the relevant bank and broker participants in the DTC system to facilitate delivery of the distribution directly to the relevant beneficial owners as soon as practicable after the Effective Date. None of the DIP Agent, the Junior DIP Trustee, the Prepetition Agent, the Trustees shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

Notwithstanding any provision of the Plan to the contrary, distributions to Holders of Senior Secured Notes Claims shall be made to or at the direction of the Senior Secured Notes Trustees and distributions to Holders of Unsecured Notes Claims shall be made to or at the direction of the Unsecured Notes Trustees, each of which shall act as Disbursing Agent for distributions to the respective Holders of Senior Secured Notes Claims and Unsecured Notes Claims, as applicable, in each case, at the sole expense of the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable. The Senior Secured Notes Trustees and the Unsecured Notes Trustees, as applicable, shall arrange to deliver such distributions to or on behalf of such Holders of Senior Secured Notes Claims and Unsecured Notes Claims, subject in all respects to any rights of the Senior Secured Notes Trustees to assert their respective charging Liens as set forth in the Senior Secured Notes Indentures. The Senior Secured Notes Trustees and the Unsecured Notes Trustees, as applicable, may, but are not required to, establish their own record date for distribution and shall transfer or direct the transfer of such distributions through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), to the extent possible. All distributions to be made to Holders of Senior Secured Notes Claims and Unsecured Notes Claims through DTC and as provided for under the applicable indenture shall be made eligible for distribution through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Senior Secured Notes Trustees or the Unsecured Notes Trustees be responsible for making, or be required to make, any distribution under the Plan to Holders of Allowed Senior Secured Notes Claims or Unsecured Notes Claims if such distribution is not eligible to be distributed through the facilities of DTC.

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ Professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors, or from the Wind-Down Reserve, as applicable.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Delivery of Distributions.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such Holder as indicated on the

Debtors' books and records or the register or related document maintained by, as applicable, the DIP Agents or the Junior DIP Trustee as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the reasonable discretion of the Disbursing Agent; *provided further* that the address for each Holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Interest Filed by such Holder, or, if no Proof of Claim or Interest has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

2.　　Minimum Distributions.

No fractional interests in New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of New Common Stock that is not a whole number, the actual distribution of New Common Stock shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.  For distribution purposes (including rounding), DTC will be treated as a single Holder.

No Cash payment of less than $100.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

3.　　Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of twelve months from the Effective Date.  After such date, in the event of a Sale Transaction Restructuring, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be released and forever barred.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

A distribution shall be deemed unclaimed if a Holder has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors or the Wind-Down Debtors, as applicable, of an intent to accept a particular distribution; (c) responded to the Debtors', Reorganized Debtors' or Wind-Down Debtors' requests, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

E.　　*Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

F.    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating any portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

G.    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

H.    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Petition Date.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this <u>Article VI</u>.

I.    *Setoffs and Recoupment.*

Except as expressly provided in this Plan, the Wind-Down Debtors may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any and all claims, rights, and Causes of Action that such Debtor or its successor may possess against the applicable Holder.

*J.*     *Claims Paid or Payable by Third Parties.*

1.     Claims Paid by Third Parties.

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor or Wind-Down Debtor, such Holder shall be barred from asserting such Claim against the Debtors and precluded from voting on any plans of reorganization Filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases. The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims Filed with respect to an Executory Contract or Unexpired Lease that received payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or a Wind-Down Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or a Wind-Down Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor or Wind-Down Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

2.     Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove the applicable portion of such Claim.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, and GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

3.     Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Notwithstanding anything herein to the contrary (including, without limitation, Article X, but except as provided in Article IV.B), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

Any and all distributions to be made to Holders of General Unsecured Claims shall be governed and made in accordance with the Litigation Trust Agreement, the UCC / TCC Recovery Allocation Agreement, the GUC Equity Trust Documents, and the GUC Sub-Trust Documents, as applicable, and shall not be subject to this Article VI.

K.    *Co-Defendant Defensive Rights*

Notwithstanding anything to the contrary in the Plan as it currently exists or as it may be further amended, the Plan Supplement (or the Plan Supplement as further amended), or the Confirmation Order or any other order entered in connection with the Plan or the Chapter 11 Cases, nothing contained in the Plan or any of the foregoing documents or orders (including, without limitation, the classification, treatment, allowance, disallowance, release, bar, injunction, Controlled Substance Injunction, or any other provision of the Plan with respect to, impacting, affecting, modifying, limiting, subordinating, or impairing, in any respect, a Co-Defendant Claim), nothing will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim or of any Co-Defendant as such rights exist or might in the future exist under applicable non-bankruptcy law.  Nothing in the Plan, any of the Definitive Documents or in the Confirmation Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim or of any Co-Defendant from asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable law.  Nothing in the Plan, any of the Definitive Documents, or the Confirmation Order shall be deemed to waive any Co-Defendant Defensive Rights, and further, except as provided above, nothing in the Chapter 11 Cases, the Plan, any of the Definitive Documents or the Confirmation Order may be used as evidence of any determination regarding any Co-Defendant Defensive Rights, and, under no circumstances shall any Entity be permitted to assert issue preclusion or claim preclusion, waiver, estoppel, or consent in response to the assertion of any Co-Defendant Defensive Rights.  This Article VI.K shall be included in the Confirmation Order.  For the avoidance of doubt, any assignment of claims or Causes of Action of the Debtors or their Estates, including any Assigned Claims or Assigned Insurance Rights, pursuant to this Plan shall be subject to the Co-Defendant Defensive Rights.  The Co-Defendant Defensive Rights (i) may be used to offset, set off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise to defend against any Cause of Action or Claim brought by any Entity against the Holder of any Co-Defendant Claim or any Co-Defendant based in whole or in part on Opioid-Related Activities; and (ii) shall in no case be used to seek any affirmative monetary recovery from any Protected Party or any asset of any Protected Party (including from any applicable Insurance Policy of a Protected Party) on account of any Claim or Cause of Action released pursuant to Article X or on account of any Claim against the Debtors.

## ARTICLE VII
## THE PLAN ADMINISTRATOR

This Article VII shall apply to a Sale Transaction Restructuring.

A.    *The Plan Administrator.*

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the amounts set forth in the Administrative / Priority Claims Reserve and the Wind-Down Reserve in accordance with the Plan, and wind-down the business and affairs of the Debtors and Wind-Down Debtors, including (all without further order of the Bankruptcy Court):  (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors, the Administrative / Priority Claims Reserve, and the Wind-Down Reserve; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Administrative / Priority Claims Reserve and the Wind-Down Reserve; (3) making distributions from the Administrative / Priority Claims Reserve and the Wind-Down Reserve as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) complying with the Debtors' continuing obligations under a Sale Order and Purchase Agreement; and (10) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court

or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Purchasers, the Wind-Down Debtors, and the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be chosen by the Purchasers, with the consent of the Debtors (and the Required Junior DIP Noteholders, not to be unreasonably withheld). Upon any other vacancy of the Plan Administrator, a permanent or interim successor Plan Administrator shall be chosen by the Wind-Down Debtors. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

1.    Plan Administrator Rights and Powers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Reserve, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

2.    Retention of Professionals.

The Plan Administrator shall have the right, subject to the Wind-Down Reserve, to retain the services of attorneys, accountants, and other Professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such Professionals shall be paid by the Wind-Down Debtors from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator to the extent set forth in the Wind-Down Reserve. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

3.    Compensation of the Plan Administrator.

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

4.    Plan Administrator Expenses.

All costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the Wind-Down Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Wind-Down Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget. Such costs, expenses and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

B.        *Wind-Down.*

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (1) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Plan, Confirmation Order, the Purchase Agreement(s), the Sale Order, and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to Wind-Down Debtors as set forth herein, the Debtors (a) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (b) shall be deemed to have canceled pursuant to this Plan all Interests, and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

C.        *Exculpation, Indemnification, Insurance & Liability Limitation.*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

D.        *Tax Returns.*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

## ARTICLE VIII
## RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR

This Article V.III shall apply to a Sale Transaction Restructuring.

A.    *Establishment of Reserve Accounts.*

The Plan Administrator shall establish each of the Administrative / Priority Claims Reserve and the Wind-Down Reserve (which may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator). The Wind-Down Reserve shall be funded in the amount set forth in the Wind-Down Budget.

B.    *Undeliverable Distribution Reserve.*

1.    Deposits.

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VIII.B.2 of this Plan.

2.    Forfeiture.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed distribution within twelve months after the first distribution is made to such Holder shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Wind-Down Debtors, or their respective properties or assets. In such cases, any Cash or other property held by the Wind-Down Debtors in the Undeliverable Distribution Reserve for distribution on account of such Claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Wind-Down Debtors, notwithstanding any federal or state escheat laws to the contrary, and shall promptly be transferred to the Wind-Down Reserve to be distributed according to the priority set forth in Article VIII.C without any further action or order of the Court.

3.    Disclaimer.

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder; *provided* that in his or her sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

4.    Distribution from Reserve.

Within 15 Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution (provided that satisfaction occurs within the time limits set forth in Article VIII.B of this Plan), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim.

C.    *Wind-Down Reserve.*

On the Effective Date, the Wind-Down Debtors shall establish the Wind-Down Reserve by depositing Cash, in the amount set forth in the Wind-Down Budget into the Wind-Down Reserve. The Wind-Down Reserve shall be used by the Wind-Down Debtors solely to satisfy the expenses of the Wind-Down Debtors and the Plan Administrator as set forth in the Plan and Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents of the Wind-Down Debtors (and excluding, for the avoidance of doubt, records and documents related to any Acquired Assets or Assumed Liabilities) shall constitute expenses of the Wind-Down Debtors and shall be paid from the Wind-Down Reserve to the extent set forth in the Wind-Down Budget. Any amount remaining in the Wind-Down Reserve after the

dissolution of the Wind-Down Debtors shall be distributed pursuant to the Waterfall Recovery. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

      D.     *Administrative / Priority Claims Reserve.*

      On the Effective Date, the Wind-Down Debtors shall establish the Administrative / Priority Claims Reserve by depositing Cash in the amount of the Administrative / Priority Claims Reserve Amount into the Administrative / Priority Claims Reserve (and the Plan Administrator shall deposit Cash into or withdraw Cash from the Administrative / Priority Claims Reserve if the Administrative / Priority Claims Reserve Amount changes at any time). The Administrative / Priority Claims Reserve Amount shall be used to pay Holders of all Allowed Priority Claims, Allowed Other Priority Claims, Allowed Administrative Claims (other than Professional Fee Claims, DIP Claims, or Junior DIP Claims), Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims in full; *provided, however*, for the avoidance of doubt, that, in the event of a Sale Transaction Restructuring, any such Allowed Priority Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims that are Assumed Liabilities shall be satisfied under the Purchase Agreement(s) and shall not be satisfied from the Administrative / Priority Claims Reserve.

      If all or any portion of any such Claim shall become a Claim that is not Allowed, then the amount on deposit in the Administrative / Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Administrative / Priority Claims Reserve, shall remain in the Administrative / Priority Claims Reserve to the extent that the Wind-Down Debtors determine necessary to ensure that the Cash remaining in the Administrative / Priority Claims Reserve is sufficient to ensure that all Allowed Priority Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims (that are not Assumed Liabilities) will be paid in accordance with the Plan without any further action or order of the Court. Any amounts remaining in the Administrative / Priority Claims Reserve after payment of all Allowed Priority Claims, Allowed Administrative Claims, Allowed Other Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the Wind-Down Reserve until such time the Wind-Down Debtors are dissolved in accordance with the provisions herein.

## ARTICLE IX
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

      A.     *Disputed Claims Process*

      The Debtors, the Reorganized Debtors, or the Wind-Down Debtors (as applicable), and the Litigation Trust (solely with respect to General Unsecured Claims within the purview of the Litigation Trust), or GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (ii) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of: (a) the Effective Date or (b) the applicable Claims Bar Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, Reorganized Debtor, Wind-Down Debtor, or GUC Equity Trust, as applicable, without the need for any objection by the Debtor, Reorganized Debtor, Wind-Down Debtor, or GUC Equity Trust, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, and notwithstanding anything in this Article IX to the contrary, the Litigation Trust (with respect to General Unsecured Claims) or GUC Sub-Trust (with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims. The Debtors and Reorganized Debtors shall allow, disallow and reconcile General Unsecured Claims that are not Tort Claims; *provided, however*, that the extent that the Litigation Trust or any GUC Sub-Trust establishes a convenience class for General Unsecured Claims that are not Tort Claims, claims in such convenience class will be allowed, disallowed or otherwise resolved by the Litigation Trust or any GUC Sub-Trust. Any distributions on account of General

Unsecured Claims will be made by the Litigation Trust or any GUC Sub-Trust, and not by the Debtors or the Reorganized Debtors.

        *B.*       *Allowance of Claims.*

After the Effective Date, subject to <u>Article IV.R</u>, the Reorganized Debtors, the Litigation Trust (solely with respect to General Unsecured Claims within the purview of the Litigation Trust), the GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust), or the Wind-Down Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date except for such rights and defenses assigned or transferred to the Senior Secured Noteholders or their Designee(s) in accordance with the Plan, in the event of a Plan Restructuring, or in accordance with the Purchase Agreement(s) in the event of a Credit Bid Transaction (which, for the avoidance of doubt, shall include all rights and defenses of the Debtors with respect to any Claims that constitute Assumed Liabilities (as defined in the Purchase Agreement), which the Purchaser shall have and retain).

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or pursuant to the Litigation Trust Documents or a Final Order is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

For the avoidance of doubt, except as otherwise provided in <u>Article IX.A</u>, the Litigation Trust (with respect to General Unsecured Claims) or GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

        *C.*       *Estimation of Claims.*

Before or after the Effective Date, the Debtors, the Reorganized Debtors, the Litigation Trust, or the Wind-Down Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor, Reorganized Debtor, Wind-Down Debtor, or Litigation Trust (solely with respect to General Unsecured Claims), as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 14 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.  For the avoidance of doubt, this <u>Article IX.C</u> shall not apply with respect to Tort Claims, which may be estimated and Allowed in the applicable amounts pursuant to the applicable Litigation Trust Documents and the other Committee Settlement Documents and subject to <u>Article IV.B</u>, or as otherwise set forth herein, and shall not be subject to estimation by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.

        *D.*       *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan),

may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors, the Litigation Trust (solely with respect to General Unsecured Claims) or the Wind-Down Debtors, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim against or Interest in the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Reorganized Debtors, the Litigation Trust (solely with respect to General Unsecured Claims) or the Wind-Down Debtors, as applicable, without the applicable Reorganized Debtor or the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) or GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

E.    *Time to File Objections to Claims.*

Any objections to Claims shall be Filed by the Debtors, the Reorganized Debtors, the Wind-Down Debtors, the Litigation Trust, as applicable, on or before the Claims Objection Deadline, as such deadline may be extended from time to time. For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

F.    *Disallowance of Claims or Interests.*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or the Wind-Down Debtors, as applicable. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Subject to the terms of the Bar Date Order (or, solely with respect to the United States, the consent order entered at Docket No. 2897), if a Proof of Claim is not received by the Claims and Noticing Agent on or before the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, the Holder of the underlying Claim shall be barred from asserting such Claim against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases. Subject to the terms of the Bar Date Order, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any claims not received by the Claims and Noticing Agent before the Claims Bar Date or the Administrative Claims Bar Date, as applicable; *provided* that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed; *provided, further*, that governmental Entities, including states, local governments and municipalities or native American tribes shall not be required to File Proofs of Claim related to any Tort Claims and the Allowance or Disallowance of Tort Claims held by those Entities shall be governed in all respects by the applicable Litigation Trust Documents.**

For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) or GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

G.    *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Disputed Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Interest; *provided* that if the Allowed amount of a Claim or Interest is Disputed, but not the existence or nature of such Claim, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.  For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

H.    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.  For the avoidance of doubt, and notwithstanding anything in this <u>Article IX</u> to the contrary, the Litigation Trust (with respect to General Unsecured Claims) GUC Sub-Trust (solely with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

I.    *Tax Treatment of Reserves for Disputed Claims.*

After the Effective Date, Cash may be distributed to Holders of Claims ultimately determined to be Allowed after the Effective Date (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under <u>Article III</u> hereof.  Pending the resolution of such Claims, a portion of the Cash to be received by Holders of such Claims may be held back and deposited into the Wind-Down Reserve as described further in <u>Article IV.I.2</u>, and to the extent that any property is deposited into such a reserve, the reserve is expected to be subject to "disputed ownership fund" treatment under section 1.468B-9 of the United States Treasury Regulations.

J.    *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; *provided* that interest on any Disputed Priority Tax Claim that (i) becomes an Allowed Priority Tax Claim and (ii) is treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code shall accrue and be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

K.    *Amendments to Claims.*

Except as otherwise expressly provided for in the Plan or the Confirmation Order, on or after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, a Claim may not be Filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, the Litigation Trust, as applicable (solely with respect to General Unsecured Claims) or a GUC Sub-Trust (solely with respect to General Unsecured Claims within

the purview of such GUC Sub-Trust), or the Wind-Down Debtors, as applicable. Absent such authorization, any new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law. For the avoidance of doubt, and notwithstanding anything in this Article IX to the contrary, the Litigation Trust (GUC Sub-Trust with respect to General Unsecured Claims within the purview of such GUC Sub-Trust) shall have exclusive authority to allow, disallow, or otherwise resolve Tort Claims.

## ARTICLE X
### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Settlement, Compromise, and Release of Claims and Interests.*

The assets of the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, are being and shall be used for the satisfaction of expense obligations and/or the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose. Except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, compromise, and release, effective as of the Effective Date, of Claims, including General Unsecured Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors or the Wind-Down Debtors, as applicable), Interests, controversies, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date (including any Causes of Action or Claims based on theories or allegations of successor liability), any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Chapter 11 Cases, that occurred prior to the Effective Date, other than as expressly provided in the Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan. The Confirmation Order shall be a judicial determination of the settlement, discharge, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.

Notwithstanding anything herein to the contrary, and for the avoidance of doubt, the Debtors, and/or the Wind-Down Debtors, as applicable, shall not be released from liability for any Tort Claims; *provided*, *however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.

### B. Release of Liens.

On the Effective Date, concurrently with the Consummation of the Restructuring Transaction and except as otherwise set forth in the Purchase Agreement, as applicable, the Retail Acquired Assets shall be transferred to and vest in New Rite Aid free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Purchase Agreement(s), each as applicable. Without limiting the foregoing, except as otherwise provided in the Purchase Agreement(s), the Plan, the Plan Supplement, the Exit Facilities Documents, the Exit 1.5 Lien Notes Documents, the Takeback Notes Documents, the AHG Notes Documentation, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with <u>Article III</u> hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. Notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims and the Junior DIP Claims shall not be released and such Liens shall remain in full force and effect until the DIP Claims and the Junior DIP Claims are paid in full in Cash or otherwise treated in a manner consistent with <u>Article II.E</u> of the Plan, respectively.

### C. Debtor Release.

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates and, if applicable, the Wind-Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, or through, for, or because of, the foregoing Entities, from any and all claims and Causes of Action, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, and the Wind-Down Debtors (if applicable), whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, and the Wind-Down Debtors (if applicable), or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Restructuring Transactions, their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another

Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the pursuit of the Restructuring Transaction, the Committee Settlement, the Committee Settlement Documents, the UCC / TCC Recovery Allocation Agreement, the AHG New-Money Commitment Agreement, the MedImpact Term Loan Sales Process, the administration and implementation of the Plan equitization (if applicable) or the Wind-Down (if applicable), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, in all cases upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  For the avoidance of doubt, nothing contained in this Plan, including this Article X.C, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights or Tort Claims Insurance Proceeds and no Assigned Claims against any Excluded Parties shall be released; *provided, further*, that nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, any Assigned Claim against any Excluded Parties or any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article X .C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.C is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good-faith settlement and compromise of the claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors or their respective Estates or, if applicable, the Reorganized Debtors or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary herein or in the Confirmation Order, consistent with the McKesson Settlement Documents, with the exception of (i) the Debtors' and Reorganized Debtors' obligations to McKesson under the Plan, (ii) McKesson and the Debtors' and Reorganized Debtors' ongoing business relationships, including under the Interim Agreement (as defined in the McKesson New Contract) and the McKesson New Contract, and (iii) McKesson's right to assert its Co-Defendant Defensive Rights as set forth in Article VI.K and in the Confirmation Order, the Debtors and the Reorganized Debtors (and each of the Debtors' and the Reorganized Debtors' Related Parties), on the one hand, and McKesson and McKesson's Related Parties, on the other hand, shall exchange full and complete mutual releases, as set forth in the McKesson Settlement Documents, the Plan and Confirmation Order.  For the avoidance of doubt, (A) McKesson is not an Excluded Party, (B) Assigned Claims shall not include any claims or Causes of Action against McKesson, *provided*, that, for the avoidance of doubt, Assigned Claims shall include the Debtors' Pass Through Rights, including any Pass Through Rights as provided in any agreement between Rite Aid and McKesson, and (C) Assigned Insurance Rights shall not include insurance rights under any Insurance Policy issued to McKesson under which any Debtor is designated as an additional insured party.

D.      *Third-Party Release.*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law, equity, contract, tort, or arising under federal or state statutory or common law, or any other

applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the pursuit of the Restructuring Transaction, the Committee Settlement, the Committee Settlement Documents, the UCC / TCC Recovery Allocation Agreement, the AHG New-Money Commitment Agreement, the MedImpact Term Loan Sales Process, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the administration and implementation of the Plan Restructuring (if applicable) and the Wind-Down (if applicable), in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided, that,* notwithstanding anything in this Plan, the Plan Supplement or the Confirmation Order to the contrary, the Debtors and/or the Wind-Down Debtors, as applicable, shall not be released from liability for any Tort Claims; *provided, however,* that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets, and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.  For the avoidance of doubt, nothing contained in this Plan, including this Article X.D, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights, or Tort Claims Insurance Proceeds and no Assigned Claims against any Excluded Parties shall be released; *provided, further,* that nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, Assigned Claims against any Excluded Parties or any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article X.D, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.D is:  (i) consensual; (ii) given in exchange for the good and valuable consideration provided by the Released Parties; (iii) a good-faith settlement and compromise of such claims and Causes of Action; (iv) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; (vii) a sound exercise of the Debtors' business judgment; and (viii) a bar to any of the Releasing Parties or the Debtors or their respective Estates or, if applicable, the Reorganized Debtors or the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt in to the releases contained in this Article X.D in accordance with this Plan and exercises such opt in may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Reorganized Debtors.  From and after the Effective Date, any Entity that did not opt in to (or otherwise did not participate in) the releases contained in this Article X.D in accordance with this Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator.  The Bankruptcy Court

will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.[9] Notwithstanding anything herein to the contrary, and for the avoidance of doubt, the Debtors shall not be released from liability for any Tort Claims; *provided, however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors or the Wind-Down Debtors, and no Person, Entity, or other party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets and the GUC Equity Pool, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability. For the avoidance of doubt, and notwithstanding the foregoing, no Holder of a General Unsecured Claim, including a Tort Claim that does not opt-in to the Third-Party Release shall be a Releasing Party or shall otherwise be deemed to grant the Third-Party Release.

For the avoidance of doubt and notwithstanding anything to the contrary herein, in the Plan Supplement, the Confirmation Order or otherwise, any recovery on behalf of claims or Causes of Action (if any) contributed to the Litigation Trust or a GUC Sub-Trust against any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with this Plan (including those not included in the definition of Debtor Related Parties) shall be expressly limited to proceeds of the applicable Insurance Policies, and no Person, Entity, or otherwise shall attempt to collect on assets of any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with the provisions of this Plan (including those not included in the definition of Debtor Related Parties), except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability, and all such directors and officers shall have the full protections of any existing D&O Liability Insurance Policies.

E.      Exculpation.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or Causes of Action in each case arising out of or related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided, however*, that no Person or Entity that is not an Exculpated Party shall be entitled to rely on the exculpation provided for in this Article X.E, including by asserting this Article X.E as a defense or the basis for a claim or Cause of Action in its own name (whether directly or derivatively, and, whether or not in the capacity as a subrogee, assignee, or successor to an Exculpated Party, except to the extent that such

---

[9]     The Solicitation Materials will not include a form or mechanism for Holders of Claims or Interests to Opt-In of the Third-Party Release. Solicitation of Opt-In Elections will occur after Confirmation of the Plan, pursuant to the Confirmation Order or separate Court order and will not occur pursuant to the Solicitation Materials; provided, that for the avoidance of doubt, such solicitation will be completed prior to the Effective Date of the Plan. The forms for the Opt-In Election will be incorporated in the Plan Supplement with an opportunity for parties to object to such forms prior to such forms being issued, and following either the resolution of any objections or the expiration of the objection period, such forms will be deemed approved.

relation renders such Person or Entity an Exculpated Party in its own right). For the avoidance of doubt, nothing contained in this Plan, including this Article X.E, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights, or Tort Claims Insurance Proceeds and no Excluded Party shall be exculpated for any Assigned Claims; *provided, further*, that nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, Claims or Causes of Action against any Excluded Parties or any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

For the avoidance of doubt, the Committees, each of their members, and the advisors to the Committees' and their members shall be Exculpated Parties and shall be exculpated for any Claims or Causes of Action associated with the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Committee Settlement (including the Settlement of Opioid Claims), the UCC / TCC Recovery Allocation Agreement, or any of the Committee Settlement Documents.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The exculpation will be in addition to, and not a limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan (including any Purchase Agreement and any documents in connection therewith).

Solely with respect to the exculpation provisions, notwithstanding anything to the contrary in the Plan, the 1125(e) Covered Parties shall not incur liability for any Claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, or the negotiations thereof. No Entity or Person may commence or pursue a Claim or Cause of Action against any of the 1125(e) Covered Parties that is subject to the terms of this paragraph, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim or Cause of Action for actual fraud, gross negligence, or willful misconduct against any such 1125(e) Covered Party and such party is not exculpated pursuant to this provision; and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such 1125(e) Covered Party. The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

F.      *Injunction.*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except with respect to Co-Defendant Defensive Rights set forth in Article VI.K, as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article X.C of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or

another provision of the Plan (including the release of Liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust, the Litigation Trust, the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.  For the avoidance of doubt, nothing contained in this Plan, including this Article X.F, shall release, compromise, impair, or in any way affect any Assigned Claims or Co-Defendant Defensive Rights set forth in Article VI.K.  This Article X.F shall not apply to Tort Claims, which shall be subject to Article X.G of the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust (with respect to General Unsecured Claims), the Litigation Trust (with respect to General Unsecured Claims), the Exculpated Parties, or the Released Parties, as applicable, that relates to or arises out of a Claim or Cause of Action subject to Article X.C, Article X.D, or Article X.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Debtor (or their Affiliates), Reorganized Debtor (or their Affiliates), Wind-Down Debtor (or their Affiliates), GUC Equity Trust, Litigation Trust, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F of the Plan.

For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as provided for in Article VI.K of this Plan or otherwise specifically provided in the Plan and Sale Order or Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors (or their Affiliates), the Estates, the Purchaser, or, if applicable, the Reorganized Debtors (or their Affiliates) or the Wind-Down Debtors (or their Affiliates), except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Reorganized Debtors or the Wind-Down Debtors, as applicable, or otherwise contemplated under the Sale Order.  Such injunction will not enjoin Persons, Entities, or Holders of Claims that do not consent to or otherwise are not subject to the Third-Party Release from pursuing any direct (but not derivative) claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Purchaser, the Reorganized Debtors (if applicable), or the Wind-Down Debtors (if applicable).

Solely with respect to Unassigned Insurance Policies, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit (i) claimants with valid workers' compensation claims or direct action claims against insurance companies under applicable non-bankruptcy law to proceed with

their claims, (ii) insurance companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) worker's compensation claims, (B) claims where the claimant asserts a direct action claim against an insurance company under applicable non-bankruptcy law, or an order as been entered by this Bankruptcy Court granting a claimant relief from the stay or the injunction set forth in the Plan to proceed with its claims, and (C) all costs in relation to each of the foregoing, and (iii) the Chubb Companies (as defined in the Confirmation Order) to draw on or against, use and/or apply all of the collateral and security provided by or on behalf of the Debtors (and the, Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, or the Wind-Down Debtors, as applicable) in accordance with and pursuant to the Chubb Insurance Program (as defined in the Confirmation Order).

    G.    *Channeling Injunction.*

    1.    <u>Terms.</u>

Pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons or Entities that have held or asserted or that hold or assert any Tort Claim shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of, on or with respect to any Tort Claim from or against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), including:

    (i)    commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Tort Claims, against, or affecting any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), or any property or interests in property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

    (ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) or against the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

    (iii)    creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) or the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

    (iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), or against the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims; and

    (v)    taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Definitive Documents, with respect to any Tort Claims.

    2.    <u>Reservations.</u>

Notwithstanding anything to the contrary in this <u>Article X.G</u> or the Confirmation Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

    (i)    the rights of Holders of Tort Claims to the treatment afforded them under the Plan and the Definitive Documents, including the rights of Holders of Tort Claims to assert such Tort Claims in accordance with the Plan and the Litigation Trust Documents;

(ii)   the rights of Persons to assert any claim, debt, litigation, or liability for payment of expenses against the Litigation Trust and/or any GUC Sub-Trust as provided in the Litigation Trust Documents;

(iii) the rights of the Litigation Trust and/or GUC Sub-Trust to pursue, litigate, collect on and enforce Assigned Insurance Rights and the Assigned Claims in accordance with the terms of the Plan;

(iv) the Litigation Trust and/or any GUC Sub-Trust from enforcing its rights, on behalf of itself, against the Debtors or the Reorganized Debtors in accordance with the terms of the Plan; or

(v)   the Litigation Trustee(s) and/or any GUC Sub-Trust Trustee(s) from assigning and/or transferring the Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims subject to reasonable restrictions so as not to interfere with, in-crease costs to, or impede the efforts of, the Litigation Trust and/or any GUC Sub-Trust, as further described in the Litigation Trust Documents, provided, however, that any such assignee or transferee shall remain subject to the terms and conditions of this Plan and the Confirmation.

3.    Modifications.

There can be no modification, dissolution or termination of this Channeling Injunction, which shall be a permanent injunction.

4.    Non-Limitation of Channeling Injunction.

Except as expressly set forth in paragraph (2) of this Article X.G, nothing in the Plan or the Litigation Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of this Channeling Injunction issued in connection with the Plan.

5.    Bankruptcy Rule 3016 Compliance.

The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

H.    Insurer Injunction.

1.    Terms.

In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted or that hold or assert any claim based on, arising under or attributable to an Insurance Policy (excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights) shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such claim based on, arising under or attributable to such Insurance Policy from or against any insurer, including:

(i)   commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy;

(ii)  enforcing, attaching, levying, collecting, or otherwise recovering, by any manner or means, any judgment, award, decree, or other order against any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy;

      (iii) creating, perfecting or enforcing in any manner any Lien of any kind against any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy;

      (iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any insurer, or against the property of any insurer, on account of any claim based on, arising under or attributable to an Insurance Policy; and

      (v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any claim based on, arising under or attributable to an Insurance Policy.

    2.    <u>Reservations</u>

    The provisions of this Insurer Injunction shall not preclude the Litigation Trust from pursuing any claim based on, arising under or attributable to an Insurance Policy excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights, or any other claim that may exist under any such Insurance Policy against any insurer, or enjoin the rights of the Litigation Trust to prosecute any action based on or arising from the Insurance Policies or the rights of the Litigation Trust to assert any claim, debt, obligation, Cause of Action or liability for payment against an insurer based on or arising from the Insurance Policies. The provisions of this Insurer Injunction are not issued for the benefit of any insurer, and no such insurer is a third-party beneficiary of this Insurer Injunction. This Insurer Injunction shall not (a) enjoin, impair or affect (i) any claims between or among insurers; or (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors or (b) prohibit any current and former directors, officers, employees, and authorized agents of the Debtors from seeking insurance coverage in their capacities as such under the D&O Liability Insurance Policies.

    The provisions of this Insurer Injunction shall be subject in all respects to <u>Article VI.K</u> of the Plan.

    Notwithstanding anything to the contrary in this <u>Article X.H</u>, the Litigation Trustee shall have the right to assign and/or transfer Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents; *provided, however,* that any assignee or transferee shall remain bound by the provisions in this Plan (including, for the avoidance of doubt, <u>Article X.D</u> of this Plan).

    Notwithstanding anything to the contrary in this Plan (including this Insurer Injunction), the Plan Supplement, the Confirmation Order, or otherwise, no Person, Entity, or party, including the Litigation Trust and the Litigation Trustee (including any successors, beneficiaries, transferees, and assigns), shall oppose any effort by any current or former director, officer, or employee of the Debtors or Reorganized Debtors or any its subsidiaries and Affiliates to seek defense cost coverage under the Insurance Policies (including under the D&O Liability Insurance Policies and including with respect to Assigned Claims). With respect to the Debtors' D&O liability policies that provide coverage for the directors' and officers' non-indemnifiable loss and do not provide direct coverage for the Debtors' losses (the "<u>Side-A Only D&O Insurance Policies</u>"), the automatic stay imposed under section 362(a) of the Bankruptcy Code does not apply, or, to the extent it does apply, the automatic stay is lifted and modified solely to the extent necessary to permit and authorize the insurers that issued the Side-A Only D&O Insurance Policies (the "<u>Side-A Only Insurers</u>") to evaluate coverage and to advance defense costs under and in accordance with the terms of the Side-A Only D&O Insurance Policies. Any advancement made under the Side-A Only D&O Insurance Policies shall not be considered property of the Debtors' estates. The automatic stay imposed under section 362(a) of the Bankruptcy Code shall not subject any of the Side-A Only Insurers to liability for paying defense costs.

    3.    <u>Modifications</u>

    To the extent the Litigation Trustee makes a good faith determination that some or all of the proceeds of the Assigned Claims, including the Tort Claim Insurance Proceeds, (excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights) are substantially unrecoverable by the Litigation Trust, the Litigation Trust

with the consent of the Debtors and Reorganized Debtors, as applicable, shall have the authority at any time, upon written notice to any affected insurer, to terminate, reduce or limit the scope of this Insurer Injunction with respect to any insurer, provided that any termination, reduction, or limitation of this Insurer Injunction (i) shall apply in the same manner to all beneficiaries of the Litigation Trust and (ii) shall comply with any procedures set forth in the Litigation Trust Documents.

> I.       *Controlled Substance Injunction*

From and after the date on which the Controlled Substance Injunction Order is entered by the Bankruptcy Court, the Debtors and the Reorganized Debtors, as applicable, and any successors to the Debtors' and the Reorganized Debtors' business operations relating to the manufacture and sale of opioid Product(s) in the United States and its territories shall abide by the Controlled Substance Injunction as set forth in **Exhibit A**.

The Debtors and the Reorganized Debtors, as applicable, consent to the entry of a final judgment or consent order upon the Effective Date imposing all of the provisions of the Controlled Substance Injunction in the state court of each of the Settling States (as defined in the Controlled Substance Injunction), as applicable.  The Debtors and the Reorganized Debtors agree that seeking entry or enforcement of such a final judgment or consent order in accordance with the Controlled Substance Injunction will not violate any other injunctions or stays that it will seek, or may otherwise apply, in connection with these Chapter 11 Cases or Confirmation.

Each of the Settling States has agreed to be bound by, and each of the Settling States shall be bound by, the terms of the Controlled Substance Injunction, including, for the avoidance of doubt, the release provisions set forth therein.  For the avoidance of doubt, as set forth in the Controlled Substance Injunction, the terms of the Controlled Substance Injunction are not effective until after the Effective Date.

> J.       *Preservation of Setoff Rights.*

Notwithstanding anything in Article X to the contrary or in a Sale Order, any right of setoff or recoupment is preserved against the Debtors, the Purchasers in the event of a Sale Transaction Restructuring or an Other Asset Sale, and any of their affiliates and successors to the extent such right(s) exist under applicable law and subject to the Debtors', Purchasers', and any of their Affiliates' and successors', as applicable, right to contest any such right(s) of setoff or recoupment; *provided, however,* that notwithstanding the foregoing or anything in the Plan to the contrary, the right of any Entity or Holder of a Claim or Interest to assert setoff or recoupment as a defense or affirmative defense to claims brought against them is expressly preserved to the extent permitted by applicable law and shall not be impaired, enjoined, precluded, restricted, or otherwise limited by the Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, nothing in the Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to any Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy law or non-bankruptcy law, including, but not limited to, the (i) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease(s) with the Debtors, under the Plan, (ii) assertion of rights or setoff or recoupment, if any, in connection with the claim reconciliation process, or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.

> K.       *Protections Against Discriminatory Treatment.*

To the maximum extent provided by section 525 of the Bankruptcy Code and the supremacy clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

L.    *Document Retention.*

On and after the Effective Date, the Reorganized Debtors and the Wind-Down Debtors, as applicable, may maintain documents in accordance with the Litigation Trust Cooperation Agreement and the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors or the Wind-Down Debtors, as applicable, in accordance with the Litigation Trust Cooperation Agreement or in connection with the terms of the Purchase Agreement(s).  In connection with the "Cooperation" provision set forth in Article IV.E.6 of the Plan, (a) the Reorganized Debtors shall bear the costs of document retention incurred in the ordinary course of business, consistent with historical practices and applicable law and (b) the Litigation Trust will bear any additional document retention costs the Litigation Trust deems reasonably appropriate or advisable to incur that are either not in the ordinary course of business for the Reorganized Debtors or are otherwise not consistent with historical document retention practices.

M.    *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

N.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

O.    *Subordination Rights.*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, their respective property, and Holders of Claims and Interests and is fair, equitable, and reasonable.

## ARTICLE XI
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI.B hereof:

1.      the DIP ABL Facility, the DIP FILO Facility, the DIP Term Loan Facility, the Junior DIP Notes, and the Financing Orders each remains in full force and effect;

2.      in the event of a Plan Restructuring or a Credit Bid Transaction, each of the Definitive Documents and the Plan Supplement must be, in form and substance acceptable to the Required Junior DIP Noteholders and the Agents (subject to the consent rights set forth in Article I.A.101 and Article I.A.284 as applicable);

3.      the Plan, the Confirmation Order, the Disclosure Statement, the Sale Order, if applicable, and the Disclosure Statement Order must be, in form and substance acceptable to the Debtors and reasonably acceptable to the Required Junior DIP Noteholders, the Agents, and the Committees;

4.      the Restructuring Transactions shall have been implemented in accordance with the Restructuring Transactions Memorandum in all material respects;

5.      each of the Confirmation Order and the Sale Order, if applicable, shall have been entered and shall not be stayed;

6.      the Bankruptcy Court shall have entered the Controlled Substance Injunction Order, and such order shall be a Final Order;

7.      in the event of a Credit Bid Transaction, New Rite Aid shall have been formed;

8.      all documents necessary to consummate this Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith and in accordance with any applicable consent rights set forth in this Plan;

9.      the Bankruptcy Court shall have entered the Final Financing Order and the Final Financing Order shall not have been vacated, stayed, revised, modified, or amended in any manner without the prior written consent of the DIP Agents and the Required Junior DIP Noteholders, and, to the extent set forth in the Final Financing Order;

10.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, and documents that are necessary to implement and effectuate the Plan;

11.      in the event of a Sale Transaction Restructuring, the Wind-Down Reserve and the Administrative / Priority Claims Reserve shall have each been funded;

12.      the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

13.      all accrued and unpaid reasonable and documented fees and expenses of the Ad Hoc Secured Noteholder Group (including any advisors thereto) in connection with the Restructuring Transactions, to the extent invoiced three Business Days prior to the Effective Date, shall have been paid in accordance with the terms and conditions set forth in the Financing Orders, the DIP Credit Agreement, and the Junior DIP Indenture, as applicable;

14.     the GUC Equity Trust Agreements shall have been executed and the GUC Equity Pool shall have been issued to the GUC Equity Trust;

15.     the Litigation Trust Documents necessary for the operation of the Litigation Trust to operate on the Effective Date shall have been executed and/or Filed, as applicable and the Committees' Initial Cash Consideration and other Litigation Trust Assets shall have been contributed to the Litigation Trust;

16.     the Committee Settlement shall be in full force and effect and the Committee Settlement and any provisions of any Definitive Documents related to the Committee Settlement or the UCC / TCC Recovery Allocation Agreement (if Filed and subject to the consent rights set forth in Article I.A.101) shall be acceptable to the Committees and shall not have been modified without the Committees' consent;

17.     in the event of the Plan Restructuring, the New Common Stock shall have been issued;

18.     (i) all waiting periods imposed by any Governmental Unit in connection with the transactions contemplated by the Plan, the Sale Transaction Restructuring, and any Other Asset Sale shall have terminated or expired and (ii) all authorizations, approvals (including regulatory approvals), consents, or clearances under the any applicable antitrust laws in connection with such transactions shall have been obtained;

19.     as applicable, the Exit Facilities Documents and the Exit 1.5 Lien Notes Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facilities and the 1.5 Lien Notes shall have been waived or satisfied in accordance with the terms thereof;

20.     in the event of (a) a Plan Restructuring or (b) a Credit Bid Transaction, any Other Asset Sale or Alternative Sale Transaction shall (i) be acceptable to the Required Junior DIP Noteholders and the Agents and (ii) shall have closed on or prior to the Effective Date;

21.     in the event of a Sale Transaction Restructuring, New Rite Aid or the applicable Purchaser shall have acquired the Retail Acquired Assets pursuant to the applicable Purchase Agreement, and in each case all conditions precedent to the closing of such Sale Transaction Restructuring shall have been satisfied or duly waived;

22.     as applicable, the Takeback Notes Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the issuance of the Takeback Notes shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Takeback Notes shall be deemed to occur concurrently with the occurrence of the Effective Date;

23.     the New Corporate Governance Documents shall be in full force and effect;

24.     any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained, as and to the extent necessary for the Debtors' emergence from chapter 11;

25.     the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein in a manner consistent in all respects with the Plan and the Plan Supplement;

26.     all DOJ Claims are subject to one or more DOJ Settlement Documents between the Debtors and their non-Debtor Affiliates, including EIC, as applicable, and the DOJ, which DOJ Settlement Documents are in form and substance acceptable to the Debtors, the Required Junior DIP Noteholders, and the Exit Facilities Agent;

27.     the AHG Notes Ticking Fee and the AHG New-Money Commitment Premium, if any, owed to the AHG New-Money Commitment Parties under the AHG New-Money Commitment Agreement shall have been paid in accordance with the terms thereof and the Final Financing Order;

28.     in the event of a Plan Restructuring or a Credit Bid Transaction, the Debtors and/or New Rite Aid, as applicable, shall have (a)(i) entered into an amended McKesson Prepetition Contract, as amended pursuant to the McKesson Settlement and (ii) assumed the McKesson Prepetition Contract, or (b) terminated the McKesson Prepetition Contract and entered into the McKesson New Contract or a new contract with an alternative supplier, which shall be effective no later than the Effective Date, in a form reasonably acceptable to the Required Junior DIP Noteholders and the Exit Facilities Agent, as applicable;

29.     in the event of a Plan Restructuring or a Credit Bid Transaction, the (a) Allowed amount of the McKesson Claim and (b) treatment of the Allowed McKesson Claim under the Plan shall each be reasonably acceptable to the Required Junior DIP Noteholders and the Exit Facilities Agent, as applicable, it being understood that the terms and conditions of the McKesson Settlement shall be deemed acceptable to the Required Junior DIP Noteholders and the Exit Facilities Agent;

30.     the distributions on account of the MedImpact Term Loan have been allocated in accordance with Section (II)(A) of Exhibit E of the Final Financing Order;

31.     in the event of a Plan Restructuring, the MedImpact Term Loan Sale Process shall have been conducted in a manner acceptable to the DIP Agents and agreed under the Final Financing Order;

32.     unless otherwise agreed by the Required Junior DIP Noteholders and the Exit Facilities Agent, there has been no material increase in the estimated aggregate amount of Allowed Administrative Claims or other Allowed Claims that must be satisfied by the Debtors or the Reorganized Debtors in full in Cash in accordance with the Plan (and which are not otherwise reasonably anticipated to be reimbursed by a third party) arising from or related to postpetition, non-ordinary course information technology expenses arising on or after June 1, 2024 (it being understood that as of the date of the filing of this Plan, the estimated aggregate amount of such potential Allowed Claims through the Effective Date (to the extent known or projected) and as provided to the Required Junior DIP Noteholders and the Exit Facilities Agent shall be deemed to be reasonably acceptable to the Required Junior DIP Noteholders and the Exit Facilities Agent);

33.     the distributions required to be made to the Junior DIP Noteholders under the Final Financing Order have been made in accordance with the terms and conditions of the Final Financing Order, the Junior DIP Documents, and the DIP Documents; and

34.     in the event of a Plan Restructuring, subject to the terms and conditions of the AHG New-Money Commitment Agreement and Article VI.G of this Plan, (a) the SCD Trust shall have been formed, and interests therein distributed, in accordance with the terms and conditions of the SCD Trust Documentation and the Plan, and (b) the AHG Notes shall have been issued in accordance with the terms and conditions of the AHG New-Money Commitment Agreement, the AHG Notes Documentation, the New Money DIP Notes Term Sheet, and the Plan.

B.      *Waiver of Conditions.*

Subject to and without limiting the rights of each party under the Final Financing Order, the conditions to Consummation set forth in Article XI.A, other than the conditions set forth in Article XI.A.13 and Article XI.A.28, may be waived by the Debtors with the consent of (i) the DIP Agents, (ii) the Exit Facilities Agent, (iii) the Required Junior DIP Noteholders, but solely in the event of a Plan Restructuring or Credit Bid Transaction, and (iv) the Committees, to the extent that such waiver materially and adversely affects the rights or entitlements of the constituencies of the Committees under the Committee Settlement, *provided* that the wavier of the condition set forth in Article XI.A.14 through Article XI.A.17 shall require the consent of the Committees, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; *provided that*, the condition in Article XI.A.12 may not be waived without the consent of the affected Professionals.

C.      *Effect of Failure of Conditions.*

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the

Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

>    D.     *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE XII
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

>    A.     *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the DIP Agents, the Required Junior DIP Noteholders, and the Committees (solely in respect of any modification that materially and adversely impacts the rights or entitlements of the constituencies of the Committees under the Committee Settlement) reserve the right to modify the Plan, whether such modification is material or immaterial, seek Confirmation consistent with the Bankruptcy Code (provided that any modification or amendment shall not be inconsistent with the Committee Settlement) and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any amendments must not be inconsistent with the Committee Settlement and the Debtors may not amend or modify any provisions of the Plan that directly relate to the Committee Settlement or the consent rights of the Committees without the consent of the Committees (which may be granted or denied by the Committees in their sole discretion).  Any amendments to the UCC / TCC Recovery Allocation Agreement shall require consent of the Committees in their sole discretion.

>    B.     *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

>    C.     *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, with the consent of the Required Junior DIP Noteholders, the DIP Agents, and the Committees (solely to the extent set forth in the Disclosure Statement Order), to revoke or withdraw the Plan before the Confirmation Date and to File subsequent plans, in each case subject to any applicable consent rights as set forth in a Sale Order, the Purchase Agreement(s), or the Financing Orders.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan and the conditional approval of the Disclosure Statement, including the approval of the procedures by which acceptances and rejections of the Plan were solicited, shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests, or the fixing or limiting of the recovery to which the Holders of such Claims were entitled under the Plan and, the Committee Settlement), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims, Causes of Action, or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, or any other Entity; *provided* that for the avoidance of doubt, if the closing date of the Sale Transaction Restructuring, and/or any Other

Asset Sale(s) has occurred, then the revocation or withdrawal of the Plan, or the failure to obtain Confirmation or Consummation of the Plan, shall not affect the occurrence of such closing date or the consummation of the Restructuring Transaction.

**ARTICLE XIII**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, except as otherwise set forth in this Plan, over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Subject to Article IX.A of this Plan, and except as set forth to the contrary in the Committee Settlement Documents with respect to General Unsecured Claims, allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Reorganized Debtors or the Wind-Down Debtors, as applicable, amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.     grant any consensual request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.     ensure that distributions to Holders of Allowed Claims other than General Unsecured Claims are accomplished pursuant to the provisions of the Plan;

6.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters that do not relate to the Assigned Claims or the Assigned Insurance Rights, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.     enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, except as it relates to the Assigned Claims or Assigned Insurance Rights;

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article X hereof and enter such orders as may be necessary to implement such releases, injunctions, and other provisions, except as it relates to the Assigned Claims or Assigned Insurance Rights;

13.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI hereof;

14.      enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

17.      enter an order concluding or closing the Chapter 11 Cases;

18.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

19.      consider any modifications of the Plan, including any Plan Supplement documents Filed after the Confirmation Date, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article X hereof;

24.      enforce all orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

25.      hear any other matter related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction to:

1.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the UCC / TCC Recovery Allocation Agreement and the Committee Settlement Documents other than the Litigation Trust Documents; *provided* that Bankruptcy Court's jurisdiction to hear and determine disputes between or among any beneficiaries of the Litigation Trust arising in connection with the interpretation,

implementation, or enforcement of the Litigation Trust Documents shall be exclusive to the extent consistent with applicable law except with the consent of the Debtors or the Reorganized Debtors;

2.        ensure that distributions to Holders of General Unsecured Claims are accomplished pursuant to the provisions of the Plan; and

3.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any Assigned Claims and, to the extent authorized by law and the terms of the applicable Insurance Policies, any Assigned Insurance Rights.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

*A.        Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors (if applicable), the Wind-Down Debtors (if applicable), and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

*B.        Additional Documents.*

On or before the Effective Date, subject to the terms of this Plan, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Following the Effective Date, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the GUC Equity Trust or Litigation Trust, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

*C.        Payment of Statutory Fees.*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date (or funded by the Reorganized Debtors and disbursed by the Disbursing Agent on behalf of each of the Reorganized Debtors). After the Effective Date, any Debtor entity making disbursements on behalf of any Debtor or any Reorganized Debtor, or making disbursements on account of an obligation of any Debtor or any Reorganized Debtor (each a "Disbursing Entity"), shall be jointly and severally liable to pay Quarterly Fees when due and payable. The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11- MOR. After the Effective Date, the Reorganized Debtors, and any Disbursing Entities shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Reorganized Debtors, and Disbursing Entities shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The Litigation Trust Assets (including the Committees' Initial Cash Consideration) disbursed to the Litigation Trust and any Sub-Trust(s) upon the Effective Date will be included in the calculation of the statutory fees payable to the U.S. Trustee by the Debtors and the Reorganized Debtors for the quarter in which the Effective Date occurs, and neither the Debtors, the Reorganized Debtors, nor the Litigation Trust or any Sub-Trust(s) will be responsible for any statutory fees based on the Litigation Trust's (or any Sub-Trusts') subsequent distribution.

D.      *Statutory Committees and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committees shall dissolve automatically and the members thereof and each Professional retained thereby shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that (a) the Committees will remain in place after the Effective Date solely for the purpose of addressing (i) all final fee applications for all Professionals for the Committees and any matters concerning Professional Fee Claims held or asserted by any Professional retained by the Committees; (ii) the resolution of any appeals of the Confirmation Order or other appeals to which the Committees are a party; and (iii) as necessary to consummate the Committee Settlement, including the UCC / TCC Recovery Allocation Agreement, and (b) the members of the Committees are discharged from all of their duties as of the date that the Committees is dissolved with respect thereto.

E.      *Rights of Purchasers under a Sale Order.*

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of the rights or obligations of the Purchasers under a Sale Order.

F.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

G.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.      *Notices.*

All pleadings, notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      <u>if to the Debtors, to:</u>

Rite Aid Corporation
200 Newberry Commons
Etters, Pennsylvania 17319
Attn: Thomas Sabatino
Email address: thomas.sabatino@riteaid.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile: (212) 446-4900

Attn: Joshua A. Sussberg, P.C.; Aparna Yenamandra, P.C.; Ross J. Fiedler; Zachary R. Manning
Email Addresses: joshua.sussberg@kirkland.com; aparna.yenamandra@kirkland.com; ross.fiedler@kirkland.com; zach.manning@kirkland.com

2.    if to the DIP Agents, DIP Lenders, or Exit Facilities Agent, to:

Choate, Hall, & Stewart LLP
Two International Place
Boston, Massachusetts 02110
Attn: John F. Ventola; Kevin J. Simard; J.P. Jaillet; Jonathan D. Marshall
Email Addresses: jventola@choate.com; ksimard@choate.com; jjaillet@choate.com; jmarshall@choate.com

3.    if to a member of the Ad Hoc Secured Noteholder Group, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064W
Attn: Andrew N. Rosenberg; Christopher Hopkins; Douglas R. Keeton
Email Addresses: arosenberg@paulweiss.com; chopkins@paulweiss.com; dkeeton@paulweiss.com

– and –

Fox Rothschild LLP
49 Market Street
Morristown, New Jersey 07960
Attn: Howard A. Cohen and Joseph J. DiPasquale.

Email address: hcohen@foxrothschild.com; jdipasquale@foxrothschild.com

4.    if to the UCC, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8000
Attn: Kenneth H Eckstein; Adam C. Rogoff; Rachael Ringer; Megan Wasson
Email Addresses: keckstein@kramerlevin.com; arogoff@kramerlevin.com; rringer@kramerlevin.com; mwasson@kramerlevin.com

5.    if to the TCC, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn: Arik Preis; Mitchell P. Hurley; Kate Doorley; Theodore James Salwen; Brooks Barker
Email Addresses: apreis@akingump.com; mhurley@akingump.com; kdoorley@akingump.com; jsalwen@akingump.com; bbarker@akingump.com

After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors or the

Reorganized Debtors or the Wind-Down Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.    *Entire Agreement.*

Except as otherwise indicated (including with respect to the Purchase Agreement(s) and a Sale Order, as applicable), the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses.  This Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to Plan and the documents comprising the Plan Supplement is part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

J.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/RiteAid or the Bankruptcy Court's website at www.njb.uscourts.gov.

K.    *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Purchasers' consent; and (3) nonseverable and mutually dependent.

L.    *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors or the Wind-Down Debtors, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

P.      *Special Provisions Regarding the United States.*

Notwithstanding anything to the contrary herein, the special provisions for the United States shall be subject in all respects to the DOJ Settlements.  To the extent that terms of the Plan (including these Special Provisions Regarding the United States) or any Definitive Documents conflict with the terms of the DOJ Settlement Documents, the DOJ Settlement Documents shall control.  Further, notwithstanding anything to the contrary in this Article XIV.P, nothing herein shall (i) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code, or (ii) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

1.      As to the United States (including all agencies, departments, and instrumentalities thereof), notwithstanding anything to the contrary in this  Plan or any other Definitive Documents, nothing shall:

(a)      expand the scope of discharge, release, exculpation, or injunction permitted to Debtors and the Reorganized Debtors under the Bankruptcy Code, including sections 524, 1125(e), and 1141 of the Bankruptcy Code, as may be applicable. For the avoidance of doubt, the discharge, release, and injunction provisions contained in this Plan and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action, or any criminal action;

(b)      discharge, release, exculpate, impair, extinguish, enjoin, or otherwise preclude the United States in any way from asserting, enforcing, or collecting, outside the Bankruptcy Court: (i) any liability to the United States that is not a "claim" (as defined in 11 U.S.C. § 101(5)); (ii) any Claim of the United States arising on or after the Effective Date; (iii) any liability of the Debtors under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (iv) any liability to the United States, including but not limited to any liabilities arising under the IRC, environmental law, criminal law, civil law or common law, of any non-Debtor Entity (including EIC, any Released Parties or Exculpated Parties);

(c)     affect or impair any valid right of setoff or recoupment of the United States against any of the Debtors or Reorganized Debtors; *provided, however*, that the rights and defenses with respect any such rights of setoff or recoupment are fully preserved (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish or limit setoff or recoupment rights);

(d)     divest any court, commission or tribunal of jurisdiction except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code), including jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by the Confirmation Order, the Plan or the Bankruptcy Code; *provided*, *however*, that the Bankruptcy Court shall retain jurisdiction as set forth in and pursuant to the terms of the Plan to the extent permitted by law;

(e)     be deemed to (i) determine or settle the tax liability of any Person, including but not limited to the Debtors, (ii) have determined the federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or Confirmation Order, or (iii) expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334;

(f)     authorize the assumption, assignment, sale or other transfer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including intellectual property and patents, (v) leases, (vi) agreements, (vii) certifications, (viii) applications, (ix) registrations, (x) billing numbers and other identifiers, (xi) licenses, (xii) permits, (xiii) covenants, (xiv) guarantees, (xv) indemnifications, (xvi) data, (xvii) records, (xviii) inventory, (xix) payment obligations, (xx) Medicare agreements, or (xxi) other interests of the United States (collectively, "<u>Federal Interests</u>"), without compliance with all terms of the Federal Interests and with all applicable non-bankruptcy law;

(g)     be interpreted to set cure amounts related to any Federal Interests, including any Medicare agreements, or to require the United States to novate, approve or otherwise consent to the assumption, assignment, sale or other transfer of any Federal Interests, including any Medicare agreements;

(h)     constitute or be deemed an approval or consent by the United States;

(i)     waive, alter or otherwise limit the United States' property rights;

(j)     limit or expand the scope of any protections provided to any Debtor pursuant to section 525 of the Bankruptcy Code; or

(k)     release, discharge, enjoin, limit, or otherwise prejudice any rights, claims, or Causes of Action the United States has or may have against any surety under any bond, and nothing shall release, discharge, or exculpate any surety from its obligations or liabilities pursuant to non-bankruptcy law, including any obligation or liability of any surety of the Debtors or Reorganized Debtors with respect to any bond.

2.      As to the United States (including all agencies, departments, and instrumentalities thereof), notwithstanding anything to the contrary in this  Plan or any other Definitive Documents (including, without limitation, the "Committee Settlement," the "Settlement of Opioid Claims," the "Channeling Injunction," and the "UCC/TCC Recovery Allocation Agreement," nothing shall release, discharge, enjoin, limit, or otherwise prejudice the United States' rights and claims under the Medicare Secondary Payer Act, 42 USC

§§ 1395y(b), section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173), or the Federal Medical Care Recovery Act, 42 U.S.C. §§ 2651-2653, all of which are fully reserved by the United States.  For the avoidance of doubt, the United States is not required to seek a Final Order from the Bankruptcy Court authorizing the United States to bring any claim or Cause of Action referenced in the preceding sentence and all non-bankruptcy rights and defenses to any claim or Cause of Action are likewise fully preserved.

3.      Without limiting the foregoing, nothing in this Plan or any other Definitive Documents shall  limit, modify, or in any way affect the authority of the Secretary of United States Department of Health and Human Services ("HHS") to regulate (1) the enrollment or participation by any Reorganized Debtor or Wind-Down Debtor in any Medicare program or (2) the right and authority of the Secretary of HHS or CMS to review, audit, approve, deny, suspend or make Medicare payments, or to recoup or setoff any liabilities from such payments to any entity, in accordance with the provisions of, and regulations, policies and procedures promulgated under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq. and Federal law*, including CMS' right to recover in the ordinary course Medicare Part B overpayments that became due before or during the Chapter 11 Cases with respect to any Reorganized Debtors that continue post-Effective Date as Medicare Part B suppliers under the Debtors' Medicare enrollment agreements; *provided, howev*er, that absent an agreement between CMS and the applicable Reorganized Debtor or Wind-Down Debtor, pending the occurrence of the Effective Date, CMS will seek approval from the Bankruptcy Court before effectuating any setoffs or recoupment to the extent required by section 362 of the Bankruptcy Code.

4.      Notwithstanding anything to the contrary herein, nothing in the Plan or any Definitive Documents shall bind the United States in any application of statutory, or associated regulatory, authority grounded in Title 19 of the Social Security Act, 42 U.S.C. § 1396-1 *et seq.* (the "Medicaid Program") or in section 1115 of Title 11 of the Social Security Act.  The United States is neither enjoined nor in any way prejudiced in seeking recovery debts or obligations owed or that may become owing to the United States under the Medicaid Program, subject to applicable law.

*[Remainder of page intentionally left blank]*

Dated:  August 15, 2024

RITE AID CORPORATION
on behalf of itself and all other Debtors

_/s/ Jeffrey S. Stein_
_____
Jeffrey S. Stein
Chief Executive Officer
Chief Restructuring Officer
Rite Aid Corporation

**Exhibit A**

**Controlled Substance Injunction**

# Rite Aid Controlled Substance Compliance Program & Anti-Diversion Injunctive Terms

**WHEREAS**, on October 15, 2023, Rite Aid Corporation and certain of its affiliates, as the debtors and debtors in possession, commenced with the Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code;

**WHEREAS**, on April __, 2024, the Bankruptcy Court entered the *Order Approving the Disclosure Statement For, and Confirming the [Second ] Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates* [Docket No. __]; and

**WHEREAS**, Rite Aid has agreed to be bound by the injunctive terms set forth herein, and in consideration of such terms, the Settling States (as defined below) have agreed to the discharge and release terms set forth herein.

**NOW, THEREFORE**, in consideration of the terms set forth herein, Rite Aid and the Settling States agree as follows:

## I.    INTRODUCTION

1.  Except where these Injunctive Terms specify a different implementation period, Rite Aid shall implement the Injunctive Terms set forth below by the Injunctive Terms Implementation Date (defined below).

2.  For purposed of this Controlled Substance Compliance Program & Anti-Diversion Injunction, the term "Rite Aid" shall mean Rite Aid Hdqtrs. Corp. and its affiliated debtors and debtors in possession in the bankruptcy cases filed on October 15, 2023, captioned *In re Rite Aid Corporation, et al.*, (MBK) Case No. 2023-18993 (Bankr. D.N.J.), a Rite Aid successor pharmacy corporation, and an "Acquiring Third Party." An "Acquiring Third Party" shall mean a retail pharmacy that (i) dispenses Schedule II High Alert Controlled Substances, (ii) is registered or licensed within or by a Settling State, and (iii) purchases, leases, manages, or otherwise controls twenty-five percent (25%) or more of Rite Aid's retail pharmacy stores, measured at the time of the

Bankruptcy Plan Effective Date, within a consecutive two-year period during the term of the agreement.[1]

3. To the extent that Rite Aid already has in place positions, committees, departments, policies or programs that satisfy the Injunctive Terms, no renaming or other change is required by these Injunctive Terms.

4. All sections of the Injunctive Terms, unless explicitly stated otherwise, apply to retail pharmacies that dispense Schedule II High Alert Controlled Substances and that are owned, leased, managed, or otherwise controlled by Rite Aid ("Covered Pharmacies").

5. It shall be a term of any purchase, lease, management, or other agreement between Rite Aid and an Acquiring Third Party that the Acquiring Third Party abide by these Injunctive Terms with respect to Covered Pharmacies acquired from Rite Aid. Nothing in these Injunctive Terms shall require an Acquiring Third Party to implement or apply requirements or standards to Covered Pharmacies that are less stringent than those that it already applies or would apply under its own policies, federal, state or local law or any other settlement or agreement.

6. In the event that (a) an Acquiring Third Party comes to purchase, lease, manage, or otherwise control Covered Pharmacies and, (b) that Acquiring Third Party has entered into a global opioid settlement with injunctive relief provisions, the injunctive relief provisions from the Acquiring Third Party's global opioid settlement to the Covered Pharmacies shall apply.

7. In connection with its chapter 11 cases, Rite Aid consents to the entry of a final judgment or consent order upon the Bankruptcy Plan Effective Date imposing these injunctive terms in the respective court of each of the Settling States. During the pendency of the chapter 11 cases, these injunctive terms are enforceable in the Bankruptcy Court. After the Bankruptcy Plan Effective Date, these injunctive terms are enforceable in state court in each of the Settling States; *provided* that if not entered in the state court of a Settling State, the Bankruptcy Court shall have jurisdiction over the interpretation, implementation, or enforcement of this Injunction.

8. Overview

    a. Rite Aid will implement or maintain a Controlled Substance Compliance Program ("CSCP").

---

[1] The term "Acquiring Third Party" shall not include a retail pharmacy that purchases prescriptions from a Rite Aid pharmacy or successor pharmacy (i.e. a "pourover") but does not otherwise meet the definition set forth above.

b. The CSCP must include written standard operating procedures and/or corporate policies (the "CSCP Policies and Procedures") required by these Injunctive Terms.

c. The CSCP shall apply during the term of these Injunctive Terms, to each of the Covered Pharmacies.

d. Rite Aid shall provide a copy of the relevant CSCP Policies and Procedures to each Settling State within 30 days of the Injunctive Terms Implementation Date or, in the case of Acquiring Third Parties, within 60 days of becoming an Acquiring Third Party. To the extent any implementation is expected to require additional time, the Parties agree to work together in good faith to establish a timeline for implementation. No later than twenty (20) days after the Injunctive Terms Implementation Date, each Settling State shall identify the person or office to whom Rite Aid must provide a copy of the relevant CSCP Policies and Procedures and any other State-specific reporting required under these Injunctive Terms.

e. Settling States shall form the States Injunctive Relief Committee to serve as a point of contact for Rite Aid and to perform such other roles as set forth herein. Upon the committee's formation, Settling States shall provide notice to Rite Aid of the members of the committee.

9. Compliance with Laws

a. Rite Aid acknowledges and agrees that the Covered Pharmacies must comply with applicable state and federal laws, regulations, and rules, including those regarding the dispensing of Controlled Substances. The requirements of these Injunctive Terms are in addition to, and not in lieu of, any other requirements of federal, state, or local law. Nothing in the Injunctive Terms shall be construed as relieving Rite Aid of the obligation of its Covered Pharmacies to comply with all federal, state and local laws, regulations or rules, nor shall any of the provisions of the Injunctive Terms be deemed as permission for Rite Aid to engage in any acts or practices prohibited by such laws, regulations or rules.

b. The Injunctive Terms are not intended to and shall not be interpreted to prevent Rite Aid from taking or implementing any other compliance or policy steps that are more restrictive or that are necessary to conform with federal, state, or local legal requirements, unless such steps would conflict with State or local law. The Injunctive Terms are not intended to and shall not be interpreted to require Rite Aid to inventory any Controlled Substances or any particular Controlled Substances or to require dispensing of any Controlled Substances or of any individual, types, subsets or categories of Controlled Substances prescriptions.

P - 3

c.  In the event that Rite Aid determines that there may be a conflict between the Injunctive Terms and the express requirements of federal, state, or local laws, or interpretations of such laws articulated by an agency responsible for enforcing such laws or a court ("Express Interpretations"), such that Rite Aid determines that it cannot comply with the Injunctive Terms without violating these express requirements or Express Interpretations, Rite Aid shall follow the express requirements of the federal, state or local law or Express Interpretation thereof and shall provide notice to the Settling State(s). Within thirty (30) days after receipt of a notification from Rite Aid referenced above, Rite Aid and the Settling State shall meet and discuss the potential conflict, and Rite Aid shall comply with any reasonable requests from the Settling State as necessary to determine whether there is a conflict between the Injunctive Terms and the express requirements of federal, state, or local laws, or Express Interpretations. In the event that Rite Aid believes a court or administrative action brought by a governmental body in a Settling State has commenced against it or its pharmacists for actions required by the Injunctive Terms, then Rite Aid may notify the Attorney General of the Settling State of such pending action. If the State agrees that the court or administrative action is a result of actions required by the Injunctive Terms, the State will engage in best efforts to resolve the conflict or assist in achieving resolution of the court or administrative action. Nothing in this paragraph shall (i) limit the right of the Settling State to disagree with Rite Aid as to the conflict; (ii) be deemed to relieve Rite Aid from following any subsequently enacted law or regulation, or judicial decisions from a regulatory authority with jurisdiction over controlled substances that is more restrictive than the provisions of the Injunctive Terms, or from following the Injunctive Terms if they are more restrictive than applicable laws at issue in the administrative action if there is no conflict; (iii) be deemed to relieve Rite Aid from adhering to the outcome of a court or administrative action when it is determined that there is no conflict; or (iv) limit a Settling State's ability to relieve Rite Aid of a duty under these Injunctive Terms if that Settling State determines that that term is in conflict with that Settling State's express legal requirements.

d.  Rite Aid shall retain all records it is required to create pursuant to its obligations hereunder for a period no shorter than three years, unless otherwise specified. Nothing in these Injunctive Terms shall prevent a Settling State from issuing a lawful subpoena or Civil Investigative Demand (CID) for records pursuant to an applicable law.

9.  **No Admission and No Use as Evidence.** Rite Aid admits no liability or wrongdoing. These Injunctive Terms shall not be considered, construed, or represented to be (1) an

admission, concession, or evidence of liability, wrongdoing, or to impose the existence of any legal obligations or requirements other than the requirement to follow these Injunctive Terms; (2) an admission, concession or evidence of the reach, requirements, meaning or interpretation of any statute or regulation; or (3) a waiver or limitation of any defense otherwise available to Rite Aid. These Injunctive Terms shall not be offered or received in evidence or otherwise relied on in any action or proceeding for any purpose other than in an action or proceeding to modify or enforce or monitor compliance with these Injunctive Terms.

## II.    TERM AND SCOPE

1.  The term of these Injunctive Terms shall be for ten years from the Injunctive Terms Implementation Date, unless otherwise specified herein.

2.  Except as otherwise stated herein, the Injunctive Terms shall apply to Covered Pharmacies, including any Schedule II High Alert Controlled Substances dispensed by any such retail pharmacy stores that are mailed or shipped to patients in a Settling State. Should Rite Aid operate an online pharmacy that is registered or licensed to dispense Schedule II High Alert Controlled Substances in any Settling State while these Injunctive Terms are in effect, the Injunctive Terms shall apply to such pharmacy as well. Notwithstanding the foregoing, these Injunctive Terms shall not apply to the mail order pharmacy of Rite Aid's affiliated pharmacy benefit manger, Elixir.

3.  These Injunctive Terms may be amended by mutual agreement of a majority of the States Injunctive Relief Committee and Rite Aid. Any such amendments must be in writing.

## III.    DEFINITIONS

1.  For purposes of these Injunctive Terms, the plural shall be interpreted to include the singular and the singular shall be interpreted to include the plural (*e.g*., "Party" shall include both parties).

2.  The term "Bankruptcy Court" means the court where Rite Aid filed for bankruptcy on October 15, 2023, captioned *In re Rite Aid Corporation, et al.*, (MBK) Case No. 2023-18993 (Bankr. D.N.J.).

3.  The term "Distributor Injunctive Terms" means Exhibit P of the Settlement Agreement, dated as of July 21, 2021, between McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation and certain States and subdivisions.

P - 5

4.  The term "Bankruptcy Plan Effective Date" means the date upon which Rite Aid emerges from Bankruptcy, as evidenced by a notice of effective date filed on the Bankruptcy Court's docket.

5.  The term "Block" means an action preventing or otherwise prohibiting any pharmacist from filling prescriptions for Controlled Substances from a specific identified Prescriber.

6.  The term "Clearinghouse" means the system established by Section XVII of the Distributor Injunctive Terms.

7.  The term "Controlled Substances" means those substances designated under schedules II-V pursuant to the federal Controlled Substances Act.

8.  The term "High Alert Controlled Substances" shall be limited to: (a) oxycodone; (b) hydrocodone; (c) hydromorphone; (d) tramadol; (e) oxymorphone; (f) morphine; (g) methadone; and (h) fentanyl.

9.  The term "Injunctive Terms Implementation Date" means 30 days after the Bankruptcy Plan Effective Date.

10. The term "Patient" means any individual who receives a prescription for a High Alert Controlled Substance from a Prescriber, whether legally valid or not, and attempts to fill it at a Covered Pharmacy in a Settling State.

11. The term "Chapter 11 Plan" means the plan of reorganization (with any technical modifications) under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules thereto.

12. The term "Prescriber" means any individual that has written a prescription for a High Alert Controlled Substance, whether legally valid or not, that is presented to a Covered Pharmacy in a Settling State.

13. The term "Red Flag(s)" means the enumerated Patient Red Flags, Prescription Red Flags, and Prescriber Red Flags set out in Section IX.

14. The term "Settling State(s)" means, each of the following States:  California; Connecticut; Delaware; Idaho; Massachusetts; Michigan; New Hampshire; New Jersey; New York; Ohio; Oregon; Pennsylvania; Vermont; Virginia; and Washington.

15. The term "States Injunctive Relief Committee" means a committee representing the Settling States composed of between four and eight members designated by the Settling States. The members of the States Injunctive Relief Committee shall be employees of a Settling State's Office of Attorney General and/or employees of another agency of a Settling State.

## IV.  CONTROLLED SUBSTANCE COMPLIANCE PERSONNEL

1. Rite Aid shall designate a Controlled Substance Compliance Director, or other appropriately titled position, to be a member of the Controlled Substance Compliance Committee (described below in Section VI), and to oversee a Controlled Substance Monitoring Department and Rite Aid's compliance with 21 C.F.R. 1306.04 and these Injunctive Terms. As used in these Injunctive Terms, the terms "Controlled Substance Compliance Committee" and "Controlled Substance Monitoring Department" refer to the entity or entities, however titled, that carry out the functions required by these Injunctive Terms.  Notwithstanding the preceding sentence, to the extent an existing position, committee or department carries out the functions required by these Injunctive Terms, any other functions undertaken by such position, committee or department shall not be subject to these Injunctive Terms or oversight by the Settling States pursuant to these Injunctive Terms.  The position, committee and department discussed in these Terms may bear different names and need not be limited to the roles and functions set forth herein.

2. The Controlled Substance Compliance Director shall have knowledge of and experience with the laws and regulation of Controlled Substances, in particular the regulations in 21 C.F.R. § 1306.04.

3. The Controlled Substance Compliance Director shall provide at least quarterly reports to the Controlled Substance Compliance Committee (described below in Section VI) regarding Rite Aid's compliance with these Injunctive Terms, including the implementation of any changes to the CSCP Policies and Procedures required by these Injunctive Terms.

4. Staffing levels of Rite Aid's Controlled Substance Monitoring Department shall be reviewed periodically, but at least on an annual basis, by Rite Aid's Controlled Substance Compliance Committee to assess whether such staffing levels are sufficient for the Controlled Substance Monitoring Department to comply with this Agreement. This review shall include consideration of relevant developments in technology, law, and regulations.

5. Throughout the term of these Injunctive Terms, Rite Aid shall maintain a telephone and electronic submission hotline(s) (the "Hotline") to permit employees and/or Patients and/or members of the public to anonymously report suspected inappropriate or

illegitimate dispensing, prescribing or diversion of High Alert Controlled Substances, violations of the CSCP Policies and Procedures, these Injunctive Terms, Rite Aid's company policy, or other applicable law. The Hotline may be implemented by adding a dedicated option to existing systems that includes reporting regarding High Alert Controlled Substances. Rite Aid shall publish its Hotline contact information to its employees and Patients in the Settling States. Rite Aid shall maintain for the duration of Injunctive Terms a record of each complaint made to the Hotline regarding High Alert Controlled Substances and documentation regarding any investigation or response to such complaints. Nothing herein shall require Rite Aid to investigate a pharmacist's professional judgment to refuse a prescription that the pharmacist believes was prescribed or is being used for other than a legitimate medical purpose or that the pharmacist believes was not prescribed by an individual Prescriber acting in the usual course of his or her professional practice.

## V.    **INDEPENDENCE**

1. Rite Aid's Controlled Substance Monitoring Department personnel, pharmacists and pharmacist technicians who work at Covered Pharmacies within the Settling States, and field personnel who supervise pharmacists and pharmacist technicians (together, "CSCP Employees") at such pharmacies, shall not be compensated in whole or in part by commissions, bonuses, incentives or any other monetary or non-pecuniary benefit that depends in material part on revenue or profitability targets or expectations to sales of Controlled Substances. Nothing in these Injunctive Terms shall be interpreted to prevent compensation of employees based on sales volume, revenue or profitability targets/expectations for enterprise-, store-, or pharmacy-wide sales that include Controlled Substances.

2. No CSCP Employees may be terminated, suspended, threatened with or face any other negative employment consequence for failing to meet any revenue or profitability targets or expectations that depend in material part on sales of Controlled Substances. Nothing in these Injunctive Terms shall be interpreted to prevent Rite Aid from taking employment action based on sales volume, revenue or profitability targets/expectations for enterprise-, store-, or pharmacy-wide sales that include Controlled Substances.

3. Personnel in Rite Aid's Controlled Substance Monitoring Department shall not report to Rite Aid's sales, marketing, or business development departments, and sales, marketing, or business development departments shall not be authorized to make decisions regarding the promotion, compensation, demotion, admonition, discipline, commendation, periodic performance reviews, hiring, or firing of Controlled Substance Monitoring Department personnel. This provision does not apply to an officer or executive to whom both the Controlled Substance Monitoring Department and sales, marketing and/or business development departments report.

4. Rite Aid's sales, marketing and business development departments are prohibited from interfering with, obstructing, or otherwise exerting control over any Controlled Substance Monitoring Department or Controlled Substance Committee decision-making. This provision does not apply to an officer or executive to whom both the Controlled Substance Monitoring Department and sales, marketing and/or business development departments report.

5. To the extent necessary to comply with this section, Rite Aid's Controlled Substance Compliance Committee shall review, modify, and direct any changes to any compensation and non-retaliation policies specific to the sale or dispensing of High Alert Controlled Substances.

## VI.  <u>OVERSIGHT</u>

1. To the extent not already established, within two (2) months of the Injunctive Terms Implementation Date or acquisition of the Covered Pharmacies, Rite Aid shall establish a compliance committee, however titled, that includes representatives from its respective legal, compliance, pharmacy operations and asset protection departments, however named, to provide oversight over the CSCP and its compliance with the Injunctive Terms.  For the purposes of reference herein, this committee, however named, shall be referred to as the "Controlled Substance Compliance Committee."  Rite Aid shall maintain its Controlled Substance Compliance Committee for the duration of the term of the Injunctive Terms.  The Controlled Substance Compliance Director shall be a member of the Controlled Substance Compliance Committee.

2. Rite Aid's Controlled Substance Compliance Committees shall have quarterly meetings during which the Controlled Substance Compliance Director shall report on, and the Controlled Substance Compliance Committee shall review, among other things, (a) the Prescription Validation Process, including the CSCP Policies and Procedures on identifying and resolving Patient, Prescriber, and Prescription Red Flags; (b) the training required under the Injunctive Terms; (c) proactive due diligence and site visits; (d) the Prescriber Review Processes; (e) significant new national and regional diversion trends involving Controlled Substances; (f) Rite Aid's adherence to the Injunctive Terms and applicable laws and regulations; and (g) any technology, staffing, or other resource needs for the CSCP. The Controlled Substance Compliance Committee shall have access to all CSCP reports described in the following subsection.

3. On an annual basis, Rite Aid's Controlled Substance Compliance Committees shall provide a written report to the President of Rite Aid's Retail Division, the Chief Financial Officer of its Retail Division, the Chief Legal Officer of its Retail Division, and its corporate Chief Compliance Officer, outlining (a) Rite Aid's adherence to, and any material deviations from these Injunctive Terms; (b) the allocation of resources sufficient to comply with these Injunctive Terms; and (c) any revisions to the CSCP that the Controlled Substance Compliance Committee has approved.  The corporate

Chief Compliance Officer shall determine if and when it is appropriate to make a report to the Board or any subcommittee thereof, but shall report at least annually.

4. Rite Aid, through its Controlled Substance Monitoring Department and Committee, shall, at least once every year, review and oversee any enhancements to the CSCP Policies and Procedures and systems for dispensing activity that the Controlled Substance Compliance Committee deems necessary.

5. The Controlled Substance Compliance Committee shall be responsible for the approval of all material revisions to the CSCP Policies and Procedures, provided that nothing herein shall prevent Rite Aid from implementing changes to the CSCP Policies and Procedures pending such review and approval.

## VII.  <u>MANDATORY TRAINING</u>

1. The CSCP Policies and Procedures shall be published in a form and location readily accessible to all pharmacy and compliance personnel at each of the Covered Pharmacies in the Settling States.  Online availability is sufficient, so long as pharmacy and compliance personnel have access to a computer with access to the CSCP Policies and Procedures.

2. Rite Aid shall launch training for all existing CSCP Employees, to the extent practical (for example, accounting for employee leave), covering the CSCP Policies and Procedures, including the Prescription Validation Process and corresponding responsibility.  Such training shall be launched within 30 days of the Injunctive Terms Implementation Date or, in the case of Acquiring Third Parties, within 90 days of the acquisition of the Covered Pharmacies. All CSCP Employee new hires, to the extent practical, shall be required to participate in such trainings within 30 days of hiring or four months of the Injunctive Terms Implementation Date (or in the case of Acquiring Third Parties, four months of the date that Covered Pharmacies were acquired), whichever is later.  Rite Aid will further require that every CSCP Employee, to the extent practical, receive such training at least once every three (3) years for the term of these Injunctive Terms.

3. On an annual basis for the duration of these Injunctive Terms, Rite Aid shall test its CSCP Employees on their knowledge regarding the CSCP Policies and Procedures, including the Prescription Validation Process and corresponding responsibility.

4. It shall be a part of the CSCP Policies and Procedures and all trainings of all CSCP Employees required under these Injunctive Terms that pharmacists shall refuse to dispense Controlled Substances that they believe were prescribed or are being used for other than a legitimate medical purpose or that they believe were not prescribed by an individual Prescriber acting in the usual course of his or her professional practice.

5. All trainings required under these Injunctive Terms shall also make clear that (i) compensation and non-retaliation policies, including pursuant to these Injunctive Terms, prevent CSCP Employees from being compensated or penalized in any way related to revenue or profitability targets or expectations specific to sales of Controlled Substances; and (ii) pharmacists will not be penalized in any way for exercising their professional judgment to refuse to fill prescriptions for Controlled Substances pursuant to their corresponding responsibility.

## VIII.   THE PRESCRIPTION VALIDATION PROCESS

1. As part of its CSCP, Rite Aid shall maintain a Prescription Validation Process in the CSCP Policies and Procedures, as further described and set forth in this section, that each pharmacist employed by Rite Aid at a Covered Pharmacy in a Settling State must follow when dispensing a prescription for a Controlled Substance. The inclusion of an enumerated Red Flag in these Injunctive Terms shall not be considered, construed, or represented to be an admission, concession, or evidence of any factual or legal contention related to such Red Flag. A Red Flag shall not be interpreted to mean that a prescription is, or is more likely than not, illegitimate and/or not issued in the usual course of professional practice or treatment.

2. A Red Flag will be considered "resolved" if, after further investigation as described below, and given other facts and circumstances surrounding the prescription, a pharmacist determines, in his or her professional judgment, that the facts that triggered the Red Flag do not lead him or her to believe that the prescription was written or is being submitted for an illegitimate medical purpose or outside the usual course of a Prescriber's professional practice.

3. Rite Aid's CSCP Policies and Procedures shall provide that if a pharmacist at a Covered Pharmacy identifies any "Patient Red Flags" associated with a Controlled Substances prescription (described in Section IX(3) below), before filling the prescription the pharmacist must resolve them; and that the method of resolution falls within the judgment of the pharmacist and may include reviewing the Patient's profile and history with Rite Aid, calling the Prescriber or Prescribers if appropriate, speaking with the Patient if appropriate, calling on the pharmacist's pre-existing knowledge of the Patient or Prescriber, reviewing available Prescription Monitoring Program ("PMP" or "PDMP") data, and/or reviewing other data or information available to the pharmacist.

4. Rite Aid's CSCP Policies and Procedures shall provide that if at a Covered Pharmacy forgery or fraud is suspected, or if the pharmacist identifies any other "Prescription Red Flags" associated with a Controlled Substances prescription (described in Section IX(4) below), the pharmacist must resolve the Prescription Red Flags before filling the

prescription; and that the method of resolution falls within the judgment of the pharmacist and may include reviewing the Patient's profile and history with Rite Aid, calling the Prescriber or Prescribers if appropriate, speaking with the Patient if appropriate, calling on the pharmacist's pre-existing knowledge of the Patient or Prescriber, reviewing available PMP or PDMP data, and/or reviewing other data or information available to the pharmacist.

5. Rite Aid's CSCP Policies and Procedures shall require that if a pharmacist identifies any "Prescriber Red Flags" associated with a Controlled Substances prescription (described in Section IX(5) below), the pharmacist must resolve them before filling the prescription; and that the method of resolution falls within the judgment of the pharmacist and may include reviewing any Rite Aid records regarding the Prescriber, calling the Prescriber if appropriate, speaking with the Patient if appropriate, calling on the pharmacist's pre-existing knowledge of the Patient or Prescriber, reviewing available PMP or PDMP data, and/or reviewing other data or information available to Rite Aid.

6. Rite Aid's CSCP Policies and Procedures related to Schedule II High Alert Controlled Substances shall provide that the resolution of all Red Flags identified by the pharmacist, as well as any prescriptions that were rejected pursuant to Red Flags identified by the pharmacist, and the reasons why they were rejected, must be documented by the pharmacist, unless if based on the pharmacist's pre-existing knowledge of the Patient or Prescriber. Any such records shall be maintained for the duration of these Injunctive Terms. To the extent that a Red Flag is resolved based upon facts or circumstances that are already reflected or documented in Rite Aid's records, further documentation of those facts or circumstances is not required for resolution of substantially the same Red Flag, or another Red Flag that is resolved based upon the same facts or circumstances, on subsequent prescriptions. For example, if a Patient lives fifty-five (55) miles from a Rite Aid but works near the pharmacy and that fact is reflected in pharmacy records, no documentation for the resolution of the Red Flag addressing the Patient's distance from the pharmacy is required in connection with individual prescriptions dispensed for that Patient. A lack of documentation shall not be interpreted to create a presumption that a pharmacist did not resolve any identified Red Flags. Nothing in these Injunctive Terms shall require Rite Aid to create a record in those instances where the pharmacist rejects a prescription when presented without an effort to resolve any red flags, including but not limited to instances where the pharmacist rejects a prescription for clinical reasons, or where the pharmacist identifies on the face of the prescription a Prescription Red Flag (defined in Section IX below) that causes the pharmacist to conclude without further inquiry that the prescription is invalid.

7. Rite Aid's CSCP Policies and Procedures shall provide that, even if all Red Flags are resolved, a pharmacist shall reject a prescription if, in his or her professional judgment, he or she believes that it was written or is being submitted for other than a legitimate medical purpose and/or was written outside the usual course of an individual Prescriber's professional practice.

## IX.  <u>RED FLAGS</u>

1. Upon request by the Settling States, but no more than annually, and no earlier than seven (7) months after the Injunctive Terms Implementation Date, Rite Aid shall provide to the Settling States a report (the "Annual Data Report") that sets forth: (1) the total number of prescriptions for Controlled Substances dispensed annually at Covered Pharmacies, aggregated nationally and by state; (2) the top twenty-five prescribers of High Alert Controlled Substances in each Settling State at Covered Pharmacies; (3) the list of prescribers subject to disclosure in section X.5; (4) the specific process, system, metrics or algorithms (if any) sufficient to demonstrate the operational system's ability to identify each category of Red Flag listed in this section;[2] and (5) the total number of prescriptions that pharmacists at the Covered Pharmacies refused to dispense. Unless otherwise required by law, if a Settling State seeks to disclose any data and/or information provided under this provision as part of a proceeding to enforce these Injunctive Terms or otherwise, it shall first provide ten (10) days' notice to Rite Aid unless doing so would conflict with applicable law. A Settling State shall not otherwise disclose or provide any data provided under this provision to third parties during or after the Term of these Injunctive Terms unless required to do so by law. If a Settling State is required to disclose or provide any data under this provision to third parties during or after the Term of these Injunctive Terms, it shall first provide ten (10) days' notice to Rite Aid unless doing so would conflict with applicable law. All data and/or information provided under this paragraph shall be deemed confidential law enforcement material, to the extent state law permits, and shall not be subject to production unless required by law. Nothing in this paragraph shall be deemed to prevent a Settling State from sharing this material with other State or federal law enforcement agencies.

2. Within the three months following the provision of the Annual Data Reports, either Rite Aid or the States Injunctive Relief Committee may propose in writing a meet and confer to discuss potential changes to the scope of one or more categories of Red Flags for Rite Aid. At such a meeting, Rite Aid or the States Injunctive Relief Committee

---

[2] For any Red Flags in Section IX that take effect 18 months after the Injunctive Terms Implementation Date, as set forth in Section IX.6 below, Rite Aid will be under no obligation to report the "process, system, metrics, or algorithms (if any)" relating to those Red Flags until 18 months after the Injunctive Terms Implementation Date.

may provide additional research, information or data available to them beyond that provided in the Annual Data Reports. For example, Rite Aid might propose reducing the threshold for triggering a particular category of Red Flag or consolidating certain Red Flags or subcategories of Red Flags into a single metric, or the States Injunctive Relief Committee might propose increasing the threshold for triggering a particular Red Flag or expanding that Red Flag to include multiple subcategories (*e.g.*, number of prescriptions, distance thresholds).

    a.  If Rite Aid and the States Injunctive Relief Committee agree on such changes to one or more Red Flags, they shall document those changes in writing and they shall become a part of these Injunctive Terms for Rite Aid for all intents and purposes.

    b.  If Rite Aid and the States Injunctive Relief Committee cannot agree on the proposed changes during their meeting and confer, the Party seeking the change(s) to the Red Flag(s) may seek a 5-day mediation of the issue at its own expense. In such a mediation, the Party seeking the proposed change(s) may provide evidence from Annual Data Reports or from other research, data and information.

    c.  In any such mediation, there shall be a presumption against imposition of any proposed Red Flags, or proposed modifications to pre-existing Red Flags, that have not been identified by the United States Drug Enforcement Administration (DEA) or other law enforcement agencies tasked with the regulation of Controlled Substances.

    d.  The Red Flags required by these Injunctive Terms shall at no point be too numerous or complex to be reasonably workable for pharmacists in the context of protecting patient safety, performing corresponding responsibility, drug utilization review, and their other responsibilities.

3.  Rite Aid's CSCP Policies and Procedures shall direct its pharmacists at Covered Pharmacies to treat the following circumstances as "Patient Red Flags":

    a.  A Patient seeks to fill a Schedule II High Alert Controlled Substance prescription more than three days prior to the contemplated exhaustion date of an earlier prescription of the same Schedule II High Alert Controlled Substance (e.g., exhaustion of the days' supply assuming the prescription has been taken in accordance with the prescribers' directions on the face of the prescription), provided the previous prescription was also dispensed by the same Covered Pharmacy;

b. A Patient seeks to fill a High Alert Controlled Substance prescription from a
Prescriber after having filled High Alert Controlled Substance prescriptions at
the same Covered Pharmacy from more than four other Prescribers, from
separate practices, in a given 6-month period;[3]

c. A Patient seeks to fill a High Alert Controlled Substance prescription after
having filled three other High Alert Controlled Substance prescriptions written
by multiple Prescribers with overlapping days of supply at Rite Aid's
pharmacies within thirty (30) days;

d. The distance between a Patient's residence and the Covered Pharmacy
receiving the High Alert Controlled Substance prescription is farther than 50
miles;

e. The Patient resides more than one hundred (100) miles from the Prescriber who
issued the High Alert Controlled Substances prescription (but this shall not be
a Patient Red Flag for patients receiving prescriptions via telehealth or
telemedicine);

f. To the extent personally known by the dispensing pharmacist, a Patient seeks
to fill a High Alert Controlled Substance prescription after having two other
prescriptions for High Alert Controlled Substances subjected to documented
refusals to fill by a Rite Aid pharmacist within the past thirty (30) days;

g. To the extent personally known by the dispensing employee, a patient pays in
cash for a High Alert Controlled Substance despite having prescription drug
insurance on file for that medication;

h. Three or more Patients come to the pharmacy together to fill prescriptions for
the same High Alert Controlled Substances;

i. A Patient requests a High Alert Controlled Substance by its slang or street
description, such as "Mallinckrodt blues," "M's" or "the blue pill"; and

j. A Patient presenting a prescription for a High Alert Controlled Substance
appears visibly altered, intoxicated, or incoherent.

4. Rite Aid's CSCP Policies and Procedures shall direct its pharmacists at Covered
Pharmacies to treat the following circumstances as "Prescription Red Flags:"

a. A Controlled Substance prescription fails to meet the requirements of law;

---

[3] In Rite Aid's sole discretion, for administrative convenience Rite Aid may implement this Red
Flag without regard to whether Prescribers are at separate practices, thereby resulting in more
instances in which the flag occurs.

b. A Controlled Substance prescription that appears altered, including but not limited to, a photocopied prescription or a prescription in which an altering agent, such as white out, was used;

c. A Controlled Substance prescription written with misspellings suggesting the prescription may not have been written by a valid Prescriber;

d. A Controlled Substance prescription using atypical abbreviations suggesting the prescription may not have been written by a valid Prescriber; and

e. A Controlled Substance prescription written with multiple colors of ink or in multiple different handwritings.

5. Rite Aid's CSCP Policies and Procedures shall direct its pharmacists at Covered Pharmacies to treat the following circumstances as "Prescriber Red Flags:"

a. A Patient presents simultaneous prescriptions from a single prescriber for all three of a Schedule II High Alert Controlled Substance, a benzodiazepine, and carisoprodol;

b. A Prescriber provides a Patient with overlapping prescriptions for all three of a Schedule II High Alert Controlled Substance, a benzodiazepine, and carisoprodol;

c. To the extent personally known by the dispensing pharmacist, Prescriber has been the subject of more than ten (10) documented refusals to fill within a six month period;

d. A Prescriber has no office within fifty (50) miles of the Covered Pharmacy where a High Alert Controlled Substance prescription is submitted (but this shall not be a Prescriber Red Flag for prescribers issuing prescriptions via telehealth or telemedicine); and

e. A Prescriber of High Alert Controlled Substances uses prescriptions that are preprinted or stamped with drug type and amount.

6. The Red Flags in Section IX (3)(b) through (e), (5)(b), and 5(d) shall take effect 18 months after the Injunctive Terms Implementation Date. All other Red Flags shall take effect four (4) months after the Injunctive Terms Implementation Date. [4]

---

[4] All Red Flags will be incorporated into the relevant CSCP Policies and Procedures and training documents within thirty (30) days of the Injunctive Terms Implementation Date.

## X.    PRESCRIBER REVIEW

1. Rite Aid shall regularly review the prescribing patterns and practices of Prescribers of High Alert Controlled Substances (the "Prescriber Review Process") at Covered Pharmacies. The Prescriber Review Process shall employ algorithms, or other means, to review data on Rite Aid's retail dispensing for potential Prescribers of concern.

2. Rite Aid shall initiate Prescriber Review Process in the following circumstances:

    a. Personnel implementing the Prescriber Review Process become aware that a Prescriber of High Alert Controlled Substances located in a Settling State has been charged or indicted with a crime related to prescribing High Alert Controlled Substances by the Federal Government or law enforcement in a Settling State;

    b. Rite Aid receives a notification regarding a potentially suspicious Prescriber through its ServiceNow system from a pharmacist; or

    c. Rite Aid has received a Hotline complaint that has been investigated and substantiated concerning a Prescriber's illegitimate prescribing of High Alert Controlled Substances.

3. Based on the professional judgment of the employees operating the Prescriber Review Process, Rite Aid may also initiate the Prescriber Review Process when:

    a. Personnel implementing the Prescriber Review Process are notified in writing by law enforcement that a Prescriber of High Alert Controlled Substances located in a Settling State is the target of an investigation regarding the prescribing of Controlled Substances;

    b. Personnel implementing the Prescriber Review Process are notified in writing by field personnel who supervise Rite Aid's pharmacists in Covered Pharmacies about a Prescriber he or she thinks should be reviewed; or

    c. Rite Aid's review of dispensing data and publicly available information identifies reasons for concern regarding a Prescriber.

4. Once Rite Aid identifies a Prescriber for further investigation, it shall review pertinent and available data or information pertaining to the Prescriber, which may include interviews of pharmacists and support staff when appropriate and of the Prescriber when appropriate. All data and information collected or created as part of the Prescriber Review Process shall be maintained by Rite Aid for the length of these Injunctive

Terms. When permitted by law, nothing contained in this Section prevents Rite Aid from taking immediate action to Block a Prescriber in lieu of referral for further investigation or prevents a Rite Aid pharmacist from refusing to fill any particular prescription or refusing to fill prescriptions from a given Prescriber.

5. If after the Prescriber Review Process those making the decision have not resolved the circumstances that caused Rite Aid to further investigate the Prescriber, then the Prescriber shall be Blocked from having Controlled Substance prescriptions filled at Rite Aid's retail pharmacies in the Settling States, when permitted by law, with an opportunity, at the discretion of Rite Aid, for the Prescriber to seek future reinstatement by providing information to Rite Aid that resolves its concerns. This block shall be on top of and in addition to any block based on a Prescriber's licensure. On written demand by a Settling State, Rite Aid shall provide to that Settling State the names and, to the extent available to Rite Aid, the DEA registration or NPI numbers, of Prescribers within that Settling State who have been subject to its Prescriber Review Process and/or whose prescriptions it has blocked pursuant to the Prescriber Review Process.

## XI.    PROACTIVE DUE DILIGENCE AND SITE VISITS

1. During the term of these Injunctive Terms, Rite Aid shall conduct periodic proactive compliance reviews of its Covered Pharmacies to assist with the identification of potential compliance issues related to the dispensing of High Alert Controlled Substances at its retail pharmacy stores in the Settling States. This may be satisfied by the use of algorithms, or other electronic means, to analyze data associated with each such pharmacy's dispensing of High Alert Controlled Substances to identify particular pharmacies for review as required under this Section XI. Documentation of any resulting reviews shall be maintained by Rite Aid and made accessible to all Controlled Substance Monitoring Department personnel upon request for the duration of these Injunctive Terms.

2. During the term of these Injunctive Terms, Rite Aid personnel or qualified third-party compliance consultants shall conduct site visits to each Covered Pharmacy identified for further review during a calendar year. These site visits shall at a minimum consist of a review of Controlled Substance dispensing documentation and recordkeeping; and a review of physical surroundings and other circumstances for any indications of potential non-compliance with these Injunctive Terms or the CSCP Policies and Procedures (for Rite Aid), or any violations of other applicable laws and regulations related to the dispensing of Controlled Substances.

3. During reviews and site visits, Rite Aid personnel or qualified third-party compliance consultants shall (by video or in person) interview relevant pharmacy employees, if

appropriate, about any potential areas or issues of concern, including potential violations of laws related to the dispensing of Controlled Substances, the CSCP Policies and Procedures (for Rite Aid), and these Injunctive Terms.

4.  Rite Aid personnel or qualified third-party compliance consultants who conduct site visits shall complete a report reflecting the findings of any site visit pursuant to this section.  This report shall document areas or issues of concern, including potential violations of law related to the dispensing of Controlled Substances, the CSCP Policies and Procedures (for Rite Aid), and these Injunctive Terms.

5.  The site visit reports described above shall be maintained and made accessible by Rite Aid to all Controlled Substance Monitoring Department personnel for the duration of these Injunctive Terms. Upon its request, the States Injunctive Relief Committee shall be provided sample reports or a report for a particular Covered Pharmacy.

## XII.    THEFT AND LOSS PREVENTION

1.  In addition to complying with all theft and loss procedures, policies and precautions required by state and federal law, Rite Aid shall maintain for at least three years information regarding the receipt and disposition of inventory of all High Alert Controlled Substances at each Covered Pharmacy.

2.  In addition to any other reporting obligations under state and federal law, Rite Aid must provide to each Settling State on a quarterly basis, upon request, any reports it has made to the DEA regarding the theft or significant loss of High Alert Controlled Substances at a Covered Pharmacy in that Settling State pursuant to 21 C.F.R. §1301.76(b).  Each Settling State shall provide contact information in order to receive such reports.  There shall be no obligation to provide these reports to Settling States that receive contemporaneous reporting of thefts or significant losses of High Alert Controlled Substances to a Settling State's board of pharmacy.

## XIII.   REPORTING TO LAW ENFORCEMENT

1.  Rite Aid shall give Notice to the States Injunctive Relief Committee 10 days prior (or as soon as known to the extent it is less than 10 days) to any Covered Pharmacy being purchased by, leased to, managed by, or otherwise taken control of by an Acquiring Third Party, along with the nature of the transaction, the address of the Covered Pharmacy, and the name and address of the Acquiring Third Party.

2.  The Settling States shall inform Rite Aid to what extent their law enforcement authorities would like to receive reports, other than those already required by law or

regulation, of any confirmed forged prescriptions. To the extent not already in place, Rite Aid shall implement standard operating procedures directing its employees at Covered Pharmacies to report any confirmed forged prescriptions for High Alert Controlled Substances to those Settling States who have indicated that they want to accept it, within five (5) days of completing any review of such prescription or conduct. The Settling States shall provide contact information in order to receive such reports.

3.  Rite Aid shall document and for at least two (2) years maintain records of any such reports that are made to Settling States regarding confirmed fraudulent or forged prescriptions, which are maintained centrally.

## XIV.   ENFORCEMENT OF INJUNCTIVE TERMS

1.  Notice of Potential Violations and Opportunity to Cure.

    a.  A "Potential Violation" occurs when the Settling State determines, after appropriate investigation and due diligence, that Rite Aid is not in substantial compliance with a material aspect of the applicable Injunctive Terms. A Potential Violation may be for a single retail pharmacy. A violation of this Agreement is not presumed to occur when a pharmacist, pharmacist technician, or other field personnel who supervise pharmacists and/or pharmacist technicians employed by Rite Aid violates that entity's CSCP Policies and Procedures.

    b.  Potential Violation Discovered by Settling State.

        i.   In the event of a Potential Violation identified by a Settling State, the Settling State shall notify Rite Aid, as well as the States Injunctive Relief Committee, in writing (the "State's Notice").

        ii.  Within thirty (30) days of receipt of the State's Notice, Rite Aid shall provide a written response to the Settling State and the States Injunctive Relief Committee. The response shall include Rite Aid's position as to the act(s) of non-compliance, including, possibly, a statement setting forth why Rite Aid or the Acquiring Third Party believes it is in substantial compliance with the relevant provision(s) or a statement explaining how the Potential Violation has been addressed.

        iii. If the Settling State wishes to meet with Rite Aid, Rite Aid shall promptly make itself available for such a meeting.

c. If, after review of a written response and any meeting, the Settling State believes that a Potential Violation is ongoing or has not been substantially addressed, it will provide written notice to Rite Aid and work in conjunction with Rite Aid to devise, within thirty (30) days, a corrective action plan ("Corrective Action Plan") to remedy such Potential Violation, including a reasonable period for implementation of such plan.

d. Within sixty (60) and one hundred twenty (120) days after implementing the Corrective Action Plan, Rite Aid will provide a written compliance update to the Settling State and make itself available to meet with the Settling State if requested. If, after reviewing the compliance update and any meeting, the Settling State believes a Potential Violation remains ongoing or has not been substantially addressed, the Settling State may commence a 30-day mediation period. If mediation fails to resolve the dispute between the parties, the Settling State may take whatever action it deems necessary, including but not limited to bringing an action to enforce these Injunctive Terms, filing a new action (administrative or civil action) for a violation of the Injunctive Terms, as allowed by state law, conducting further investigation, or attempting to negotiate an updated Corrective Action Plan with Rite Aid. But the Settling State may not seek to reinstate claims that have been released as part of the Settlement Agreement.

e. If Rite Aid fails or refuses to provide a written response, to devise or implement a Corrective Action Plan or to provide a compliance update as required by subsections 1(b), 1(c) and/or 1(d), a Settling State may bring an action to enforce these Injunctive Terms, file a new action (administrative or civil action) for a violation of the Injunctive Terms, as allowed by state law, conduct further investigation, or attempt to negotiate an updated Corrective Action Plan with Rite Aid. But the Settling State may not seek to reinstate claims that have been released as part of the Settlement Agreement.

f. If, after review of a written response and any meeting, pursuant to subsections 1b. or 1c., above, the Settling State concludes that a Potential Violation is not ongoing or has been substantially addressed, the Settling State will provide written notice of this conclusion to Rite Aid within thirty (30) days of reaching its conclusion.

2. Enforcement Action. Each Settling State agrees that prior to taking any court or administrative action, other than an action that the Settling State concludes is necessary to address an immediate threat to the health, safety, or welfare of the citizens of the

Settling State, or that a public emergency requiring immediate action exists, it will follow the process outlined above. If the Settling State concludes that action is necessary to address an immediate threat to the health, safety, or welfare of the citizens of the Settling State or that a public emergency requiring immediate action exists, it will make best efforts to provide reasonable notice to Rite Aid prior to initiating any such action.

## XV.   COMPLIANCE CERTIFICATION

1. Rite Aid's Controlled Substance Compliance Director shall, after diligent inquiry, complete an annual compliance certification as set out in Section XV(4).

2. The certification shall be filed annually for the duration of these Injunctive Terms with a Settling State's appropriate licensing and/or regulatory agency and its Attorney General.

3. The certification shall state:

> "I understand the compliance requirements and responsibilities as they relate to the Controlled Substance Monitoring Department, which is under my supervision. My job responsibilities include attempting to achieve compliance with regard to the Controlled Substance Monitoring Department with all applicable statutory requirements, obligations of the Injunctive Terms, and applicable policies, and I have taken steps to promote such compliance. To the best of my knowledge, the Controlled Substance Monitoring Department is in compliance with the obligations of these Injunctive Terms. I understand that this certification is being provided to and relied upon by the State of [Settling State]."

4. If the Controlled Substance Compliance Director is unable to provide such a certification, the Controlled Substance Compliance Director shall provide a written explanation of the reasons why he or she is unable to provide the certification outlined above.

## XVI.   DATA SHARING

1. Rite Aid shall consent to the provision by its distributors of unblinded "867 Data" (data sent from the distributor to the manufacturer concerning the sale of its products to Rite Aid) from Covered Pharmacies to opioid manufacturers on any particular High Alert Controlled Substances manufactured by them as soon as commercially reasonable and at no cost to the manufacturers, provided that, pursuant to a prior written agreement with Rite Aid, the opioid manufacturers agree (a) to ensure the confidentiality of the

867 Data, except as required by law; (b) to implement safeguards and procedures to limit access to and use of the 867 Data, except as required by law; (c) that the 867 Data shall be used solely for compliance purposes as part of their Suspicious Order Monitoring programs; (d) that the 867 Data shall be shared only with specified personnel and shall not be shared with  sales personnel.[5]

2. To the extent that Rite Aid provides McKesson Corporation, Cardinal Health, Inc., or AmerisourceBergen Corporation (the "Settling Distributors") with Pharmacy Customer Data (as defined in the Distributor Injunctive Terms) for use in its Controlled Substance Monitoring Programs, Rite Aid agrees that the Settling Distributor(s) may share such Pharmacy Customer Data from Covered Pharmacies with the Monitor appointed pursuant to the Distributor Injunctive Terms, provided that the Pharmacy Customer Data does not contain any HIPAA-protected information or is redacted and/or deidentified to remove any HIPAA-protected information, and provided that the Monitor agrees, pursuant to a prior written agreement with Rite Aid, (a) to ensure the confidentiality of the Pharmacy Customer Data; (b) to implement safeguards and procedures to limit access to and use of the Pharmacy Customer Data; (c) that the Pharmacy Customer Data is used solely for the purpose of ensuring the Settling Distributors' compliance with the Distributor Injunctive Terms; and (d) that the Pharmacy Customer Data shall be shared only with specified personnel.

## XVII.  CLEARINGHOUSE

1. Rite Aid will confer with any Settling Distributor that distributes High Alert Controlled Substances to its retail pharmacies and the States Injunctive Relief Committee for a period not to exceed six (6) months from the Injunctive Terms Implementation Date or the date when Covered Pharmacies are acquired by the third party, to determine: (i) what additional deidentified information, if any, is needed from Rite Aid for a Settling Distributor to perform suspicious order monitoring; (ii) if additional deidentified information is needed, how Rite Aid shall provide it to a Settling Distributor; and (iii) what information provided by Rite Aid to a Settling Distributor, if any, may be deposited by the Settling Distributor into the Clearinghouse. For the avoidance of doubt, "deidentified" does not refer to Prescriber personal information.  If agreements are not reached, the matters in dispute shall be submitted to arbitration. Due to patient privacy and legal restrictions and other confidentiality and commercial concerns, in connection with any meet and confer described above, Rite Aid may not be compelled to provide individual patient-level or prescription level data, de-identified or otherwise, to the Settling Distributors.

---

[5] Rite Aid is free to negotiate contractual terms with any opioid manufacturer that seeks its unblinded 867 Data to ensure compliance with the provisions of this paragraph.

2. Any data provided by Rite Aid to a Settling Distributor and/or the Clearinghouse pursuant to these Injunctive Terms shall be maintained, used, and disclosed by the recipient in compliance with state and federal law, including, but not limited to, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and all applicable state and federal privacy and data security laws. Rite Aid shall de-identify any protected health information subject to this Agreement in compliance with the HIPAA de-identification standard set forth at 45 C.F.R. § 164.514, and a Settling Distributor or the Clearinghouse shall not attempt to re-identify such data.

3. No Settling Distributor or other participant in the Clearinghouse shall receive from the Clearinghouse information specific to Rite Aid.

## XVIII. DOCUMENT DISCLOSURE

1. Documents Subject to Public Disclosure. The following documents are subject to public disclosure in perpetuity, except for the redactions authorized by Section 2:

   a. The following documents publicly filed in *In re Opioid Litigation*, Index No. 400000/2017 (N.Y. Sup. Ct., Suffolk County) and *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio):[6]
      i.   All transcripts for depositions of Rite Aid's current and former employees and management,
      ii.  All Rite Aid summary judgment filings,
      iii. All Rite Aid expert reports, and
      iv.  All Rite Aid expert depositions.

   b. Rite Aid's filed motions to dismiss and exhibits in the action *United States ex rel. White, et al. v. Rite Aid Corp.*, Index No. 1:21-cv-1239 (N.D. Ohio).

2. Public Disclosure Through a Document Repository

   a. Each Settling State may publicly disclose all documents covered by this section through a public repository maintained by a governmental, non-profit, or academic institution. Each Settling State may specify the terms of any such repository's use of those documents, including allowing the repository to index and make searchable all documents subject to public disclosure, including the metadata associated with those documents.

---

[6] If Rite Aid redacted a document prior to publicly filing it, Rite Aid will provide the redacted, publicly-filed version of that document.

3. Timeline for Production

    a. Rite Aid shall produce all documents required by Section 1 within nine months from the Injunctive Terms Implementation Date.

4. Within thirty (3) calendar days of the Injunctive Terms Implementation Date, Rite Aid will make one time payments totaling $100,000 to the University of California, San Francisco Foundation (UCSF Foundation) and The John Hopkins University, to be used to support a public repository of documents subject to this section.

**Exhibit B**

**List of Co-Defendants**

**Exhibit B**

**Co-Defendant**

**AmerisourceBergen Drug Corporation**

AmerisourceBergen Drug Corporation, in its individual capacity
AmerisourceBergen Drug Corporation, as successor in interest to Bellco Drug Corp.,
H.D. Smith Holdings LLC, H.D. Smith, LLC, and Valley Wholesale Drug Co., LLC
Integrated Commercialization Solutions, Inc.
American Medical Distributors, Inc.
AmerisourceBergen Corporation
J.M. Blanco, Inc.
MWI Veterinary Supply, Inc.
ASD Specialty Healthcare, LLC
PharMEDium Services, LLC

**Cardinal Health**

Cardinal Health, Inc. ("CHI")
Cardinal Health 3, LLC
Cardinal Health 3, Inc.[1]
Cardinal Health l04, LP
Cardinal Health l07, Inc.[2]
Cardinal Health l08, LLC (f/k/a Cardinal Health l08, Inc.)
Cardinal Health ll0, LLC (d/b/a Gen-Source RX) (f/k/a Cardinal Health ll0, Inc.)
Cardinal Healthll2, LLC
Cardinal Healthll3, LLC
Cardinal Health 4ll, Inc.[3]
Cardinal Health P.R. l20, Inc. (f/k/a Borschow Hospital & Medical Supplies, Inc.)
Kinray, LLC (f/k/a Kinray, Inc.)[4]
Cardinal Health 127, Inc.
Cardinal Syracuse, Inc., a New York corporation (Syracuse, New York)[5]
Marmac Distributors, Inc., a Connecticut corporation (Hartford, Connecticut)[6]

---

[1]    Cardinal Health 3, Inc. merged into Cardinal Health 3, LLC on July 1, 2005.

[2]    Cardinal Health 107, Inc. is known as Cardinal Health 107, LLC.

[3]    Cardinal Health 411, Inc. merged into Cardinal Health 110, LLC on January 1, 2016.

[4]    Kinray, Inc. merged into Kinray, LLC on January 1, 2014.  Thereafter, Kinray, LLC merged into Cardinal Health 110, LLC on January 1, 2017.

[5]    Cardinal Syracuse, Inc. merged into Cardinal Health 110, LLC on September 30, 2001.

[6]    Marmac Distributors, Inc. merged into Cardinal Health 200, LLC as of June 30, 2000.

James W. Daly, Inc., a Massachusetts corporation (Peabody, Massachusetts)[7]
Ohio Valley-Clarksburg, Inc., a Delaware corporation (Wheeling, West Virginia)[8]
Chapman Drug Company, a Tennessee corporation (Knoxville, Tennessee)[9]
Cardinal Florida, Inc., a Florida corporation (Lakeland, Florida)[10]
Cardinal Mississippi, Inc., a Mississippi corporation (Richland, Mississippi)[11]
Solomons Company, a Georgia corporation (Savannah, Georgia)[12]
Whitmire Distribution Corporation, a Delaware corporation (Folsom, California)[13]
Humiston-Keeling, Inc., an Illinois corporation (Calumet City, Illinois)[14]
Behrens Inc., a Texas corporation (Waco, Texas)[15]
Parmed Pharmaceuticals, Inc. (f/k/a Parmed Pharmaceuticals, Inc.)[16]
Red Key, Inc., an Ohio corporation
Red Oak Sourcing, LLC, as agent for Cardinal Health
Any other subsidiary of CHI, an Ohio corporation, as may be designated by CHI

**Johnson & Johnson**
Johnson & Johnson
Janssen Pharmaceuticals, Inc.
Ortho-McNeil-Janssen Pharmaceuticals, Inc., n/k/a Janssen Pharmaceuticals, Inc.
Janssen Pharmaceutica, Inc., n/k/a Janssen Pharmaceuticals, Inc.
Alza Corporation
Janssen Ortho LLC

---

[7]   James W. Daly, Inc. changed its name to Cardinal Health 106, Inc. Cardinal Health 106, Inc. then merged into Cardinal Health 103, Inc. Thereafter, Cardinal Health 103, Inc. merged into Cardinal Health 110, LLC on May 31, 2005.

[8]   Ohio Valley-Clarksburg, Inc. merged into Cardinal Health 110, LLC on September 31, 2001.

[9]   Chapman Drug Company Merged into Cardinal Health 103, Inc. on December 31, 1998. Thereafter, Cardinal Health 103, Inc. mergedinto Cardinal Health 110, LLC on May 31, 2005.

[10]  Cardinal Florida, Inc. merged into Cardinal Health 103, Inc. on September 30, 1998. Thereafter, Cardinal Health 103, Inc. merged into Cardinal Health 110, LLC on May 31, 2005.

[11]  Cardinal Mississippi, Inc. merged into Cardinal Health 103, Inc. on September 30, 1998. Thereafter, Cardinal Health 103, Inc. merged into Cardinal Health 110, LLC on May 31, 2005.

[12]  Solomons Company merged into Cardinal Health 103, Inc. on September 23, 1998. Thereafter, Cardinal Health 103, Inc. merged into Cardinal Health 110, LLC on May 31, 2005.

[13]  Whitmire Distribution Corporation is the former name of Cardinal Health 110, LLC.

[14]  Humiston-Keeling, Inc. merged into Cardinal Health 110, LLC on July 1, 1994.

[15]  Behrens Inc. merged into Cardinal Health 110, LLC on June 30, 1998.

[16]  Parmed Pharmaceuticals, Inc. converted to Parmed Pharmaceuticals, LLC on January 1, 2014. Parmed Pharmaceuticals, LLC merged into Cardinal Health 110, LLC on January 1, 2016.

**Henry Schein, Inc.**
Henry Schein, Inc.
Henry Schein Medical Systems, Inc.
Insource, Inc.
General Injectables & Vaccines, Inc.

**Teva Pharmaceuticals USA, Inc.**
Actavis, Inc.
Actavis Elizabeth LLC
Actavis Laboratories FL, Inc.
Actavis Pharmaceuticals NJ, Inc.
Actavis South Atlantic LLC
Anda, Inc.
Barr Laboratories Inc
Cephalon, Inc.
Ivax Pharmaceuticals LLC
Teva API, Inc
Teva Pharmaceuticals, Inc
Teva Pharmaceuticals USA, Inc.
Watson Laboratories, Inc.
Actavis Pharma, Inc.
Actavis Laboratories UT, Inc.
Actavis Mid Atlantic LLC
Actavis LLC
Actavis Totowa LLC
Actavis Kadian LLC
Teva Puerto Rico LLC (f/k/a Warner Chilcott Company LLC)
Cephalon, Inc. (n/k/a Cephalon LLC)
Cupric Holding Co., Inc. (n/k/a Cupric Holding Co. LLC)
Cobalt Pharmaceuticals Inc. (n/k/a Cobalt Laboratories LLC)
Teva Pharmaceutical Holdings Coöperatieve U.A
Teva Pharmaceuticals Europe B.V.
Teva Sales and Marketing, Inc.
Teva Branded Pharmaceutical Products R&D, Inc.
Anda Pharmaceuticals, Inc.
Anesta LLC
Barr Laboratories Inc.
Teva Biopharmaceuticals USA, Inc.
Anda Marketing Inc
Teva Pharmaceutical Industries Ltd.
Abrika Pharmaceuticals, Inc.
Amide Pharmaceutical, Inc.
Arrow International Limited
Breath Limited
Teva Women's Health, LLC
Lotus Labs Pvt. Limited

Pliva Hrvatska d.o.o.
Pliva, Inc.
Teva API B.V.
Teva Czech Industries S.R.O.
Teva Pharmaceuticals Curacao N.V.
Plantex Ltd.
Assia Chemical Industries Ltd.

**Mylan**
Viatris Inc.
Mylan Inc.
Mylan Pharmaceuticals Inc.
Mylan Institutional Inc.
Mylan Technologies Inc.
Mylan Specialty, L.P.
Mylan Bertek Pharmaceuticals Inc.

**McKesson Corporation**[17]
McKesson Corporation
McKesson Canada Corporation
McKesson Medical Surgical Inc.
McKesson Specialty Care Distribution Corporation
McKesson Specialty Distribution LLC
McKesson Medical Surgical Minnesota Supply Inc.
Health Mart Systems, Inc.
McKesson Medical-Surgical Top Holdings Inc.
RxC Acquisition Company
Relay Health Corporation
McKesson High Volume Solutions Inc.
Summa Script LLC
NorthStar Rx LLC
McKesson Pharmacy Systems LLC
Macro Helix LLC
Masters Drug Company, Inc.
NDCHealth Corporation
McKesson Plasma and Biologics LLC

---

[17] Nothing in this **Exhibit B** shall impact or impair the terms and conditions of the McKesson Settlement, including the mutual releases set forth therein. For the avoidance of doubt, McKesson and its related entities that are listed on this **Exhibit B** are listed solely for purposes of making it clear that McKesson is entitled to assert its Co-Defendant Defensive Rights.

**Walmart**

Walmart Inc. and any and all of its past and present direct and indirect parents, subsidiaries, divisions, predecessors, affiliates, successors, assigns, or joint ventures that are set forth in the definition of Released Entities in the Walmart Settlement Agreement, including without limitations the entities in the illustrative entity list appended as Exhibit J thereto (available at https://nationalopioidsettlement.com/wp-content/uploads/2024/02/Walmart-Settlement-Agreement-2024.01.03.pdf).

**Walgreens**

Walgreen Co. and any and all of its past and present direct and indirect parents, subsidiaries, divisions, predecessors, affiliates, successors, assigns, or joint ventures that are set forth in the definition of Released Entities in the Walgreens Settlement Agreement, including without limitations the entities in the illustrative entity list appended as Exhibit J thereto (available at https://nationalopioidsettlement.com/wp-content/uploads/2023/10/2023.10.13-Updated-Walgreens-Multistate-Settlement-Agreement.pdf).

**CVS**

CVS Health Corporation and CVS Pharmacy, Inc. and any and all of their past and present direct and indirect parents, subsidiaries, divisions, predecessors, affiliates, successors, assigns, or joint ventures that are set forth in the definition of Released Entities in the CVS  Settlement Agreement, including without limitations the entities in the illustrative entity list appended as Exhibit J thereto (available at https://nationalopioidsettlement.com/wp-content/uploads/2024/03/2022-12-09-CVS-Global-Opioid-Settlement-Agreement-with-2023-02-03-Technical-Correctios-and-2023-09-29-and-2023-12-15-Updates.pdf).

**Exhibit B**

**Disclosure Statement**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

|  |  |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

<div align="center">

**DISCLOSURE STATEMENT**
**RELATING TO THE SECOND AMENDED**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF RITE AID CORPORATION AND ITS DEBTOR AFFILIATES**

</div>

---

[1]    The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034.  A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid.  The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these Chapter 11 Cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN
ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING
OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THE INFORMATION IN
THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE
STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN
OFFER TO BUY ANY SECURITIES.

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE
STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING
VOTES TO ACCEPT OR REJECT THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF RITE AID CORPORATION AND ITS DEBTOR AFFILIATES.
NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY
ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR
AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY
CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING
THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS
OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL,
OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO
CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL,
SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE
STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED
THEREBY.   FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE
ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT
DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS,
SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS
AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS
BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES
ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH
THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY
DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY
BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND
PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY
REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN IN ALL
PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT
HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE
SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE
INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY
MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON
FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON
VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS.
WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY
REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF
AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE

BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY SEEK TO OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN <u>ARTICLE XI</u> OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING <u>ARTICLE IX</u>, ENTITLED "RISK-FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND
## FORWARD-LOOKING STATEMENTS

The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by the Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign federal regulatory authority and neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  The issuance of securities on or after the Effective Date will not have been registered pursuant to a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or with any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws").  Any representation to the contrary is a criminal offense.  The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of the 1145 Securities, and to the extent such exemption is not available, then such 1145 Securities will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws.  Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

The Private Placement Securities will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or another available exemption from registration and similar applicable state securities laws, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.  Each recipient of New Common Stock distributed other than in reliance upon section 1145(a) of the Bankruptcy Code shall be required to make customary representations to the Debtors including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws.  Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements."  However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms.  Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions, and estimates.  These statements are subject to significant risks, uncertainties and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- Business strategy;

- Technology;

- Financial condition, revenues, cash flows, and expenses;

- **The adequacy of the Debtors' capital resources and liquidity;**

- **Levels of indebtedness, liquidity, and compliance with debt covenants;**

- **Financial strategy, budget, projections, and operating results;**

- **The amount, nature, and timing of capital expenditures;**

- **Availability and terms of capital;**

- **Successful results from the Debtors' operations;**

- **The integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;**

- **Costs of conducting the Debtors' other operations;**

- **Delays in filing reports with the SEC and modifications to previously reported financial results as a result of the application of accounting standards;**

- **General economic and business conditions;**

- **Effectiveness of the Debtors' risk management activities;**

- **Counterparty credit risk;**

- **The outcome of pending and future litigation;**

- **Uncertainty regarding the Debtors' future operating results;**

- **Plans, objectives, and expectations;**

- **Risks in connection with acquisitions;**

- **The potential adoption of new governmental regulations; and**

- **The Debtors' ability to satisfy future cash obligations.**

**Statements concerning these and other matters are not guarantees of the Company's future performance.  There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein.  These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; (f) customer responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect**

to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors'; (l) the effect of competitive products, services, or procuring by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost-reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the Exit Facilities and the New Common Stock, to be entered into, or issued, as the case may be, pursuant to the Plan; (s) the results of renegotiating certain key commercial agreements and any disruptions to relationships with landlords, suppliers, partners, among others; (t) compliance with laws and regulations; and (u) each of the other risks identified in this Disclosure Statement.  Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct.  The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.  We undertake no obligation to update or revise the forward-looking statements included in the Plan and Disclosure Statement, whether as a result of new information, future events or otherwise.

# Table of Contents

**Page**

| | | |
|---|---|---|
| I. | **INTRODUCTION** ..................................................................................................... | **1** |
| II. | **PRELIMINARY STATEMENT** ................................................................................ | **1** |
| III. | **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN** ................................................................................................................ | **6** |

| | | |
|---|---|---|
| A. | What is chapter 11? ............................................................................................... | 6 |
| B. | Why are the Debtors sending me this Disclosure Statement? ............................... | 6 |
| C. | Am I entitled to vote on the Plan? ....................................................................... | 7 |
| D. | What is the "toggle" feature of the Plan? ............................................................ | 7 |
| E. | What is the Restructuring Transaction under the Plan? ........................................ | 7 |
| F. | When will I be informed if the Debtors "toggle" to a Sale Transaction Restructuring? ................ | 8 |
| G. | What will I receive from the Debtors if the Plan is consummated? ...................... | 8 |
| H. | What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim? ................................................ | 13 |
| I. | Are any regulatory approvals required to consummate the Plan? ........................ | 18 |
| J. | What happens to my recovery if the Plan is not confirmed or does not go effective? ............... | 18 |
| K. | If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ................ | 18 |
| L. | What are the sources of Cash and other consideration required to fund the Plan? .......................... | 19 |
| M. | What is the effect of the Plan on the Debtors' ongoing businesses? ................... | 24 |
| N. | Are there risks to owning the New Common Stock upon emergence from chapter 11? ............... | 25 |
| O. | Is there potential litigation related to the Plan? ................................................. | 25 |
| P. | What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan? ................ | 25 |
| Q. | What is the GUC Equity Trust? ........................................................................... | 25 |
| R. | What is the Litigation Trust? ............................................................................... | 26 |
| S. | Does the Plan preserve Causes of Action? .......................................................... | 27 |
| T. | Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan? ................ | 28 |
| U. | What is the deadline to properly execute, complete, and submit Ballots (*i.e.*, vote)? .................... | 43 |
| V. | How do I vote for or against the Plan? ................................................................ | 43 |
| W. | Why is the Bankruptcy Court holding a Combined Hearing? ............................... | 43 |
| X. | What is the purpose of the Combined Hearing? ................................................... | 43 |
| Y. | When is the Combined Hearing set to occur? ...................................................... | 44 |
| Z. | Will any party have significant influence over the corporate governance and operations of the Post-Effective Date Debtors? ................ | 44 |
| AA. | Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................ | 44 |
| BB. | Do the Debtors recommend voting in favor of the Plan? ..................................... | 45 |

| | | |
|---|---|---|
| IV. | **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** ............ | **45** |

| | | |
|---|---|---|
| A. | Rite Aid's Background and Current Operations. ................................................... | 45 |
| B. | Rite Aid's Prepetition Corporate and Capital Structure and Liquidity Profile. ............... | 48 |

| | | |
|---|---|---|
| V. | **EVENTS LEADING TO THE CHAPTER 11 FILINGS** ........................................ | **51** |

| | | |
|---|---|---|
| A. | Liability Management Transactions and Debt Paydowns. ...................................... | 51 |

| | | |
|---|---|---|
| **B.** | Cost-Saving Measures. | 52 |
| **C.** | Sale-Leaseback Transactions. | 52 |
| **D.** | Advisor Engagement. | 52 |
| **E.** | Footprint Rationalization and Rite Aid 2.0 Business Plan. | 52 |
| **F.** | Asset Sales. | 52 |
| **G.** | Corporate Governance Efforts. | 53 |
| **H.** | Stakeholder Engagement. | 55 |

**VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED DEVELOPMENTS OF THE CHAPTER 11 CASES. ....55**

| | | |
|---|---|---|
| **A.** | First Day Relief and Other Case Matters. | 55 |
| **B.** | Appointment of Statutory Committees. | 58 |
| **C.** | Retention of Debtors' Professionals. | 59 |
| **D.** | Lease Rejections and Optimization. | 60 |
| **E.** | Retail and Elixir Sale Processes. | 62 |
| **F.** | Approval of the DIP Facility. | 66 |
| **G.** | Adequate Protection Obligations. | 67 |
| **H.** | Mediation. | 68 |
| **I.** | The Federal Trade Commission Settlement. | 69 |
| **J.** | The Debtor's Pension Plan. | 70 |
| **K.** | Multiemployer Pension Plans. | 71 |
| **L.** | The McKesson Supply Agreement and Related Developments. | 71 |
| **M.** | The Bar Date Order. | 72 |
| **N.** | The *White* DOJ FCA Settlement. | 72 |
| **O.** | The Controlled Substance Injunction. | 73 |
| **P.** | The NAS Claimants and Related Developments. | 73 |
| **Q.** | State of Maryland Adversary Proceeding. | 74 |
| **R.** | Proposed Confirmation Schedule. | 75 |

**VII.    SUMMARY OF THE PLAN. ....76**

| | | |
|---|---|---|
| A. | General Settlement of Claims and Interests. | 76 |
| B. | [[Settlement of Tort Claims | 77 |
| C. | Equitization Transaction. | 78 |
| D. | Sale Transaction Restructuring. | 81 |
| E. | Committee Settlement. | 82 |
| F. | Insurance Neutrality. | 92 |
| G. | Sources of Consideration for Plan Distributions. | 92 |
| H. | Plan Administrator and the Wind-Down Debtors. | 97 |
| I. | Liquidating Trust. | 99 |
| J. | Release of Liens. | 101 |
| K. | Cancellation of Existing Securities and Agreements. | 101 |
| L. | Corporate Action. | 102 |
| M. | New Corporate Governance Documents. | 103 |
| N. | Management Incentive Plan. | 103 |
| O. | Effectuating Documents; Further Transactions. | 103 |
| P. | Section 1146 Exemption. | 104 |
| Q. | Exemption from Securities Act Registration. | 104 |
| R. | Preservation of Causes of Action. | 105 |
| S. | Private Company. | 107 |
| T. | Additional Sale Transactions. | 107 |
| U. | Employment Obligations. | 107 |

**VIII.    OTHER KEY ASPECTS OF THE PLAN ....108**

| | | |
|---|---|---|
| **A.** | Treatment of Executory Contracts and Unexpired Leases. | 108 |

|  | B. | Conditions Precedent to Consummation of the Plan | 116 |

| IX. | **RISK FACTORS** | | **120** |
| | A. | Bankruptcy Law Considerations. | 120 |
| | B. | Risks Related to Recoveries under the Plan. | 125 |
| | C. | Risks Relating to the Sale Transaction Restructuring, if Applicable. | 127 |
| | D. | Risks Related to the Debtors' and New Rite Aid's Businesses. | 128 |
| | E. | Risks Related to the Offer and Issuance of Securities Under the Plan. | 138 |

| X. | **SOLICITATION AND VOTING PROCEDURES** | | **140** |
| | A. | Holders of Claims or Interests Entitled to Vote on the Plan. | 140 |
| | B. | Voting Record Date. | 140 |
| | C. | Voting on the Plan. | 140 |
| | D. | Ballots Not Counted. | 142 |
| | E. | Votes Required for Acceptance by a Class. | 142 |
| | F. | Certain Factors to Be Considered Prior to Voting. | 143 |
| | G. | Solicitation Procedures. | 143 |

| XI. | **CONFIRMATION OF THE PLAN.** | | **144** |
| | A. | The Combined Hearing. | 144 |
| | B. | Requirements for Confirmation of the Plan. | 145 |
| | C. | Best Interests of Creditors/Liquidation Analysis. | 145 |
| | D. | Feasibility. | 145 |
| | E. | Acceptance by Impaired Classes. | 146 |
| | F. | Confirmation Without Acceptance by the Voting Class. | 146 |
| | G. | Valuation. | 147 |

| XII. | **CERTAIN SECURITIES LAW MATTERS** | | **147** |
| | A. | New Common Stock. | 147 |
| | B. | Exemption from Registration Requirements; Issuance of 1145 Securities under the Plan. | 148 |
| | C. | Resales of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code. | 149 |
| | D. | Liquidating Trust Interests and GUC Equity Trust Interests | 152 |

| XIII. | **CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN** | | **152** |
| | A. | Introduction. | 152 |
| | B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 154 |
| | C. | Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Senior Secured Notes Claims and Allowed General Unsecured Claims. | 158 |
| | D. | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders. | 169 |

| XIV. | **RECOMMENDATION OF THE DEBTORS** | | **175** |

# EXHIBITS[2]

EXHIBIT A     Plan of Reorganization

EXHIBIT B     [*Reserved*]

EXHIBIT C     Organizational Structure Chart

EXHIBIT D     Liquidation Analysis

EXHIBIT E     Financial Projections

EXHIBIT F     NAS Claimants Proposals

---

[2]     Each Exhibit is incorporated herein by reference.

## I.    INTRODUCTION

Rite Aid Corporation ("Rite Aid") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," or the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates* (the "Plan"),[1] filed contemporaneously herewith. A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.

## II.    PRELIMINARY STATEMENT

Rite Aid has been on the front lines of delivering healthcare services and retail products to millions of Americans for more than 60 years. A trusted and iconic brand with a long history of serving hundreds of American communities, Rite Aid's mission is to connect everyday care, drive down healthcare costs, and promote whole health for life. Rite Aid's retail pharmacy employs more than 5,500 pharmacists and operates approximately 1,700 pharmacies in sixteen states.

Rite Aid has a storied history of growth and success. Starting from one store in Scranton, Pennsylvania, Rite Aid grew into a Fortune 200 company. With more than $24 billion of revenue in fiscal year 2023, the Company employs more than 40,000 people and fills almost 150 million prescriptions every year. Rite Aid filed these Chapter 11 Cases to implement through the Plan a comprehensive restructuring transaction that will ensure Rite Aid can continue to serve customers and patients and deliver on its core mission for years to come.

### *Prepetition Operational and Financial*
### *Circumstances Leading to These Chapter 11 Cases*

Despite its proud heritage, a confluence of operational and financial factors stressed Rite Aid's financial condition and required a comprehensive reorganization through the Bankruptcy Code, culminating in the commencement of these Chapter 11 Cases on October 15, 2023 (the "Petition Date"):

- ***Substantial Debt Obligations***. Prepetition, Rite Aid had approximately $4.0 billion in funded debt obligations and paid approximately $200 million annually in interest. Debt-service obligations limited Rite Aid's liquidity and constrained its ability to execute on its turnaround initiatives and in-store investments.

- ***Financial and Operational Headwinds***. Rite Aid's financial performance was further impacted by record inflation; elevated labor costs to retain in-demand pharmacist and corporate talent; declining reimbursement rates from third-party payors; reduced demand for front-end merchandise and COVID vaccines; increased shrink costs which are also impacting the rest of the industry; and the loss of key accounts at Elixir, its pharmacy benefit manager ("PBM") business unit which recently sold to MedImpact Healthcare Systems, Inc ("MedImpact"). These headwinds increased operating costs and decreased revenues.

- ***Sub-Optimal Retail Footprint***. The Company's store portfolio was burdened by unprofitable stores which were difficult to effectively exit absent the tools available in chapter 11. These stores challenged the Company's earnings profile, turnaround initiatives, and free cash flow.

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

Even where the Company had been able to close stores, it was burdened by millions of dollars of annual "dead rent" costs due to its inability to exit underlying leases outside of a chapter 11 process.

- **Liquidity and Trade Challenges**. The Company was and continues to be heavily reliant on trade credit. As restructuring-related news and rumors swirled prior to the Petition Date, trade terms contracted. The Company faced working capital constraints as vendors increasingly demanded security deposits and cash-on-delivery (or cash-in-advance) for goods. In fact, prepetition, the Company's liquidity position decreased by more than $100 million due to trade contraction in September and early October.

- **Litigation Overhang**. The Company has a large and varied litigation claims portfolio, including more than 1,600 opioid-related suits. Rite Aid also defends significant contract disputes, government investigations, and securities matters. The Company's extensive litigation portfolio was expensive to manage, drained liquidity, required substantial time and attention from key executives, and complicated the ability to explore out-of-court alternatives, particularly when combined with other operational headwinds.

- **Competitive Pressures**. Rite Aid continues to operate in a highly competitive pharma-retail space. Traditional competitors include other (and much bigger) retail drugstore chains, like CVS and Walgreens; independent drugstores; supermarkets like Kroger; and mass merchandisers like Walmart and Target. Further, online retailers like Amazon and online pharmacies like Capsule, which have different cost structures, have increased competition.

*Proactive Measures to Address*
*Headwinds and Ensure Smooth Transition to Reorganization*

Prepetition, Rite Aid took proactive action to address these headwinds through a variety of measures, over a number of years:

- **Liability Management Transactions**. The Company executed several transactions to reduce indebtedness and borrowing costs, including a 2020 exchange of senior notes due in 2023 for the 2026 Secured Notes; a 2021 redemption of certain outstanding notes at par; and a series of cash tender offers in 2022 for outstanding notes. These transactions extended the Company's runway to explore additional turnaround opportunities. The Company explored other, out-of-court alternatives.

- **Strategic Debt Paydowns**. In recent years, the Company reduced interest expense by paying down approximately $280 million of the 2025 Secured Notes, $52 million of the 2027 Unsecured Notes, and $27 million of the 2028 Unsecured Notes.

- **Cost-Saving Measures**. Over the past several years, the Company explored and executed several cost-saving measures and operational improvements. The Company closed over 200 underperforming stores; initiated a series of restructuring plans to reorganize the executive management team and reduce managerial layers; rationalized its front-end retail offerings to free up working capital and refresh its merchandise assortment; and optimized its pricing and promotional strategies.

- **Sale-Leaseback Transactions**. The Company took advantage of favorable real estate markets in each of 2021, 2022, and 2023, to sell dozens of owned properties (including distribution centers) and enter into long-term leases with the purchasers. These transactions resulted in net proceeds of approximately $178 million in 2021, $57 million in 2022, and $73 million in 2023.

- **Advisor Engagement**.  Rite Aid engaged Guggenheim Securities, LLC ("Guggenheim Securities") in December 2022 and Kirkland & Ellis LLP in April 2023 to assist Rite Aid in analyzing its financing needs and to explore capital structure alternatives and restructuring options.  The Company also engaged Alvarez & Marsal North America, LLC ("Alvarez & Marsal") in May 2023 to conduct a footprint assessment, assist with the business plan and transformation, accelerate cost savings and, if necessary, support contingency preparations.  In addition, Rite Aid engaged Jeffrey Stein as a consultant in June 2023, and Mr. Stein became the Company's Chief Executive Officer and Chief Restructuring Officer contemporaneously with the Petition Date.

- **Footprint Rationalization and Rite Aid 2.0 Business Plan**.  Rite Aid developed the Company's business plan over the course of the summer of 2023 ("Rite Aid 2.0").  The Company with the assistance of its advisors, also undertook an intensive, store-level evaluation that tested the stores' financial performance, rent relative to market, supply chain, and other operational and geographic considerations influencing the competitive landscape.  Based on that analysis, the Company identified a series of stores for closure, which would allow the Company to focus on the remaining portfolio and its ability to invest capital into the remaining stores.

- **Asset Sales**.  In parallel with Rite Aid's turnaround efforts, the Company, with the assistance of Guggenheim Securities, began a marketing process for Elixir, the pharmacy benefit manager.  The Company used the chapter 11 process to complete the Elixir marketing process, culminating in the sale of Elixir effective February 1, 2024 to MedImpact.  The Company has also launched a marketing process for the retail business that remains ongoing as of the filing of this Disclosure Statement.

- **Corporate Governance Refresh**.  The Board formed a Special Committee that met weekly (or more frequently) to consider the strategic and financial alternatives available to the Company.  In addition, Rite Aid proactively evaluated its corporate governance structure and engaged six seasoned Disinterested Directors with substantial restructuring experience to assist its boards.

- **Stakeholder Engagement**.  In parallel with these efforts, Rite Aid engaged with key stakeholders across its capital structure in the hopes of consummating a deleveraging, out-of-court transaction.  Over several months, Rite Aid engaged with a large group of its secured noteholders (the "Ad Hoc Secured Noteholder Group") regarding options to strengthen its balance sheet and right-size its capital structure; the agent on its prepetition ABL Facility, regarding potential financing options; and various governmental agencies and litigation claimants regarding consensual resolutions of several investigations and claims.

### Key Developments in the Chapter 11 Cases

As the Company proceeded with the initiatives described above, it became evident that a restructuring through chapter 11 would best position Rite Aid for long-term success.  Negotiations between the Company and its stakeholders regarding the terms of a comprehensive restructuring accelerated during the summer of 2023.  Following months of diligence and extensive, arm's-length negotiations, Rite Aid and the Ad Hoc Secured Noteholder Group, in consultation with the DIP Agents, had reached an agreement in principle regarding the terms of such a restructuring on October 15, 2023, and concurrently commenced the Chapter 11 Cases.  The restructuring term sheet (the "Restructuring Term Sheet"), attached as Exhibit A to the First Day Declaration [Docket No. 20], memorialized the terms of that agreement in principle at the time.  To facilitate consummation of the restructuring, Rite Aid also obtained nearly $3.5 billion of committed postpetition debtor-in-possession financing, comprised of the DIP ABL Facility, the DIP FILO Facility, and the DIP Term Loan Facility.  The Company filed, on the first day of the cases, initial versions

of this Disclosure Statement and the Plan, a confirmation scheduling motion, global bidding procedures, and lease rejection procedures, among other customary "first day" motions and filings.

Since the commencement of these cases, the Company has taken important steps to advance its restructuring goals:

- **"First Day" Relief.** Obtained all crucial "first day" relief, on a final basis, enabling the Company to smoothly transition its operations into chapter 11;

- **DIP Facilities.** Obtained approval of the DIP Facilities on a final basis with the support of key stakeholder constituencies (including the Committees and the Ad Hoc Secured Noteholder Group), providing continued access to sufficient liquidity for the Company to achieve its restructuring objectives;

- **Interim McKesson Agreement.** Reached agreement with McKesson on the terms of an interim postpetition supply agreement, ensuring the go-forward supply of critical medicines and avoiding the need to litigate the Debtors' adversary complaint;

- **Footprint Rationalization.** Effectuated (a) the rejection of 643 leases resulting in approximately $171 million in annual occupancy savings and (b) the sale of 5 leases for cash proceeds of approximately $1.754 million—each resulting in significant cost savings and cash proceeds as contemplated by "Rite Aid 2.0";

- **Elixir Sale Process.** Obtained court approval of and, on February 1, 2024, consummated the sale of the Elixir Acquired Assets; and

- **Retail Sale Process.** Continued engagement with various interested parties around the terms of potential qualified bids for some or all of the Company's retail assets, including multiple extensions of the Qualified Bid Deadline (as defined in the Bidding Procedures) to facilitate the best possible bids for the Company's assets.

The U.S. Trustee appointed the UCC and the TCC on November 2, 2023. Following the appointment of the Committees, the Company and its advisors devoted significant time and resources to providing diligence and formal discovery productions to and engaging with the Committees and their advisors on key issues and case developments, including regarding the structure of the Restructuring Transactions contemplated by the initial Restructuring Term Sheet and the initial Plan, the treatment of each Committees' constituencies, and final approval and terms of the DIP Facilities, among others. Regarding document production and diligence sharing, the Company has produced more than 1.1 million pages of diligence and discovery to the Committees.

In connection with the settlement reached pursuant to the Final Financing Order, the Debtors, the Committees, the Ad Hoc Secured Noteholder Group, the DIP Agents, and other key stakeholders agreed on the terms of a global mediation process (the "Mediation"), with Hon. Judge Shelly C. Chapman (Ret.) as mediator.

### *Global Settlement and the Restructuring Transactions Contemplated in the Plan*

The Plan is the product of the Mediation and additional extensive, hard-fought negotiations between the Debtors and parties in interest, including the DIP Agents, the Ad Hoc Secured Noteholder Group, the Committees, the U.S. Department of Justice (the "DOJ"), McKesson Corporation ("McKesson"), an ad hoc group of States (formed through the States' Attorneys General), and many others. Indeed, through the Plan, the Debtors have negotiated a series of Restructuring Transactions, and will

effectuate several agreements in principle, subject to final documentation, resolving many of the key issues in these cases.  Through the Plan the Debtors will achieve:

- The deleveraging of Rite Aid's balance sheet by more than $2 billion through the Restructuring Transactions;

- Agreement in principle with McKesson with regard to the settlement of, among other things, the treatment of the McKesson Claim and the terms of the go-forward McKesson New Contract

- The global settlement and resolution of long-running litigation, including regarding certain opioid-related litigation, and other disputes;

- $57 million in new money capital from certain members of the Ad Hoc Secured Noteholder Group, pursuant to the AHG New Money Commitment Agreement;

- The Debtors' active pursuit of the sales process in connection with their retail pharmacy business;

- Subject to conditions of effectiveness of the Plan, emergence from chapter 11 as a revitalized, streamlined "Rite Aid 2.0" business focused on the Debtors' core retail pharmacy business, with enhanced liquidity through access to the Exit Facility, the Takeback Notes, and the new money commitment described above, subject to any Other Asset Sales that may occur between now and the Effective Date;

- A path forward for the Debtors' monetization of the MedImpact Term Loan, including a framework for submission by certain members of the Ad Hoc Secured Noteholder Group of a backstopped stalking horse bid for the MedImpact Term Loan, which will ensure the Debtors receive the highest and best consideration for the MedImpact Term Loan, pursuant to the Plan; and

- Through the Committee Settlement set forth in the Plan, the good-faith compromise and settlement of Claims and controversies among the Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Lenders, which settlement includes the provision of cash (the Committees Initial Cash Contribution and the Committees Post-Emergence Cash Contribution), GUC Equity Trust Interests, Litigation Trust Class A Interests, and other consideration as set forth in <u>Article III.B.6</u> of the Plan to Holders of Allowed General Unsecured Claims.

The centerpiece of the Restructuring Transactions contemplated in the Plan is the Plan Restructuring.  Broadly summarizing, and as more fully provided in the Plan and this Disclosure Statement, under the Plan Restructuring, subject to the outcome of any Sale Transaction Restructuring (described in greater detail below), Holders of Allowed Senior Secured Notes Claims, including such Holders in the Ad Hoc Secured Noteholder Group, will become the go-forward majority owners of the revitalized "Rite Aid 2.0" business, receiving among other consideration described herein and in the Plan (such as the Takeback Notes, the CMSR Recovery, and interests in a Litigation Trust), 90% of New Common Stock less certain deductions, including on account of the GUC Equity Pool.

The Debtors believe that Holders of Allowed General Unsecured Claims will receive through the Plan and the Committee Settlement substantially improved consideration relative to what they would otherwise receive in a liquidation, including cash payments, among other consideration, to Holders of General Unsecured Claims, who the Debtors believe would otherwise receive no recovery in a liquidation.  This consideration includes assets to be placed in a Liquidation Trust formed pursuant to the Plan, to include

substantial cash payments, including an upfront cash payment of $20 million in the aggregate and post-emergence cash payments of up to $27.5 million (the Committees Initial Cash Consideration and the Committees Post Emergence Cash Consideration, respectively, each as defined in the Plan), Assigned Claims, the proceeds of the Assigned Claims, Assigned Insurance Rights, the Tort Claim Insurance Proceeds and the Litigation Trust Class A Interests.  Holders of Allowed General Unsecured Claims will receive interests in the GUC Equity Trust, which will hold the GUC Equity Pool, which is 10% of New Common Stock, subject to (a) reasonable and customary minority protections, (b) certain agreed-upon anti-dilution protections, and (c) dilution on account of the New Common Stock issued pursuant to the Management Incentive Plan.

In all, the Plan, and the Restructuring Transactions contemplated therein, represent the culmination of a herculean effort from the Debtors and their stakeholders to preserve a fundamentally sound and critically important pharmacy business.  Despite the many challenges that Rite Aid faced on the eve of these chapter 11 cases, the Debtors are now poised to pursue confirmation of a plan that will put the Reorganized Debtors on strong financial and operational footing and continue to serve the daily healthcare needs of millions of Americans.  The Debtors strongly believe that the Plan is in the best interests of their estates and represents the best available alternative at this time.  The Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan to ensure their long-term viability and success.  Accordingly, the Debtors strongly recommend that Holders of Claims entitled to vote to accept the Plan.

### III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

#### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

#### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

6

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined in the Plan). Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | FILO Term Loan Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Equity Interests in Rite Aid | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.    What is the "toggle" feature of the Plan?

The Plan will implement the Plan Restructuring unless the Debtors pivot or "toggle" to a Sale Transaction Restructuring that is determined to provide superior value relative to the Plan Restructuring. If the Debtors "toggle" to the Sale Transaction Restructuring, Claims and Interests will receive the proposed treatment under the Plan for a Sale Transaction Restructuring. As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Plan did not include a "toggle" feature, which reduces expenses and permits the Debtors to emerge in either scenario on the expedited timeline currently contemplated.

A vote to accept the Plan is a vote to approve both the Plan Restructuring, including any Other Asset Sales, and a Sale Transaction Restructuring. If the Debtors "toggle" to a Sale Transaction Restructuring pursuant to the Plan, the Debtors will file and serve a notice of such Sale Transaction by the Sale Transaction Notice Deadline, which shall be the same date as the Plan Supplement Deadline (as defined in the Disclosure Statement Order). Restructuring that includes the identity of the successful bidder.

### E.    What is the Restructuring Transaction under the Plan?

Under the Plan, the Debtors are pursuing a Restructuring Transaction through either the (i) Plan Restructuring, the Debtors' baseline restructuring proposal, or (ii) the Sale Transaction Restructuring.

#### 1.    Plan Restructuring.

The Plan Restructuring means the transactions and reorganization contemplated by, and pursuant to, the Plan in accordance with Article IV.C of the Plan. The Plan Restructuring will only occur if certain agreed-upon conditions are satisfied, unless otherwise waived, extended, or modified. If the agreed-upon

conditions do not materialize, the Restructuring Transaction will toggle to the Sale Transaction Restructuring described below.

## 2.    Sale Transaction Restructuring.

As the Debtors pursue the Plan Restructuring, they will continue to engage with all parties regarding the Sale Transaction Restructuring.  Should any Sale Transaction Restructuring materialize that proves more value maximizing than the Plan Restructuring, the Debtors will "toggle" and pursue such a sale(s).

A Sale Transaction Restructuring is described further in Article IV.D of the Plan, and means one or more sale(s) of some, all, or substantially all of the Debtors' assets pursuant to the Bidding Procedures, consummated through one or more Sale Orders, including a Credit Bid Transaction and an Alternative Sale Transaction, that results, in the aggregate, in the disposition of all or substantially all of the Debtors' assets through one or more sale transactions.  In a Credit Bid Transaction, Holders of Senior Secured Notes Claims could purchase all, substantially all, or a material portion of the Debtors' Assets, except for the Elixir Acquired Assets, pursuant to a Purchase Agreement on account of a Credit Bid.[2]  In an Alternative Sale Transaction, one or more third parties would purchase all or substantially all of certain Retail Acquired Assets.

In the event of a Sale Transaction Restructuring, treatment of certain Classes of Claims will toggle as described in Article III.B of the Plan, with Holders of Senior Secured Notes Claims and General Unsecured Claims receiving their Pro Rata shares of Distributable Proceeds, if any, pursuant to the Waterfall Recovery described in the Plan.  For the avoidance of doubt, Holders of General Unsecured Claims shall receive the consideration set forth in the Committee Settlement in either a Plan Restructuring or a Sale Transaction Restructuring, including such adjustments as are necessary to provide Holders of General Unsecured Claims with the economic equivalent of the Committee Settlement.

For more information regarding the Restructuring Transaction, please see Article IV of the Plan.

## F.    When will I be informed if the Debtors "toggle" to a Sale Transaction Restructuring?

The Debtors continue to engage with multiple parties regarding a potential Sale Transaction Restructuring.  If the Debtors "toggle" to a Sale Transaction Restructuring pursuant to the Plan, the Debtors will file and serve a notice of such Sale Transaction Restructuring by the Sale Transaction Notice Deadline that includes the identity of the successful bidder.

## G.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Moreover, the Debtors, the Disinterested Directors, and the Committees continue to investigate and evaluate potential estate claims.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.  FOR A COMPLETE**

---

[2]    At this time, the Required AHG Noteholders have not submitted a credit bid.

**DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim, unless such Holder agrees to less favorable treatment, shall receive, at the option of the Debtors, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim: (i) payment in full in Cash; (ii) the collateral securing its Other Secured Claim; (iii) Reinstatement of its Other Secured Claim; or (iv) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code. | **TBD** | **100%** |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, shall receive, at the option of the applicable Debtor or Wind-Down Debtor, as applicable, in full and final satisfaction, compromise, settlement, and release of and in exchange for | **TBD** | **100%** |

---

[3]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions. "Allowed" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed by the Claims Bar Date or the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed) in accordance with the terms of the Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be Filed), is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt:  (x) a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed after the Claims Bar Date or the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or agreement in writing by the Debtors and the Holder of such late-Filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "Allow" and "Allowing" shall have correlative meanings.

| | | | | |
|---|---|---|---|---|
| | | its Claim:  (i) payment in full in Cash; or (ii) such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code. | | |
| 3 | ABL Facility Claims | To the extent any Allowed ABL Facility Claim remains outstanding on the Effective Date, and except to the extent that a Holder of an Allowed ABL Facility Claim and the Debtor against which such Allowed ABL Facility Claim is asserted agree to less favorable treatment, each Holder of an Allowed ABL Facility Claim shall receive, at the option of the applicable Holder of an Allowed ABL Facility Claim, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim: (i) payment in full in Cash; or (ii) its Pro Rata share of the Exit ABL Facility Loans issued under the Exit ABL Facility. | $0[4] | 100% |
| 4 | FILO Term Loan Facility Claims | To the extent any Allowed FILO Term Loan Facility Claims remain outstanding, and except to the extent that a Holder of an Allowed FILO Term Loan Facility Claim and the Debtor against which such Holder asserts a Claim agree to less favorable treatment for such Holder, each Holder of an Allowed FILO Term Loan Facility Claim shall receive, at the option of the applicable Holder of an Allowed FILO Term Loan Facility Claim, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim: (i) payment in full in Cash; or (ii) its Pro Rata share of Exit FILO Term Loan Facility Loans issued under the Exit FILO Term Loan Facility. | $0[5] | 100% |
| 5 | Senior Secured Notes Claims | Except to the extent that a Holder of an Allowed Senior Secured Notes Claim and a Debtor against which such Allowed Senior Secured Notes Claim is asserted agree to less favorable treatment, on the Effective Date, each Holder of a Senior Secured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim: (i) in the event of | $1,226.9 | Unspecified[6] |

---

[4] The obligations arising under the ABL Facility were converted into DIP ABL Obligations pursuant to the terms of the Financing Orders.

[5] The obligations arising under the FILO Term Loan Facility were converted into DIP FILO Facility obligations pursuant to the terms of the Financing Orders.

[6] As described herein, the Ad Hoc Secured Noteholder Group supports this approach under the Plan Restructuring. Because the Debtors do not want to prejudice the sale process by disclosing estimated recoveries for Holders of Allowed Senior Secured Notes Claims and Holders of Allowed General Unsecured Claims, such recoveries are not estimated herein.  For more detail, please see Article G of this Disclosure Statement entitled, "Valuation." The Debtors have discussed this approach with counsel to the Ad Hoc Secured Noteholder Group.

| | | | | |
|---|---|---|---|---|
| | | a Plan Restructuring: (1) its Pro Rata share of (A) 90% of the New Common Stock, subject to dilution on account of the New Common Stock issued pursuant to the Management Incentive Plan, (B) the Takeback Notes, (C) the CMSR Recovery, (D) up to $2.5 million from the proceeds of the sale of unoccupied real estate of the Debtors that is not part of the Reorganized Debtors, distributed on the first anniversary of the Effective Date, and (E) the Litigation Trust Class B Interests; and (2)(A) if the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures, (I) such Holder's MedImpact NewCo Subscription Rights and (II) such Holder's Pro Rata share of the MedImpact NewCo Notes issued on account of the Final MedImpact Term Loan Bid – Senior Secured Notes Claims Amount, subject to dilution by the MedImpact Backstop Fee NewCo Notes, the MedImpact Rights Offering NewCo Notes, and the MedImpact Unsubscribed NewCo Notes; or (B) if the MedImpact Term Loan Backstop Parties do not acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures, such Holder's Pro Rata share of Cash available for distribution to Holders of Senior Secured Notes Claims in accordance with Section (II)(A) of Exhibit E of the Final Financing Order; or (ii) in the event of a Sale Transaction Restructuring, its Pro Rata share of the Distributable Proceeds, if any, pursuant to the Waterfall Recovery. | | |
| 6 | General Unsecured Claims[7] | As a settlement of all open disputes with the Debtors, the Holders of DIP Claims, and the Holders of Senior Secured Notes Claims, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, a portion of the Litigation Trust Assets and the GUC Equity Trust Interests, as set forth in the UCC / TCC Recovery Allocation | **TBD[8]** | **Unspecified** |

---

[7] For the avoidance of doubt, General Unsecured Claims do not include any Senior Secured Notes Deficiency Claims.

[8] Many of the Claims in Class 6 (General Unsecured Claims) are contingent, unliquidated, and/or disputed. The Proofs of Claim filed on account of such Claims often do not state a Claim amount. Moreover, many that do include a Claim amount assert unsupported amounts or amounts that the Debtors have yet to be able to reconcile. The information necessary to conclusively determine the amount of Claims in Class 6 is generally not available from the Proofs of Claim. Accordingly, such an estimate of the aggregate value of Claims in Class 6 is not currently provided.

| | | Agreement and in accordance with the Litigation Trust Documents, the GUC Equity Trust Documents, and any GUC Sub-Trust Documents, including: (i) the Committees Initial Cash Consideration, (ii) the Committees Post-Emergence Cash Consideration, (iii) 100% of the GUC Equity Trust Interests; (iv) the Tort Claim Insurance Proceeds, and (v) Litigation Trust Class A Interests.<br><br>(c)    *[Channeling:* As of the Effective Date, in accordance with the Plan and the Litigation Trust Documents, any and all liability of the Debtors and/or the Reorganized Debtors for any and all Tort Claims shall automatically, and without further act, deed or court order, be channeled exclusively to, and all of the Debtors' and Reorganized Debtors' liability for such claims shall be assumed by, the Litigation Trust or any applicable GUC Sub-Trust. Each Tort Claim shall be asserted exclusively against the Litigation Trust or GUC Sub-Trust and resolved solely in accordance with the terms, provisions and procedures of the Litigation Trust Documents or GUC Sub-Trust Documents. The sole recourse of any Person, Entity, or other party on account of any Tort Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder Filed a Proof of Claim in the Chapter 11 Cases, shall be to the Litigation Trust or GUC Sub-Trust as and to the extent provided in the Litigation Trust Documents and GUC Sub-Trust Documents. Notwithstanding anything to the contrary herein, Holders of Tort Claims are enjoined from asserting against any Debtor (or their Affiliates) or any Reorganized Debtor (or their Affiliates) any Tort Claim and may not proceed in any manner against any Debtor (or their Affiliates) or Reorganized Debtor (or their Affiliates) on account of any Tort Claim in any other forum whatsoever, including any state, federal, or non-U.S. court or administrative or arbitral forum, and are required to pursue Tort Claims exclusively against the Litigation Trust or GUC Sub-Trust, solely as and to the extent provided in the Litigation Trust Documents and GUC Sub-Trust Documents.]* | | |
| 7 | Intercompany Claims | Each Intercompany Claim shall be, at the option of the Debtors, and, in the event of a Plan Restructuring or a Credit Bid Transaction, with the consent of the Required | **N/A** | **N/A** |

| | | | | |
|---|---|---|---|---|
| | | AHG Noteholders, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as is reasonably determined by the Debtors. | | |
| 8 | Intercompany Interests | Each Intercompany Interest shall be, at the option of the Debtors, and, in the event of a Plan Restructuring or a Credit Bid Transaction, with the consent of the Required AHG Noteholders, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interest, or such other treatment as is reasonably determined by the Debtors. | **N/A** | **N/A** |
| 9 | Existing Equity Interests in Rite Aid | All Existing Equity Interests in Rite Aid will be cancelled and extinguished, and Holders of Existing Equity Interests in Rite Aid shall receive no recovery on account of such Interests. | **N/A** | **N/A** |
| 10 | Section 510(b) Claims | Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to Holders of such Claims. | **N/A** | **N/A** |

### H.    What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

#### 1.    Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that, in the event of a Sale Transaction Restructuring or an Other Asset Sale, any Allowed Administrative Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of

13

the applicable Purchaser and shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors; *provided*, *further*, that, in the event of a Sale Transaction Restructuring, any Allowed Administrative Claim that is not an Assumed Liability under any Purchase Agreement shall instead be satisfied solely from the Administrative / Priority Claims Reserve; *provided, further*, that in the event of the Plan Restructuring or the Credit Bid Transaction, (i) the aggregate amount of Cash distributed to Holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims, and (ii) the treatment of such Claims shall be acceptable to the Required AHG Noteholders. For the avoidance of doubt, any McKesson Claim that is an Administrative Claim shall be treated in accordance with the terms of the McKesson Settlement.

Except for Professional Fee Claims, DIP Claims, Disinterested Director Fee Claims, AHG Notes Ticking Fee Claims, and MedImpact Termination Fee Claims, and unless previously Filed, subject to the terms of any Sale Orders, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors or the Wind-Down Debtors, as applicable, no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the Reorganized Debtors or the Wind-Down Debtors and the requesting party on or before the Administrative Claim Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims, DIP Claims, Disinterested Director Fee Claims, AHG Notes Ticking Fee Claims, and MedImpact Termination Fee Claims, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Debtors, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors, the Wind-Down Debtors, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## 2.    Payment of Fees and Expenses under Financing Orders.

On the Effective Date, the Debtors shall pay all accrued and unpaid fees, expenses, disbursements, contribution or indemnification obligations, including without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by each of the DIP Agents, the DIP Lenders, the Prepetition Agent, the Ad Hoc Secured Noteholder Group, and the Trustees, whether incurred prior to or after the Petition Date, in each case to the extent payable or reimbursable under or pursuant to the Financing Orders, the DIP Credit Agreements, the Prepetition Credit Agreement, or the Indentures, as applicable (subject to any applicable conditions set forth in the Financing Orders). Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims. Nothing herein shall require the DIP Agents, DIP Lenders, the Prepetition Agent, the Trustees, or their respective Professionals, to File applications, a Proof of Claim, or otherwise seek approval of the Court as a condition to the payment of such Allowed Administrative Claims. For the avoidance of doubt, nothing herein shall be deemed to impair, discharge, or negatively impact or affect the rights of the DIP Agents, Prepetition Agent, or the Trustees to exercise any charging Liens pursuant to the terms of the DIP Credit Agreements, the Indentures, or the Prepetition Credit Agreement, as applicable, subject to any applicable intercreditor agreements.

**3.** **Professional Fee Claims.**

(a) **Final Fee Applications and Payment of Professional Fee Claims.**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors or the Wind-Down Debtors (or the authorized signatories to the Professional Fee Escrow Account, after consultation with the Plan Administrator), as applicable, shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

(b) **Professional Fee Escrow Account.**

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind-Down Reserve. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

(c) **Professional Fee Amount.**

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors, the DIP Agents, and/or the Committees before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors and the DIP Agents no later than five days before the anticipated Effective Date; *provided* that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional, with such estimate provided to the DIP Agents. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account in consultation with the Required AHG Noteholders. For the avoidance

of doubt, to the extent that the hourly and monthly fees (but not success fees) and expenses of the Committees and the Committees' Professionals incurred on or after March 26, 2024 are less than $7.5 million (consisting of (i) $1.5 million in connection with certain agreed-upon compensation litigation matters and (ii) $6.0 million for all other fees and expenses of the Committees and the Committees' Professionals incurred on or after March 26, 2024, excluding fees and expenses described in the preceding clause (i)), the Committees' Initial Cash Consideration shall be increased by an amount equal to the difference between (a) $7.5 million and (b) the fees and expenses actually incurred by the Committees and the Committees' Professionals during the aforementioned period.

<div align="center">(d)    <strong>Post-Effective Date Fees and Expenses.</strong></div>

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors or the Wind-Down Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Purchaser(s) shall not be liable or otherwise responsible for the payment of any Professional Fee Claims.

After the Effective Date, to the extent the Senior Trustees provide services or incur expenses, including professional fees, related to the Plan or the applicable indenture, including with respect to the effectuation of any distributions under the Plan or any action the Debtors request to be taken in furtherance of the Plan, the reasonable and documented fees and expenses of the Trustees, including professional fees, shall be paid in the ordinary course by the Debtors or the Debtors' successor-in-interest. Notwithstanding this section, the Trustees shall have the right to exercise their respective charging liens under the applicable indentures against distributions on account of the respective Notes Claims for the payment of the Trustees' fees and expenses, to the extent not otherwise paid.

<div align="center"><strong>4.    Priority Tax Claims.</strong></div>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that (a) any Allowed Priority Tax Claim that is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser, shall not be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, (b) in the event of a Sale Transaction Restructuring pursuant to Article IV.D of the Plan, any Allowed Priority Tax Claim that (i) is an Assumed Liability under a Purchase Agreement shall be an obligation of the applicable Purchaser, shall not be an obligation of the Debtors or the Wind-Down Debtor, and shall not be satisfied from the Administrative / Priority Claims Reserve and (ii) is not an Assumed Liability under a Purchase Agreement shall be satisfied solely from the Administrative / Priority Claims Reserve, and (c) the aggregate amount of Cash distributed to Holders of Allowed Priority Tax Claims shall be acceptable to the Required AHG Noteholders.

<div align="center"><strong>5.    DIP Claims.</strong></div>

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, costs, other charges, and expenses. Upon the satisfaction of the Allowed DIP Claims in accordance with the terms

of the Plan, the Final Financing Order, and the Purchase Agreement, all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Pursuant to the DIP Credit Agreement, all distributions pursuant to <u>Article II.E</u> of the Plan shall be made to the applicable DIP Agent for distributions to the applicable DIP Lenders in accordance with the DIP Credit Agreements and DIP Documents unless otherwise agreed upon in writing by such DIP Agent and the Debtors. The DIP Agents shall hold or direct distributions for the benefit of the applicable Holders of DIP Claims. Each DIP Agent shall retain all rights as DIP Agent under the DIP Documents in connection with the delivery of the distributions to the DIP Lenders. The DIP Agents shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Agents.

<div align="center">(a)    <strong>DIP ABL Claims.</strong></div>

Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP ABL Claim, each Holder of an Allowed DIP ABL Claim shall receive: (a) in the event of a Plan Restructuring, at the option of the applicable Holder of an Allowed DIP ABL Claim, (i) its Pro Rata share of the Exit ABL Facility or (ii) payment in full in Cash on the Effective Date; or (b) in the event of a Sale Transaction Restructuring, either, at each of the DIP ABL Lenders' discretion, (i) payment in full in Cash on the Effective Date or (ii) its Pro Rata share of the Exit ABL Facility.

<div align="center">(b)    <strong>DIP FILO Claims.</strong></div>

Except to the extent that a Holder of an Allowed DIP FILO Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP FILO Claim, each Holder of an Allowed DIP FILO Claim shall receive: (a) in the event of a Plan Restructuring, at the option of the applicable Holder of an Allowed DIP FILO Claim, (i) its Pro Rata share of the Exit FILO Term Loan Facility or (ii) payment in full in Cash on the Effective Date; or (b) in the event of a Sale Transaction Restructuring, either, at each of the DIP FILO Lenders' discretion, (i) payment in full in Cash on the Effective Date or (ii) its Pro Rata share of the Exit FILO Term Loan Facility.

<div align="center">(c)    <strong>DIP Term Loan Claims.</strong></div>

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP Term Loan Claim, each Holder of an Allowed DIP Term Loan Claim shall receive payment in full in Cash on the Effective Date.

<div align="center"><strong>6.    AHG New-Money Commitment Agreement Claims and MedImpact Term Loan Backstop Commitment Agreement Claims.</strong></div>

As of the Effective Date, in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement and the MedImpact Term Loan Backstop Commitment Agreement, the Claims of the AHG New-Money Commitment Parties and the MedImpact Term Loan Backstop Parties on account of the AHG Notes Ticking Fee and the MedImpact Termination Fee shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the AHG New-Money Commitment Agreement and the MedImpact Term Loan Backstop Commitment Agreement, and the MedImpact Termination Fee, if any, and the AHG Notes Ticking Fee, shall each be an Allowed Administrative Claim under section 503(b) of the Bankruptcy Code.

<div align="center">17</div>

(a)        **MedImpact Termination Fee.**

Except to the extent that a Holder of an Allowed MedImpact Termination Fee Claim (if any) agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each such Claim, each Holder thereof shall receive payment in full in Cash on or prior to the Effective Date in accordance with, and subject to, the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement.

(b)        **AHG Notes Ticking Fee Claims.**

Except to the extent that a Holder of an Allowed AHG Notes Ticking Fee Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each such Claim, each Holder thereof shall receive (i) if the AHG New-Money Commitment Agreement is not terminated, AHG Notes issued on or prior to the Effective Date or (ii) if the AHG New-Money Commitment Agreement is terminated, payment in full in Cash, if so entitled, in each case, in accordance with, and subject to, the terms and conditions of the AHG New-Money Commitment Agreement.

**I.        Are any regulatory approvals required to consummate the Plan?**

The Debtors anticipate that regulatory filings and subsequent approvals may be required to consummate the Plan, should a Plan Restructuring proceed, prior to and after any change of ownership or control resulting from a sale of the Debtors' ownership interests in order to continue healthcare-related operations (e.g., operation of the pharmacies) and to receive reimbursement from healthcare programs. The Debtors are also subject to the expiration of applicable antitrust waiting periods and/or approval by certain antitrust authorities. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained. With respect to the Sale Transaction Restructuring contemplated by the Plan, while regulatory filings and subsequent approvals may not be required as conditions to close the Sale Transaction Restructuring, they may be required as a practical matter because Purchasers will have to obtain new state healthcare licenses and/or new Medicare or Medicaid enrollments, among other requirements.

**J.        What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.

**K.        If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court and entry of the Confirmation Order on the docket of the Chapter 11 Cases. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. See Article XI of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 144, for a discussion of the conditions precedent to consummation of the Plan.

L.      **What are the sources of Cash and other consideration required to fund the Plan?**

All amounts necessary for the Debtors and, if applicable, the Wind-Down Debtors, to make payments or distributions pursuant to the Plan shall be (in each case subject to the terms of the Purchase Agreement(s) and the Sale Order, as applicable) obtained from the proceeds of the issuance of New Common Stock, Exit Facilities, Takeback Notes, the MedImpact NewCo Notes (if any), the CMSR Distribution, the AHG Notes, Cash of the Debtors, and any additional Cash consideration provided under one or more Purchase Agreements, in accordance with the terms thereof.  Unless otherwise agreed, distributions required by the Plan on account of Allowed Claims that are Assumed Liabilities under a Purchase Agreement shall be the sole responsibility of the applicable Purchaser.

1.      **The New Common Stock.**

In the event of a Plan Restructuring, on the Effective Date, New Rite Aid is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Transactions Memorandum, issue the New Common Stock for distribution to the Holders of Allowed Senior Secured Notes Claims and the GUC Equity Trust in accordance with the terms of the Plan and the New Corporate Governance Documents (including the New Shareholders Agreement) without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.  The New Common Stock shall be issued and distributed free and clear of all Liens, Claims, and other Interests.  All of the New Common Stock issued pursuant to the Plan, as contemplated by the Plan Restructuring, shall be duly authorized and validly issued and shall be fully paid and non-assessable.

2.      **Exit Facilities.**

On the Effective Date, New Rite Aid shall enter into the Exit Facilities on the terms set forth in the Exit Facilities Documents.  To the extent not already approved, Confirmation shall be deemed approval of the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of New Rite Aid to enter into and execute the Exit Facilities Credit Agreement, and such other Exit Facilities Documents as may be required to effectuate the Exit Facilities.

On the Effective Date or such date as otherwise approved by the Sale Order, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facilities Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent not already approved, New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

3.      **MedImpact Term Loan Sales Process, Rights Offering, and NewCo Notes.**

(a)      **MedImpact Term Loan Sales Process**

In accordance with, and subject to, the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement, following the Confirmation Date, the Debtors shall commence or continue, as applicable, the MedImpact Term Loan Sales Process in accordance with the MedImpact Term Loan Bidding Procedures. Entry of the MedImpact Term Loan Bidding Procedures Order, which shall be entered on or before the Confirmation Date, shall (i) constitute Bankruptcy Court approval of the MedImpact Term Loan Sales Process, (ii) authorize the Debtors' entry into and performance under the MedImpact Term Loan Backstop Commitment Agreement and constitute Bankruptcy Court approval thereof, including the payment of the MedImpact Term Loan Backstop Commitment Premium or the MedImpact Termination Fee, as applicable, in accordance with the terms thereof, and (iii) approve the MedImpact Term Loan Bidding Procedures. The Cash proceeds of the sale of the MedImpact Term Loan shall be applied pursuant to Section (II)(A) of Exhibit E to the Final Financing Order, unless otherwise agreed as among the DIP Agents and the Required AHG Noteholders.

(b)      **Creation of MedImpact Term Loan NewCo and MedImpact Term Loan Rights Offering**

If the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures and the MedImpact Term Loan Backstop Commitment Agreement, the following provisions shall be in effect, subject in all respects to the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement:

On or prior to the Effective Date, the Debtors shall create the MedImpact Term Loan NewCo and enter into the MedImpact Term Loan Stalking Horse Bidder Documentation and the MedImpact NewCo Notes Documentation. Pursuant to the MedImpact Term Loan Rights Offering Procedures[, prior to the Effective Date,] the Debtors shall distribute the MedImpact NewCo Subscription Rights to Eligible Holders in accordance with the Plan, the MedImpact Term Loan Backstop Commitment Agreement, and the MedImpact Term Loan Rights Offering Procedures. Eligible Holders shall be entitled to participate in the MedImpact Term Loan Rights Offering up to a maximum amount of each Eligible Holder's Pro Rata share of the MedImpact Aggregate Rights Offering Amount.

The MedImpact Term Loan Rights Offering will be backstopped, severally and not jointly, by the MedImpact Term Loan Backstop Parties pursuant to the MedImpact Term Loan Backstop Commitment Agreement. 20% of the MedImpact Rights Offering NewCo Notes to be sold and issued pursuant to the MedImpact Term Loan Rights Offering shall be reserved for the MedImpact Term Loan Backstop Parties pursuant to the MedImpact Term Loan Backstop Commitment Agreement. MedImpact Term Loan NewCo will pay the MedImpact Term Loan Backstop Commitment Premium to the MedImpact Term Loan Backstop Parties no later than the Effective Date in accordance with the terms and conditions set forth in the MedImpact Term Loan Backstop Commitment Agreement and the Plan.

Upon exercise of the MedImpact NewCo Subscription Rights pursuant to the terms of the MedImpact Term Loan Backstop Commitment Agreement and the MedImpact Term Loan Rights Offering Procedures, MedImpact Term Loan NewCo shall be authorized to issue the applicable principal amount of MedImpact Rights Offering NewCo Notes issuable pursuant to such exercise. Pursuant to the MedImpact Term Loan Backstop Commitment Agreement, if after following the procedures set forth in the MedImpact Term Loan Rights Offering Procedures, there remain any unexercised subscription rights, the MedImpact Term Loan Backstop Parties shall purchase, severally and not jointly, their applicable portion of the

aggregate principal amount of the MedImpact Rights Offering NewCo Notes associated with such unexercised subscription rights in accordance with the terms and conditions set forth in the MedImpact Term Loan Backstop Commitment Agreement and the MedImpact Term Loan Rights Offering Procedures.

On the Effective Date, upon the consummation of the MedImpact Term Loan Rights Offering, the issuance of the MedImpact NewCo Notes and the transfer of the MedImpact Term Loan to MedImpact Term Loan NewCo, the Debtors shall transfer all equity or other ownership or residual interests in MedImpact Term Loan NewCo to the MedImpact NewCo Trustee or its designee in a manner acceptable to the Debtors and the MedImpact Term Loan Backstop Parties.

<div align="center">(c)    <b>MedImpact NewCo Notes</b></div>

If the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures and the MedImpact Term Loan Backstop Commitment Agreement, the following provisions shall be in effect, subject to the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement:

On the Effective Date, the MedImpact Term Loan NewCo shall issue the MedImpact NewCo Notes on the terms set forth in the MedImpact NewCo Notes Documentation. To the extent not already approved, Confirmation shall be deemed approval of the MedImpact NewCo Notes Documentation, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the MedImpact Term Loan NewCo in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the MedImpact Term Loan NewCo to enter into and execute the MedImpact NewCo Notes Indenture, and such other MedImpact NewCo Notes Documentation as may be required to issue the MedImpact NewCo Notes.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement, on the Effective Date, all of the Liens and security interests to be granted in accordance with the MedImpact NewCo Notes Documentation, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the MedImpact NewCo Notes Documentation; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the MedImpact NewCo Notes Documentation; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent not already approved, the MedImpact Term Loan NewCo and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

<div align="center"><b>4.    The SCD Trust and the AHG Notes.</b></div>

On or prior to the Effective Date, subject to the terms and conditions of the AHG New-Money Commitment Agreement, the Debtors shall create the SCD Trust and enter into the SCD Trust Documentation and the AHG Notes Documentation. On or prior to the Effective Date, subject to the terms

and conditions of the AHG New-Money Commitment Agreement, the SCD Trust shall, and to the maximum extent permitted by applicable law, (a) (i) hold all right, title, and interest to no less than $[350,000,000] of the SCD Claim, which the Debtors shall transfer from Debtor Ex Options, LLC to the SCD Trust, (b) issue, or cause to be issued, the AHG Notes to the applicable AHG New-Money Commitment Parties in accordance with the AHG Notes Documentation, (c) be vested with all requisite authority to distribute the CMSR Recovery in accordance with the Plan and the terms and conditions of the AHG New-Money Commitment Agreement, and (d) following receipt of the proceeds of the CMS Receivable, be vested with all requisite authority to distribute sufficient Cash to the Reorganized Debtors to fund any mandatory prepayments required under the terms of the Exit Facilities Documents from the proceeds of such CMS Receivable.  To the extent not already approved, Confirmation shall be deemed approval of the AHG Notes Documentation and the SCD Trust Documentation, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the SCD Trust in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the SCD Trust to enter into and execute the SCD Trust Documentation, the AHG Notes Purchase Agreement, the AHG Notes Indenture, and such other AHG Notes Documentation as may be required to issue the AHG Notes.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement, the Elixir Intercreditor Agreement shall provide, among other things, that distributions from EIC on account of the SCD Claim shall be allocated (i) *first*, to the SCD Trust in an amount sufficient to repay $57,000,000 in Cash of the AHG Notes; (ii) *second*, to the SCD Trust for the benefit of the Exit Lenders in an amount sufficient to repay the [Exit ABL Facility] in the amount of $60,000,000 (which amount shall be applied to fund an immediate prepayment under the Exit FILO Term Loan Facility); (iii) *third*, to the extent Excess Availability is less than $700,000,000, to the SCD Trust for the benefit of the Exit Lenders, in an amount equal to the lesser of $57,000,000 and the amount necessary to fund a prepayment under the Exit ABL Facility to cause Excess Availability to equal $700,000,000 (which amount shall be used to fund an immediate prepayment under the Exit ABL Facility); (iv) *fourth*, to the extent the aggregate amount of proceeds of the CMS Receivable paid to the SCD Trust to repay in full in Cash the SCD Notes and to fund distributions under the Plan pursuant to clause (v) below are $285,000,000, (the "Creditor Distribution"), except to the extent that SCD Trust receives less than $285,000,000 to repay in full in Cash the AHG Notes and to fund distributions under the Plan, in which case the Creditor Distribution will be reduced on a dollar-by-dollar basis by each dollar the SCD Trust receives under $285,000,000 to repay in full in Cash the AHG Notes and to fund distributions under the Plan, until the Creditor Distribution reaches zero, provided that the Creditor Distribution shall not be less than zero; and (v) *fifth*, to the SCD Trust in an amount equal to all remaining proceeds of the CMS Receivable (which amount the SCD Trust shall use to fund a distribution pursuant to Article III.B.5 of the Plan.).  The Debtors may, with the consent of the DIP Agents and the Required AHG Noteholders, enter into one or more alternative transactions or structuring arrangements with respect to the transactions, arrangements, and distributions described in this paragraph and the preceding paragraph, which alternative transactions, arrangements, and distributions shall be economically neutral with respect to the Creditor Distribution.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement, on the Effective Date, all of the Liens and security interests to be granted in accordance with the AHG Notes Documentation, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the AHG Notes Documentation; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the AHG Notes Documentation; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent not already approved, the SCD Trust and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

The Cash proceeds of the AHG Notes shall be used to pay down the loans outstanding under the DIP ABL Facility, thereby reducing the DIP ABL Claims on a dollar-for-dollar basis.

## 5.    Takeback Notes.

On the Effective Date, in the event of a Plan Restructuring, New Rite Aid shall enter into the Takeback Notes on the terms set forth in the Takeback Notes Documents.  To the extent not already approved, Confirmation shall be deemed approval of the Takeback Notes Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of New Rite Aid to enter into and execute the Takeback Indenture, and other such Takeback Notes Documents as may be required to effectuate the Takeback Notes.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Takeback Notes Documents, to the extent applicable:  (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Takeback Notes Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Takeback Notes Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

## 6.    Cash on Hand.

Except as otherwise provided in the Plan, the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims solely in accordance with the terms of the Plan, including any Cure Costs in connection with a Plan Restructuring.

7.      **Creation of the Administrative / Priority Claims Reserve and the Wind-Down Reserve.**

On or before the Effective Date, in the event of a Sale Transaction Restructuring, each of the Administrative / Priority Claims Reserve and Wind-Down Reserve shall be funded in accordance with the Purchase Agreement, the Sale Order, and section 1129 of the Bankruptcy Code, as applicable, and subject to the applicable consent rights of the Required AHG Noteholders.

8.      **Payment of Cure Costs.**

In the event of a Sale Transaction Restructuring or an Other Asset Sale, the Debtors or Purchaser shall pay all Cure Costs, if any, pursuant to sections 365 or 1123 of the Bankruptcy Code and in accordance with the Purchase Agreement(s) and Sale Order(s).

M.      **What is the effect of the Plan on the Debtors' ongoing businesses?**

1.      **Plan Restructuring.**

In the event of the Plan Restructuring and on the Effective Date, in accordance with the terms of the New Corporate Governance Documents, the New Rite Aid Board shall be appointed, and New Rite Aid shall adopt the New Corporate Governance Documents; *provided* that each Disinterested Director of the Debtors shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and discretion in accordance with the terms of the Plan. Each Disinterested Director shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to New Rite Aid, the Reorganized Debtors, or any other Entity without such director's prior written consent. Each Disinterested Director of the Debtors retains the right to review, approve, and make decisions, as well as to file papers and be heard before the Bankruptcy Court, on all matters under such director's continuing authority.

2.      **Sale Transaction Restructuring.**

In the event of a Sale Transaction Restructuring, on and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) resolving Disputed Claims, (b) making distributions on account of Allowed Claims as provided hereunder, (c) establishing and funding the Administrative / Priority Claims Reserve and the Wind-Down Reserve, (d) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (e) filing appropriate tax returns, (f) complying with its continuing obligations under the Purchase Agreement(s), if any, (g) liquidating all assets of the Wind-Down Debtors, and (h) otherwise administering the Plan. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind-Down Debtors to File motions or substitutions of parties or counsel in each such matter.

In the event of a Credit Bid Transaction, on or prior to the Effective Date, New Rite Aid and certain direct or indirect subsidiaries (as applicable) shall be formed for the purpose of acquiring all of the Acquired Assets and assuming all of the Assumed Liabilities.

24

**N.** **Are there risks to owning the New Common Stock upon emergence from chapter 11?**

Yes.  *See* <u>Article IX</u> of the Disclosure Statement, entitled "Risk Factors," which begins on page 120.

**O.** **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.  See <u>Article IX.A</u> of this Disclosure Statement which begins on page 120.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  See <u>Article XI.F</u> of this Disclosure Statement which begins on page 146.

**P.** **What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On the Effective Date, the New Rite Aid Board shall adopt and implement the Management Incentive Plan as determined by the New Rite Aid Board and in accordance with the MIP Documents.

**Q.** **What is the GUC Equity Trust?**

The GUC Equity Trust is one or more trusts and/or sub-trusts (including as a sub-trust of a single trust that also includes the Litigation Trust as a sub-trust) established prior to or on the Effective Date pursuant to, and in accordance with, Article IV.E.2 of the Plan to hold the GUC Equity Trust Assets for the benefit of Holders of Allowed General Unsecured Claims pursuant to the applicable GUC Equity Trust Agreement.  For the avoidance of doubt, the GUC Equity Trust and the Litigation Trust may be sub-trusts within a single trust, as mutually agreed between the Debtors, the Committees, and the GUC Equity Trustee.

On or prior to the Effective Date, the Debtors shall take all reasonably necessary steps to establish the GUC Equity Trust as one or more standalone trusts and/or sub-trusts in accordance with the Plan, *provided, however*, that the Debtors will not be required to take any actions which would result in holders of New Common Stock exceeding 300 holders.  Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect, except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the GUC Equity Trust as a "qualified settlement fund," "disputed ownership fund," or otherwise, to treat the GUC Equity Trust as a "widely held fixed investment trust" under section 1.671-5 of the Treasury Regulations and the GUC Equity Trustee will report consistently therewith.  Such treatment is assumed with respect to the following discussion.  In accordance therewith, neither the GUC Equity Trust nor GUC Equity Trustee shall have the power to vary the investment of the GUC Equity Trust within the meaning of section 301.7701-4(c) of the Treasury Regulations.  For U.S. federal income tax purposes, each holder of a GUC Equity Trust Interest will generally be required to include their pro rata share of each item of income, gain, deduction, loss, or credit attributable to the GUC Equity Trust Assets.

To the extent the Debtors and the Committees determine in their reasonable discretion to treat all or any portion of the GUC Equity Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations,

any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return may be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

No request for a ruling from the IRS will be sought on the classification of the GUC Equity Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Equity Trust. If the IRS were to successfully challenge the classification of the GUC Equity Trust as a widely held fixed investment trust, the federal income tax consequences to the GUC Equity Trust and the holders of GUC Equity Trust Interests could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the GUC Equity Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

The GUC Equity Trust will file information tax returns with the IRS and provide tax information statements to holders of GUC Equity Trust Interests consistently with the rules of section 1.671-5 of the Treasury Regulations and any other applicable provisions of law, including information regarding items of income, gain, deduction, loss or credit attributable to the GUC Equity Trust Assets. Each holder of GUC Equity Trust Interests must report on its federal income tax return its share of all such items.

If, as of the Effective Date, the UCC / TCC Recovery Allocation Agreement is not in full force and effect, the GUC Equity Trustee shall hold the GUC Equity Trust Assets for the benefit of the Holders of the GUC Equity Trust Interests as later determined in accordance with the terms of the UCC / TCC Recovery Allocation Agreement. The GUC Equity Trust Interests shall be distributed in accordance with the UCC / TCC Recovery Allocation Agreement.

### R.    What is the Litigation Trust?

The Litigation Trust is one or more trusts and/or sub-trusts (including as a sub-trust of a single trust that also includes the GUC Equity Trust as a sub-trust) established on or prior to the Effective Date pursuant to, and in accordance with, Article IV.E.3 of the Plan. On the Effective Date, the Debtors shall take all necessary steps to establish the Litigation Trust as one or more standalone trust and/or sub-trusts in accordance with the Plan and the Litigation Trust Documents, including as set forth in the Litigation Trust Cooperation Agreement. Notwithstanding anything to the contrary herein, the Debtors and the Reorganized Debtors, as applicable, shall transfer the Litigation Trust Assets to the Litigation Trust, which, except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations, and such treatment is assumed with respect to the following discussion. For the avoidance of doubt, in the event of any transfer of the Litigation Trust Assets to the Litigation Trust, the provisions set forth herein shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Causes of Action transferred to the Litigation Trust.

The Litigation Trust shall be established for the purposes of liquidating the Litigation Trust's assets, reconciling claims asserted against the Debtors and the Reorganized Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust and the purposes described in the Plan. Upon the transfer of the Debtors' or the Reorganized Debtors' assets to the Litigation Trust, the Debtors and the Reorganized Debtors will have no reversionary or further interest in or with respect to the Litigation Trust Assets. To the extent beneficial interests in the Litigation

26

Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests; *provided* that, for the avoidance of doubt, to the extent the GUC Equity Trust is established as a sub-trust under the Litigation Trust, such GUC Sub-Trust shall be governed by the GUC Equity Trust provisions set forth in Article IV.E.2 of the Plan.  Prior to any transfer of the Litigation Trust Assets to the Litigation Trust, the Committees may designate trustee(s) for the Litigation Trust for the purposes of administering the Litigation Trust, as more fully described in the Litigation Trust Documents.  The reasonable costs and expenses of the trustee(s) shall be paid from the Litigation Trust.

### S.     Does the Plan preserve Causes of Action?

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VII and Article X of the Plan, and the terms of the Committee Settlement, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action other than the Assigned Claims and the Assigned Insurance Rights, whether arising before or after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) that constitute Elixir Acquired Assets or Retail Acquired Assets, (b) exculpated or released (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article X, or (c) waived in accordance with Article IV.R of the Plan which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Reorganized Debtors or the Wind-Down Debtors, as applicable, as of the Effective Date.

The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the Commonwealth of Massachusetts on account of, or relating to, the Massachusetts OAG Agreement, and the Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such Claims. Additionally, each of the California AG Proofs of Claim is an Allowed General Unsecured Claim.  The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the California AG, or any mediate or immediate transferee of the California AG, on account of, or relating to, the California AG Agreement, and the Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such Claims.

The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, may pursue such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights), as appropriate, in accordance with the best interests of the Reorganized Debtors and the Wind-Down Debtors, as applicable.  The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may exclusively enforce any and all such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights).  The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights) and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Purchaser in accordance with the Purchase Agreement(s) or

otherwise expressly provided in the Plan, including <u>Article IV</u> and <u>Article X</u> of the Plan.  Unless any such Causes of Action against an Entity are expressly waived (including pursuant to <u>Article IV.R</u> of the Plan), relinquished, exculpated, released, compromised, assigned, or transferred to a Purchaser in accordance with a Purchase Agreement, or settled in the Plan or a Final Order, the Reorganized Debtors and the Wind-Down Debtors expressly reserve all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, Claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Notwithstanding anything to the contrary in the Plan, in the Plan Supplement or in the Confirmation Order, the Debtors shall preserve and transfer and/or assign to the Litigation Trust, the Assigned Claims and the Assigned Insurance Rights and the right to commence, prosecute, or settle all Assigned Claims and Assigned Insurance Rights belonging to such Debtors or their Estates, subject to the occurrence of the Effective Date and the other terms and conditions set forth in the Plan; *provided*, that, subject to the terms and conditions of the Plan, (a) the Litigation Trust or GUC Sub-Trust(s) shall be the successor-in-interest to the Debtors' rights, title, and interest in any Assigned Claims and Assigned Insurance Rights, (b) the Litigation Trust or GUC Sub-Trust(s) as may be applicable, shall have exclusive standing to pursue the Assigned Claims and Assigned Insurance Rights, and (c) the Litigation Trustee or GUC Sub-Trust Trustee(s), pursuant to the Committee Settlement Documents, shall have the right to commence, prosecute, or settle such Assigned Claims and Assigned Insurance Rights and to decline to do any of the foregoing in its discretion and without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  In pursuing any Assigned Claim or Assigned Insurance Right, the Litigation Trust or GUC Sub-Trust(s) shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which an Assigned Claim or Assigned Insurance Right may be bought under section 546 of the Bankruptcy Code. The Litigation Trust or GUC Sub-Trust(s) shall be entitled to recover on any Assigned Claims or Assigned Insurance Rights as a result of the Settlement of Tort Claims described in <u>Article IV.B</u> of the Plan and/or any settlement or judgment with respect to the other Assigned Claims and no consent shall be necessary for the Litigation Trust or GUC Sub-Trust(s) to transfer such the proceeds of any such Assigned Claims or Assigned Insurance Rights once received from an insurer or other third-party.  For the avoidance of doubt, the Litigation Trust or applicable GUC Sub-Trust shall be solely responsible for effectuating all distributions on account of the Litigation Trust Assets for General Unsecured Claims.

**T.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan? [9]**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and are an essential element of the negotiations among the Debtors and key stakeholders in obtaining their support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the DIP Facilities, the Plan, and multiple other interrelated key transactions that together will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.  Each Holder of Claims or Interests will have the ability to exempt itself from the definition of "Releasing Party," which

---

[9]    Release provisions remain subject to Mediation and the completion of any ongoing diligence efforts by the Disinterested Directors at the applicable Debtor Entities.

procedures will be determined pursuant to the Confirmation Order.  By not consenting to the Third-Party
Release, such Holder will forgo the benefit of obtaining the releases set forth in Article X of the Plan if
such party would otherwise by a Released Party.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, EACH SOLELY IN THEIR CAPACITY AS SUCH:  [(A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE WIND-DOWN DEBTORS; (D) THE AGENTS; (E) THE TRUSTEES; (F) THE PREPETITION SECURED PARTIES; (G) THE DIP SECURED PARTIES; (H) THE SENIOR SECURED NOTEHOLDERS (INCLUDING THE AD HOC SECURED NOTEHOLDER GROUP AND EACH OF ITS MEMBERS); (I) EACH OF THE LENDERS UNDER THE EXIT FACILITIES; (J) THE COMMITTEES AND EACH MEMBER OF THE COMMITTEES; (K) THE LITIGATION TRUSTEE AND THE GUC EQUITY TRUSTEE; (L) IN THE EVENT OF ANY SALE TRANSACTION RESTRUCTURING OR OTHER ASSET SALE, THE PURCHASER(S); (M) THE MEDIMPACT TERM LOAN BACKSTOP PARTIES, MEDIMPACT TERM LOAN NEWCO, AND THE MEDIMPACT NEWCO TRUSTEE; (N) THE AHG NEW-MONEY COMMITMENT PARTIES AND THE SCD TRUSTEE; (O) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN; (P) ALL HOLDERS OF CLAIMS THAT ARE DEEMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (Q) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (R) ALL HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (S) ALL HOLDERS OF GENERAL UNSECURED CLAIMS WHO ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN;[10] (T) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (S); AND (U) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH CLAUSE (S).  FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, HOLDERS OF TORT CLAIMS SHALL NOT BE DEEMED TO RELEASE THE DEBTORS, PROVIDED, HOWEVER, THAT ANY RECOVERY FROM ANY SUCH TORT CLAIM AGAINST THE DEBTORS (AND THEIR AFFILIATES), THE REORGANIZED DEBTORS (AND THEIR AFFILIATES), AND/OR THE WIND-DOWN DEBTORS, AS APPLICABLE, INCLUDING BY WAY OF SETTLEMENT OR JUDGMENT, SHALL BE LIMITED TO THE LITIGATION TRUST ASSETS, AS APPLICABLE, AND NO PERSON, ENTITY, OR PARTY SHALL EXECUTE, GARNISH, OR OTHERWISE ATTEMPT TO COLLECT ANY SUCH RECOVERY FROM ANY ASSETS OTHER THAN THE LITIGATION TRUST ASSETS, EXCEPT TO THE EXTENT AND ONLY AS NECESSARY TO TRIGGER ANY**

---

[10]  As explained in the Disclosure Statement, the Solicitation Materials will not include a form or mechanism for Holders to opt-out of the releases set forth in the Plan.  Solicitation of elections with respect to Holder releases will occur after Confirmation of the Plan, pursuant to the Confirmation Order or separate Court order, and will not occur pursuant to the Solicitation Materials; *provided* that, for the avoidance of doubt, such solicitation will be completed prior to the Effective Date of the Plan.  The Debtors shall consult with the Committees and the Required AHG Noteholders regarding such solicitation process and the solicitation process shall be consistent with the Committee Settlement and reasonably acceptable to the Committees as it relates to the solicitation process for general unsecured creditors.

**INSURANCE CARRIER'S OBLIGATION TO PAY SUCH LIABILITY.  NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, ANY OF THE DEBTORS' CURRENT AND FORMER DIRECTORS AND OFFICERS THAT ARE NOT A DEBTOR RELATED PARTY SHALL NOT BE A RELEASING PARTY.]**

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

**THE SOLICITATION MATERIALS WILL NOT INCLUDE A FORM OR MECHANISM FOR HOLDERS OF CLAIMS OR INTERESTS TO OPT-OUT OF THE THIRD-PARTY RELEASE.  SOLICITATION OF OPT-OUT ELECTIONS WILL OCCUR AFTER CONFIRMATION OF THE PLAN, PURSUANT TO THE CONFIRMATION ORDER OR SEPARATE COURT ORDER AND WILL NOT OCCUR PURSUANT TO THE SOLICITATION MATERIALS; PROVIDED THAT, FOR THE AVOIDANCE OF DOUBT, SUCH SOLICITATION WILL BE COMPLETED PRIOR TO THE EFFECTIVE DATE OF THE PLAN.  THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS OF THE PLAN REMAIN THE SUBJECT OF MEDIATION.**

1.     **Settlement, Compromise, and Release of Claims and Interests.**

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, the assets of the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, are being and shall be used for the satisfaction of expense obligations and/or the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose.  Except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, compromise, and release, effective as of the Effective Date, of Claims, including General Unsecured Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors or the Wind-Down Debtors, as applicable), Interests, controversies, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date (including any Causes of Action or Claims based on theories or allegations of successor liability), any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Chapter

11 Cases, that occurred prior to the Effective Date, other than as expressly provided in the Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan. The Confirmation Order shall be a judicial determination of the settlement, discharge, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.

Notwithstanding anything herein or in the Plan to the contrary, and for the avoidance of doubt, the Debtors, and/or the Wind-Down Debtors, as applicable, shall not be released from liability for any Tort Claims; *provided*, *however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.

## 2.    Release of Liens.

**On the Effective Date, concurrently with the Consummation of the Restructuring Transaction and except as otherwise set forth in the Purchase Agreement, as applicable, the Retail Acquired Assets shall be transferred to and vest in New Rite Aid free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Purchase Agreement(s), each as applicable. Without limiting the foregoing, except as otherwise provided in the Purchase Agreement(s), the Plan, the Plan Supplement, the Exit Facilities Documents, the Takeback Notes Documents, the MedImpact NewCo Notes Documentation (if applicable), the AHG Notes Documentation, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with <u>Article III</u> of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. Notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims shall not be released and such Liens shall remain in full force and effect until the DIP Claims are paid in full in Cash or otherwise treated in a manner consistent with <u>Article II.E</u> of the Plan.**

## 3.    Debtor Release.

**[Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable**

consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates and, if applicable, the Wind-Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, or through, for, or because of, the foregoing Entities, from any and all claims and Causes of Action, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, and the Wind-Down Debtors (if applicable), whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in Law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, and the Wind-Down Debtors (if applicable), or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Restructuring Transactions, their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the pursuit of the Restructuring Transaction, the Committee Settlement, the Committee Settlement Documents, the UCC / TCC Recovery Allocation Agreement, the AHG New-Money Commitment Agreement, the MedImpact Term Loan Backstop Commitment Agreement, the MedImpact Term Loan Rights Offering, the MedImpact Term Loan Rights Offering Procedures, the MedImpact Term Loan Sales Process, the administration and implementation of the Plan equitization (if applicable) or the Wind-Down (if applicable), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, in all cases upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.    For the avoidance of doubt, nothing contained in the Plan, including <u>Article X.C</u> of the Plan, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights or Tort Claims Insurance Proceeds and no Assigned Claims against any Excluded Parties shall be released; *provided, further*, that nothing herein or in the Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, any Assigned Claim against any Excluded Parties or any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in <u>Article X.C</u> of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in <u>Article X.C</u> of the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good-

faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors or their respective Estates or, if applicable, the Reorganized Debtors or the Wind-Down Debtors asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.]

4.       **Third-Party Release.**

[Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the pursuit of the Restructuring Transaction, the Committee Settlement, the Committee Settlement Documents, the UCC / TCC Recovery Allocation Agreement, the AHG New-Money Commitment Agreement, the MedImpact Term Loan Backstop Commitment Agreement, the MedImpact Term Loan Rights Offering, the MedImpact Term Loan Rights Offering Procedures, the MedImpact Term Loan Sales Process, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the administration and implementation of the Plan Restructuring (if applicable) and the Wind-Down (if applicable), in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided, that*, notwithstanding anything herein, in the Plan, the Plan Supplement or the Confirmation Order to the contrary, the Debtors and/or the Wind-Down Debtors, as applicable, shall not be released from liability for any Tort Claims; *provided*, *however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets, and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any

such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability. For the avoidance of doubt, nothing contained in the Plan, including Article X.D of the Plan, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights, or Tort Claims Insurance Proceeds and no Assigned Claims against any Excluded Parties shall be released; *provided, further*, that nothing in the Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, Assigned Claims against any Excluded Parties or any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article X.D of the Plan, which include by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article X.D of the Plan is: (i) consensual; (ii) given in exchange for the good and valuable consideration provided by the Released Parties; (iii) a good-faith settlement and compromise of such claims and Causes of Action; (iv) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; (vii) a sound exercise of the Debtors' business judgment; and (viii) a bar to any of the Releasing Parties or the Debtors or their respective Estates or, if applicable, the Reorganized Debtors or the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt out of the releases contained in Article X.D of the Plan in accordance with the Plan and does not exercise such opt out may not assert any Claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Reorganized Debtors. From and after the Effective Date, any Entity that opted out of (or otherwise did not participate in) the releases contained in Article X.D of the Plan in accordance with the Plan may not assert any Claim or other Cause of Action against any Released Party for which it is asserted or implied that such Claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such Claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Released Party. For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.[11] Notwithstanding anything herein to the contrary, and for the avoidance of doubt, the Debtors shall not be released from liability for any Tort Claims; *provided, however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or

---

[11] The Solicitation Materials will not include a form or mechanism for Holders of Claims or Interests to Opt-Out of the Third-Party Release. Solicitation of Opt-Out Elections will occur after Confirmation of the Plan, pursuant to the Confirmation Order or separate Court order and will not occur pursuant to the Solicitation Materials; provided, that for the avoidance of doubt, such solicitation will be completed prior to the Effective Date. of the Plan. The forms for the Opt-Out Election will be incorporated in the Plan Supplement, and will be filed with sufficient notice in advance of the Combined Hearing.

judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors or the Wind-Down Debtors, and no Person, Entity, or other party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets and the GUC Equity Pool, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.

For the avoidance of doubt and notwithstanding anything to the contrary herein, in the Plan Supplement, the Confirmation Order or otherwise, any recovery on behalf of claims or Causes of Action (if any) contributed to the Litigation Trust or a GUC Sub-Trust against any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with the Plan (including those not included in the definition of Debtor Related Parties) shall be expressly limited to proceeds of the applicable Insurance Policies, and no Person, Entity, or otherwise shall attempt to collect on assets of any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with the provisions of the Plan (including those not included in the definition of Debtor Related Parties), except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability, and all such directors and officers shall have the full protections of any existing D&O Liability Insurance Policies.

## 5.    Exculpation.

**[Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any claim or Cause of Action for any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or Causes of Action in each case arising out of or related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; _provided, however_, that no Person or Entity that is not an Exculpated Party shall be entitled to rely on the exculpation provided for in <u>Article X.E</u> of the Plan, including by asserting <u>Article X.E</u> of the Plan as a defense or the basis for a claim or Cause of Action in its own name (whether directly or derivatively, and, whether or not in the capacity as a subrogee, assignee, or successor to an Exculpated Party, except to the extent that such relation renders such Person or Entity an Exculpated Party in its own right).  For the avoidance of doubt, nothing contained in the Plan, including <u>Article X.E</u> of the Plan, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights, or Tort Claims Insurance Proceeds and no Excluded Party shall be Exculpated for any Assigned Claims; _provided, further_, that nothing in the Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, Claims or Causes of Action against any Excluded Party for any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.**

For the avoidance of doubt, the Committees, each of their members, and the advisors to the Committees' and their members shall be Exculpated Parties and shall be exculpated for any Claims or Causes of Action associated with the formulation, preparation, dissemination, negotiation or filing, or Consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Committee Settlement, the Settlement of Tort Claims, the UCC / TCC Recovery Allocation Agreement, or any of the Committee Settlement Documents.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The exculpation will be in addition to, and not a limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in the Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan (including any Purchase Agreement and any documents in connection therewith).]

6.    Injunction.

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Article X.C</u> of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of Liens pursuant to <u>Article X.B</u> of the Plan), or are subject to exculpation pursuant to <u>Article X.E</u> of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust, the Litigation Trust, the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or

36

the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.  For the avoidance of doubt, nothing contained in the Plan, including **Article X.F** of the Plan, shall release, compromise, impair, or in any way affect any Assigned Claims.  **Article X.F** of the Plan shall not apply to Tort Claims, which shall be subject to **Article X.G** of the Plan.

No Person or Entity may commence or pursue a claim or Cause of Action of any kind against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates) (if applicable), the GUC Equity Trust (with respect to General Unsecured Claims), the Litigation Trust (with respect to General Unsecured Claims), the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to **Article X.C**, **Article X.D**, or **Article X.E** of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor (or their Affiliates), Reorganized Debtor (or their Affiliates), Wind-Down Debtor (or their Affiliates), GUC Equity Trust, Litigation Trust, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in **Article X.F** of the Plan.

For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as otherwise specifically provided in the Plan and Sale Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors (or their Affiliates), the Estates, the Purchaser, or, if applicable, the Reorganized Debtors (or their Affiliates) or the Wind-Down Debtors (or their Affiliates), except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Reorganized Debtors or the Wind-Down Debtors, as

applicable, or otherwise contemplated under the Sale Order. **Such injunction will not enjoin Persons or Entities that do not consent to the Third-Party Release from pursuing any direct (but not derivative) Claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Purchaser, the Reorganized Debtors (if applicable), or the Wind-Down Debtors (if applicable).**

7.      **Channeling Injunction.**

(a)      **Terms.**

Pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons or Entities that have held or asserted or that hold or assert any Tort Claim shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of, on or with respect to any Tort Claim from or against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), including:

(i) commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Tort Claims, against or affecting any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates), or any property or interests in property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

(ii) enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) or against the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

(iii) creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) or the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims;

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) or against the property of any Debtor (or its Affiliates) or Reorganized Debtor (or its Affiliates) with respect to any Tort Claims; and

(v) taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Definitive Documents, with respect to any Tort Claims.

(b)      **Reservations.**

Notwithstanding anything to the contrary in Article X.G of the Plan or the Confirmation Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i) the rights of Holders of Tort Claims to the treatment afforded them under the Plan and the Definitive Documents, including the rights of Holders of Tort Claims to assert such Tort Claims in accordance with the Plan and the Litigation Trust Documents;

(ii) the rights of Persons to assert any claim, debt, litigation, or liability for payment of expenses against the Litigation Trust and/or any GUC Sub-Trust as provided in the Litigation Trust Documents;

(iii) the rights of the Litigation Trust and/or GUC Sub-Trust to pursue, litigate, collect on and enforce Assigned Insurance Rights and the Assigned Claims in accordance with the terms of the Plan;

(iv) the Litigation Trust and/or any GUC Sub-Trust from enforcing its rights, on behalf of itself, against the Debtors or the Reorganized Debtors in accordance with the terms of the Plan; or

(v) the Litigation Trustee(s) and/or any GUC Sub-Trust Trustee(s) from assigning and/or transferring the Assigned Insurance Rights to Holders for Tort Claims of Allowed Tort Claims subject to reasonable restrictions so as not to interfere with, in-crease costs to, or impede the efforts of, the Litigation Trust, and/or any GUC Sub-Trust, as further described in the Litigation Trust Documents, *provided*, however, that any such assignee or transferee shall remain subject to the terms and conditions of the Plan and the Confirmation.

(c)      **Modifications.**

There can be no modification, dissolution or termination of this Channeling Injunction, which shall be a permanent injunction.

(d)      **Non-Limitation of Channeling Injunction.**

Except as expressly set forth in paragraph (2) of Article X.G of the Plan, nothing in the Plan or the Litigation Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of this Channeling Injunction issued in connection with the Plan.

(e)      **Bankruptcy Rule 3016 Compliance.**

The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**8.      Insurer Injunction.**

(a)      **Terms.**

In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted or that hold or assert any Claim based on, arising under or attributable to an Insurance Policy (excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights) shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to such Insurance Policy from or against any insurer, including:

(i) commencing, conducting or continuing, in any manner any action or other proceeding of
any kind (including an arbitration or other form of alternate dispute resolution) against any
insurer, or against the property of any insurer, on account of any Claim based on, arising
under or attributable to an Insurance Policy;

(ii) enforcing, attaching, levying, collecting, or otherwise recovering, by any manner or means,
any judgment, award, decree, or other order against any insurer, or against the property of
any insurer, on account of any Claim based on, arising under or attributable to an Insurance
Policy;

(iii) creating, perfecting or enforcing in any manner any Lien of any kind against any insurer,
or against the property of any insurer, on account of any Claim based on, arising under or
attributable to an Insurance Policy;

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or
recoupment of any kind, whether directly or indirectly, against any obligation due to any
insurer, or against the property of any insurer, on account of any Claim based on, arising
under or attributable to an Insurance Policy; and

(v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply
with, the provisions of the Plan applicable to any Claim based on, arising under or
attributable to an Insurance Policy.

(b) **Reservations.**

The provisions of this Insurer Injunction shall not preclude the Litigation Trust from pursuing any
Claim based on, arising under or attributable to an Insurance Policy excluding (a) the Unassigned Insurance
Policies and (b) the Unassigned Insurance Rights, or any other claim that may exist under any such
Insurance Policy against any insurer, or enjoin the rights of the Litigation Trust to prosecute any action
based on or arising from the Insurance Policies or the rights of the Litigation Trust to assert any claim, debt,
obligation, Cause of Action or liability for payment against an insurer based on or arising from the Insurance
Policies.  The provisions of this Insurer Injunction are not issued for the benefit of any insurer, and no such
insurer is a third-party beneficiary of this Insurer Injunction.  This Insurer Injunction shall not (a) enjoin,
impair or affect (i) any claims between or among insurers; or (ii) the rights of current and former directors,
officers, employees and authorized agents of the Debtors or (b) prohibit any current and former directors,
officers, employees, and authorized agents of the Debtors from seeking insurance coverage in their
capacities as such under the D&O Liability Insurance Policies.

Notwithstanding anything to the contrary in Article X.H of the Plan, the Litigation Trustee shall
have the right to assign and/or transfer Assigned Insurance Rights for Tort Claims to Holders of Allowed
Tort Claims subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the
efforts of, the Litigation Trust, as further described in the Litigation Trust Documents; *provided, however*,
that any assignee or transferee shall remain bound by the provisions in the Plan (including, for the avoidance
of doubt, Article X.D of the Plan).

Notwithstanding anything to the contrary in the Plan (including this Insurer Injunction), the Plan
Supplement, the Confirmation Order, or otherwise, no Person, Entity, or party, including the Litigation
Trust and the Litigation Trustee (including any successors, beneficiaries, transferees, and assigns), shall
oppose any effort by any current or former director, officer, or employee of the Debtors or Reorganized
Debtors or any its subsidiaries and Affiliates to seek defense cost coverage under the Insurance Policies
(including under  the D&O Liability Insurance Policies and including with respect to Assigned Claims).

(c)      **Modifications.**

To the extent the Litigation Trustee makes a good faith determination that some or all of the proceeds of the Assigned Claims, including the Tort Claim Insurance Proceeds, (excluding (a) the Unassigned Insurance Policies and (b) the Unassigned Insurance Rights) are substantially unrecoverable by the Litigation Trust, the Litigation Trust with the consent of the Debtors and Reorganized Debtors, as applicable, shall have the authority at any time, upon written notice to any affected insurer, to terminate, reduce or limit the scope of this Insurer Injunction with respect to any insurer, provided that any termination, reduction, or limitation of this Insurer Injunction (i) shall apply in the same manner to all beneficiaries of the Litigation Trust and (ii) shall comply with any procedures set forth in the Litigation Trust Documents.

## 9.      Controlled Substance Injunction.

From and after the date on which the Controlled Substance Injunction Order is entered by the Bankruptcy Court, the Debtors and the Reorganized Debtors, as applicable, and any successors to the Debtors' and the Reorganized Debtors' business operations relating to the manufacture and sale of opioid Product(s) in the United States and its territories shall abide by the Controlled Substance Injunction as set forth in Exhibit A attached to the Plan.

The Debtors and the Reorganized Debtors, as applicable, consent to the entry of a final judgment or consent order upon the Effective Date imposing all of the provisions of the Controlled Substance Injunction in the state court of each of the Settling States (as defined in the Controlled Substance Injunction), as applicable.  The Debtors and the Reorganized Debtors agree that seeking entry or enforcement of such a final judgment or consent order in accordance with the Controlled Substance Injunction will not violate any other injunctions or stays that it will seek, or may otherwise apply, in connection with these Chapter 11 Cases or Confirmation.

Each of the Settling States has agreed to be bound by, and each of the Settling States shall be bound by, the terms of the Controlled Substance Injunction, including, for the avoidance of doubt, the release provisions set forth therein.  For the avoidance of doubt, as set forth in the Controlled Substance Injunction, the terms of the Controlled Substance Injunction are not effective until after the Effective Date.

## 10.      Preservation of Setoff Rights.

Notwithstanding anything in Article X of the Plan to the contrary or in a Sale Order, any right of setoff or recoupment is preserved against the Debtors, the Purchasers in the event of a Sale Transaction Restructuring or an Other Asset Sale, and any of their affiliates and successors to the extent such right(s) exist under applicable law and subject to the Debtors', Purchasers', and any of their Affiliates' and successors', as applicable, right to contest any such right(s) of setoff or recoupment; *provided*, *however*, that notwithstanding the foregoing or anything in the Plan to the contrary, the right of any Entity or Holder of a Claim or Interest to assert setoff or recoupment as a defense or affirmative defense to claims brought against them is expressly preserved to the extent permitted by applicable law and shall not be impaired, enjoined, precluded, restricted, or otherwise limited by the Plan or the Confirmation Order.

Notwithstanding anything to the contrary in the Plan, nothing in the Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to any Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy law or non-bankruptcy law, including, but not limited to, the (i) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease(s) with the Debtors, under the Plan, (ii) assertion of rights or setoff or recoupment, if any, in connection with the claim reconciliation process,

or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.

### 11.      Protections Against Discriminatory Treatment.

To the maximum extent provided by section 525 of the Bankruptcy Code and the supremacy clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 12.      Document Retention.

On and after the Effective Date, the Reorganized Debtors and the Wind-Down Debtors, as applicable, may maintain documents in accordance with the Litigation Trust Cooperation Agreement and the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors or the Wind-Down Debtors, as applicable, in accordance with the Litigation Trust Cooperation Agreement or in connection with the terms of the Purchase Agreement(s).  The Litigation Trust shall bear the costs of the document retention by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors necessary for the "Cooperation" provision in Article IV.E.6 of the Plan.

### 13.      Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### 14.      Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

### 15.      Subordination Rights.

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to

any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, their respective property, and Holders of Claims and Interests and is fair, equitable, and reasonable.

U.    **What is the deadline to properly execute, complete, and submit Ballots (*i.e.*, vote)?**

All Ballots must be properly executed, completed, and submitted so that they are **actually received** by Kroll by April 15, 2024, at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").

V.    **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan. All Ballots (including master Ballots and pre-validated Ballots) for Holders of Claims in Class 5 must be properly completed, executed, and delivered, so that the applicable Ballot is **actually received** by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC ("Kroll" or the "Claims and Noticing Agent") **on or before April 15, 2024, at 4:00 p.m., prevailing Eastern Time**. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures" for more information.

W.    **Why is the Bankruptcy Court holding a Combined Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan (the "Confirmation Hearing") and recognizes that any party in interest may object to Confirmation of the Plan. In addition, the Debtors are seeking approval of this Disclosure Statement on a final basis at such Confirmation Hearing (the "Combined Hearing"). The Combined Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Combined Hearing once scheduled. The Combined Hearing may be adjourned from time to time without further notice.

X.    **What is the purpose of the Combined Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Y.      **When is the Combined Hearing set to occur?**

The Bankruptcy Court has scheduled the Combined Hearing for April 22, 2024, at 10:00 a.m. (prevailing Eastern Time). The Combined Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan and approval of the Disclosure Statement on a final basis must be filed and served on the Debtors, and certain other parties, by no later than April 15, 2024, at 4:00 p.m. (prevailing Eastern Time) in accordance with the Combined Hearing Notice that accompanies this Disclosure Statement and the Disclosure Statement Order.

Z.      **Will any party have significant influence over the corporate governance and operations of the Post-Effective Date Debtors?**

On the Effective Date, in accordance with the terms of the New Corporate Governance Documents, the New Rite Aid Board shall be appointed, and New Rite Aid shall adopt the New Corporate Governance Documents; *provided* that each Disinterested Director of the Debtors shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and discretion in accordance with the terms of the Plan. Each Disinterested Director shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to New Rite Aid, the Reorganized Debtors, or any other Entity without such director's prior written consent. Each Disinterested Director of the Debtors retains the right to review, approve, and make decisions, as well as to file papers and be heard before the Bankruptcy Court, on all matters under such director's continuing authority.

AA.     **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' proposed Claims and Noticing Agent via one of the following methods:

> *By calling the telephone number included in your Ballot, or by contacting the Claims and Noticing Agent by phone at:*
> 844-274-2766 (US/Canada, toll-free)
> 646-440-4878 (International, toll)
>
> *By regular mail, hand delivery, or overnight mail at:*
> Rite Aid Corporation Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, New York 11232

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the claims and noticing agent at https://restructuring.ra.kroll.com/riteaid (free of charge) or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee).

**BB.** **Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors, the Committees, the DIP Lenders, McKesson, and the Ad Hoc Secured Noteholder Group reached a global settlement in principle to be implemented through the Plan. The Debtors believe that the settlements, as set forth in the Plan, provide for the best, and only available, alternative to the Debtors' creditors, provide a greater recovery (or potential for recovery) compared to a liquidation, and provide the greatest chance for the Debtors to emerge from chapter 11 as a going concern.

## IV. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A. Rite Aid's Background and Current Operations.

#### 1. The Beginning of the Rite Aid Story.

In 1962, Alex Grass, a lawyer-turned-entrepreneur, opened a discount drugstore in Scranton, Pennsylvania. He named it Thrift D Discount Center.

Mr. Grass's business was a quick success, and the Company grew rapidly. In 1963, Thrif D opened five more drugstores, extending into New York. The next year, Thrif D expanded into New Jersey and Virginia. By 1966, there were 36 stores in five Northeast and Mid-Atlantic states, including its first in-store pharmacy in New Rochelle, New York.

In 1968, the Company changed its name to "Rite Aid Corporation" and made its first public offering, issuing 350,000 shares on the American Stock Exchange. In 1970, Rite Aid Corporation moved to the New York Stock Exchange, where its common stock traded until October 31, 2023.

After going public, Rite Aid continued to grow its store count and geographic reach through acquisitions. By 1981, Rite Aid had become the third largest retail drug chain in the country. In 1983, Rite Aid's sales exceeded $1 billion, and the Company made the *Fortune* 500.

By 1995, Rite Aid was the nation's No. 1 drugstore chain in store numbers and the No. 2 chain in sales, operating nearly 3,000 stores. In 1996, the Company announced its largest acquisition, a merger with Thrifty PayLess Holdings, Inc., adding more than 1,000 stores in the western United States.

#### 2. Overcoming a Troubled Period.

Amid the growth, in 1995, Martin Grass succeeded his father as Rite Aid's chairman and CEO. By the late 1990s, *Business Week* and the *Wall Street Journal* investigated allegations of improper dealings within Rite Aid. The Company launched an internal investigation, which uncovered accounting irregularities, among other issues. In November 1999, the Company's auditors resigned and withdrew their opinions regarding Rite Aid's financial statements for fiscal years 1998 and 1999. The Securities and Exchange Commission and the U.S. Attorney for the Middle District of Pennsylvania also investigated Rite Aid. Several former, senior executives pled guilty in criminal proceedings.

Along with legal troubles, Rite Aid faced serious financial headwinds. Rite Aid struggled to integrate recent acquisitions, particularly that of Thrifty PayLess. The Company labored under the $6-plus billion debt load that funded its growth. In June 1999, the Company re-adjusted its earnings for prior years. Its stock price sunk, and the Company negotiated a deal with its creditors to avoid bankruptcy.

But, with a new executive team, the Company weathered the setbacks and gradually overcame them. The new executive team brought Rite Aid's store expansion program to a halt. New management launched a rigorous review of the existing store portfolio. It targeted underperforming units for closure and improved the productivity of the existing store base.

Once Rite Aid recovered and regained its footing, Rite Aid slowly and strategically expanded the business. In 2007, Rite Aid bought Brooks and Eckerd drugstore chains. In 2014, Rite Aid acquired Health Dialog, which provides personalized healthcare coaching and disease management services. Then, in 2015, Rite Aid entered the PBM business by acquiring what is now known as Elixir. And in 2020, Rite Aid acquired Bartell Drugs, a 67-location Seattle-area chain.

Rite Aid has also regularly explored various divestitures. In October 2015, Walgreens announced that it would acquire Rite Aid for $17.2 billion pending regulatory approval. After a lengthy review by the Federal Trade Commission that lasted well over a year, Rite Aid and Walgreens determined not to move forward with Walgreen's acquisition of the full Company, when it became apparent that the transaction would not be approved. Walgreens and Rite Aid then negotiated a sale of a subset of Rite Aid's stores. After resolving certain antitrust concerns, the Federal Trade Commission ultimately approved an agreement for Walgreens to purchase 1,932 stores, approximately half of the then-store count, including some of Rite Aid's strongest performing locations, and three distribution centers for $4.38 billion. The sale closed in March 2018. In 2018, Rite Aid and Albertson Companies announced but ultimately terminated a merger of the then-remaining Rite Aid stores.

### 3.     Rite Aid's Business Operations Today.

Over the course of six decades, Rite Aid cemented itself as a staple of American families in hundreds of communities. Prior to the sale of the Elixir PBM business to MedImpact, which became effective on February 1, 2024, Rite Aid operated through two primary business lines: Retail Pharmacy and Pharmacy Services.

***Retail Pharmacy***. In the Retail Pharmacy Segment, Rite Aid's highly trained pharmacists offer a wide range of health care services, including dispensing medications; performing immunizations and other clinical care; assisting customers with high blood pressure and diabetes care; and educating customers on managing their medications and potential side effects. Rite Aid also sells a full selection of health and beauty aids and personal care products, seasonal merchandise, and a large private brand portfolio of food and consumer products.

Pharmacists are core to the business. In 2020, Rite Aid unveiled a new strategy called RxEvolution to elevate the role of Rite Aid pharmacists—the "last mile" of health care—to keep customers healthy and connected to their care teams. Throughout the pandemic, Rite Aid's pharmacists were on the front lines of testing and vaccinating, and the Company made great strides in changing perceptions of pharmacists as providers whose reach extends well beyond filling prescriptions. Rite Aid pharmacists have tremendous impact: in fiscal year 2022, Rite Aid pharmacists administered 14.3 million COVID vaccines, 3.6 million COVID tests, 2.6 million influenza vaccines, and other vaccines, like Hepatitis and HPV.

To ensure the proper flow of critical merchandise to their retail locations, Rite Aid manages a complex supply chain network with more than 9,000 vendors and seven distribution centers. Rite Aid's supply chain team manages the steady flow of goods into the distribution centers and out to the stores and has an active quality control process up and down the supply chain. To combat risks of patient misuse of prescription drugs, the Company maintains a Controlled Substance Compliance Program, including an Opioid Prescription Validation Process, among other things.

The Company relies primarily on its partnership with McKesson to fulfill its prescription drug requirements. Over the past twenty years, no partnership has been more crucial to the Company's success than its relationship with McKesson. The Company purchases almost all of its branded pharmaceutical products and generic pharmaceutical products from McKesson, accounting for 98% of the dollar volume of its prescription drugs in the Retail Pharmacy Segment.

*Pharmacy Services*. Prior to February 1, 2024, Rite Aid owned and operated a PBM business, Elixir. PBMs act as intermediaries to process prescriptions, help with drug utilization, and control costs for the groups that pay for drugs, such as insurance companies, unions, and large employers. Through Elixir, the Pharmacy Services Segment provided a comprehensive suite of PBM offerings to various clients—including regional health plans, commercial employers, and labor groups.

On February 1, 2024, as described further herein, Rite Aid closed the sale of Elixir to MedImpact through a sale conducted pursuant to section 363 of the Bankruptcy Code.

### 4.      Rite Aid's Employee Base.

The Company employs over [40,000] people, most on a full-time basis. The Company is proud of its comprehensive compensation and benefit packages, including:

- Incentive payments or bonuses based on the employee's performance, sales targets, the Company's performance, and other identified goals;

- Opportunities to own Company equity; and

- A number of insurance and benefits programs, including health benefits, prescription drug benefits, life insurance, disability benefits, and retirement plans

Approximately 12,000 of the Company's employees are unionized under 18 collective bargaining agreements ("CBAs"). The CBAs cover batches of individual stores, largely arranged by geography. Unionized employees work at stores in Washington, Pennsylvania, Ohio, California, New York, New Jersey, and Michigan. The Company generally makes monthly contributions to provide health, welfare, and retirement benefits to certain union employees, and the unions administer the retirement benefits.

The Company contributes to ten multiemployer defined benefit pension plans under the terms of certain CBAs. The Company also contributes to multiemployer health and welfare plans on behalf of certain of its union-represented employees. The Company also sponsors benefit plans in which its non-union employees, and certain union employees, may be eligible to participate. The benefit plans sponsored by the Company include medical, dental, and vision plans, life insurance, tuition assistance programs, and paid time off, among other things.

Certain retired employees also receive retiree health and other benefits. The retirement plans sponsored by the Company include a defined benefit pension plan ("Pension Plan") and three 401(k) plans. Under the 401(k) plans, the Company makes employer-matching contributions to eligible participants. The Pension Plan has been closed for enrollment since December 31, 2001, but certain eligible participants continue to accrue benefits under the plan.

### 5.      Regulatory Framework.

The Company is subject to extensive and overlapping regulatory oversight. There are various federal, state, and local laws, regulations, and administrative practices concerning the provision of and payment for healthcare services, including:

- Federal, state, and local licensure and registration requirements concerning the operation of pharmacies, pharmacy benefit managers, and health discount programs;

- State insurance licensing requirements and regulation by state insurance departments of financial solvency and market conduct;

- Medicare, Medicaid, and other publicly financed health benefit plan regulations regarding the submission of claims;

- The Affordable Care Act; and

- Regulations of the Food and Drug Administration, Consumer Product Safety Commission, Federal Trade Commission, and Drug Enforcement Administration.

The Company is also subject to laws and regulations governing the purchase, sale, storage, and dispensing of controlled substances, listed chemicals, and other products, including nicotine products, medical devices, and alcoholic beverages.  In addition, various laws govern the Company's relationship with its employees, including health and safety standards, minimum wage requirements, equal opportunity matters, and unionizing efforts.

**B.**     **Rite Aid's Prepetition Corporate and Capital Structure and Liquidity Profile.**

**1.**     **Corporate Structure.**

Rite Aid Corporation is the ultimate parent of each Debtor.  It conducts business through its 124 subsidiaries, 121 of which are wholly owned (directly or indirectly) and 120 of which are Debtors.  A simplified corporate structure chart is attached hereto as **Exhibit C**.  The Company maintains its corporate headquarters in Philadelphia, Pennsylvania.

**2.**     **Capital Structure.[12]**

As of the Petition Date, the Debtors' long-term, funded debt obligations totaled approximately $4.0 billion:

---

[12]     Certain of the Debtors' prepetition debt issuances, including the liens granted with respect thereto, were the subject of potential challenges by the Committees under the Bankruptcy Code or other applicable law.  The Committee Settlement constitutes a proposed settlement of such challenges, in addition to a settlement of General Unsecured Claims.

| Instrument | Maturity | Principal<br>*($ in millions)* |
|---|---|---|
| **Secured Debt** | | |
| ABL Facility | August 20, 2026 | $2,223[13] |
| FILO Term Loan Facility | August 20, 2026 | $400 |
| 2025 Secured Notes | July 1, 2025 | $320 |
| 2026 Secured Notes | November 15, 2026 | $850 |
| Finance Leases | — | $18 |
| **Total Secured Debt** | | **$3,811** |
| **Unsecured Debt** | | |
| 2027 Unsecured Notes | February 15, 2027 | $186 |
| 2028 Unsecured Notes | December 15, 2028 | $2 |
| **Total Unsecured Debt** | | **$188** |
| **Total Funded Debt** | | **$3,999** |

(a)     **The Prepetition ABL and FILO Term Loan Facility.**

Rite Aid Corporation, as a parent borrower, Bank of America, N.A., as administrative agent and collateral agent, and certain lenders are parties to that certain Credit Agreement, dated as of December 20, 2018 (as amended most recently as of December 1, 2022, the "Prepetition Credit Agreement").

The Prepetition Credit Agreement provides for a senior secured asset-based revolving credit facility with a maximum availability of $2.85 billion (the "ABL Facility"). As of the Petition Date, approximately $2.2 billion in aggregate principal amounts remained outstanding under the ABL Facility.

The Prepetition Credit Agreement also provides for a "first-in, last-out" term loan facility in the aggregate principal amount of $400 million (the "FILO Term Loan Facility" and together with the Prepetition ABL Facility, the "Prepetition Credit Facilities"). As of the Petition Date, $400 million in borrowings remained outstanding under the FILO Term Loan Facility.

The Prepetition Credit Facilities mature on August 20, 2026. They are guaranteed by all of Rite Aid Corporation's subsidiaries, excluding the Non-Guarantor Subsidiaries (such guarantors, the "Prepetition Obligors"). They are secured by liens on substantially all assets (other than all real property and interests therein, all equity interest in the direct or indirect subsidiaries and other exclusions) of Rite Aid Corporation and the Prepetition Obligors. The Prepetition Credit Facilities have the same collateral package as the Senior Secured Notes (as defined below), but have first priority interest in certain assets, including accounts receivables, inventory, cash, deposit accounts, and intellectual property, among other things. There are certain restrictions on amounts available to be drawn under the Prepetition ABL Facility. Availability of the FILO Term Loan Facility is also subject to a borrowing base calculation.

(b)     **The Prepetition Secured Notes.**

Rite Aid Corporation has two tranches of prepetition secured notes (the "Senior Secured Notes"):

---

[13]    Excludes approximately $237 million of outstanding letters of credit.

- **7.500% Senior Secured Notes due 2025 (the "<u>2025 Secured Notes</u>")**.  On February 5, 2020, Rite Aid Corporation issued $600 million of 7.500% Senior Secured Notes due July 1, 2025 (approximately $320 million of which remains outstanding).

- **8.000% Senior Secured Notes due 2026 (the "<u>2026 Secured Notes</u>")**.  On July 27, 2020, Rite Aid Corporation issued $850 million of 8.000% Senior Secured Notes due November 15, 2026 (approximately $850 million of which remains outstanding).

The Senior Secured Notes are secured by liens on substantially all assets (other than all real property and interests therein, all equity interest in the direct or indirect subsidiaries and other exclusions) of Rite Aid Corporation and the Prepetition Obligors.  The Prepetition Obligors guarantee both tranches. Additionally, the collateral package for the Senior Secured Notes is the same as the Prepetition Credit Facilities, but have first priority interest in certain assets, including equipment, general intangibles (other than intellectual property), fixtures and equipment, among other things.

Inability to refinance the 2025 Secured Notes or the 2026 Secured Notes would trigger a springing maturity on the Prepetition Credit Facilities.  Specifically, the Prepetition Credit Facilities mature on the 91 days prior to the stated maturity of the 2025 Secured Notes and 2026 Secured Notes if, on such 91 days, the 2025 Secured Notes or the 2026 Secured Notes are outstanding.

### (c)      The Prepetition Unsecured Notes.

Rite Aid Corporation also has two tranches of unsecured notes (the "<u>Unsecured Notes</u>"):

- **7.700% Notes due 2027 (the "<u>2027 Unsecured Notes</u>")**.  On December 17, 1996, Rite Aid Corporation issued $300 million of 7.700% of Notes due February 15, 2027 (approximately $186 million of which remains outstanding as of the Petition Date).  No other Debtor guarantees or is otherwise obligated under these notes.

- **6.875% Notes due 2028 (the "<u>2028 Unsecured Notes</u>")**.  On December 21, 1998, Rite Aid Corporation issued $150 million of 6.875% Notes due December 15, 2028 (approximately $2 million of which remains outstanding as of the Petition Date).  No other Debtor guarantees or is otherwise obligated under these notes.

### (d)      Litigation Overhang

The Company also has a large and varied litigation claims portfolio, including more than 1,600 opioid-related suits as well as claims alleging other tortious acts or omissions by the Debtors.  Rite Aid is also subject to significant contract disputes, government investigation, and securities matters, all as described more fully herein.

### (e)      Finance Leases.

The Company leases most of its retail stores and certain distribution facilities under non-callable operating and finance leases, most of which have initial lease terms of five to 22 years.  The Company also leases certain of its equipment and other assets under non-callable operating leases with initial terms of three to 10 years.  As of the Petition Date, approximately $18 million remained outstanding under such equipment and other asset operating leases.

(f)    **Common Stock.**

Shares of Rite Aid Corporation's common stock traded on the New York Stock Exchange ("<u>NYSE</u>") under the symbol "RAD." In September 2023, Rite Aid Corporation received notice from the NYSE that it is no longer in compliance with certain NYSE continued listing standards relating to minimum market capitalization and minimum stock price. On October 16, 2023, the NYSE announced the commencement of proceedings to delist Rite Aid's common stock from the NYSE, and immediately suspended trading.

### 3.    Rite Aid's Liquidity.

The Company has two primary sources of liquidity: (i) cash provided by operating activities and (ii) borrowings under its debt facilities. The Company principally uses its cash to provide working capital for operations, to service interest and principal payments, and to fund capital expenditures. As of January 31, 2024, the Company has $401 million of total liquidity, including $270 million borrowing capacity under the DIP ABL Facilities and $131 million in cash.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

As summarized in the Preliminary Statement, a confluence of headwinds stressed the Company's financial performance leading up to the Petition Date. This Article V summarizes how—over several years—the Company reacted to those headwinds.

### A.    Liability Management Transactions and Debt Paydowns.

The Company executed several transactions and debt pay-downs to reduce funded debt and borrowing costs. These transactions extended the Company's runway to explore additional turnaround opportunities.

*First*, on June 25, 2020, the Company announced it would exchange up to $750 million in aggregate principal amount of the then-outstanding 6.125% senior notes due 2023 ("<u>2023 Notes</u>") for a combination of $600 million of the newly issued 8.0% 2026 Secured Notes and $145.5 million in cash. Shortly thereafter, the Company increased the maximum exchange amount to $1.125 billion. On July 24, 2020, the Company announced that it had exchanged $1.063 billion of the 6.125% Notes for $849.9 million of the 2026 Secured Notes and $206 million in cash.

*Second*, on May 28, 2021, the Company redeemed 100% of the remaining outstanding 2023 Notes at par.

*Third*, on August 20, 2021, the Company amended its Prepetition Credit Agreement to provide for the $2.8 billion ABL Facility and the $350 million FILO Term Loan Facility. As a result of the amendment, Rite Aid was able to extend its debt maturity profile and obtain additional liquidity.

*Fourth*, on December 1, 2022, the Company further amended its Prepetition Credit Agreement, to upsize both the Prepetition Credit Facilities, collectively increasing the Company's liquidity by $100 million.

*Fifth*, in recent years, the Company reduced interest expense by paying down certain of its funded debt. Specifically, in June, November, and December 2022, the Company paid off $115 million, $160 million, and $5 million, respectively, of its 2025 Secured Notes. In June 2022, the Company paid

down $52 million of its 2027 Unsecured Notes and $27 million of its 2028 Unsecured Notes. In total, these pay downs saved approximately $22 million in cash interest expense since June 2022.

### B. Cost-Saving Measures.

The Company explored and executed several cost-saving measures and operational improvements. First, the Company closed over 200 underperforming stores. Second, the Company initiated a new, large-scale program to reduce operating and overhead costs to better align the operation to the optimized store footprint. The Company is now executing that program and focused on delivering pharmaceuticals and services with efficiency. Third, at its retail locations, the Company rationalized its front-end retail offerings to improve working capital and refresh its merchandise assortment. Finally, the Company also launched additional initiatives to enhance optimization of its pricing and promotional strategies.

### C. Sale-Leaseback Transactions.

The Company also took advantage of favorable real estate markets in each of 2021, 2022, and 2023 to sell dozens of owned properties (including distribution centers) and enter into long-term leases with the purchasers. These transactions resulted in net proceeds of approximately $178 million in 2021, $57 million in 2022, and $73 million in 2023.

### D. Advisor Engagement.

Rite Aid engaged Guggenheim Securities and Kirkland & Ellis LLP in December 2022 and April 2023, respectively, to assist Rite Aid in analyzing its financing needs and exploring its capital structure alternatives and restructuring options. The Company also engaged Alvarez & Marsal in May 2023 to conduct a footprint assessment, assist with the business plan and transformation, accelerate cost savings and, if necessary, support contingency preparations.

### E. Footprint Rationalization and Rite Aid 2.0 Business Plan.

Unprofitable stores have hampered the Company's growth, turnaround initiatives, and free cash flow, while the inability to reinvest in the business allowed competitors to outpace the Company. Rite Aid undertook a bottoms-up footprint rationalization effort and developed the Company's business plan, referred to as "Rite Aid 2.0." The Company also undertook an intensive, store-level evaluation, testing stores' financial performance, rent relative to market, and supply chain and other operational and geographic considerations impacting its competitive landscape and overall strategies with its network, an analysis that remains continually ongoing. Based on this analysis, the Company identified a series of stores for closure to focus on the remaining portfolio and ability to invest capital into the remaining stores.

### F. Asset Sales.

The Company began a marketing process for Elixir over the summer of 2023. The Company, with the assistance of Guggenheim Securities, prepared marketing materials and contacted 12 parties prepetition. Due to the operational and regulatory expertise required to operate a PBM, the marketing efforts focused on potential strategic buyers. Nine potential bidders executed non-disclosure agreements and were granted access to a virtual data room as well as offered management presentations. The Company successfully used the chapter 11 process to complete the Elixir marketing process, culminating in closing of the sale of Elixir to MedImpact on February 1, 2024.

The Company also explored a potential sale of some or all of its retail business, which process remains ongoing through these Chapter 11 Cases. The Elixir and Rite Aid Retail marketing processes are described further in Article VI.C.

### G.    Corporate Governance Efforts.

The Company's board and senior management proactively managed the Company's circumstances and maintained a strong governance process.

***First***, beginning in March 2023, the board of directors and certain committees thereof began convening weekly meetings with the Company's restructuring advisors. Those weekly meetings, which focused on restructuring-related updates and workstreams, supplemented the board's regular cadence of meetings.

***Second***, seven experienced advisor consultants were engaged over the summer of 2023 to aid the Company and certain of its subsidiaries in their evaluation of alternatives and contingency planning efforts.

- Jeffrey Stein.  Mr. Stein has more than 30 years of experience in the restructuring space, regularly serving as an officer and director supporting companies experiencing significant challenges, including operational and financial restructurings.  Mr. Stein previously served as the chief restructuring officer of Whiting Petroleum Corporation, Philadelphia Energy Solutions, LLC, and Westmoreland Coal Company.  He is currently the chairman of the board of Ambac Financial Group, Inc. and the liquidating trustee for the estate of Ditech Holding Corporation, among other roles, and, as described below, on October 15, 2023, he was appointed Chief Executive Officer and Chief Restructuring Officer of Rite Aid Corporation.

- Lisa Broderick. Ms. Broderick is an accomplished senior executive with 35 years of experience across technology, finance, and business development industries.  She is founder and Managing Partner of Conversus Group LLC, a management consulting firm that has performed turn arounds of companies across technology, telecommunications, manufacturing, and service-based industries.

- Paul Keglevic.  Mr. Keglevic is an experienced independent director, with prior senior executive and Big 5 accounting experience.  Mr. Keglevic's experience includes leading the restructuring of the largest LBO in U.S. history.  Mr. Keglevic currently sits on the boards of WeWork, utility company Evergy, and healthcare company Envision, in addition to having served as an independent board member across a wide range of other companies and sectors.

- Roger Meltzer.  With over 35 years of experience in law firm leadership, including nearly 15 years managing DLA Piper, including two terms as Chairman, Mr. Meltzer brings deep experience in managing large organizations through major financial headwinds, expansion, and growth.  Mr. Meltzer has served as a director to several non-profit and for-profit organizations, where he has brought to bear decades of leadership experience and practice in corporate and securities law.

- Steven Panagos. Mr. Panagos is a turnaround expert with experience leading complex financial and operational restructurings for organizations across a spectrum of industries.  He has served as an independent director to companies undergoing significant changes, including PhyMed, JCPenney, Pier1 Imports, and American Consolidated Natural Resources.  Mr. Panagos also spent a decade as Vice Chairman and Managing Director of the Recapitalization & Restructuring Group at Moelis & Company.

- Stefan Selig. Mr. Selig is an accomplished banker and senior executive. He served as President Obama's Under Secretary of Commerce for International Trade. Prior to serving in that role, he was the Executive Vice Chairman of Global Corporate & Investment Banking at Bank of America Merrill Lynch. In 2017, Mr. Selig founded BridgePark Advisors LLC to advise a select group of CEOs, boards of directors, and institutional and high net worth investors on business strategy, mergers and acquisitions, and financings, among other things. Mr. Selig has served as an independent director to numerous companies undergoing reorganizations.

- Carrie Teffner. Ms. Teffner has more than 30 years of financial and operational leadership experience in consumer products and retail industries, having served as the Chief Financial Officer of Crocs, PetSmart, Weber-Stephen Products LLC, and Timberland. Ms. Teffner has also served as a director on the boards of public companies, including companies undergoing reorganizations.

*Third*, once it became clear that a near-term chapter 11 process was a distinct possibility, the Company proactively evaluated its corporate governance structure. The Company determined to appoint certain of the advisor consultants to Disinterested Director positions at three entities in the corporate structure:

| Entity | Disinterested Directors | Disinterested Directors' Counsel |
|---|---|---|
| Hunter Lane, LLC (Elixir) | Stefan Selig, Roger Meltzer | Katten Muchin Rosenman LLP |
| Rite Aid Corporation | Paul Keglevic, Carrie Teffner | Kobre & Kim[14] |
| Thrifty PayLess, Inc. | Steven Panagos, Lisa Broderick | Milbank LLP |

The applicable boards each unanimously adopted resolutions forming special committees composed of the applicable Disinterested Directors and delegated authority to the special committees to, among other things, take certain actions related to potential or actual conflicts of interest (if any) that may arise between their respective Company entity on one hand and their respective Company's members, affiliates, or directors and officers on the other hand in connection with, among other things, a restructuring (the "Conflict Matters"). The applicable boards delegated to each special committee the exclusive authority to investigate and determine, based on the advice of counsel, and in each special committee's business judgment, whether any matter constitutes a Conflict Matter, and to review, consider, investigate, negotiate, settle, approve, authorize, and act upon any Conflict Matters. Each special committee's diligence efforts with respect to Conflict Matters remain ongoing, with the assistance of the Disinterested Directors' applicable counsel.

Further, on October 15, 2023, the Board determined that it was in the best interests of the Company and its stakeholders to appoint Jeffrey Stein, one of the advisor consultants, to the positions of Chief Executive Officer and Chief Restructuring Officer of Rite Aid, leveraging Mr. Stein's extensive restructuring and operational experience to guide the Company through these Chapter 11 Cases and consummation of the Restructuring Transactions.

---

[14] Wilson Sonsini Goodrich & Rosati represents the full board of Rite Aid Corporation.

### H.    Stakeholder Engagement.

In the lead-up to the Petition Date, Rite Aid engaged with key stakeholders across its capital structure in the hopes of consummating a deleveraging, out-of-court transaction. Over several months, Rite Aid engaged with the Ad Hoc Secured Noteholder Group regarding options to strengthen its balance sheet and right-size its capital structure; the agent on its existing ABL Facility, regarding potential financing options; and various governmental agencies, regarding resolution of a number of investigations.

## VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED DEVELOPMENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration. At a hearing on October 16, 2023, (the "First Day Hearing") the Bankruptcy Court granted certain of the relief initially requested in the First Day Motions on an interim and final basis, as applicable, with orders entered contemporaneously with or shortly following the First Day Hearing. As of the date hereof, the Bankruptcy Court has granted most of the First Day Motions on a final basis, as specified below: [15]

- **Case Management Motion**: On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 149] approving the *Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 3] on a final basis.

- **Schedules Extension Motion**: On October 19, 2023, the Bankruptcy Court entered an order [Docket No. 157] approving the *Debtors' Motion Seeking Entry of an Order Extending Time to (I) File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 4] on a final basis.

- **Utilities Motion**:    On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 135] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, (IV) Authorizing Certain Fee Payments for Services Performed, and (V) Granting Related Relief* [Docket No. 5] (the "Utilities Motion") on an interim basis. The Bankruptcy Court entered an order approving the Utilities Motion on a final basis on November 20, 2023 [Docket No. 708].

- **NOL Motion**: On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 142] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock, and (II) Granting Related Relief* [Docket No. 7] (the "NOL Motion") on an interim basis. The

---

[15]    The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid.

Bankruptcy Court entered an order approving the NOL Motion on a final basis on November 20, 2023 [Docket No. 707].

- **Customer Programs Motion**:  On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 146] approving the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer Their Existing Retail Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (B) Continue Client Programs and Servicing Related to the Elixir Business and (II) Granting Related Relief* [Docket No. 8] (the "Customer Programs Motion") on an interim basis.  On December 20, 2023, the Bankruptcy Court entered an order approving the Customer Programs Motion on a final basis [Docket No. 1140].

- **Creditor Matrix Motion**:  On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 148] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Redact Certain Personally Identifiable Information of Natural Persons (II) Waiving the Requirement to File a List of Equity Holders and Provide Notices Directly to Equity Security Holders, and (III) Granting Related Relief* (the "Creditor Matrix Motion") [Docket No. 9] on an interim basis.  On February 16, 2024, the Bankruptcy Court adjourned the hearing regarding the final relief as requested in the Creditor Matrix Motion to April 17, 2024 [Docket No. 1974].

- **Cash Management Motion**:  On October 17, 2023, the Bankruptcy Court entered an order [Docket No. 123] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 10] (the "Cash Management Motion") on an interim basis.  On December 22, 2023, the Bankruptcy Court entered an order approving the Cash Management Motion on a final basis [Docket No. 1160].

- **Kroll Retention Application**:  On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 143] approving the *Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 11] (the "Kroll Retention Application") on a final basis.

- **Insurance & Surety Bond Motion**:  On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 144] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations, and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief* [Docket No. 12] (the "Insurance & Surety Bond Motion") on an interim basis.  On November 20, 2023, the Bankruptcy Court entered an Order approving the Insurance Motion on a final basis [Docket No. 705].

- **Taxes Motion**:  On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 139] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 13] (the "Taxes Motion") on an interim basis.  On December 20, 2023, the Bankruptcy Court entered an order approving the Taxes Motion on a final basis [Docket No. 1136].

- **Scheduling and Protocols Motion**:  On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 150] approving the *Debtors' Motion for Order Approving Certain Dates and Protocols in Connection with Plan Confirmation* [Docket No. 14] (the "Scheduling and Protocols Motion").  As set forth in the motion seeking conditional approval of this Disclosure Statement [Docket No. 1791], the dates and deadlines set forth in the Scheduling and Protocols Motion no longer apply and are replaced by the dates and deadlines set forth in the Disclosure Statement Order.

- **Record Date Motion**:  On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 138] approving the *Debtors' Motion for Entry of an Order (I) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Certain Claims Against the Debtors' Estates, and (II) Granting Related Relief* [Docket No. 16] on a final basis.

- **Wages Motion**:  On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 134] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Associate Wages, Salaries, Other Compensation, and Reimbursable Associate Expenses and (B) Continue Associate Benefits Programs, and (II) Granting Related Relief* [Docket No. 17] ("Wages Motion") on an interim basis.  On January 30, 2024, the Bankruptcy Court entered an order approving the Wages Motion on a final basis [Docket No. 1770].

- **Critical Vendors Motion**:  On October 18, 2023, the Bankruptcy Court entered an order [Docket No. 147] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(B)(9) Claimants, (B) Lien Claimants, and (C) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 18] ("Critical Vendors Motion") on an interim basis.  On October 18, 2023, the Bankruptcy Court entered an order approving the Critical Vendors Motion on an interim basis [Docket No. 147].  On November 20, 2023, the Bankruptcy Court entered a second order approving the Critical Vendors Motion on an interim basis [Docket No. 704].  On December 20, 2023, the Bankruptcy Court entered an order approving the Critical Vendors Motion on a final basis [Docket No. 1137].

- **Joint Administration Motion**:  On October 17, 2023, the Bankruptcy Court entered an order [Docket No. 122] approving the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 21] on a final basis.

- **Bidding Procedures Motion**:  On October 18, 2023, the Bankruptcy Court entered the Bidding Procedures Order on a final basis.  Following discussions with parties in interest, the Debtors submitted a proposed Amended Bidding Procedures Order to the Bankruptcy Court, which was approved on January 9, 2024 on a final basis.

- **Store Closing Motion**:  On October 17, 2023, the Bankruptcy Court entered an order [Docket No. 121] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* [Docket No. 37] (the "Store Closing Motion").  On October 17, 2023, the Bankruptcy Court entered an order approving the Store Closing Motion on an interim basis [Docket No. 121].  On November 20, 2023, the Bankruptcy Court entered an order approving the Store Closing Motion on a final basis [Docket No. 709] (the "Initial Store Closing Order").  In furtherance of their thoroughly considered, value-focused store closure process and to satisfy certain of the Debtors' obligations under the DIP Facilities, the Debtors filed the *Debtors' Motion for Entry of an*

*Amended Final Order (I) Authorizing and Approving the Conduct of Store Closing Sales, with
Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances and (II) Granting
Related Relief* [Docket No. 1569] (the "Amended Store Closing Motion") to amend the Store
Closing Order to permit the engagement of a store-closing services consultant, among other
requested relief, which motion was granted on January 29, 2024 [Docket No. 1648]
(the "Amended Store Closing Order").

## B.    Appointment of Statutory Committees.

### 1.    Appointment of the Official Committee of Unsecured Creditors.

On November 2, 2023, the U.S. Trustee filed the *Notice of Appointment of Official Committee of
Unsecured Creditors* [Docket No. 431] appointing the Official Committee of Unsecured Creditors
(the "UCC").  The nine-member UCC has retained Kramer Levin Naftalis & Frankel LLP and Kelley Drye
& Warren LLP as its legal counsel, Lazard Frères & Co., LLC as its investment banker, and AlixPartners,
LLP as its financial advisor (collectively, the "UCC Professionals").  The Bankruptcy Court entered orders
approving the retention of the UCC Professionals [Docket Nos. 1519, 1520, 1521, and 1557].  The UCC is
composed of the following members:

- McKesson Corporation;

- ComputershareTrust Co.;

- Loyd F. Schmuckley Jr.;

- Humana Health Plan Inc.;

- Benderson Development Company LLC;

- United Food and Commercial Workers International Union;

- Pension Benefit Guaranty Corp.; and

- Realty Income Corp.

### 2.    Appointment of the Official Committee of Tort Claimants.

On November 2, 2023, the U.S. Trustee filed the *Notice of Appointment of Official Committee of
Tort Claimants* [Docket No. 432] appointing the tort claimants' committee (the "TCC" and together with
the UCC, the "Committees").  The nine-member TCC has retained Akin Gump Strauss Hauer & Feld LLP
and Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. as its legal counsel, Jefferies LLC as its investment
banker, and Province, LLC as its financial advisor, (collectively, the "TCC Professionals").  The
Bankruptcy Court entered orders approving the retention of the TCC Professionals [Docket Nos. 1576,
1577, 1578, and 1579].  The TCC is composed of the following voting members:

- Blue Cross Blue Shield Association;

- Erie County Medical Center Corp.;

- Michael Masiowski, M.D.;

- Nancy Zailo;

- Andrew Parsons;

- Karen Pforr;

- Sandra Blankenship;

- Rite Valega; and

- Alphonse Borowski.

In addition to these voting members appointed by the U.S. Trustee, the Baltimore City Board of School Commissioners serves as an *ex officio* member of the TCC on behalf of certain public school districts. Immediately after the appointment of the Committees, the Debtors began sharing diligence with each of the TCC and UCC and engaging in formal discovery processes in a coordinated fashion and on substantially the same terms with respect to each Committee. This diligence and production effort has been a substantial undertaking. The Debtors have also proactively engaged with the Committees regarding the key components of these Chapter 11 Cases, including the asset sale processes described herein, the Final Financing Order, and the substance of the Plan and framework of the Restructuring Transactions contemplated therein. This engagement has been productive and continues to proceed as part of the ongoing mediation process described further herein. Information transfer and dialogue between the Debtors and the Committees remains robust and ongoing.

### C.    Retention of Debtors' Professionals.

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable: (a) Kirkland & Ellis, LLP and Kirkland & Ellis International LLP, as co-counsel to the Debtors; (b) Cole Schotz P.C., as co-counsel to the Debtors; (c) Guggenheim Securities as investment banker to the Debtors; (c) Wilson Sonsini Goodrich & Rosati, P.C. as special counsel to the board of directors of Debtor Rite Aid Corporation; (d) Milbank LLP as counsel to the Special Committee of Debtor Thrifty PayLess, Inc.; (e) Kobre & Kim LLP as counsel to Carrie Teffner and Paul Keglevic in their capacity as Disinterested Directors of certain of the Debtors; (f) Katten Muchin Rosenman LLP as counsel to Roger Meltzer and Stefan M. Selig in their capacity as Disinterested Directors of Debtor Hunter Lane, LLC; (g) Alvarez & Marsal as financial advisor to the Debtors; (h) A&G, as real estate consultant and advisor to the Debtors; (i) Deloitte & Touche LLP as independent auditor to the Debtors; (j) Kroll Restructuring Administration, LLC, as administrative advisor to the Debtors; and (k) PwC US Business Advisory LLP as accounting advisory services provider, valuation advisory services provider, and tax advisory services provider to the Debtors (collectively, the "Professionals"). Concurrently with the application requesting authorization to retain Alvarez & Marsal North America, LLC, the Debtors sought entry of an order designating Marc Liebman, Managing Director of Alvarez and Marsal North America, LLC, as Chief Transformation Officer to the Debtors. The Bankruptcy Court subsequently entered orders approving the retention of the Professionals and Mr. Liebman [Docket Nos. 1133, 1414, 1415, 1435-1440, 1496, 1637, 1928].

The Debtors also filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Transaction Parties in Interest Related to the Debtors' Professional Retention Applications* [Docket No. 806] (the "Sealing Motion"), whereby the Debtors sought authorization to redact and file under seal the names of Confidential Transaction Parties (as defined herein) in connection with the Debtors' Professional Applications. To protect the Debtors' commercially sensitive information while providing the necessary disclosures required under the Bankruptcy Code and Bankruptcy Rules, the Professionals disclosed in their schedules their relationships with certain of the Debtors' potential

transaction counterparties (the "Confidential Transaction Parties") without disclosing the names of such entities and individuals.  Due to the inherently competitive nature of the sale processes, revealing the Confidential Transaction Parties may chill the marketing process by preventing current potential counterparties from moving forward with negotiations and deterring potential counterparties from getting involved in the sale processes.  Moreover, certain of the Confidential Transaction Parties have executed non-disclosure agreements with the Debtors that require that their identities remain confidential.  Accordingly, disclosing the identities of the Confidential Transaction Parties before a transaction is negotiated would violate the underlying confidentiality agreements.  A hearing is currently set for April 17, 2024 for the Bankruptcy Court to consider the Debtors' Sealing Motion.

### D.    Lease Rejections and Optimization.

As discussed in the First Day Declaration, the Debtors have worked tirelessly to build stakeholder consensus around a value-maximizing restructuring of the Company.  The Debtors' efforts on this front yielded agreement on restructuring terms among the Company and certain of its key creditor constituencies.  A key component of the Company's go-forward business plan—and the value-maximizing restructuring of the Debtors—is the continuation and completion of the Debtors' ongoing effort to rationalize their retail pharmacy store footprint.  This effort entails, among other things, the closure of certain underperforming stores (based on a comprehensive cost-benefit analysis) with the goal of creating an efficient and profitable remaining store footprint.

The Company's store portfolio rationalization process accelerated in the months leading up to the Petition Date in connection with the Company's broader restructuring efforts and has continued following the Petition Date in connection with the ongoing implementation and restructuring pathway to "Rite Aid 2.0."  During the twelve-month period ending on September 30, 2023, the Debtors closed approximately 210 stores, leaving the Debtors with approximately 2,100 operating stores as of the Petition Date.

The Debtors' meticulous, thoroughly considered store closure plan is centered on value maximization and an asset disposition strategy based on value realizable through the sale or internal transfer of prescription files and related records (collectively, the "Prescription Assets"), store inventory, including front-end retail inventory, and store fixtures, furniture, and equipment.  Before the Petition Date, the Debtors, with the assistance of their advisors, conducted a comprehensive analysis of the Debtors' store portfolio, financial performance, and market geography to identify unprofitable, underperforming, or otherwise sub-optimal store locations.  Once identified, the Debtors determined the best strategy to maximize proceeds from the closure process for each location.  With respect to inventory, the Debtors' strategy for maximizing store proceeds consists of either (i) conducting a self-managed strategic mark-down plan followed by a clearance sale; and/or (ii) transferring inventory to other Company store locations that would remain open.  With respect to Prescription Assets, the Debtors' strategy consists of either (i) transferring (or "pouring") Prescription Assets to nearby Company store locations that would remain open, or (ii) selling Prescription Assets to another (non-Rite Aid) pharmacy.

Following the Petition Date, the Debtors have closed an additional 345 stores, as of February 1, 2024.  Subsequent to the closure of stores, as described further herein, the Debtors considered whether to reject or to assume and assign related leases:  since the Petition Date, the Debtors have effectuated (a) the rejection of 585 leases resulting in approximately $171 million in annual occupancy savings and (b) the sale of 5 leases for cash proceeds of approximately $1.754 million.  Further to the foregoing, the Debtors have taken the following steps with respect to their lease rejection and optimization strategy:

1.     **Store Closings.**

On October 16, 2023, the Debtors filed the Store Closing Motion, through which the Debtors sought approval of certain Sale Guidelines (as defined in the Store Closing Motion) and to conduct 154 initial store closings.  On October 17, 2023, the Bankruptcy Court entered an order approving the Store Closing Motion on an interim basis [Docket No. 121] (the "Interim Store Closing Order"), and on November 20, the Bankruptcy Court entered the Initial Store Closing Order, granting such relief on a final basis.

On January 23, 2024, the Debtors filed the Amended Store Closing Motion, pursuant to which the Debtors sought authorization to enter into and perform under certain consulting agreements among the Debtors, SB360 Capital Partners, LLC, and Hilco Merchant Resources, LLC (together, the "Consultants"). As contemplated by the Amended Store Closing Motion, the Consultants are to provide a suite of services in connection with the store closings, including:  data analysis; planning, logical coordination, oversight, and execution support; and monetization of retail inventory and furniture, fixtures, and equipment at closing stores.  On January 29, 2024, the Bankruptcy Court entered the Amended Store Closing Order, granting such relief.  Pursuant to the Interim Store Closing Order, the Initial Store Closing Order, and the Amended Store Closing Order, the Debtors have proceeded to notice parties in interest of their decision to close 426 additional stores, as of January 31, 2024, consistent with the "Rite Aid 2.0" business plan.

2.     **Lease Rejections.**

On October 16, 2023, the Debtors filed the (i) *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 24] (the "Rejection Procedures Motion," and the procedures contemplated thereby, the "Rejection Procedures"), through which the Debtors sought approval of certain procedures for rejecting or assuming executory contracts and unexpired leases; and (ii) *Debtors' Motion for Entry of an Order (I) Authorizing (A) the Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Any Personal Property, Each Effective as of the Rejection Date and (II) Granting Related Relief* [Docket No. 25] (the "Rejection Motion"), whereby the Debtors sought to reject 347 leases of non-residential real property as of October 15, 2023.  The Bankruptcy Court subsequently entered orders approving the rejection of certain leases proposed to be rejected by the Debtors' Rejection Motion [Docket Nos. 710; 723; 831-38, 847, 1006, 1021, 1041, 1056, 1057, 1096, 1240, 1379, 1423, 1494, 1617, 1624, 1645, 1646].  On November 20, 2023, the Bankruptcy Court entered an order approving the Rejection Procedures Motion [Docket No. 702] (the "Rejection Procedures Order").

Consistent with the requirements of the DIP Facilities, and in order to facilitate an orderly, considered, and value-maximizing disposition of their lease portfolio, the Debtors sought an extension of the statutory deadline under section 365(d)(4) of the Bankruptcy Code to assume or reject unexpired leases. On November 30, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order Pursuant to Section 365(d)(4) of the Bankruptcy Code (I) Extending Debtors' Time to Assume of Reject Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* (the "Lease Rejection Extension Motion") [Docket No. 842], whereby the Debtors sought entry of an order to extend the Debtors' time to assume or reject unexpired leases for an additional 90 days, for a total of 210 days from the petition date, through and including May 13, 2024.  On December 20, 2023, the Bankruptcy Court entered an order approving the Lease Rejection Extension Motion [Docket No. 1132].

Pursuant to the Rejection Procedures Order, the Debtors have subsequently provided notice of and completed rejection of 643 unexpired leases.

The Debtors continue to evaluate their store portfolio.  On February 21, 2024, the Debtors filed the *Motion for Entry of an Order (I) Authorizing and Approving Procedures for Exiting Certain Leased Real*

*Property and (II) Granting Related Relief* [Docket No. 2024] (the "<u>Exit Procedures Motion</u>") and the
*Motion Seeking Entry of an Order (I) Consensually Extending the Time Within Which the Debtors Must
Assume or Reject Unexpired Leases of Non-Residential Real Property, (II) Authorizing the Debtors to
Provide Certain Consideration to Landlords in Exchange for Consenting to Such Extension, and (III)
Granting Related Relief* [Docket No. 2023] (the "<u>Second Lease Extension Motion</u>").  Through the Second
Lease Extension Motion, the Debtors sought Bankruptcy Court approval to further extend the time within
which the Debtors could decide to assume or reject approximately 1,500 of their unexpired commercial real
estate leases to the earlier of (i) the entry of an order confirming a chapter 11 plan for the Debtors (subject
to the occurrence of the effective date of such plan), and (ii) September 30, 2024.  Through the Exit
Procedures Motion, the Debtors sought Bankruptcy Court approval of procedures governing store closings
and associated store closing sales at premises not covered by the Second Lease Extension Motion.  The
relief requested in the Exit Procedures Motion and the Second Lease Extension Motion facilitates the
Debtors' ability to make considered, value-maximizing decisions concerning their portfolio.  On March 8,
2024, the Bankruptcy Court entered an order [Docket No. 2319] granting the relief requested in the Exit
Procedures Motion.  The Bankruptcy Court will consider the Second Lease Extension Motion at a hearing
on April 17, 2024.

E.      **Retail and Elixir Sale Processes**

        Foundational to the Debtors' reorganization is the Debtors' commitment to dual track their Plan
and the Plan Restructuring with sale processes designed to (i) gauge market interest in a transaction (or
transactions) that generate value in excess of that which is currently contemplated under the Plan
Restructuring and (ii) dispose of other assets in an effort to realize maximum value for stakeholders.  To
effectuate these sale processes, the Debtors filed the *Debtors' Motion For Entry of an Order (I) Approving
Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect
Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Elixir Form APA and
The Rite Aid Retail Form APA, (V) Establishing Notice and Procedures for the Assumption and Assignment
of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, (VII)
Authorizing the Sale of Assets, and (VIIII) Granting Related Relief* [Docket No. 33] (the "<u>Bidding
Procedures Motion</u>") seeking authority to proceed with multiple expeditious, yet flexible, bidding and sale
processes.  The Bidding Procedures Motion was approved at the First Day Hearing, and on October 18,
2023, the Bankruptcy Court entered an order approving the Bidding Procedures Motion [Docket No. 129]
(the "<u>Bidding Procedures Order</u>").   On January 9, 2024, the Bankruptcy Court entered the Amended
Bidding Procedures Order approving certain modifications to the Bidding Procedures and the Bidding
Procedures Order following discussions with stakeholders.  Through the Bidding Procedures Order and
Amended Bidding Procedures Order, the Debtors (1) concluded the going-concern asset sale process of
their pharmacy benefit manager business, primarily owned by Debtor Hunter Lane, LLC and its Debtor
subsidiaries (collectively, "<u>Elixir</u>," and the assets of Elixir, the "<u>Elixir Assets</u>," and the sale thereof, the
"<u>Elixir Sale Transaction</u>"), culminating in the closing of the Elixir Sale Transaction on February 1, 2024,
and (2) have proceeded to market all or a portion of their remaining assets, chiefly comprising their retail
pharmacy business segment  (such assets, the "<u>Rite Aid Retail Assets</u>" and together with the Elixir Assets,
the "<u>Assets</u>," and the sale of the Rite Aid Retail Assets, the "<u>Rite Aid Retail Sale Transaction</u>," and together
with the Elixir Sale Transactions, the "<u>Sale Transactions</u>"), as a market test relative to the Plan
Restructuring.

        1.      **Elixir Marketing Process.**

        In the months preceding the commencement of these Chapter 11 Cases, the Debtors, with the
assistance of Guggenheim Securities and their other advisors, launched a process to solicit market interest
in a going-concern sale of Elixir.  During this prepetition marketing process, the Debtors dedicated
substantial time and effort to conducting outreach to a select group of strategic parties.  The Debtors, in

consultation with Guggenheim Securities, determined which parties to contact based upon, among other criteria, the parties' potential familiarity with the Elixir business, potential capacity to consummate a large-scale transaction (particularly given certain regulatory considerations), and industry knowledge and experience.

Specifically, beginning in July 2023, the Debtors, with the assistance of Guggenheim Securities, reached out to a group of twelve strategic investors experienced in investing in the pharmacy benefits management sector. An additional party proactively reached out and requested to participate in an evaluation of the Elixir Assets. Of these parties, nine executed non-disclosure agreements with the Debtors. Following execution of non-disclosure agreements, the Debtors, with the assistance of their advisors, held initial counterparty meetings and thereafter provided access to a virtual data room containing significant diligence documentation. Those documents included, among other things, confidential evaluation materials, an investor presentation, financial models and operational information about the Debtors and their non-Debtor affiliates, information about the marketing process, and summary memorandums providing detail on the Elixir Assets.

In August 2023, the Debtors, with the assistance of Guggenheim Securities, instructed bidders to submit preliminary indications of interest for the Elixir Assets by September 7, 2023, addressing the following key considerations, among any others, to enable the Debtors to fully evaluate each bidder's proposal: (a) the identity and description of the bidder; (b) the purchase price for the Elixir business to be paid in cash; (c) descriptions of the material assumptions informing the proposed purchase price; (d) a description of due diligence information required to make a definitive proposal; (e) a transaction structure and proposed source of funds; (f) prospective plans for the Elixir business following consummation of a transaction; (g) any conditions precedent required to be satisfied to consummate a transaction; (h) estimates of time required to execute and close a transaction; (i) the bidder's contact information and a list of any external advisors retained to assist in due diligence; and (j) any other matters material to a proposal.

(a)    **MedImpact Stalking Horse Bidder.**

Ultimately, on October 15, 2023, the Debtors executed an asset purchase agreement with MedImpact (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Elixir APA"). The Debtors determined that MedImpact's bid represented not only the best overall proposal for the Elixir Assets, but the only actionable proposal as of the Petition Date. The Elixir APA provided for, among other things, MedImpact's purchase of the Elixir Assets through a section 363 public auction process contemplated by the Bidding Procedures.

(b)    **Postpetition Elixir Marketing Process.**

After the Petition Date and pursuant to the Bidding Procedures Order, the Debtors continued the Elixir marketing process, soliciting higher or otherwise better bids for the Elixir Assets. During the postpetition period, the Debtors, with the assistance of Guggenheim Securities, and with input from the advisors to the Committees, engaged an additional 36 potential bidders. Despite these robust marketing efforts, as of the Elixir Bid Deadline, the Debtors did not receive a Qualified Bid with respect to the Elixir Assets other than the Stalking Horse Bid submitted by MedImpact. Accordingly, and pursuant to section XI of the Bidding Procedures, the Debtors elected, in consultation with the Consultation Parties, to cancel the Elixir Auction and filed the *Notice of Successful Bidder and Cancellation of Auction Solely with Respect to the Elixir Assets* [Docket No. 1145]. Moreover, in accordance with the Bidding Procedures Order, the Debtors, in consultation with the Consultation Parties, determined MedImpact to be the Successful Bidder with respect to the Elixir Assets.

The Debtors sought entry of the proposed *Order (I) Approving the Sale of Acquired Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform their Obligations under the Stalking Horse Purchase Agreement, (III) Approving Assumption and Assignment of Certain Executory Contracts and (IV) Granting Related Relief* (the "Elixir Sale Order") [Docket No. 1204] for approval of the Elixir APA and consummation of the Elixir Sale Transaction. Specifically, as more fully set forth in the Elixir APA, the Debtors sought approval to sell the Acquired Assets (as defined thereunder) to MedImpact in exchange for (a) the assumption of certain Assumed Liabilities (as defined in the Elixir APA) and (b) subject to adjustment pursuant to section 2.7 of the Elixir APA, $576.5 million in consideration comprised of cash and certain Term Loans (as defined in the Elixir APA,) (*i.e.*, the Seller Financing discussed below). The Debtors also sought approval of the assumption and assignment to MedImpact of certain executory contracts and unexpired leases associated with the Acquired Assets. A sale hearing to conclude the Elixir Sale Transaction process occurred on January 9, 2024, and on January 17, 2024, the Bankruptcy Court entered the Elixir Sale Order, approving the Elixir APA and consummating the Elixir Sale Transaction [Docket No. 1510].

On January 18, 2024, the Debtors filed a *Supplemental Notice of Proposed Assumed and Assigned Executory Contracts and Unexpired Leases, each Solely with Respect to the Elixir Assets* [Docket No. 1531], disclosing 449 additional executory contracts which the Debtors intend to assume and assign to MedImpact. On February 1, 2024, the Debtors and MedImpact closed the Elixir Sale Transaction.

### (c)    MedImpact Seller Financing.

In connection with the sale of the Elixir business, on November 16, 2023, the Company filed a motion [Docket No. 643] (the "Seller Financing Motion") with the Bankruptcy Court seeking approval to provide seller financing to MedImpact to fund a substantial portion of the purchase price of the Elixir Sale Transaction (the "Seller Financing"). The Debtors, in their business judgment and in consultation with their advisors, determined entry into the Seller Financing as proposed by the Seller Financing Motion was necessary in order to ensure that the Elixir Sale Transaction with MedImpact, the Debtors' best and only viable alternative to sell the Elixir business, could proceed to closing. Without the Seller Financing, MedImpact would have been unable to obtain the financing necessary to fund the purchase price and close the Elixir Sale Transaction.

On December 19, 2023, the Bankruptcy Court approved the Seller Financing in a bench ruling and on December 20, 2023, the Bankruptcy Court entered the Seller Financing Order, approving the Seller Financing and entry into that certain Second Amended and Restated Credit Agreement, dated as of November 8, 2023, by and between MI OpCo Holdings, Inc., as borrower thereunder, MI OpCo H2, LLC, as a guarantor thereunder, the other guarantors from time to time party thereto, the lenders and the other L/C issuers from time to time party thereto, and Bank of America, N.A., as administrative agent, swing-line lender and L/C issuer (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "MedImpact Term Loan Credit Agreement"), subject to certain conditions set forth therein.

As discussed above, on February 1, 2024, upon the satisfaction of the conditions to closing, the Sellers and MedImpact consummated the Elixir Sale Transaction as contemplated by the Elixir APA, thereby completing the disposition of substantially all of the Elixir Assets. In connection with consummation of the Elixir Sale Transaction, the Sellers received Term Loans (as defined in the Elixir APA) pursuant to the Seller Financing Term Loan Credit Agreement in the aggregate principal amount, after giving effect to customary working capital calculations, equal to $567.382 million, and cash in an aggregate amount equal to $43.125 million.

Additionally, upon closing of the Elixir Sale Transaction and the Seller Financing, on February 1, 2024, the Company, entered into (x) that certain Collateral Assignment of Financing Documents (the "DIP ABL Collateral Assignment"), by and between the Company, as assignor, and Bank of America, N.A., in its capacity as collateral agent for each of the Senior Secured Parties (as defined in the DIP ABL Credit Agreement), as assignee (in such capacity, the "Assignee"), and (y) that certain Collateral Assignment of Financing Documents (the "DIP Term Loan Collateral Assignment"), by and among the Company, as assignor, and the Assignee, in its capacity as collateral agent for each of the Secured Parties (as defined in the DIP Term Loan Credit Agreement).  Pursuant to each of the DIP ABL Collateral Assignment and the DIP Term Loan Collateral Assignment, the Company, in connection with the Elixir Sale Transaction, collaterally assigned all of its rights arising under the Seller Financing Term Loan Credit Agreement and the other seller financing documentation in favor of the Assignee, for the ratable benefit of the Senior Secured Parties (as defined in the DIP ABL Credit Agreement) and the Secured Parties (as defined in the DIP Term Loan Credit Agreement), as applicable, as collateral security for the Senior Loan Obligations (as defined in the DIP ABL Credit Agreement) and the Obligations (as defined in the DIP Term Loan Credit Agreement), as applicable.

## 2. Rite Aid Retail Marketing Process.

In accordance with the process outlined in the Bidding Procedures, the Company set forth a timeline for the sale of its Rite Aid Retail Assets whereby all binding bids would have needed to be received by no later than December 18, 2023.  As these cases and the Rite Aid retail marketing process progressed, the Debtors, in consultation with the DIP Agents, the Ad Hoc Secured Noteholder Group in its capacity as a Consultation Party (as defined in the Bidding Procedures), and the Committees, determined certain extensions to the sale schedule to be necessary to facilitate the solicitation and development of interested parties' potential bids.  To that end, the Company filed the *Notices of Extension of Certain Dates and Deadlines Related to the Debtors' Bidding Procedures Amended Sale Schedule* [Docket Nos. 611, 819, 1152, 1229, and 1571] extending the sale process deadlines and providing the Company with additional time to complete their comprehensive marketing process, to receive and evaluate bids, and, if necessary, to hold an Auction to determine the highest and best bid for the Company's assets.

The Qualified Bid Deadline for this process occurred on February 6, 2024, and one or more auctions, if necessary, will be held in the near-term.  A hearing in the Bankruptcy Court would be scheduled thereafter to approve any potential sale transaction involving all or part of the Company's assets.  Should the Company receive an actionable bid, including a potential Credit Bid from the Ad Hoc Secured Noteholder Group,[16] for all or substantially all of the Company's assets which the Company believes, in its reasonable business judgment, provides more value to stakeholders than the Plan Restructuring, the Plan provides flexibility for the Debtors to "toggle" to implementation of such a Sale Transaction Restructuring.

In the event that such a higher or otherwise better Sale Transaction Restructuring materializes, the Debtors will file and serve a notice of such Sale Transaction Restructuring by the Sale Transaction Notice Deadline that includes the identity of the successful bidder.  In the event no such transaction materializes, the Debtors will notice parties in interest by the Sale Transaction Notice Deadline of their decision to pursue the Plan Restructuring and not the Sale Transaction Restructuring.

## 3. Health Dialog Sale Transaction

Through the Rite Aid Retail Marketing Process, the Debtors received a Qualified Bid from Infomedia Group, Inc. (d/b/a Carenet Health) ("Carenet") for certain assets comprising part of the Debtors'

---

[16]    At this time, the Required AHG Noteholders have not submitted a Credit Bid.

Health Dialog business ("Health Dialog") and such assets, the "Health Dialog Assets").  Health Dialog provides personalized population health solutions to improve the health of members, while reducing overall medical costs for companies and organizations.  The Health Dialog Assets comprise Health Dialog's Nurse Advice Line, Chronic Care Management, and Shared Decision-Making business solutions, along with associated client contracts.  Carenet is a provider of healthcare engagement, clinical support, telehealth and advocacy solutions.  On March 6, 2024, the Debtors executed with Carenet an Asset Purchase Agreement (the "Health Dialog APA") providing for the sale of the Health Dialog Assets to Carenet (the "Health Dialog Sale Transaction"), subject to Bankruptcy Court approval and customary closing conditions.  A hearing before the Bankruptcy Court to consider approval of the Health Dialog Sale Transaction is currently scheduled for April 10, 2024.

### F.      Approval of the DIP Facility.

The Debtors' businesses are abnormally cash-intensive, with significant daily and monthly cash needs to meet obligations to vendors, employees, and landlords, among others.  In light of their cash needs, the Debtors undertook extensive, arm's-length negotiations with lenders under the prepetition ABL Facility and the prepetition FILO Term Loan Facility to obtain sufficient liquidity to fund the Debtors' day-to-day operations during the Chapter 11 Cases.  The DIP ABL Facility, the DIP FILO Facility, and the DIP Term Loan Facility (as from time to time amended, amended and restated, modified, or supplemented, collectively, the "DIP Facilities") are essential to the Debtors' realization of a successful, value-maximizing restructuring.  In particular, the liquidity provided under the DIP Facilities is necessary for the Debtors to fund postpetition operations and chapter 11 process costs, and to send a strong signal to the market and to the Company's key constituencies that the Company can and will satisfy postpetition obligations in the ordinary course.

On October 18, the Bankruptcy Court entered the Interim Financing Order [Docket No. 120] approving, on an interim basis, the relief requested in the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Financing Motion").  Through the DIP Financing Motion, as approved by the Interim Financing Order, the Debtors were granted interim access to an aggregate $3.45 billion in commitments under the DIP Facilities to support working capital needs and administrative costs during the Chapter 11 Cases.  Specifically, following entry of the Interim Financing Order, the DIP Facilities were used to administer the Chapter 11 Cases, operate the Debtors' business in the ordinary course, and facilitate the marketing processes for the retail pharmacy and Elixir business segments as the Debtors have sought and concluded, respectively, value-maximizing sales of those segments' assets.  The DIP Facilities comprise: (i) the DIP ABL Facility in the aggregate principal amount of up to $2.85 billion, (ii) the DIP FILO Facility in the aggregate principal amount of $400 million, and (iii) the DIP Term Loan Facility in the aggregate principal amount of $200 million.  In addition to the funds made available through the DIP Facilities, the Interim Financing Order permitted the Debtors to use prepetition cash collateral to meet the Debtors' postpetition liquidity needs.

The PBGC and the DOJ, acting on behalf of the United States, filed limited objections (the "PBGC Objection" and the "DOJ Objection," respectively, and together, the "DIP Objections") to the DIP Financing Motion.  Each of the DIP Objections focused on previously requested relief in the DIP Financing Motion with regard to certain ordinary course intercompany transactions among EIC, a non-debtor affiliate of the Debtors, and Debtor EX Options, LLC ("EX Options").  The Debtors, the PBGC, and the DOJ engaged in extensive negotiations in the period leading up to the final hearing on the DIP Financing Motion.  Although these negotiations significantly narrowed the remaining disputed issues with regard to the DIP Financing Motion, they did not fully resolve the DIP Objections.  Accordingly, on December 18, 2023, the

Debtors filed the *Debtors' Omnibus Reply in Support of the Limited Objections to the DIP Motion and the Cash Management Motion* [Docket No. 1101] (the "DIP Reply"). In the DIP Reply, the Debtors argued, among other things, that final approval of the DIP Financing Motion on the terms set forth therein was essential to EIC's ordinary-course operations and protecting the lives that depend on coverage provided by EIC. Moreover, the Debtors argued that maintaining the *status quo* between EIC and EX Options was necessary to ensure the Debtors could pursue a value-maximizing, going concern restructuring. Finally, the Debtors argued that the Bankruptcy Court had jurisdiction over the matters related to EIC through the exercise of its "related to" jurisdiction, which extends to non-debtor affiliates, the equity of which constitutes property of a bankruptcy estate. On December 19, 2023, the Bankruptcy Court held a final hearing on the DIP Financing Motion, at the conclusion of which the Bankruptcy Court orally granted the DIP Financing Motion on a final basis, subject to the revision of certain terms of the Debtors' proposed final order. On December 22, 2023, following several days of further negotiations with the PBGC and the DOJ with regard to the form of the final order, the Bankruptcy Court entered the Final Financing Order approving the DIP Financing Motion on a final basis [Docket No. 1159].

The relief granted in the Final Financing Order incorporates the terms of a settlement with the Committees, which engaged in constructive dialogue with the Debtors with respect thereto. As a result of arm's-length, good faith negotiations in the days and weeks that immediately followed the Committees' appointment, the Debtors, the Ad Hoc Secured Noteholder Group, the DIP Lenders, and the Committees reached a negotiated settlement on various issues relating to, among other things, an increase in the Committee's investigation budget to $500,000, the extension of the challenge period to February 29, 2024,[17] modifications to the event of default triggers, the right to seek to surcharge lender collateral pursuant to section 506(c) of the Bankruptcy Code, the application of section 552(b) of the Bankruptcy Code to the proceeds of certain prepetition collateral, the preservation of the status quo as it relates to EIC, and an agreement to engage in Mediation to attempt to reach a comprehensive resolution on matters related to the Plan and Rite Aid Retail Sale Transaction.

On January 22, 2024, the Debtors filed a *Notice of Amended DIP Credit Agreements* [Docket No. 1567] disclosing that on January 19, 2024, the Debtors entered into (a) that certain Third Amendment and Consent to Debtor-in-Possession Credit Agreement, amending the DIP ABL Credit Agreement; and (b) that certain Third Amendment and Consent to Debtor-in-Possession Term Loan Agreement, amending the DIP Term Loan Credit Agreement. On February 29, 2024, the Debtors filed an additional *Notice of Amended DIP Credit Agreements* [Docket No. 2223], disclosing that on the date thereof the Debtors had entered into that certain Fourth Amendment and Consent to Debtor-in-Possession Term Loan Agreement, amending the DIP Term Loan Credit Agreement. Effective as of the filing of such notice with the Bankruptcy Court, the Chapter 11 Milestones set forth in Schedule 5.20 to each Amended DIP Credit Agreement replaced the Chapter 11 Milestones set forth in Exhibit D to the Final Financing Order.

On February 29, 2024, the Debtors filed the *Debtors' Application in Lieu of Motion for Entry of Amended Final DIP Order* [Docket No. 2225] requesting that the Court enter an amended version of the Final Financing Order (the "Amended Final Financing Order"). On March 1, 2024, the Court entered the Amended Final Financing Order [Docket No. 2230].

### G.    Adequate Protection Obligations.

The relief granted in the Final Financing Order includes granting certain adequate protection (the "Adequate Protection Obligations") to the Prepetition Credit Agreement Lenders, the Prepetition Agent, the Senior Secured Noteholders, and the Senior Secured Notes Trustees (the "Prepetition Secured

---

[17]    The challenge period was later extended by agreement to April 19, 2024.

"Parties"). The Adequate Protection Obligations were intended to adequately protect the Prepetition Secured Parties' interests in collateral securing their prepetition claims against the Debtors from any diminution in value (each, a "Diminution in Value"). Specifically, the Prepetition Secured Parties were granted:

(a)     liens (the "Adequate Protection Liens") on all or substantially all of the Debtors' assets. The Adequate Protection Liens are senior to all other prepetition liens in the Debtors' assets. With regard to certain collateral in which the Senior Secured Noteholders held first priority prepetition liens, the Adequate Protection Liens granted to the Senior Secured Noteholders are senior to all other liens (but junior to the Carve Out),[18] including liens held by the DIP Lenders pursuant to the Final Financing Order;

(b)     superpriority administrative expense claims (the "Adequate Protection Superpriority Claims") in the amount of any Diminution in Value. The Adequate Protection Superpriority Claims are senior to any and all other administrative expenses claim, but junior to the Carve Out and superpriority administrative expense claims granted to the DIP Lenders. None of the Prepetition Secured Parties are entitled to receive payments or other distributions in respect of the Adequate Protection Superpriority Claims unless and until all DIP Claims have been paid in full and the commitments to lend under the DIP Facilities have been terminated; and

(c)     payment (the "Adequate Protection Payments") of all reasonable and documented fees and expenses of the Prepetition Secured Parties payable under the prepetition credit documents, or as otherwise permitted in the Financing Orders, including fees and expenses of counsel and other professionals to the Prepetition Secured Parties.

Typically, determinations of whether any Diminution of Value has occurred take place after the effective date of a chapter 11 plan when creditor recoveries have been determined. Accordingly, the Debtors cannot currently estimate whether any Diminution of Value has occurred or will occur and, if such a Diminution of Value does occur, what the amount of the resulting Adequate Protection Superpriority Claim(s) may be. In light of the Debtors' current business environment and the events of these Chapter 11 Cases, as described herein, it is possible that the value of the Debtors' assets securing the Prepetition Secured Parties' claims may have decreased during these Chapter 11 Cases. As a result, the Prepetition Secured Parties could have substantial Adequate Protection Superpriority Claims under the terms of the Final Financing Order, which rank senior in priority to claims of General Unsecured Creditors. Accordingly, any such Adequate Protection Superpriority Claims would need to be paid in full from distributable assets before any distributions could be made to General Unsecured Creditors.[19]

**H.      Mediation.**

At a hearing on December 19, 2023, the Bankruptcy Court authorized the Debtors and certain key parties in interest in the Chapter 11 Cases to participate in Mediation to reach a comprehensive resolution regarding matters related to, among other things, the Plan and Rite Aid Retail Sale Transaction. On January 9, 2024, the Debtors filed the *Debtors' Application in Lieu of Motion in Support of Entry of Stipulation and Agreed Order (I) Appointing Hon. Shelley C. Chapman (Ret.) as Mediator to Mediate the Mediation Topics, (II) Referring Such Matters to Mediation, (III) Directing the Mediation Parties to Participate in the Mediation, and (IV) Granting Related Relief* (the "Mediation Stipulation") [Docket No.

---

[18]    "Carve Out" has the meaning set forth in ¶ 11(b) of the Final Financing Order.

[19]    The Committees do not agree with the Debtors' assertions regarding any Diminution in Value claims asserted by the Prepetition Secured Parties, and reserve all rights.

1420], and on January 12, 2024 and January 30, 2024, the Bankruptcy Court entered an order and amended order, respectively, approving the Mediation Stipulation (the "Mediation Order") [Docket Nos. 1469, 1771] pursuant to which, among other things, the Hon. Shelley C. Chapman (Ret.) was appointed as Mediator. The Mediation parties include, among others, the Debtors, the DIP Agents, the steering committee of the Ad Hoc Secured Noteholder Group, and the Committees (collectively, the "Mediation Parties").

The Debtors, with the other Mediation Parties, have successfully agreed in principle on the components of a global settlement, the terms of which are embodied in the Plan. Through Mediation, the Debtors successfully reached an agreement in principle with McKesson with respect to the treatment of McKesson Claim and the terms of the go-forward McKesson New Contract.[20] The Debtors also reached agreement in principle with the DIP Lenders and the Ad Hoc Secured Noteholder Group on the terms of the Exit Facilities, the Takeback Notes, and structuring of the go-forward business at emergence.[21] In addition, the Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Lenders agreed in principle to the terms of the Committee Settlement.

## I.     The Federal Trade Commission Settlement.

In the months leading up to the commencement of the Debtors' Chapter 11 Cases, the Federal Trade Commission (the "FTC") was investigating two aspects of the Debtors' conduct: (1) whether the Debtors had failed to comply with document retention and compliance obligations in a 2010 administrative consent order entered in *In the Matter of Rite Aid Corporation*, C-4308, 150 F.T.C. 694 (Nov. 12, 2010) (the "2010 Order"); and (2) whether the Debtors' use of facial recognition software in certain Rite Aid stores for asset protection purposes prior to 2021 violated the Federal Trade Commission Act, 15 U.S.C. §§ 41-58 (the "FTC Act").

Following several months of negotiations, the Debtors and the FTC reached an agreement to resolve the FTC's investigations in December 2023. The Debtors did not admit liability. On January 8, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing and Approving the Settlement Between the Debtors and the Federal Trade Commission* (the "FTC Settlement Motion") [Docket No. 1408], whereby the Debtors sought entry of an order from the Bankruptcy Court approving the *Proposed Stipulated Order for Permanent Injunction and Other Relief* (the "Proposed FTC Order"). The resolution with the FTC involves implementation of an updated and expanded administrative consent order, the Proposed FTC Order, that will replace and extend the 2010 Order.[22] Compared to the 2010 Order, the Proposed FTC Order, among other things, incorporates additional injunctive terms related to the Debtors' management of personal information and use of facial recognition technologies and prohibits the Debtors from using facial recognition technology for security or surveillance purposes for five years. The Proposed FTC Order does *not* contemplate any monetary payment by the Debtors.

On December 19, 2023, the FTC voted to proceed with the settlement by authorizing its staff to (i) file a complaint (the "FTC Complaint")[23] in the United States District Court for the Eastern District of

---

[20]   The McKesson Settlement Documents remain subject to ongoing review, negotiation, finalization, and discussions with other key stakeholders.

[21]   The definitive documentation memorializing and implementing the agreement amongst the Debtors, the DIP Lenders, and the Ad Hoc Secured Noteholder Group with respect to the Exit Facilities and the Takeback Notes remain subject to ongoing review, negotiation, and finalization, and discussions with other key stakeholders.

[22]   A copy of the Proposed FTC Order is attached as Exhibit A to the FTC Settlement Motion.

[23]   A copy of the FTC Complaint is attached as Exhibit B to the FTC Settlement Motion.

Pennsylvania setting forth the FTC's allegations (such court, the "E.D. Penn. District Court," and such suit, the "District Court Action");[24] and (ii) file jointly with the Debtors a joint motion to stay (the "Motion to Stay").[25]   The FTC staff filed the FTC Complaint and Motion to Stay later that same day on December 19, 2023.  The Motion to Stay explains that the FTC and the Debtors have agreed to a proposed resolution of the allegations in the FTC Complaint.  The proposed resolution involves the E.D. Penn. District Court, in its discretion, entering an order (the "District Court FTC Settlement Order") (which is attached to the Motion to Stay) that anticipates subsequent entry of the Proposed FTC Order by the FTC in a manner that would supplant and replace the 2010 Order.  The Motion to Stay further explains that the Debtors require the approval of the Bankruptcy Court to enter into the settlement and the Bankruptcy Court's consent to entry of the Proposed FTC Order.  The Motion to Stay states that should the Bankruptcy Court approve the settlement, the parties will then jointly request that the E.D. Penn. District Court enter the District Court FTC Settlement Order.  On January 4, 2024, the E.D. Penn. District Court granted the Motion to Stay.  On January 23, 2024, the Bankruptcy Court entered an Order approving the FTC Settlement Motion [Docket No. 1574].  On January 24, 2024, the Debtors and the FTC filed a joint motion requesting an order lifting the stay in the E.D. Penn. District Court and for entry of the District Court FTC Settlement Order.  On February 26, 2024 the E.D. Penn. District Court entered orders granting the joint motion, lifting the stay in the E.D. Penn District Court and entering the District Court FTC Settlement Order.

### J.   The Debtor's Pension Plan.

PBGC is the wholly owned United States government corporation and agency created under Title IV of ERISA to administer the federal pension insurance program and to guarantee the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.  Debtor Rite Aid Corporation sponsors a pension plan (the "Pension Plan"), which is covered by Title IV of ERISA.  PBGC asserts that the other Debtors are members of Rite Aid Corporation's controlled group, as defined in 29 U.S.C. § 1301(a)(14).

If the Pension Plan continues, the Reorganized Debtors intend to assume the Pension Plan to the extent of their respective obligations under the Pension Plan and applicable law.  PBGC asserts that, if the Pension Plan terminates and is underfunded on the date of termination, the distress termination provisions of 29 U.S.C. § 1341(c) or the provisions for a PBGC-initiated termination under 29 U.S.C. § 1342(a) will govern termination of the Pension Plan.  PBGC asserts that if the Pension Plan terminates, Rite Aid Corporation and all members of its controlled group would be (i) jointly and severally liable for the unfunded benefit liabilities of the terminated Pension Plan; and (ii) liable for termination premiums for the Pension Plan at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7).

Through the Plan Restructuring, the Debtors will assume the Pension Plan to the extent of their respective obligations under the Pension Plan and applicable law.

PBGC has filed proofs of claim against each of the Debtors asserting: (i) estimated contingent claims, subject to termination of the Pension Plan during the bankruptcy proceeding, for unfunded benefit liabilities in the amount of approximately $23,200,000 on behalf of the Pension Plan; (ii) unliquidated claims for unpaid required minimum contributions owed to the Pension Plan; and (iii) unliquidated claims for unpaid statutory premiums, if any, owed to PBGC on behalf of the Pension Plan. PBGC asserts that

---

[24]   The FTC Complaint and the Motion to Stay (as defined herein) were filed in the District Court Action, proceeding under Case No. 2:23-cv-05023 and the case caption *Federal Trade Commission v. Rite Aid Corporation and Rite Aid Hdqtrs. Corp.*

[25]   A copy of the Motion to Stay is attached as Exhibit C to the FTC Settlement Motion.

these claims, if any, would be entitled to priority under 11 U.S.C. §§ 507(a)(2), (a)(8), and/or (a)(5), as applicable, in unliquidated amounts.

PBGC asserts that if the Pension Plan is terminated prior to Confirmation and the Debtors successfully reorganize, the obligation to PBGC for termination premiums would not exist until after Confirmation and the Effective Date occur. PBGC further asserts that, under these circumstances, such premiums would not be a dischargeable claim or debt within the meaning of sections 727 or 1141, as applicable, of the Bankruptcy Code. However, PGBC asserts that, if the Pension Plan is terminated and the Debtors liquidate, the obligation to PBGC for termination premiums is payable by the Debtors as a general unsecured claim. PBGC estimates that the amount of such termination premium liability for the Pension Plan would total approximately $25,417,500 in the aggregate.

The Debtors and Reorganized Debtors respectfully disagree with many of PBGC's foregoing assertions and the Debtors and the Reorganized Debtors reserve all rights and defenses relating to any asserted liability, including but not limited to contesting the validity, priority, and amount of such claims.

### K. Multiemployer Pension Plans.

Certain of the Debtors contribute to one or more of nine multiemployer pension plans (the "Multiemployer Pension Plans") pursuant to the terms of certain collective bargaining agreements entered into with certain unions. Depending on the nature, structure, and terms of the ultimate Restructuring Transaction, the consummation of the Restructuring Transaction could trigger certain withdrawal liabilities under one or more of the Multiemployer Pension Pensions. With respect to the Plan Restructuring, based on currently available information, the Debtors do not expect that consummation of the Plan Restructuring would trigger any withdrawal liability under any of the Multiemployer Pension Plans. With respect to the Sale Transaction Restructuring, the Debtors' consummation of the Sale Transaction Restructuring may trigger complete withdrawal liability under one or more of the Multiemployer Pension Plans (and corresponding unsecured claims against the applicable Debtors). Any potential complete withdrawal liability triggered by consummation of the Sale Transaction Restructuring could be mitigated through the execution of an agreement under ERISA section 4204(a) (29 U.S.C. § 1384) as part of such Sale Transaction Restructuring. Such an agreement would be subject to negotiation between the Debtors and the other party or parties to such Sale Transaction Restructuring.

### L. The McKesson Supply Agreement and Related Developments.

For 20 years, McKesson has supplied Rite Aid's pharmacies with pharmaceutical products. Under the McKesson Prepetition Contract, McKesson supplied—on a just-in-time basis—almost all of the pharmaceutical products that Rite Aid sells in its 2,000-plus pharmacies. McKesson is the sole supplier to the Debtors for a majority of all products within the Debtors' retail business. Rite Aid purchases all of its branded pharmaceutical products and almost all generic pharmaceutical products from McKesson. The Debtors and McKesson have entered into an interim postpetition supply agreement (the "Interim Postpetition Supply Agreement"), the terms of which are summarized in Exhibit A of the Bankruptcy Court's *Order Authorizing and Approving the Settlement between the Debtors and McKesson Corporation* [Docket No. 630].

As described above, the Debtors and McKesson reached an agreement in principle in Mediation with respect to the treatment of McKesson Claim and the terms of the go-forward McKesson New Contract,

embodied in the McKesson 503(b)(9) Settlement and the McKesson Settlement, respectively.[26] The terms of the McKesson New Contract are highly sensitive commercial information and are therefore confidential. The Debtors will seek approval of the McKesson Settlement, including the New McKesson Contract, with appropriate redactions, through confirmation of the Plan. Among other things, the McKesson 503(b)(9) Settlement provides for the following treatment of McKesson's 503(b)(9) Claim: (a) $25 million paid in Cash at emergence, with a contingent potential increase of up to an additional $25 million based on certain available Cash thresholds at emergence (the "Incremental Initial Payment"); (b) approximately $33.8 million of accounts payable to be assumed and paid in cash by MedImpact to McKesson at emergence; (c) up to $175 million payable semi-annually over a period of three (3) years, which will be reduced on a dollar-for-dollar basis in an amount equal to the Incremental Initial Payment, if any (the "McKesson Guaranteed Cash Obligations"); d) up to five (5) additional contingent deferred Cash payments in an aggregate amount of up to $100 million, based on achieving certain adjusted EBITDA thresholds; and (e) a General Unsecured Claim for any remaining amount. The terms and conditions of the McKesson 503(b)(9) Settlement will be disclosed in the Plan Supplement.

### M.    The Bar Date Order.

On October 16, 2023, the Debtors filed the Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief [Docket No. 32] (the "Bar Date Motion"). On November 20, 2023 the Bankruptcy Court entered the Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief [Docket No. 703] (the "Bar Date Order"), and on December 2 and December 4, 2023, the Debtors filed their Schedules [Docket Nos. 860-979, 998]. Pursuant to the Bar Date Order, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases was January 12, 2024, at 5:00 p.m. (prevailing Eastern Time) (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is April 12, 2024, at 5:00 p.m. (prevailing Eastern Time).

### N.    The *White* DOJ FCA Settlement.

On October 2, 2019, three former Rite Aid pharmacy personnel filed a *qui tam* complaint against certain of the Debtors in the U.S. District Court for the Eastern District of Pennsylvania, which action was later transferred to the U.S. District Court for the Northern District of Ohio (the "N.D. Ohio District Court"). On March 13, 2023, the United States intervened in the action, naming Rite Aid Corporation and certain other Debtors as defendants. The United States has alleged violations of the federal False Claims Act and Controlled Substances Act relating to the dispensing of controlled substances, primarily opioids. In connection with the *White* litigation, the United States has asserted that any liabilities of the Debtors resulting from the Debtor defendants' alleged violations of the federal False Claims Act or the Controlled Substances Act would be a non-dischargeable debt under sections 727 or 1141, as applicable, of the Bankruptcy Code.

On March 11, 2024, the Debtors and the United States filed a joint status report in the N.D. Ohio District Court, indicating an agreement in principle resolving the United States' claims in the *White* action,

---

[26]    The McKesson Settlement Documents remain subject to ongoing review, negotiation, finalization, and discussions with other key stakeholders.

subject to approval by authorizing officials within the DOJ and additional conditions, including acceptable documentation of the settlement terms and the confirmation and effectiveness of a chapter 11 plan of reorganization for the Debtors. The Debtors continue to engage with the DOJ to finalize the terms of the settlement resolving the *White* action.

### O.    The Controlled Substance Injunction

The Debtors and the Settling States reached an agreement in principle resolving the Settling States' claims against the Debtors. The Debtors and the Settling States will consent to the entry of the Controlled Substance Injunction Order in these Chapter 11 Cases. From and after the date of the Controlled Substance Injunction Order is entered by the Bankruptcy Court, the Debtors and the Reorganized Debtors, as applicable, and any successors to the Debtors' and the Reorganized Debtors' business operations relating to the manufacture and sale of opioid products in the United States and its territories shall abide by the Controlled Substance Injunction.

The Debtors and the Reorganized Debtors, as applicable, will consent to the entry of a final judgment or consent order upon the Effective Date imposing all of the provisions of the Controlled Substance Injunction in the state court of each of the Settling States, as applicable. The Debtors and the Reorganized Debtors will agree that seeking entry or enforcement of such a final judgment or consent order in accordance with the Controlled Substance Injunction will not violate any other injunctions or stays that it will seek, or may otherwise apply, in connection with these Chapter 11 Cases or confirmation of the Plan.

Each of the Settling States will agree to be bound by the terms of the Controlled Substance Injunction, including, for the avoidance of doubt, the release provisions set forth therein. For the avoidance of doubt, as set forth in the Controlled Substance Injunction, the terms of the Controlled Substance Injunction will not be effective until after the Effective Date.

The Controlled Substance Injunction remains subject to final approval by the Debtors and the Settling States and confirmation and consummation of the Plan. The Debtors continue to engage with the Settling States to finalize the terms of the Controlled Substance Injunction.

### P.    The NAS Claimants and Related Developments.

Certain guardians of individuals who allegedly experienced fetal opioid exposure while in utero and, allegedly in connection with such exposure, were diagnosed at birth with neonatal abstinence syndrome (the "NAS Claimants") have asserted contingent, unliquidated General Unsecured Claims against the Debtors, alleging that their injuries arose in part from the Debtors' alleged failure to implement sufficiently rigorous verification processes in dispensing opioid products. The NAS Claimants assert their claims in connection with two lawsuits, *In re: Opioid Litigation*, 22-C9000 NAS (Kanawha Cnty. Cir. Ct. May 31, 2023) (the "West Virginia Litigation"), which was dismissed as to the Debtors in May 2023, and *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Oh.) (the "Opioids MDL"), wherein the NAS Claimants represent five plaintiffs out of more than three thousand active claims.

The NAS Claimants have filed several pleadings in the Chapter 11 Cases in connection with their claims. On November 19, 2023, the NAS Claimants filed their *Motion for an Order Granting Relief from the Automatic Stay to Prosecute Movants' Claims with the West Virginia Mass Litigation Panel and the United States District Court for the Northern District of Ohio and Waiving the 14-Day Requirement Under Rule 4001(a)(3)* [Docket No. 675] (the "NAS Lift Stay Motion") seeking relief from the automatic stay to proceed against the Debtors with respect to the dismissed West Virginia Litigation and the Opioids MDL, and their *Motion for an Order for 2004 Examination of Debtors' Insurance Policies* [Docket No. 677] (the "NAS Rule 2004 Motion") seeking further discovery in support of the NAS Lift Stay Motion. On

January 9, 2024, following a hearing and the Debtors' and the Committees' objections to the NAS Lift Stay Motion and NAS Rule 2004 Motion, the Debtors and the NAS Claimants entered into, and the Bankruptcy Court subsequently approved, the *Stipulation & Consent Order Resolving the NAS Creditors' Motion for Relief From the Automatic Stay [Dkt. 675] and the NAS Creditors' Motion for a Rule 2004 Examination of Debtors' Insurance Policies [Dkt. 677]* [Docket No. 1418] (the "NAS Lift Stay Stipulation"). Pursuant to the NAS Lift Stay Stipulation, the Debtors agreed not to object to the NAS Claimants' appeal of the dismissal of the West Virginia Litigation as to non-Debtor parties, the NAS Claimants agreed to withdraw the NAS Lift Stay Motion and the NAS Rule 2004 Motion, and the Debtors and NAS Claimants agreed to certain production and discovery procedures.

Following the entry of the NAS Lift Stay Stipulation, the NAS Claimants filed (i) a motion for leave to conduct a deposition of Debtor Rite Aid Corporation's corporate representative with respect to certain matters relating to the Debtors' Insurance Policies [Docket No. 2203], (ii) a motion to file under seal the NAS Claimants' anticipated confirmation objection [Docket No. 1831], and (iii) a motion to file under seal the NAS Claimants' anticipated adversary complaint seeking declaratory judgment against the Debtors and certain of their insurance carriers as to rights the NAS Claimants may have to the Debtors' Insurance Policies [Docket No. 2299]. Each of these motions remains pending as of the filing of this Disclosure Statement.

The NAS Claimants assert General Unsecured Claims and, if their claims are Allowed, will receive the treatment specified in the Plan for Holders of General Unsecured Claims in Class 6.

The NAS Claimants requested that certain proposed provisions be included in the Plan (the "NAS Claimants' Proposal," attached hereto as **Exhibit F-1**). The NAS Claimants also provided a formal objection (the "NAS Claimants' Combined Objection," attached hereto as **Exhibit F-2**, and, together with the NAS Claimants' Proposal, the "NAS Claimants' Addendum") to the approval of the Disclosure Statement on a final basis and confirmation of the Plan. The NAS Claimants' Addendum is attached hereto as **Exhibit F**.

For the avoidance of doubt, the Debtors do not approve of, agree with, or substantively accept any of the assertions made in the NAS Claimants' Addendum. The Debtors dispute that the NAS Claimants' Proposal is appropriate for inclusion in the Plan or for attachment to the Disclosure Statement, substantively and/or procedurally, and, for the avoidance of doubt, the NAS Claimants' Proposal has not been incorporated into the Plan and its inclusion as an exhibit to this Disclosure Statement does not entail a representation by any party that it describes the Plan.

The Debtors dispute the NAS Claimants' Combined Objection. The Debtors assert that this Disclosure Statement complies with section 1125 of the Bankruptcy Code and that the Plan complies with section 1129 of the Bankruptcy Code without the NAS Claimants' Proposal and notwithstanding the NAS Claimants' Combined Objection. The Debtors reserve all rights to oppose the NAS Claimants' Objection and any request by the NAS Claimants for revisions to the Plan or further revisions to this Disclosure Statement in connection with the NAS Claimants' Proposals. The Debtors have agreed that, by attaching the NAS Claimants' Addendum hereto, the issues raised and discussed therein have been preserved for the Combined Hearing.

### Q.    State of Maryland Adversary Proceeding.

On February 20, 2024, the State of Maryland ("Maryland") commenced an adversary proceeding (Case No. 24-01091-MBK) against the Debtors by filing a complaint that seeks a determination from the Bankruptcy Court that certain claims held by Maryland are not dischargeable. Maryland alleges, generally, that Rite Aid violated the Maryland Consumer Protection Act, the Maryland False Claims Act, the

Maryland False Health Claims Act, the Maryland False Advertising Act, the Maryland Controlled Substances Act, and other statutes, as well as common law claims for fraud and public nuisance relating to the dispensing of controlled substances, primarily opioids.  The Debtors deny the allegations and the relief sought.  The Debtors are engaging with Maryland to better ascertain the basis for Maryland's allegations, among other things.

R.     **Proposed Confirmation Schedule.**

In consultation with the DIP Agents, the Ad Hoc Secured Noteholder Group, and the Committees, and pursuant to the milestones set forth in the DIP Facilities, the Debtors have agreed to certain scheduling milestones to ensure an orderly and timely implementation of the Restructuring Transactions.  The Debtors intend to proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs.  To that end, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | February 20, 2024 |
| Solicitation Mailing Deadline | April 1, 2024.  To the extent that such distribution is not made by the Solicitation Mailing Deadline, the Debtors shall distribute the Solicitation Packages immediately thereafter; *provided*, that the Debtors shall distribute the Combined Hearing Notice no later than two (2) business days following the Solicitation Mailing Deadline. |
| Publication Deadline | April 1, 2024.  To the extent that submission of the Publication Notice in a format modified for publication to the *New York Times* (national edition) and the *Financial Times* (global edition) is not made by the Publication Deadline, the Debtors shall complete such submission immediately thereafter; *provided* that the Debtors shall submit the Publication Notice no later than two (2) business days following the Publication Deadline. |
| Plan Supplement Filing Deadline | April 8, 2024 |
| Voting Deadline | April 15, 2024, at 4:00 p.m., prevailing Eastern Time |
| Confirmation and Final Disclosure Statement Objection Deadline | April 15, 2024, at 4:00 p.m., prevailing Eastern Time |
| Deadline to File Voting Report | April 19, 2024 |
| Confirmation Brief and Confirmation and Final Disclosure Statement Objection Reply Deadline | April 19, 2024, at 4:00 p.m., prevailing Eastern Time |
| Combined Hearing Date (*i.e.*, Confirmation Hearing Date)[27] | April 22, 2024, at 10:00 a.m., prevailing Eastern Time |

## VII.    SUMMARY OF THE PLAN

The key terms of the Plan, specific aspects of the Restructuring Transactions, and New Rite Aid's operations following the Consummation of the Plan can be found in the Plan, attached hereto as **Exhibit A**, among others described herein and therein.

### A.    General Settlement of Claims and Interests.

As discussed in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under

---

[27]    Any amendments to the Plan to incorporate the terms of the UCC/TCC Allocation Agreement shall be filed prior to the Combined Hearing.

the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including the McKesson Settlement, the DOJ FCA Settlement, the DOJ Elixir Settlement, the Committee Settlement[, and the Settlement of Tort Claims.] The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

B.     [[Settlement of Tort Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies related to Tort Claims in an amount that the TCC believes is worth $[●] (the "Settlement of Tort Claims"). With respect to the Settlement of Tort Claims, the Debtors and the TCC believe the Plan's treatment of Tort Claims is fair, equitable, reasonable, and appropriate, including, without limitation, the resolution of the Debtors' liability for Tort Claims, the distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan. More than [25,000] Proofs of Claim alleging liability arising out of or in connection with Tort Claims were filed against the Debtors by the Claims Bar Date. The TCC believes that any reasonable estimate, projection or valuation of the total liability for Tort Claims, if the Debtors had the ability to pay those Tort Claims outside of the Chapter 11 Cases, exceeds the full face value of all Insurance Policies providing coverage for Tort Claims, and likely exceeds the total value of the Estates.

In exchange for the settlement of their Claims, Holders of Tort Claims shall receive such treatment as set forth in the Plan, but subject to the allocation of recoveries on account of such treatment as set forth in the UCC/TCC Recovery Allocation Agreement. Nothing in the Plan or the Committee Settlement Documents, including the UCC/TCC Recovery Allocation Agreement, is intended to, and shall not be construed to, limit the amount of Tort Claim Insurance Proceeds available to Holders of Tort Claims [other beneficiaries of the Litigation Trust to the extent applicable in accordance with the UCC/TCC Recovery Allocation Agreement], and the Litigation Trustee shall retain the right to pursue the full agreed settlement value of the Tort Claims from Insurance Policies (other than the Unassigned Insurance Policies) pursuant to the Assigned Insurance Rights subject to the terms and conditions of the Plan. For the avoidance of doubt, nothing herein is intended to alter or enlarge the rights and obligations of any insurer under any Insurance Policy. This paragraph does not and shall not be construed to impair, diminish, or compromise (i) any of the rights and protections of the Debtors, the Reorganized Debtors (and any Affiliates), the Wind-Down Debtors, and the Debtor Related Parties or (ii) any of the release, discharge, and exculpation provisions in the Plan.]]

1.     Non-Precedential Effect for Holders of Tort Claims

[[This Plan, the Plan Supplement, and the Confirmation Order constitute a good faith, full and final comprehensive compromise and settlement of Tort Claims based on the unique circumstances of these Chapter 11 Cases (such as the unique facts and circumstances relating to the Debtors as compared to other defendants in tort litigation and the need for an accelerated resolution without litigation) such that (i) none of the of the foregoing documents, nor any materials used in furtherance of Confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed and admission, used as precedent, or used by any party or Person in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding except as necessary, and as admissible in such context, to enforce their terms and to evidence the terms of

the Plan before the Bankruptcy Court or any other court of competent jurisdiction and (ii) any obligation of any party, in furtherance of such compromise and settlement, to not exercise rights that might otherwise be applicable to such party shall be understood to be an obligation solely in connection with this specific compromise and settlement and to be inapplicable in the absence of such compromise and settlement. This Plan, the Plan Supplement, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding involving opioid claims or other tort claims in which none of the Debtors, the Reorganized Debtors, or the Litigation Trust is a party; provided that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Supplement, or the Confirmation Order. Any claimant's support of, or position or action taken in connection with the Plan, the Plan Supplement, and the Confirmation Order may differ from their position or testimony in any other litigation or proceeding except in connection with these Chapter 11 Cases. Further, the treatment of tort claims as set forth in the Plan is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other Chapter 11 Cases relating to tort claims, nor shall it be used as precedent by any Entity or party in any other chapter 11 case related to tort claims. This provision does not and shall not be construed to impair, diminish, or compromise (A) any of the rights and protections of the Debtors, the Reorganized Debtors (and any Affiliates), the Wind-Down Debtors, and the Debtor Related Parties or (B) any of the release, discharge, and exculpation provisions in the Plan.]]

### C.      Equitization Transaction.[28]

If the Plan Restructuring occurs, the following provisions shall govern in lieu of Article IV.D of the Plan.

On the Effective Date (or before the Effective Date, as specified in the Restructuring Transactions Memorandum), the Debtors or the Reorganized Debtors (as applicable) shall take all actions set forth in the Restructuring Transactions Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the Plan Restructuring described therein, subject in all respects to the terms set forth in the Plan, including, as applicable: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial Law; (iv) the execution, delivery, and Filing of the Exit Facilities Documents, (v) the issuance of New Common Stock and any other securities necessary to implement the Restructuring Transactions, all of which shall be authorized and approved in all respects; (vi) the execution and delivery of the Definitive Documents, (vii) the execution and delivery of the Takeback Notes Documents, if applicable, and (viii) all other actions that the Debtors determine (with the consent of the Required AHG Noteholders) to be necessary or appropriate in connection with the Consummation of the Plan Restructuring.

---

[28]    Unless otherwise determined no later than seven days prior to the Voting Deadline pursuant to a public notice served on parties receiving documents pursuant to Bankruptcy Rule 2002, the Debtors shall pursue the Plan Restructuring.

The Confirmation Order shall, and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, approved by, or necessary to effectuate the Plan, including the Restructuring Transactions, including, for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy law.

### 1.      Reorganized Debtors.

On the Effective Date, in accordance with the terms of the New Corporate Governance Documents, the New Rite Aid Board shall be appointed, and New Rite Aid shall adopt the New Corporate Governance Documents; *provided* that each Disinterested Director of the Debtors shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and discretion in accordance with the terms of the Plan. Each Disinterested Director shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to New Rite Aid, the Reorganized Debtors, or any other Entity without such director's prior written consent. Each Disinterested Director of the Debtors retains the right to review, approve, and make decisions, as well as to file papers and be heard before the Bankruptcy Court, on all matters under such director's continuing authority.

### 2.      Corporate Existence.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist on and after the Effective Date as a separate legal Entity with all the powers available to such Entity pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Corporate Governance Documents, in each case consistent with the Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 3.      New Rite Aid Board.

Under the Plan Restructuring, on or prior to the Effective Date, the New Rite Aid board shall be appointed. The Required AHG Noteholders shall select the New Rite Aid board members.

### 4.      Vesting of Assets.

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan (other than the GUC Equity Pool, the Committees' Initial Cash Consideration, the Committees' Post-Emergence Cash Consideration, and the other Litigation Trust Assets), shall vest in each respective Reorganized Debtor free and clear of all Liens,

Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, including <u>Article X</u> thereof, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.  For the avoidance of doubt, Holders of General Unsecured Claims shall be entitled to the Committees' Post-Emergence Cash Consideration and Litigation Trust Assets as set forth in the Committee Settlement.

Notwithstanding anything contained in the Plan to the contrary and for the avoidance of doubt, any DIP ABL Lender's and/or any DIP FILO Lender's potential entry into the Exit Facilities and the Exit Facilities Documents shall be fully subject to the express written consent of the relevant DIP ABL Lenders and the DIP FILO Lenders, and nothing contained in the Plan shall imply that any of the DIP ABL Lenders or the DIP FILO Lenders have consented at this time to provide any loans or financial accommodations pursuant to the Exit Facilities and the Exit Facilities Documents.

### 5.        Other Asset Sales.

In the event the Plan Restructuring occurs and it incorporates one or more Other Asset Sale(s), the Reorganized Debtors will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Reorganized Debtors shall have the power and authority to take any action necessary to wind-down and dissolve any applicable Debtor's Estate(s).  As soon as practicable after the Effective Date, the Reorganized Debtors shall:  (1) cause such Debtors to comply with, and abide by, the terms of the Plan, Confirmation Order, the Purchase Agreement(s), the Sale Order, the Committee Settlement, and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of such Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Reorganized Debtors may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Reorganized Debtors without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to the Reorganized Debtors as set forth herein, such Debtors (a) for all purposes shall be deemed to have withdrawn their business operations from any state in which such Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (b) shall be deemed to have canceled pursuant to the Plan all Interests, and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, notwithstanding such Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.  For the avoidance of doubt, in the event one or more Other Asset Sales and the Effective Date occurs, the Committee Settlement shall remain in full force and effect, including such adjustments as are necessary to provide Holders of General Unsecured Claims with the economic equivalent of the Committee Settlement.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Reorganized Debtors.

D.      **Sale Transaction Restructuring.**

If the Sale Transaction Restructuring occurs, the following provisions shall govern in lieu of Article IV.B of the Plan.

On the Effective Date (or before the Effective Date, as specified in the Restructuring Transactions Memorandum), the Debtors or the Wind-Down Debtors (as applicable) shall take all actions set forth in the Restructuring Transactions Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the Sale Transaction Restructuring as described in the Plan, subject in all respects to the terms set forth in the Plan, including, as applicable:  (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial Law; (iv) the execution, delivery, and Filing of the Exit Facilities Documents, (v) the execution and delivery of the Definitive Documents, and (vi) all other actions that the Debtors and the Purchasers determine to be necessary or appropriate in connection with the Consummation of the Sale Transaction Restructuring, including, among other things, making filings or recordings that may be required by applicable law in connection with the Plan and authorizing and directing the Senior Secured Notes Trustees to effectuate the Credit Bid in accordance with the Sale Order, as applicable, and providing that any assignees of the Credit Bid, if applicable, are bound by the terms and provisions of the direction to the Senior Secured Notes Trustees.  For the avoidance of doubt, in the event of a Sale Transaction Restructuring, the Committee Settlement shall be incorporated into any Sale Transaction Restructuring and shall remain in full force and effect, including such adjustments as are necessary to provide Holders of General Unsecured Claims with the economic equivalent of the Committee Settlement.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

### 1.      **Formation of New Rite Aid.**

In the event of a Credit Bid Transaction, on or prior to the Effective Date, New Rite Aid and certain direct or indirect subsidiaries (as applicable) shall be formed for the purpose of acquiring all of the Acquired Assets and assuming all of the Assumed Liabilities.

### 2.      **Wind-Down Debtors.**

In the event of a Sale Transaction Restructuring, on and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) resolving Disputed Claims, (b) making distributions on account of Allowed Claims as provided hereunder, (c) establishing and funding the Administrative / Priority Claims Reserve and the Wind-Down Reserve, (d) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (e) filing appropriate tax returns, (f) complying with its continuing obligations under the Purchase Agreement(s), if any, (g) liquidating all assets of the Wind-Down Debtors, and (h) otherwise administering

81

the Plan. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind-Down Debtors to File motions or substitutions of parties or counsel in each such matter.

### 3. Vesting of Assets.

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, in the event of a Sale Transaction Restructuring, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, including the Remnant Assets of the Debtors, shall vest in each respective Wind-Down Debtor for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, the Wind-Down Debtors may, at the direction of the Plan Administrator, and subject to the Purchase Agreement(s), the Sale Order, and the Confirmation Order, use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### E. Committee Settlement.

The Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Agents agreed to the terms of the Committee Settlement to be implemented through the Plan and to be approved by the Bankruptcy Court as a good faith compromise and settlement of Claims and controversies among the Debtors, the Committees, the Ad Hoc Secured Noteholder Group, and the DIP Agents. The compromises and settlements included in the Committee Settlement are each (a) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (b) necessary and integral to the Plan and the success of these Chapter 11 Cases. The description of the Committee Settlement contained herein is qualified in its entirety by the applicable definitive documents pertaining thereto, which definitive documents shall, unless otherwise specified herein, be Filed with the Plan Supplement. For the avoidance of doubt, no Holder of a General Unsecured Claim, including Holders of Tort Claims, shall attempt to recover, including on account of any Tort Claim or other Claim or Cause of Action, from the Reorganized Debtors or their Affiliates (including EIC).

Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Confirmation Order, or otherwise, the finalization and execution of the UCC/TCC Recovery Allocation Agreement shall not be a condition to Confirmation or Consummation of the Plan. To the extent the UCC / TCC Recovery Allocation Agreement is finalized prior to Confirmation of the Plan, it shall be approved by the Court in a manner in form and substance satisfactory to the Committees.

### 1. Consideration.

Holders of General Unsecured Claims shall receive the GUC Equity Trust Interests and Litigation Trust Class A Interests, as set forth in Article III of the Plan, subject to the terms of the UCC / TCC Recovery Allocation Agreement.

The Committees Post-Emergence Cash Consideration shall be subject to the following limitations:

(a)     Committees Post-Emergence Cash Consideration on account of the CMS Receivable shall in all respects remain subject to the waterfall distribution

set forth in the Elixir Intercreditor Agreement (the "CMSR Distributions Schedule"), which states that proceeds from the CMS Receivable shall be allocated: (i) *first*, to the SCD Trust in an amount sufficient to repay $57,000,000 in Cash of the AHG Notes; (ii) *second*, to the SCD Trust for the benefit of the Exit Lenders in an amount sufficient to repay the [Exit ABL Facility] in the amount of $60,000,000 (which amount shall be applied to fund an immediate prepayment under the Exit FILO Term Loan Facility); (iii) *third*, to the extent Excess Availability is less than $700,000,000, to the SCD Trust for the benefit of the Exit Lenders, in an amount equal to the lesser of $57,000,000 and the amount necessary to fund a prepayment under the Exit ABL Facility to cause Excess Availability to equal $700,000,000 (which amount shall be used to fund an immediate prepayment under the Exit ABL Facility); and (iv) *fourth*, to the extent the aggregate amount of proceeds of the CMS Receivable paid to the SCD Trust to repay in full in Cash the AHG Notes and to fund distributions under the Plan pursuant to clause (v) below are $285,000,000, $5,000,000 to the Litigation Trust (such amount, the "Creditor Distribution"), except to the extent that the SCD Trust receives to repay in full in Cash the AHG Notes and to fund distributions under the Plan less than $285,000,000 on account of the CMS Receivable, in which case, the Creditor Distribution will be reduced on a dollar-by-dollar basis by each dollar the SCD Trust receives under $285,000,000 until the Creditor Distribution reaches zero; *provided* that the Creditor Distribution shall not be less than zero; and (v) *fifth*, to the SCD Trust in an amount equal to all remaining proceeds of the CMS Receivable (which amount the SCD Trust shall use to fund a distribution pursuant to Article IIIB.5 of the Plan. The Debtors may, with the consent of the DIP Agents and the Required AHG Noteholders, enter into one or more alternative transactions or structuring arrangements with respect to the transactions, arrangements, and distributions described in this paragraph, which alternative transactions, arrangements, and distributions shall be economically neutral with respect to the Creditor Distribution. The CMSR Distributions Schedule shall not be modified without the consent of the Debtors, the DIP Agents, and the Required AHG Noteholders (together, the "CMSR Distributions"); *provided, however*, that the allocation in the CMSR Distributions Schedule shall not be modified in a manner inconsistent with the Committee Settlement and adverse to the Committees without the consent of the Committees.

(b)     The Committees Post-Emergence Cash Consideration payment of $20 million shall be subject to the Payment Conditions (as defined in the Exit Facilities Documents); *provided, however*, that, at the Committees' election, either:

(i)     (1) there must be capacity under the Payment Conditions to pay the Ad Hoc Secured Noteholder Group on account of each corresponding dollar paid to the Committees; or (2) if, on or prior to the date on which such Specified Committee Payments are due, the Senior Secured Noteholders shall have received dividends or distributions (other than as a result of (A) the immediately preceding Article VII.1.(b)(i)(1) (in an amount not to exceed the

amount of the Specified Committee Payment) or (B) the CMSR Distributions (collectively (A) and (B), the "Excluded Distributions")), then, the Specified Committee Payments (in an aggregate amount up to the amount of dividends and distributions made to the Ad Hoc Secured Noteholder Group during the immediately preceding 12-month period (other than Excluded Distributions)) shall be exempted from the requirements to satisfy Payment Conditions. In no event shall the Specified Committee Payments exceed (x) $5 million in any 12-month period and (y) $20 million in the aggregate; or

(ii)     (1) there must be capacity under the Payment Conditions to pay the Ad Hoc Secured Noteholder Group on account of each corresponding dollar paid to the Committees; or (2) if the Ad Hoc Secured Noteholder Group shall take dividends or distributions (other than as a result of (A) the immediately preceding Article VII.1.(b)(ii)(1) (in an amount not to exceed the amount of the Specified Committee Payment) or (B) the CMSR Distributions (collectively, (A) and (B), the "Alternative Excluded Distributions")), there must be capacity under the Payment Conditions for a corresponding dollar to go to satisfy the Specified Committee Payments that are payable in the immediately succeeding 12-month period, and upon such dividends or distributions to the Ad Hoc Secured Noteholder Group (other than Alternative Excluded Distributions), New Rite Aid shall cause a corresponding amount (up to the Specified Committee Payments that are payable in the immediately succeeding 12-month period and not previously escrowed) to be segregated and escrowed for the benefit of the Committees and paid to the Committees to satisfy the Specified Committee Payments on the applicable Required Payment Dates.

To the extent the Payment Condition applies and cannot be satisfied at the time a payment is due to the Committees or to the Ad Hoc Secured Noteholder Group, such obligation shall remain outstanding (without accruing interest) until the Payment Condition can be satisfied to permit the payments as described above. Payment to the Committees as set forth herein are subject to a prepayment discount if paid early at the election of the Ad Hoc Secured Noteholder Group.

## 2.     GUC Equity Trust.

On or prior to the Effective Date, the Debtors shall take all reasonably necessary steps to establish the GUC Equity Trust as one or more standalone trusts and/or sub-trusts in accordance with the Plan; *provided, however,* that the Debtors will not be required to take any actions which would result in holders of New Common Stock exceeding 300 holders. Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect, except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the GUC Equity Trust as a "qualified settlement fund," "disputed ownership fund," or otherwise, to treat the GUC Equity Trust as a "widely held fixed investment trust" under section 1.671-5 of the Treasury Regulations and the GUC Equity Trustee will report consistently therewith. Such treatment is assumed

with respect to the following discussion.  In accordance therewith, neither the GUC Equity Trust nor GUC Equity Trustee shall have the power to vary the investment of the GUC Equity Trust within the meaning of section 301.7701-4(c) of the Treasury Regulations.  For U.S. federal income tax purposes, each holder of a GUC Equity Trust Interest will generally be required to include their pro rata share of each item of income, gain, deduction, loss, or credit attributable to the GUC Equity Trust Assets.

To the extent the Debtors and the Committees determine in their reasonable discretion to treat all or any portion of the GUC Equity Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations, any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return may be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

No request for a ruling from the IRS will be sought on the classification of the GUC Equity Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Equity Trust.  If the IRS were to successfully challenge the classification of the GUC Equity Trust as a widely held fixed investment trust, the federal income tax consequences to the GUC Equity Trust and the holders of GUC Equity Trust Interests could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the GUC Equity Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

The GUC Equity Trust will file information tax returns with the IRS and provide tax information statements to holders of GUC Equity Trust Interests consistently with the rules of section 1.671-5 of the Treasury Regulations and any other applicable provisions of law, including information regarding items of income, gain, deduction, loss or credit attributable to the GUC Equity Trust Assets.  Each holder of GUC Equity Trust Interests must report on its federal income tax return its share of all such items.

If, as of the Effective Date, the UCC / TCC Recovery Allocation Agreement is not in full force and effect, the GUC Equity Trustee shall hold the GUC Equity Trust Assets for the benefit of the Holders of the GUC Equity Trust Interests as later determined in accordance with the terms of the UCC / TCC Recovery Allocation Agreement.  The GUC Equity Trust Interests shall be distributed in accordance with the UCC/TCC Recovery Allocation Agreement.

### 3.      Litigation Trust.

On the Effective Date, the Debtors shall take all necessary steps to establish the Litigation Trust as one or more standalone trust and/or sub-trusts in accordance with the Plan and the Litigation Trust Documents, including as set forth in the Litigation Cooperation Agreement.  Notwithstanding anything to the contrary herein, the Debtors and the Reorganized Debtors, as applicable, shall transfer the Litigation Trust Assets to the Litigation Trust, which , except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations, and such treatment is assumed with respect to the following discussion.  For the avoidance of doubt, in the event of any transfer of the Litigation Trust Assets to the Litigation Trust, the provisions set forth in Article IV.E.3 of the Plan shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Causes of Action transferred to the Litigation Trust.  The Litigation Trust shall be established for the purposes of liquidating the Litigation Trust's assets, reconciling claims asserted against the Debtors and

the Reorganized Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust and the purposes described in the Plan. Upon the transfer of the Debtors' or the Reorganized Debtors' assets to the Litigation Trust, the Debtors and the Reorganized Debtors will have no reversionary or further interest in or with respect to the Litigation Trust Assets. To the extent beneficial interests in the Litigation Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests; *provided* that, for the avoidance of doubt, to the extent the GUC Equity Trust is established as a sub-trust under the Litigation Trust, such GUC Sub-Trust shall be governed by the GUC Equity Trust provisions set forth in Article IV.E.2 of the Plan. Prior to any transfer of the Litigation Trust Assets to the Litigation Trust, the Committees may designate trustee(s) for the Litigation Trust for the purposes of administering the Litigation Trust, as more fully described in the Litigation Trust Documents. The reasonable costs and expenses of the trustee(s) shall be paid from the Litigation Trust.

(a)    **Transfer of Assigned Claims and Assigned Insurance Rights**

In furtherance of the transfer of the Litigation Trust Assets to the Litigation Trust and in accordance with the Litigation Trust Agreements, on the Effective Date, the Debtors shall be deemed to have irrevocably transferred, granted and assigned to the Litigation Trust, and the Litigation Trust shall receive and accept, any and all of the Assigned Claims and the Assigned Insurance Rights. The foregoing transfer shall be (i) free and clear of any and all actual or alleged Liens or encumbrances of any nature whatsoever (other than, as applicable, the Tort Claims and the Assigned Claims), (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Debtors, the Litigation Trust, the Bankruptcy Court, or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the applicable Insurance Policies. The transfer of the Assigned Insurance Rights contemplated in this Section is not an assignment of any Insurance Policy itself. The Confirmation Order shall contain findings with respect to the preservation of Assigned Claims and Assigned Insurance Rights as contemplated by the Committee Settlement and the Plan. Notwithstanding the foregoing, the Litigation Trustee and/or GUC Sub-Trust Trustee shall have the power to assign and/or transfer Assigned Insurance Rights for Tort Claims to Holders of Allowed Tort Claims, subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents.

(b)    **[Vesting of the Litigation Trust Assets in the Litigation Trust**

The corpus of the Litigation Trust shall consist of the Litigation Trust Assets. On the Effective Date, pursuant to the Plan and in accordance with the Litigation Trust Documents, the Litigation Trust Assets shall be irrevocably transferred to and vest in the Litigation Trust free and clear of any and all actual or alleged Claims, Interests, Liens, other encumbrances and liabilities of any kind (other than, as applicable, the Tort Claims and the Assigned Claims). The Litigation Trust shall have no liability for, and the Litigation Trust Assets shall vest in the Litigation Trust free and clear of, any and all actual or alleged pre-petition and post-petition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the Litigation Trust Documents. From and after the Effective Date, all proceeds of the Litigation Trust Assets, including without limitation, the Proceeds of Assigned Claims and the Tort Claim Insurance Proceeds, shall be paid to the Litigation Trust to be applied in accordance with the Plan, including the treatment of claims set forth in <u>Article III</u> of the Plan, the Litigation Trust Documents and, as applicable, the UCC/TCC Recovery Allocation Agreement. Notwithstanding the foregoing, the Litigation Trustee and/or GUC Sub-Trust Trustee shall have the power to assign and/or transfer Assigned Insurance

Rights for Tort Claims to Holders of Allowed Tort Claims, subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents.

(c)      **Assumption of Liability for Tort Claims**

As of the Effective Date, any and all liability of the Debtors (or their Affiliates) and the Reorganized Debtors (or their Affiliates) for any and all Tort Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Litigation Trust solely for the purpose of effectuating the purpose of the Litigation Trust. Distributions, in accordance with the Litigation Trust Documents from the Litigation Trust, any GUC Sub-Trust and the GUC Equity Trust, shall be the sole source of recovery, if any, in respect of such Tort Claims, and the Holder of such Tort Claims shall have no other or further recourse to the Debtors (and their Affiliates), their Estates, the Reorganized Debtors (and their Affiliates), or the Wind-Down Debtors. In furtherance of the foregoing, the Litigation Trust, subject to and only to the extent provided in the Litigation Trust Documents, shall have all defenses, cross-claims, offsets, and recoupments regarding the Tort Claims that the Debtors, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the Litigation Trust Documents and the Plan. For the avoidance of doubt, nothing in this Section shall limit or affect the transfer of the Assigned Insurance Rights or the Assigned Claims.

(d)      **Institution and Maintenance of Legal and Other Proceedings**

On the Effective Date (and subject to the establishment of the Litigation Trust and/or any GUC Sub-Trust), (a) the Litigation Trust and/or any GUC Sub-Trust shall be empowered, and have the sole authority, to initiate, prosecute, defend, and resolve the Assigned Claims and Assigned Insurance Rights that are transferred to the Litigation Trust by operation of the Plan, subject to the terms and conditions of the Plan; (b) the Litigation Trust and/or any GUC Sub-Trust shall be empowered, and have the sole authority, to initiate, prosecute, defend and resolve the Assigned Claims, the Tort Claims, and the Assigned Insurance Rights in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the Litigation Trustee(s) and/or any GUC Sub-Trust Trustee, subject to the terms and conditions of the Plan; and (c) subject to applicable law and contractual rights, the Litigation Trust and/or any GUC Sub-Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Litigation Trust and/or any GUC Sub-Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(e)      **Administration of Tort Claims**

On the Effective Date (and subject to the establishment of the Litigation Trust and/or any GUC Sub-Trust): (a) all Tort Claims will be administered, processed, and resolved pursuant to the provisions outlined in the Litigation Trust Documents; (b) the Litigation Trustee or GUC Sub-Trust Trustee, as applicable, shall determine the eligibility, amount and allowance of Tort Claims in accordance with the applicable Litigation Trust Documents; (c) the determination by the Litigation Trustee or GUC Sub-Trust Trustee, as applicable, of the eligibility, amount and allowance of each Tort Claim shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other Person, except as set forth herein and in the Litigation Trust Documents; and (d) the Litigation Trust, any GUC Sub-Trust and the GUC Equity Trust shall be the sole source of recovery for Holders of Tort Claims. Holders of Disallowed Tort Claims shall have no recourse to the Litigation Trust, any GUC Sub-Trust or the GUC Equity Trust, the Debtors (or their Affiliates or their Estates), the Reorganized Debtors (or their Affiliates), the Wind-Down Debtors, or the Released Parties in respect of such Disallowed Tort Claims.]

(f)    **Litigation Trust Distributions**

The Litigation Trust and/or any GUC Sub-Trust shall make distributions in accordance with the Plan, the Confirmation Order, the Litigation Trust Documents, and, as applicable, the UCC / TCC Recovery Allocation Agreement.

(g)    **Litigation Trust Treatment.**

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, except to the extent the Debtors and the Committees determine otherwise in their reasonable discretion to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, the Debtors expect to treat the Litigation Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Litigation Trust will take a position on the Litigation Trust's tax return accordingly.  Such treatment is assumed with respect to the following discussion.  For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Litigation Trust.

No request for a ruling from the IRS will be sought on the classification of the Litigation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust.  If the IRS were to successfully challenge the classification of the Litigation Trust as a grantor trust, the federal income tax consequences to the Litigation Trust and the Litigation Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Litigation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the trustee(s) of the Litigation Trust shall make a good faith valuation of the Litigation Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the trustee(s) of the Litigation Trust, and the Holders of Claims receiving interests in the Litigation Trust shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the Litigation Trust among the Litigation Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the Litigation Trust had sold all of the Litigation Trust Assets at their tax book value and distributed the proceeds to the Litigation Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust.  The tax book value of the Litigation Trust Assets shall equal their fair market value on the date of the transfer of the Litigation Trust Assets to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Litigation Trust shall in no event be dissolved later than five (5) years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Litigation Trust that any further extension would not adversely affect the status of the trust as a

liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

The Litigation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include certain items relating to the holding or disposition (or deemed disposition) of the Litigation Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each Litigation Trust beneficiary holding a beneficial interest in the Litigation Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Litigation Trust will pertain to Litigation Trust beneficiaries who receive their interests in the Litigation Trust in connection with the Plan.

(h) **Disputed Ownership Fund, Qualified Settlement Fund, or Widely Held Fixed Investment Trust Treatment.**

To the extent the Debtors and the Committees determine in their reasonable discretion to treat all or any portion of the Litigation Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations, any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return may be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The treatment of a "widely held fixed investment trust" would be as described above with respect to the GUC Equity Trust.

4. **GUC Sub-Trusts.**

To the extent provided for in the UCC/TCC Recovery Allocation Agreement, the GUC Sub-Trusts shall be established on the Effective Date subject to such documentation as may be required, to hold and distribute, as applicable, such consideration as may be allocated to any subset of Holders of General Unsecured Claims.

5. **SCD Trust.**

Subject to the terms and conditions of the AHG New-Money Commitment Agreement and the Plan, no earlier than the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall transfer the applicable portion of the Elixir Rx Intercompany Claim to the SCD Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations. The SCD Trust shall be established for the primary purpose of liquidating the SCD Trust's assets and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the SCD Trust. Upon the transfer of the SCD Claim to the SCD Trust, the Debtors and the Reorganized Debtors, will have no reversionary or further interest in or with respect to the assets of the SCD Trust. To the extent beneficial interests in the SCD Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. Prior to any transfer of the SCD Claim to the SCD Trust, the Debtors and the Reorganized Debtors, as applicable, may designate trustee(s) for the SCD Trust for the purposes of administering the SCD Trust in accordance with the terms and conditions of the AHG New-Money Commitment Agreement. The reasonable costs and expenses of the trustee(s) shall be paid from the SCD Trust.

(a)    **SCD Trust Treatment.**

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the SCD Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any SCD Trust will take a position on the SCD Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of the SCD Claim to the SCD Trust will be deemed to occur as (a) a first-step transfer of the SCD Claim to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the SCD Trust.

No request for a ruling from the IRS will be sought on the classification of the SCD Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the SCD Trust. If the IRS were to successfully challenge the classification of the SCD Trust as a grantor trust, the federal income tax consequences to the SCD Trust and the SCD Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the SCD Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the SCD Trust Assets to the SCD Trust, the trustee(s) of the SCD Trust shall make a good faith valuation of the SCD Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the SCD Trust, and the Holders of Claims receiving interests in the SCD Trust shall take consistent positions with respect to the valuation of the SCD Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the SCD Trust among the SCD Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the SCD Trust had sold all of the SCD Trust Assets at their tax book value and distributed the proceeds to the SCD Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the SCD Trust. The tax book value of the SCD Trust Assets shall equal their fair market value on the date of the transfer of the SCD Trust Assets to the SCD Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The SCD Trust shall in no event be dissolved later than five (5) years from the creation of such SCD Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the SCD Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the SCD Trust Assets.

The SCD Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the SCD Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each SCD Trust beneficiary holding a beneficial interest in the SCD Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the SCD Trust will pertain to SCD Trust beneficiaries who receive their interests in the SCD Trust in connection with the Plan.

(b)      **Disputed Ownership Fund Treatment.**

With respect to any of the assets of the SCD Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the SCD Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

6.      **Cooperation.**

The Debtors and Reorganized Debtors, as applicable, shall provide reasonable cooperation necessary to maximize the value of Estate Causes of Action, the Assigned Claims and the Assigned Insurance Rights, including, without limitation, (i) providing the Litigation Trust and its Professionals with reasonable access to the Debtors' books, records, and other documents that are relevant to and necessary for the advancement of Assigned Claims assigned to the Litigation Trust (including privileged documents that are relevant to and necessary for the advancement of Assigned Claims and Assigned Insurance Rights assigned to the Litigation Trust only), (ii) to the extent able by applicable law, providing the Litigation Trust and its Professionals with reasonable access to Debtors' employees and agents for fact finding, consultation, interviews, and as witnesses (including as needed to authenticate documents where appropriate) as relevant to and necessary for the advancement of Claims assigned to the Litigation Trust, (iii) to the extent able by applicable law, providing the Litigation Trust and its Professionals with reasonable access to systems and Debtor personnel as relevant for administration of the Litigation Trust, (iv) funding insurance archival efforts, including costs to retain Marsh to undertake archival efforts and costs incurred by personnel of the Debtors, the Reorganized Debtors, and/or the Wind-Down Debtors, as applicable, and Professionals of the Debtors, the Reorganized Debtors, and/or the Wind-Down Debtors to cooperate with and assist Marsh in the insurance archival efforts, (v) taking commercially reasonable measures to retain documents related to the advancement of Assigned Claims assigned to the Litigation Trust, consistent with the Litigation Trust Cooperation Agreement, and (vi) to the extent able by applicable law, providing assistance to maximize the value of the Assigned Insurance Rights, as reasonably determined by the Committees, the Litigation Trust or any of their respective Professionals.  Any attorney-client privilege, work-product protections, or other privilege or immunity held by any of the Debtors, including any predecessors, committee or sub-committees, or other designated Entities or Persons, related to the Claims assigned to the Litigation Trust shall be extended to and shared with Litigation Trust under the terms of the Litigation Trust Cooperation Agreement (and for the avoidance of doubt, will not be extended to or shared with the Committees, their members, or their professionals).  The transfer of any privileged books and records provided to the Litigation Trust under the terms of the Litigation Trust Cooperation Agreement shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records.  Further, none of the Debtors or the Reorganized Debtors shall be liable for violating any confidentiality or privacy protections as a result of transferring the books and records to the Litigation Trust in accordance with the Litigation Trust Cooperation Agreement.  The Reorganized Debtors (and, to the extent the Litigation Trust is formed and funded prior to the Effective Date), the Debtors shall be promptly reimbursed for all reasonable and documented costs and expenses, including costs associated with allocating time of employees and professionals of the Reorganized Debtors (or Debtors) in connection with any such obligations.  For the avoidance of doubt, after the Confirmation Date and prior to the Effective Date, the Debtors shall reasonably cooperate with the foregoing, subject to and consistent with any budget requirements and as is necessary to comply with and satisfy closing conditions (including Article XI.A.29 of the Plan).

7.      **Additional Terms.**

The Debtors shall assume the Pension Plan as well as all CBAs and union contracts.

F.      **Insurance Neutrality.**

Nothing in the Plan, the Plan Supplement, or the Confirmation Order shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Insurance Policies, provided that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the Insurance Policies, and thus the rights or obligations of any insurer, the Debtors, and the Litigation Trust, arising out of or under any Insurance Policy, whether before or after the Effective Date, are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan, the Plan Supplement, and the Confirmation Order (including the findings contained therein or issued in conjunction therewith), and, to the extent the insurers have or had adequate notice from any source, any other ruling made or order entered by the Bankruptcy Court whether prior to or after the Confirmation Date. Furthermore, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall relieve or discharge any insurer of the Debtors from their obligations under the Insurance Policies.

G.      **Sources of Consideration for Plan Distributions.**

All amounts necessary for the Debtors and, if applicable, the Wind-Down Debtors, to make payments or distributions pursuant hereto shall be (in each case subject to the terms of the Purchase Agreement(s) and the Sale Order, as applicable) obtained from the proceeds of the issuance of New Common Stock, Exit Facilities, Takeback Notes, the MedImpact NewCo Notes (if any), the CMSR Distribution, the AHG Notes, Cash of the Debtors, and any additional Cash consideration provided under one or more Purchase Agreements, in accordance with the terms thereof. Unless otherwise agreed, distributions required by the Plan on account of Allowed Claims that are Assumed Liabilities under a Purchase Agreement shall be the sole responsibility of the applicable Purchaser.

1.      **The New Common Stock.**

In the event of a Plan Restructuring, on the Effective Date, New Rite Aid is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Transactions Memorandum, issue the New Common Stock for distribution to the Holders of Allowed Senior Secured Notes Claims and the GUC Equity Trust (if applicable) in accordance with the terms of the Plan and the New Corporate Governance Documents (including the New Shareholders Agreement) without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Common Stock shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Common Stock issued pursuant to the Plan, as contemplated by the Plan Restructuring, shall be duly authorized and validly issued and shall be full paid and non-assessable.

2.      **Exit Facilities.**

On the Effective Date, New Rite Aid shall enter into the Exit Facilities on the terms set forth in the Exit Facilities Documents. To the extent not already approved, Confirmation shall be deemed approval of the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and

authorization of New Rite Aid to enter into and execute the Exit Facilities Credit Agreement, and such other Exit Facilities Documents as may be required to effectuate the Exit Facilities.

On the Effective Date or such date as otherwise approved by the Sale Order, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facilities Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent not already approved, New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

### 3.    MedImpact Term Loan Sales Process, Rights Offering, and NewCo Notes.

### (a)    MedImpact Term Loan Sales Process

In accordance with, and subject to, the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement, following the Confirmation Date, the Debtors shall commence or continue, as applicable, the MedImpact Term Loan Sales Process in accordance with the MedImpact Term Loan Bidding Procedures.  Entry of the MedImpact Term Loan Bidding Procedures Order, which shall be entered on or before the Confirmation Date, shall (i) constitute Bankruptcy Court approval of the MedImpact Term Loan Sales Process, (ii) authorize the Debtors' entry into and performance under the MedImpact Term Loan Backstop Commitment Agreement and constitute Bankruptcy Court approval thereof, including the payment of the MedImpact Term Loan Backstop Commitment Premium or the MedImpact Termination Fee, as applicable, in accordance with the terms thereof, and (iii) approve the MedImpact Term Loan Bidding Procedures.  The Cash proceeds of the sale of the MedImpact Term Loan shall be applied pursuant to Section (II)(A) of Exhibit E to the Final Financing Order, unless otherwise agreed as among the DIP Agents and the Required AHG Noteholders.

### (b)    Creation of MedImpact Term Loan NewCo and MedImpact Term Loan Rights Offering

If the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures and the MedImpact Term Loan Backstop Commitment Agreement, the following provisions shall be in effect, subject in all respects to the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement:

On or prior to the Effective Date, the Debtors shall create the MedImpact Term Loan NewCo and enter into the NewCo Documentation and the MedImpact NewCo Notes Documentation.  Pursuant to the MedImpact Term Loan Rights Offering Procedures[, prior to the Effective Date,] the Debtors shall distribute the MedImpact NewCo Subscription Rights to Eligible Holders in accordance with the Plan, the

MedImpact Term Loan Backstop Commitment Agreement, and the MedImpact Term Loan Rights Offering Procedures. Eligible Holders shall be entitled to participate in the MedImpact Term Loan Rights Offering up to a maximum amount of each Eligible Holder's Pro Rata share of the MedImpact Aggregate Rights Offering Amount.

The MedImpact Term Loan Rights Offering will be backstopped, severally and not jointly, by the MedImpact Term Loan Backstop Parties pursuant to the MedImpact Term Loan Backstop Commitment Agreement. 20% of the MedImpact Rights Offering NewCo Notes to be sold and issued pursuant to the MedImpact Term Loan Rights Offering shall be reserved for the MedImpact Term Loan Backstop Parties pursuant to the MedImpact Term Loan Backstop Commitment Agreement. MedImpact Term Loan NewCo will pay the MedImpact Term Loan Backstop Commitment Premium to the MedImpact Term Loan Backstop Parties no later than the Effective Date in accordance with the terms and conditions set forth in the MedImpact Term Loan Backstop Commitment Agreement and the Plan.

Upon exercise of the MedImpact NewCo Subscription Rights pursuant to the terms of the MedImpact Term Loan Backstop Commitment Agreement and the MedImpact Term Loan Rights Offering Procedures, MedImpact Term Loan NewCo shall be authorized to issue the applicable principal amount of MedImpact Rights Offering NewCo Notes issuable pursuant to such exercise. Pursuant to the MedImpact Term Loan Backstop Commitment Agreement, if after following the procedures set forth in the MedImpact Term Loan Rights Offering Procedures, there remain any unexercised subscription rights, the MedImpact Term Loan Backstop Parties shall purchase, severally and not jointly, their applicable portion of the aggregate principal amount of the MedImpact Rights Offering NewCo Notes associated with such unexercised subscription rights in accordance with the terms and conditions set forth in the MedImpact Term Loan Backstop Commitment Agreement and the MedImpact Term Loan Rights Offering Procedures.

On the Effective Date, upon the consummation of the MedImpact Term Loan Rights Offering, the issuance of the MedImpact NewCo Notes and the transfer of the MedImpact Term Loan to MedImpact Term Loan NewCo, the Debtors shall transfer all equity or other ownership or residual interests in MedImpact Term Loan NewCo to the MedImpact NewCo Trustee or its designee in a manner acceptable to the Debtors and the MedImpact Term Loan Backstop Parties.

(c)  **MedImpact NewCo Notes**

If the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures and the MedImpact Term Loan Backstop Commitment Agreement, the following provisions shall be in effect, subject to the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement:

On the Effective Date, the MedImpact Term Loan NewCo shall issue the MedImpact NewCo Notes on the terms set forth in the MedImpact NewCo Notes Documentation. To the extent not already approved, Confirmation shall be deemed approval of the MedImpact NewCo Notes Documentation, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the MedImpact Term Loan NewCo in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the MedImpact Term Loan NewCo to enter into and execute the MedImpact NewCo Notes Indenture, and such other MedImpact NewCo Notes Documentation as may be required to issue the MedImpact NewCo Notes.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement, on the Effective Date, all of the Liens and security interests to be granted in accordance with the MedImpact NewCo Notes Documentation, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the

collateral granted thereunder in accordance with the terms of the MedImpact NewCo Notes Documentation; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the MedImpact NewCo Notes Documentation; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent not already approved, the MedImpact Term Loan NewCo and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

### 4.    The SCD Trust and the AHG Notes.

On or prior to the Effective Date, subject to the terms and conditions of the AHG New-Money Commitment Agreement, the Debtors shall create the SCD Trust and enter into the SCD Trust Documentation and the AHG Notes Documentation. On or prior to the Effective Date, subject to the terms and conditions of the AHG New-Money Commitment Agreement, the SCD Trust shall, and to the maximum extent permitted by applicable law, (a) (i) hold all right, title, and interest to no less than $350,000,000 of the SCD Claim, which the Debtors shall transfer from Debtor Ex Options, LLC to the SCD Trust, (b) issue, or cause to be issued, the AHG Notes to the applicable AHG New-Money Commitment Parties in accordance with the AHG Notes Documentation, (c) be vested with all requisite authority to distribute the CMSR Recovery in accordance with the Plan and the terms and conditions of the AHG New-Money Commitment Agreement, and (d) following receipt of the proceeds of the CMS Receivable, be vested with all requisite authority to distribute sufficient Cash to the Reorganized Debtors to fund any mandatory prepayments required under the terms of the Exit Facilities Documents from the proceeds of such CMS Receivable. To the extent not already approved, Confirmation shall be deemed approval of the AHG Notes Documentation and the SCD Trust Documentation, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the SCD Trust in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the SCD Trust to enter into and execute the SCD Trust Documentation, the AHG Notes Purchase Agreement, the AHG Notes Indenture, and such other AHG Notes Documentation as may be required to issue the AHG Notes.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement, the Elixir Intercreditor Agreement shall provide, among other things, that distributions from EIC on account of the SCD Claim shall be allocated (i) *first*, to the SCD Trust in an amount sufficient to repay $57,000,000 in Cash of the AHG Notes; (ii) *second*, to the SCD Trust for the benefit of the Exit Lenders in an amount sufficient to repay the [Exit ABL Facility] in the amount of $60,000,000 (which amount shall be applied to fund an immediate prepayment under the Exit FILO Term Loan Facility); (iii) *third*, to the extent Excess Availability is less than $700,000,000, to the SCD Trust for the benefit of the Exit Lenders, in an amount equal to the lesser of $57,000,000 and the amount necessary to fund a prepayment under the Exit ABL Facility to cause Excess Availability to equal $700,000,000 (which amount shall be used to fund an immediate prepayment under the Exit ABL Facility); (iv) *fourth*, to the extent the aggregate amount of proceeds of the CMS Receivable paid to the SCD Trust to repay in full in Cash the SCD Notes and to fund distributions under the Plan pursuant to clause (v) below are $285,000,000, the Creditor Distribution"), except to the extent that SCD Trust receives less than $285,000,000 to repay in full in Cash the AHG Notes

and to fund distributions under the Plan, in which case the Creditor Distribution will be reduced on a dollar-by-dollar basis by each dollar the SCD Trust receives under $285,000,000 to repay in full in Cash the AHG Notes and to fund distributions under the Plan, until the Creditor Distribution reaches zero, provided that the Creditor Distribution shall not be less than zero; and (v) *fifth*, to the SCD Trust in an amount equal to all remaining proceeds of the CMS Receivable (which amount the SCD Trust shall use to fund a distribution pursuant to Article III.B.5 of the Plan.). The Debtors may, with the consent of the DIP Agents and the Required AHG Noteholders, enter into one or more alternative transactions or structuring arrangements with respect to the transactions, arrangements, and distributions described in this paragraph and the preceding paragraph, which alternative transactions, arrangements, and distributions shall be economically neutral with respect to the Creditor Distribution.

Subject to the terms and conditions of the AHG New-Money Commitment Agreement, on the Effective Date, all of the Liens and security interests to be granted in accordance with the AHG Notes Documentation, to the extent applicable: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the AHG Notes Documentation; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the AHG Notes Documentation; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent not already approved, the SCD Trust and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

The Cash proceeds of the AHG Notes shall be used to pay down the loans outstanding under the DIP ABL Facility, thereby reducing the DIP ABL Claims on a dollar-for-dollar basis.

5.      **Takeback Notes.**

On the Effective Date, in the event of a Plan Restructuring, New Rite Aid shall enter into the Takeback Notes on the terms set forth in the Takeback Notes Documents.  To the extent not already approved, Confirmation shall be deemed approval of the Takeback Notes Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by New Rite Aid in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of New Rite Aid to enter into and execute the Takeback Indenture, and other such Takeback Notes Documents as may be required to effectuate the Takeback Notes.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Takeback Notes Documents, to the extent applicable:  (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Takeback Notes Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Takeback Notes Documents; and (d) shall not be subject

to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent New Rite Aid and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

### 6. Cash on Hand.

Except as otherwise provided in the Plan, the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims solely in accordance with the terms of the Plan, including any Cure Costs in connection with a Plan Restructuring.

### 7. Creation of the Administrative / Priority Claims Reserve and the Wind-Down Reserve.

On or before the Effective Date, in the event of a Sale Transaction Restructuring, each of the Administrative / Priority Claims Reserve and Wind-Down Reserve shall be funded in accordance with the Purchase Agreement, the Sale Order, and section 1129 of the Bankruptcy Code, as applicable, and subject to the applicable consent rights of the Required AHG Noteholders.

### 8. Payment of Cure Costs.

In the event of a Sale Transaction Restructuring or an Other Asset Sale, the Debtors or Purchaser shall pay all Cure Costs, if any, pursuant to sections 365 or 1123 of the Bankruptcy Code and in accordance with the Purchase Agreement(s) and Sale Order(s).

### H. Plan Administrator and the Wind-Down Debtors.

Article IV.H of the Plan shall apply to a Sale Transaction Restructuring.

### 1. Plan Administrator.

As set forth below, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order.  On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in Article VII of the Plan.  The Plan Administrator shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets without any additional notice to or approval from the Bankruptcy Court.

## 2.    Board of the Debtors.

As of the Effective Date, in the event of a Sale Transaction Restructuring: (a) the existing board of directors or managers, as applicable, of each of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity Holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor; *provided* that each Disinterested Director of the Debtors shall retain respective authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan; (b) each Disinterested Director shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors, or the Wind-Down Debtors, or any other Entity without such director's prior written consent; (c) each Disinterested Director of the Debtors retains the right to review, approve, and make decisions as well as to file papers and be heard before the Bankruptcy Court on all matters under such director's continuing authority; and (d) subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Wind-Down Debtors with respect to its affairs.  Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve any of the Debtors, and shall:  (a) file a certificate of dissolution, cancellation, or equivalent document for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of any of the Debtors under the applicable laws of each applicable Debtor's state of formation; (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors or any of their Affiliates.

## 3.    Tax Returns.

After the Effective Date and subject to the Purchase Agreement(s), the Plan Administrator shall complete and file all final or otherwise required federal, state, provincial, and local tax returns for each of the Debtors and the Wind-Down Debtors.

### 4. Dissolution of the Wind-Down Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction. Notwithstanding the foregoing, the Plan Administrator shall retain the authority to take all necessary actions to dissolve the Debtors in, and withdraw the Debtors from, applicable states and provinces to the extent required by applicable law.

### I. Liquidating Trust.

Article IV.I of the Plan shall apply to a Sale Transaction Restructuring.

Notwithstanding anything to the contrary in the Plan, the Plan Administrator, on behalf of the Wind-Down Debtors, may, subject to the consent of the Required AHG Noteholders may transfer all or any portion of the Remnant Assets to the Liquidating Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations. For the avoidance of doubt, in the event of a Permitted Transfer, the provisions set forth in Article IV.R of the Plan shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Causes of Action transferred to the Liquidating Trust. The Liquidating Trust shall be established for the primary purpose of liquidating the Liquidating Trust's assets, reconciling claims asserted against the Debtors and the Wind-Down Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust. Upon the transfer of the Debtors' or the Wind-Down Debtors' assets to the Liquidating Trust, the Debtors and the Wind-Down Debtors will have no reversionary or further interest in or with respect to the assets of the Liquidating Trust. To the extent beneficial interests in the Liquidating Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. Prior to any Permitted Transfer, the Plan Administrator may designate trustee(s) for the Liquidating Trust for the purposes of administering the Liquidating Trust. The reasonable costs and expenses of the trustee(s) shall be paid from the Liquidating Trust.

### 1. Liquidating Trust Treatment.

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject

to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the Liquidating Trust had sold all of the Liquidating Trust Assets at their tax book value and distributed the proceeds to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

## 2.      Disputed Ownership Fund Treatment.

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

J.      **Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates that have not been previously released shall be fully released, settled, and compromised, and the Holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the Debtors' Estates shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases, at the sole expense of the Debtors or the Wind-Down Debtors, as applicable.  Notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims shall not be released and such Liens shall remain in full force and effect until the DIP Claims are paid in full in Cash or otherwise treated in a manner consistent with Article II.E of the Plan.

K.      **Cancellation of Existing Securities and Agreements.**

On the Effective Date, except as otherwise specifically provided for in the Plan or one or more Purchase Agreements:  (1) the obligations under the DIP Documents, the Prepetition Credit Agreement, the 2025 Secured Notes Indenture, the 2026 Secured Notes Indenture, the 2027 Unsecured Notes Indenture, the 2028 Unsecured Notes Indenture, and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled, except as set forth in the Plan, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

On or after the Effective Date, each Holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture(s) or credit agreement that governs the rights of such Holder of such Claim upon such Holder's (or its nominee's or designee's) receipt of the distributions to which it is entitled pursuant to the Plan.  Such surrendered certificate or instrument shall be deemed cancelled as set forth in, and subject to the exceptions set forth in, Article IV.K of the Plan.  If the record Holder of a Notes Claim is DTC or its nominee, the applicable Trustee, or another securities depository or custodian thereof, and Holders of Notes Claims are represented by a global security held by or on behalf of DTC, the applicable Trustee, or such other securities depository or custodian, then each such Holder of such Notes Claims shall be deemed to have surrendered such Holder's note, debenture, or other evidence of indebtedness upon surrender of such global security by DTC, the applicable Trustee, or such other securities depository or custodian thereof.

Notwithstanding the foregoing, (a) no Executory Contract or Unexpired Lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, (b) the Prepetition Credit Agreement, the Senior Secured Notes Indentures, and the Unsecured Notes Indentures shall continue in effect solely for the purpose of (i) allowing Holders of the ABL Facility Claims, FILO Term Loan

Facility Claims, the Trustees, to receive the distributions provided for under the Plan, (ii) allowing the Prepetition Agent, the Trustees to receive or direct distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan, (iii) preserving all rights, including rights of enforcement, of the Prepetition Agent, the Trustees to indemnification or contribution pursuant and subject to the terms of the Prepetition Credit Agreement, the Indentures, in respect of any claim or Cause of Action asserted against the Prepetition Agent, the Trustees, as applicable, (iv) permitting each of the Prepetition Agent, the Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, and (v) preserving any rights of the DIP Agents, the Prepetition Agents, the Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture, Prepetition Credit Agreement, or DIP Credit Agreements, including any rights to priority of payment and/or to exercise charging Liens.

The Prepetition Agent shall be released and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Prepetition Agent and their respective representatives and Professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Prepetition Agent shall be relieved of and released from any obligations and duties arising thereunder.

Except as provided in the Plan, on the Effective Date, each DIP Agent and its respective agents, successors, and assigns shall be automatically and fully released of all of their duties and obligations associated with the applicable DIP Documents. The commitments and obligations, if any, of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

On and after the Effective Date, the duties and responsibilities of the Trustees under the applicable indenture shall be discharged and released, except (i) to the extent required to effectuate the Plan including, but not limited to, making distributions under the Plan to the Holders of Allowed Notes Claims under the applicable indenture, and (ii) with respect to any rights of the Trustees to payment of reasonable and documented fees, expenses, and indemnification obligations (to be documented in accordance with the terms of the applicable Indenture) as against any money or property distributable to Holders of Claims pursuant and subject to the terms of the applicable indenture, including any rights to priority of payment and/or to exercise charging liens. After the performance by the Trustees and their respective representatives and professionals of any obligations and duties required under or related to the Plan or the Confirmation Order, the Trustees shall be deemed to be forever relieved of and released from any obligations and duties arising thereunder.

L.    **Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including, as applicable:    (1) selection of the Plan Administrator; (2) implementation of the Restructuring Transactions; (3) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors, before, on, or after the Effective Date involving the corporate structure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, in connection with the Plan or corporate structure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security Holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors,

except for any filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution with applicable governmental authorities required pursuant to applicable state or provincial Law.. Before, on, or after the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by <u>Article IV.L</u> of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

## M.     New Corporate Governance Documents.

In the event of a Plan Restructuring or Credit Bid Transaction, on the Effective Date, New Rite Aid shall enter into and deliver the New Corporate Governance Documents to each holder of New Common Stock, and the New Corporate Governance Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each party shall be bound thereby, in each case, and as applicable, without the need for execution by any party thereto other than New Rite Aid. Any Entity's acceptance of New Common Stock, including any New Common Stock issuable upon exercise of any warrants issued pursuant to the Plan or otherwise, shall be deemed as its agreement to the New Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms, and each such Entity will be bound thereby in all respects.

The New Corporate Governance Documents will prohibit the issuance of non-voting Equity Securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the New Corporate Governance Documents may be amended or restated as permitted by such documents and the Laws of their respective states, provinces, or countries of incorporation or organization.

## N.     Management Incentive Plan.

On the Effective Date, the New Rite Aid Board shall adopt and implement the Management Incentive Plan as determined by the New Rite Aid Board and in accordance with the MIP Documents.

## O.     Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Committee Settlement, the MedImpact Term Loan Sale, Sale Transaction Restructuring, the Other Asset Sale(s), and the instruments issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or the Wind-Down Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Debtors or the Wind-Down Debtors, as applicable, may issue, execute, deliver, file, or record, such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate implement, and further evidence the terms and conditions of the Committee Settlement, including, but not limited to, the Litigation Trust Agreement, the GUC Equity Trust Documents, the GUC Sub-Trust Documents, the Litigation Trust Cooperation Agreement, and the other Committee Settlement Documents.

### P.      Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to New Rite Aid, from a Debtor to the Wind-Down Debtor, or from the Wind-Down Debtor to the Liquidating Trust or to any other Person) of property under the Plan (including pursuant to the Purchase Agreement(s), if applicable, or a Plan Restructuring) or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Wind-Down Debtors, including in accordance with any Purchase Agreement, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any Restructuring Transaction), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### Q.      Exemption from Securities Act Registration.

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of securities under the Plan. The issuance of the 1145 Securities under the Plan is expected to be exempt from the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code. Thus, the 1145 Securities to be issued under the Plan (a) would not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) would be freely tradable and transferable by any initial recipient thereof that (i) is not an "Affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "Affiliate" within 90 days of such transfer, and (iii) is not an Entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. Should the Debtors elect on or after the Effective Date to reflect any ownership of the 1145 Securities to be issued under the Plan through the facilities of DTC, the Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the 1145 Securities to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding any policies, practices, or procedures of DTC, DTC shall cooperate with and take all actions reasonably requested by a Disbursing Agent or an indenture trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distribution be characterized as repayments of

principal or interest. No Disbursing Agent or indenture trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC. The rights of holders of New Common Stock, including the right to transfer such interests, will also be subject to any restrictions in the New Corporate Governance Documents, to the extent applicable.

To the extent that section 1145 of the Bankruptcy Code is inapplicable, the offering, issuance, exchange, or distribution of any securities pursuant to the Plan, including the Private Placement Securities, is or shall be conducted in a manner that is exempt from the registration requirements of section 5 of the Securities Act and applicable state and local securities laws, pursuant to section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder (including Regulation D), Regulation S under the Securities Act and/or another available exemption from registration under Section 5 of the Securities Act. To the extent such securities are issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder or Regulation S under the Securities Act, each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each recipient shall be required to make customary representations to the Debtors including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

The interests in the Liquidating Trust, the Litigation Trust, any GUC Sub-Trust, or the GUC Equity Trust Interests are not expected to be deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, or the provision of section 1145 of the Bankruptcy Code is expected to apply to such interests (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) or the issuance of such interests is expected to be exempt from the registration under section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the 1145 Securities, Private Placement Securities, or interests in the Liquidating Trust, the Litigation Trust, any GUC Sub-Trust, or the GUC Equity Trust Interests under applicable securities laws.

### R. Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VII and Article X of the Plan, and the terms of the Committee Settlement, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action other than the Assigned Claims and the Assigned Insurance Rights, whether arising before or after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) that constitute Elixir Acquired Assets or Retail Acquired Assets, (b) exculpated or released (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article X, or (c) waived in accordance with Article IV.R of the Plan which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Reorganized Debtors or the Wind-Down Debtors, as applicable, as of the Effective Date.

The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the Commonwealth of Massachusetts on account of, or relating to, the Massachusetts OAG Agreement, and

the Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such claims. Additionally, each of the California AG Proofs of Claim is an Allowed General Unsecured Claim. The Debtors and the Wind-Down Debtors, as applicable, shall waive any Avoidance Action against the California AG, or any mediate or immediate transferee of the California AG, on account of, or relating to, the California AG Agreement, and the Confirmation Order shall serve as approval by the Bankruptcy Court of the release of such claims.

The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, may pursue such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights), as appropriate, in accordance with the best interests of the Reorganized Debtors and the Wind-Down Debtors, as applicable. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall retain and may exclusively enforce any and all such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights). The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action (but not, for the avoidance of doubt, the Assigned Claims and the Assigned Insurance Rights) and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Purchaser in accordance with the Purchase Agreement(s) or otherwise expressly provided in the Plan, including in Article IV and Article X of the Plan. Unless any such Causes of Action against an Entity are expressly waived (including pursuant to Article IV.R of the Plan), relinquished, exculpated, released, compromised, assigned, or transferred to a Purchaser in accordance with a Purchase Agreement, or settled in the Plan or a Final Order, the Reorganized Debtors and the Wind-Down Debtors expressly reserve all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, Claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Notwithstanding anything to the contrary in the Plan, in the Plan Supplement or in the Confirmation Order, the Debtors shall preserve and transfer and/or assign to the Litigation Trust, the Assigned Claims and the Assigned Insurance Rights and the right to commence, prosecute, or settle all Assigned Claims and Assigned Insurance Rights belonging to such Debtors or their Estates, subject to the occurrence of the Effective Date and the other terms and conditions set forth in the Plan; *provided*, that, subject to the terms and conditions of the Plan, (a) the Litigation Trust or GUC Sub-Trust(s) shall be the successor-in-interest to the Debtors' rights, title, and interest in any Assigned Claims and Assigned Insurance Rights, (b) the Litigation Trust or GUC Sub-Trust(s) as may be applicable, shall have exclusive standing to pursue the Assigned Claims and Assigned Insurance Rights, and (c) the Litigation Trustee or GUC Sub-Trust Trustee(s), pursuant to the Committee Settlement Documents, shall have the right to commence, prosecute, or settle such Assigned Claims and Assigned Insurance Rights and to decline to do any of the foregoing in its discretion and without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. In pursuing any Assigned Claim or Assigned Insurance Right, the Litigation Trust or GUC Sub-Trust(s) shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which an Assigned Claim or Assigned Insurance Right may be bought under section 546 of the Bankruptcy Code. The Litigation Trust or GUC Sub-Trust(s) shall be entitled to recover on any Assigned Claims or Assigned Insurance Rights as a result of the Settlement of Tort Claims described in Article IV.B of the Plan and/or

any settlement or judgment with respect to the other Assigned Claims and no consent shall be necessary for the Litigation Trust or GUC Sub-Trust(s) to transfer such the proceeds of any such Assigned Claims or Assigned Insurance Rights once received from an insurer or other third-party. For the avoidance of doubt, the Litigation Trust or applicable GUC Sub-Trust shall be solely responsible for effectuating all distributions on account of the Litigation Trust Assets for General Unsecured Claims.

### S.    Private Company.

In the event of a Plan Restructuring, the Reorganized Debtors shall not have any class of Equity Securities listed on a national securities exchange and shall make commercially reasonable efforts to take the steps necessary to be a private company without Securities Act or Exchange Act reporting obligations upon emergence or as soon as reasonably practicable thereafter in accordance with and to the extent permitted by the Securities Act and the Exchange Act.

### T.    Additional Sale Transactions.

Pursuant to the Bidding Procedures and Bidding Procedures Order, interested parties may submit a bid for some, all, or any portion of the Debtors' assets. If, in the Debtors' business judgment, and subject to the Bidding Procedures and the terms of the Bidding Procedures Order, the Debtors determine that one or more bids for all or a portion of the Debtors' assets offers higher or otherwise better terms to the Debtors' Estates, then the Debtors may conduct (a) in the event of a Plan Restructuring, Other Asset Sale(s) for those assets or (b) in the event of a Sale Transaction Restructuring, Alternative Sale Transaction(s) for those assets, with the consent of the Required AHG Noteholders in the event of a Plan Restructuring or a Credit Bid Transaction. Such Other Asset Sale(s) or Alternative Sale Transaction(s), as applicable, would be consummated pursuant to section 363 of the Bankruptcy Code either pursuant to the Plan or separate Purchase Agreement(s) to be approved pursuant to separate Sale Order(s), and the treatment of proceeds from such Other Asset Sale(s) or Alternative Sale Transaction(s) shall be distributed pursuant to the Plan or separate Court order and in a manner consistent with the Final Financing Order. For the avoidance of doubt, pursuit of any Other Asset Sales shall not impact the Committee Settlement.

### U.    Employment Obligations.

For the avoidance of doubt, the collective bargaining agreements ("CBAs") between labor unions and various Debtors may only be rejected pursuant to and in accordance with the procedures and standards set forth in section 1113 of the Bankruptcy Code; provided that the Debtors shall assume the Pension Plan as well as all CBAs and union contracts.

The cure amounts, if any, related to the assumption of the CBAs shall be satisfied in full by payment by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course, of all the Debtors' or the Reorganized Debtors' obligations under the assumed CBA(s), as applicable, arising under the CBAs to the extent such obligations are valid and payable. As a result, if the CBAs are assumed, no Proof of Claim, request for administrative expense, or cure claim need be Filed with respect to such cure amounts, provided, however, that the Debtors' and the Reorganized Debtors' rights, defenses, claims, and counterclaims with respect to any such obligations are expressly preserved.

After the Effective Date, the Reorganized Debtors intend to, in the ordinary course of their business, as and to the extent required by the Pension Plan's governing documents and in accordance with applicable non-bankruptcy law: (i) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 as required by applicable law; (ii) pay, or cause to be paid, all required premiums, if any, owed to PBGC under 29 U.S.C. §§ 1306 and 1307, for the Pension Plan under ERISA or the Internal Revenue Code; and (iii) administer the Pension Plan in accordance with the applicable provisions of ERISA

and the IRC.  Further, if the Pension Plan continues and is assumed by the Reorganized Debtors, PBGC and the Debtors agree that all Proofs of Claim Filed by PBGC would be deemed withdrawn on the Effective Date without incurring liability in the bankruptcy.

Nothing in the Chapter 11 Cases, the Disclosure Statement, the Plan, the Confirmation Order, or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plan for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plan, subject to any and all applicable rights and defenses of such parties, which are expressly preserved.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document Filed in the Chapter 11 Cases.  For the avoidance of doubt, if the Pension Plan continues, the Reorganized Debtors shall not be released from any liability or obligation under ERISA, the IRC, and any other applicable law relating to the Pension Plan.

## V.    Notice Regarding U.S. Government Payor Statutory Rights.

The United States takes the position that nothing in the Plan, Plan Supplement, Confirmation Order, or any other Definitive Document can release, discharge, enjoin, limit, or otherwise prejudice the United States' rights under the Medicare Secondary Payer Act, 42 USC §§ 1395y(b) et seq., section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173), or the Federal Medical Care Recovery Act, 42 U.S.C. §§ 2651-2653.

# VIII.    OTHER KEY ASPECTS OF THE PLAN

## A.    Treatment of Executory Contracts and Unexpired Leases.

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (1) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) have been previously assumed or rejected by the Debtors pursuant to the Assumption/Rejection Procedures Order or any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (4) are to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, through a Sale Order in connection with any sale transaction, including in a Sale Transaction Restructuring that is pending on the Confirmation Date; (5) are a contract, release, or other agreement or document entered into in connection with the Plan; or (6) are an Insurance Policy.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing of a motion or identification in the Plan Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code, as clarified by the Extension Order.  To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either

through the Filing of a motion or identification in the Plan Supplement or similar schedule in connection with a Sale Order, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein or in the Confirmation Order or any Purchase Agreement to be approved pursuant to the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Notwithstanding anything herein to the contrary, with respect to any Unexpired Lease that is not assumed on the Effective Date pursuant to Article V.A of the Plan, the effective date of rejection of such Unexpired Leases shall be the later of: (A) the Effective Date, except (1) in connection with a Court-Ordered Cure Cost pursuant to Article V.C or (2) if agreed by the applicable counterparty, and (B) the date upon which the Debtors notify the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable; *provided* that on the date the Debtors surrender the premises as set forth in subsection (B) above, all property remaining in the premises will be deemed abandoned free and clear of any interests, Liens, Claims, and encumbrances and landlords may dispose of such property without further notice or court order, unless otherwise agreed by the applicable lessor or pursuant to an order of the Bankruptcy Court. If the effective date of any rejection of an Unexpired Lease is after the Confirmation Date pursuant to the terms in the Plan, the Reorganized Debtors shall provide notice of such rejection to the applicable landlord no later than the Initial Extended 365(d)(4) Deadline[29], setting forth the deadline for Filing any Claims arising from such rejection, which notice shall also be served upon the GUC Equity Trustee and Litigation Trustee.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the rights of counterparties to Unexpired Leases of nonresidential real property to object to the continued possession of such leased property, including the ability to conduct GOB sales on the properties, or failure to comply with any other lease terms or obligations, including payment of rents and charges and insurance obligations, in each case related to such Unexpired Lease following entry of the Confirmation Order are expressly preserved, and the rights of such counterparties to request such objection be heard on shortened notice are preserved.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in, and be fully enforceable by the applicable Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties thereto, subject to Article V.A of the Plan. Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable.

Subject to any Sale Order, to the maximum extent permitted by Law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (A) result in a violation, breach, or default under such

---

[29] "Initial Extended 365(d)(4) Deadline" shall have the meaning given to such term in the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures for Exiting Certain Leased Real Property and (II) Granting Related Relief* [Docket No. 2024].

Executory Contract or Unexpired Lease, (B) increase, accelerate, or otherwise alter any obligations, rights or liabilities of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors under such Executory Contract or Unexpired Lease, or (C) result in the creation or imposition of a Lien upon any property or asset of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors pursuant to the applicable Executory Contract or Unexpired Lease, and to the extent any provision in any such Executory Contract or Unexpired Lease restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the transactions contemplated by the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, and any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption thereof (subject to the other provisions of Article V.A of the Plan) shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, after the Confirmation Date, an Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts and Unexpired Leases as of the Confirmation Date may not be rejected by the applicable Debtor(s), other than as provided for in the Plan, unless the applicable lessor or contract counterparty has (x) consented to such rejection, (y) objected to the assumption of such Executory Contract or Unexpired Lease and such objection remains outstanding, or (z) in the case of Unexpired Leases, consented to an extension of the time period in which the applicable Debtor(s) must assume or reject such Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code (as extended with the applicable lessor's consent, the "Deferred Deadline"), in which case for purposes of clause (z) the applicable Debtor(s) shall have until the Deferred Deadline to assume such Unexpired Lease, subject to the applicable lessor's right to object to such assumption, or such Unexpired Lease shall be deemed rejected. For any Executory Contract or Unexpired Lease assumed pursuant to this paragraph, all Cure Costs shall be paid on the Effective Date or as soon as reasonably practicable thereafter, unless subject to a dispute with respect to Cure Cost, such dispute shall be addressed in accordance with Article V.C of the Plan.

Notwithstanding anything to the contrary in the Plan, in the event of a Sale Transaction Restructuring under Article V.D of the Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement (i) the Schedule of Assumed Executory Contracts and Unexpired Leases and (ii) any schedule of Executory Contracts and Unexpired Leases that is attached to any Purchase Agreement(s), with the consent of the Purchaser, at any time up to the earlier of (x) 90 days following the closing date of a Sale Transaction Restructuring, and (y) solely with respect to Unexpired Leases of nonresidential real property, the deadline set forth in section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the consent of the applicable landlord counterparty, consistent with the Purchase Agreement, as applicable (the "Designation Rights Period").

## 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time shall be barred from asserting such Claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions on account of such Claims in these Chapter 11 Cases. The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims not timely filed; *provided* that the Debtors will provide notice to such claimant at the address**

110

**or email address on the Proof of Claim, to the extent such information is provided, informing such claimant that its Claim will be removed from the Claims Register as a result of being untimely filed**. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Article III.B</u> of the Plan and may be objected to in accordance with the provisions of <u>Article IX</u> of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to (i) use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, or any third party, and (ii) shall be authorized to assert a Claim for any and all damages arising from the abandonment of such property by filing a Claim in accordance with <u>Article V.B</u> of the Plan.

**3.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, pay all Cure Costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan on such terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that, if a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved. Any Cure Cost shall be deemed fully satisfied, released, and discharged upon payment of the Cure Cost.

Unless otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Cost must be Filed, served, and actually received by counsel to the Debtors no later than 14 days after the service of notice of assumption on affected counterparties. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment and any untimely request for an additional or different Cure Cost shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by the applicable Reorganized Debtors or the Wind-Down Debtors, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

Any payment of Cure Costs by the Debtors or a Purchaser, as applicable, in connection with Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to a Sale Transaction Restructuring or an Other Asset Sale shall be satisfied in full by the Debtors or the Purchaser(s), as applicable, in accordance with the terms in the Purchase Agreement(s) and the Sale Order(s), as applicable (including the Assignment Procedures), including in the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Debtors, the Purchaser, or any assignee to provide "adequate assurance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption.

Except as otherwise set forth in any applicable Sale Order, if there is any dispute regarding any Cure Costs, the ability of the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure Costs shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such

dispute, approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Any such disputes shall be scheduled for hearing upon request of the affected counterparty or the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, at the earliest convenience of the Court; provided that no hearing will be scheduled on less than 10 days' notice to the affected counterparty, and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and that no such hearing shall be scheduled less than 30 days after the Effective Date unless agreed to between the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the affected counterparty. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, may reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely Filed objection) regarding any Cure Cost or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Assumed Contracts and Unexpired Leases (such greater amount, the "Court-Ordered Cure Cost"), the Debtors shall have the right to (a) satisfy the Court-Ordered Cure Cost as soon as reasonably practicable thereafter and assume such Executory Contract or Unexpired Lease in accordance with the terms herein or, (b) within 14 days of such determination, remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected on the later of (i) the date of entry of the Court-Ordered Cure Cost and, (ii) solely with respect to Unexpired Leases, the date upon which the Debtors notify the landlord in writing (email being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable, and in the case of rejection of an Unexpired Lease pursuant to the preceding clause (ii), the Debtors shall, pursuant to section 365(d)(4) of the Bankruptcy Code, immediately surrender the related premises to the lessor unless otherwise agreed with the applicable lessor or ordered by the Court, subject to the applicable counterparty's right to object to such rejection; provided that, after the deadline to assume an Executory Contract or Unexpired Lease set forth in section 365(d) of the Bankruptcy Code, as clarified by the Extension Order, an Executory Contract or Unexpired Lease may only be removed from the Schedule of Assumed Executory Contracts and Unexpired Leases if (1) the applicable counterparty consents to such rejection, (2) the applicable counterparty objected to the assumption or cure of such Executory Contract or Unexpired Lease and such objection remains outstanding, or (3) the court orders a Court-Ordered Cure Cost. Notwithstanding anything to the contrary herein, the Reorganized Debtors, the Wind-Down Debtors, and the applicable counterparty shall be entitled to the full benefits of the Executory Contract or Unexpired Lease (including without limitation, any license thereunder) pending the resolution of any Cure Cost dispute.

The assumption of any Executory Contract or Unexpired Lease in connection with any Sale Transaction Restructuring, Plan Restructuring, or Other Asset Sale and the cure of defaults associated therewith in accordance with section 365(b) of the Bankruptcy Code, including the payment of any Cure Costs as adjudicated or agreed upon by the Debtors and the applicable Purchaser, shall result in the full release and satisfaction of any Cure Cost, Claims, or defaults, whether monetary or nonmonetary, including those arising from or triggered by the filing of these Chapter 11 Cases and provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, in each case at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption or (2) the effective date of such assumption without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing herein shall affect the allowance of Claims or any Cure Cost agreed to by the Debtors, the**

**Reorganized Debtors, or the Wind-Down Debtors, as applicable, in any written agreement amending or modifying any Executory Contract or Unexpired Lease prior to its assumption.** Notwithstanding anything in the Plan, the Purchase Agreement(s), the Sale Order(s), the Plan Supplement, or otherwise to the contrary, any non-Debtor party to any such Executory Contract or Unexpired Lease shall be entitled to receive, and nothing herein shall release or result in the satisfaction of such party's right to receive, payment in full of all Cure Costs and all amounts that have accrued or otherwise arisen as of the Effective Date (but are not in default as of the Effective Date) with respect to any Executory Contract or Unexpired Lease.

4.    **Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

5.    **Insurance Policies.**

Notwithstanding anything to the contrary in the Plan, the Plan Supplement or the Confirmation Order:

Nothing in the Plan, the Plan Supplement or the Confirmation Order shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies. After the Effective Date, all directors, officers, managers, authorized agents or employees of the Debtors (or their Affiliates) who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Liability Insurance Policies for the full term of such policies, including but not limited to any extension of coverage after the end of such policy period if any extended reporting period has been purchased, in accordance with the terms thereof.

The Debtors shall maintain tail coverage for any current D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the current D&O Liability Insurance Policies.

Each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (ii) such Insurance Policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall vest in the Reorganized Debtors or the Wind-Down Debtors, as applicable.

The Litigation Trust or GUC Sub-Trust(s) shall be responsible for monitoring and preserving the ability to maintain claims that are Assigned Claims or Assigned Insurance Rights against the Insurance Policies (except for (a) the Debtors' Unassigned Insurance Policies and (b) the Unassigned Insurance Rights), including the D&O Liability Insurance Policies. To the extent the Debtors are not the first named insured under any Insurance Policy and notwithstanding Confirmation of the Plan or the occurrence of the Effective Date (i) nothing herein shall constitute a rejection of such Insurance Policy, (ii) such Insurance

Policy shall remain in full force and effect, and (iii) any and all rights of the Debtors under such Insurance Policy shall remain in full force and effect. For the avoidance of doubt, the dissolution of the Debtors or the Reorganized Debtors shall have no impact upon the rights of the Litigation Trust or GUC Sub-Trust(s) to assert the Assigned Insurance Rights or Assigned Claims.

After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, and the Litigation Trust, the GUC Sub-Trust(s), and any successor or assign of the Litigation Trust or the GUC Sub-Trust(s) shall not terminate the coverage under any D&O Liability Insurance Policies (including the "tail policy") in effect prior to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy in accordance with and subject in all respects to the terms and conditions of any applicable D&O Liability Insurance Policy, which shall not be altered, for the full term of such D&O Liability Insurance Policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

For the avoidance of doubt, nothing herein shall in any way impair the Litigation Trust's or GUC Sub-Trust's ability on and after the Effective Date to assert on behalf of the Debtors or Reorganized Debtors, as applicable, any Assigned Claims or any Assigned Insurance Rights, on account of such Assigned Claims or such Assigned Insurance Rights, which shall not be altered except as otherwise provided herein. Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement the Insurance Policies, with the reasonable consent and cooperation of the Litigation Trust or GUC Sub-Trust(s) and as the Debtors and the Litigation Trust or GUC Sub-Trust(s) deem necessary (except with respect to the Unassigned Insurance Policies, for which no consent is required).

### 6. Indemnification Provisions.

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of each of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of the Debtors than the Indemnification Provisions in place prior to the Effective Date. [For the avoidance of doubt, Indemnification Provisions shall be Reinstated for any Excluded Party.]

### 7. D&O Liability Insurance Policies.

Each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, pursuant to section 365 of the Bankruptcy Code or otherwise, subject to the Debtors' rights to seek amendment to such Insurance Policies and (ii) such Insurance Policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall vest in the Reorganized Debtors or the Wind-Down Debtors, as applicable. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Insurance Policies of the Debtors, including each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the Insurance Policies, including D&O Liability

114

Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

The Debtors shall maintain tail coverage under any D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

For the avoidance of doubt, nothing herein shall in any way impair the Litigation Trust's ability on and after the Effective Date to assert on behalf of the Debtors or Reorganized Debtors, as applicable, any Assigned Claims or any Assigned Insurance Rights, on account of such Assigned Claims or such Assigned Insurance Rights, subject to the terms and conditions of the applicable Insurance Policies, including the D&O Liability Insurance Policies, which shall not be altered. Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement the Insurance Policies, including the D&O Liability Insurance Policies, as the Debtors and Reorganized Debtors, as applicable, deem necessary.

### 8.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, a Sale Order, or the Purchase Agreement(s), each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including easements, reciprocal easement agreements, construction operating and reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 9.    Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan or a Sale Order. Following the expiration of the Designation Rights Period, as applicable, the Debtors may not subsequently reject any Unexpired Lease previously designated as assumed or assumed and assigned and may not assume or assume and assign an Unexpired Lease previously designated as rejected on the Schedule of Assumed Contracts and Unexpired Leases absent the consent of the applicable lessor or order of the Bankruptcy Court. A final and timely designation with respect to all Unexpired Leases of nonresidential real property will be made in accordance with Article V.A of the Plan.

10.     **Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4)(B)(ii) of the Bankruptcy Code.

11.     **Contracts and Leases Entered Into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor (but excluding any contracts or leases assigned to a Purchaser in accordance with a Purchase Agreement), will be performed by the applicable Debtor or, after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases but excluding any Executory Contracts or Unexpired Leases that have been rejected as of the date of entry of the Confirmation Order) will survive and remain unaffected by entry of the Confirmation Order.

12.     **Sale Order Assignment Procedures.**

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of a Sale Order or the Assignment Procedures attached thereto, in the event of a Sale Transaction Restructuring or an Other Asset Sale.

B.      **Conditions Precedent to Consummation of the Plan**

1.      **Conditions Precedent to the Effective Date**

It shall be a condition to the occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI.B of the Plan;

1.      the DIP ABL Facility, the DIP FILO Facility, the DIP Term Loan Facility, and the Financing Orders each remains in full force and effect;

2.      in the event of a Plan Restructuring or a Credit Bid Transaction, each of the Definitive Documents must be, in form and substance acceptable to the Required AHG Noteholders and the Agents (subject to any additional consent rights set forth in Article I.A.96);

3.      the Plan, the Confirmation Order, the Disclosure Statement, the Sale Order, if applicable, and the Disclosure Statement Order must be, in form and substance acceptable to the Debtors and reasonably acceptable to the Required AHG Noteholders, the Agents, and the Committees;

4.      the Restructuring Transactions shall have been implemented in accordance with the Restructuring Transactions Memorandum in all material respects;

5.      each of the Confirmation Order and the Sale Order, if applicable, shall have been entered and shall not be stayed;

6.      the Bankruptcy Court shall have entered the Controlled Substance Injunction Order, and such order shall be a Final Order;

7.      in the event of a Credit Bid Transaction, New Rite Aid shall have been formed;

8.      all documents necessary to consummate the Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith and in accordance with any applicable consent rights set forth in the Plan;

9.      the Bankruptcy Court shall have entered the Final Financing Order and the Final Financing Order shall not have been vacated, stayed, revised, modified, or amended in any manner without the prior written consent of the DIP Agent and, to the extent set forth in the Final Financing Order, there shall be no default or event of default existing under the DIP Credit Agreement or the Final Financing Order;

10.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, and documents that are necessary to implement and effectuate the Plan;

11.      in the event of a Sale Transaction Restructuring, the Wind-Down Reserve and the Administrative / Priority Claims Reserve shall have each been funded;

12.      the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

13.      all accrued and unpaid reasonable and documented fees and expenses of the Ad Hoc Secured Noteholder Group (including any advisors thereto) in connection with the Restructuring Transactions, to the extent invoiced three Business Days prior to the Effective Date, shall have been paid in accordance with the terms and conditions set forth in the Financing Order, and the DIP Credit Agreement, as applicable;

14.      the GUC Equity Trust Agreements shall have been executed and the GUC Equity Pool shall have been issued to the GUC Equity Trust;

15. the Litigation Trust Documents necessary for the operation of the Litigation Trust to operate on the Effective Date shall have been executed and/or Filed, as applicable and the Committees' Initial Cash Consideration and other Litigation Trust Assets shall have been contributed to the Litigation Trust;

16.      the Committee Settlement shall be in full force and effect and the Committee Settlement and any provisions of any Definitive Documents related to the Committee Settlement or the UCC/TCC Recovery Allocation Agreement (if Filed and subject to the consent rights set forth in the Plan) shall be reasonably acceptable to the Committees and shall not have been modified without the Committees' consent (not to be unreasonably withheld);

17.      in the event of the Plan Restructuring, the New Common Stock shall have been issued;

18.      (i) all waiting periods imposed by any Governmental Unit in connection with the transactions contemplated by the Plan, the Sale Transaction Restructuring, and any Other Asset Sale shall have terminated or expired and (ii) all authorizations, approvals (including regulatory approvals), consents, or clearances under the any applicable antitrust Laws in connection with such transactions shall have been obtained;

19.      as applicable, the Exit Facilities Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facilities shall have been waived or satisfied in accordance with the terms thereof;

20.     in the event of (a) a Plan Restructuring or (b) a Credit Bid Transaction, any Other Asset Sale or Alternative Sale Transaction shall (i) be acceptable to the Required AHG Noteholders and the Agents and (ii) shall have closed on or prior to the Effective Date;

21.     in the event of a Sale Transaction Restructuring, New Rite Aid or the applicable Purchaser shall have acquired the Retail Acquired Assets pursuant to the applicable Purchase Agreement, and in each case all conditions precedent to the closing of such Sale Transaction Restructuring shall have been satisfied or duly waived;

22.     any Sale Transaction Restructuring shall be acceptable to the Required AHG Noteholders;

23.     as applicable, the Takeback Notes Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the issuance of the Takeback Notes shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Takeback Notes shall be deemed to occur concurrently with the occurrence of the Effective Date;

24.     the New Corporate Governance Documents shall be in full force and effect;

25.     any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained;

26.     the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein in a manner consistent in all respects with the Plan and the Plan Supplement;

27.     all DOJ Claims are subject to one or more settlement agreements between the Debtors and their non-Debtor Affiliates, including EIC, as applicable, and the DOJ, which settlement agreements (a) provide for no less than $350 million in available proceeds on account of the CMS Receivable to fund distributions to Holders of Allowed DIP Claims and Holders of Allowed Senior Secured Notes Claims and (b) are otherwise in form and substance acceptable to the Debtors, the Required AHG Noteholders and the Exit Facilities Agent;

28.     on the Effective Date, the Debtors shall have Pro Forma Closing Liquidity of at least $700,000,000;

29.     the Debtors shall have delivered to the Ad Hoc Secured Noteholder Group (a) pro forma consolidated and consolidating financial statements of the Reorganized Debtors as of and for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 45 days prior to the Effective Date, (b) monthly financial statements for the twelve months ended prior to the Effective Date, concluding the month ending at least 30 days prior to the Effective Date, and (c) forecasts, prepared by the management of the Debtors (in consultation with the Debtors' financial advisor) and in form and substance and with assumptions satisfactory to the Ad Hoc Secured Noteholder Group, of (i) balance sheets, income statements, and cash flow statements and (ii) the Revolving Borrowing Base, the FILO Borrowing Base, and Excess Availability (in each case, as defined in the Exit Facilities Credit Agreement), in each case, for each month for the first twelve full fiscal months following the Effective Date and on an annual basis thereafter through the term of the Exit Facilities, which projections shall demonstrate projected Excess Availability in excess of $700,000,000 as of the end of each month for the 12 months following the Effective Date;

30.     in the event of a Plan Restructuring or a Credit Bid Transaction, the Debtors and/or New Rite Aid, as applicable, shall have (a)(i) entered into an amended McKesson Prepetition Contract, as

amended pursuant to the McKesson Settlement and (ii) assumed the McKesson Prepetition Contract, or (b) terminated the McKesson Prepetition Contract and entered into the McKesson New Contract or a new contract with an alternative supplier, which shall be effective no later than the Effective Date, in a form reasonably acceptable to the Required AHG Noteholders and the Exit Facilities Agent, as applicable;

31.    the Debtors shall have conducted the sales and marketing process for the Rite Aid Retail Assets in the manner agreed upon between the Debtors and the Required AHG Noteholders.

32.    the aggregate amount of Allowed Administrative Claims, Allowed Priority Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims to be paid pursuant to the Plan shall be reasonably acceptable to the Required AHG Noteholders;

33.    in the event of a Plan Restructuring or a Credit Bid Transaction, the (a) Allowed amount of the McKesson Claim and (b) treatment of the Allowed McKesson Claim under the Plan shall each be reasonably acceptable to the Required AHG Noteholders and the Exit Facilities Agent, as applicable;

34.    in the event of a Plan Restructuring, (a) if the MedImpact Term Loan Backstop Parties acquire the MedImpact Term Loan pursuant to the MedImpact Term Loan Bidding Procedures, (i) the MedImpact Term Loan Rights Offering shall have been conducted in accordance with the Plan, the MedImpact Term Loan Rights Offering Procedures and the MedImpact Term Loan Backstop Commitment Agreement, (ii) the MedImpact Term Loan NewCo shall have been formed, and interests therein distributed to the MedImpact NewCo Trustee, in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement and the Plan, and (iii) the MedImpact NewCo Notes shall have been distributed in accordance with the terms and conditions of the MedImpact Term Loan Backstop Commitment Agreement, the MedImpact NewCo Notes Documentation, the MedImpact Term Loan Rights Offering, and the Plan or (b) if the MedImpact Term Loan Backstop Parties do not acquire the MedImpact Term Loan, the Cash proceeds of the MedImpact Term Loan have been allocated in accordance with Section (II)(A) of Exhibit E of the Final Financing Order;

35.    in the event of a Plan Restructuring, the MedImpact Term Loan Sale shall have been conducted in accordance with the MedImpact Term Loan Bidding Procedures and shall have occurred and been consummated on or prior to the Effective Date; and

36.    in the event of a Plan Restructuring, subject to the terms and conditions of the AHG New-Money Commitment Agreement, (a) the SCD Trust shall have been formed, and interests therein distributed, in accordance with the terms and conditions of the SCD Trust Documentation and the Plan, (b) the AHG Notes shall have been issued in accordance with the terms and conditions of the AHG New-Money Commitment Agreement and the AHG Notes Documentation, and (c) the Debtors shall have entered into the Elixir Intercreditor Agreement.

## 2.    Waiver of Conditions.

Subject to and without limiting the rights of each party under the Final Financing Order, the conditions to Consummation set forth in Article XI.A of the Plan, other than the condition set forth in Article XI.A.13 of the Plan, may be waived by the Debtors (with the consent of (i) the DIP Agents, (ii) the Exit Facilities Agent, (iii) the Required AHG Noteholders, but solely in the event of a Plan Restructuring or Credit Bid Transaction, and (iv) the Committees, to the extent that such waiver directly, materially, and adversely affects the rights or entitlements of Committees under the Committee Settlement, *provided* that the wavier of the condition set forth in Article XI.A.14 through Article XI.A.17 of the Plan shall require the consent of the Committees, without notice, leave, or order of the Bankruptcy Court or any formal action

other than proceeding to confirm or consummate the Plan; *provided that*, the condition in Article XI.A.12 of the Plan may not be waived without the consent of the affected Professionals.

### 3.    Effect of Failure of Conditions.

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

### 4.    Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## IX.    RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.**

### A.    Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.    The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

### 2.    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place.  In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new or amended Plan.  If the Debtors do not secure sufficient working capital to continue their operations of if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

### 4.    The Debtors May be Unable to Finalize a Resolution in Mediation, which could Impact the Debtors' Ability to Confirm the Plan

As discussed above, the Debtors and other parties in interest have reached an agreement in principle on a global settlement of issues subject to Mediation, among others.  The definitive documentation of the global settlement remains subject to final approval from the Debtors, the DIP Lenders, the Ad Hoc Secured Noteholder Group, McKesson, and the Committees.  The Debtors are hopeful that the global settlement will be finalized in advance of the Combined Hearing.  However, there is no guarantee that the global settlement will be finalized.  Among other issues, and although the Debtors have reached an agreement in principle with McKesson regarding the terms of the McKesson New Contract, pursuant to which McKesson will supply certain of the Reorganized Debtors with, among other things, pharmaceutical products critical to the operation of their pharmacy business, such agreement has not been formally executed nor approved

by the Bankruptcy Court.  Failure to consummate the McKesson Settlement may negatively affect the Debtors' ability to successfully confirm the Plan.[30]

The Debtors believe that the Plan attached hereto provides for the best (and only) available alternative to the Debtors' creditors, provides for a greater recovery (or potential recovery, as applicable) for creditors compared to a liquidation, and provides the greatest chance for the Debtors to emerge from these Chapter 11 Cases as a revitalized, streamlined going-concern retail pharmacy business.

## 5.    The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

## 6.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

---

[30]    The definitive documentation memorializing and implementing the McKesson Settlement and the McKesson 503(b)(9) Settlement remain subject to ongoing review, negotiation, finalization, and discussions with other key stakeholders.

7.    **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8.    **Certain Parties May Argue That Their Claims are Non-Dischargeable, and if Successful With Respect to Material Claims, the Debtors May be Unable to Secure Confirmation of the Plan.**

Certain creditors may take the position their claims are non-dischargeable.  Such creditors may make such allegations at any time, notwithstanding the existence of deadlines established by the Bankruptcy Rules or applicable Court order, entry of the Confirmation Order, or the occurrence of the Effective Date. Claimholders and other interested parties should refer to Articles IX.D.6(c) and IX.D.6(e) of this Disclosure Statement for discussions of certain debts and Claims, including those arising under the federal False Claims Act, that the United States asserts are not dischargeable claims or debts within the meaning of sections 727 or 1141, as applicable, of the Bankruptcy Code. Such assertions of non-dischargeablility, if successful with respect to material claims, could result in denial of confirmation, changes to the Plan, or, if asserted after occurrence of the Effective Date, the Reorganized Debtors being required to honor such claims.

9.    **The Debtors May Not Be Able to Obtain Exit Facility Commitments.**

Based on the Financial Projections, the Debtors believe that they will need exit financing or alternative sources of liquidity to support their efforts to effectuate this restructuring and exit from these Chapter 11 Cases.  There is a risk that the Debtors may not be able to secure Exit Facility Commitments and consummate the Plan.  If the Debtors are unable to secure Exit Facility Commitments, the Plan may not be feasible.

10.    **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' services, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 11. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 12. The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 13. Contingencies Could Affect Votes of Voting Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Class that is entitled to vote to accept or reject the Plan or require any sort of revote by such Impaired Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will

ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

14.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Post-Effective Date Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan remain subject to Mediation and the completion of any ongoing diligence efforts by the Disinterested Directors at the applicable Debtor Entities and objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.[31]

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits embodied in the Plan.

B.    Risks Related to Recoveries under the Plan.

1.    In the Event of a Plan Restructuring, the Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.

In the event of a Plan Restructuring, assuming that the Effective Date occurs, the Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections attached hereto represent the Debtors' management team's best estimate of the Debtors' future financial performance, which are necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized. If the Reorganized Debtors do not achieve their projected financial results, or are unable to procure sufficient exit financing to effectuate the Restructuring Transactions, the value of the New Common Stock may be negatively affected, and the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.    In the Event of a Plan Restructuring, Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date.

In the event of a Plan Restructuring, assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Date Debtors. The holders may have interests that differ from those of the

---

[31]    Releases effectuated through the Plan remain the subject of Mediation. The Debtors will seek approval of the substance and structure of the releases at Confirmation. Solicitation of elections with respect to Holder releases will occur after Confirmation, following the conclusion of the Mediation process.

other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock. In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

### 3. Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

### 4. The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy Their Obligations, Which May Not Be Successful.

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit Facilities.

The Debtors do not have a commitment from either the DIP Lenders or a third party to provide the Exit Facilities. There is no guarantee that the Debtors will be able to secure such a commitment and, thus, the Debtors may seek to emerge from the Chapter 11 Cases without an Exit Facility or with an Exit Facility on unfavorable terms. Either situation would negatively affect the New Rite Aid's ability to operate going forward.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facilities. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

5.      **The New Common Stock is Subject to Dilution.**

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with the issuance of additional shares of New Common Stock or the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including pursuant to the Management Incentive Plan.

6.      **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt.**

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable.  Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

7.      **Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized Debtors.**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors and the Reorganized Debtors and Holders of certain Claims.

C.      **Risks Relating to the Sale Transaction Restructuring, if Applicable.**

1.      **The Debtors Might Not Be Able to Satisfy Closing Conditions in Connection with the Sale Transaction Restructuring.**

It is possible that the Debtors may not satisfy the closing conditions of a Sale Transaction Restructuring if the Debtors determine to pursue a Sale Transaction Restructuring.  A failure to satisfy any of the closing conditions of the Sale Transaction Restructuring related thereto could prevent the Sale Transaction Restructuring and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

2.      **The Sale Transaction Restructuring, if Applicable, Will Affect the Debtors' Operations.**

Pursuant to the Sale Transaction Restructuring, as applicable, all, substantially all, or one or more groups of assets of the Debtors may be sold pursuant to Bankruptcy Code sections 105, 363 and 365.  Any remaining assets of the Debtors will be transferred to the Reorganized Debtors and will either be operated in the ordinary course or wound down.  To the extent substantially all the assets of the Debtors are sold in a Restructuring Transaction that is a Sale Transaction Restructuring, it is anticipated that Reorganized Debtors will have no active ongoing operations except as contemplated for the Wind-Down Debtors or the Plan Administrator, as applicable.   To the extent only certain of the Debtors' assets are sold, the Reorganized Debtors are anticipated to continue operating the remaining assets.  However, whatever form the Restructuring Transaction takes, the Debtors could experience business disruptions that negatively affect their operations.

D.      **Risks Related to the Debtors' and New Rite Aid's Businesses.**

1.      **New Rite Aid May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

New Rite Aid's ability to make scheduled payments on, or refinance their debt obligations, depends on the New Rite Aid's financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond New Rite Aid's control. New Rite Aid may be unable to maintain a level of cash flow from operating activities sufficient to permit New Rite Aid to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under any Exit Facilities or Takeback Facilities and upon emergence.

2.      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) the ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) the ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) the ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) the ability to maintain contracts that are critical to the Debtors' operations; (e) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.      **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' and Subsequently New Rite Aid's Businesses.**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases

128

continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4.      Financial Results May Be Volatile and May Not Reflect Historical Trends.

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Finally, the business plan was developed by the Debtors with the assistance of their restructuring advisor, Alvarez & Marsal. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

### 5.      The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.

The Debtors' operations are subject to various federal, state, and local laws and regulations, including state healthcare licenses (e.g., state pharmacy license requirements), occupational health and safety laws and evolving environmental standards. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of New Rite Aid. In addition, to the extent a Sale Transaction Restructuring that involves the transfer of pharmacy retail assets is effectuated, certain state healthcare licenses (e.g., state pharmacy license requirements) may not transfer. As a result, such pharmacy may be required to temporarily shut operations and then re-open under the new owner's license. Similarly, any Medicare or Medicaid enrollments will not transfer, and the new owner will have to enroll in such programs before they can seek reimbursement. This disruption to operations and revenue could have a material adverse effect on the business, financial condition, results of operations and cash flows of New Rite Aid.

Governmental investigations, as well as *qui tam* lawsuits, may lead to significant fines, penalties, settlements, or other sanctions, including exclusion from federal and state healthcare programs. Settlements of lawsuits involving Medicare and Medicaid enrollment and/or payment issues routinely require both

monetary payments and corporate integrity agreements, each of which could have an adverse effect on the Debtors' business, results of operations, financial position, and cash flows.

> **6.      New Rite Aid May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, New Rite Aid may become party to litigation. Any claims against New Rite Aid, whether meritorious or not, could be time-consuming, result in costly litigation, and divert significant resources. If any of these legal proceedings were to be determined adversely to New Rite Aid, or New Rite Aid were to enter into a settlement arrangement, New Rite Aid could be exposed to monetary damages that could have an adverse effect on New Rite Aid's business, financial condition and results of operations and therefore any distributions made to Holders of New Common Stock. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that New Rite Aid may become party to, nor the final resolution of such litigation. The impact of any such litigation on New Rite Aid businesses and financial stability, however, could be material.

As disclosed in the Debtors' SEC filings, the Debtors are regularly involved in a variety of legal matters including arbitration, litigation (and related settlement discussions), audits by counter parties under our contracts, and other claims, and is subject to regulatory proceedings including audits, inspections, inquiries, investigations, and similar actions by health care, insurance, pharmacy, tax, and other governmental authorities arising in the ordinary course of its business and across a number of subject areas (including employment, data privacy, and general liability matters). The Debtors record accruals for outstanding legal matters and applicable regulatory proceedings when it believes it is probable that a loss has been incurred, and the amount can be reasonably estimated. These estimates are updated as the facts and circumstances of the cases develop and/or change.

> (a)      **Usual and Customary Litigation.**

As of the Petition Date, the Debtors were defending several lawsuits alleging that they overcharged for prescription drugs by not submitting the price available to members of the Debtors' Rx Savings Program as the pharmacy's usual and customary ("U&C") price, as well as related theories.

- *Humana Health Plan, Inc. v. Rite Aid Hdqtrs. Corp.*, 22-cv-226-DJH-CHL (W.D. Ky.). Humana Health Plan, Inc. sought to enforce a previously issued arbitration award against the Debtors for $122.6 million plus interest regarding alleged U&C overcharges. On August 4, 2023, the Bankruptcy Court issued an order confirming the arbitration award and entered judgment against the Debtors. At this time, the Debtors have accrued an amount equal to the Arbitration Award plus post-judgment interest. The Debtors have entered into an agreement with Humana that tolled the enforcement of the judgment until October 15, 2023.

- *Stafford v. Rite Aid Corp.*, 17-cv-01340-AJB-JLB (S.D. Cal.) (consolidated with *Josten v. Rite Aid Corp.* No. 18-cv-00152-TWR-AHG). Plaintiff brought a putative consumer class action against the Debtors, asserting that it was obligated to charge plaintiff's insurance companies its U&C prices for prescription drugs but failed to do so.

- *Cnty. Of Monmouth v. Rite Aid Corp. et al.*, 2:20-cv-02024-KSM (E.D. Pa.). In April 2020, the County of Monmouth and Diane Scavello commenced a putative class action against the Debtors, seeking to represent a class of third-party payers and insured Rite Aid customers who were allegedly overcharged for prescription drug purchases. Plaintiffs assert claims for fraud, negligent misrepresentation, unjust enrichment, and violation of twelve states' consumer

protection laws.  On March 31, 2023, the court denied the Debtors' motion to compel arbitration.

- *Blue Cross and Blue Shield of North Carolina v. Rite Aid Corp. et al.*, 20-cv-01731 (D. Minn.). The Debtors are defending two consolidated lawsuits filed by various Blue Cross/Blue Shield plans operating in eight states, alleging the Debtors improperly submitted various U&C overcharges to several pharmacy benefit managers.

- *WellCare Health Plans, Inc. v. Rite Aid Hdqtrs. Corp.*, 22-CA-000524 (Fla. 13th Cir. Ct.).  The Debtors are defending a lawsuit filed in January 2022 in Florida state court for breach of contract, fraud, and unjust enrichment related to U&C pricing.  The claims are raised by WellCare plans as well as Meridian, whose health plans and PBM WellCare acquired in 2020 and was assigned their interests.  WellCare alleges that the Debtors inflated its U&C prices by not using Rx Savings Program prices and thus overcharged members insured under primarily Medicare Advantage, Medicare Part D, and Medicaid plans.

(b)    **Drug Utilization and Code 1 Litigation.**

*U.S. ex rel. Schmuckley v. Rite Aid Corp.*, 2-12-CV-01699-KM-EFB (C.D. Cal.).  Plaintiff Loyd Schmuckley, as relator, brought a *qui tam* lawsuit against the Debtors, alleging that it failed to perform certain verification and documentation requirements for "Code 1" drugs between 2007 and 2014 as required under California's Medicaid program.  The State of California intervened in 2017, asserting False Claims Act claims, among others.  The parties have reached an agreement to settle this matter.  Under the settlement, among other provisions, the Company paid the California Department of Justice $2.0 million, and the California Department of Justice will file a general unsecured proof of claim for $58.0 million against Rite Aid's bankruptcy estate.  The settlement did not resolve Relator's claim for attorney fees and expenses.

On February 12, 2024, the law firm Waters, Kraus & Paul commenced an adversary proceeding (Case No. 24-01062-MBK) against Debtors Rite Aid Corporation, Rite Aid Hdqtrs. Corp., and Thrifty Payless, Inc. (together, the "Rite Aid Defendants") by filing a complaint (the "Schmuckley Complaint") seeking a determination from the Bankruptcy Court that certain fees and expenses incurred in connection with the commencement, pursuit, and settlement of the lawsuit captioned *United States, et al., ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation, et al.,* Case No. 2:12-CV-1699 (the "FCA Action"), filed with the United States District Court for the Eastern District of California, are not dischargeable in the Debtors' Chapter 11 Cases.  While the underlying claims asserted in the FCA Action were resolved through the California AG Agreement and are being addressed elsewhere in the Plan, the fees and expenses of Loyd F. Schmuckley, Jr., as Relator, and Waters, Kraus & Paul were expressly carved out for separate determination.  As of the date hereof, the Rite Aid Defendants' deadline to respond to the Schmuckley Complaint is April 15, 2024.

(c)    **Controlled Substances Litigation.**

The Debtors are currently a defendant in a number of lawsuits relating to alleged opioid abuse along the pharmaceutical supply chain, including manufacturers, wholesale distributors, and retail pharmacies. As of September 13, 2023, 1,658 opioid lawsuits have been filed against the Debtors; 1,509 of the lawsuits are pending in federal court (of which 1,472 lawsuits have been transferred to the multi-district litigation

noted below), and 149 lawsuits have been filed in state court. The Debtors have also asserted an insurance coverage action for costs that may be reimbursed for these opioid-related lawsuits.[32]

*In re Nat'l Prescription Opiate Litig.*, 17-MD-2804 (N.D. Ohio). Numerous counties, cities, municipalities, Native American tribes, hospitals, third-party payers, and others across the U.S. asserted opioid-related claims that include public nuisance and negligence theories of liability against the Debtors and various other defendants in the MDL. On June 1, 2022, the U.S. Judicial Panel on Multidistrict Litigation ordered that newly filed cases will no longer be transferred to the MDL. Cases against the Debtors that are not part of the MDL are pending in state and federal court and allege similar claims. The Debtors presently have no active MDL cases being prepared for trial at this time. At least 136 cases naming the Debtors are pending, and more than 100 other cases have a potential remand, although the court has only remanded one case where Rite Aid is a defendant. From time to time, some of these cases may be settled, dismissed or otherwise terminated, and additional such cases may be filed and the Debtors are exploring possible avenues for resolving some or all of its portfolio of opioids-related litigation, although no assurance can be given that the litigation will be resolved to the parties' mutual satisfaction, or that a resolution will not include a monetary payment, and that the payment will not be material.

*U.S. ex rel. White et al. v. Rite Aid Corp. et al.*, 21-cv-01239-CEF (N.D. Ohio). On October 2, 2019, three former Rite Aid pharmacy personnel filed a *qui tam* complaint against certain of the Debtors in the U.S. District Court for the Eastern District of Pennsylvania, which action was later transferred to the U.S. District Court for the Northern District of Ohio (the "N.D. Ohio District Court"). On March 13, 2023, the United States intervened in the action, naming Rite Aid Corporation and certain other Debtors as defendants. The United States has alleged violations of the federal False Claims Act and Controlled Substances Act relating to the dispensing of controlled substances, primarily opioids. In connection with the *White* litigation, the United States has asserted that any liabilities of the Debtors resulting from the Debtor defendants' alleged violations of the federal False Claims Act or the Controlled Substances Act would be a non-dischargeable debt under sections 727 or 1141, as applicable, of the Bankruptcy Code.

As described above, on March 11, 2024, the Debtors and the United States filed a joint status report in the N.D. Ohio District Court, indicating an agreement in principle resolving the United States' claims in the *White* action, subject to approval by authorizing officials within the DOJ and additional conditions, including acceptable documentation and the confirmation and effectiveness of a chapter 11 plan of reorganization for the Debtors. The Debtors continue to engage with the DOJ to finalize the terms of the settlement resolving the *White* action.

Further, as described above, the Debtors and the Settling States have reached an agreement in principle regarding the terms of the Controlled Substance Injunction and the resolution of the Settling States' claims against the Debtors. The Controlled Substance Injunction remains subject to final approval by the Debtors and the Settling States. The Debtors continue to engage with the Settling States to finalize the terms of the Controlled Substance Injunction.

---

[32]     In *Rite Aid Corp. et al. v. ACE Americans Ins. Co. et al.*, No. 339, 2020 (Del.), the Company has asserted insurance recovery and breach of contract claims against its insurance carrier, seeking the recovery of defense, settlement, and/or judgment costs that may be paid for opioid-related lawsuits including the MDL. Although the trial court determined that this insurer was obligated to reimburse the Company for its defense costs, the Delaware Supreme Court reversed the trial court's order and ruled that the insurer had no duty to defend the first MDL suits set for trial based on the specific allegations at issue in those cases. The matter has been remanded to the lower court for further proceedings.

(d)    **Securities Litigation.**

*In re Rite Aid Securities Litigation*, 2022-cv-04201 (E.D. Pa.).  Plaintiff brought a putative shareholder class action against the Debtors and certain executives, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, alleging misstatements and omissions concerning the growth of Elixir's PBM services businesses.  An amended complaint was filed July 31, 2023, and the Debtors filed their motion to dismiss on October 2, 2023.  Additionally, the Debtors have responded to a books and records request.

*Holland v. Rite Aid Corp. et al.*, 2023-cv-00589 (N.D. Ohio).  Plaintiff brought a putative shareholder class action against the Debtors and certain former and current executives, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, alleging misstatements and omissions concerning the Debtors' risk for regulatory action and litigation related to its controlled substances practices.  The matter has been transferred to the Eastern District of Pennsylvania.  An amended complaint was filed on September 8, 2023.  The Debtors received three books and records requests, which the Debtors are negotiating.

(e)    **Elixir Investigation and Related Claims.**

Debtors Rite Aid Corporation, Ex Options, and Ex Solutions, LLC, and their non-Debtor affiliate Elixir Insurance Company (collectively, the "Elixir Companies") are the subjects of an investigation by the DOJ concerning whether they have violated the federal False Claims Act, by knowingly submitting, or causing to be submitted, false claims to Medicare (the "Elixir Investigation").  In connection with the Elixir Investigation, in August 2022 and thereafter, the Elixir Companies received Civil Investigation Demands ("CIDs") from the DOJ, which remain pending.  The Elixir Companies continue to engage with DOJ regarding the CIDs and a possible resolution of the of the United States' claims arising from this investigation.

In connection with the Elixir Investigation, the United States asserts that any liabilities of the Debtors resulting from the Debtor defendants' alleged violations of the federal False Claims Act would be non-dischargeable debts under sections 727 or 1141, as applicable, of the Bankruptcy Code.

On March 26, 2024, the Debtors and the DOJ reached a settlement in principle resolving the Elixir Investigation, the CIDs, and the United States' potential claims arising therefrom, subject to final DOJ approval and confirmation and consummation of the Plan. The foregoing settlement in principle remains subject to approval by authorizing officials within the DOJ and additional conditions, including acceptable documentation of the settlement terms and the confirmation and effectiveness of a chapter 11 plan of reorganization for the Debtors. The Debtors continue to engage with the DOJ to finalize the terms of the settlement resolving the Elixir Investigation.

7.    **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors may experience increased levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

8.      **The Debtors May Not Be Able to Accurately Report Their Financial Results.**

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

9.      **Inflation Could Adversely Impact the Debtors' Financial Condition and Results of Operations.**

Inflation in the United States began to rise significantly in the second half of the calendar year of 2021 and continued to rise through the middle of 2022; the inflation rate remains relatively high.  This is primarily believed to be the result of the economic impacts from the COVID-19 pandemic, including the global supply chain disruptions, strong economic recovery and associated widespread demand for goods, and government stimulus packages, among other factors.  For instance, global supply chain disruptions have resulted in shortages in materials and services.  Such shortages have resulted in inflationary cost increases for labor, materials, and services, and could continue to cause costs to increase as well as scarcity of certain products.  The Debtors are experiencing inflationary pressures in many areas of their businesses, including with respect to employee wages and the cost of prescription drugs, although, to date, they have been able to slightly offset such pressures through price increases and other measures.  The Debtors cannot, however, predict any future trends in the rate of inflation or associated increases in their operating costs and how that may impact their business.  To the extent the Debtors are unable to recover higher operating costs resulting from inflation or otherwise mitigate the impact of such costs on their business, gross margins could decrease, and their financial condition and results of operations could be adversely affected.  Acts by the U.S. Federal Reserve, or other governmental entities, intended to address inflation may also have a negative impact on the Debtors, such as increased borrowing costs.

10.     **Failure or Significant Disruption to the Debtors' Information Technology Systems / Infrastructure or a Cyber-Security Breach Could Adversely Affect the Debtors' Operations.**

Technology and computer systems are critical to many aspects of the Debtors' pharmacy business, including, but not limited to, the drug supply chain, the Debtors' dispensing of drugs, and the Debtors' reimbursement.  For instance, the Debtors have historically relied extensively on computer systems used by Rite Aid, Elixir Insurance, Bartell, and Health Dialog, to manage the Debtors' ordering, pricing, point-of-sale, inventory replenishment, and other processes.  The Debtors' computer systems are at risk for failures, security breaches, and natural disasters, and they have been subject to attack by perpetrators of random or targeted malicious technology-related events, such as cyberattacks, ransomware, computer malware, worms, bot attacks, or other destructive or disruptive software and attempts to misappropriate customer information, including credit card information.  These sorts of attacks could subject the Debtors' systems to damage or interruption from power outages, computer and telecommunications failures, computer malware, cyber-security breaches, vandalism, coordinated cyber-security attacks, severe weather conditions, catastrophic events, and human error.  The Debtors' disaster recovery planning considers many

134

possible scenarios but cannot account for all eventualities.  Collectively, the Debtors are building a security-aware culture across the organization by providing role-based security training, developing security champions across technology and business areas, and partnering with industry experts.  The Debtors' information security program is designed to protect confidential information, networks, and systems against attacks through a multi-layered approach to address information security threats and vulnerabilities.  However, a compromise of the Debtors' information security controls or of those businesses with whom the Debtors interact, which results in confidential information being accessed, obtained, damaged, or used by unauthorized or improper persons, could harm the Debtors' reputation and expose them to regulatory actions and claims from customers and clients, financial institutions, payment card associations, and other persons, any of which could adversely affect the Debtors' business, financial position and results of operations.  Moreover, a data security breach could require that the Debtors expend significant resources related to the Debtors' information systems and infrastructure and could distract management and other key personnel from performing their primary operational duties.  The Debtors could also be adversely impacted by any significant disruptions in, or security breaches of, the systems and technology of third-party suppliers, or processors the Debtors interact with, including key payors and vendors with whom the Debtors share information.  If the Debtors' systems are damaged, fail to function properly, or otherwise become unavailable, the Debtors may incur substantial costs to repair or replace them, and may experience loss of critical data and interruptions or delays in the Debtors' ability to perform critical functions, which could adversely affect the Debtors' business and results of operations.  Any compromise or breach of the Debtors' data security, whether external or internal, or misuse of customer, associate, supplier, or the Debtors' data could also result in a violation of applicable privacy, information security, and other laws, significant legal and financial exposure, fines or lawsuits, damage to the Debtors' reputation, loss or misuse of the information, and a loss of confidence in the Debtors' security measures, which could harm the Debtors' business.  Although the Debtors maintain cyber-security insurance, they cannot know that the coverage limits under the Debtors' insurance program will be adequate to protect them against future claims.

To effectively compete with the Debtors' competitors and continue business partner relations, the Debtors must and are investing in and updating their technology and computer systems.  In addition, as the regulatory environment related to information security, data collection and use, and privacy becomes increasingly rigorous, with new and constantly changing requirements applicable to the Debtors' business, compliance with those requirements could also result in additional costs.  While the Debtors seek to ensure that their security operations are current and that their technology can properly interface with the Debtors' business partners, there are risks that the Debtors' technology investments will not be successful, will not provide a return on investment, and/or may fail or never be deployed.  Oftentimes, the Debtors are implementing multiple updates or technology changes at the same time.  The Debtors are currently in the process of changing their omni-channel distribution, and there can be no assurance that the Debtors will be able to implement this technology on its intended timeline or that it will achieve its intended benefits.

11.    **Any Failure to Protect the Security of Personal Information About the Debtors' Customers and Associates, Could Result in Significant Business Liability and Reputational Harm.**

In the ordinary course of business, the Debtors collect, process and store certain personal information that the Debtors' customers provide to purchase products or services, enroll in promotional programs, register on the Debtors' the website, or otherwise communicate and interact with us, including in connection with the Debtors' administration of COVID-19 vaccines.  The Debtors may collect, maintain, and store information about the Debtors' associates in the normal course of business and contract with third-party business associates and vendors to accomplish these tasks.  The Debtors may share information about such persons with vendors that assist with certain aspects of their business.  Despite instituted safeguards for the protection of such information, security could be compromised, and confidential customer or business information misappropriated, for which the Debtors have paid related penalties in the past.  Data

135

breaches or violations of data protection laws may result in liability for the Company, even if caused, in whole or in part, by a business associate, vendor, or other third-party. The unlawful handling or disclosure of sensitive personal information could also pose a serious risk to the Debtors' customers' trust in the Company, including the unlawful handling or disclosure due to security breaches of the systems and technology of third-party suppliers or processors that the Debtors interact with, including key payors and vendors with whom they share information including PHI, PII, and personal credit card information. The Debtors are constantly working to enhance their defenses against Ransomware attacks, but there is always a risk of controls being defeated which could result in loss of customer or business information that could disrupt the Debtors' operations, damage their reputation, and expose them to claims from customers, financial institutions, payment card companies and other persons, or result in governmental investigation and enforcement, sanctions, fines, and/or penalties, any of which could have an adverse effect on the Debtors' business, financial condition, and results of operations. Compliance with more rigorous privacy and information security laws and standards, including, without limitation, the 2010 FTC Consent Order to which the Debtors are subject regarding the protection of personal information, may result in significant expense due to increased investment in technology, the ongoing development and implementation of new operational and control processes, and other security protocols or efforts. The Debtors' brand, reputation, and customer loyalty may be negatively impacted, and they may become subject to enforcement actions, fines, penalties, and additional obligations under new or extended consent orders, in the event of any personal information-related privacy or security issues or the breach or violation of the FTC Consent Order. The occurrence or scope of any future data privacy or security failures are unpredictable, and it may prove difficult or impossible to fully mitigate or remediate their negative consequences. If the Debtors fail to comply or are alleged to have failed to comply with applicable data protection and privacy and security laws and regulations, they could be subject to government regulatory investigations and enforcement actions, as well as private individual or class action lawsuits.

### 12. New and Emerging Payment Models for Health Care Services Reimbursement May Hinder the Debtors' Retail Pharmacies' Ability to Compete and Negatively Impact the Debtors' Revenue.

Government and commercial payors are increasingly exploring alternatives to fee-for-service payment models. Such alternatives include risk sharing, value-based payment and bundled payment systems for health care services. The Debtors' retail pharmacies do not operate as part of integrated health care delivery models and, unlike some of the Debtors' competitors, they have not invested in health care delivery models which integrate different health care services, such as pharmacy and primary care services. Additionally, the Debtors' retail pharmacies are not active participants in any risk assumption payment models. Moreover, it is operationally difficult to apply value-based payment to prescription drug benefit services. To the extent that payors increasingly embrace these new payment delivery models and systems, and the Debtors' retail competitors are able to adapt to such changes, the Debtors' retail pharmacies risk being excluded from such networks and the corresponding loss of reimbursement. Even though the COVID-19 pandemic and resulting government waivers have allowed pharmacists to embrace an expanded scope of services, the end of the COVID-19 pandemic could result in a rollback of those waivers, and the Debtors' pharmacists may no longer be authorized to offer such services as part of the various novel delivery and payment models.

### 13. A Change in the Debtors' Pharmacy and Payor Mix Could Adversely Affect the Debtors' Profit Margins.

The Debtors' Retail Pharmacy Segment is subject to changes in pharmacy and payor mix, including shifts in pharmacy prescription volume toward programs offering less favorable reimbursement terms, which could adversely affect the results of the Debtors' operations. For instance, the Debtors anticipate that a growing number of prescription drug sales will involve government subsidized drug benefit programs,

90-day fill programs, and specialty drug sales, under which the Debtors' business may receive lower margins. As the Debtors' government-funded businesses grow, their exposure to changes in law and policy under those programs will increase. Also, the government could reduce funding for health care or other programs or cancel, decline to renew, or modify the Debtors' contracts, which could adversely impact their business, operating results, and cash flows. Moreover, many Medicare Part D plans and commercial payors are adopting preferred pharmacy networks, in which participating pharmacies must accept lower reimbursement in exchange for access to the payors' patient population. The Debtors could incur negative financial impacts should the terms and conditions of such preferred networks become less favorable or if the Debtors are unable to offset lower reimbursement with additional prescription volume, other business, or improved efficiencies. The Debtors could also be negatively impacted by changes in the relative distribution of drugs dispensed at the Debtors' pharmacies between brands and generics or if the Debtors experience an increase in the amounts they pay to procure pharmaceutical products.

14.    **A Substantial Portion of the Debtors' Pharmacy Revenue is Currently Generated From a Limited Number of Third-Party Payors, and, if There is a Loss of, or Significant Change to Prescription Drug Reimbursement Rates by, a Major Third-Party Payor, the Debtors' Revenue Will Decrease and the Debtors' Business and Prospects Could be Adversely Impacted.**

A substantial portion of the Debtors' pharmacy revenue is currently generated from a limited number of third-party payors. While the Debtors are not limited in the number of third-party payors with which they can do business and results may vary over time, the Debtors' top five third-party payors accounted for 83.4%, 77.4%, and 77.9% of their pharmacy revenue during fiscal 2023, 2022, and 2021, respectively. The largest third-party payor, CVS/Caremark, represented 33.4%, 32.1%, and 30.4% of pharmacy sales during fiscal 2023, 2022, and 2021, respectively. The Debtors expect that a limited number of third-party payors will continue to account for a significant percentage of their pharmacy revenue, and the loss of all or a portion of, or a significant change to customer access or prescription drug reimbursement rates by, a major third-party payor could decrease the Debtors' revenue and harm their business. Revenue could further be impacted through changes in third-party payor behavior responding to the implementation of CMS' final rule on the assessment of pharmacy price concessions, specifically through the Part D bid process and subsequent contracts.

In 2020, CMS adopted the Transparency in Coverage Final Rule, which requires non-grandfathered group health plans and health insurance issuers offering non-grandfathered coverage in the group and individual markets to disclose on a public website certain price information, including negotiated rates and historical net prices for covered prescription drugs. Enforcement began on July 1, 2022. CMS' enforcement of the rule could inhibit the ability of pharmacy stakeholders, including the Debtors' PBM and retail pharmacy business segments, respectively, from negotiating favorable reimbursement contracts for the Debtors' Company.

15.    **Certain Risks are Inherent in Providing Pharmacy Services; the Debtors' Insurance May Not be Adequate to Cover Any Claims Against Them.**

Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs, and expiration of drugs. In addition, federal and state laws that require the Debtors' pharmacists to offer counseling, without additional charge, to customers about medication, dosage, delivery systems, common side effects, and other information the pharmacists deem significant can impact the Debtors' business. The Debtors' pharmacists may also have a duty to warn customers regarding any potential negative effects of a prescription drug if the warning could reduce or negate these effects. Although the Debtors maintain professional liability and errors and

omissions liability insurance, from time to time, claims result in the payment of significant amounts, some portions of which are not funded by insurance.  The Debtors cannot assure you that the coverage limits under their insurance programs will be adequate to protect them against future claims, or that the Debtors will be able to maintain this insurance on acceptable terms in the future.  The Debtors' results of operations, financial condition, or cash flows may be adversely affected if in the future their insurance coverage proves to be inadequate, unavailable, there is an increase in liability for which the Debtors self-insure, or they suffer reputational harm as a result of an error or omission.

### 16.      Trading in Common Stock During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks

All of the indebtedness is senior to the existing common stock in the Debtors' capital structure. The Plan contemplates that the Debtors' existing equity interests will be cancelled and discharged in connection with the Chapter 11 Cases and the holders of those equity interests, including the holders of common stock, will be entitled to no recovery.  Accordingly, any trading in common stock during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks to purchasers of common stock.

### E.      Risks Related to the Offer and Issuance of Securities Under the Plan.

### 1.      A Liquid Trading Market for the New Common Stock May Not Develop.

Following emergence from chapter 11, New Rite Aid will not be a publicly traded company.  As the New Common Stock are not expected to be listed on a securities exchange following emergence from chapter 11, it is unlikely that there will be a liquid trading market for the New Common Stock.  To the extent there is a trading market for the New Common Stock, the liquidity of any market for New Common Stock will depend upon, among other things, the number of holders of shares of the New Common Stock, the Debtors' financial performance and prospects, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell the New Common Stock may be substantially limited.

As it is not expected that any of the New Common Stock will be listed on a securities exchange, the Reorganized Debtors do not expect to be subject to the reporting requirements of the Securities Act, and Holders of the New Common Stock will not be entitled to any information except as expressly required by the applicable governance documents.  As a result, the information which the Debtors are required to provide the holders of New Common Stock on an ongoing basis is expected to be less than the Debtors would be required to provide if the New Common Stock were registered under the Exchange Act or listed on a national securities exchange.  This lack of information could impair your ability to evaluate your ownership and impair the marketability of the New Common Stock.

### 2.      The Trading Price for the New Common Stock May Be Depressed Following the Effective Date.

Holders of Claims that receive the New Common Stock may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Common Stock available for trading could cause the trading price for the New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

3.     **Certain Holders of the New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Interests.**

Pursuant to section 1145(a)(1) of the Bankruptcy Code, 1145 Securities issued under the Plan may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by Holders of Claims or Interests (as applicable) who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock are not expected to be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell the New Common Stock.  *See* Article XII to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 147.

4.     **Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies.**

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and may be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. In order to resell securities under Rule 144, both non-affiliates and affiliates will need to meet the holding period requirements specified by Rule 144. In addition, in order to resell securities under Rule 144, an affiliate must comply with the volume, manner of sale, and notice requirements of Rule 144.

Holders of New Common Stock who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article XII to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 147.

5.     **Restrictions May Be Placed on the New Common Stock Following the Effective Date.**

If as of the Effective Date the Debtors expect to qualify for the 382(l)(5) Exception (as defined herein) and not elect out of its application, the certificate of incorporation of New Rite Aid, with the consent of the Required AHG Noteholders, may include certain restrictions and information procedures with respect to transfers with respect to the New Rite Aid Common Stock to minimize the likelihood of a subsequent "ownership change" and thus protect the value of its available tax attributes. For further information on the potential restrictions and procedures, *see* Article XIII to this Disclosure Statement, entitled "Special Bankruptcy Exceptions."

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.    Holders of Claims or Interests Entitled to Vote on the Plan.

Only Holders of Claims in Class 5 (the "Voting Class") are entitled to vote to accept or reject the Plan.  The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.  The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 4, 6, 7, 8, 9, or 10.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND SOLICITATION PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### B.    Voting Record Date.

**The Voting Record Date is February 20, 2024** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.  For the avoidance of doubt, a holder will only be entitled to receive a Solicitation Package based on a claim arising from a rejected executory contract or unexpired lease if such claim is filed by the Voting Record Date.

### C.    Voting on the Plan.

**The Voting Deadline is April 15, 2024, at 4:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered as directed, so that your Ballot, pre-validated beneficial holder Ballot or the master Ballot containing your vote is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline.  Ballots or master Ballots returned by facsimile will not be counted.  Additionally, certain Holders of Class 5 Claims may need to abide by certain voting procedures, as discussed further in this section.

> **DELIVERY OF BALLOTS.  PLEASE SELECT JUST ONE OPTION TO SUBMIT YOUR VOTE:**
>
> **FOR CLASS 5 NOMINEES AND CLASS 5 BENEFICIAL HOLDERS OF THE SENIOR SECURED NOTES THAT RECEIVED A PRE-VALIDATED BALLOT AND A RETURN ENVELOPE ADDRESSED TO THE SOLICITATION AGENT:**
>
> **VIA E-MAIL (PREFERRED METHOD):  RETURN A PROPERLY EXECUTED MASTER OR PRE-VALIDATED BALLOT WITH YOUR VOTE TO RITEAIDBALLOTS@RA.KROLL.COM (PLEASE REFERENCE "RITE AID MASTER BALLOT" OR "RITE AID PRE-VALIDATED BALLOT" IN THE SUBJECT LINE, AS APPLICABLE)**

**VIA MAIL OR OVERNIGHT COURIER:  YOU MAY SUBMIT YOUR MASTER BALLOT OR YOUR PRE-VALIDATED BALLOT (AS APPLICABLE) BY THE POSTAGE PREPAID RETURN ENVELOPE PROVIDED OR BY FIRST CLASS MAIL, OR OVERNIGHT COURIER:**

**RITE AID CORPORATION BALLOTS PROCESSING CENTER
C/O KROLL RESTRUCTURING ADMINISTRATION LLC
850 THIRD AVENUE, SUITE 412
BROOKLYN, NY 11232**

**IF YOU WOULD LIKE TO COORDINATE HAND DELIVERY OF YOUR MASTER BALLOT OR PRE-VALIDATED BALLOT (AS APPLICABLE), PLEASE EMAIL RITEAIDBALLOTS@RA.KROLL.COM AND PROVIDE THE ANTICIPATED DATE AND TIME OF YOUR DELIVERY.**

**FOR CLASS 5 BENEFICIAL HOLDERS THAT RECEIVED A RETURN ENVELOPE ADDRESSED TO THEIR NOMINEE:**

**PLEASE RETURN YOUR BALLOT TO YOUR NOMINEE, ALLOWING ENOUGH TIME FOR YOUR NOMINEE TO CAST YOUR VOTE ON A MASTER BALLOT BEFORE THE VOTING DEADLINE.  CLASS 5 BENEFICIAL HOLDERS SHOULD VOTE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY THEIR NOMINEE.**

**BALLOTS WILL NOT BE ACCEPTED BY TELECOPY, FACSIMILE, EMAIL, OR OTHER ELECTRONIC MEANS OF TRANSMISSION.**

**PLEASE RETURN A PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT 844-274-2766 (US/CANADA, TOLL FREE) OR +1 646-440-4878 (INTERNATIONAL, TOLL).  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED EXCEPT AS OTHERWISE PROVIDED FOR IN THE SOLICITATION PROCEDURES OR IN THE SOLE AND ABSOLUTE DISCRETION OF THE DEBTOR.**

1.      **Voting Procedures for Certain Holders of Notes in Class 5.**

Certain voting parties hold their Claims in "street name" through a bank, broker, dealer, trustee, or other intermediary (each, a "<u>Nominee</u>"), including Holders of certain Senior Secured Notes Claims (the "<u>Beneficial Holder(s)</u>").  Such Beneficial Holders may vote on the Plan by one of the following two methods (as selected by such Beneficial Holder's Nominee):

- Complete and sign the enclosed Beneficial Holder Ballot (or submit your vote in such other manner as your Nominee may instruct).  Return the Beneficial Holder Ballot to your Nominee as promptly as possible according to your Nominee's instructions and in sufficient time to allow your Nominee to include your vote on a master Ballot and return such completed master Ballot to the Claims and Noticing Agent so that it is actually received by the Claims and Noticing Agent by the Voting Deadline.  If no self-addressed, postage-paid envelope was enclosed for this purpose, contact your Nominee for instructions; or

- Complete and sign the pre-validated Beneficial Holder Ballot (as described below) provided to you by your Nominee. Return the pre-validated Beneficial Holder Ballot to the Claims and Noticing Agent according to delivery instructions provided by your Nominee or as provided above by the Voting Deadline.

Any vote returned to a Nominee will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Claims and Noticing Agent a master Ballot casting the vote of such Beneficial Holder.

If any Beneficial Holder holds Senior Secured Notes Claims through more than one Nominee, such Beneficial Holder may receive multiple mailings containing Beneficial Holder Ballots. The Beneficial Holder should execute a separate Beneficial Holder Ballot for each block of certain Senior Secured Notes Claims that it holds through any particular Nominee and return each Beneficial Holder Ballot to the respective Nominee in the return envelope provided therewith. Beneficial Holders who execute multiple Beneficial Holder Ballots with respect to certain Senior Secured Notes Claims held through more than one Nominee must indicate on each Beneficial Holder Ballot the names of all such other Nominees and the additional amounts of such Senior Secured Notes Claims so held and voted.

A Nominee that, on the Voting Record Date, is the record Holder of certain Senior Secured Notes Claims for one or more Beneficial Holders is authorized to distribute the Beneficial Holder Ballot and solicitation materials and information to, and collect votes from, its Beneficial Holder clients, as appropriate, in accordance with its customary practices, including the use of a voter information form ("VIF") in lieu of, or in addition to, a Beneficial Holder Ballot, electronic mail, telephone, and electronic website link (for access to solicitation materials and/or submission of Plan votes).

**D.    Ballots Not Counted.**

The following Ballots will not be counted toward Confirmation: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) it was transmitted by means other than as specifically set forth in the Ballots, (iii) any Ballot cast by any party that does not hold a Claim in a Voting Class; (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims and Noticing Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described in the Disclosure Statement Order and the Solicitation Procedures attached thereto. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**E.    Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

F.      **Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Class or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Class pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to the "Risk Factors" section in Article IX of this Disclosure Statement.

G.      **Solicitation Procedures.**

1.      **Claims and Noticing Agent.**

Pursuant to the Bankruptcy Court's Order approving the Kroll Retention Application, the Debtors have retained Kroll to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

2.      **Solicitation Package.**

The following materials constitute the solicitation package that will be distributed to Holders of Claims in the Voting Class (collectively, the "Solicitation Package"):  (a) the Solicitation Procedures; (b) the applicable forms of Ballots, together with detailed voting instructions and instructions on how to submit the Ballots; (c) the Cover Letter, which describes the contents of the Solicitation Package and urges Holders of Claims in the Voting Class to vote to accept the Plan; (d) the Combined Hearing Notice; (e) the Disclosure Statement (and the exhibits thereto, including the Plan); (f) the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures); (g) a pre-addressed, postage pre-paid reply envelope; and (h) any additional documents that the Bankruptcy Court has ordered to be made available to Holders of Claims in the Voting Class.

The Solicitation Package shall provide the Disclosure Statement (with all exhibits thereto, including the Plan), the Disclosure Statement Order (without exhibits) and the Solicitation Procedures in electronic format, flash drive or CD-ROM, and all other contents of the Solicitation Package, including the Cover Letter, Combined Hearing Notice, and Ballots, shall be provided in paper format.  In the case of Beneficial

Holders of the Senior Secured Notes Claims in Class 5, the Solicitation Packages shall be served in accordance with the customary procedures of the bank or brokerage firm (or that firm's agent) (each, a "Nominee") holding the securities in "street name" for its Beneficial Holder clients. Any Voting Holder, excluding Beneficial Holders of the Senior Secured Notes Claims in Class 5, who has not received a Solicitation Package should contact the Solicitation Agent. Any Beneficial Holder of the Senior Secured Notes Claims in Class 5 who has not received a Solicitation Package should contact their Nominee for further assistance.

3.    **Distribution of the Solicitation Package and Plan Supplement.**

The Debtors are causing the Claims and Noticing Agent to distribute the Solicitation Package to Holders of Claims in the Voting Class on April 1, 2024 (the "Solicitation Mailing Deadline"), or, to the extent such distribution is not made by the Solicitation Mailing Deadline, immediately thereafter; *provided* that the Debtors shall distribute the Combined Hearing Notice no later than two (2) business days following the Solicitation Mailing Deadline, as provided in the Disclosure Statement Order.

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by: (a) calling 844-274-2766 (US/Canada, toll-free) or +1 646-440-4878 (international, toll), (b) emailing RiteAidInfo@ra.kroll.com (with "Rite Aid Solicitation" in the subject line) and/or (c) writing to the Claims and Noticing Agent at Rite Aid Corporation Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, New York 11232. You may also obtain copies of the solicitation materials and any pleadings filed with the Bankruptcy Court, free of charge, by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/riteaid, or for a fee on the Bankruptcy Court's website at https://www.njb.uscourts.gov, the required password for which can be gotten via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than 7 days before the Voting Deadline (*i.e.*, April 8, 2024). If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

## XI.    CONFIRMATION OF THE PLAN

### A.    The Combined Hearing.

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Combined Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

## B.      Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

## C.      Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7 on such date.

The Liquidation Analysis (the "Liquidation Analysis") has been prepared by the Debtors' financial and restructuring advisors, Alvarez & Marsal, and Kirkland & Ellis LLP and is attached hereto as **Exhibit D** and incorporated herein by reference.  Based upon the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## D.      Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their restructuring advisors, Alvarez & Marsal, and Kirkland & Ellis LLP have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that Reorganized Debtors will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

E.     **Acceptance by Impaired Classes.**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[33]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

F.     **Confirmation Without Acceptance by the Voting Class.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

Although certain Impaired Classes are conclusively deemed to reject the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. The Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

---

[33]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### 1. No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### G. Valuation.

At the time of filing this Disclosure Statement, the Debtors continue to engage with multiple parties with respect to potential Other Asset Sales and/or the Sale Transaction Restructuring as a supplement or alternative to the Plan Restructuring, respectively. Because the Debtors do not want to prejudice this competitive sale process by disclosing expected recoveries for Holders of Allowed Senior Secured Notes Claims or Allowed General Unsecured Claims, this Disclosure Statement does not include a valuation analysis. *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. June 9, 2023) (ECF No. 378) (order approving disclosure statement without a valuation analysis); *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (same); *In re Z Gallerie, LLC.*, No. 19-10488 (LSS) (Bankr. D. Del. May 2, 2019) (ECF No. 259) (same); *In re PES Holdings, LLC.*, No. 19-11626 (KG) (Bankr. D. Del. Dec. 11, 2019) (ECF No. 259) (same). In the event the Debtors proceed to consummate the Plan Restructuring, the Debtors intend to file a valuation analysis with respect to the Plan Restructuring in advance of the Combined Hearing, to the extent necessary to obtain confirmation of the Plan.

## XII. CERTAIN SECURITIES LAW MATTERS

### A. New Common Stock.

As discussed herein, in the event the Restructuring Transaction is a Plan Restructuring, the Plan provides for the offer, issuance, sale, and distribution of New Common Stock to certain Holders of prepetition Claims against the Debtors. The Debtors believe that the shares of New Common Stock will be

"securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities laws.

The issuance of the New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) after the Petition Date pursuant to the restructuring transactions under the Plan is, and subsequent transfers of such New Common Stock by the holders thereof that are not "underwriters" (which definition includes "Controlling Persons") will be, exempt from federal and state securities registration requirements under the Bankruptcy Code, Securities Act and any applicable state securities laws as described in more detail below, except in limited circumstances.

In addition, any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, and will also be considered "restricted securities." Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that under certain conditions the offering, issuance, and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

The following discussion of the issuance and transferability of the New Common Stock relates solely to matters arising under federal securities laws and state securities laws. The rights of holders of New Common Stock, including the right to transfer such interests, will also be subject to any restrictions in the New Corporate Governance Documents to the extent applicable. Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.

**B.** **Exemption from Registration Requirements; Issuance of 1145 Securities under the Plan.**

The 1145 Securities will be issued after the Petition Date without registration under the Securities Act, state securities laws, or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code provides, among other things, that section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of issuance of a security do not apply to the offering, issuance, distribution or sale of stock, options, warrants, or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property. The Debtors believe that the 1145 Securities issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The Private Placement Securities will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of the New Common Stock. Recipients of

the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

Each certificate representing, or issued in exchange for or upon the transfer, sale, or assignment of, the Private Placement Securities or book entry position shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

**"THE SECURITIES [REPRESENTED BY THIS CERTIFICATE] WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND SUCH SECURITIES [AND THE COMMON STOCK, IF ANY, ISSUABLE UPON EXERCISE OF SUCH SECURITIES] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

New Rite Aid reserves the right to reasonably require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the Private Placement Securities. New Rite Aid also reserve the right to stop the transfer of any Private Placement Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive Private Placement Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any Private Placement Securities except in accordance with an exemption from registration, including under Rule 144 of the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the Private Placement Securities will be subject to the other restrictions described above.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

### C. Resales of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.

#### 1. Resales of New Common Stock Issued Pursuant to Section 1145.

The 1145 Securities to the extent offered, issued, and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States and under any state or local law requiring registration for offer or sale of a security by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of the New Common Stock.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest;

(2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter, although the staff of the SEC has not endorsed this view.

Resales of the 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such 1145 Securities who are deemed to be "underwriters" may be entitled to resell their 1145 Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of control securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the 1145 Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Stock and, in turn, whether any Person may freely trade such New Common Stock.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE POST-EFFECTIVE DATE DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF 1145 SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

2.    **Resales of New Common Stock Issued Pursuant to Section 4(a)(2) of the
Securities Act, Regulation D Promulgated Thereunder, Regulation S under
the Securities Act, and/or Other Available Exemptions from Registration.**

To the extent the exemption set forth section 1145(a) of the Bankruptcy Code is unavailable, New Common Stock will be offered, issued, and distributed in reliance of Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration. The Private Placement Securities will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable Blue-Sky Laws.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is subject to the reporting requirements of Section 13 or 15(d) under the Exchange Act and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Common Stock offered, issued, and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for an issuer that is subject to the reporting requirements of Section 13 or 15(d) under the Exchange Act), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act. The Reorganized Debtors do not expect to be subject to the reporting requirements of Section 13 or 15(d) under the Exchange Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Common Stock are exempt from the registration requirements of section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Common Stock will also be subject to any applicable transfer restrictions contained in the New Corporate Governance Documents.

D.     **Liquidating Trust Interests and GUC Equity Trust Interests.**

The Debtors believe that either (i) the interests in the Liquidating Trust or the GUC Equity Trust Interests shall not be deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, or the provision of section 1145 of the Bankruptcy Code will apply to such interests (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) or (ii) that the issuance of such interests shall be exempt from registration under Section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act, regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW COMMON STOCK MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

**XIII.   CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN**

A.     **Introduction.**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Allowed Senior Secured Notes Claims and General Unsecured Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those summarized herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to Holders of Allowed Senior Secured Notes Claims and General Unsecured Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Holders of Claims whose functional currency is not the U.S. dollar, Holders of Claims who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). Moreover, this summary does not address any aspect of U.S. non-income (including state or gift), state, local, or non-U.S. taxation, considerations under any applicable tax treaty or any tax arising under section 1411 of the IRC (the "Medicare" tax on certain investment income). Furthermore, this summary assumes that a Holder of an Allowed Claim holds only Claims in a single class and holds such Claims and New Common Stock, as applicable, as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors and the Post-Effective Date Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This discussion also assumes that none of the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes and that each of the Allowed Claims are denominated in U.S. dollars. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than as a Holder of a Claim, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of an Allowed Senior Secured Notes Claim and/or a General Unsecured Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of an Allowed Senior Secured Notes Claim or a General Unsecured Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of an Allowed Senior Secured Notes Claim or a General Unsecured Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Allowed Senior Secured Notes Claim and/or a General Unsecured Claims are

urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE PLAN, AS WELL AS THE CONSEQUENCES TO THEM OF THE PLAN ARISING UNDER ANY OTHER U.S. FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL, OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TREATY.**

    **B.**     **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

    **1.**     **Characterization of the Restructuring Transactions.**

The Debtors expect that the Restructuring Transactions will be structured in one of three ways: (a) a recapitalization of the existing Debtors under their current corporate structure (in the event of a Plan Restructuring), (b) a disposition of assets and liabilities of the Debtors to a newly-formed entity in a transaction intended to be tax-free reorganization pursuant to sections 368(a)(1)(G) and 354 of the IRC (in the event of a Credit Bid Transaction) or (c) potentially in conjunction with either of the aforementioned structures, a sale of some, all, or substantially all of the Debtors' assets in one or more taxable sales (in the event of one or more Alternative Sale Transactions). The Plan will implement the Plan Restructuring unless the Debtors pivot or "toggle" to a Sale Transaction Restructuring determined to provide superior value relative to the Plan Restructuring.

The Debtors generally do not expect to recognize any gain or loss as a result of consummating a Plan Restructuring or Credit Bid Transaction, other than with respect to any Alternative Sale Transactions that occur in conjunction therewith. Note, however, there can be no guarantee that a transaction structured as a Credit Bid Transaction will qualify as a tax-free reorganization pursuant to sections 368(a)(1)(G) and 354 of the IRC, in which case, it would be expected that the Credit Bid Transaction would be treated similar to an Alternative Sale Transaction for U.S. federal income tax purposes. In an Alternative Sale Transaction, the Debtors will generally realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets sold. Any such gain generally will be reduced by the amount of tax attributes available for use by the Debtors, and any remaining gain will be recognized by the Debtors and result in a cash tax obligation. In all three scenarios, the Debtors will be subject to the rules discussed below with respect to cancellation of indebtedness income ("COD Income"). In both the Plan Restructuring and the Credit Bid Transaction Scenario, the Reorganized Debtors will be subject to the limitations on net operating losses ("NOLs"), deferred interest deductions under section 163(j) of the IRC ("163(j) Deductions") and other tax attributes discussed below.

If the Restructuring Transactions are structured as a Plan Restructuring or Credit Bid Transaction, the New Common Stock may be (or include) stock or other equity interests of a newly-created entity (including the parent of the Reorganized Debtors and/or a newly formed entity treated as a successor to Rite Aid under the applicable reorganization provisions of the IRC), and the Reorganized Debtors would receive all or a portion of the Debtors' assets.

### 2.      Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the fair market value of the New Common Stock and/or Cash and any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  163(j) Deductions are not subject to reduction under these rules.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Pursuant thereto, the tax attributes of each debtor member of an affiliated group of corporations that is excluding COD Income are first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

The aggregate tax basis of the Debtors in their assets (determined on an entity-by-entity basis, and in the case of an affiliated group of corporations, subject to the look-through rule described above) is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the Debtors will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor").  Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

In the event of a structure with only one or more Alternative Sale Transactions (or if the Credit Bid Transaction is not respected as a tax-free reorganization), COD Income would reduce the Debtors remaining NOLs but would not affect the tax basis of the assets acquired by the Reorganized Debtors or other buyer in a taxable purchase.  In an Alternative Sale Transaction or if the Credit Bid Transaction was treated as a taxable asset sale, the Reorganized Debtors or buyer would not succeed to any of the Debtors tax attributes and should take tax basis in any acquired assets equal their fair market value as of the Effective Date or the closing date of such sale.  As noted above, in connection with the Restructuring Transactions structured as a Plan Restructuring or Credit Bid Transaction, the Debtors expect to realize COD Income, all of which would likely be applied to reduce NOLs generated by the Consolidated Group.  The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the fair market value of the New Common Stock and any other consideration, none of which can be determined until after the Plan is consummated.

(a)    **General Section 382 Annual Limitation.**

After giving effect to the reduction in tax attributes from excluded COD Income (if any), to the extent the Reorganized Debtors succeed to the Debtors' tax attributes (i.e., if the Restructuring Transactions are not structured only as one or more Alternative Sale Transactions pursuant to which the Debtors' assets, and not stock of corporate entities, are being transferred to the Reorganized Debtors for U.S. federal income tax purposes), the Reorganized Debtors' ability to use any remaining tax attributes ("Pre-Change Losses") post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the ownership change occurs, or 3.44 percent for March 2024). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains). As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

(b)    **Special Bankruptcy Exceptions.**

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). A key aspect of the "qualified creditor" analysis is the length of time that creditors have held their claims, together with a favorable presumption regarding that holding period that applies to creditors who receive less than five percent of the stock of a reorganized company (the "Qualified Creditor Presumption"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis but, instead, NOL carryforwards and 163(j) Deductions would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately

156

before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards and 163(j) Deductions by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation would be determined under the regular rules for ownership changes.

Whether the section 382 rules will apply and whether the 382(l)(5) Exception is relevant will depend on the manner in which the Plan is implemented.  In the case of a Plan Restructuring or Credit Bid Transaction, however, the Debtors believe that the 382(l)(5) Exception may be available based on currently available information and that such exception may provide significant cash tax savings by allowing increased usage of their NOLs.

In light of the substantial value that the 382(l)(5) Exception is expected to provide to the Debtors, the Debtors may file a motion seeking entry of an order from the Bankruptcy Court providing for certain procedures to help safeguard the availability of the 382(l)(5) Exception.  In particular, such procedures would be intended to help preserve the 382(l)(5) Exception by assisting the Debtors in taking advantage of the Qualified Creditor Presumption.  Among other items, the procedures that are expected to be required by the order would require Substantial Claimholders[34] to provide notice of such status and for the parties to any transfer of Claims to provide notice of such transfer if it would increase the amount of Claims of which a Substantial Claimholder has ownership (as determined under certain attribution rules) or would result in an individual or entity becoming a Substantial Claimholder.  Moreover, if the Debtors determine that certain persons or entities must sell or transfer all or a portion of their Beneficial Ownership of Claims acquired on or after the Record Date so that the requirements of the 382(l)(5) Exception are satisfied, the Debtors may file a motion with the Bankruptcy Court for entry of an order—after notice to any statutory committee appointed in these Chapter 11 Cases and the relevant claimholder(s) and a hearing— that such claimholder(s) must sell, cause to sell, or otherwise transfer a specified amount of its Beneficial Ownership

---

[34]    (a) a "Substantial Claimholder" is any entity or individual person that has Beneficial Ownership of Claims in an amount that would entitle such holder to receive more than 4.75 percent of the equity of the Reorganized Debtors under a chapter 11 plan of reorganization (such amount, the "Threshold Amount"); (b) the "Protected Amount" is the greater of the Threshold Amount and the amount of Claims an entity or individual person is the Beneficial Owner as of the Record Date; (c) the "Record Date" is the date that is five (5) business days after the date the Interim Order is entered; (d) "Beneficial Ownership" will be determined in accordance with the applicable rules of section 382 of the IRC, and the Treasury Regulations promulgated thereunder (other than Treasury Regulations section 1.382-2T(h)(2)(i)(A)) and includes direct, indirect, and constructive ownership (*e.g.*, (1) a holding company would be considered to beneficially own all securities owned by its subsidiaries, (2) a partner in a partnership would be considered to beneficially own its proportionate share of any securities owned by such partnership, (3) an individual and such individual's family members may be treated as one individual, (4) persons and Entities acting in concert to make a coordinated acquisition of securities may be treated as a single entity, and (5) a holder would be considered to beneficially own securities that such holder has an Option (as defined herein) to acquire); (v) a "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors arising out of relating to the period prior to the Petition Date, whether secured or unsecured; (vi) an "Option" includes all interests described in Treasury Regulations section 1.382-4(d)(9), including any contingent purchase right, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

of Claims to a person or entity that is not a Substantial Claimholder and whose holding such claims would not result in such transferee becoming a Substantial Claimholder.

If as of the Effective Date the Debtors expect to qualify for the 382(l)(5) Exception and not elect out of its application, the certificate of incorporation of New Rite Aid would likely include certain restrictions and information procedures with respect to transfers with respect to the New Common Stock to minimize the likelihood of a subsequent "ownership change" and thus protect the value of its available tax attributes. If these restrictions are sought, subject to certain exceptions and potential thresholds, the certificate of incorporation of New Rite Aid generally may restrict (i) any person or Entity from accumulating 4.75% or more of any class of stock of New Rite Aid through secondary acquisitions, and, if a person or Entity already owns 4.75% or more of such stock, from acquiring additional stock, and (ii) any person or Entity that owns 4.75% or more of the New Common Stock from disposing of all or portion of such stock. It is expected that such procedures would only apply to the extent New Rite Aid has already experienced a certain threshold of transfers of its ownership. The restrictions would further provide that any attempted transfer of New Common Stock in violation of the restrictions described above will be prohibited and void ab initio.

C.       **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Senior Secured Notes Claims and Allowed General Unsecured Claims.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to a U.S. Holder of Allowed Senior Secured Notes Claims or Allowed General Unsecured Claims in a Plan Restructuring will depend, in part, on whether for U.S. federal income tax purposes the (a) Claim surrendered by such U.S. Holder constitutes a "security" of a Debtor, and (b) any consideration received by such U.S. Holder constitutes a stock or a "security" issued by the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity). Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long term capital gain if the U.S. Holder held its Claim for more than one year

at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

*Due to the inherently factual nature of the determination of whether a debt instrument constitutes a "security", U.S. Holders of Allowed Senior Secured Notes Claims and Allowed General Unsecured Claims are urged to consult their tax advisors regarding the status of their Claims and, if applicable, the consideration received by them, as "securities" for U.S. federal income tax purposes.*

1.      **Consequences of the Restructuring Transactions to U.S. Holders of Allowed Senior Secured Notes Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed Senior Secured Notes Claim will receive its *pro rata* share of, (a) in the event the Restructuring Transaction is a Plan Restructuring, (i) New Common Stock, (ii) the Takeback Notes, (iii) the CMSR Recovery, (iv) the Litigation Trust Class B Interests, and (v) either (A) if the MedImpact Term Loan Stalking Horse Bid is the winning bid to acquire the MedImpact Term Loan, MedImpact NewCo Subscription Rights and MedImpact NewCo Notes; or (B) if the MedImpact Term Loan Stalking Horse Bid is not the winning bid to acquire the MedImpact Term Loan, Cash (the "Senior Secured Noteholder Recovery"), and (b) in the event the Restructuring Transaction is not a Plan Restructuring, Cash.

(a)      **Treatment of U.S. Holders of Allowed Senior Secured Notes Claims if the Restructuring Transactions are Structured as a Plan Restructuring or as a Credit Bid Qualifying as a Tax-Free Reorganization.**

(i)      **Treatment if Allowed Senior Secured Notes Claims Are Treated as Securities.**

If the Senior Secured Notes Claims are treated as securities, then the exchange of such Claims should be treated as a "recapitalization" within the meaning of section 368(a)(1)(E) of the IRC, or potentially in the case of a Credit Bid, a "reorganization" within the meaning of section 368(a)(1)(G) of the IRC.

Other than with respect to any amounts received that are attributable to accrued but unpaid interest (or OID), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the *lesser* of (a) the amount of gain realized from the exchange, which should be equal to (i) the *sum* of (A) the fair market value of any New Common Stock, MedImpact NewCo Subscription Rights, interests in the CMSR Recovery, Litigation Trust Class B Interests, and MedImpact NewCo Notes received in exchange for the Claim of such Holder and (B) the issue price of any Takeback Notes received, *minus* (ii) the U.S. Holder's adjusted basis, if any, in the Claim, *and* (b) the *sum* of (i) the fair market value (or issue price, in the case of any Takeback Notes) of any Senior Secured Noteholder Recovery received that does not constitute stock or securities of Rite Aid (or an entity that is a "party to a reorganization" with Rite Aid within the meaning of section 368 of the IRC (together with Rite Aid, a "Rite Aid Reorganization Party")).

With respect to any Senior Secured Noteholder Recovery that is treated as a stock or security of a Rite Aid Reorganization Party, a U.S. Holder should obtain an aggregate tax basis in such consideration, other than any such amounts treated as received in satisfaction of accrued but unpaid interest (or OID), and subject to the rules relating to market discount, *equal* to (a) the tax basis of the Claim exchanged, *minus* (b) the fair market value (or issue price, in the case of any Takeback Notes) of any Senior Secured Noteholder

159

Recovery received that does not constitute stock or securities of a Rite Aid Reorganization Party, *plus* (c) the gain recognized (if any, determined as described above). The holding period for such Senior Secured Noteholder Recovery should include the holding period for the exchanged Claims.

With respect to any Senior Secured Noteholder Recovery that is not treated as a stock or security of a Rite Aid Reorganization Party, a U.S. Holder should obtain a tax basis in such property equal to the property's fair market value (or issue price, in the case of any Takeback Notes) as of the date such property is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such property.

<div style="text-align:center">

**(ii)      Treatment Allowed Senior Secured Notes Claims Are Not Treated as Securities.**

</div>

If the Senior Secured Notes Claims are not treated as securities then the exchange of such Claims should be treated as a taxable exchange pursuant to section 1001 of the IRC.

A U.S. Holder should obtain a tax basis in each Senior Secured Noteholder Recovery received equal to the property's fair market value (or issue price, in the case of any Takeback Notes) as of the date such property is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such property.

<div style="text-align:center">

**(b)      Treatment of U.S. Holders of Allowed Senior Secured Notes Claims if the Restructuring Transactions are not Structured as a Plan Restructuring or as a Credit Bid Qualifying as a Tax-Free Reorganization.**

</div>

To the extent receiving Cash, a U.S. Holder should recognize gain or loss equal to (a) the sum of any Cash received, *minus* (b) the Holder's adjusted tax basis in its Allowed Senior Secured Notes Claim.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, (which differs from the treatment described above), see the sections entitled "Accrued Interest" and "Market Discount" below.

<div style="text-align:center">

**2.      Consequences of the Restructuring Transactions to U.S. Holders of Allowed General Unsecured Claims.**

</div>

Except to the extent that a U.S. Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each U.S. Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the Committees Initial Cash Consideration, the Committees Post-Emergence Cash Consideration, the GUC Equity Trust Interests, the Litigation Trust Class A Interests, and potentially certain other Cash (the "GUC Recovery").

<div style="text-align:center">

**(a)      Treatment of U.S. Holders of Allowed General Unsecured Claims if the Restructuring Transactions are Structured as a Plan Restructuring or as a Credit Bid Qualifying as a Tax-Free Reorganization.**

**(i)      Treatment if Allowed General Unsecured Claim Is Treated as a Security of Rite Aid.**

</div>

<div style="text-align:center">160</div>

If a General Unsecured Claim is treated as a security of Rite Aid, then the exchange of such Claim should be treated as a "recapitalization" within the meaning of section 368(a)(1)(E) of the IRC, or potentially in the case of a Credit Bid, a "reorganization" within the meaning of  section 368(a)(1)(G) of the IRC.

Other than with respect to any amounts received that are attributable to accrued but unpaid interest (or OID), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the *lesser* of (a) the amount of gain realized from the exchange, which should be equal to (i) the *sum* of any Cash received and the fair market value of any GUC Equity Trust Interests, the Litigation Trust Class A Interests, and any other GUC Recovery received, *minus* (ii) the U.S. Holder's adjusted basis, if any, in the Claim, *and* (b) the *sum* of (i) the amount of Cash and the fair market value of any other GUC Recovery received that does not constitute stock or securities of a Rite Aid Reorganization Party.

With respect to any GUC Recovery that is treated as a stock or security of a Rite Aid Reorganization Party, a U.S. Holder should obtain an aggregate tax basis in such consideration, other than any such amounts treated as received in satisfaction of accrued but unpaid interest (or OID), and subject to the rules relating to market discount, *equal* to (a) the tax basis of the Claim exchanged, *minus* (b) the fair market value of any GUC Recovery received that does not constitute stock or securities of a Rite Aid Reorganization Party, *plus* (c) the gain recognized (if any, determined as described above). The holding period for such GUC Recovery should include the holding period for the exchanged Claims.

With respect to any GUC Recovery that is not treated as a stock or security of a Rite Aid Reorganization Party, a U.S. Holder should obtain a tax basis in such property equal to the property's fair market value as of the date such property is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such property.

### (ii)    Treatment if Allowed General Unsecured Claim Is Not Treated as a Security of Rite Aid.

If a General Unsecured Claim is not treated as a security of Rite Aid, then the exchange of such Claim should be treated as a taxable exchange pursuant to section 1001 of the IRC.

Subject to the discussion of accrued interest and market discount below, each Holder of a General Unsecured Claim would generally recognize gain or loss in the exchange in an amount equal to the difference between (a) the amount of Cash received and the fair market value of any other GUC Recovery received, *less* (b) the U.S. Holder's adjusted tax basis in its Allowed General Unsecured Claim.

A U.S. Holder should obtain a tax basis in any non-Cash GUC Recovery received equal to the property's fair market value as of the date such property is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such property.

### (b)    Treatment of U.S. Holders of Allowed General Unsecured Claims if the Restructuring Transactions are not Structured as a Plan Restructuring or as a Credit Bid Qualifying as a Tax-Free Reorganization.

To the extent receiving Cash, a U.S. Holder should recognize gain or loss equal to (a) the amount of any Cash received, *minus* (b) the Holder's adjusted tax basis in its Allowed General Unsecured Claim.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, (which differs from the treatment described above), see the sections entitled "Accrued Interest" and "Market Discount" below.

**3.      [GUC Equity Trust Treatment.**

(a)      **Widely Held Fixed Investment Trust Treatment.**

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect, except to the extent is is determined to treat the GUC Equity Trust as a "qualified settlement fund," "disputed ownership fund," or otherwise, to treat the GUC Equity Trust as a "widely held fixed investment trust" under section 1.671-5 of the Treasury Regulations and the GUC Trustee will report consistently therewith.  Such treatment is assumed with respect to the following discussion.  In accordance therewith, neither the GUC Equity Trust nor GUC Equity Trustee shall have the power to vary the investment of the GUC Equity Trust within the meaning of section 301.7701-4(c) of the Treasury Regulations.  For U.S. federal income tax purposes, each holder of a GUC Equity Trust Interest will generally be treated as holding their Pro Rata share of the GUC Equity Trust Assets directly (or the New Common Stock held in trust by the GUC Equity Trust for the benefit of each of the Holders of General Unsecured Claims).  The consequences to holders of GUC Equity Trust Interests would then generally be as described in *"Consequences to U.S. Holders of the Ownership and Disposition of New Common Stock"* and, for Non-U.S. Holders, "*Consequences to Non-U.S. Holders of the Ownership and Disposition of New Common Stock.*"

No request for a ruling from the IRS will be sought on the classification of the GUC Equity Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Equity Trust.  If the IRS were to successfully challenge the classification of the GUC Equity Trust as a widely held fixed investment trust, the federal income tax consequences to the GUC Equity Trust and the holders of GUC Equity Trust Interests could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the GUC Equity Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

The GUC Equity Trust will file information tax returns with the IRS and provide tax information statements to holders of GUC Equity Trust Interests consistently with the rules of section 1.671-5 of the Treasury Regulations and any other applicable provisions of law, including information regarding items of income, gain, deduction, loss, or credit attributable to the GUC Equity Trust Assets.  Each holder of GUC Equity Trust Interests must report on its federal income tax return its share of all such items.

(b)      **Disputed Ownership Fund or Qualified Settlement Fund Treatment.**

With respect to any of the assets of the GUC Equity Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "widely held fixed investment trust" treatment is otherwise unavailable or not elected to be applied with respect to the GUC Equity Trust, such assets may be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, and in such case it is intended that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, it may be determined to treat the GUC Equity Trust as a a "qualified settlement fund" within the meaning of the Treasury Regulations promulgated under section 468B of the Tax Code. Such Treasury Regulations provide that a fund, account, or trust will be a qualified settlement fund if three conditions are met. First, the fund, account, or trust must be established pursuant to an order of or be approved by a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. A court order giving preliminary approval to a fund, account, or trust will satisfy this requirement even though the order is subject to review or revision. Second, the fund, account, or trust must be established to resolve or satisfy on or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising, among other things, out of a tort. Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and person related to the transferor. The GUC Equity Trust may be established with the express purposes of satisfying the requirements of a qualified settlement fund and may be treated as a separate taxable entity, with its modified gross income subject to U.S. federal income tax at the highest rate applicable to estates and trusts (currently 37%). For purposes of determining the GUC Equity Trust's modified gross income, payments to the GUC Equity Trust and payments from the GUC Equity Trust to holders of GUC Equity Trust Interests in settlement of their Claims would not be taken into account.

### 4. Liquidating Trust Treatment for SCD Trust, Litigation Trust, and Other Circumstances.

This section shall apply to interests in the SCD Trust, Litigation Trust (except to the extent it is determined to treat the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise), and, otherwise, in the case of a Restructuring Transaction that is not consummated as a Plan Restructuring pursuant to the terms in the Plan and herein.

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the SCD Trust and the Litigation Trust (solely for purposes of this section, referred to collectively as the "Trusts") as "liquidating trusts" under section 301.7701-4(d) of the Treasury Regulations and grantor trusts under section 671 of the IRC, and the trustees of the Trusts will take positions on the Trusts' tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Trusts will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets and SCD Claim, in each case, as encumbered by any liabilities (solely for purposes of this section, referred to collectively as the "Trusts Assets"), as applicable, to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Trusts, as applicable.

No request for a ruling from the IRS will be sought on the classification of the Trusts. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Trusts. If the IRS were to successfully challenge the classification of the Trusts as a grantor trust, the federal income tax consequences to the Trusts and the Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Trusts as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Trusts Assets to the Trusts, the trustees of the Trusts shall make a good faith valuation of the Trusts Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustees of the Trusts, and the holders of Claims receiving interests in the Trusts shall take consistent positions with respect to the valuation of the Trusts Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of the Trusts among the Trust beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such beneficiary if the Trusts had sold all of the Trusts Assets at their tax book value and distributed the proceeds to the applicable Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Trusts. The tax book value of the Trusts Assets shall equal their fair market value on the date of the transfer of the applicable Trusts Assets to the Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. The holders of interests in any Trust will be treated as the owners of their pro rata share of any Trust Assets.

The Trusts shall in no event be dissolved later than five (5) years from the creation of such Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Trusts Assets.

The Trusts will file annual information tax returns with the IRS as grantor trusts pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Trusts Assets (e.g., income, gain, loss, deduction, and credit). Each Trust beneficiary holding a beneficial interest in a Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Trusts will pertain to Trusts beneficiaries who receive their interests in a Trust in connection with the Plan.

    (a)      **Disputed Ownership Fund, Qualified Settlement Fund, or Widely Held Fixed Investment Trust Treatment.**

With respect to any of the assets of a Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to a Trust, such assets may be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, and in such case it is intended that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, it may be determined to treat a Trust as a "qualified settlement fund" within the meaning of the Treasury Regulations promulgated under section 468B of the Tax Code. Such Treasury Regulations provide that a fund, account, or trust will be a qualified settlement fund if three conditions are met. First, the fund, account, or trust must be established pursuant to an order of or be approved by a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. A court order giving preliminary approval to a fund, account, or trust will satisfy this requirement even though the order is subject to review or revision. Second, the fund, account, or trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising, among other things, out of a tort. Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of

the transferor and person related to the transferor.  The Trust may be established with the express purposes of satisfying the requirements of a qualified settlement fund and may be treated as a separate taxable entity, with its modified gross income subject to U.S. federal income tax at the highest rate applicable to estates and trusts (currently 37%).  For purposes of determining the Trust's modified gross income, payments to the Trust and payments from the Trust to holders of interests therein in settlement of their Claims would not be taken into account.

The treatment of a "widely held fixed investment trust" would be as described above with respect to the GUC Equity Trust.

### 5. Accrued Interest.

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Claim under the Plan is attributable to accrued but unpaid interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims.  Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest.  Certain Treasury Regulations, however, allocates payments first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.*

### 6. Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, *multiplied* by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the disposition of an Allowed Claim (determined as described above) which was acquired with market discount should be treated as ordinary income to the

extent of the amount of market discount that accrued thereon while such Allowed Claim was treated as held by such U.S. Holder (unless such U.S. Holder elected to include such amount of market discount in income as it accrued). To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-free transaction for other property, any market discount that accrued on such Allowed Claim (*i.e.*, up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim.*

7.     **Consequences to U.S. Holders of the Ownership and Disposition of New Common Stock.**

(a)     **Dividends on New Common Stock.**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of New Rite Aid as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares of the New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as New Rite Aid has sufficient earnings and profits and certain holding period requirements are satisfied. The length of time that a U.S. Holder has held its stock is reduced for any period during which such U.S. Holder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

(b)     **Sale, Redemption, or Repurchase of New Common Stock.**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock, as applicable as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Senior Secured Notes Claims or recognized an ordinary loss on the exchange of its Allowed Senior Secured Notes Claims for New Common Stock.

8.    **U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Takeback Notes.**

(a)    **Payments of Qualified Stated Interest**

Payments or accruals of "qualified stated interest" (as defined below) on the Takeback Notes will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the Takeback Notes, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

(b)    **Original Issuance Discount**

Where, as here, certain U.S. Holders of Senior Secured Notes Claims receiving debt instruments are also receiving other property in exchange for their Claims (*e.g.*, New Common Stock), the "investment unit" rules may apply to the determination of the "issue price" for any debt instrument received in exchange for their Senior Secured Notes Claims. In such case, the issue price of the Takeback Notes will depend, in part, on the issue price of the "investment unit," and the respective fair market values of the elements of consideration that compose the investment unit. The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument. As a result, the issue price of the investment unit will depend on whether the investment unit is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an established market (*i.e.*, whether there is trading on an "established securities market" at any time during the 31-day period ending 15 days after the Effective Date). In general, consideration can be treated as being traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes available with respect to the items discussed below. Additionally, when determining fair market value under these rules, actual trades and firm quotes will generally be dispositive, while it may be possible to refute the application of mere "indicative" quotes if such indicative quotes "materially misrepresent[] the fair market value of the property" being valued.

If none of the components of an investment unit nor the surrendered Senior Secured Notes Claims are publicly traded on an established market, then the issue price of the applicable Takeback Notes would generally be determined under section 1273(b)(4) or 1274 of the Tax Code, as applicable. If none of the components of the investment unit are publicly traded on an established market, but the Senior Secured Notes Claims are so traded, then the issue price of the investment unit will be determined by the fair market value of such Senior Secured Notes Claims.

If the investment unit received in exchange for Senior Secured Notes Claims is considered to be publicly traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit. The law is somewhat unclear on whether an investment unit is treated as publicly traded if some, but not all, elements of such investment unit are publicly traded. In the event that an applicable Takeback Notes is publicly traded on an established market but the New Common Stock and/or other elements of consideration are not treated as publicly traded on an established market, the determination of the issue price of the loans under the applicable Takeback Notes is unclear. Such issue price could be based on (i) in the case where the Senior Secured Notes Claims are also publicly traded on an established market, on the trading value of such Senior Secured Notes Claims, allocated as described above, (ii) based on the demonstrated trading price of the applicable Takeback Notes, or (iii) the stated redemption price at maturity of the applicable Takeback Notes.

167

If an issue price is determined for the investment unit received in exchange for the Senior Secured Notes Claims under the above rules, then the issue price of an investment unit is allocated among the elements of consideration making up the investment unit based on their relative fair market values, with such allocation determining the issue price of the applicable Takeback Notes.

An issuer's allocation of the issue price of an investment unit is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

As discussed above, a debt instrument, such as a Takeback Notes, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually. Moreover, a Takeback Notes could be treated as issued with OID to the extent the allocation rules described above result in the Takeback Notes having an issue price that is less than their stated redemption price at maturity.

For purposes of determining whether there is OID, the *de minimis* amount is generally equal to ¼ of 1 percent of the principal amount of the Takeback Notes multiplied by the remaining number of complete years to maturity from their original issue date, or if the Takeback Notes provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations). If the Takeback Notes are issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Takeback Notes, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the Takeback Notes that is attributable to previously accrued OID that has been included in its income. If the amount of OID on the Takeback Notes is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the Takeback Notes, and a Pro Rata amount of such *de minimis* OID must be included in income as principal payments are received on the Takeback Notes.

### (c)  Sale, Taxable Exchange or other Taxable Disposition

Upon the disposition of the Takeback Notes by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but untaxed interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the Takeback Notes, as applicable. A U.S. Holder's adjusted tax basis in their interest in the Takeback Notes will be determined in the manner set forth above. A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such Takeback Notes for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

9.    **Consequences to U.S. Holders of the Ownership and Disposition of MedImpact NewCo Notes.**

If the MedImpact Term Loan Backstop Parties are the winning bidder for the MedImpact Term Loan, any MedImpact NewCo Notes issued to such Holders are expected to be treated as equity interests in the MedImpact Term Loan NewCo for U.S. federal income tax purposes. It has not yet been determined if the MedImpact Term Loan NewCo will be treated as a C corporation, partnership or disregarded entity, or trust for U.S. federal income tax purposes. If treated as a C corporation, then ownership of the MedImpact NewCo Notes is generally expected to have consequences as described in Section C.6 above, except that MedImpact Term Loan NewCo would be the issuer rather than New Rite Aid. If treated as a partnership or disregarded entity, then holders of the MedImpact NewCo Notes will take into account their share of income, gain, loss, deduction, and credit from MedImpact Term Loan NewCo on their individual income tax returns. If treated as a trust, then ownership of the MedImpact NewCo Notes is generally expected to have consequences similar to those described in Section C.4 above.

10.    **Treatment of MedImpact NewCo Subscription Rights.**

Although not entirely free from doubt, the Reorganized Debtors intend to take the position that a U.S. Holder of a Senior Secured Notes Claim that elects to exercise its MedImpact NewCo Subscription Rights should be treated as purchasing, in exchange for its MedImpact NewCo Subscription Rights, and the amount of Cash paid by the U.S. Holder to exercise such rights, MedImpact Rights Offering NewCo Notes. Such a purchase should generally be treated as the exercise of an option under general U.S. federal income tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the MedImpact NewCo Subscription Rights. A U.S. Holder's aggregate tax basis in the MedImpact Rights Offering NewCo Notes received should equal the sum of (a) the amount of Cash paid by the U.S. Holder to exercise the rights in respect of such consideration, plus (b) such U.S. Holder's tax basis in such rights immediately before such rights are exercised. A U.S. Holder's holding period for the MedImpact Rights Offering NewCo Notes received pursuant to such exercise should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise the MedImpact NewCo Subscription Rights may be entitled to claim a (likely short-term capital) loss equal to the amount of tax basis allocated to such rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses. U.S. Holders electing not to exercise such rights should consult with their own tax advisors as to the tax consequences of such decision.

D.    **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed Senior Secured Notes Claims and General Unsecured Claims. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock or MedImpact NewCo Notes, as applicable.

1.      **Gain Recognition by Non-U.S. Holders.**

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.      **Accrued Interest.**

Subject to the discussion of FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest (or original issue discount, if any) with respect to Allowed Senior Secured Notes Claims generally will not be subject to U.S. federal income or withholding tax, *provided* that the Non-U.S. Holder provides to the withholding agent, prior to receipt of such payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(a)      the Non-U.S. Holder actually or constructively owns ten percent or more of the total combined voting power of all classes of Debtor's stock entitled to vote;

(b)      the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Debtor (each, within the meaning of the IRC);

(c)      the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

(d)      such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and

profits that are attributable to the accrued interest at a rate of thirty percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest (or original issue discount, if any) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a thirty percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest (or original issue discount, if any). For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders - Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any.

3.     **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of the Takeback Notes.**

(a)     **Interest Payments; Accrued Interest (and OID).**

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such amounts paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder may qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in New Rite Aid (or, in the case of interest received pursuant to the Plan, the Debtors) within the meaning of Section 871(h)(3) of the Code and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to New Rite Aid (or, in the case of interest received pursuant to the Plan, the Debtors), actually or constructively through the ownership rules under Section 864(d)(4) of the Tax Code;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives New Rite Aid (or, as applicable, the Debtors') paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest on the Takeback Notes paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the Takeback Notes or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply), provided the appropriate statement is provided to New Rite Aid (or, with respect to interest received pursuant to the Plan, the Debtors) paying agent unless an applicable income tax treaty provides otherwise. To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

(b)    **Sale, Taxable Exchange, or Other Disposition of the Takeback Notes.**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption, or other taxable disposition of the Takeback Notes (other than any amount representing accrued but unpaid interest on the loan) unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the Takeback Notes under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above. To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable income tax treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

4.    **Consequences to Non-U.S. Holders of the Ownership and Disposition of New Common Stock.**

(a)    **Dividends.**

Any distributions made with respect to New Common Stock (other than certain distributions of stock of New Rite Aid) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of New Rite Aid, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain). Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not ECI (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS may prescribe), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are ECI (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If a Reorganized Debtor is considered a "U.S. real property holding corporation" (a "USRPHC"), distributions to a Non-U.S. Holder will generally be subject to withholding by Reorganized Debtor at a rate of 15 percent to the extent they are not treated as dividends. In the event the New Common Stock are regularly traded on an established market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of equity interests that includes New Common Stock during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations.

(b)    **Sale, Redemption, or Repurchase of New Common Stock.**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock of New Rite Aid unless:

(i)    such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(ii)    such gain is ECI (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

173

(iii)   the issuer of such New Common Stock is or has been during a specified testing period a USRPHC (as discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a non-U.S. Holder of New Common Stock generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder ("FIRPTA").  Taxable gain from a non-U.S. Holder's disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the non-U.S. Holder's adjusted tax basis in such interest) would constitute ECI.  A non-U.S. Holder would also be subject to withholding tax equal to fifteen percent of the amount realized on the disposition and generally required to file a U.S. federal income tax return.  The amount of any such withholding may be allowed as a credit against the non-U.S. Holder's U.S. federal income tax liability and may entitle the non-U.S. Holder to a refund if the non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation would be a USRPHC with respect to a non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds fifty percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (a) the five-year period ending on the effective time of the applicable disposition or (b) the non-U.S. Holder's holding period for its interests in the corporation.

In general, FIRPTA will not apply upon a non-U.S. Holder's disposition of its New Common Stock if (x) the New Common Stock is treated as "regularly traded" on an established market and continue to be regularly traded on an established market and (y) the non-U.S. Holder did not directly or indirectly own more than five percent of the value of the New Common Stock during a specified testing period.

## 5.     FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual, or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder are urged to consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### 6.      Information Reporting and Back-Up Withholding.

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.   Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.   RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  April 1, 2024

Rite Aid Corporation
on behalf of itself and all other Debtors


*/s/ Jeffrey S. Stein*

Jeffrey S. Stein
Chief Executive Officer
Chief Restructuring Officer
Rite Aid Corporation

## Exhibit A

### Plan of Reorganization

[*Filed separately*]

## Exhibit B

**Proposed Disclosure Statement Order**

## <u>Exhibit C</u>

**Corporate Organization Chart**

## **Exhibit D**

**Liquidation Analysis**

## Exhibit E

**Financial Projections**

## Exhibit E-1

## Redline of Financial Projections

**<u>Exhibit F</u>**

**NAS Claimants' Addendum**

## Exhibit F-1

### NAS Claimants' Proposal

The **NAS Claimants** requested that the following proposed provisions be included in the Plan.  The Debtors have included this <u>Exhibit F-1</u> without substantive revision as it was proposed by the NAS Claimants.  The Debtors made certain nonsubstantive formatting revisions for consistency with the Disclosure Statement and the other exhibits attached thereto.

For the avoidance of doubt, the Debtors do not approve of, agree with, or substantively accept any of the assertions made in the NAS Claimants' Proposal and dispute that they are appropriate for inclusion in the Plan or for attachment to the Disclosure Statement, substantively and/or procedurally.  The Debtors assert that this Disclosure Statement complies with section 1125 of the Bankruptcy Code without inclusion of the NAS Claimants' Proposal and that the Plan complies with section 1129 of the Bankruptcy Code without corresponding revisions.  The Plan for which the Debtors have requested to solicit votes <u>does not include these provisions</u>.  The Debtors reserve all rights to oppose any request by the NAS Claimants for revisions to the Plan or further revisions to this Disclosure Statement in connection with the NAS Claimants' Proposals.

I.      ESTABLISHMENT OF MINORS' TRUST

The trusts to be created under the Plan will contain a trust for the payment of opioid-related claims by minors ("Minors Trust").  The Minors' Trust will be funded with approximately $2.0 billion over 2 years as follows for the benefit of holders of opioid-related claims asserted by NAS Claimants against the Debtor, a combination of (a) Cash Contribution: on the effective date of the Plan, $1.0 billion in cash will be delivered to the Minors' Trust, subject to adjustment as follows: (a) commencing on the first business day after the confirmation date, interest will accrue on such amount at the rate of 4% per annum and (b) such amount will be reduced by the amount of expenses of the Minors' Trust that are paid by the reorganized Debtor in advance of the effective date of the Plan;  (b) On the first anniversary of the effective date of the Plan $750 million will be delivered to the Minors' Trust; (c) On the second anniversary of the effective date of the Plan $250 million will be delivered to the Minors' Trust.

Promissory Note: On the Effective Date of the Plan, a $400 million promissory note ("NAS Promissory Note") will be delivered to the Minors' Trust for all opioid-related claims by NAS Claimants, with such promissory note to bear no interest and mature on the first anniversary of the Effective Date.

It is anticipated that the Minors' Trust will pay all current opioid-related claims asserted by NAS Claimants against the Debtor within one year after it is established. All opioid-related claims asserted by NAS Claimants will be processed, liquidated, and paid by the Minors' Trust. In that regard, the Plan includes opioid personal injury trust distribution procedures for opioid-related claims asserted by NAS Claimants that describe a detailed methodology for the fair and equitable resolution of opioid-related claims, such as NAS, FOE and NOWS. The trust distribution procedures are attached as an exhibit to the Plan and are summarized later in this Disclosure Statement. The compensation anticipated to be paid by the trust for opioid-related claims asserted by NAS Claimants against the Debtor compares very favorably to amounts claimants have received to date in the tort system, as the trust will pay out over $2 billion while the vast majority of NAS Claimants have recovered nothing, if only for the fact that among the numerous actions that have been filed with the courts not one has proceeded to trial, and one settlement in a contested matter led to a $500,000 recovery for the minor asserting opioid-related claims.  Pursuant to the Plan and sections 524(g) and/or 105(a) of the Bankruptcy Code, the sole recourse for claimants that are minors will be to the Minors' Trust.  Claimants of the Debtor, including minors, will no longer have any right to assert opioid-related claims against the Debtor or other parties identified in the Plan.

As defined in the Plan and used in this Disclosure Statement: "Ancillary Indemnity Claim" means a Claim for contribution, reimbursement, subrogation, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law, and any other derivative Claim, whether in the nature of or sounding in contract, tort, warranty, or other theory of law, that is not an Indirect NAS Claimant Personal Injury Claim.

Indirect NAS Personal Injury Claim. "Indirect NAS Personal Injury Claim" means (a) a Opioid Personal Injury Claim asserted for and on behalf of a minor for contribution, reimbursement, subrogation, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law, and any other derivative Opioid Personal Injury Claim, whether in the nature of or sounding in contract, tort, warranty, or other theory of law in respect of

(i)      the payment, whether pursuant to a settlement, judgment, or verdict, of any claim for or otherwise relating to death, injury, or damages that is asserted by or on behalf of an injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual or (a) the payment of medical or other expenses of, or the provision of medical treatment, medical equipment, or other services or goods

to, an injured individual, but, for the avoidance of doubt, not a Claim for contribution, reimbursement, subrogation, or indemnity, or any other derivative Claim, in respect of legal fees or expenses incurred by the holder of such NAS Personal Injury Claim in connection with such payment, (b) a NAS Personal Injury Claim of _____ for contribution, reimbursement, subrogation, or indemnity under any _____ or otherwise, or (c) a Governmental Action Claim.

For the avoidance of doubt, an Indirect NAS Personal Injury Claim shall not include (a) any claim for or otherwise relating to death, injury, or damages caused by NAS or a product or material containing opioids that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual caused by FOE or a product or material containing NAS regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict or

(ii)    any claim against any _____ based on, arising out of, or in any way relating to the _
_____.    By way of illustration and not limitation of claims contemplated by the foregoing clause (is), an Indirect NAS Personal Injury Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death. "NAS Personal Injury Claim" means any claim or NAS Personal Injury Demand against the Debtor or any other Protected Party, whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to opioid products based on the alleged pre-Effective Date acts or omissions of the Debtor or any other Person for whose conduct the Debtor has, or is alleged to have, liability, whether by assumption of such liability from such other Person, by agreement to indemnify, defend, or hold harmless such other Person from and against such liability, or otherwise, including any such claims and NAS Personal Injury Demands directly or indirectly arising out of or in any way relating to:  (a) any opioid products previously dispensed, distributed, marketed, sold, supplied, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, and/or in any other way made available by the Debtor or any other Person; (b) any opioid or opioid-containing materials present at any premises owned, leased, occupied, or operated by any Person.

NAS Personal Injury Claims include all such claims and NAS Personal Injury Demands, whether:

(1) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, reimbursement, or any other theory of law, equity or admiralty, whether brought, threatened, or pursued in any United States court or other court anywhere in the world, including Canada.

(2) liquidated or unliquidated, fixed or contingent, direct or indirect, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity, or otherwise (including under piercing the corporate veil, agency, alter ego, successor liability, fraudulent conveyance, conspiracy, enterprise liability, market share, joint venture, or any other legal or equitable theory);

(3) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs, fees, injunctive, or similar relief, or any other measure of damages;

(4) seeking any legal, equitable, or other relief of any kind whatsoever, including, for the avoidance of doubt, any claims and NAS Personal Injury Demands arising out of or in any way relating to the presence of or exposure to NAS or NAS-containing products assertable against the Debtor or any other Protected Party; or

(5) held by Persons residing within the United States or in a foreign jurisdiction, including Canada. NAS Personal Injury Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. NAS Personal Injury Claims do not include any claim or demand by any present or former employee of a predecessor or Affiliate of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer.

For the avoidance of doubt, NAS Personal Injury Claims include: (is) all claims, demands, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; (ii) PI/Stay Order Claims.  Notwithstanding the foregoing, NAS Personal Injury Claims do not include any claim that a Settling NAS Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling NAS Insurance Company to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.

## Exhibit F-2

### NAS Claimants' Combined Objection

The NAS Claimants requested that the following objection to final approval of the Disclosure Statement and confirmation of the Plan be attached to the Disclosure Statement.  The Debtors have included this **Exhibit F-2** without substantive revision as it was drafted by the NAS Claimants.

For the avoidance of doubt, the Debtors do not approve of, agree with, or substantively accept any of the assertions made in the NAS Claimants' Combined Objection and dispute each of the assertions therein.  The Debtors assert that this Disclosure Statement complies with section 1125 of the Bankruptcy Code and that the Plan complies with section 1129 of the Bankruptcy Code.  The Debtors reserve all rights to oppose the NAS Claimants' Combined Objection at the Combined Hearing.

**Exhibit C**

**Proposed Confirmation Order and Effective Date Notice**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al.*, | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## NOTICE OF (I) ENTRY OF ORDER CONFIRMING
## THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF RITE AID CORPORATION AND ITS
## DEBTOR AFFILIATES AND (II) OCCURRENCE OF EFFECTIVE DATE

**PLEASE TAKE NOTICE** that on [__], 2024, the Honorable Michael B. Kaplan, Chief Judge, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of New Jersey (the "Court"), entered the *Order Approving the Disclosure Statement for, and Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid*

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these Chapter 11 Cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

*Corporation and Its Debtor Affiliates* [Docket No. [___]] (the "Confirmation Order") confirming the Plan[2] and approving the Disclosure Statement [Docket No. [●]] of the above-captioned debtors (the "Debtors").

      **PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on [_____], 2024.

      **PLEASE TAKE FURTHER NOTICE** that this Confirmation Order and the Plan are available for inspection.  You may obtain a copy of this Confirmation Order or the Plan:  (a) upon request to Kroll Restructuring Administration LLC (the noticing and claims agent to be retained in these Chapter 11 Cases) by calling (844) 274-2766 (toll free) or, for international callers, (646) 440-4878; (b) by visiting the website maintained in these Chapter 11 Cases at **https://restructuring.ra.kroll.com/RiteAid**; or (c) for a fee via PACER by visiting http://www.njb.uscourts.gov.

      **PLEASE TAKE FURTHER NOTICE** that the Court has approved certain discharge, release, exculpation, injunction, and related provisions in Article X of the Plan.

      **PLEASE TAKE FURTHER NOTICE** that the Plan and its provisions are binding on the Debtors and the Reorganized Debtors, as applicable, and any Holder of a Claim or an Interest and such Holder's respective successors and assigns, whether or not the Claim or the Interest of such Holder is Impaired under the Plan, and whether or not such Holder voted to accept the Plan.

      **PLEASE TAKE FURTHER NOTICE** that the Plan and this Confirmation Order contain other provisions that may affect your rights.  You are encouraged to review the Plan and this Confirmation Order in their entirety.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (As Further Modified)* [Docket No. 3833] (as modified, amended, and including all supplements, the "Plan").

Dated: [_____], 2024

/s/ DRAFT
_____
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          fyudkin@coleschotz.com
          svanaalten@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:    esassower@kirkland.com
          joshua.sussberg@kirkland.com
          aparna.yenamandra@kirkland.com
          ross.fiedler@kirkland.com
          zach.manning@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**<u>Exhibit D</u>**

**Third Party Release Opt-In Notice and Related Opt-In Form**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re:<br><br>RITE AID CORPORATION, *et al.*,<br><br>                                Debtors.[1] | Chapter 11<br><br>Case No. 23-18993 (MBK)<br><br>(Jointly Administered) |

<div align="center">

**NOTICE AND THIRD-PARTY RELEASE OPT-IN FORM**

</div>

---

[1]    The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims, noticing, and solicitation agent at https://restructuring.ra.kroll.com/RiteAid.   The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

**PLEASE READ – YOUR RESPONSE WILL NOT BE COUNTED IF RECEIVED AFTER
NOVEMBER 15, 2024 AT 5:00 P.M. PREVAILING EASTERN TIME**

This notice is for Holders of Claims (including Tort Claims) as of August 8, 2024 (the "Opt-In Record Date")[2] under the Debtors' Plan (as defined below) regardless of whether such Holder voted in favor of or against the Plan, abstained from voting on the Plan, or was not entitled to vote on the Plan.

**Checking the box on the electronic Third-Party Release Opt-In Form on the E-Opt-In Portal maintained by Kroll Restructuring Administration LLC ("Kroll" or the "Claims and Noticing Agent") or on the enclosed hard copy, paper Third-Party Release Opt-In Form and submitting such completed Third-Party Release Opt-In Form so that it is actually received by Kroll by November 15, 2024, at 5:00 p.m., prevailing Eastern Time will signify your election to participate in the "Third-Party Release," which means that you will release whatever claims you may hold against certain people and entities that are not Debtors (including certain current officers and directors of the Debtors), and you will be released from whatever claims such other people and entities may hold against you related to Rite Aid.**

YOUR FAILURE TO SUBMIT YOUR THIRD-PARTY RELEASE OPT-IN FORM (EITHER ELECTRONICALLY OR BY PAPER COPY) WILL NOT AFFECT THE DISTRIBUTION YOU ARE GETTING UNDER THE PLAN. YOU ARE UNDER NO LEGAL OBLIGATION TO RETURN THIS FORM OR SUBMIT AN ELECTRONIC OPT-IN, AND THERE IS NO PENALTY TO YOU FOR FAILURE TO RETURN THIS FORM OR FOR FAILURE TO OPT IN TO ANY RELEASE.

For more specific information and instructions, please read the Third-Party Release Opt-In Form enclosed at the end of this notice as **Attachment A**.

If you did not hold a Claim as of the Opt-In Record Date, you are not entitled to make the optional Opt-In Election.

If you do not wish to elect to participate in the Third-Party Release, you are not required to take any further action.

---

**PLEASE TAKE NOTICE THAT** on March 28, 2024, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No. 2482] (the "Disclosure Statement Order"): (a) authorizing Rite Aid Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (As Modified)* (as modified, amended, or supplemented from time to time, the "Plan");[3] (b) conditionally approving the *Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (As Modified)* (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the notices of non-voting status (the "Notices of Non-Voting Status") to be distributed to Holders of Claims in certain non-voting classes; (d) scheduling certain dates with respect thereto; and (e) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** on or about April 3, 2024, the Debtors caused the Solicitation Packages and Notices of Non-Voting Status to be distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Order, and the Solicitation Procedures.

**PLEASE TAKE FURTHER NOTICE THAT** on June 3, 2024, the Bankruptcy Court entered the *Confirmation Scheduling Order* [Docket No. 3684] (the "Scheduling Order") pursuant to which the Bankruptcy Court

---

[2]   For the avoidance of doubt, all of the Debtors' landlords, whether or not such landlords filed a proof of claim by the Opt-In Record Date, shall be entitled to submit a Third-Party Release Opt-In Form.

[3]   Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan, Disclosure Statement, or Confirmation Order, as applicable.

amended certain of the dates and deadlines set forth in the Disclosure Statement Order in connection with the confirmation of the Plan and final approval of the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for voting on the Plan was June 14, 2024 at 5:00 p.m. (prevailing Eastern Time) (the "Voting Deadline"). The deadline to file new or additional objections to the Plan and/or final approval of the Disclosure Statement was June 18, 2024 at 5:00 p.m. (prevailing Eastern Time) (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE THAT** on June 19, 2024, the Debtors filed an amended version of the Plan [Docket No. 3833].

**[PLEASE TAKE FURTHER NOTICE THAT** on [August [●], 2024, the Bankruptcy Court entered an order [Docket No. [●]] (the "Confirmation Order") confirming the Plan and approving the Disclosure Statement on a final basis. Paragraph [197] of the Confirmation Order authorizes the Debtors to solicit, receive, and tabulate the election of certain Holders of Claims to opt in to the Third-Party Release contained in the Plan.]

**PLEASE TAKE FURTHER NOTICE THAT** to the extent you were a Holder of one or more Claims as of the Opt-In Record Date, you may elect to opt in to the Third-Party Release by checking the box on the Third-Party Release Opt-In Form enclosed at the end of this notice as **Attachment A** and returning your completed Third-Party Release Opt-In Form in accordance with the instructions provided in **Attachment A**. You may opt in to the Third-Party Release regardless of whether you voted to accept or reject the Plan, abstained from voting on the Plan, or were not entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact the Claims and Noticing Agent, by: (a) calling the Claims and Noticing Agent at (844) 274-2766 (U.S./ Canada, toll free) or +1 (646) 440-4878 (international); (b) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/RiteAid; (c) writing to the Claims and Noticing Agent at Rite Aid Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; or (d) emailing RiteAidInfo@ra.kroll.com (with "In re Rite Aid Opt-In Form Inquiry" in the subject line). You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/RiteAid, or the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims or the Third-Party Release Opt-In Form, you should contact Kroll in accordance with the instructions provided above. You may also contact representatives of the Official Committee of Unsecured Creditors by email at RiteAidCreditorInfo@KramerLevin.com or the Official Committee of Tort Claimants at riteaidcreditorinfo@akingump.com.

---

**You will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors) if you make the Opt-In Election before November 15, 2024, at 5:00 p.m. (prevailing Eastern Time) (the "Opt-In Deadline"). YOUR FAILURE TO RETURN THIS FORM WILL NOT AFFECT THE DISTRIBUTION YOU ARE GETTING UNDER THE PLAN OF REORGANIZATION. YOU ARE UNDER NO LEGAL OBLIGATION TO RETURN THIS FORM OR SUBMIT AN ELECTRONIC OPT-IN, AND THERE IS NO PENALTY TO YOU FOR FAILURE TO RETURN THIS FORM OR FOR FAILURE TO OPT IN TO ANY RELEASE.**

**You may make the Opt-In Election electronically through the dedicated online portal maintained by Kroll or by returning the enclosed "Third-Party Release Opt-In Form" in accordance with the instructions in Attachment A. If you make the Opt-In Election electronically, you must click submit before 11:59 PM ET on the Opt-In Deadline. If you make the Opt-In Election by completing and returning the Third-Party Release Opt-In Form, you must return it so that it is actually received by Kroll on or before the Opt-In Deadline.**

---

**Your decision to opt in to the Third-Party Release is entirely voluntary, is not a requirement under the Plan or applicable law, and will not impact any potential recovery or distribution pursuant to the Plan.**

**IF YOU CHECK THE BOX AND OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE X.D</u> OF THE PLAN, THE THIRD-PARTY RELEASE WILL BE BINDING ON YOU.**

**IF YOU DO NOT WISH TO GRANT THE THIRD-PARTY RELEASES, YOU ARE NOT REQUIRED TO TAKE ANY ACTION AT THIS TIME, AND YOU SHOULD NOT RETURN THE ENCLOSED THIRD-PARTY RELEASE OPT-IN FORM.  YOU WILL NOT GIVE OR RECEIVE A RELEASE UNDER THE PLAN UNLESS YOU RETURN THE THIRD-PARTY RELEASE OPT-IN FORM.**

Specific information on the releases follows.

*[Continued on next page.]*

**ARTICLE X** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE X.D CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

ALL HOLDERS OF CLAIMS THAT ELECT TO OPT IN TO THE PROVISIONS CONTAINED IN ARTICLE X.D OF THE PLAN USING THE ENCLOSED THIRD-PARTY RELEASE OPT-IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY DECLINING TO OPT IN TO THE RELEASES SET FORTH IN ARTICLE X.D OF THE PLAN, YOU WILL RETAIN YOUR CLAIMS AGAINST RELEASED PARTIES OTHER THAN THE DEBTORS OR REORGANIZED DEBTORS, BUT WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE X.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AND NOTICING AGENT OR YOUR COUNSEL.

NO PERSON OR ENTITY THAT IS AN EXCLUDED PARTY UNDER THE PLAN MAY BE A RELEASED PARTY, AND IF YOU ARE AN EXCLUDED PARTY THE FACT THAT YOU HAVE RECEIVED THIS THIRD-PARTY RELEASE OPT-IN FORM DOES NOT CONSTITUTE AN OFFER TO PARTICIPATE IN THE THIRD-PARTY RELEASE TO THE EXTENT SUCH AN OFFER OR SUCH PARTICIPATION WOULD BE INCONSISTENT WITH THE PLAN.

*[Remainder of page intentionally left blank.]*

Dated:

_/s/ DRAFT_ _____

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted _pro hac vice_)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
                wusatine@coleschotz.com
                fyudkin@coleschotz.com
                svanaalten@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted _pro hac vice_)
Aparna Yenamandra, P.C. (admitted _pro hac vice_)
Ross J. Fiedler (admitted _pro hac vice_)
Zachary R. Manning (admitted _pro hac vice_)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900
Email:     esassower@kirkland.com
                joshua.sussberg@kirkland.com
                aparna.yenamandra@kirkland.com
                ross.fiedler@kirkland.com
                zach.manning@kirkland.com

_Co-Counsel to the Debtors and_
_Debtors in Possession_

# Attachment A

## Third-Party Release Opt-In Form

## OPTIONAL:  THIRD-PARTY RELEASE OPT-IN FORM

*IF YOU WOULD LIKE TO MAKE THE OPTIONAL OPT-IN ELECTION*, **PLEASE INDICATE IN SECTION 1, THE CATEGORY OF CLAIMANT INTO WHICH YOU FALL, CHECK THE BOX IN SECTION 2, 3, OR 4 (AS APPLICABLE), AND PROVIDE THE REQUESTED INFORMATION.  YOUR FAILURE TO SUBMIT A THIRD-PARTY RELEASE OPT-IN FORM (EITHER ELECTRONICALLY OR BY PAPER COPY) WILL NOT AFFECT THE DISTRIBUTION YOU ARE GETTING UNDER THE PLAN OF REORGANIZATION.  YOU ARE UNDER NO LEGAL OBLIGATION TO RETURN THIS FORM OR SUBMIT AN ELECTRONIC OPT-IN, AND THERE IS NO PENALTY TO YOU FOR FAILURE TO RETURN THIS FORM OR FOR FAILURE TO OPT IN TO ANY RELEASE.**

*IF YOU WOULD LIKE TO MAKE THE OPTIONAL OPT-IN ELECTION*, **YOU MUST MAKE THE OPTIONAL OPT-IN ELECTION VIA EITHER (i) ACCESSING THE DEDICATED ONLINE PORTAL (THE "E-OPT-IN PORTAL") MAINTAINED BY KROLL RESTRUCTURING ADMINISTRATION LLC ("KROLL" OR THE "CLAIMS AND NOTICING AGENT") AND SUBMITTING YOUR OPT-IN ELECTION ELECTRONICALLY, OR (ii) SUBMITTING THIS HARD-COPY THIRD-PARTY RELEASE OPT-IN FORM (THE "PAPER OPT-IN FORM").  SUBMITTING YOUR OPT-IN THROUGH THE E-OPT-IN PORTAL WILL AUTOMATICALLY GENERATE A CONFIRMATION RECEIPT FOR YOUR RECORDS.**

**IF YOU ARE SUBMITTING YOUR OPT-IN ELECTION ELECTRONICALLY, PLEASE BE SURE TO CLICK SUBMIT AND AWAIT YOUR CONFIRMATION OF RECEIPT.  IF YOU ARE SUMBITTING YOUR OPT-IN VIA PAPER OPT-IN FORM, PLEASE SIGN, AND DATE THE PAPER FORM AND SUBMIT IT *PROMPTLY* BY ONE OF THE METHODS BELOW.**

**FOR HOLDERS OF CLAIMS THAT ARE NOT UNSECURED NOTES CLAIMS OR IF YOU ARE AN ATTORNEY FOR ONE OR MORE OF THE TORT CLAIMANTS: IF YOU ARE A HOLDER OF A CLAIM AS OF THE OPT-IN RECORD DATE THAT IS NOT AN UNSECURED NOTES CLAIM OR YOU ARE THE ATTORNEY FOR ONE OR MORE OF THE TORT CLAIMANTS AND ARE AUTHORIZED TO MAKE THE OPT-IN ELECTION FOR YOUR CLIENTS, YOU WILL RECEIVE A UNIQUE, 15-DIGIT, E-OPT-IN NUMBER BELOW:**

---

Please visit http://restructuring.ra.kroll.com/riteaid, click on the "Submit E-Opt-In" section of the website (the "E-Opt-In Portal") and follow the instructions to submit your electronic Opt-In Election.

**IMPORTANT NOTE:**  You will need the following information to retrieve and submit your customized electronic Opt-In Election

**Unique E-Opt-In ID#:**_____

The Claims and Noticing Agent's online portal is the sole manner in which Opt-In Elections will be accepted via electronic or online transmission.  Opt-In Elections submitted by facsimile, email or other means of electronic transmission will not be counted.

Creditors who submit an Opt-In Election using the Claims and Noticing Agent's online portal should NOT also submit a paper Opt-In Election Form.

---

**FOR HOLDERS OF UNSECURED NOTES CLAIMS:  IF YOU ARE A HOLDER OF A CLAIM AS OF THE OPT-IN RECORD DATE THAT IS AN UNSECURED NOTES CLAIM, YOU NEITHER NEED NOR WILL BE ISSUED A 15-DIGIT UNIQUE E-OPT-IN ID TO ACCESS THE E-OPT-IN PORTAL; RATHER, YOU (OR YOUR NOMINEE) WILL USE YOUR NOMINEE'S FOUR-DIGIT "DTC PARTICIPANT NUMBER" TO ACCESS THE E-OPT-IN PORTAL.**

You are receiving this Third-Party Release Opt-In Form (this "Opt-In Form") because you are a Holder of one or more Claims[1] against Rite Aid Corporation and/or its debtor-Affiliates (collectively, the "Debtors") including, but not limited to, General Unsecured Claims, Tort Claims, and Unsecured Notes Claims as of **August 8, 2024** (the "Opt-In Record Date").[2]  **You will be deemed to grant the Third-Party Release set forth below if you affirmatively opt in by checking the box and returning this Opt-In Form in accordance with the directions below on or before November 15, 2024 at 5:00 p.m. (prevailing Eastern Time) (the "Opt-In Deadline")**.

---

**THE OPT-IN DEADLINE IS NOVEMBER 15, 2024 AT 5:00 P.M. (PREVAILING EASTERN TIME).**

**FOR YOUR OPT IN TO BE EFFECTIVE, THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE YOUR OPT-IN ELECTION EITHER ELECTRONICALLY VIA THE E-OPT-IN PORTAL OR VIA THIS PAPER OPT-IN FORM, WITH THE BOX BELOW CHECKED, ON OR BEFORE THE OPT-IN DEADLINE.**

**IF YOUR OPT-IN IS RECEIVED EITHER ELECTRONICALLY OR VIA PAPER FORM AFTER THE OPT-IN DEADLINE, YOUR OPT-IN FORM WILL NOT BE COUNTED AND YOU WILL NOT BE SUBJECT TO THE THIRD-PARTY RELEASE.**

**IF YOU SUBMIT YOUR OPT-IN ELECTION ELECTRONICALLY, YOU DO NOT NEED TO SUBMIT A PAPER OPT-IN FORM AND VICE VERSA.**

---

PLEASE READ AND FOLLOW THE BELOW INSTRUCTIONS FOR COMPLETING THIS OPT-IN FORM CAREFULLY BEFORE COMPLETING AND SUBMITTING YOUR OPT-IN ELECTION ELECTRONICALLY OR BY PAPER OPT-IN FORM.

The Third-Party Release in Article X.D of the Plan is a mutual release of claims you may hold against multiple parties and that multiple parties may hold against you.  The full text of the Third-Party Release is included below.

**If you choose not to opt in to the Third-Party Release set forth in Article X.D of the Plan (i.e., to grant the Third-Party Release)**, you do not need to take any further action.  By not submitting this Opt-In Form, or submitting it without the box below checked, you will not be subject to the Third-Party Release.  Taking no action and electing not to opt in to the Third-Party Release means that, on the Effective Date of the Plan, **you will not release any claims you hold against the other parties to the Third-Party Release, and the other parties to the Third-Party Release will not release any claims they may hold against you.  The Debtors will also not release any claims they may hold against you.**[3]  YOUR FAILURE TO MAKE THE OPT-IN ELECTION EITHER THROUGH THE E-OPT-IN PORTAL OR BY RETURNING A PAPER OPT-IN FORM WILL NOT AFFECT THE DISTRIBUTION YOU ARE GETTING UNDER THE PLAN OF REORGANIZATION.  YOU ARE UNDER NO LEGAL OBLIGATION TO RETURN THIS FORM, AND THERE IS NO PENALTY TO YOU FOR FAILURE TO RETURN THIS FORM OR SUBMIT AN ELECTRONIC OPT-IN OR FOR FAILURE TO OPT IN TO ANY RELEASE.

---

[1]   Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan, Disclosure Statement, or Confirmation Order, as applicable.  You may obtain copies of the Plan, Confirmation Order, and any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/RiteAid, or via the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

[2]   For the avoidance of doubt, all of the Debtors' landlords, whether or not such landlords filed a proof of claim by the Opt-In Record Date, shall be entitled to submit a Third-Party Release Opt-In Form.

[3]   If you elect to opt in to the Third-Party Release, you will be deemed to be a Released Party, and the Debtors and the Releasing Parties will release any claims related to the Debtors that they may hold against you.  Under the Plan, Excluded Parties are not Releasing Parties, and for the avoidance of doubt may not elect to become Releasing Parties by using this Opt-In Form.  "Excluded Parties" refers to a cohort of stakeholders that explicitly will not receive a Third-Party Release and the Debtors will retain claims against those parties.  In this Opt-In Form and the attached notice, "you" does not refer to any person or entity that is an Excluded Party.

**If you choose to opt in to the Third-Party Release set forth in <u>Article X.D</u> of the Plan**, you <u>must</u> check the box below labeled "**OPTIONAL RELEASE ELECTION**." You must also provide the requested identifying information, and promptly submit your completed Opt-In Form electronically via the E-Opt-In Portal maintained by Kroll or by first class mail or overnight courier. By submitting your Opt-In by the E-Opt-In Portal or by this Paper Opt-Form with the box checked, you will be deemed to have consented to the Third-Party Release. You will release any claims you hold against the other parties to the Third-Party Release and other parties to the Third-Party Release will release any claims they may hold against you. **If you check the box and opt in to the Third-Party Release, the Debtors will also release any claims they may hold against you.**

<u>Submitting your Opt-In Form electronically</u>. You may submit this Opt-In Form electronically via Kroll's electronic submission portal by visiting Kroll's case website at https://restructuring.ra.kroll.com/riteaid/, navigating to the "Quick Links" section of the site and clicking on "Submit Opt-In Election Form."

<u>Submitting your Opt-In Form in hard copy</u>. You may submit this Opt-In Form via paper copy by completing, signing, and sending it (by first class mail or overnight courier) to Kroll at:

<div align="center">

**RITE AID CORP. OPT-IN PROCESSING CENTER**
**C/O KROLL RESTRUCTURING ADMINISTRATION LLC**
**850 THIRD AVENUE, SUITE 412**
**BROOKLYN, NY 11232**

</div>

If you believe you have received this Opt-In Form in error, please contact the Claims and Noticing Agent immediately by: (a) calling the Claims and Noticing Agent at (844) 274-2766 (U.S./Canada, toll free) or +1 (646) 440-4878 (international), (b) emailing the Claims and Noticing Agent at RiteAidInfo@ra.kroll.com with a reference to "In re Rite Aid – Opt-In Form Inquiry" in the subject line, or (c) writing to the Claims and Noticing Agent at Rite Aid Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232.

<u>Important information regarding the Third-Party Release:</u>

YOU MAY ELECT TO GRANT THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE X.D</u> OF THE PLAN (*I.E.*, "OPT IN") <u>ONLY IF</u> YOU CHECK THE BOX BELOW AND TIMELY SUBMIT THE FORM BELOW. THE ELECTION TO CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.

<div align="center">

[*Continued on next page.*]

</div>

**Please select one (and only one) of the options below:**

> I am the Holder of a Claim as of the Opt-In Record Date that is not a
> Notes Claim (*i.e.* a General Unsecured Claim or a Tort Claim)
> (If you check this box, please proceed to Section 2)
>
> or
>
> I am the Attorney for one or more of the Tort Claimants as of the Opt-In
> Record Date and am authorized to make this Opt-In Election on their
> behalf.  (If you check this box, please proceed to Section 3)
>
> or
>
> I am the Beneficial Holder of a Notes Claim as of the Opt-In Record Date
> (If you check this box, please proceed to Section 4)

**Section 2 – OPTIONAL RELEASE ELECTION FOR HOLDERS OF CLAIMS NOT BASED ON PUBLICLY TRADED NOTES (*I.E.* GENERAL UNSECURED CLAIMS OR TORT CLAIMS)**

**If you are an attorney for multiple tort claimants and you previously submitted a Solicitation Directive, for administrative convenience, you may use the procedures set forth in Section 3 hereto.**

**OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE X.D OF THE PLAN AND INCLUDED IN FULL ON THE FOLLOWING PAGES IF YOU CHECK THE BOX BELOW:**

| |
|---|
| **By checking this box, you elect to OPT IN to the Third-Party Release** |

**PLEASE PROVIDE THE INFORMATION BELOW (as of the Opt-In Record Date):**

| | |
|---|---|
| **Name:** | |
| **Company Name (if Applicable):** | |
| **Address:** | |
| **Telephone Number:** | |
| **E-Mail Address:** | |
| **Claim Number:** | |
| **Signature:** | |
| **Date:** | |

**Certifications.**

By signing this Opt-In Form, the undersigned ("You") certifies that:

(a) as of the Opt-In Record Date, either: (i) You were the Holder of one or more Claims or (ii) You were an authorized signatory for the Entity that was a Holder of one or more Claims;

(b) You (or in the case of an authorized signatory, the Holder) have received a copy of the *Notice and Third-Party Release Opt-In Form* and Your Opt-In Form is completed pursuant to the terms and conditions set forth herein;

(c) You have submitted the Opt-In Form with respect to all of Your Claims against the Debtors or, if you are an authorized signatory or other representative as contemplated by clauses (a)(i) or (a)(ii) above; and

7

(d)   You have not submitted a prior Opt-In Form on account of these same Claims against the Debtors or, if any other Opt-In Forms have been submitted with respect to such Claims against the Debtors, then any such earlier Opt-In Forms are hereby revoked.

*[Remainder of page intentionally left blank]*

## Section 3.  OPTIONAL RELEASE ELECTION FOR ATTORNEYS OF HOLDERS OF TORT CLAIMS

Please use this section if you are submitting this form as a representative for multiple holders of Tort Claims.  You may fill out this form as a representative only if you have legal authority to do so and have previously completed and submitted a solicitation directive acknowledging your authority to act on behalf of the Holders you represent in connection with the Debtors' Chapter 11 Cases.  If you are completing this form as a representative for more than one Holder of Tort Claims, you must attach a list in Microsoft Excel format, for which a template will be made available from the Claims and Noticing Agent, providing the information required in the Certifications below for each Holder covered by this form.

**OPTIONAL RELEASE ELECTION.  ON BEHALF OF YOUR CLIENTS, YOU MAY ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE X.D</u> OF THE PLAN AND INCLUDED IN FULL ON THE FOLLOWING PAGES <u>IF</u> YOU CHECK THE BOX BELOW:**

<div style="border:1px solid black; text-align:center;">

**By checking this box, you elect to <u>OPT IN</u> to the Third-Party Release**

</div>

**<u>Certifications.</u>**

By signing this Opt-In Form, the undersigned ("<u>You</u>") certifies that:

(a) as of the Opt-In Record Date, either:  (i) You were the Holder of one or more Claims; (ii) You were an authorized signatory for the Entity that was a Holder of one or more Claims; or (iii) You were a representative for multiple Holders of Tort Claims and submitted a solicitation directive attesting to your authority to make an election with respect to the Third-Party Release on behalf of such Holders;

(b) You (or in the case of an authorized signatory, the Holder) have received a copy of the *Notice and Third-Party Release Opt-In Form* and Your Opt-In Form is completed pursuant to the terms and conditions set forth herein;

(c) You have submitted the Opt-In Form with respect to all of Your Claims against the Debtors or, if you are an authorized signatory or other representative as contemplated by clauses (a)(ii) or (a)(iii) above, You have submitted the Opt-In Form with respect to all Claims against the Debtors held by the Beneficial Holders or Holders of Tort Claims You represent; and

(d) You have not submitted a prior Opt-In Form on account of these same Claims against the Debtors or, if any other Opt-In Forms have been submitted with respect to such Claims against the Debtors, then any such earlier Opt-In Forms are hereby revoked.

## Section 4: OPTIONAL RELEASE ELECTION FOR BENEFICIAL HOLDERS OF UNSECURED NOTES CLAIMS

**OPTIONAL RELEASE ELECTION.** YOU MAY ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN **ARTICLE X.D** OF THE PLAN AND INCLUDED IN FULL ON THE FOLLOWING PAGES **IF** YOU CHECK THE BOX BELOW:

| |
|---|
| **By checking this box, you elect to OPT IN to the Third-Party Release** |

**PLEASE PROVIDE THE INFORMATION BELOW:**

| | |
|---|---|
| **Name:** | |
| **Company Name (if Applicable):** | |
| **Address:** | |
| **Telephone Number:** | |
| **E-Mail Address:** | |
| **Name of DTC Participant Nominee through Which You Held the Notes** | |
| **Four Digit DTC Participant Number for Your DTC Participant Nominee through Which You Held the Notes** | |
| **Account Number at DTC Participant through Which You Held the Notes** | |
| **Amount of Notes** | |
| **Signature:** | |
| **Date:** | |

*Please check one box below to indicate the CUSIP Number/ISIN to which this Opt-In Form pertains.*

| | NOTE DESCRIPTION | CUSIP NUMBER/ ISIN |
|---|---|---|
| | **Unsecured Notes** | |
| ☐ | 7.70% Unsecured Notes Due February 15, 2027 | CUSIP 767754AJ3 / ISIN US767754AJ35 |
| ☐ | 6.875% Unsecured Notes Due December 15, 2028 (144A) | CUSIP 767754AR5 / ISIN US767754AR50 |
| ☐ | 6.875% Unsecured Notes Due December 15, 2028 (REGS) | CUSIP U76659AF5 / ISIN USU76659AF59 |

**Certifications.**

By signing this Opt-In Form, the undersigned ("You") certifies that:

(a)  as of the Opt-In Record Date, You were the Beneficial Holder (or authorized signatory for a Beneficial Holder) of one or more Unsecured Notes Claims;

(b)  You (or in the case of an authorized signatory, the Holder) have received a copy of the *Notice and Third-Party Release Opt-In Form* and Your Opt-In Form is completed pursuant to the terms and conditions set forth herein;

(c)  You have submitted the Opt-In Form with respect to all of Your Claims against the Debtors or, if you are an authorized signatory or other representative as contemplated by clauses (a).  You have submitted the Opt-In Form with respect to all Claims against the Debtors held by the Beneficial Holders You represent; and

(d)  You have not submitted a prior Opt-In Form on account of these same Claims against the Debtors or, if any other Opt-In Forms have been submitted with respect to such Claims against the Debtors, then any such earlier Opt-In Forms are hereby revoked.

## PLEASE SUBMIT YOUR OPT-IN FORM PROMPTLY!

**THE FOLLOWING PROVISIONS AND DEFINITIONS ARE COPIED FROM THE PLAN VERBATIM. PLEASE REVIEW THEM CAREFULLY.**

**Article X.D of the Plan provides for a release of claims against certain non-Debtor third-parties (the "Third-Party Release"):**

> Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the Mediation (including the negotiations with respect thereto), the pursuit of the Restructuring Transaction, the Committee Settlement, the Committee Settlement Documents, the UCC / TCC Recovery Allocation Agreement, the AHG New-Money Commitment Agreement, the MedImpact Term Loan Sales Process, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the administration and implementation of the Plan Restructuring (if applicable) and the Wind-Down (if applicable), in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided, that*, notwithstanding anything in this Plan, the Plan Supplement or the Confirmation Order to the contrary, the Debtors and/or the Wind-Down Debtors, as applicable, shall not be released from liability for any Tort Claims; *provided, however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets, and shall in no circumstances extend to the Reorganized Debtors, and no Person, Entity, or party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability. For the avoidance of doubt, nothing contained in this Plan, including this Article X.D, shall release, compromise, impair, or in any way affect any Assigned Claims, Assigned Insurance Rights, or Tort Claims Insurance Proceeds and no Assigned Claims against any Excluded Parties shall be released; *provided, further*, that nothing in this Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, Assigned Claims against any Excluded Parties or any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article X.D, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.D is: (i) consensual; (ii) given in exchange for the good and valuable consideration provided by the Released Parties; (iii) a good-faith settlement and compromise of such claims and Causes of Action; (iv) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (v) fair, equitable, and reasonable; (vi) given and

made after due notice and opportunity for hearing; (vii) a sound exercise of the Debtors' business judgment; and (viii) a bar to any of the Releasing Parties or the Debtors or their respective Estates or, if applicable, the Reorganized Debtors or the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt in to the releases contained in this Article X.D in accordance with this Plan and exercises such opt in may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Reorganized Debtors.  From and after the Effective Date, any Entity that did not opt in to (or otherwise did not participate in) the releases contained in this Article X.D in accordance with this Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.  Notwithstanding anything herein to the contrary, and for the avoidance of doubt, the Debtors shall not be released from liability for any Tort Claims; *provided, however*, that any recovery from any such Tort Claim against the Debtors (or their Affiliates) and/or the Wind-Down Debtors (or their Affiliates), as applicable, including by way of settlement or judgment, shall be limited to the Litigation Trust Assets and shall in no circumstances extend to the Reorganized Debtors or the Wind-Down Debtors, and no Person, Entity, or other party shall execute, garnish, or otherwise attempt to collect any such recovery from any assets other than the Litigation Trust Assets and the GUC Equity Pool, except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability.  For the avoidance of doubt, and notwithstanding the foregoing, no Holder of a General Unsecured Claim, including a Tort Claim that does not opt-in to the Third-Party Release shall be a Releasing Party or shall otherwise be deemed to grant the Third-Party Release.

        For the avoidance of doubt and notwithstanding anything to the contrary herein, in the Plan Supplement, the Confirmation Order or otherwise, any recovery on behalf of claims or Causes of Action (if any) contributed to the Litigation Trust or a GUC Sub-Trust against any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with this Plan (including those not included in the definition of Debtor Related Parties) shall be expressly limited to proceeds of the applicable Insurance Policies, and no Person, Entity, or otherwise shall attempt to collect on assets of any officer or director of Rite Aid or any of its directors or officers not released by the Debtors in accordance with the provisions of this Plan (including those not included in the definition of Debtor Related Parties), except to the extent and only as necessary to trigger any insurance carrier's obligation to pay such liability, and all such directors and officers shall have the full protections of any existing D&O Liability Insurance Policies.]

**Definitions related to the Debtor Release and the Third-Party Release:**

UNDER THE PLAN, "***RELATED PARTY***" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, COMMITTEE MEMBERS, MEMBERS OF ANY GOVERNING BODY, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, MANAGED ACCOUNTS OR FUNDS, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS OR MANAGERS, EMPLOYEES, AGENTS, TRUSTEES, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY OTHER ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER OF AN ENTITY), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, AND NOMINEES.  FOR THE AVOIDANCE OF DOUBT, NO EXCLUDED PARTY SHALL BE A RELATED PARTY.

[UNDER THE PLAN, "**_RELEASED PARTY_**" MEANS, COLLECTIVELY, IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS (INCLUDING ANY DEBTOR RELATED PARTY); (B) THE REORGANIZED DEBTORS; (C) THE WIND-DOWN DEBTORS; (D) THE RELEASING PARTIES (EXCEPT TO THE EXTENT THAT ANY EXCLUDED PARTY WOULD OTHERWISE CONSTITUTE A RELEASING PARTY); (E) THE SENIOR SECURED NOTEHOLDERS (INCLUDING THE AD HOC SECURED NOTEHOLDER GROUP AND EACH OF ITS MEMBERS); (F) THE AGENTS; (G) THE TRUSTEES; (H) THE DIP SECURED PARTIES; (I) THE JUNIOR DIP SECURED PARTIES; (J) THE PREPETITION SECURED PARTIES; (K) EACH OF THE LENDERS UNDER THE EXIT FACILITIES; (L) THE COMMITTEES AND EACH MEMBER OF THE COMMITTEES; (M) THE LITIGATION TRUSTEE, THE GUC EQUITY TRUSTEE, AND THE GUC SUB-TRUST TRUSTEE (IF ANY); (N) AHG NEW-MONEY COMMITMENT PARTIES; (O) THE SCD TRUSTEE; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A), (B), AND (C); (Q) EACH DEBTOR RELATED PARTY OF EACH ENTITY IN CLAUSES (A), (B), AND (C); (R) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (D) THROUGH (P) AND THE FOLLOWING CLAUSE (S); AND (S) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (D) THROUGH (P) AND THIS CLAUSE (S); _PROVIDED_ THAT, IN EACH CASE, ANY HOLDER OF A CLAIM OR INTEREST THAT IS NOT A RELEASING PARTY SHALL NOT BE A "RELEASED PARTY."  FOR THE AVOIDANCE OF DOUBT, NO EXCLUDED PARTY SHALL BE A RELEASED PARTY.   FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, HOLDERS OF TORT CLAIMS SHALL NOT BE DEEMED TO RELEASE THE DEBTORS, PROVIDED, HOWEVER, THAT ANY RECOVERY FOR ANY SUCH TORT CLAIM AGAINST THE DEBTORS (AND THEIR AFFILIATES), THE REORGANIZED DEBTORS (AND THEIR AFFILIATES), AND/OR THE WIND-DOWN DEBTORS, AS APPLICABLE, INCLUDING BY WAY OF SETTLEMENT OR JUDGMENT, SHALL BE LIMITED TO THE LITIGATION TRUST ASSETS, AS APPLICABLE, AND NO PERSON, ENTITY, OR PARTY SHALL EXECUTE, GARNISH, OR OTHERWISE ATTEMPT TO COLLECT ANY SUCH RECOVERY FROM ANY ASSETS OTHER THAN THE LITIGATION TRUST ASSETS, EXCEPT TO THE EXTENT AND ONLY AS NECESSARY TO TRIGGER ANY INSURANCE CARRIER'S OBLIGATION TO PAY SUCH LIABILITY.  FOR THE AVOIDANCE OF DOUBT, ANY DEBTOR RELATED PARTY SHALL BE A RELEASED PARTY.]

[UNDER THE PLAN, "**_RELEASING PARTY_**" MEANS, COLLECTIVELY, IN EACH CASE SOLELY IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE WIND-DOWN DEBTORS; (D) THE AGENTS; (E) THE TRUSTEES; (F) THE PREPETITION SECURED PARTIES; (G) THE DIP SECURED PARTIES; (H) THE JUNIOR DIP SECURED PARTIES; (I) SENIOR SECURED NOTEHOLDERS (INCLUDING THE AD HOC SECURED NOTEHOLDER GROUP AND EACH OF ITS MEMBERS); (J) EACH OF THE LENDERS UNDER THE EXIT FACILITIES; (K) THE COMMITTEES AND EACH MEMBER OF THE COMMITTEES; (L) THE LITIGATION TRUSTEE AND THE GUC EQUITY TRUSTEE; (M) THE AHG NEW-MONEY COMMITMENT PARTIES; (N) THE SCD TRUSTEE; (O) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THE PLAN; (P) ALL HOLDERS OF CLAIMS THAT ARE DEEMED TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (Q) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (R) ALL HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (S) ALL HOLDERS OF GENERAL UNSECURED CLAIMS WHO ARE DEEMED TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THE PLAN; (T) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (S); AND (U) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH CLAUSE (S).  FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, HOLDERS OF TORT CLAIMS SHALL NOT BE DEEMED TO RELEASE THE DEBTORS, PROVIDED, HOWEVER, THAT ANY RECOVERY FOR ANY SUCH TORT CLAIM AGAINST THE DEBTORS (AND THEIR AFFILIATES), THE REORGANIZED DEBTORS (AND THEIR AFFILIATES), AND/OR THE WIND-DOWN DEBTORS, AS APPLICABLE, INCLUDING BY WAY OF SETTLEMENT OR JUDGMENT, SHALL BE LIMITED TO THE LITIGATION TRUST ASSETS, AS APPLICABLE, AND NO PERSON, ENTITY, OR PARTY SHALL EXECUTE, GARNISH, OR OTHERWISE ATTEMPT TO COLLECT ANY SUCH RECOVERY FROM ANY ASSETS OTHER THAN THE LITIGATION TRUST ASSETS, EXCEPT TO THE EXTENT AND ONLY AS NECESSARY TO TRIGGER ANY INSURANCE CARRIER'S OBLIGATION TO PAY SUCH LIABILITY.   NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE FOLLOWING SHALL NOT BE A RELEASING PARTY: (X)

ANY OF THE DEBTORS' CURRENT AND FORMER DIRECTORS AND OFFICERS THAT ARE NOT A DEBTOR RELATED PARTY; AND (Y) THE UNITED STATES.]

## INSTRUCTIONS FOR COMPLETING THIS OPT-IN FORM

1.     You must submit your Opt-In Election either (i) electronically through the E-Opt-In Portal maintained by Kroll or (ii) by Paper Opt-In Form returned to Kroll.

2.     Capitalized terms used in the Opt-In Form or in these instructions (the "<u>Instructions</u>") but not otherwise defined therein or herein shall have the meaning set forth in the Plan or the Confirmation Order, as applicable.  You may obtain copies of the Plan, Confirmation Order, and any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/RiteAid, or via the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

3.     In Section 1, check the box that describes your status as a claimant.  The box you check will determine which subsequent section (2, 3 or 4) you will need to complete.

4.     **If you choose to opt in to the Third-Party Release**, you <u>must</u> complete the Opt-In Form by taking the following steps:

        (a)   clearly indicate your decision to "opt-in" to the Third-Party Release by checking the box labeled "**OPTIONAL RELEASE ELECTION**" in the Opt-In Form;

        (b)   carefully read the Certifications and provide the requested identification information; <u>and</u>

        (c)   sign, date and submit your Opt-In Form either electronically or in hard copy as described in the Opt-In Form.

5.     <u>**Return of Opt-In Form**</u>:  Your Opt-In Form MUST be submitted to the Claims and Noticing Agent so as to be **actually received** by the Claims and Noticing Agent on or before the Opt-In Deadline, which is **5:00 p.m. (prevailing Eastern Time) on November 15, 2024**.

6.     If an Opt-In Form is received by the Claims and Noticing Agent <u>after</u> the Opt-In Deadline, it will not be effective.  Additionally**,** the following Opt-In Forms will <u>NOT</u> be counted:

- Any Opt-In Form that is illegible or contains insufficient information to permit the identification of the holder of the claim;

- Any Opt-In Form sent to the debtors, the debtors' agents/representatives (other than the claims and noticing agent), the debtors' financial or legal advisors or the creditors' committee;

- Any Opt-In Form transmitted by facsimile or e-mail;

- Any unsigned Opt-In Form**;** or

- Any Opt-In Form not completed in accordance with the procedures approved in the confirmation order and as described herein.

7.     The time by which an Opt-In Form including your vote is **actually received** by the Claims and Noticing Agent shall be the time used to determine whether your Opt-In Form has been submitted by the Opt-In Deadline.  **The Opt-In Deadline is November 15, 2024, at 5:00 p.m., prevailing Eastern Time**.

8.      If multiple Opt-In Forms are received from the same Holder with respect to the same Claim prior to the Opt-In Deadline, the last Opt-In Form timely received will supersede and revoke any earlier received Opt-In Forms.

9.      The Opt-In Form is not a letter of transmittal and may not be used for any purpose other than to opt in to the Third-Party Release.

10.     The Opt-In Form does not constitute, and shall not be deemed to be, (a) a proof of claim, (b) proof of interest, or (c) an assertion or admission of a Claim or Interest.

11.     Please be sure to sign and date your Opt-In Form.  If you are signing an Opt-In Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing.  In the event that additional documents are needed to verify the authority of the signatory, the Claims and Noticing Agent or the Debtors may request such documents, or the Bankruptcy Court may order you to submit proper evidence to the requesting party within a reasonable time. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Opt-In Form.

### PLEASE SUBMIT YOUR OPT-IN FORM PROMPTLY!

**IF YOU HAVE ANY QUESTIONS REGARDING THIS OPT-IN FORM
OR THE INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT
THE CLAIMS AND NOTICING AGENT AT:**

**(844) 274-2766 (U.S./ CANADA, TOLL FREE) OR +1 (646) 440-4878 (INTERNATIONAL)**

**OR VIA E-MAIL TO: RITEAIDINFO@RA.KROLL.COM
(WITH "IN RE RITE AID – OPT-IN FORM INQUIRY" IN THE SUBJECT LINE)**

---

**IF THE CLAIMS AND NOTICING AGENT DOES NOT ACTUALLY RECEIVE THE OPT-IN FORM FROM YOU BEFORE THE OPT-IN DEADLINE, WHICH IS 5:00 P.M. PREVAILING EASTERN TIME ON NOVEMBER 15, 2024, THEN YOUR OPT-IN ELECTION WILL NOT BE EFFECTIVE.**

---

Form 147 – ntccnfpln

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

_____

Case No.:  23–18993–MBK
Chapter:  11
Judge:  Michael B. Kaplan

In Re: Debtor(s) (name(s) used by the debtor(s) in the last 8 years, including married, maiden, trade, and address):
   Rite Aid Corporation
   1200 Intrepid Avenue
   2nd Floor
   Philadelphia, PA 19122
Social Security No.:

Employer's Tax I.D. No.:
   23–1614034
_____

## NOTICE OF ORDER CONFIRMING CHAPTER 11 PLAN

   NOTICE IS HEREBY GIVEN that an Order Confirming the Chapter 11 plan was entered on August 16, 2024.

   IT IS FURTHER NOTICED,

   1. The clerk shall close the case 180 days after entry of the order confirming plan. Local Rule 3022–1(a).

   2. On motion of a party in interest filed and served within the time period set forth above, the court may for cause extend the time for closing the case. Local Rule 3022–1(c).

   3. All applications for allowance of fees and expenses shall be filed within 90 days after entry of a final order confirming plan, or such fees and expenses shall be deemed to be waived. Local Rule 2016–4.

Dated: August 16, 2024
JAN: wiq

Jeanne Naughton
Clerk

# Exhibit B

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
esassower@kirkland.com
joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com
ross.fiedler@kirkland.com
zach.manning@kirkland.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
svanaalten@coleschotz.com

*Co-Counsel to the Debtors and
Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| RITE AID CORPORATION, *et al*., | Case No. 23-18993 (MBK) |
| Debtors.[1] | (Jointly Administered) |

<div align="center">

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING
THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF RITE AID CORPORATION AND ITS
DEBTOR AFFILIATES AND (II) OCCURRENCE OF EFFECTIVE DATE**

</div>

**PLEASE TAKE NOTICE** that on August 16, 2024, the Honorable Michael B. Kaplan, Chief Judge, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of New Jersey (the "Court"), entered the *Order Approving the Disclosure Statement for, and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (With Further Modifications)* [Docket No. 4532]

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these Chapter 11 Cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

(the "<u>Confirmation Order</u>") confirming the Plan[2] and approving the Disclosure Statement attached as <u>Exhibit B</u> to the Confirmation Order of the above-captioned debtors (the "<u>Debtors</u>").

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan shall be deemed to have occurred at **11:59 p.m. on August 30, 2024** in accordance with the Plan and Confirmation Order; *provided, however*, that the Debtors facilitated and will continue to facilitate all necessary Effective Date transactions, including, without limitation, with respect to the administration of funds contemplated to be paid pursuant to the Plan.

**PLEASE TAKE FURTHER NOTICE** that this Confirmation Order and the Plan are available for inspection. You may obtain a copy of this Confirmation Order or the Plan: (a) upon request to Kroll Restructuring Administration LLC (the noticing and claims agent to be retained in these Chapter 11 Cases) by calling (844) 274-2766 (toll free) or, for international callers, (646) 440-4878; (b) by visiting the website maintained in these Chapter 11 Cases at **https://restructuring.ra.kroll.com/RiteAid**; or (c) for a fee via PACER by visiting http://www.njb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE** that the Court has approved certain discharge, release, exculpation, injunction, and related provisions in <u>Article X</u> of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Plan and its provisions are binding on the Debtors and the Reorganized Debtors, as applicable, and any Holder of a Claim or an Interest and such Holder's respective successors and assigns, whether or not the Claim or the Interest of such Holder is Impaired under the Plan, and whether or not such Holder voted to accept the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Plan and this Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and this Confirmation Order in their entirety.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and Its Debtor Affiliates (With Further Modifications)* attached as <u>Exhibit A</u> to the Confirmation Order (as modified, amended, and including all supplements, the "<u>Plan</u>").

Dated: September 3, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
           wusatine@coleschotz.com
           fyudkin@coleschotz.com
           svanaalten@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
Zachary R. Manning (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:    esassower@kirkland.com
          joshua.sussberg@kirkland.com
          aparna.yenamandra@kirkland.com
          ross.fiedler@kirkland.com
          zach.manning@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*